No. 21-1168

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

SONY MUSIC ENTERTAINMENT, *et al.*,

Plaintiffs-Appellees,

v.

COX COMMUNICATIONS, INC., *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court for the Eastern District of Virginia at Alexandria

## BRIEF OF AMICUS CURIAE INTERNET ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLANTS

Joseph C. Gratz
Samuel J. Zeitlin
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: 415-362-6666
Facsimile: 415-236-6300

June 1, 2021                     *Counsel for Amicus Curiae Internet Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION ....................................................................................................1

ARGUMENT ............................................................................................................4

    I.     The value of internet service does not lie in providing access to infringing material ...................................................4

    II.    Terminating a subscriber's internet access is not a reasonable response to notice of copyright infringement .....................8

CONCLUSION .......................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
   293 F.3d 707 (4th Cir. 2002) ...................................................................................2

*ALS Scan, Inc. v. Steadfast Networks, LLC*,
   819 Fed. App'x 522 (9th Cir. 2020) ........................................................................9

*BMG Rights Management (US) LLC v. Cox Communications, Inc.*,
   881 F.3d 293 (4th Cir. 2018) ...................................................................................8

*CoStar Grp., Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ............................................................................4, 8

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ........................................................................4, 5, 7

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ......................................................................................10, 11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...................................................................................8

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ........................................................................3, 8, 12

**Other Authorities**

About Classroom, Google Help,
   https://support.google.com/edu/classroom/answer/6020279?hl=en
   (last visited May 23, 2021) .....................................................................................6

Alexandra Masciantonio et al., *Don't put all social network sites in one basket: Facebook, Instagram, Twitter, TikTok, and their relations with well-being during the COVID-19 pandemic*, PLOS One (Mar. 11, 2021), https://doi.org/10.1371/journal.pone.0248384 ..................7

Frank La Rue (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Rep. of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression* ¶ 78, U.N. Doc. A/HRC/17/27 (May 16, 2011), https://www2.ohchr.org/english/bodies/hrcouncil/docs/17session/A.HRC.17.27_en.pdf ...................................................................................11

Human Rights Council Res. 32/13, U.N. Doc. A/HRC/RES/32/13, at 4 (July 1, 2016), https://digitallibrary.un.org/record/845727/files/A_HRC_RES_32_13-EN.pdf ..................................................................................................11

Microsoft Outlook for Business, Microsoft, https://www.microsoft.com/en-us/microsoft-365/outlook/outlook-for-business (last visited May 23, 2021) ..............................................................6

Microsoft Teams, Microsoft, https://www.microsoft.com/en-us/microsoft-teams/free (last visited May 23, 2021) .............................................6

OneDrive for Business, Microsoft, https://www.microsoft.com/en-us/microsoft-365/onedrive/onedrive-for-business (last visited May 23, 2021) ..................................................................................................................6

H. Trostle et al., *Profiles of Monopoly: Big Cable and Telecom* 1, 5, 7, (2020), https://ilsr.org/wp-content/uploads/2020/08/2020_08_Profiles-of-Monopoly.pdf ..........................10

SharePoint, Microsoft, https://www.microsoft.com/en-us/microsoft-365/sharepoint/collaboration (last visited May 23, 2021) ....................................6

iii

## INTEREST OF AMICUS CURIAE

Internet Association represents roughly forty leading technology companies.[1] Its membership includes a broad range of internet companies, from travel sites and online marketplaces to social networking services and search engines. Internet Association advances public policy solutions that strengthen and protect internet freedoms, foster innovation and economic growth, and empower small businesses and the public. It respectfully submits this Brief of Amicus Curiae in Support of Appellant to encourage this Court to consider the importance of internet access to Appellant's subscribers, and to the subscribers of other internet service providers—which is to say, almost everyone in America.

## INTRODUCTION

The district court held that copyright law requires internet service providers ("ISPs") to *terminate internet access* to subscribers accused of illegal downloading. The doctrines of vicarious and contributory copyright liability do not justify this draconian rule, and the judgment below should therefore be reversed.

---

[1] No counsel for any party authored this brief in whole or in part. No counsel or party other than amicus and its members contributed money intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

1

Twenty years ago, when we still leaned on metaphors to talk about the internet, it was common to describe it as an "information superhighway." *See, e.g.*, *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 709 n.1 (4th Cir. 2002). Cox's service enables access to the internet and to the services Amicus and its members represent: the places internet users go to work, learn, play, and connect.

