Case No. 21-01168

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

SONY MUSIC ENTERTAINMENT, ET AL.,

*Plaintiffs-Appellees,*

v.

COX COMMUNICATION, INC. and COXCOM, LLC,

*Defendants-Appellants.*

(see full caption on inside cover)

---

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY AND TECHNOLOGY, AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES, ASSOCIATION OF RESEARCH LIBRARIES, AND PUBLIC KNOWLEDGE IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

---

On Appeal from the U.S. District Court for the Eastern District of Virginia
Case No. 1:18-cv-950-LO-JFA
Hon. Liam O'Grady

---

Mitchell L. Stoltz
Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae*

*(Additional counsel listed on signature page)*

SONY MUSIC ENTERTAINMENT; ARISTA MUSIC; ARISTA
RECORDS, LLC; LAFACE RECORDS LLC; PROVIDENT LABEL GROUP,
LLC; SONY MUSIC ENTERTAINMENT US LATIN LLC; VOLCANO
ENTERTAINMENT III, LLC; ZOMBA RECORDINGS LLC; SONY/ATV
MUSIC PUBLISHING LLC; EMI AL GALLICO MUSIC CORP.; EMI ALGEE
MUSIC CORP.; EMI APRIL MUSIC INC.; EMI BLACKWOOD MUSIC INC.;
COLGEMS-EMI MUSIC INC.; EMI CONSORTIUM MUSIC PUBLISHING
INC., d/b/a EMI Full Keel Music; EMI,CONSORTIUM SONGS, INC., d/b/a EMI
Longitude Music; EMI FEIST CATALOG INC.; EMI MILLER CATALOG INC.;
EMI MILLS MUSIC, INC.; EMI UNART CATALOG INC.; EMI U CATALOG
INC.; JOBETE MUSIC CO. INC.; STONE AGATE MUSIC; SCREEN GEMS-
EMI MUSIC, INC.; STONE DIAMOND MUSIC CORP.; ATLANTIC
RECORDING CORPORATION; BAD BOY RECORDS LLC; ELEKTRA
ENTERTAINMENT GROUP, INC.; FUELED BY RAMEN LLC;
ROADRUNNER RECORDS, INC.; WARNER-TAMERLANE PUBLISHING
CORP.; WB MUSIC CORP.; UNICHAPPELL MUSIC, INC.; RIGHTSONG
MUSIC INC.; COTILLION MUSIC, INC.; INTERSONG U.S.A., INC.; UMG
RECORDINGS, INC.; CAPITOL RECORDS, LLC; UNIVERSAL MUSIC
CORP.; UNIVERSAL MUSIC – MGB NA LLC; UNIVERSAL MUSIC
PUBLISHING INC.; UNIVERSAL MUSIC PUBLISHING AB; UNIVERSAL
PUBLISHING LIMITED; UNIVERSAL MUSIC PUBLISHING MGB LIMITED;
UNIVERSAL MUSIC – Z TUNES LLC; UNIVERSAL/ISLAND MUSIC
LIMITED; UNIVERSAL/MCA MUSIC PUBLISHING PTY. LIMITED;
POLYGRAM PUBLISHING, INC.; SONGS OF UNIVERSAL, INC.; WARNER
RECORDS, INC., f/k/a W.B.M. Music Corp.,

*Plaintiffs-Appellees*,

and

NONESUCH RECORDS INC.; WARNER BROS. RECORDS, INC.;
WARNER/CHAPPELL MUSIC, INC.; W.B.M. MUSIC CORP.; UNIVERSAL-
POLYGRAM INTERNATIONAL TUNES, INC.; UNIVERSAL – SONGS OF
POLYGRAM INTERNATIONAL, INC.; UNIVERSAL POLYGRAM
INTERNATIONAL PUBLISHING, INC.; MUSIC CORPORATION OF
AMERICA, INC., d/b/a Universal Music Corporation; RONDOR MUSIC
INTERNATIONAL,

*Plaintiffs*,

v.

COX COMMUNICATIONS, INCORPORATED; CoxCom, LLC,

*Defendants-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-01168_      Caption: _Sony Music Entertainment, et al. v. Cox Communication, Inc._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Electronic Frontier Foundation, Center for Democracy and Technology, American Library Association,_

_Association of College and Research Libraries, Association of Research Libraries, Public Knowledge_

who are _____amici curiae_____, make the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Mitchell L. Stoltz                    Date:    June 1, 2021

Counsel for: Electronic Frontier Foundation

# **TABLE OF CONTENTS**

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES
WITH A DIRECT FINANCIAL INTEREST IN LITIGATION ............................. i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ..................................................................... v

STATEMENT OF INTEREST ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ..................................................................................... 4

    I.   The District Court's Misreading of Secondary Liability Doctrines Burdens
        Lawful and Important Uses of the Internet ....................................... 4

        A.   Vicarious Liability Requires a Meaningful Ability to Supervise
              Infringing Activity, Which ISPs Lack. ............................... 5

        B.   Terminating Subscribers Is Not Required to Avoid Contributory
              Infringement. ........................................................ 9

    II.   The District Court Endorsed a Damage Award That Raises Grave Due
        Process Concerns. ............................................................... 11

        A.   The District Court Did Not Meaningfully Consider Fair Notice. ... 12

        B.   The District Court Misconstrued the Public Interests At Stake ..... 14

    III.  This Verdict Would Cause Disproportionate Harm to the Public. ............. 16

        A.   Upholding This Verdict Would Result in Innocent and Vulnerable
              Users Losing Essential Internet Access. ............................ 17

        B.   Losing Internet Access Is an Extreme Public Harm. ...................... 23

              1.   Internet Access Is Essential to Participation in Economic,
                    Cultural, and Social Activity. ................................ 23

              2.   The COVID-19 Pandemic Has Intensified Reliance on
                    Internet Access – and That Reliance Will Persist .......... 24

              3.   The Consequences of Losing Internet Access Are Severe
                    and Disproportionate. ...................................... 25

CONCLUSION ................................................................................ 29

iii

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C) ......................................................31

CERTIFICATE OF SERVICE................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*BMG Rights Mgmt LLC v. Cox Comm'n Inc*,
  881 F.3d 293 (4th Cir. 2018) ..........................................................................9, 11

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ...............................................................12, 13, 14, 15

*Capitol Records, Inc. v. Thomas-Rasset*,
  692 F.3d 899 (8th Cir. 2012) ..............................................................13, 14, 15

