No. 21-1168

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**SONY MUSIC ENTERTAINMENT; ARISTA MUSIC; ARISTA RECORDS, LLC; LAFACE RECORDS LLC; PROVIDENT LABEL GROUP, LLC; SONY MUSIC ENTERTAINMENT US LATIN LLC; VOLCANO ENTERTAINMENT III, LLC; ZOMBA RECORDINGS LLC; SONY/ATV MUSIC PUBLISHING LLC; EMI AI GALLICO MUSIC CORP.; EMI ALGEE MUSIC CORP.; EMI APRIL MUSIC INC.; EMI BLACKWOOD MUSIC INC.; COLGEMS-EMI MUSIC INC.; EMI CONSORTIUM MUSIC PUBLISHING INC., d/b/a EMI Full Keel Music; EMI CONSORTIUM SONGS, INC., d/b/a EMI Longitude Music; EMI FEIST CATALOG INC.; EMI MILLER CATALOG INC.; EMI MILLS MUSIC, INC.; EMI UNART CATALOG INC.; EMI U CATALOG INC.; JOBETE MUSIC COMPANY, INC.; STONE AGATE MUSIC; SCREEN GEMS-EMI MUSIC, INC.; STONE DIAMOND MUSIC CORP.; ATLANTIC RECORDING CORPORATION; BAD BOYS RECORDS LLC; ELEKTRA ENTERTAINMENT GROUP, INC.; FUELED BY RAMEN LLC; ROADRUNNER RECORDS, INC.; WARNER-TAMERLANE PUBLISHING CORP.; WB MUSIC CORP.; UNICHAPPELL MUSIC, INC.; RIGHTSONG MUSIC INC.; COTILLION MUSIC, INC.; INTERSONG U.S.A., INC.; UMG RECORDINGS, INC.; CAPITOL RECORDS, LLC; UNIVERSAL MUSIC CORP.; UNIVERSAL MUSIC – MGB NA LLC; UNIVERSAL MUSIC PUBLISHING INC.; UNIVERSAL MUSIC PUBLISHING AB; UNIVERSAL PUBLISHING LIMITED; UNIVERSAL MUSIC PUBLISHING MGB LIMITED; UNIVERSAL MUSIC – Z TUNES LLC; UNIVERSAL/ISLAND MUSIC LIMITED; UNIVERSAL/MCA MUSIC PUBLISHING PTY. LIMITED; POLYGRAM PUBLISHING, INC.; SONGS OF UNIVERSAL, INC.; WARNER RECORDS, INC., f/k/a W.B.M. Music Corp.,**

*Plaintiffs-Appellees*

and

**NONESUCH RECORDS INC.; WARNER BROS. RECORDS, INC.; WARNER CHAPPELL MUSIC, INC. f/k/a Warner/Chappell Music, Inc.;**

**W.C.M. MUSIC CORP., f/k/a W.B.M. Music Corp.; POLYGRAM INTERNATIONAL TUNES, INC.; UNIVERSAL – SONGS OF POLYGRAM INTERNATIONAL, INC.; UNIVERSAL POLYGRAM INTERNATIONAL PUBLISHING, INC.; MUSIC CORPORATION OF AMERICA, INC., d/b/a Universal Music Corporation; RONDOR MUSIC INTERNATIONAL,**

*Plaintiffs,*

v.

**COX COMMUNICATIONS, INC. AND COXCOM, LLC,**
*Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, 1:18-CV-00950-LO-JFA

*AMICUS CURIAE* **BRIEF OF NTCA – THE RURAL BROADBAND ASSOCIATION; CTIA – THE WIRELESS ASSOCIATION; AND USTELECOM – THE BROADBAND ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

David E. Weslow
Megan L. Brown
Ari S. Meltzer
Kevin G. Rupy
Adrienne J. Kosak
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
mbrown@wiley.law

*Counsel for NTCA – The Rural Broadband Association, CTIA – The Wireless Association, and USTelecom – The Broadband Association*

June 1, 2021

## <u>CORPORATE DISCLOSURE STATEMENT</u>

NTCA – The Rural Broadband Association, CTIA – The Wireless Association, and USTelecom – The Broadband Association ("Amici") are non-profit associations of service providers and suppliers for the telecom industry. Their members provide broadband internet access services to millions of consumers and businesses across the country. Amici have no parent corporations, and no publicly held corporation owns 10 percent or more of any of Amici's stock.

## STATEMENT REGARDING CONSENT TO FILE

All parties have consented to the filing of this brief.

Pursuant to Fed. R. App. P. 29(c), amici state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici or their counsel made a monetary contribution to the brief's preparation or submission.

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ..........................................i

STATEMENT REGARDING CONSENT TO FILE.............................. ii

TABLE OF CONTENTS........................................................... iii

TABLE OF AUTHORITIES .....................................................iv

INTEREST OF *AMICUS CURIAE*....................................................1

SUMMARY OF ARGUMENT ..........................................................3

ARGUMENT ...............................................................................7

I.    THE DISTRICT COURT ERRED BY FINDING THAT COX HAD SPECIFIC KNOWLEDGE OF INFRINGEMENT. .....................................7

     A.    ISPs Do Not Acquire Knowledge of Copyright Infringement from Deficient Notices. ........................................9

     B.    The Takedown Notices at Issue Here Fail to Provide Knowledge of Actionable Infringement............................15

II.   EXPANDING CONTRIBUTORY LIABILITY TO GENERAL KNOWLEGE IMPERMISSIBLY BURDENS ISPS AND IMPEDES FEDERAL TELECOMMUNICATIONS POLICY...................................19

