# No. 21-1168

IN THE

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

SONY MUSIC ENTERTAINMENT, ET AL,

*Plaintiffs-Appellees,*

*v.*

COX COMMUNICATIONS, INC. AND COXCOM, LLC

*Defendants-Appellants.*

(See full caption on inside cover)

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:18-cv-950 (LO/JFA)
Honorable Liam O'Grady

## BRIEF OF *AMICUS CURIAE* INTERNET COMMERCE COALITION IN SUPPORT OF DEFENDANTS-APPELLANTS' APPEAL SEEKING REVERSAL

Andrew L. Deutsch
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California  90067
(310) 595-3000

June 1, 2021

# 21-1168

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————

SONY MUSIC ENTERTAINMENT, ARISTA MUSIC; ARISTA RECORDS,
LLC; LAFACE RECORDS LLC; PROVIDENT LABEL GROUP, LLC; SONY
MUSIC ENTERTAINMENT US LATIN LLC; VOLCANO ENTERTAINMENT
III, LLC; ZOMBA RECORDINGS LLC; SONY/ATV MUSIC PUBLISHING
LLC; EMI AI GALLICO MUSIC CORP.; EMI ALGEE MUSIC CORP.; EMI
APRIL MUSIC INC.; EMI BLACKWOOD MUSIC INC.; COLGEMS-EMI
MUSIC INC.; EMI CONSORTIUM MUSIC PUBLISHING INC., d/b/a EMI Full
Keel Music; EMI CONSORTIUM SONGS, INC., d/b/a EMI Longitude Music;
EMI FEIST CATALOG INC.; EMI MILLER CATALOG INC.; EMI MILLS
MUSIC, INC.; EMI UNART CATALOG INC.; EMI U CATALOG INC.;
JOBETE MUSIC COMPANY, INCORPORATED; STONE AGATE MUSIC;
SCREEN GEMS-EMI MUSIC, INCORPORATED; STONE DIAMOND MUSIC
CORP.; ATLANTIC RECORDING CORPORATION; BAD BOYS RECORDS
LLC; ELEKTRA ENTERTAINMENT GROUP, INCORPORATED; FUELED
BY RAMEN LLC; ROADRUNNER RECORDS, INC.; WARNERTAMERLANE
PUBLISHING CORPORATION; WB MUSIC CORPORATION;
UNICHAPPELL MUSIC, INCORPORATED; RIGHTSONG MUSIC INC.;
COTILLION MUSIC, INCORPORATED; INTERSONG U.S.A., INC.; UMG
RECORDINGS, INCORPORATED; CAPITOL RECORDS, LLC; UNIVERSAL
MUSIC CORPORATION; UNIVERSAL MUSIC -MGB NA LLC; UNIVERSAL
MUSIC PUBLISHING INC.; UNIVERSAL MUSIC PUBLISHING AB;
UNIVERSAL PUBLISHING LIMITED; UNIVERSAL MUSIC PUBLISHING
MGB LIMITED; UNIVERSAL MUSIC - Z TUNES LLC;
UNIVERSAL/ISLAND MUSIC LIMITED; UNIVERSAL/MCA MUSIC
PUBLISHING PTY. LIMITED; POLYGRAM PUBLISHING, INC.; SONGS OF
UNIVERSAL, INC.; WARNER RECORDS, INC., f/k/a W.B.M. Music Corp.;
WARNER CHAPPELL MUSIC, INC., f/k/a Warner/Chappell Music, Inc.;
W.C.M. MUSIC CORP., f/k/a W.B.M. Music Corp.

*Plaintiffs–Appellees*

and

NONESUCH RECORDS INC.; WARNER BROS. RECORDS, INC.;
WARNER/CHAPPELL MUSIC, INC.; W.B.M. MUSIC CORP.; UNIVERSAL -
POLYGRAM INTERNATIONAL TUNES, INC.; UNIVERSAL - SONGS OF
POLYGRAM INTERNATIONAL, INC.; UNIVERSAL POLYGRAM
INTERNATIONAL PUBLISHING, INC.; MUSIC CORPORATION OF
AMERICA, INC., d/b/a Universal Music Corporation; RONDOR MUSIC
INTERNATIONAL,

*Plaintiffs,*

v.

COX COMMUNICATIONS, INC. and COXCOM, LLC

*Defendants–Appellants.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-1168_        Caption: _Sony Music Entertainment et al v. Cox Communications, Inc. et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

Internet Commerce Coalition
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew L. Deutsch                     Date:      June 1, 2021

Counsel for: Amicus Internet Commerce Coalition

Print to PDF for Filing

# **TABLE OF CONTENTS**

Page

RULE 29(a)(4)(E) STATEMENT ............................................................1

STATEMENT OF CONSENT TO FILE *AMICUS* BRIEF .....................1

CORPORATE DISCLOSURE STATEMENT .......................................1

INTEREST OF *AMICUS CURIAE* ......................................................2

ARGUMENT .........................................................................................10

I     THE DISTRICT COURT ERRED IN FINDING COX VICARIOUSLY
LIABLE FOR ITS SUBSCRIBERS' INFRINGING ACTS .......................10