The internet is no longer in need of a metaphor. The past year has taught us that though a pandemic may shutter physical cities, everyday life can still continue online. In lockdown, internet access became more necessary to Cox's subscribers than any physical highway. It became the primary means by which Americans received information vital to their health and welfare, obtained public assistance, continued to work and earn a living, accessed education services, shopped for food and household essentials, communicated with their loved ones, participated in democracy during a national election, and scheduled vaccinations that could enable them to return to many of the aspects of our lives that we have long taken for granted. And although COVID-19 has thrown the importance of the internet into sharp relief, the underlying changes in American life began well before the pandemic, and their impact will continue to be felt even as vaccination starts to bring the virus under control.

2

Although the district court made many reversible errors, this brief addresses two in particular. First, the district court's opinion on vicarious liability is fatally flawed because it held that Cox, an ISP that charges a flat monthly fee for service, receives a direct financial benefit from infringements by its subscribers. Dkt. 707 at 17–20. But the value of Cox's service is in *access to the internet*, with all its lawful uses. People who use the internet to work, learn, and socialize need internet access—and pay the same flat fee for that access—regardless of whether a minority of those users may infringe copyright online.

Second, the district court's opinion on contributory liability erroneously characterizes terminating a subscriber's internet access as a "simple measure" to prevent copyright infringement, equivalent to a web host taking down a specific piece of infringing content. Dkt. 707 at 21–22. But a "simple measure" must be "reasonable." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671 (9th Cir. 2017). Termination of internet access, with the consequences that entails, is not reasonable because it is a grossly disproportionate response to accusations of illegal downloading.

Amicus therefore asks this Court to reverse the judgment below.

# ARGUMENT

I. **The value of internet service does not lie in providing access to infringing material**

In order for a defendant to be held vicariously liable for the copyright infringement of another, the defendant must have (1) "the right and ability to supervise the infringing activity," and (2) "a direct financial interest in such activities." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). Receipt of "a one-time set-up fee and flat periodic payments for service" does not satisfy the direct financial interest element unless "the value of the service lies in providing access to infringing material," such that "the infringing activity constitutes a draw for subscribers, not just an added benefit." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). If the record lacks evidence that the service provider "attracted or retained subscriptions because of the infringement or lost subscriptions because of [its] eventual obstruction of the infringement," then a claim for vicarious copyright infringement fails as a matter of law. *Id.*

Relying on the language from *Ellison* quoted above, the district court held that Cox had a direct financial interest in infringement because terminating internet access to subscribers accused of music piracy would cause Cox to lose those subscribers' subscription fees. Dkt. 707 at 19–20. This logic was flawed. If a flat-rate service loses subscribers (and thus revenue) after *blocking infringement*, that could in theory be evidence that infringement draws subscribers to the service. *See*

4

*Ellison*, 357 F.3d at 1079. But the district court looked at the financial impact of *terminating entire accounts*, not just blocking infringement (which Cox lacks the ability to do). Of course Cox would lose revenue after terminating subscribers' internet access. Termination means Cox stops providing any service at all, and prevents all the lawful uses of the internet Cox enables. That has no bearing on whether there is "a causal relationship between the *infringing activity* and any financial benefit" received by Cox. *Id.* (emphasis added). To hold otherwise would mean that flat-rate services *always* have a direct financial interest in infringement, because they would always lose money if they terminate accused subscribers.

The actual question at hand is whether the value of flat-rate internet access "lies in providing access to infringing material." *Ellison*, 357 F.3d at 1079. Obviously not. The internet is an essential and ubiquitous part of modern life. Its lawful uses are limited only by the imagination, but include the services of Amicus's members in ecommerce, social media, cloud computing, and many other arenas. During the pandemic, as so many physical institutions were forced to close their doors, the lawful uses of the internet have only become more important to everyday life.

Workers need internet access to do their jobs. Microsoft's Office 365 software suite is a critical tool for America's tens of millions of office workers.

5

Workers use Outlook's email and calendar functions to communicate and coordinate.[2] They chat on Teams as they work together in real-time.[3] And they use Sharepoint and OneDrive to store, edit, and collaborate on their projects.[4] All of this software relies on internet access—and for all those working from home during the pandemic, it requires internet access at home.