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ..............................................................10

*Digital Sin, Inc. v. Does 1–176*,
  279 F.R.D. 239 (S.D.N.Y. 2012) ........................................................19

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998) ............................................................................14

*Fogerty v. Fantasy, Inc.*,
  510 U.S. 517 (1994) ..............................................................................4

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ..................................................................8

*Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*,
  955 F.2d 1143 (7th Cir. 1992) ..............................................................5

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
  327 F. Supp. 3d 606 (S.D.N.Y. 2018) ..................................................14

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ............................................................................16

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
  284 F.3d 505 (4th Cir. 2002) ................................................................5

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ........................................................................24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ..............................................................9

*Perfect 10, Inc. v. Giganews, Inc.*,
  No. CV 11-07098-AB SHX, 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014)........6

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
  494 F.3d 788 (9th Cir. 2007) ..........................................................................5, 8, 9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ............................................................................... *passim*

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
  464 F. Supp. 3d 795 (E.D. Va. 2020) ....................................................................12

*St. Louis, Iron Mountain & S. Ry. Co. v. Williams*,
  251 U.S. 63 (1919) ......................................................................................12, 15

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ............................................................................12, 13, 14

*Tattoo Art, Inc. v. TAT Int'l LLC*,
  498 F. App'x 341 (4th Cir. 2012) .........................................................................14

*TXO Prod. Corp. v. All. Res. Corp.*,
  509 U.S. 443 (1993) ............................................................................................12

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
  384 F. Supp. 3d 743 (W.D. Tex. 2019) ...............................................................17

*United States v. Ellis*,
  984 F.3d 1092 (4th Cir. 2021) ..............................................................................23

*United States v. Hamilton*,
  986 F.3d 413 (4th Cir. 2021) ................................................................................23

*United States v. LaCoste*,
  821 F.3d 1187 (9th Cir. 2016) ..............................................................................24

*VHT, Inc. v. Zillow Group*,
  918 F.3d 723 (9th Cir. 2019) ..................................................................................8

**Statutes**

17 U.S.C. § 504 .........................................................................................................13

17 U.S.C. § 512 .........................................................................................................10

Consolidated Appropriations Act of 2021, Pub. L. No. 116-260............................25

Me. Rev. Stat. Ann. § 9301 (2020)............................................................................7

Minn. Stat. Ann. § 325M.01 (2020) ..........................................................................7

Nev. Rev. Stat. § 205.498 (2020) ..............................................................................7

## Other Authorities

2020 Broadband Deployment Report, 35 FCC Rcd. 8986, (Apr. 24, 2020).....21, 22

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright...........................15

Colby Leigh Rachfal, Cong. Rsch. Serv., *COVID-19 and Broadband: Potential Implications for the Digital Divide* (2020) ...........................................................26

*Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Wayback Mach. (Dec. 7, 2017) ...................................................................................17

*Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Xfinity....17

D'Vera Cohn & Jeffrey S. Passel, *A Record 64 Million Americans Live in Multigenerational Households*, Pew Rsch. Ctr. (Apr. 5, 2018) ..........................20

*Digital Nation Data Explorer*, National Telecommunications and Information Administration (June 10, 2020)..........................................................................19

H. Trostle et al., *Profiles of Monopoly: Big Cable and Telecom*, Inst. for Loc. Self-Reliance (2020)...........................................................................................20

Harmeet Kaur, *Why Rural Americans are Having a Hard Time Working From Home*, CNN (Apr. 29, 2020) ...............................................................................27

*In re Bridging the Digital Divide for Low-Income Consumers*, FCC Rcd. 10886 (Nov. 19, 2019)......................................................................23

*In re Emergency Broadband Benefit Program*, 36 FCC Rcd. No. 20-445 (Feb. 26, 2021) .........................................................24

*In re Lifeline and Link Up Reform & Modernization*, 30 FCC Rcd. 7818 (June 18, 2015) ....................................................................24

*In re Restoring Internet Freedom*, Joint Comments of Internet Engineers, Pioneers, and Technologists, WC Docket No. 17-108, Fed. Commc'ns Comm'n (July 17, 2017)..........................................................................................6, 7

Institute of Museum and Library Sciences, *Rural Libraries in America* (2017).....18

*Internet Access in Maryland*, BroadbandNow .....................................................22

*Internet Access in North Carolina*, BroadbandNow .............................................22

*Internet Access in South Carolina*, BroadbandNow..............................................22

*Internet Access in Virginia*, BroadbandNow........................................................22

*Internet Access in West Virginia*, BroadbandNow ................................................22

*ISP Cox Hands Six Month Internet Ban to Alleged Repeat Infringer*, TorrentFreak (July 12, 2020) ..............................................................................20

Jacob Kastrenakes, *FCC Fines Verizon $1.35 Million Over 'Supercookie' Tracking*, The Verge (Mar. 7, 2016) ....................................................7

Jon Brodkin, *Comcast, Charter Expand Broadband Domination as Cable Hits 67% Market Share*, Ars Technica (Mar. 9, 2020), ..............................17

Karl Bode, *AT&T Will Kick Internet Users Offline for Piracy,* Vice (Nov. 6, 2018)......................................................................................17

*Keep Americans Connected Pledge*, FCC ............................................................25

Kellen Browning, *Seniors Seeking Vaccines Have a Problem: They Can't Use the Internet*, N.Y. Times (Feb. 28, 2021) ..........................................27, 28

Kris Maher, *Remote Schooling Out of Reach for Many Students in West Virginia Without Internet*, Wall St. J. (Sept. 13, 2020) ....................................26

Natalie C. Benda et al., *Broadband Internet Access Is a Social Determinant of Health,* 110 Am. J. Pub. Health 1123 (2020) ......................................28

Natasha Singer, *Learning Apps Have Boomed in the Pandemic. Now Comes the Real Test.*, N.Y. Times (Mar. 17, 2021) ............................................26

Natasha Singer, *Online Schools are Here to Stay, Even After the Pandemic*, N.Y. Times (Apr. 11, 2021) ..........................................................................26

Pew Research Center, *Library usage and engagement*, (2019) ............................18

Pew Research Center, *Public libraries and technology: From 'houses of knowledge' to 'houses of access'*, (2014)............................................18

Press Release, Fed. Commc'ns Comm'n, *FCC Waives Rural Health Care and E-Rate Program Gift Rules to Promote Connectivity for Hospitals and Students During Coronavirus Pandemic* (Mar. 18, 2020) ..................................28