CONCLUSION ...............................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  881 F.3d 293 (4th Cir. 2018) ........................................................................*passim*

*BMG Rights Mgmt. (US) LLC v. Cox Comms., Inc.*,
  149 F. Supp. 3d 634 (E.D. Va. 2015) ...............................................................14

*In re Application of the United States for an Order Pursuant to 18
  U.S.C. § 2703(d)*,
  830 F. Supp. 2d 114 (E.D. Va. 2011) ...............................................................12

*Lenz v. Universal Music Corp.*,
  815 F.3d 1145 (9th Cir. 2016) ...................................................................15, 18

*Malibu Media, LLC v. Doe*,
  No. 3:18-CV-01369 (JAM), 2020 WL 4719219 (D. Conn. Aug. 13,
  2020) ..................................................................................................................14

*Malibu Media, LLC v. Does 1-5*,
  No. 12 Civ. 2950(JPO), 2012 WL 2001968
  (S.D.N.Y. June 1, 2012) ....................................................................................14

*Malibu Media, LLC v. Fodge*,
  No. 14-7611 (KM) (JBC), 2016 WL 1337259
  (D.N.J. Apr. 5, 2016) .........................................................................................14

*Malibu Media, LLC v. Mantilla*,
  No. 3:18-cv-01369 (JAM), 2020 WL 6866678
  (D. Conn. Nov. 20, 2020) ..................................................................................14

*MGM v. Grokster, Ltd.*,
  545 U.S. 913 (2005)......................................................................................16, 27

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017).................................................................................23, 24

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
  494 F.3d 788 (9th Cir. 2007) ..........................................................................7, 27

iv

## TABLE OF AUTHORITIES
(continued)

**Page**

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)................................................................8, 10, 26, 27

*United States v. Carter*,
No. 20-CR-00253-VC-1, 2021 WL 1246772
(N.D. Cal. Apr. 5, 2021) ........................................................................26

*United States v. Eaglin*,
913 F.3d 88 (2d Cir. 2019) ...................................................................24

*United States v. LaCoste*,
821 F.3d 1187 (9th Cir. 2016) ..............................................................24

*United States v. Perazza-Mercado*,
553 F.3d 65 (1st Cir. 2009)...................................................................25

*United States v. Sealed Juv.*,
781 F.3d 747 (5th Cir. 2015) ................................................................24

**Statutes**

17 U.S.C. § 512(c) ..........................................................................8, 9, 10, 11

17 U.S.C. § 512(f)....................................................................................15

17 U.S.C. § 512(i)...............................................................................18, 26

47 U.S.C. § 230(b)(1)..............................................................................20

47 U.S.C. § 1302(a)................................................................................20

**Other Authorities**

144 Cong. Rec. H10615-10621 (1998)......................................................10

American Rescue Plan Act, 2021, H.R. 1319, 117th Cong., tit. VII, §
7402 (2021)...........................................................................................22

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N,
tit. IX, § 904, 134 Stat. 1182 (2020)...................................................22

# TABLE OF AUTHORITIES
(continued)

**Page**

FCC, "Emergency Broadband Benefit Providers,"
  https://www.fcc.gov/emergency-broadband-benefit-providers...........................23

FCC, "Keep Americans Connected,"
  https://www.fcc.gov/keep-americans-connected ................................................23

Feb. 10, 2021 Ltr. from the Consortium of School Networking to
  House Committee on Energy & Commerce,
  https://www.cosn.org/sites/default/files/Homework%20Gap%20Co
  alition%20letter-House%20E%26C%20re%20E-
  rate%20funds%202.10.21.pdf .......................................................................22

H.R. Rep. No. 105-551, pt. 2 ........................................................................10, 18

*In the Matter of COVID-19 Telehealth Program; Promoting
  Telehealth for Low-Income Consumers*, Report and Order and
  Order on Reconsideration, WC Dkt. 20-89; 18-213, FCC 21-39......................21

*In the Matter of Emergency Broadband Benefit Program*,
  Report and Order, WC Dkt. No. 20-445, FCC 21-29.........................................22

*In the Matter of Inquiry Concerning Deployment of Advanced
  Telecommunications Capability to All Americans in a Reasonable
  and Timely Fashion*, 36 FCC Rcd 836 (2021),
  https://docs.fcc.gov/public/attachments/FCC-21-18A1_Rcd.pdf .....................20

## INTEREST OF *AMICUS CURIAE*

Amici NTCA, CTIA, and USTelecom are leading trade associations representing broadband internet service providers ("ISPs") and suppliers for the telecommunications industry.

NTCA represents nearly 850 community-based voice and broadband service providers in the most rural parts of the United States, who deliver essential connectivity services in rural and small-town communities across the United States.

CTIA represents the wireless communications industry. Members include mobile and fixed wireless broadband Internet service providers, providers of other wireless services, device manufacturers, and other wireless industry participants.

USTelecom's member companies offer a wide range of services across communications platforms, including voice, video, and data over local exchange, long distance, wireless, internet, and cable. USTelecom's diverse member base ranges from large publicly traded communications corporations to small companies and cooperatives—providing advanced communications services to both urban and rural markets across the country.