II    THE DISTRICT COURT ERRED IN APPLYING THE KNOWLEDGE
ELEMENT FOR CONTRIBUTORY COPYRIGHT LIABILITY .............17

      A.    The Principles Underlying the Knowledge Element...........................17

      B.    The District Court Misapplied the Knowledge Requirement .............22

CONCLUSION ......................................................................................28

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A & M Records v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ................................................................12

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ................................................................20

*BMG Rights Mgmt. (US) LLC v. Cox Comms., Inc.*,
  881 F.3d 293 (4th Cir. 2018) ...................... 2, 5, 8, 17, 19, 20, 21, 22, 24, 26, 27

*Capitol Records, LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) ....................................................................9

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) .......................................................11, 13, 14, 15

*EMI Christian Music Grp., Inc. v. MP3Tunes, LLC*,
  844 F.3d 79 (2d Cir. 2016) ................................................................9, 12

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)...........................................................................20

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
  ____ U.S. ___., 136 S. Ct. 1923 (2016)............................................................23

*MGM Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)...................................................................10, 11, 19

*Packingham v. North Carolina*,
  ___ U.S. ___, 137 S. Ct. 1730 (2017)............................................................3, 4

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) .........................................................11, 14, 15

*Perfect 10 v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ................................................................24, 25

ii

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................................18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) .............................................................................................10

*Sony Music Entertainment v. Cox Communs., Inc.*,
   426 F. Supp. 3d 217 (E.D. Va. 2019) .......................................2, 5, 17, 22, 24, 25

*Sony Music Entertainment v. Cox Communs., Inc.*,
   464 F. Supp. 3d 795 (E.D. Va. 2020) ...........................................2, 5, 11, 14, 15

*United States v. Becerra*,
   835 F. App'x. 751 (5th Cir. 2021) ......................................................................4

*United States v. Ellis*,
   984 F.3d 1092 (4th Cir. 2021) .........................................................................4, 7

*United States v. Holena*,
   906 F.3d 288 (3d Cir. 2018) ...............................................................................4

*United States v. Holm*,
   326 F.3d 872 (7th Cir. 2003) ...............................................................................4

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) ..................................................................................9

**Federal Statutes**

17 U.S.C. § 512(i) ......................................................................................................8

17 U.S.C. § 512(i)(1)(A) ............................................................................................8

17 U.S.C. § 512(a) ...............................................................................................8, 9

17 U.S.C. § 512(*l*) .....................................................................................................8

**Rules**

Federal Rules of Appellate Procedure 29(a)(4)(E) ...................................................1

Federal Rules of Civil Procedure 50 .......................................................................22

Federal Rules of Civil Procedure 59 .......................................................................22

**Other Authorities**

Bridy, Annemarie, "Addressing Infringement: Developments in
    Content Regulation in the US and the DNS, The Oxford Handbook
    of Intermediary Liability Online (ed. Giancarlo Frosio), at 640
    (2020) ............................................................................................................6

https://www.pewresearch.org/fact-tank/2020/12/18/what-weve-
    learned-about-americans-views-of-technology-during-the-time-of-
    covid-19/ (last accessed May 30, 2021) .............................................................3

Urban, Jennifer M. and Karaganis, Joe and Schofield, Brianna, Notice
    and Takedown in Everyday Practice (March 22, 2017). UC
    Berkeley Public Law Research Paper No. 2755628, at 88
    (available at SSRN: https://ssrn.com/abstract=2755628)....................................6

## RULE 29(a)(4)(E) STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* Internet Commerce Coalition states that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *amicus*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.[1]

## STATEMENT OF CONSENT TO FILE *AMICUS* BRIEF

All parties to this appeal have consented to the filing of this *amicus curiae* brief.

## CORPORATE DISCLOSURE STATEMENT

The Internet Commerce Coalition is a nonprofit corporation incorporated under the laws of Maryland.  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

---

[1]  Defendant-Appellant Cox Communications, Inc. ("Cox") is one of four members of *amicus* Internet Commerce Coalition, but neither Cox nor its counsel has contributed any money intended to fund this brief's preparation or submission, and its counsel has not authored this brief in whole or in part.  Any reference herein to the functions of members of the Internet Commerce Coalition should be read as not including Cox.

## INTEREST OF *AMICUS CURIAE*

*Amicus* Internet Commerce Coalition ("ICC"), whose members are AT&T Inc., Comcast Corporation, Google LLC and Cox Communications, Inc., promotes the widespread deployment of robust, affordable high speed Internet service for the American public.  ICC members function nationwide as "conduit" Internet service providers (ISPs) in providing Internet access to over 43 million subscribers.[2]  ICC has a strong interest in ensuring that the Copyright Act, as applied to the Internet, is uniformly interpreted, and that courts act consistently with Congress's intention to foster growth of the Internet with a minimum of regulation, as expressed in the Digital Millennium Copyright Act ("DMCA") and other statutes.[3]

The appealed-from decisions and judgment of the Eastern District of Virginia[4] ignored this Court's precedent, erroneously expanded the scope of contributory and vicarious liability of ISPs for copyright infringement, and should be reversed. As explained below, these rulings misapprehend this Court's ruling in

---

[2]     This and other data concerning ICC members does not include Cox data.

[3]     ICC has a long-standing interest in these issues, as shown by the *amicus* brief it filed in *BMG Rights Mgmt. (US) LLC v. Cox Comms., Inc.*, 881 F.3d 293 (4th Cir. 2018) ("*BMG*").