Students need the internet to access educational services. The spread of COVID-19 led to school closures across America. To stop children from losing a year of education, teachers continued their classes online. Google Classroom enables students to attend virtual classes over video, to complete assignments and receive feedback, to share resources and interact with peers and teachers.[5] Google Classroom has been so important during the pandemic because it is free for all to use. But Google Classroom, like all the infrastructure of online learning, depends on internet access.

---

[2] *See* Microsoft Outlook for Business, Microsoft, https://www.microsoft.com/en-us/microsoft-365/outlook/outlook-for-business (last visited May 23, 2021).

[3] *See* Microsoft Teams, Microsoft, https://www.microsoft.com/en-us/microsoft-teams/free (last visited May 23, 2021).

[4] *See* SharePoint, Microsoft, https://www.microsoft.com/en-us/microsoft-365/sharepoint/collaboration (last visited May 23, 2021); OneDrive for Business, Microsoft, https://www.microsoft.com/en-us/microsoft-365/onedrive/onedrive-for-business (last visited May 23, 2021).

[5] About Classroom, Google Help, https://support.google.com/edu/classroom/answer/6020279?hl=en (last visited May 23, 2021).

6

Everyone needs internet access to stay connected to the people they care about. Americans have long relied on the internet to stay in touch with friends and family scattered across the country and the world. But with travel cut off and in-person socializing curtailed, email, video chat, and social media took on new importance in our lives. Researchers studying the psychological impact of the pandemic discovered that active use of Instagram and Twitter enhanced social support and feelings of connectedness.[6] Internet access enables people to maintain the social ties that are critical to mental well-being.

The ability to pirate music is not what makes Cox's subscribers purchase internet access. Copyright infringement happens online because *everything* happens online, today more than ever. Internet access is a necessity of modern life, like water, power, and phone service. Cox's subscribers need internet access to live their lives, and they will pay Cox's monthly flat fee rate regardless of whether someone in their household wants to engage in copyright infringement. Because Cox has no direct financial interest in the infringement of plaintiffs' music, it cannot be subject to vicarious liability for failure to terminate internet access to accused infringers. *See Ellison*, 357 F.3d at 1079.

---

[6] *See* Alexandra Masciantonio et al., *Don't put all social network sites in one basket: Facebook, Instagram, Twitter, TikTok, and their relations with well-being during the COVID-19 pandemic*, PLOS One (Mar. 11, 2021), https://doi.org/10.1371/journal.pone.0248384.

7

## II. Terminating a subscriber's internet access is not a reasonable response to notice of copyright infringement

A defendant is liable for contributory copyright infringement if it (1) has "knowledge of the infringing activity," and (2) "causes or materially contributes to the infringing conduct of another." *CoStar*, 373 F.3d at 550. In *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 306 (4th Cir. 2018), this Court held that "providing a product with 'substantial non-infringing uses' can constitute a material contribution to copyright infringement" if it is done with "the *intent* to cause copyright infringement." As an example, the Court offered *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007). The Ninth Circuit held in *Amazon.com* that a "computer system operator" materially contributes to infringing content if it "can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." A "simple measure" is one that is "reasonable and feasible." *Amazon.com*, 508 F.3d at 1172; *Giganews*, 847 F.3d at 672.

Applying the "simple measures" standard, the district court held that the jury was entitled to find that Cox's failure to terminate internet access for accused infringers satisfied the material contribution element of contributory copyright liability. Dkt. 707 at 20–22. This too was an error. The case law on "simple measures" concerns removing or disabling access to *infringing content*, not preventing users accused of infringing copyrights in the past from infringing on the

8

internet in the future (or, for that matter, doing anything on the internet in the future) by terminating their internet service. The Ninth Circuit's recent decision in *ALS Scan, Inc. v. Steadfast Networks, LLC*, 819 Fed. App'x 522, 523 (9th Cir. 2020), makes the distinction clear.[7] In *Steadfast*, the court held that a data center leasing a server to a website was not contributorily liable for infringement on that website. *Id.* at 523–24. The court concluded that the data center had no "simple measures" available to it other than forwarding notices to the website provider. The data center "did not operate, control, or manage any functions" of the website, and could not "supervise, access, locate, or delete" the infringement in a granular way; thus it could stop the infringement only by terminating service to its customer entirely. *Id.* at 524. The Ninth Circuit did *not* hold that terminating the website's access to the data center's servers was a "simple measure" the defendant was required to take to avoid contributory liability. The same logic applies in greater force to the termination of internet access in this case.