*QuickFacts Virginia*, U.S. Census Bureau (July 1, 2019)......................................22

Rachel Oaks, *Internet Provider Data Caps Guide*, CableTV.com (Mar. 30, 2021)....................................................................................21

Reply All, *#118 A Pirate in Search of a Judge*, Gimlet Media, (Mar. 15, 2018) ...19

Restatement (Second) of Agency § 250 (Am. L. Inst. 1958)...................................6

Richard Fry, *More Adults Now Share Their Living Space, Driven in Part by Parents Living with Their Adult Children*, Pew Rsch. Ctr. (Jan. 31, 2018)........20

viii

Stan Horaczek, *Here's How Much Internet Bandwidth You Actually Need to Work from Home*, Popular Sci. (Mar. 12, 2020) ...........................................................21

Stuart Andreason et al., Fed. Rsrv. Bank of Atlanta, *The Digital Divide and the Pandemic: Working from Home and Broadband and Internet Access* (2020)....24

Todd Haselton, *Your Phone's Unlimited Data Plan Isn't Really Unlimited – This is What You Really Get*, CNBC (July 14, 2018) .....................................................21

U.S. Census Bureau, Access to the Internet (2018) ...............................................19

Vinhcent Le & Gissela Moya, *On the Wrong Side of the Digital Divide: Life Without Internet Access, and Why We Must Fix it in the Age of COVID-19*, Greenlining Inst. (June 2, 2020) ........................................................................22

# STATEMENT OF INTEREST[1]

*Amicus curiae* Electronic Frontier Foundation ("EFF") is a member-supported, non-profit civil liberties organization that has worked for more than 30 years to protect consumer interests, innovation, and free expression in the digital world. EFF and its more than 34,000 active donors have a strong interest in helping the courts and policymakers ensure that copyright law serves the interests of creators, innovators, and the general public.

*Amicus curiae* the Center for Democracy & Technology ("CDT") is a non-profit, public interest organization focused on privacy and civil liberties issues affecting the Internet and other digital technologies. CDT represents the public's interest in an open and accessible Internet and promotes constitutional and democratic values of free expression, privacy, and non-discrimination in the digital age.

*Amicus curiae* the American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of more than 57,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving

---

[1] No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici*, their members, or their counsel contributed money that was intended to fund the preparing or submitting of this brief. All parties have consented to the filing of this brief.

1

library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries ("ARL") is an association of 124 research libraries in North America. ARL's members include university libraries, public libraries, government and national libraries. ARL programs and services promote equitable access to and effective use of recorded knowledge in support of teaching and research. Together, these three organizations represent more than 100,000 libraries and 350,000 individuals. Libraries provide Internet access for over 100 million Americans.

Public Knowledge is a non-profit public interest 501(c)(3) corporation, working to defend citizens' rights in the emerging digital culture. Its primary mission is to promote online innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest. Applying its years of expertise in these areas, Public Knowledge frequently files amicus briefs in cases that raise novel issues at

the intersection of media, copyright, and telecommunications law.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The core question in this litigation is whether an internet service provider (ISP) was sufficiently aggressive in terminating the accounts of thousands of subscribers, and if not, the consequences of that policy decision. The district court's answer misconstrued the law, the actual relationship between ISPs and subscribers, and the public interest. Affirming it would have dangerous consequences far beyond this case.

Every use of the internet, be it for political organizing, access to government services and healthcare, commerce, education, finding and forming community, or simply entertainment, requires the services of an ISP. Terminating that service means withdrawing an essential tool for participation in daily life. Moreover, terminating an ISP account doesn't just cut off an allegedly infringing subscriber. It potentially cuts off every household member or – in the case of a school, library, or business – every student, faculty member, patron, and employee who shares the internet connection. And with little or no competition among broadband ISPs in many areas of the country, those users may have no other way to connect.

Given this reality, the stakes of this case for internet users are enormous. The district court's judgment and the jury's damage award in this case are founded on fundamental errors of law that, if affirmed, will force ISPs to terminate more

subscribers with less justification or risk staggering liability. First, the judgment relies on unwarranted extensions of copyright's two "secondary liability" doctrines, which will encourage ISPs to terminate subscribers when more proportionate means of addressing infringement exist. Second, the staggering and poorly justified $1,000,000,000 award of statutory damages against Cox thwarts basic principles of due process and the public interest.

The purpose of the Copyright Act is "enriching the general public through access to creative works." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). This purpose informs "the limited scope of the copyright holder's statutory monopoly," including the proper scope of secondary liability, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 442 (1984), as well as the damages calculation. The district court's handling of this case lost sight of that purpose, to the detriment of the general public. This Court should reverse.

## ARGUMENT

### I.    The District Court's Misreading of Secondary Liability Doctrines Burdens Lawful and Important Uses of the Internet.

The decision below is based on a fundamental misreading of law and fact. As a matter of law, the district court ignored key elements of vicarious liability and contributory infringement, both of which are derived from common law tort

4

principles.[2] As a matter of fact, the district court misconstrued the relationship between ISPs and their customers, and particularly how ISPs differ from applications like social networks and search engines that are delivered over the internet.

### A. Vicarious Liability Requires a Meaningful Ability to Supervise Infringing Activity, Which ISPs Lack.

Vicarious liability for copyright infringement applies when a party "(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002). This doctrine derives from common law principles of respondeat superior. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007). Its canonical purpose is to "prevent an entity that profits from infringement from hiding behind undercapitalized 'dummy' operations." *Nelson-Salabes*, 284 F.3d at 513 (quoting *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992)). Consistent with those origins, the first element requires a showing of "some level of principal-agent relationship" between the liable party and the actual infringer. *Perfect 10, Inc. v. Giganews, Inc.*,

---

[2] *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007).

5

No. CV 11-07098-AB SHX, 2014 WL 8628031, at *3 (C.D. Cal. Nov. 14, 2014), *aff'd*, 847 F.3d 657 (9th Cir. 2017).

Under the common law, vicarious liability attaches to the principal of a non-employee agent only when the principal intended the harmful result or directed the manner of the agent's conduct. Restatement (Second) of Agency § 250 (Am. L. Inst. 1958). This principle gives meaning to the "right and ability to supervise" requirement.