Amici advocate on behalf of their members before Congress, regulators, and the courts for policies that will ensure all Americans have access to high-speed broadband connectivity and the ability to benefit from the opportunities broadband

enables. The associations regularly participate in advocacy to protect a fair and predictable legal environment for their members to offer critical services that connect America. *E.g.*, *New York State Telecommunications Assoc., Inc. v. James*, No. 2:21-cv-2389, Dkt. No. 1 (E.D.N.Y. Apr. 30, 2021). They also file amicus briefs in cases, like this, that threaten to harm the ability of American consumers to benefit from advanced communications services. *E.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Comms., Inc.*, No. 16-1972, Dkt. No. 31-1 (4th Cir. Nov. 14, 2016).

ISPs perform an essential function in the internet ecosystem by developing, operating, and maintaining the network infrastructure required to facilitate reliable, ubiquitous internet access. From 1996 through 2019, ISPs invested $1.78 trillion building out their networks, providing Americans with the capability to access the internet at dizzying speeds. The depth and breadth of broadband deployment across competing platforms has spurred a dynamic of competitive investment and innovation among networks, applications, content, and devices, providing substantial benefits to consumers and the United States economy. The import of these efforts became particularly clear over the past 14 months, as broadband networks sustained virtually all facets of American life during the COVID crisis.

Amici's members are adversely affected by the district court's decision finding that Appellees' notices of alleged infringement provided the requisite knowledge of infringement to support a contributory infringement claim. As a

result of the district court's decision, Amici's members could face an impossible choice: incur substantial potential liability for copyright infringement merely for transmitting content over their networks or participate in a system that forces service termination and unjustly deprives Americans of critical internet access without due process or other reasoned consideration.

In recent years, Amici's members have experienced a substantial increase in the volume of deficient notices and associated demands from copyright holders and their agents related to content transmitted over Amici's members' networks. One of Amici's members was bombarded with over two million notices in one day, causing the server for inbound copyright notices to crash. Deficient notices interfere with the business of Amici's members, make it virtually impossible to identify and respond to instances of actual copyright infringement, and threaten to deny consumers' access to the benefits of the internet by demanding that users' access be terminated.

## **SUMMARY OF ARGUMENT**

Amici urge the Court to reverse the district court's order granting summary judgment to Appellees. The district court's finding—that Cox had specific knowledge of infringement it could act on, based on its receipt of notices of alleged *past* infringement—raises grave public policy and practical implications. The Court should correct this decision and clarify when, if ever, a transmission ISP—

which does not host data, and instead acts as a mere conduit to transmit data for its customers—gains "specific knowledge" that its services are being used for infringing purposes and, therefore, must cut off a subscriber's access to what has become an indispensable tool for all aspects of American life.

First, the district court imputed knowledge to Cox based on non-specific and often equivocal information. The notices that purportedly conveyed this knowledge failed to meet analogous statutory requirements for specific knowledge and did not reasonably inform Cox of acts of direct infringement by its subscribers. The ruling also suggests that any subscriber whose IP address appears on a notice should have their internet service disconnected, without a finding of copyright infringement or even whether the IP address points to the actual "infringer." Thus, the ruling could force ISPs to terminate internet access to entire households and businesses based on unverifiable allegations of bad acts by some unidentified individual using the ISP's network to connect to the internet.

Second, the district court's ruling runs afoul of this Court's prior holding that for an ISP to be liable for contributory infringement, the ISP must possess knowledge that it can "*do* something about." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 312 (4th Cir. 2018). Transmission ISPs, by the nature of their services, cannot *do* anything to impact the alleged infringements identified in Appellees' notices because the alleged infringements already

4

occurred. At most, transmission ISPs can look at the notices and attempt a probability determination of whether a particular IP address is likely to be used for allegedly infringing activities again in the future. However, a probability determination is just that—a guess about what *might* occur rather than specific knowledge about what *will* occur.

The district court did not decide, nor could it have decided on summary judgment, whether Cox knew or willfully blinded itself to the substantial certainty of future infringement by each implicated subscriber. Nor did the district court articulate a reasonable standard for identifying that knowledge. Instead, the district court simply accepted (on summary judgment, no less) that if a particular IP address was identified in three notices of alleged infringement, Cox obtained specific knowledge that the subscriber associated with that IP address would commit copyright infringement in the future. This is neither a sound assumption given the variable content and validity of notices, nor is it realistic for mere conduit ISPs to process and make such determinations. Nevertheless, to insulate themselves from crushing liability, ISPs receiving unverified notices of alleged copyright infringement could be forced to take the only action within their control: cut off internet access to each user of an associated account based on the *mere possibility* that account may be the subject of future notices.

The consequences of the district court's decision could be staggering. This

5

new knowledge standard will encourage abuses of how copyright notices are sent. Transmission ISPs will receive more and more notices with limited information, to the point that meaningful processing will be impossible (to the extent it is not already). Fearing astronomical damages for secondary liability, transmission ISPs may have no choice but to terminate consumers' internet access on a massive scale. Businesses, schools, libraries, and households could lose access to what has become an essential service, based solely on accusations that some unidentified person connected through their router committed copyright infringement— accusations that mere conduit ISPs have neither the duty nor the ability to independently investigate. And the impacted businesses, schools, libraries, and households will have no meaningful recourse, with no method to dispute the copyright owners' claims.

This is a quintessential case of using a cannon to kill a mosquito. The consequences of denying consumers access to the internet based on unverified allegations of prior copyright infringement cannot be overstated. It has become particularly evident over the past year that the internet has become not only an essential platform for the exercise of free speech, but a critical means of access to education, employment opportunities, vaccines, medical care, defense and vindication of legal rights, and access to food and other essential products and services. The Federal Communications Commission ("FCC") has invested

significant resources in promoting the "virtuous cycle" to bring high-speed internet access to all Americans, and courts have recognized the severe deprivation posed by any attempts to limit access to the internet.  In this light, the district court's decision on summary judgment—a finding that notices with limited information not subject to verification create sufficient knowledge of infringement to impose liability on transmission ISPs—does not comport with either the law or public interest, and should be rejected.