[4]     *Sony Music Entertainment v. Cox Communs., Inc. I*, 426 F. Supp. 3d 217, 236 (E.D. Va. 2019) ("*Sony I*"); *Sony Music Entertainment v. Cox Communs., Inc.*, 464 F. Supp. 3d 795, 813 (E.D. Va. 2020) ("*Sony II*").

*BMG* and conflict with limitations on secondary liability that have been uniformly applied in other circuits. The primary purpose of this *amicus* brief, however, is not to point out the district court's errors. It is to explain, from ICC's unique perspective, the serious adverse consequences that ISPs, and ultimately all Internet-using Americans, could suffer if those errors are not corrected by this Court.

The vast majority of Americans use the Internet every day for a wide range of lawful purposes, including communication, work, education, entertainment, commerce, and social connection. The COVID-19 pandemic has highlighted how vital Internet access is to daily life: 53% of Americans recently described the Internet as essential to their lives and another 34% as important to them personally. https://www.pewresearch.org/fact-tank/2020/12/18/what-weve-learned-about-americans-views-of-technology-during-the-time-of-covid-19/ (last accessed May 30, 2021).

Today, the Internet also enables access to First Amendment-protected expression and information. In *Packingham v. North Carolina*, ___ U.S. ___, 137 S. Ct. 1730, 1736 (2017), the Supreme Court noted that for many, the Internet provides "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. . . . [T]o foreclose

3

access to social media altogether is to prevent the user from engaging in the

legitimate exercise of First Amendment rights." (internal citation omitted).[5]

It is unavoidable that some people will use Internet service for improper

purposes, just as, once invented, telephones were used for wire fraud.

*Packingham*, ___ U.S. at ___, 137 S. Ct. at 1736.  But the baby is far more

valuable than the bathwater, and overzealous regulation that denies vital Internet

service to the public because of some misuse should be avoided.  Courts have

understood this problem in the sphere of copyright and have accordingly imposed

reasonable limitations on the scope of secondary liability.

First, vicarious liability requires proof of direct financial benefit to the

defendant from another's copyright infringement.  But since all subscribers

(including infringers) pay a monthly fee for Internet access, courts have agreed that

an ISP's receipt of such fees is not sufficient to meet this burden. *See infra* at 11.

Instead, the plaintiff must show in addition that the customer was "drawn" to use

---

[5] *Id.* at 1736 (internal citation omitted).  The vital nature of Internet access has also
been recognized in criminal sentencing, where sentences imposing sweeping bans
on Internet use have been repeatedly vacated.  As this Court recently said in *United
States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021), "[a] complete ban on internet
access is a particularly broad restriction . . . ."  *See also United States v. Becerra*,
835 F. App'x. 751, 756 (5th Cir. 2021); *United States v. Holena*, 906 F.3d 288, 294
(3d Cir. 2018); *United States v. Holm*, 326 F.3d 872, 878 (7th Cir. 2003) ("[S]uch a
ban renders modern life . . . exceptionally difficult").

4

the defendant's Internet service (as opposed to any other Internet service) because of the availability of infringing copies of the plaintiff's works. *See infra* at 12-14.

Second, because infringement occurs on all Internet networks, this Court, in *BMG*, refused to impose contributory liability on an ISP simply because it had generalized knowledge that some customers will use the ISP's Internet service to infringe. *See infra* at 21. Instead, contributory liability can be imposed only where an ISP knows of (or willfully blinds itself to) specific acts of infringement by particular subscribers and *also* knows "that infringement is substantially certain to result from [its] continued provision of Internet access to particular subscribers." *BMG*, 881 F.3d at 311.

The district court disregarded these critical limitations, sustaining vicarious liability even though there was no proof that infringers were specifically "drawn" to the Cox service, *Sony II*, 464 F. Supp. 3d at 815, and finding on summary judgment that as a matter of law, Cox had the knowledge necessary to contributory liability solely from receiving the plaintiffs' DMCA notices. *Sony I*, 426 F. Supp. 3d at 232-33. It refused to submit the knowledge issue to the jury despite Cox's showing evidence that some of DMCA notices were false and that Cox could not be substantially certain of future infringement by subscribers named in the notices. Page Proof Opening Brief of Defendants-Appellants [Dkt. No. 27] ("Cox Br."), at 43.

In reviewing the rulings below, the Court should understand the enormous burden that ISPs face today in addressing automated claims of infringement. In 2020 alone, the members of ICC (excluding Cox) received and processed over *seven million* DMCA notices, almost all of which were machine-generated, and the total number of notices processed by the entire ISP industry was much greater. Studies establish that the accuracy of such automated notices, which are not reviewed by human beings before being sent to ISPs, is often questionable.[6]

Furthermore, a residential Internet account may be used not just by the primary subscriber, but also by several persons in the household at the same or different times. Business and institutional accounts may be used by hundreds or thousands of individual users simultaneously. Terminating an account based on a machine-generated DMCA notice means terminating all users' lawful access to the Internet, not just the access of one allegedly infringing user.