Terminating internet access is not a "simple measure" because it is not a "reasonable" response to unadjudicated accusations of copyright infringement. It is not reasonable because it is grossly disproportionate. As discussed in the previous section, people depend on the internet to work, learn, and socialize,

---

[7] No Court of Appeals other than the Ninth Circuit has ever applied the "simple measures" standard.

9

especially during the pandemic. Most households have two or fewer options for broadband internet, and tens of millions only have one.[8] Subscribers terminated by their ISP may well have nowhere else to turn, with life-altering consequences to follow. A parent whose internet access is terminated due to a teenager's music piracy may find themselves unable to do their job. Students in a household whose internet access has been terminated may be cut off from their remote classroom. Anyone who loses internet access will face greater barriers to communicate with their friends and family.

In *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court struck down a statute prohibiting sex offenders from accessing social media sites because it swept far beyond the scope of any legitimate state interest. Writing for the majority, Justice Kennedy wrote that the law

> with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to become a town crier with a voice that resonates farther than it could from any soapbox.

---

[8] *See* H. Trostle et al., *Profiles of Monopoly: Big Cable and Telecom* 1, 5, 7, (2020), https://ilsr.org/wp-content/uploads/2020/08/2020_08_Profiles-of-Monopoly.pdf.

10

*Id.* at 1737. If banning social media access was a disproportionate punishment for *convicted sex offenders*, so much more so is a complete termination of internet access for those accused of downloading a few songs without paying their ninety-nine-cent price.

    Justice Kennedy's statements in *Packingham* align U.S. law with an international consensus that "the same rights that people have offline must also be protected online, in particular freedom of expression, which is applicable regardless of frontiers and through any media of one's choice[.]"[9] Ten years ago, the U.N. Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression identified termination of internet access for copyright infringement as a disproportionate sanction that therefore violates international human rights law.[10] In the decade since that report issued, the internet has become a steadily more important part of peoples' lives, and the

---

[9] Human Rights Council Res. 32/13, U.N. Doc. A/HRC/RES/32/13, at 4 (July 1, 2016), https://digitallibrary.un.org/record/845727/files/A_HRC_RES_32_13-EN.pdf.(condemning "measures to intentionally prevent or disrupt access to or dissemination of information online in violation of international human rights law[.]").

[10] Frank La Rue (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Rep. of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression* ¶ 78, U.N. Doc. A/HRC/17/27 (May 16, 2011), https://www2.ohchr.org/english/bodies/hrcouncil/docs/17session/A.HRC.17.27_en.pdf.

11

sanction has therefore become more disproportionate to the offense.

Termination of internet access to a house, business, or smaller ISP is not like removing or disabling access to infringing content. It is more like cutting off electricity to a building. Doing so may stop illegal downloading from occurring on the property, but failure to do so does not make the power company contributorily liable for whatever takes place. Regardless of whether termination is in some sense "simple" for Cox to accomplish, it is not "reasonable," and failure to do so therefore does not create contributory copyright liability. *See Giganews, Inc.*, 847 F.3d at 672.

## CONCLUSION

For the reasons set forth in this brief, Amicus asks the Court to reverse the judgment below.

Dated: May 24, 2021

Respectfully submitted,

DURIE TANGRI LLP

By: */s/ Joseph C. Gratz*
JOSEPH C. GRATZ
SAMUEL J. ZEITLIN
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: 415-362-6666
Facsimile: 415-236-6300
jgratz@durietangri.com
szeitlin@durietangri.com

Attorneys for *Amicus Curiae*
Internet Association

12

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a) or Federal Rule of Appellate Procedure 28.1. This brief contains 2,608 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman, 14 point font.

Dated: May 24, 2021                    DURIE TANGRI LLP

                                       By: */s/ Joseph C. Gratz*
                                           JOSEPH C. GRATZ
                                           SAMUEL J. ZEITLIN
                                           217 Leidesdorff Street
                                           San Francisco, CA 94111
                                           Telephone: 415-362-6666
                                           Facsimile: 415-236-6300
                                           jgratz@durietangri.com
                                           szeitlin@durietangri.com

                                           Attorneys for *Amicus Curiae*
                                           Internet Association