Subscribers are not ISP agents, and ISPs cannot meaningfully direct or supervise the manner in which subscribers use the internet. Indeed, any finding to the contrary would sharply conflict with the public's understanding of an ISP's role. "ISPs compete primarily on the reliability and bandwidth of their Internet connections. Customers subscribe to an ISP's service . . . because the subscription enables customers to transmit and receive data to and from the wider internet."[3] By design and common practice, ISPs' systems are largely agnostic to the applications that users choose to run, or to the contents of their communications, both of which are the domain of users themselves and "edge providers" such as social networks,

---

[3] *In re Restoring Internet Freedom*, Joint Comments of Internet Engineers, Pioneers, and Technologists, WC Docket No. 17-108, at 17-18, Fed. Commc'ns Comm'n (July 17, 2017), https://perma.cc/86G2-EL25.

6

website operators, email providers, and so on.[4] Federal and state regulators have

worked for decades to enforce that agnostic approach, sometimes called "net

neutrality."[5] When ISPs have engaged in "supervision" by observing their

customers' Internet use in detail or attempting to control it, customers have

generally found this intolerable and ISPs have faced substantial fines.[6]

In some circumstances, ISPs may in fact be barred by law from observing

their users' activities in sufficient detail to supervise the manner of their internet

use. Various state laws forbid ISPs from using or disclosing information about

their users' web browsing history, application usage, and the contents of users'

communications. *See* 35-A Me. Rev. Stat. Ann. § 9301 (2020) ("web browsing

history . . . application usage history"); Minn. Stat. Ann. § 325M.01 (2020)

("online sites visited"); Nev. Rev. Stat. § 205.498 (2020) ("all information

concerning a subscriber").

Given these facts, it's no surprise that the district court did *not* find that Cox

had the right or ability to supervise the applications used by its users, or the

manner of their use. Instead, the court simply found it sufficient that Cox had the

---

[4] *See id.* at 6-9.

[5] *See generally* https://en.wikipedia.org/wiki/Net_neutrality.

[6] *See* Jacob Kastrenakes, *FCC Fines Verizon $1.35 Million Over 'Supercookie' Tracking*, The Verge (Mar. 7, 2016, 12:43 PM), https://perma.cc/E32Z-SWS5.

7

ability to terminate subscribers. Order, ECF no. 707, at 17-18. But this is not the test for vicarious liability: because anyone can terminate a principal-agent relationship whenever the parties' agreement permits, vicarious liability must require more.

In effect, by equating a right and ability to terminate with the ability to direct a customer's conduct, the district court eliminated the first prong of the vicarious liability standard altogether, contrary to decades of copyright jurisprudence. For example, courts have long distinguished between a landlord, who is not held vicariously liable for infringement by tenants, and a "dance hall owner" whose close participation in the activities that take place on their premises makes them liable when infringement occurs. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 438 n.18 (1984) (collecting cases); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) ("pervasive participation" of flea market owner in vendors' infringing sales made it vicariously liable). Moreover, under the district court's formulation, in nearly all of the internet service cases where a court found the "right and ability to supervise" infringing conduct lacking, the court should have found liability instead, because these service providers, too, were able to terminate users' accounts. *See, e.g., VHT, Inc. v. Zillow Group*, 918 F.3d 723, 747 (9th Cir. 2019); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007).

8

**B.    Terminating Subscribers Is Not Required to Avoid Contributory Infringement.**

Contributory infringement has two elements: knowledge of infringement and a "material contribution" to the infringement. *Perfect 10 Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). Knowledge of infringement must be specific enough that a service provider can act on the knowledge. *BMG Rights Mgmt LLC v. Cox Comm'n Inc*, 881 F.3d 293, 311-12 (4th Cir. 2018). Adopting the Ninth Circuit's test, the district court held that a service provider with knowledge of specific acts of infringement is liable for those acts if it "can take simple measures to prevent further damage to copyrighted works" but fails to take them. Order, ECF No. 707 at 20 (citing *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1172 (9th Cir. 2007)).

But the district court misapplied this standard in a way that harms ISP users whether they infringe or not. First, the court's jury instruction that "plaintiffs have established that Cox had specific enough knowledge of the infringement occurring on its network that Cox could have done something about it," Jury Instructions 22, ECF No. 671, implies that Cox could have "done something" in response to notices of infringement, but did not. In fact, Cox presented evidence that it warns, remonstrates with, cajoles, and threatens subscribers whose accounts are subject to infringement accusations, and that its communications are effective at stopping most infringement. The jury instruction suggested that these efforts did not matter,

9

and that "something" more was needed—i.e., terminating accounts, the only thing Cox was reluctant to do.

The district court's narrow focus on termination reflects the Digital Millennium Copyright Act's safe harbor provisions. *See* ECF No. 707, at 71 ("Cox knew . . . the requirements of the DMCA."). That statute creates a shield against most infringement remedies for certain service providers who comply with its terms. One of its requirements is that the service provider "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). ISPs that do not adequately implement such a policy may lose the DMCA safe harbor.

Although ISPs that do not adequately implement a termination policy may lose the DMCA safe harbor, that is a separate issue from whether or not copyright infringement has occurred. This Court has made clear that the DMCA does not change or supplant the judge-made doctrines of copyright liability for Internet services. *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F.3d 544, 553 (4th Cir. 2004). The statute leaves courts "free to continue to construe the Copyright Act in deciding the scope and nature of prima facie liability." *Id.*

Unlike the DMCA safe harbor, the doctrine of contributory liability does not require ISPs to terminate subscribers in order to avoid liability. Contributory

10

infringement applies only when a service provider has "knowledge that infringement is substantially certain to result" from their continued provision of service. *BMG*, 881 F.3d at 311. Cox's remonstrances and warnings to accused subscribers made continuing infringement far from certain, because nearly all heeded those warnings. Thus, under this Court's standard, Cox did not necessarily have the requisite knowledge – but the district court's instruction ensured that the jury would not fully consider that possibility.

The consequences of that mistake, left unaddressed, will reach far beyond this case. Requiring termination when other measures are effective to address infringement will cause ISPs to terminate customers more often than necessary. As set forth in Part III below, that outcome would not serve the public interest.

## II. The District Court Endorsed a Damage Award That Raises Grave Due Process Concerns.

Aside from its statutory infirmities, *see* Cox Opening Br. 58–74, the damage award calculation approved by the district court raises two significant due process concerns. First, the district court's reasoning would vitiate the concept of fair notice by allowing unbounded liability for ISPs. Compounding that flaw, the district court's view of the public interests at stake poses a significant risk of harmful overdeterrence. At a minimum, the district court should have considered the award's likely effects on internet users, who would bear the brunt of stepped-

11

up, inflexible copyright enforcement by ISPs.