## **ARGUMENT**

## I.    **THE DISTRICT COURT ERRED BY FINDING THAT COX HAD SPECIFIC KNOWLEDGE OF INFRINGEMENT.**

To prevail on a claim for contributory copyright infringement, a plaintiff must establish that the defendant "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007).  The district court found on summary judgment that Cox had knowledge of infringement by its residential and business customers, based on notices generated and sent on Appellees' behalf.  JA__ (Dkt. No. 610, "Op.").  The court concluded that because the notices that Appellees transmitted to Cox included some level of detail, the notices provided more than "generalized" knowledge, and were therefore sufficient to impute actionable knowledge of infringement to Cox.  Op. 18.

Amici strongly disagree with the district court's conclusion regarding Cox's knowledge of infringement. The information included in Appellees' notices could not provide Cox with actual knowledge of specific infringement that it could act upon. As this Court recently held, "the proper standard requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *BMG*, 881 F.3d at 311-12. These notices fail to provide information Cox could do something about, in at least two ways.

First, the information in the notices is limited, equivocal, and falls short even of the notice requirements set out in 17 U.S.C. § 512(c)(3). Second, by virtue of transmission ISPs' services, the notices could not provide actionable information to Cox. By the time Cox received the notices, the complained-of infringement was complete (if it happened at all), and Cox had no ability to prevent or ameliorate that infringement. The only reasonable theory under which the notices provided actionable information is that they informed Cox of users who might infringe again. But *likely* to infringe again is not the appropriate standard; the appropriate standard is *substantial certainty* that each subscriber would infringe again—which the district court did not and could not find on summary judgment. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434-42 (1984); *BMG*, 881 F.3d at 309-10.

In sum, the district court's ruling regarding Cox's knowledge of

8

infringement is inconsistent with established precedent and could force transmission ISPs, including Amici's members, to terminate all broadband service to subscribers based solely on equivocal, non-statutorily based allegations of prior infringement.  Given the potentially dire consequences such haphazard termination would impose upon the American public, this holding cannot stand.

A.    **ISPs Do Not Acquire Knowledge of Copyright Infringement from Deficient Notices.**

The notices sent to Cox by Appellees in this case are simply too vague to place transmission ISPs on notice of infringement, failing to meet even the Congressionally mandated threshold set out in analogous statutes.  In 17 U.S.C. § 512(c)(3), Congress mandated specific details to be given to hosted-content providers in order to provide them with valid notice of infringement.  The notice provision requires, *inter alia*: (1) identification of the copyrighted works allegedly infringed; (2) identification of the alleged infringing material, and information reasonably sufficient to permit the service provider to locate the material; (3) a statement that the complaining party has a good faith belief that the complained-of use is not authorized by the copyright owner, its agent, or the law; and (4) a statement that the information therein is accurate.  17 U.S.C. § 512(c)(3)(A).  If a notice fails to substantially comply with these requirements, it must be corrected prior to the ISP being deemed to have actual knowledge of the alleged infringing activity.  *Id.* § 512(c)(3)(B).

9

Given the parallels between these statutory notice requirements and the question of knowledge presented here, Congress's studied decision when creating the Digital Millennium Copyright Act ("DMCA") and careful balancing of competing interests should be given deference. *See Sony*, 464 U.S. at 431 ("Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology."). In striking this balance, Congress recognized the importance of providing service providers not only with "information reasonably sufficient . . . to identify and locate the allegedly infringing material," but also to "*examine* the allegedly infringing material expeditiously." H.R. Rep. No. 105-551, pt. 2, at 55 (emphasis added). Otherwise, "if America's service providers are subject to litigation for acts of third parties at the drop of a hat, they will lack the incentive to provide quick and efficient access to the Internet." 144 Cong. Rec. H10615-10621 (1998).

While Section 512(c)(3) establishes a minimum requirement for notices to providers of hosted content, mere conduits would need significantly *more* information than that set out in Section 512(c)(3) to be reasonably held to have knowledge. Unlike hosted content providers, which actually store and can control

10

access to content, transmission ISPs "only provide[] Internet access to [their] subscribers. Cox does not . . . store copyright-infringing material on its own computer servers, or control what its subscribers store on their personal computers." *See BMG*, 881 F.3d at 299.  Transmission ISPs have neither a duty nor reasonable means to monitor the transmissions by their subscribers.   They also have no ability to investigate completed transmissions to confirm the complained-of conduct.[1]  And unlike hosted content, which can be taken down as a targeted remedy and includes a process for the accused infringer to challenge the action taken, transmission ISPs have no ability to disable the alleged infringement other than through terminating internet access—which, as discussed in greater detail below, is an extreme punishment in the modern era, especially for unproven offenses.  It is unfathomable, then, that transmission ISPs can be expected to act based on information that is anything but complete, accurate, and verifiable— certainly, they cannot act on *less* information than that required by Section 512(c)(3).

The notices here did not provide the information required under Section 512(c)(3), nor did they rise to the level of specific information that Cox could have acted upon.  Among their material shortcomings, the notices often equivocated in their own assertions, including cautionary language that the target "may be liable,"

---

[1] Even if they could, there would be significant privacy implications to ISPs

and that the notices are "accurate, based upon the data available to us".  JA__ (Dkt. No. 404 at 28-29).  In many cases, the notices did not even identify the alleged infringing works.  *Id*.