If the rulings below are not reversed, ISPs could face billions of dollars of contributory liability solely because they continued to supply Internet service to an

---

[6] *See, e.g.*, Urban, Jennifer M. and Karaganis, Joe and Schofield, Brianna, Notice and Takedown in Everyday Practice (March 22, 2017). UC Berkeley Public Law Research Paper No. 2755628, at 88 (available at SSRN: https://ssrn.com/abstract=2755628) (last accessed May 27, 2021); Bridy, Annemarie, "Addressing Infringement: Developments in Content Regulation in the US and the DNS," The Oxford Handbook of Intermediary Liability Online (ed. Giancarlo Frosio), at 640 (2020).

account where a handful of past infringements were alleged, even though infringements cannot be predicted in advance of when they occur and, in many cases, the ISP could not be substantially certain that the account would be used to infringe in the future. ISPs could face equally crippling damages on the vicarious liability side, since the district court essentially held that the flat monthly fee that ISPs receive from every subscriber meets the financial benefit test, as long as some subscribers view Internet access as a means to infringe.

In that case, an ISP would be more likely to minimize the risk of potentially crippling damages by implementing a "hair-trigger" policy of terminating an account's Internet access once it receives a single machine-generated DMCA notice. Even though the courts have declined to deny Internet access to *convicted criminals*, *Ellis*, 984 F.3d at 1104, the district court's reasoning would lead to the loss of Internet access based on *mere allegations* of civil copyright liability. Even if a DMCA notice were correct, many more than the actual infringer would suffer from such a policy, as all the innocent users of a terminated household, educational, or business account would also lose Internet access necessary to work, education, communication, shopping, participation in social life, and First Amendment expression. Accordingly, *amicus* respectfully asks the Court to consider the broader negative effects of the district court's errors and reverse the judgment below.

7

This concern is not answered by the "safe harbor" statutory immunity from monetary liability that conduit ISPs are eligible for under the DMCA.  17 U.S.C. § 512(a).  Congress' adoption of the safe harbor cannot be read as permitting an expansion of the secondary liability of ISPs.[7]  Moreover, to qualify for this statutory immunity, the ISP must show that it has "adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  All of the ISP members of the ICC maintain systems to process third-party claims of infringement received under the DMCA, have established response systems to review such claims, and have established policies for termination of repeat infringers, as required to qualify for the conduit ISP safe harbor of 17 U.S.C. § 512(a).[8]

---

[7]    See 17 U.S.C. § 512(*l*) ("The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.")

[8]    In this case, Cox was disqualified from asserting the safe harbor immunity under § 512(a) by reason of the Court's prior finding in *BMG*, 881 F.3d at 305, that Cox had not implemented its policy for terminating repeat infringers in a "consistent or meaningful way," as required by 17 U.S.C. § 512(i).

However, an ISP's immunity from monetary liability is not a certainty.  An ISP cannot be sure in advance of litigation whether it will be deemed eligible for a safe harbor immunity.  Indeed, district and appellate courts often disagree on such eligibility.  *See, e.g.*, *EMI Christian Music Grp., Inc. v. MP3Tunes, LLC*, 844 F.3d 79, 89-91 (2d Cir. 2016) (reversing district court ruling that defendant had a reasonably implemented policy to terminate repeat infringers); *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 88-93 (2d Cir. 2016) (reversing district court ruling that safe harbor was not available for infringements of pre-1972 sound recordings); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 32-38 (2d Cir. 2012) (reversing district court ruling that defendant was entitled to safe harbor protection and remanding for fact-finding).

Given this uncertainty of statutory protection and the massive damages awarded against Cox in the present case, *amicus* believes that the protection of 17 U.S.C. § 512(a) will not be enough assurance for many conduit ISPs.  Unless this Court reverses the erroneous judgment below, ISPs are more likely to minimize their now potentially catastrophic risks by promptly cutting off service to accounts of thousands, if not millions, of Internet accounts solely because one user, who may not even be the primary subscriber, has been accused by an automated system of infringement.  The ultimate victims will be the many Americans who will lose

9

vital Internet services and a primary means of First Amendment expression and information.

## ARGUMENT

## I

## THE DISTRICT COURT ERRED IN FINDING COX VICARIOUSLY LIABLE FOR ITS SUBSCRIBERS' INFRINGING ACTS.

The central concern in secondary liability cases is determining "the circumstances in which it is just to hold one individual accountable for the [infringing] actions of another." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984) ("*Sony Corp.*"). Although the Copyright Act does not mention secondary liability, infringement of copyright is a tort, and judges have long applied common-law principles of secondary liability to hold certain actors not directly participating in infringement liable in damages. *Id.* (citing cases); *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Over time, three theories of secondary liability for copyright infringement have emerged: contributory infringement; vicarious infringement; and inducement of infringement. *Sony Corp.*, 464 U.S. at 434-35; *Grokster,* 545 U.S. at 936-37.[9] Contributory infringement and inducement both require the plaintiff to advance unequivocal proof that the secondary actor intended that infringement result from

---

[9] Inducement liability is not at issue in this appeal.

its acts. *Grokster,* 545 U.S. at 932-33.  In contrast, vicarious liability can be imposed "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *Id.* at 931.