### A.    The District Court Did Not Meaningfully Consider Fair Notice.

The Due Process Clause "imposes substantive limits beyond which penalties

may not go." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 454 (1993)

(internal quotation marks omitted). These limits apply to statutory damages. *St.*

*Louis, Iron Mountain & S. Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919). Due

process requires fair notice "of the severity of the penalty that a State may

impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996); *see also State*

*Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427 (2003).

Here, the district court found Cox received fair notice based on a simplistic

formula: "As there is no potential ambiguity in construing the statutory dollar

amounts, and Cox was keenly aware of the volume of infringement notices it

received, the product of these two values was reasonably foreseeable." *Sony Music*

*Ent. v. Cox Commc'ns, Inc*., 464 F. Supp. 3d 795, 845 (E.D. Va. 2020). According

to this formula, however, ISP defendants would have to foresee potentially infinite

risk. As the district court acknowledged, Cox received nearly 5.8 million notices

during the claim period. *Id.* at 837 n.29. If statutory damages had been awarded in

this case for each of the infringement notices Cox received, the aggregate award

would have approached an absurd $580 billion. *See Sony Music Ent.*, 464 F. Supp.

3d at 837 n.29, 847. What is worse, the only practical limit the district court

12

identified—Cox's cap on the number of notices accepted—was itself a source of
risk, as plaintiffs claimed this practice was an unreasonable implementation of
Cox's repeat infringer policy. *Id.* at 846; Complaint, ECF No. 1, at ¶¶2, 87.

The jury based its eventual damage award on the number of works rather
than the number of notices, but that number also was not reasonably foreseeable.
The statute itself is clear: "For the purposes of this subsection, all the parts of a
compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). And
the district court itself acknowledged that the congressional intent behind this
provision is "to shield a defendant's potential liability from undue multiplication."
Order, ECF No. 707, at 46. Yet even when the district court agreed with Cox that
the number of works supporting the jury's award was inflated in a manner
inconsistent with the text and intent of § 504(c)(1), *Id.* at 44, it allowed that
number to stand.

Fair notice requires more, particularly where, as here, the claim is for
secondary liability. ISPs do not have the same knowledge or insight into the
number of works behind a damage award as a direct infringer. For example, the
defendant in *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012),
arguably had fair notice of the number of works at issue because she placed them
into a shared folder. *Id.* at 902. The Eighth Circuit rejected fair notice concerns and
reliance on *Campbell* and *Gore* because the authorizing statute "identifie[s] and

13

constrain[s]" statutory damages. *Id.* at 907. But no such constraint applies here, where the per-work cap on statutory damages ceases to function as an "upper bound." *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 635 (S.D.N.Y. 2018).[7]

### B.     The District Court Misconstrued the Public Interests At Stake

Even if fair notice were given, this award far exceeds what is reasonably necessary to vindicate "legitimate interests in punishment and deterrence." *Gore*, 517 U.S. at 568. Due process requires consideration of "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 418. Although the Supreme Court announced this standard in the context of punitive rather than statutory damages, its application to copyright statutory damages is appropriate given that those damages serve purposes of both compensation and punishment. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998).[8] And even under the less precise *Williams* standard, the

---

[7] The district court did allow that the absolute amount of the award was relevant to the due process inquiry, Order, ECF No. 707, at 72, but instead of asking whether Cox had fair notice of that amount, simply observed that Cox faced damages that were not fixed and continued over a period of years. *Id.* at 73.

[8] The district court concluded that this Court has already deemed *Gore* inapplicable to copyright statutory damages. Order, ECF No. 707, at 54 n.26. However, that conclusion rested entirely on an unpublished decision finding the argument to be "unavailing" as applied to the specific award in question. *Tattoo Art, Inc. v. TAT Int'l LLC*, 498 F. App'x 341, 348 (4th Cir. 2012).

14

award below was "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Williams*, 251 U.S. at 67.

Secondary liability cases involving file sharing, like this one, are unusually likely to lead to disproportionate and unreasonable awards. As one copyright treatise noted regarding peer-to-peer file sharing cases involving direct infringement by a single infringer, "reason seems to have broken down completely in this domain." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.04[E][1][a][iii] (2021).

That is precisely what happened here. Unwilling to estimate actual harm, plaintiffs instead invited the jury to punish Cox for harms suffered by the entire content industry. Trial Tr. vol. 12, ECF No. 674, 2972. The district court endorsed this approach, relying on *Thomas-Rasset* to find that consideration of industry-wide harms justified an award many multiples higher than actual damages or lost profits, because copyright protection "is meant to achieve an important public interest." *Sony*, 464 F. Supp. 3d at 839 (quoting *Thomas-Rasset*, 692 F.3d at 908).

But while damage awards should demonstrate "due regard for the interests of the public," *Williams*, 251 U.S. at 67, copyright awards may implicate *multiple* public interests. Outsized, disproportionate awards can "over-deter," leading "potential defendants to spend more to prevent the activity that causes the economic harm . . . than the cost of the harm itself." *Gore*, 517 U.S. at 593 (Breyer,

15

J., concurring). That, in turn, can inhibit new creativity and innovation. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 960 (2005) (Breyer, J., concurring) (warning that threats of massive statutory liability may "chill . . . technological development").

And when the disproportionate award falls on an ISP, the cost of overdeterrence may actually fall on users more than the ISP itself. The likely response of Cox and other ISPs to a $1 billion award would be to more readily terminate an account regardless of how many users rely on it. As a result, all users of an account accused of repeat infringement—whether the account belongs to a household, hospital, university, or regional ISP—would bear the consequences of stepped-up enforcement, increased surveillance, or cooperation with rightsholders' agents in forwarding settlement demands. Given that it looked to the interests of a select group of third parties—the recording industry—in justifying the damage award, the court's due process review here should have considered this other third-party cost as well.

## III.    This Verdict Would Cause Disproportionate Harm to the Public.

The district court's misguided approach to both secondary liability and damages is likely to have a profound effect on all internet users. ISPs will respond to the lower threshold for secondary liability and exposure to unbounded damage awards by increasing the frequency of account terminations, cutting off users'

16

ability to meaningfully participate in economic and civic life. Indeed, they already are.