Further, while the notices included passing reference to counter-notice procedures, they directed the recipient to contact the sender, "not Cox."  *See* Op. 18.  And, the notices impossibly shifted the burden to the recipient to prove the negative—that they did not engage in infringement—based on notices that offered only an IP address (which most customers would not know) and a date stamp. Requiring ISPs to accept these notices as true without any mechanism for verification or dispute is an affront to the due process of consumers and ISPs alike.

Another critical omission from the notices is the failure to identify the alleged infringer with enough particularity for an ISP to act.  As mentioned above, these notices provided only an IP address and a time stamp, relying on the ISP to identify the customer who was assigned to that IP address at that time.  Given the dynamic nature of IP assignments, if the time used by the copyright owner is not perfectly synced with the time used by the ISP, it could result in the ISP identifying the wrong subscriber.  *See, e.g.*, *In re Application of the United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d 114, 120 (E.D. Va.

---

accessing subscribers' computers or investigating subscribers' internet histories.

2011) (noting dynamic IP addressing, in which a particular customer's IP address can change each time she logs onto the internet).

Even if the IP address accurately identified the subscriber named on the account, the notice did not necessarily identify the individual responsible for the alleged infringement—be it a family member, a guest in the household, or someone unknown to the subscriber taking advantage of an unsecured network. The District of Connecticut addressed this issue quite plainly in a recent decision denying default judgment on copyright claims:

> Imagine that someone accesses the internet via a particular internet protocol ("IP") address and illegally downloads movies. That IP address was assigned by an internet service provider ("ISP") to one of its subscriber accounts. Is it fair to say that the ISP account subscriber—the person who pays the internet bill—is the individual who must have engaged in the illegal activity and who should pay a large damages award if he or she does not appear in court to deny doing anything wrong? At a time when wireless internet networks and personal electronic devices are ubiquitous, and when network passwords, logins for TV streaming services, and Amazon accounts are freely shared with family, friends, roommates, businesses, and even strangers, I don't think so.

13

*Malibu Media, LLC v. Doe*, No. 3:18-CV-01369 (JAM), 2020 WL 4719219, at *1 (D. Conn. Aug. 13, 2020).[2]  Likewise, should a transmission ISP be found to have knowledge of its customer's copyright infringement, such that it must either terminate that customer's access or face extraordinary liability, when it has no information that its customer is the person who allegedly infringed?[3]  The clear answer is no.  *Cf. BMG*, 881 F.3d at 311 (finding that information that did not show which subscribers were infringing provides only "generalized knowledge [that] does not reflect an intent to cause infringement").

The problems with the notices increase exponentially when considered in context.  Transmission ISPs can receive thousands (or millions) of notices each day.  Their ability to process the notices is limited (e.g., by insufficient information

---

[2] This *Malibu Media* case is just one in a line of cases filed by a notorious copyright troll, prompting numerous courts to push back on the idea that IP addresses constitute sufficient evidence to hold individuals responsible for internet copyright infringement.  *See, e.g.*, *Malibu Media, LLC v. Does 1-5*, No. 12 Civ. 2950(JPO), 2012 WL 2001968, at *1 ("S.D.N.Y. June 1, 2012); *Malibu Media, LLC v. Fodge*, No. 14-7611 (KM) (JBC), 2016 WL 1337259, at *3 (D.N.J. Apr. 5, 2016); *Malibu Media, LLC v. Mantilla*, No. 3:18-cv-01369 (JAM), 2020 WL 6866678, at *1 (D. Conn. Nov. 20, 2020).

[3] Appellees and the district court quoted *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, for the proposition that "[w]hile identity is a key issue in many individual infringement suits, it has little relevance in a large-scale secondary liability suit."  149 F. Supp. 3d 634, 664 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018) ("*BMG I*"); Op. 23.  But to simply dismiss individual identity in this manner fails to see the forest for the trees.  Indeed, Appellees went on to distinguish the *Cobbler Nev., LLC v. Gonzalez* decision because that case addressed "concerns about imposing duties and liability upon private internet subscribers."  Op. 23.  Those same private internet subscribers will feel the brunt of the district court's decision here; if this sweeping finding regarding knowledge stands, transmission ISPs may be forced to swiftly terminate those private subscribers' access based on nonspecific notices.

14

and time constraints), much less investigate the notices to determine if they warrant termination of a customer's essential access to the internet or even hint at possible repeat infringement. By imputing knowledge to mere conduit ISPs based on notices that cannot meet even the Congressional standard for hosted content providers, the district court placed an insurmountable burden on the ISPs' shoulders. It cannot be that transmission ISPs must blindly accept all notices, regardless of content, and terminate subscribers' access to the internet based on unproven and unverifiable allegations.