The district court here held that the jury could find that Cox profited directly from infringement, based solely on evidence that some Cox employees may have "looked at customers' monthly payments when considering whether to terminate them for infringement." *Sony II*, 464 F. Supp. 3d at 815.  However, an ISP's receipt and retention of monthly payments from subscribers (even infringing subscribers) does not suffice to show that the ISP received a direct financial benefit from infringement. *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004). Where a plaintiff pursues a vicarious infringement claim against a ISP, it must show that infringers were "drawn" to the ISP's Internet service, paying their fees because that service – as opposed to a competing service – gave readier access to infringing material. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017).  The district court misapplied this "draw" requirement, and therefore erred in sustaining the jury's verdict on vicarious liability.

While the question of a defendant's financial benefit from infringement was addressed in many pre-Internet vicarious liability cases, courts have developed a refined approach to the question in Internet cases.  The financial benefit element

11

has been found where a service provider promotes its service to the public as a means to accomplish infringement.  In *A & M Records v. Napster, Inc.,* 239 F.3d 1004, 1023 (9th Cir. 2001), the defendant was a web service whose primary purpose was to allow users to access and download infringing music files.  The Ninth Circuit found that Napster had built its userbase, and thus its revenues, by supplying this access and emphasizing it in promoting its service.  It concluded that such evidence that "the availability of infringing material 'acts as a "draw" for customers'" established the financial benefit element for vicarious infringement. *Id.* (citing *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 262 (9th Cir. 1996)).

Later cases have followed *Napster* in concluding that "draw" can be found where the service actively promotes itself to the public as facilitating infringement. *See, e.g., EMI Christian Music Grp., Inc.,* 844 F.3d at 99 (defendant operated a service where consumers could store music files in a "locker" and play them through numerous devices, and a sister website where consumers could locate and upload free (i.e., pirated) music found on the Internet and store it on defendant's "locker storage" website; "draw" element satisfied because defendant's marketing for its lockers emphasized the availability of free music on sister website).

However, absent evidence showing promotion of infringement, courts have taken a more circumspect approach to the financial benefit element.  The Ninth

Circuit in *Ellison* drew a distinction between aspects of Internet service that

consumers value and will pay for, and aspects of the service that act as a "draw"

for those wanting to infringe:

> There are, however, cases in which customers value a service that does not
> "act as a draw." Accordingly, Congress cautions courts that "receiving a
> one-time set-up fee and flat periodic payments for service ... [ordinarily]
> would not constitute receiving a 'financial benefit directly attributable to
> the infringing activity.' " S. Rep. 105–190, at 44. But "where the value of
> the service lies in providing access to infringing material," courts might
> find such "one-time set-up and flat periodic" fees to constitute a direct
> financial benefit. *Id.* at 44–45. Thus, the central question of the "direct
> financial benefit" inquiry in this case is whether the infringing activity
> constitutes a draw for subscribers, not just an added benefit.

357 F.3d at 1080.

The "draw" principle thus requires a plaintiff pursuing a vicarious copyright

infringement claim to show that users were attracted to the defendant's service

*because* its service in particular allowed infringing access to the plaintiff's works.

It is not enough to show that all Internet services make it easier to access infringing

material. Indeed, if it were the rule that providing paying subscribers with the

ability to access infringing material somewhere on the Web was sufficient to

establish financial benefit, every ISP could well be bankrupted by vicarious

infringement claims. But this is not the law. Instead, there must be a "causal

relationship" between the accessibility of the plaintiff's copyrighted material over

13

the particular defendant's service (as opposed to any other service) and the financial benefit the defendant receives from consumers.

The focus of the "draw" inquiry is on what the defendant's *customers perceive* to be the "value of the [defendant's] service" when they pay their monthly subscription fee or when they decide to cancel the service.  S. Rep. 105-190, at 45; *see Ellison*, 357 F.3d at 1079 (rejecting claim of vicarious liability against AOL where "there is no evidence that AOL customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available.");  *Giganews,* 847 F.3d at 674 ("Perfect 10 was required to provide evidence that customers were drawn to Giganews's services because of the infringing Perfect 10 material at issue. We also conclude that there was no evidence indicating that anyone subscribed to Giganews because of infringing Perfect 10 material.").

In denying Cox's post-trial motion to vacate the vicarious liability verdict, the district court did not dispute that the "draw" principle is the proper basis to determine whether an ISP obtains financial benefit from user infringement.  *Sony II*, 464 F. Supp. 3d at 814.  However, the court misapplied the principle by disregarding its focus on what motivates *consumers*.  As Cox's appeal brief points out, the plaintiffs presented no evidence on why consumers subscribed to the Cox service or maintained their accounts, or showing that consumers believed the Cox

14

service afforded easier access to infringing works than competing services. Cox Br., at 31. The district court's post-trial ruling cited no facts before the jury indicating that customers paid their fees to Cox because "the value of the service lies in providing access to infringing material." *Ellison*, 357 F.3d at 1079 (quoting S. Rep. 105-190, at 45).

The one fact that *was* cited by the district court, that some Cox employees may have "looked at customers' monthly payments when considering whether to terminate them for infringement" (*Sony II*, 464 F. Supp. 3d at 814), was not sufficient to meet the requirements of the "draw" principle.