### A.    Upholding This Verdict Would Result in Innocent and Vulnerable Users Losing Essential Internet Access.

While ISPs are secretive about their repeat infringer policies, available information demonstrates they would respond to new and unpredictable liability by tightening policies and increasing account terminations. For example, Comcast, the country's largest fixed broadband access provider,[9] has revised its policy from "reserv[ing] the right" to consider an account with multiple notifications as violating its policy to treating any such account as a repeat infringer.[10] As rightsholders file more cases against ISPs, those ISPs are also terminating subscribers more readily. *See UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 755 (W.D. Tex. 2019) (ISP terminated an account for the first time in six years).

---

[9] Jon Brodkin, *Comcast, Charter Expand Broadband Domination as Cable Hits 67% Market Share*, Ars Technica (Mar. 9, 2020, 12:03 PM), https://perma.cc/Y7WH-GV78.

[10] *Compare Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Xfinity, https://perma.cc/9CGC-457J, *with Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Wayback Mach. (Dec. 7, 2017), https://perma.cc/E4QG-BGXE. *See also* Karl Bode, *AT&T Will Kick Internet Users Offline for Piracy,* Vice (Nov. 6, 2018, 12:51 PM), https://perma.cc/F3AB-E3X8.

More aggressive termination policies would punish the innocent and guilty alike. Unlike most accounts with edge providers, ISP subscriptions are shared by multiple users. For example, the record shows multiple instances of alleged infringement associated with accounts for universities, hospitals, local government agencies, and, in the case of subcontracted services, entire municipalities. *See* Trial Tr. vol. 5 (P.M. Portion), ECF No. 642, 1044; Trial Tr. vol. 4 (P.M. Portion), ECF No. 640, 861; Trial Tr. vol. 7 (P.M. Portion), ECF No. 654, 1474; Trial Tr. vol. 10 (P.M. Portion), ECF No. 660, 2512–14, 2552. These institutions are essential sources of internet access for millions. The same holds true for public libraries, upon which 77% of Americans without Internet access in their homes rely on for Internet access.[11] Library users who take advantage of libraries' computers and Internet connections are more likely to be young, Black, female, and lower income.[12] They are also likely to live in rural communities.[13]

Cox was rightly hesitant to terminate accounts like these. *See* Trial Tr. vol. 5

---

[11] Pew Research Center, *Public libraries and technology: From 'houses of knowledge' to 'houses of access'*, (2014) https://perma.cc/NT5F-3JJ3 (2014). https://perma.cc/NT5F-3JJ3.

[12] Pew Research Center, *Library usage and engagement*, (2019) https://perma.cc/D5C5-EE92.

[13] Institute of Museum and Library Sciences, *Rural Libraries in America* (2017), https://perma.cc/RHV3-ZLXQ (one in five rural library visitors access the internet on library terminals).

(P.M. Portion), ECF No. 642, 1085–95, 1099–1100. Given a $1 billion damage award, combined with the district court's lower threshold for secondary liability, neither Cox nor other ISPs would hesitate again.

Even for residential accounts, the consequences of terminating internet access will not be confined to individual repeat infringers. In other file sharing cases, rightsholders have estimated that 30% of the names of account holders identified as infringers were not responsible for the alleged infringement. *See, e.g., Digital Sin, Inc. v. Does 1–176*, 279 F.R.D. 239, 242 (S.D.N.Y. 2012) (granting protective order due to likelihood of misidentified infringers).[14] That figure is unsurprising. In 2018, almost eight million U.S. persons accessed the internet at home without a paid subscription,[15] and more than 77 million Americans used the internet at someone else's home.[16] As one terminated Cox subscriber stated, "One

---

[14] *See, e.g.*, Reply All, *#118 A Pirate in Search of a Judge*, Gimlet Media, at 0:40–2:08, 21:40–24:05 (Mar. 15, 2018), https://perma.cc/5FX5-N2DZ (recounting the case of a Comcast subscriber whose account was nearly terminated because an ex-roommate had continued to use the subscriber's login credentials).

[15] U.S. Census Bureau, Access to the Internet (2018), https://perma.cc/DZ5J-PH4V (last visited May 13, 2021).

[16] *Digital Nation Data Explorer*, National Telecommunications and Information Administration (June 10, 2020), https://perma.cc/P8L9-Y5RP (last visited May 14, 2021).

19

cannot control what everyone does on the internet in one household or business."[17]

Multi-user accounts are especially common in shared households, which have been increasing in number as of late.[18] *See, e.g.*, Trial Tr. vol. 7 (P.M. Portion), ECF No. 654, 1680–81 (single mother working several jobs and in school at risk of termination because of minor son's online activity). Since non-white, low-income individuals are more likely to live in shared households and share broadband subscriptions,[19] stepped-up termination would worsen the racial and economic digital divide.

These effects are exacerbated by the lack of competition in the broadband market. Nationwide, more than 77 million people have access to just one broadband provider.[20] In these areas, termination by a single ISP means loss of

---

[17] *See ISP Cox Hands Six Month Internet Ban to Alleged Repeat Infringer*, TorrentFreak (July 12, 2020), https://perma.cc/U5BV-YRKC; *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 755 (W.D. Tex. 2019) (Texas-based ISP Grande Communication terminated subscribers for first time in over six years).

[18] Richard Fry, *More Adults Now Share Their Living Space, Driven in Part by Parents Living with Their Adult Children*, Pew Rsch. Ctr. (Jan. 31, 2018), https://perma.cc/U87Q-YZVS.

[19] *See* D'Vera Cohn & Jeffrey S. Passel, *A Record 64 Million Americans Live in Multigenerational Households*, Pew Rsch. Ctr. (Apr. 5, 2018), https://perma.cc/FX3K-XVTJ.

[20] H. Trostle et al., *Profiles of Monopoly: Big Cable and Telecom*, Inst. for Loc. Self-Reliance 39 (2020), https://perma.cc/698Q-R4GF.

broadband internet access entirely. Although mobile broadband services do exist, they are incomplete substitutes for wireline broadband.[21] Aside from lower average speeds, mobile broadband plans often come with low monthly data caps that users will quickly exceed if they use mobile data for necessary day-to-day functions, such as telecommuting or remote education.[22] Users must then choose between paying overages (a financial strain on low-income subscribers in particular) or losing internet access.[23] In any event, it is very difficult, if not impossible, to fill out a job application on a smartphone.

This disparity is felt in states such as Virginia, where 608,000 out of approximately 8.5 million residents have access to only one wired broadband

---

[21] 2020 Broadband Deployment Report, 35 FCC Rcd. 8986, ¶ 12 (Apr. 24, 2020).