### B. The Takedown Notices at Issue Here Fail to Provide Knowledge of Actionable Infringement.

The district court's decision also fails because the notices relating to prior infringement of the claimant's works, considered en masse, do not provide knowledge of *actionable* infringement.[4] For an ISP to be contributorily liable for copyright infringement, it must both have knowledge of infringement and materially contribute to *that* infringement. Op. 15 (emphasis added). The notices at issue here did not provide Cox with knowledge sufficient to act on the infringement the notices identified. Transmission ISPs do not host data, but rather

---

[4] Deficient notices misdirected to transmission ISPs also increase the likelihood that copyright owners will violate 17 U.S.C. § 512(f). Section 512(f) requires the copyright owner to consider fair use and other non-infringing uses before sending such notices. Transmission ISPs, as mere conduits, would have no way to see the allegedly infringing material, much less determine if the copyright owner has met its duty to consider permissible uses of such material. *See Lenz v. Universal Music Corp.*, 801 F.3d 1126 (9th Cir. 2015).

facilitate the transmission of data. Upon receiving notice of copyright infringement, Amici's members cannot go to a site or server location, identify the alleged infringing material, and take that material down. By the time they learn of the alleged infringement, the transmission is long-since complete. The ISP has no means to prevent that infringement, nor any means to alter or even review what happened.

Implicit, then, in the district court's order is the assumption that once a subscriber has been accused of past copyright infringement, an ISP must act to prevent that subscriber from possibly infringing *again* in the future. But the relevant question cannot be simply whether the subscriber has allegedly infringed in the past. *See MGM v. Grokster, Ltd*., 545 U.S. 913, 937 (2005) ("[M]ere knowledge of infringing potential or of actual infringing uses would not be enough to subject a distributor to liability."); *BMG*, 881 F.3d at 312 (requiring knowledge that the ISP can "*do* something about"). The question is whether the particular subscriber in question *will* infringe again—whether "infringement is substantially certain to result from Cox's continued provision of Internet access to particular subscribers." *BMG*, 881 F.3d at 311.

When considering the proper question—whether Cox knew or willfully blinded itself to the *substantial certainty* that particular subscribers will infringe again—it is clear that the district court's decision was both procedurally and

substantively inappropriate. Procedurally, the question of knowledge of a particular subscriber's actions and likelihood that the subscriber would infringe again is a highly fact specific inquiry, poorly suited for summary judgment. Certainly, it is not appropriate to determine whether each subscriber will infringe again from only a few representative notices, as the court did here. *See* Op. 18.

Substantively, the district court relied on an arbitrary standard that does not provide nearly enough information for Cox to have actionable knowledge. The court appears to have adopted Appellees' position that three notices of alleged infringement for a single subscriber is sufficient to impute knowledge to a transmission ISP. Op. 3. Such a bright line approach is both deficient and ripe for error. First, to assume knowledge based on a threshold number of notices—of which the content is variable and the veracity is unknown—is to replace the knowledge requirement with a probability determination: after a certain number of notices, is it likely a particular user will engage in future infringement?[5] Amici see no daylight between this probability determination and the "should have known" negligence standard rejected in *BMG,* 881 F.3d at 310.

Second, the number of notices alone cannot serve as a reliable proxy for actual knowledge. There is no law, either enacted by Congress or decided by

---

[5] The record before the district court suggested just the opposite—that most customers receiving notices were not likely to receive another. *See* Dkt. No. 27 at 42.

courts, identifying the number of alleged infringements that are "allowed" before an ISP is required to disconnect the customer's service.[6]  Indeed, 17 U.S.C. § 512(i) dictates just the opposite, encouraging the service provider to use a flexible and careful approach to termination by reasonably implementing a policy for repeat infringers, and enforcing it in "appropriate circumstances."[7]  Furthermore, as addressed above, the information provided in notices can be variable and equivocal.  Subscribers should be given an opportunity to contest such notices.  *See generally Lenz*, 815 F.3d 1145 (finding that copyright owner could be liable for material misrepresentations to service provider).  And, in instances similar to the present case in which Appellees specifically directed targets *not* to contact Cox, ISPs may be unaware of the resolution of such contests.  How can a transmission ISP be held to a standard of actual knowledge or willful blindness based on standards not set by Congress, that bear little resemblance to real-world knowledge of actual infringement?

---

[6] Further complicating a transmission ISP's ability to take meaningful action to prevent infringement, there is no law specifying how long a customer's service must be disconnected or even ways to prohibit the subscriber from quickly switching to another ISP (assuming there is another one in the location where the subscriber resides).

[7] In explaining this flexible standard, Congress noted that not all accusations of infringements are created equal—"that there are different degrees of on-line copyright infringement, from the inadvertent and noncommercial, to the willful and commercial"—and that this standard was not intended to undermine providers' protections "by suggesting that a provider must investigate possible infringements, monitor its services, or make difficult judgments as to whether conduct is or is not infringing." H.R. Rep. No. 105-551, pt. 2, at 61.

Third, Appellees' three-notice threshold is untenable.  Transmission ISPs receive, at times, *millions of notices a day*.  Two notices could come in for one IP address in a single day—or a single hour.  If the ISP has not had time to process those notices and act accordingly by the time the third notice rolls in, can it really be said that the ISP *knowingly* contributed to infringement?[8]  The sheer number of notices, without context regarding timing, processing, and content, provides no meaningful information regarding what an ISP knew, when it knew it, and whether remedial actions were appropriate.

The district court's decision on summary judgment, that Cox possessed actionable knowledge of infringement based on a bulk assessment of unverifiable notices of *past* acts of alleged infringement, diminishes the knowledge standard that this Court tightened just a few years ago.  The implications of relaxing this standard could be devastating, given the critical nature of the non-infringing uses of ISP service.

## II.     EXPANDING CONTRIBUTORY LIABILITY TO GENERAL KNOWLEGE IMPERMISSIBLY BURDENS ISPS AND IMPEDES FEDERAL TELECOMMUNICATIONS POLICY.