First, whatever Cox's termination practices are, they could not show what the "draw" principle requires, namely that as a general matter the value of Cox's service *to the customer* "lies in providing access to infringing material," *Ellison*, 357 F.3d at 1079, and thus causes the customer to pay his monthly fees to Cox rather than another provider. Second, there must be a causal connection between the "draw" and the particular infringements at issue in litigation. *See Ellison*, 357 F.3d at 1079; *Giganews, Inc.*, 847 F.3d at 674. Otherwise, a provider can be found vicariously liable simply because some unnamed customers use their Internet access for infringement of works not even belonging to the plaintiff. That causal connection was entirely lacking here. As Cox notes, there was no testimony from the plaintiff's expert as to why individual subscribers to the Cox service did

15

anything, or that Cox's network was used for infringement more than other networks.  Cox Br. at 31.

If not reversed, the district court's mistaken application of the "draw" principle will have a significant adverse impact on ISPs and likely will lead to terminations of Internet accounts that will affect many thousands, if not millions, of innocent users.  A copyright plaintiff would be able to establish the financial benefit element by (1) showing that it sent a notice of infringement to the ISP and the ISP did not immediately thereafter terminate the account used by the accused subscriber, and (2) arguing that the ISP did not terminate the account in order to continue the revenue flow from the subscriber.

As noted above, major ISPs receive millions of machine-generated DMCA takedown notices each year, and it is impossible to investigate the legitimacy of all notices.  To avoid massive damages exposure, ISPs would be forced to accept the accuracy and legitimacy of each notice and terminate each accused account without further investigation.  All users of the terminated accounts would lose Internet access, which as explained in the Interest of *Amicus Curiae* section, is equivalent to being left behind in today's world.

The Court should therefore reverse the vicarious liability judgment.

## II

## THE DISTRICT COURT ERRED IN APPLYING THE KNOWLEDGE ELEMENT FOR CONTRIBUTORY COPYRIGHT LIABILITY

### A.    The Principles Underlying the Knowledge Element

In *BMG*, this Court decided when an ISP can be held contributorily liable for the alleged infringements of its Internet service subscribers.  It held that the plaintiff must show that the ISP had an intent to further its subscribers' infringement, and that an intent could be inferred only from facts showing that the provider had "knowledge that infringement is *substantially certain* to result from [its] *continued* provision of Internet access to *particular subscribers*."  *BMG*, 881 F.3d at 311 (emphases added).

Here, the district court did not even mention *BMG*'s factual question of "substantial certainty" in its summary judgment decision, even though Cox presented evidence at summary judgment that some of the notices were false and that a majority of its subscribers ceased alleged infringements after receiving only one or two DMCA notices.  Cox Br. at 42.  Instead, the district court ruled as a matter of law that reasonable jurors could only conclude that (a) the DMCA notices sent to Cox were all accurate, *Sony I*, 426 F. Supp. 3d at 231-32, and

17

(b) the notices alone gave Cox culpable knowledge of particular subscriber infringements. *Id.* at 232-33. As shown below, taking the issue of whether Cox knew that future infringement was substantially certain away from the jury, in the face of hotly contested facts on the issue, was error. Unless reversed, the contributory judgment entered below will create dire consequences for ISPs and the millions of customers they serve.

From the mid-1990s, when web browser software first made it possible for consumers to access the World Wide Web via Internet services, courts have been concerned about infringement claims asserted against those who provide the technology supporting Internet communications. As one early influential decision said, "[w]here the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1372 (N.D. Cal. 1995) (declining to impose direct liability on an ISP where all infringing acts were those of the user).

On the contributory liability front, the judiciary responded with a series of holdings designed to ensure that only ISPs that actually intend their Internet service to be used for infringement be liable in damages for customer infringement.

18

Because secondary infringers rarely declare their intent to further another's infringement, most cases involving contributory liability for infringement apply the common-law tort principle that where an actor knows that injurious consequences are substantially certain to follow from her act, and nevertheless proceeds, the law infers that she intended to produce the result. *BMG*, 881 F.3d at 307 (citing Restatement (Second) of Torts § 8A, cmt. b (1965) and *Grokster*, 545 U.S at 932). However, this inference is limited where liability is premised on the secondary actor's sale or supply of a product or service that can be used for both infringing and non-infringing purposes. In that circumstance, courts will presume an intent to infringe from sale or supply alone only "when an article is good for nothing else but infringement." *Id.*

However, where the defendant's service has substantial lawful uses as well as the potential for infringing use – and Internet service is the paradigm of such a service – mere proof of sale or supply is "equivocal" as to intent to further infringement, and the plaintiff must show "more acute fault than the mere understanding that some of one's products will be misused" in order to impose contributory liability. *Grokster*, 545 U.S. at 932. The courts have responded to *Grokster*'s holding by placing a more demanding burden on plaintiffs alleging contributory infringement.

19

First, they have held that a plaintiff cannot prevail by showing that the ISP negligently failed to address customer infringement. In *BMG*, this Court, citing *Grokster*, reversed the current district court's contributory liability judgment, and held that the district court erred by instructing the jury that it could find the ISP defendant liable if it "should have known of such infringing activity" – that is, acted negligently. 881 F.3d at 307-10. To meet the knowledge requirement, the finder of fact must conclude that the supplier of a service either (1) actually knew that the buyer would use the service for direct infringement, or (2) willfully blinded itself to the buyer's infringement, which requires proof that the defendant (a) subjectively believed that there was a high probability that the customer would infringe and (b) took "deliberate actions to avoid learning of [the infringement]." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (patent infringement); *see BMG*, 881 F.3d at 308-09; *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003). The intent requirement of contributory liability is not satisfied by a lesser showing that the supplier acted negligently or recklessly. *BMG*, 881 F.3d at 309.