[22] *See* Stan Horaczek, *Here's How Much Internet Bandwidth You Actually Need to Work from Home*, Popular Sci. (Mar. 12, 2020), https://perma.cc/NV9X-HJ4X. *Compare* Rachel Oaks, *Internet Provider Data Caps Guide*, CableTV.com (Mar. 30, 2021), https://perma.cc/685M-APFA, *with* Todd Haselton, *Your Phone's Unlimited Data Plan Isn't Really Unlimited – This is What You Really Get*, CNBC (July 14, 2018, 11:52 AM), https://perma.cc/5A44-MDMA.

[23] *See* Haselton, *supra* (explaining how users are capped on high-speed data even when subscribed to "unlimited" data plans, which exist on priced tiers).

internet provider.[24] Similar numbers exist in North Carolina,[25] South Carolina,[26] and West Virginia.[27] Maryland fares somewhat better, with 96.6% of residents having access to wired broadband with speeds of 25 Mbps or faster.[28] Nonetheless, 249,000 Maryland residents have access to only one ISP.[29] This lack of options puts many "on the wrong side of the 'digital divide,'" which "affects low-income families and communities of color the most."[30] Rural areas, including tribal lands, have particularly limited ISP options,[31] often because providers have little economic incentive to build out services in sparsely populated places.

---

[24] *Internet Access in Virginia*, BroadbandNow, https://broadbandnow.com/Virginia [https://perma.cc/UZ77-8QQ8]; *QuickFacts Virginia*, U.S. Census Bureau (July 1, 2019), https://perma.cc/2Q3A-MTQ9.

[25] *Internet Access in North Carolina*, BroadbandNow, https://perma.cc/2KFL-EU2X (over 1.3 million residents have no high-speed broadband, no wired internet, or access to only one provider).

[26] *Internet Access in South Carolina*, BroadbandNow, https://perma.cc/K55S-7LRA (over 1 million residents have no high-speed broadband, no wired internet, or access to only one provider).

[27] *Internet Access in West Virginia*, BroadbandNow, https://perma.cc/3CN7-VBUR (over 900,000 residents have no broadband, no wired internet, or access to only one provider).

[28] *Internet Access in Maryland*, BroadbandNow, https://perma.cc/G7MB-YH5K.

[29] *Id*.

[30] Vinhcent Le & Gissela Moya, *On the Wrong Side of the Digital Divide: Life Without Internet Access, and Why We Must Fix it in the Age of COVID-19*, Greenlining Inst. (June 2, 2020), https://perma.cc/EGY8-ZZLH.

[31] 2020 Broadband Deployment Report, 35 FCC Rcd. at 8990, ¶ 9.

Further, the record demonstrates that ISPs would be especially likely to terminate "low-return" subscribers. *See Sony*, 464 F. Supp. 3d at 838 ("[Cox] looked at the total revenue coming from each subscriber when considering possible . . . termination."). For one thing, many such users rely upon state and federal subsidies for internet access[32] and cannot afford to sign up for expensive "bundled" accounts that ISPs may be more reluctant to terminate.

## B.      Losing Internet Access Is an Extreme Public Harm.

Loss of internet access "imposes a massive deprivation of liberty[,]" *United States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021), particularly now that so much economic and social activity has moved online. Accordingly, the public has a strong interest in preserving, not terminating, that access.

### 1.      Internet Access Is Essential to Participation in Economic, Cultural, and Social Activity.

As this Court stated when reviewing supervised release conditions, "the Internet is crucial in finding jobs, paying bills, and navigating life in this digital age." *United States v. Hamilton*, 986 F.3d 413, 421 (4th Cir. 2021). The Federal Communications Commission concurs, noting that internet access "institutions and schools, and even government agencies, require Internet access for full

---

[32] *See In re Bridging the Digital Divide for Low-Income Consumers*, 34 FCC Rcd. 10886, ¶ 3 (Nov. 19, 2019) (Fifth Report and Order).

participation in key facets of society."[33]  Cutting off internet access "constrains . . . freedom in ways that make it difficult to participate fully in society and the economy." *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016). The Supreme Court has similarly recognized that social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," such that banning even this subset of internet use can impermissibly burden First Amendment rights. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).

### 2.    The COVID-19 Pandemic Has Intensified Reliance on Internet Access – and That Reliance Will Persist

During the pandemic, business and school closures nationwide "led people to turn to virtual learning, telemedicine, and telework to enable social distancing measures."[34] That, in turn exposed pre-existing fault lines between those with and without access.[35] It has also permanently enmeshed broadband usage in daily life.

---

[33] *In re Lifeline and Link Up Reform & Modernization*, 30 FCC Rcd. 7818, ¶ 4 (June 18, 2015) (Second Further Notice of Proposed Rulemaking).

[34] *In re Emergency Broadband Benefit Program*, 36 FCC Rcd. No. 20-445, ¶ 1 (Feb. 26, 2021) (Report and Order).

[35] *See* Stuart Andreason et al., Fed. Rsrv. Bank of Atlanta, *The Digital Divide and the Pandemic: Working from Home and Broadband and Internet Access*, 1 (2020), https://perma.cc/5A4B-CP6L (explaining how internet access and affordability have become key determinants of a person's ability to maintain financial and job security during the pandemic).

24

Consequently, Congress and the FCC are striving to ensure that low-income households can afford and maintain broadband internet access. The Consolidated Appropriations Act of 2021 provided $3.2 billion to reimburse broadband providers serving low-income households. *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, § 904. And the FCC has urged ISPs not to terminate subscribers for non-payment or exceeding data caps and to open WiFi hotspots to those in need.[36]

The district court's decision would undermine these policies. ISPs would be much less inclined to leave public WiFi hotspots open in underserved neighborhoods, because doing so risks crushing liability. They also would be incentivized to increase terminations for alleged copyright infringement, regardless of how many users a single account termination would affect.

### 3. The Consequences of Losing Internet Access Are Severe and Disproportionate.

Distance learning, telework, and telemedicine have become essential during the pandemic and are likely to remain so. For many or even most subscribers, loss of internet access would be catastrophic.