Amici cannot overstate the importance of considering the real-world implications of the district court's decision regarding knowledge.  Cox was hit with

---

[8] Further, ISPs may receive multiple notices for the same copyrighted work.  ISPs have no clear guidance on whether these must count as one notice (as they may reflect only a single act of infringement) or multiple notices for the purposes of determining when termination is appropriate.

a *$1 billion* judgment, not for any affirmative act of infringement by Cox, but for not acting expeditiously in terminating large numbers of customers' access to the internet.  The court's decision—that mere conduit ISPs gain knowledge of prospective infringement based on the sheer number of notices, regardless of their validity or veracity—could open all transmission ISPs to significant risk of similar findings unless they discontinue internet access to entire households and business. This is contrary to Congress and the FCC's goal of increasing access to the internet to advance the "virtuous cycle" of innovation and growth.

Indeed, the exponential growth in access to the internet is no accident.  It is a direct result of federal policies designed "to promote the continued development of the Internet," 47 U.S.C. § 230(b)(1), and "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans," 47 U.S.C. § 1302(a).  ISPs have made great gains in recent years to the benefit of Americans who previously lacked access to high-speed broadband services.  In 2019, the number of Americans living in areas without access to high-speed internet service dropped from 18.1 million to 14.5 million, with the great majority of those gains in rural areas. *See In the Matter of Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 36 FCC Rcd 836, 837 (2021), https://docs.fcc.gov/public/attachments/FCC-21-18A1_Rcd.pdf.   Further, mobile

providers have decreased the number of Americans lacking access to 4G LTE
mobile broadband by 57%. *Id.* By the end of 2019, 94% of Americans had access
to both fixed and mobile broadband service. *Id.* at 837-38.

The district court's decision could cause a significant backslide in these
efforts, and the effects of the decision will be felt most acutely by consumers who
run the risk of losing access to what has become a truly essential service. Since the
onset of the COVID-19 pandemic, the value of reliable Internet service has never
been clearer. Increasingly, entire households depend on a single high-speed
Internet connection for critical activities such as virtual learning, telework, medical
visits, and more. This increased dependency has been repeatedly noted:

- The FCC found an "explo[sion]" in the use of telehealth in response to the
  pandemic—a "vital tool" to providing patient care while minimizing risk of
  exposure to COVID-19. *See In the Matter of COVID-19 Telehealth
  Program; Promoting Telehealth for Low-Income Consumers*, Report and
  Order and Order on Reconsideration, WC Dkt. No. 20-89; 18-213, FCC 21-
  39, at 2 ¶ 1 (Mar. 30, 2021), https://docs.fcc.gov/public/attachments/FCC-
  21-39A1.pdf.

- The FCC has recognized that the emphasis on virtual learning, telemedicine,
  and telework during the pandemic "has only increased every household's
  need for access to broadband services." *See In the Matter of Emergency*

*Broadband Benefit Program*, Report and Order, WC Dkt. No. 20-445, FCC 21-29, at 2 ¶ 1 (Feb. 26, 2021), https://docs.fcc.gov/public/attachments/FCC-21-29A1.pdf.

- The Consortium of School Networking recently urged Congressional action to address the "cruelest aspect of the digital divide": children without Internet connectivity who are "unable to participate in online learning, after-school enrichment, and programs that help address loss of opportunities to learn during this difficult time." Feb. 10, 2021 Ltr. to House Committee on Energy & Commerce, https://www.cosn.org/sites/default/files/Homework%20Gap%20Coalition%20letter-House%20E%26C%20re%20E-rate%20funds%202.10.21.pdf.

In recognition of the significantly increased need for internet accessibility, Congress committed billions of dollars to increase accessibility and capabilities. *See, e.g.*, American Rescue Plan Act, 2021, H.R. 1319, 117th Cong., tit. VII, § 7402 (2021) (establishing the $7.171 billion Emergency Connectivity Fund to help schools and libraries provide connectivity to students, staff, and patrons); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N, tit. IX, § 904, 134 Stat. 1182, 2130 (2020) (establishing the $3.2 billion Emergency Connectivity Fund to help Americans afford internet service during the pandemic). Industry has rallied around these efforts, with over 800 companies signing up to participate in

the Emergency Broadband Benefit program, *see* https://www.fcc.gov/emergency-broadband-benefit-providers, and 800 companies and associations pledging, *inter alia*, to "not terminate service to any residential or small business customers because of their inability to pay their bills due to the disruptions caused by the coronavirus pandemic," *see* FCC, "Keep Americans Connected," https://www.fcc.gov/keep-americans-connected.

Numerous courts also have addressed the increasing essentiality of internet access and have taken an appropriately cautious approach to actions that would deprive Americans of this resource. Even in cases where the alleged wrongdoers' actions are deeply damaging to society and public safety, courts are extremely reluctant to terminate internet access. In *Packingham v. North Carolina*, the Supreme Court struck down a law making it a felony for registered sex offenders to access certain social media, finding that it prevented the impacted individuals' ability to legitimately exercise their First Amendment rights. 137 S. Ct. 1730, 1737 (2017). In so holding, the Supreme Court emphasized the importance of internet access, noting that the law "bars access to what for many are principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id.*

Expanding upon *Packingham*, the Second Circuit in *United States v. Eaglin* was reluctant to terminate internet access even for an individual convicted of felonious sexual assault of children.  913 F.3d 88 (2d Cir. 2019).  The Second Circuit found that "the imposition of a total Internet ban as a condition of supervised release inflicts a severe deprivation of liberty." *Id.* at 97.  Its reasoning rested in part on the "essential" nature of the internet, "as it provides avenues for seeking employment, banking, accessing government resources, reading about current events, and educating oneself." *Id.* at 98.  "[T]o consign an individual to a life virtually without access to the Internet is to exile that individual from society." *Id.* at 91.