Second, the courts have held that an ISP defendant must have particularized knowledge of specific infringements occurring on its system, sufficient to allow it to identify both the infringing subscriber and infringing material. Using the Internet to communicate, inform, entertain, or transact business is lawful and vital

20

in today's world.  However, it is an unavoidable fact that a small minority of

persons using the Internet reproduce, transmit, or display infringing copies of

copyrighted works.  Imposing secondary liability on ISPs merely because they

know their systems are sometimes used by customers to infringe would have the

practical effect of driving them out of business.

Requiring proof of particularized knowledge follows from the common-law

rule of inferred intent: if a person "knows that the [injurious] consequences are

certain, or substantially certain, to result from his act, and still goes ahead, he is

treated by the law as if he had in fact desired to produce the result."  Restatement

(Second) of Torts § 8A, cmt. b (1965), cited at *BMG*, 881 F.3d at 311.  Thus, it is

not sufficient to infer from the fact that the provider has "generalized

knowledge . . . that infringement was occurring somewhere on its network," that it

intended its service to further a particular subscriber's infringement.  *BMG*, 881

F.3d at 311 (citation omitted).  As this Court held in *BMG*, such an inference is

permissible only if it is shown that the provider had "knowledge that infringement

is *substantially certain* to result from [its] *continued* provision of Internet access to

*particular subscribers*."  *Id.* (emphases added).

It is a question of fact, not law, whether the ISP defendant knows that a

subscriber named in a notice will be "substantially certain" to infringe in the future

if permitted continued access to the Internet.  The inquiry is subjective, because

21

there must be proof that the *ISP* has "knowledge that infringement is substantially

certain to result. . . ." *BMG*, 881 F.3d at 311.  It is particularized, because the ISP

must know that infringement is substantially certain to result from continued

service to "*particular subscribers*."  *Id.* (emphasis added).  And it is demanding,

because merely foreseeing a reasonable probability of future infringement is not

equivalent to having "substantial certainty" that the infringement will occur.  Even

in a multi-infringement case, there will almost always be a triable issue of fact as

to substantial certainty.  Individual subscribers' histories will have to be considered

by jurors, as well as the provider's past experience about how often subscribers

ceased infringement after being notified of DMCA notices received by the ISP.

### B.     The District Court Misapplied the Knowledge Requirement

The district court erred in taking the knowledge issue away from the jury.  It

ruled on summary judgment that, as a matter of law, the plaintiffs' DMCA notices

were accurate and gave Cox culpable knowledge of infringement.  *Sony I*, 426 F.

Supp. 3d at 233.  It declined to revisit this ruling in denying Cox's post-trial

motions under Federal Rules of Civil Procedure 50 and 59.  *Sony II*, 464 F.

Supp. 3d at 813.

Its decision ignored entirely *BMG's* direction that an ISP can only be held

liable if it is "substantially certain" that a specific customer will continue to

infringe if Internet service is not terminated.  It foreclosed factfinding on this issue even though Cox presented substantial evidence on summary judgment contesting the accuracy of plaintiffs' notices, Cox Br. at 8, and showing that most of its subscribers, once informed that Cox had received one to three DMCA notices about their account, never received another notice.  Cox Br. at 42-43.  In fact, it appears that Cox was held liable here for infringements occurring before it received any notice against a subscriber,  Cox Br. at 39-40, even though "[c]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct."  *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, ____ U.S. ___., 136 S. Ct. 1923, 1933 (2016).

These rulings are fundamentally erroneous.  First, DMCA notices generated by "bots," such as those the plaintiffs' agents sent in this case, do not automatically give an ISP knowledge either that a particular subscriber is an infringer or that a particular work has been infringed.   Studies show that such notices are sometimes erroneous.  *See supra* at 6.  Cox itself presented evidence at trial that some of the notices it received were "false."  Cox Br. at 8.  Reasonable jurors could have concluded from the evidence that some of the plaintiffs' machine-generated notices were inaccurate and did not give Cox knowledge of every infringement for which damages was ultimately awarded.  Those jurors could also have concluded from Cox's evidence that receipt of plaintiffs' notices did not make Cox substantially

certain that the users of the accounts accused of infringement would continue to infringe.   However, the district court did not allow the jury to make up its own mind on these essential issues.

Second, the district court ignored *BMG*'s holding that the plaintiff must show that Cox had "knowledge that infringement is substantially certain to result from Cox's continued provision of Internet access to particular subscribers."  881 F.3d at 311.  Indeed, the phrase "substantially certain" never appears in its summary judgment opinion.  Instead, the court fixated on *BMG's* subsequent paraphrase of this holding, which said that, "[p]ut another way, the proper standard requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *Id.* at 311-12 (emphasis in original).