*Education.* Low-income students in particular rely on public WiFi and

---

[36] *Keep Americans Connected Pledge*, FCC, https://perma.cc/BCN7-JMFF (last visited Feb. 22, 2021).

shared subscriptions for broadband internet access for remote education. Their struggles to access reliable broadband have become the new "Homework Gap"[37] and their need for reliable broadband will not disappear post-pandemic.[38] Even before the pandemic, "a growing number of schools [were] issuing homework assignments online."[39] And increased use of free internet-based education tools during the pandemic "has sped the adoption of technology in education by easily 5 to 10 years."[40] School districts nationwide are also creating online schools "with an eye to operating them for years to come."[41] But in West Virginia, for example, 30% to 50% of elementary school students do not have internet access at home.[42] Thus, loss of broadband access will lead to more challenges and fewer opportunities for students from disadvantaged communities.

*Employment.* As COVID-19 has moved work online, residents of places like

---

[37] *See* Colby Leigh Rachfal, Cong. Rsch. Serv., *COVID-19 and Broadband: Potential Implications for the Digital Divide*, 2 (2020), https://perma.cc/C6AF-VQWU.

[38] *See* Natasha Singer, *Learning Apps Have Boomed in the Pandemic. Now Comes the Real Test.*, N.Y. Times (Mar. 17, 2021), https://perma.cc/DMJ5-98CA.

[39] *See* Rachfal, *supra*.

[40] *See* Singer, *supra*.

[41] Natasha Singer, *Online Schools are Here to Stay, Even After the Pandemic*, N.Y. Times (Apr. 11, 2021), https://perma.cc/R58A-WDJP.

[42] Kris Maher, *Remote Schooling Out of Reach for Many Students in West Virginia Without Internet*, Wall St. J. (Sept. 13, 2020, 5:30 AM), https://perma.cc/N6WL-ETBV.

Grottoes, Virginia, where reliable broadband is unavailable for many households, must rely on inferior alternatives.[43] For example, Stephanie Anstey, a middle school history teacher, has only satellite broadband at home.[44] "[E]mails can take 30 seconds to load" unsuccessfully, and videoconferencing and cloud services are impossible.[45] "So Anstey's new office is in her car in the corner of the parking lot [of her school] where the WiFi signal is the strongest."[46] Across America, civic institutions, like libraries, schools, and churches, have opened their WiFi for free to help those like Anstey.[47] But where those institutions cannot perfectly police use of those accounts, stepped-up copyright enforcement puts them in peril.

*Health.* Seniors are having difficulty using internet resources that have been the primary method of obtaining both information about the COVID-19 vaccine and the vaccine itself.[48] Connectivity has thus become a "life-or-death" matter for

---

[43] *See* Harmeet Kaur, *Why Rural Americans are Having a Hard Time Working From Home*, CNN (Apr. 29, 2020, 8:14 AM), https://perma.cc/D34P-7ZLP.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *See id.*

[48] *See* Kellen Browning, *Seniors Seeking Vaccines Have a Problem: They Can't Use the Internet*, N.Y. Times (Feb. 28, 2021), https://perma.cc/5UHB-5XRM.

the twenty-two million older Americans without wired broadband.[49] Health policy experts have urged that, for all age groups, "broadband Internet access . . . must be recognized as a social determinant of health."[50] For this reason, the FCC waived rules in order to ease broadband providers' participation in federal telehealth programs, recognizing that broadband access "will play an increasingly critical part in treating patients and helping healthcare providers maximize their impact on their communities."[51]

* * *

In sum, terminated subscribers would face near-insurmountable difficulties with such fundamental parts of life as finding and maintaining work, getting an adequate education, and obtaining healthcare. Innocent users, who may not even know they share an internet connection with repeat infringers, should not bear the punishment of losing the ability to participate in economic and civic life. This punishment is overly harsh for most infringers as well—the harm of being

---

[49] *See id.*

[50] *See* Natalie C. Benda et al., *Broadband Internet Access Is a Social Determinant of Health,* 110 Am. J. Pub. Health 1123, 1123 (2020).

[51] Press Release, Fed. Commc'ns Comm'n, *FCC Waives Rural Health Care and E-Rate Program Gift Rules to Promote Connectivity for Hospitals and Students During Coronavirus Pandemic* (Mar. 18, 2020), https://perma.cc/G4KH-EXP9.

fundamentally cut off from society is disproportionate to the costs of noncommercial, small-scale copyright infringement. No judge-made doctrine of secondary liability or interpretation of Section 504 requires or should require these consequences.

## CONCLUSION

The decision below impermissibly lowers the threshold for a finding of secondary liability for copyright infringement and increases the likelihood of secondary liability posing an existential threat to all but the largest ISPs. The consequence of that decision, if upheld, would be the loss of internet access for an untold number of internet users regardless of whether they had engaged in any infringing activity. Neither copyright precedent nor any legitimate interest of copyright holders or the public justifies this result. This Court should reverse.

Dated: June 1, 2021                              Respectfully submitted,

                                                 */s/ Mitchell L. Stoltz*

                                                 Mitchell L. Stoltz
                                                    *Counsel of Record*
                                                 **ELECTRONIC FRONTIER**
                                                 **FOUNDATION**
                                                 815 Eddy Street
                                                 San Francisco, California 94109
                                                 (415) 436-9333
                                                 mitch@eff.org

Corynne McSherry
**ELECTRONIC FRONTIER**
**FOUNDATION**
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
corynne@eff.org

Erik Stallman
**SAMUELSON LAW,**
**TECHNOLOGY &**
**PUBLIC POLICY CLINIC**
UC Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
Tel: (510) 643-4800
estallman@clinical.law.berkeley.edu

Juliana DeVries
**SAMUELSON LAW,**
**TECHNOLOGY &**
**PUBLIC POLICY CLINIC**
UC Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
Tel: (510) 643-4800
jdevries@clinical.law.berkeley.edu

*Counsel for amici curiae*[52]

---

[52] Counsel and amici acknowledge and appreciate the contributions to this brief of UC Berkeley, School of Law students Waen Vejjajiva, Kevin Yang, and Benjy Malings.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)**

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.     This Brief of *Amici Curiae* in Support of Defendants-Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a) or Fed. R. App. P. 28.1 because this brief contains 6,392 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman.

Dated: June 1, 2021                              */s/ Mitchell L. Stoltz*
                                                 Mitchell L. Stoltz

                                                 *Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Fourth Circuit by using the

appellate CM/ECF system on June 1, 2021

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Dated: June 1, 2021                          */s/ Mitchell L. Stoltz*
                                             Mitchell L. Stoltz

                                             *Counsel of Record for Amici Curiae*