Many other circuits have reached similar conclusions regarding the importance of internet access.  *See, e.g.*, *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016) ("Use of the Internet is vital for a wide range of routine activities in today's world—finding and applying for work, obtaining government services, engaging in commerce, communicating with friends and family, and gathering information on just about anything, to take but a few examples. Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult to participate fully in society and the economy."); *United States v. Sealed Juv.*, 781 F.3d 747, 756 (5th Cir. 2015) ("We must recognize that access to computers and the Internet is essential to functioning in today's society. The

Internet is the means by which information is gleaned, and a critical aid to one's education and social development."); *United States v. Perazza-Mercado*, 553 F.3d 65, 72 (1st Cir. 2009) ("[W]e must be cognizant of the importance of the internet in today's world. An undue restriction on internet use 'renders modern life—in which, for example, the government strongly encourages taxpayers to file their returns electronically, where more and more commerce is conducted on-line, and where vast amounts of government information are communicated via website—exceptionally difficult.' . . . In light of the 'ubiquitous presence' of the internet and the 'all-encompassing nature of the information it contains,' a total ban on [defendant's] internet use at home seems inconsistent with the vocational and educational goals of supervised release." (internal citations omitted)).  Most recently, the Northern District of California found restrictions on internet access by a child pornography offender to be unduly broad, in light of the significant, growing, and ever-changing nature of the internet:

> [T]he internet has become, for many people, a primary source of news and social interaction, and a primary means of buying food, looking for jobs, and booking transportation. Partially in recognition of the internet's growing importance, the Second, Third, Seventh, Eighth, and Tenth Circuits have all held that conditions of release banning internet use (or conditioning use on the prior approval of a probation officer) are unreasonable. The role that the internet plays in society has dramatically increased even in the last twenty years, and will undoubtedly continue to change in unforeseen ways in

> the future. The restrictions imposed on child pornography
> offenders must account for these changes.

*United States v. Carter*, No. 20-CR-00253-VC-1, 2021 WL 1246772, at *1 (N.D.

Cal. Apr. 5, 2021) (internal citations omitted).

In this context, the district court's decision simply cannot stand. It is unconscionable that courts would recognize the need for a more permissive approach to internet access for convicted sex offenders while, at the same time, applying copyright law in a manner that could force transmission ISPs to terminate internet access for ever increasing numbers of consumers—who have not even been convicted of the action alleged. In light of courts' recognition of the essential nature of the internet, it is contrary to public interest[9] to force ISPs to cut off an entire household's or business' internet access, based not on convictions of heinous crimes, but rather on equivocal and unverifiable allegations of past copyright infringement by an unknown party.

The district court, and other courts in the past, have understandably shown regard for the difficulty copyright holders experience pursuing direct infringement claims. *E.g.*, Op. 24; *Sony*, 464 U.S. at 442 (noting the need for "effective—not merely symbolic—protection of the statutory monopoly"). But the district court's opinion here swings the pendulum too far in the other direction. To give copyright

---

[9] And again, it is also contrary to Congressional intent in enacting the DMCA, which dictates a flexible approach to terminating repeat infringers. *See* 17 U.S.C. § 512(i).

holders easier recourse, the district court has potentially set America on a path toward one of two unacceptable results: either (1) transmission ISPs fold under crippling liability judgments, or (2) ISPs avoid liability by cutting off internet connections to entire businesses and households based on equivocal and unverifiable notices, in ways that could be arbitrary and unjust. Courts cannot and should not prioritize copyright holders' ease of access to recourse above all else—they "must strike a balance between a copyright holder's legitimate demand for effective . . . protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce." *Sony*, 464 U.S. at 442; *see also id.* at 431-32 (noting that copyright law must always be construed in light of its purpose to serve the public interest); *Grokster*, 545 U.S. at 928 ("The more artistic protection is favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff."); *Perfect 10*, 494 F.3d at 794-95 ("We evaluate [plaintiff's] claims with an awareness that credit cards serve as the primary engine of electronic commerce and that Congress has determined it to be the 'policy of the United States—(1) to promote the continued development of the Internet and other interactive computer services and other interactive media [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.' . . . To find that

27

Defendants' activities fall within the scope of such tests would require a radical and inappropriate expansion of existing principles of secondary liability and would violate the public policy of the United States.").  By requiring ISPs to err on the side of prophylactic termination, the district court decision could have devastating and unjust effects on consumers and America's internet success story.

## **CONCLUSION**

The Court should reverse the district court's ruling on summary judgment regarding Cox's knowledge of infringement, and remand for reconsideration of contributory infringement based on actual knowledge of infringement or willful blindness thereof.

Respectfully submitted,


/s/  Megan L. Brown
David E. Weslow
Megan L. Brown
Ari S. Meltzer
Kevin G. Rupy
Adrienne J. Kosak
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
mbrown@wiley.law

*Counsel for NTCA – The Rural Broadband Association, CTIA – The Wireless Association, and USTelecom – The Broadband Association*

June 1, 2021

29

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because this brief contains 6479 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman, 14 point.

<u>     /s/   Megan L. Brown                    </u>

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2021, the foregoing brief was filed electronically using the Court's CM/ECF system, which will send notification of such filing to party counsel, all of whom are registered ECF filers.


<u>            /s/   Megan L. Brown            </u>