The district court treated this paraphrase as the actual holding, repeating variations on "*do* something" six times in its summary judgment opinion.  *Sony I*, 426 F. Supp. 3d at 231-233.  It likened "*do* something" to an out-of-Circuit decision, *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007), which held that a computer system operator can be held contributorily liable if it has "actual knowledge that specific infringing material is available using its system . . . and can take simple measures to prevent further damage to copyrighted works ... yet continues to provide access to infringing works." *Sony I*, 426 F. Supp. 3d at

24

230.[10]  It also likened "*do* something" to a Magistrate Judge decision from the

District of Colorado involving vicarious liability (even though knowledge is not

even an element of vicarious liability).  *Id.* at 231 (citing *Warner Bros. Records,*

*Inc. v. Charter Commc'ns, Inc,* No. 19-cv-874, 2019 WL 5387099 (D. Colo.,

Oct. 21, 2019)).  It then found that Cox could "*do* something" about subscriber

infringement solely because Cox had received machine-generated DMCA notices

from the plaintiffs' agent and "maintained the ability to suspend or terminate these

infringing accounts." *Sony I*, 426 F. Supp. 3d at 232.  It concluded "as a matter of

law" that there was no genuine issue of fact as to the sufficiency of the RIAA

notices to satisfy the knowledge element of contributory infringement.  *Id.*  The

---

[10]     *Amazon.com* is inapposite here.  Despite the caption, the primary defendant
was Google, not Amazon.  Google operated a search engine. It stored thumbnail
images of the plaintiff's photographs on its system servers that were delivered in
response to a user's image search.  This would have been a direct infringement, but
the Ninth Circuit held this storage and delivery to be a fair use and thus not an
infringement.  508 F.3d at 1163-68.  The plaintiff's second claim was that because
the Google search engine results provided users with in-line links to other websites
with full-size infringing copies of plaintiff's photographs, Google was a
contributory and vicarious infringer.  On contributory infringement, the Ninth
Circuit found triable issues on, among other things, "whether there are reasonable
and feasible means for Google to refrain from providing access to infringing
images," and remanded.  *Id.* at 1172-73.  But conduit ISPs such as ICC's members
have no ability to block their subscribers from accessing specific infringing content
on a website without specific legal authorization.  They therefore do not have the
means to "refrain from providing access to infringing [works]."

court therefore did not permit the jury to determine, as a question of fact, whether Cox had culpable knowledge of subscriber infringements.

Boiled to its bones, the district court ruling is that a plaintiff's machine-generated notices of infringement are, in and of themselves, sufficient to establish the knowledge element of contributory infringement.  An ISP which is given a notice of a single alleged subscriber infringement  and can, but does not, immediately suspend or terminate the subscriber's service has culpable knowledge as a matter of law and is responsible for all infringements by the subscriber.  *BMG* does not permit this conclusion.  For intent to infringe to be inferred, *BMG* holds that provider must have "*knowledge that infringement is substantially certain to result*" if it continues to supply a particular subscriber with service.  *Id.*, 881 F.3d at 311 (emphasis added).  This test focuses not on what the ISP can *do* but what the ISP *knows*.

However, many (if not most) cases involving machine-generated DMCA-style notices will be equivocal as to knowledge.   As noted above, ISPs receive millions of such notices each year, and have no ability to determine whether they are legitimate or accurate.  Studies have shown that many such notices are not accurate.  And, even assuming that DMCA notices are accurate, they may only show that a subscriber infringed a few times in the past, or undertook multiple infringements on only one date.  It certainly cannot be presumed from an ISP's

26

receipt of a DMCA notice that future infringements by the same subscriber are substantially certain to occur. As Cox showed at summary judgment, most of its accused subscribers only received between one and three DMCA notices (Cox Br. at 42), suggesting that most accused subscribers ceased any infringing activity after a handful of warnings.

Substantial certainty of future infringement will therefore almost always be a disputed issue of fact for a jury to decide, as most ISPs can present the same kind of evidence negating substantial certainty that Cox did. *BMG* expressly noted that determination of whether an ISP had culpable knowledge of subscriber infringement (or willfully blinded itself to the facts) "must be made by a jury properly instructed as to the law." 881 F.3d at 312. Here also, whether the plaintiffs' notices gave Cox substantial certainty that each of the accused subscribers would continue to infringe, and thus permitted an inference that Cox intended each of the infringements following the notices to occur, is something that only a properly instructed jury could resolve.

Finally, failing to reverse the district court's ruling on contributory liability would have serious adverse consequences to the public and ISPs generally, similar to those flowing from the court's errors on vicarious liability. ISPs, in order to minimize their own risk of paying ruinously large damages, would either have to rely on the uncertainty of safe harbor protection under the DMCA, or be compelled

27

to terminate Internet service to a subscriber immediately upon receiving a plaintiff's notice of infringement, regardless of whether it believed the subscriber had infringed or was likely to infringe again. Thousands, if not millions, of consumers would lose Internet service and the vital personal social and economic connections that such service provides.  See discussion at 7, 9-10, 16, *supra*.

By applying the wrong legal standard on the knowledge element and taking the question of culpable knowledge away from the jury, the district court erred.  Its judgment on contributory liability should be reversed and the issue remanded for a new trial.

## CONCLUSION

For the reasons stated above, the Court should reverse the judgment below.

Respectfully submitted,

/s/ *Andrew L. Deutsch*
Andrew L. Deutsch
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
(310) 595-3000

*Attorneys for Amicus Curiae*
*Internet Commerce Coalition*

Dated:  June 1, 2021

**CERTIFICATE OF COMPLIANCE**

This *amicus curiae* brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i), because this brief contains 6,483 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, version 2008 (Office 365), in Times New Roman 14-point font.