No. 21-1168

_____

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**SONY MUSIC ENTERTAINMENT, ET AL.,**

*Plaintiffs-Appellees,*

v.

**COX COMMUNICATIONS, INC. and COXCOM, LLC,**

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Eastern District of Virginia in No. 1:18-cv-950 (LO/JFA)
District Judge Liam O'Grady

_____

**BRIEF OF *AMICI CURIAE* INTELLECTUAL PROPERTY
LAW PROFESSORS IN SUPPORT OF APPELLANTS**

_____

<div style="margin-left:40%">

Phillip R. Malone
JUELSGAARD INTELLECTUAL
  PROPERTY AND INNOVATION CLINIC
Mills Legal Clinic at Stanford Law
  School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: (650) 725-6369
jipic@law.stanford.edu

*Attorney for Amici Curiae*

</div>

June 1, 2021

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1168          Caption: Sony Music Entertainment v. Cox Communications, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Intellectual Property Law Professors (see attachment)
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?   ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Phillip R. Malone                    Date:    06/01/2021

Counsel for: Amici Curiae

Print to PDF for Filing

## <u>ATTACHMENT TO DISCLOSURE STATEMENT</u>

**Professor John R. Allison**
McCombs School of Business, University of Texas at Austin

**Professor Ann Bartow**
University of New Hampshire Franklin Pierce School of Law

**Professor Michael A. Carrier**
Rutgers Law School

**Professor Andrew Chin**
University of North Carolina School of Law

**Professor Brian L. Frye**
University of Kentucky College of Law

**Professor Jim Gibson**
University of Richmond School of Law

**Professor Eric Goldman**
Santa Clara University School of Law

**Professor Stacey M. Lantagne**
University of Mississippi School of Law

**Professor Mark A. Lemley**
Stanford Law School

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Mark McKenna**
Notre Dame Law School

**Professor Viva R. Moffat**
University of Denver Sturm College of Law

**Professor Tyler T. Ochoa**
Santa Clara University School of Law

**Professor Blake E. Reid**
University of Colorado Law School

**Professor Guy A. Rub**
Michael E. Moritz College of Law, The Ohio State University

**Professor Pamela Samuelson**
University of California Berkeley Law School

**Professor Rebecca Tushnet**
Harvard Law School

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

DISCLOSURE STATEMENT.............................................................................. i

ATTACHMENT TO DISCLOSURE STATEMENT........................................ ii

TABLE OF CONTENTS ................................................................................... v

TABLE OF AUTHORITIES............................................................................. vi

INTEREST OF *AMICI CURIAE* ...................................................................... 1

SUMMARY OF ARGUMENT......................................................................... 1

ARGUMENT ................................................................................................... 3

I.   Direct financial benefit for vicarious liability requires that infringement
     act as a draw for subscribers. ...................................................................... 3

II.  Applying an overly broad test for direct financial benefit would violate
     open internet principles and inflict disproportionate harm on internet
     users.............................................................................................................. 9

APPENDIX

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001)................................................................... 4

*Adobe Sys. Inc. v. Canus Prods., Inc.*,
173 F. Supp. 2d 1044 (C.D. Cal. 2001) ...................................................... 6

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004)........................................................... passim

*Erickson Prods., Inc. v. Kast*,
921 F.3d 822 (9th Cir. 2019)...................................................................... 4

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) .................................................................................. 3

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
284 F.3d 505 (4th Cir. 2002)...................................................................... 3

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) ......................................................................... 12, 13

*Parker v. Google, Inc.*,
242 F. App'x 833 (3d Cir. 2007) ................................................................ 4

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017)........................................................... 2, 4, 5, 6

*Perfect 10, Inc. v. Giganews, Inc.*,
No. CV 11-07098, 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014) ............... 6

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
464 F. Supp. 3d 795 (E.D. Va. 2020)................................................ 2, 6, 7, 8

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
No. 19-cv-00710, 2020 WL 3957675 (M.D. Fla. July 8, 2020) ............ 5, 6, 7

## **Legislative Materials**

S. Rep. No. 105-190 (1998)..............................................................................4, 5, 8

## **Other Authorities**

Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev.
(forthcoming 2021), https://perma.cc/CZ48-435J ......................................11

Frank La Rue, *Report of the Special Rapporteur on the Promotion and
Protection of the Right to Freedom of Opinion and Expression*, U.N.
Doc. A/HRC/17/27 (May 16, 2011), https://perma.cc/M8KC-Z9FT ..........12

Kaleigh Rogers, *More Than 100 Million Americans Can Only Get Internet
Service from Companies that Have Violated Net Neutrality*, Vice:
Motherboard (Dec. 11, 2017, 2:30 PM), https://perma.cc/JS6T-4FM3.......12

Mary Rasenberger & Christine Pepe, *Copyright Enforcement and File
Hosting Services: Have Courts Struck the Proper Balance?*, 59 J.
Copyright Soc'y U.S.A. 627 (2012) .............................................................4

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are seventeen intellectual property law professors at universities throughout the United States. *Amici* regularly teach, research, and write about copyright law and secondary liability, including in the context of online platforms and internet service providers (ISPs).[2] *Amici* have no personal interest in the outcome of this case. They do, however, share a professional interest in seeing copyright law develop in a way that properly balances the rights of copyright owners with consumer welfare, innovation, and privacy.

## SUMMARY OF ARGUMENT

The district court erred as a matter of law in upholding the jury's finding of vicarious liability. The court applied an erroneous legal standard for the "direct financial benefit" prong of vicarious copyright liability. In order for an ISP to "enjoy[] a direct financial benefit" from its subscribers' infringement, infringing activity must "constitute[] a draw for subscribers." *Ellison v. Robertson*, 357 F.3d 1072, 1076, 1079 (9th Cir. 2004). But no evidence on the record shows that

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] A full list of *amici* can be found in the Appendix. *Amici* thank Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic Certified Law Students Alexander Evelson and Matthew Krantz for their substantial assistance in drafting this brief.

customers purchased Cox's internet service because of the ability to infringe. Even if infringement was an "added benefit" of Cox's service rather than its draw, this is insufficient to satisfy the "direct financial benefit" inquiry. *Id.* at 1079; *cf. Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017) (finding no vicarious liability where "some subscribers joined . . . to access infringing material generally").

The district court ignored the correct legal standard and wrongly concluded that "Cox's treatment of repeat infringer accounts suffices as a causal connection between the infringement and financial gain." *Sony Music Ent. v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 815 (E.D. Va. 2020). But the "direct financial benefit" inquiry looks at what serves as a draw for Cox's *subscribers*, not the subsequent actions of Cox itself. As a result, the court was incorrect to say that "Sony was not required to prove 'draw.'" *Id.* at 814; *contra Ellison*, 357 F.3d at 1079 (noting that draw is the "*central question*" when examining direct financial benefit (emphasis added)). Sony *was* required to prove draw, and the conclusion that "retention of subscriptions" alone can establish draw is legally incorrect. *Sony*, 464 F. Supp. 3d at 814.

Affirming the district's court erroneous direct financial benefit analysis would cause significant harm beyond this case. Holding Cox vicariously liable for its subscribers' infringement where that infringement was not a draw would force

Cox and other ISPs to become copyright enforcers, a role that they are neither well equipped nor well situated to take on. ISPs are poorly positioned to police illegal use of their services: because their primary enforcement tool involves terminating users' internet, fear of liability would lead to disproportionate infringement remedies. Furthermore, fear of liability would lead ISPs to monitor internet traffic in a way that erodes subscribers' privacy interests.

For both the legal and policy reasons noted above, this Court should reverse the district court's decision regarding vicarious liability.

## **ARGUMENT**

### I. **Direct financial benefit for vicarious liability requires that infringement act as a draw for subscribers.**

The district court erred in finding Cox vicariously liable for the infringing conduct of its subscribers. Specifically, the court misinterpreted the "direct financial benefit" requirement for vicarious liability by failing to require that infringing content act as a "draw" for subscribers.

"In order to establish vicarious liability, a copyright owner must demonstrate that the entity to be held so liable . . . [obtained] an obvious and direct financial [benefit from] the exploited copyrighted materials." *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005) (noting that vicarious liability can be imposed "when the defendant profits directly

3

from the infringement"). "Courts have generally agreed that [direct] 'financial benefit exists where the availability of infringing material "acts as a draw" for customers.'" Mary Rasenberger & Christine Pepe, *Copyright Enforcement and File Hosting Services: Have Courts Struck the Proper Balance?*, 59 J. Copyright Soc'y U.S.A. 627, 660 (2012) (cleaned up) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001)). But no such draw arises from an ISP's mere failure to terminate internet service based on notices of infringement.

As part of the direct financial benefit inquiry, courts ask "whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison*, 357 F.3d at 1079. But it is not merely but-for causation that is at issue: as the Ninth Circuit stated in *Ellison*, "the central question of the 'direct financial benefit' inquiry . . . is whether the infringing activity constitutes a draw for subscribers." *Id.* (citing S. Rep. No. 105-190, at 44-45 (1998)); *see also, e.g.*, *Parker v. Google, Inc.*, 242 F. App'x 833, 837 (3d Cir. 2007) (applying the *Ellison* standard); *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) (same).

Courts have distinguished draw from an "added benefit" of a service, the latter of which is insufficient to establish direct financial benefit. *Ellison*, 357 F.3d at 1079. And courts have found "access[ing] infringing material generally" to be at most an added benefit. *See Perfect 10*, 847 F.3d at 674. In *Perfect 10*, for

4

example, the Ninth Circuit held that the plaintiff needed, but failed, to show that customers were drawn to the defendant's network because of the plaintiff's specific works. *Id.* Against that factual background, the defendant could not be held liable for vicarious infringement even if "some subscribers joined . . . to access infringing material generally." *Id.* Some courts have gone further and noted that even if specific infringing material serves as *a* draw, it must serve as "the *primary* customer draw" for vicarious liability to apply. *UMG Recordings, Inc. v. Bright House Networks, LLC*, No. 19-cv-00710, 2020 WL 3957675, at *4 (M.D. Fla. July 8, 2020) (emphasis added).

All of this is consistent with Congress's admonition that "receiving a one-time set-up fee and flat periodic payments for service . . . [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.'" *Ellison*, 357 F.3d at 1079 (alterations in original) (quoting S. Rep. No. 105-190, at 44). At most, such fees might constitute a direct financial benefit in the unusual situation "where the value of the service lies in providing access to infringing material." *Id.* (quoting S. Rep. No. 105-190, at 45). Unlike content-providing services like Grokster and Napster that marketed themselves as (and served primarily as) enablers of infringement, ISPs provide access to the internet generally. That is the value of their service. ISPs differentiate themselves by the speed and cost of network access to all content, not by the availability of any

5

specific content.

There was no evidence in this case that customers subscribed to Cox because of any knowledge or expectation about how it treated infringement. Cox Br. 30-32, ECF No. 27; *Sony*, 464 F. Supp. 3d at 813-15; *cf. Perfect 10*, 847 F.3d at 674 ("Perfect 10 does not proffer evidence showing that Giganews attracted subscriptions because of the infringing Perfect 10 material."). Indeed, the record shows no evidence that customers subscribed to Cox for any reason other than to access the internet for its wide variety of legal uses. The internet provides a vast array of information, platforms, communications, tools, services, and functionality. Access to this universe is the draw for subscribers; while some of Cox's "customer[s] may have posted or accessed copyrighted . . . material as 'an added benefit' to a subscription," such a benefit is "insufficient" to act as a draw. *Perfect 10*, 847 F.3d at 674 (quoting *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098, 2014 WL 8628031, at *4 (C.D. Cal. Nov. 14, 2014)); *see also UMG*, 2020 WL 3957675, at *4 (reasoning that "the very success of the defendant's venture must depend on the infringing activity" (cleaned up) (quoting *Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001))).

The court in *UMG* properly rejected, under facts very similar to those here, the plaintiffs' theory that "any aspect of [the defendant's] service that serves as 'a' draw to some subset of subscribers who then go on to engage in infringement

subjects [the defendant] to liability, no matter how insignificant or tangential the alleged draw is to the infringing content wherever found on the internet." 2020 WL 3957675, at *6. The court correctly reasoned that "any proportionate value that may be ascribed by post hoc edict to that general enticement to purchase internet services from [the defendant] cannot constitute a *direct* financial benefit to [the defendant] owing principally to the draw to available infringing content." *Id.*

At trial, even Sony's expert admitted that he had no information on what Cox's subscribers knew and why they may have subscribed. Cox Br. 30-31. And Cox's actions to combat copyright infringement were apparently "significantly more aggressive" than those of other ISPs, *id.* at 31,[3] further undermining the suggestion that subscribers viewed infringement as a draw. Because no evidence supports draw, the district court erred in holding that Cox obtained a direct financial benefit from the infringement of its subscribers.

The district court instead erroneously concluded that "Sony was not required to prove 'draw' according to Cox's proffered standard." *Sony*, 464 F. Supp. 3d at 814. Although the court relied on *Ellison* to support this conclusion, *see id.*, the *Ellison* court expressly stated that "draw for subscribers" is the "central

---

[3] One would expect that if Cox was enabling copyright infringement, there would be more instances of infringement on its network. The record indicates otherwise: infringement is less prevalent on Cox's network than elsewhere. Cox Br. 31.

question" of the direct financial benefit inquiry, 357 F.3d at 1079.

Based on this misinterpretation of *Ellison*, the district court relied on internal emails concerning post-infringement termination to conclude that "Cox gained *some* direct financial benefit from the infringement." *Sony*, 464 F. Supp. 3d at 815. The court held Cox's continued collection of revenue from accused infringers to be a sufficient "causal connection between the infringement and financial gain." *Id.* But the district court's focus on Cox's termination decisions— rather than on the legally relevant question of whether those decisions served as a draw to Cox's *subscribers*—was error that ignored the actual value of an ISP's service and fundamentally distorted vicarious liability doctrine.

There are sound reasons why *Ellison* and other courts have made draw for subscribers "the central question" of direct financial benefit. *Ellison*, 357 F.3d at 1079. Any benefit that Cox may have received from retaining the subscriptions of alleged infringers was not *directly* related to past infringement, since that infringement was already completed. Cox's interest in "flat periodic payments for service," *id.* (quoting S. Rep. No. 105-190, at 44), from its infringing subscribers is not the same as a financial benefit from the infringement, and to hold otherwise vitiates the requirement of obvious and *direct* benefit. The dangers of finding vicarious liability under such attenuated circumstances are exactly why courts have required a pre-accusation "draw" in order to find a direct financial benefit to

an ISP.[4]

Sony was required to prove draw based on the actions of Cox's subscribers, not on those of Cox itself. The district court did not find that Cox's subscribers were aware of Cox's termination practices or that those practices acted as a draw to any subscribers, and there does not appear to be any such evidence in the case. Thus, Cox's termination decisions do not provide the proper basis for determining direct financial benefit and vicarious liability.

## II.    Applying an overly broad test for direct financial benefit would violate open internet principles and inflict disproportionate harm on internet users.

The district court's erroneous direct financial benefit analysis would cause considerable and unwarranted harm to ISPs, consumers, and the public at large. ISPs are ill-suited to be copyright enforcers, and their enforcement tools are too blunt to provide adequate remedies for infringement. Imposing vicarious liability on ISPs, at least where infringement is not a draw for subscribers, would thus be especially dangerous.

One of the fundamental ideas of an open internet is that ISPs, which provide

---

[4] Whether the evidence at trial concerning Cox's behavior, such as emails reflecting employees' attitudes toward the DMCA or its decisions regarding the termination of alleged infringers' accounts, supports liability under *some* cause of action, it does not justify discarding critical elements of vicarious infringement law and exposing ISPs and other parties to liability in the absence of direct financial benefit.

a gateway to the internet, should not control what their subscribers can access. ISPs are conduits: they do not host content or channel customers to specific websites, but instead pass internet traffic along in a neutral manner. Accordingly, ISPs generally do not monitor the content that subscribers send and receive on their networks. Even if ISPs did want to monitor internet traffic, they would have a hard time doing so. Like telephone and power companies, ISPs lack the ability (and capacity) to follow millions of users across a complex digital infrastructure. The law accordingly distinguishes ISPs from other platforms, like those who host content, which must operate a notice-and-takedown system to cull identified instances of infringement.

If ISPs face vicarious liability for the infringement of their subscribers, at least in cases where that infringement is not a draw for subscribers, ISPs are more likely to take on an enforcement role and actively police infringing conduct. But forcing ISPs into this role raises two concerns. First, ISPs would have difficulty monitoring their users for infringement even if they faced a legal incentive to do so. Second, requiring ISPs to monitor infringement could lead to privacy-invasive monitoring of internet activity and a shift in open internet norms. It is difficult to distinguish between legitimate and illegitimate traffic without examining the traffic's content, and such examination could undermine the idea of ISPs as

neutral conduits.[5] Furthermore, such examination could expose the personal activities and data of subscribers—the majority of whom do not infringe—in a way that harms their legitimate privacy interests.

There is a third concern. If ISPs are forced to engage in proactive enforcement, they have a limited set of actions they can take to control alleged infringement. Their primary tool—terminating accused subscribers from the internet altogether—is a blunt instrument that would lead to remedies disproportionate to any violation. *See* Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. (forthcoming 2021) (manuscript at 22, 26-30, 64-65), https://perma.cc/CZ48-435J. Consumers, whether they personally engage in infringing conduct or not, could be subject to wholesale termination of their internet access based on unproven allegations of infringement occurring at the IP address through which they connect to the internet. And entities through which multiple users connect to the internet via a single IP address could lose internet access entirely due to alleged infringement by a single user. An infringing user may be one of several members of a household or one of many visitors to a business, library, or hospital. The harm of cutting off an entity in this case could greatly outweigh the harm of a single infringing act. And because 40% of

---

[5] It is likely that the typical internet user would be uncomfortable knowing that their ISP is monitoring every (legitimate) site they visit, even if the overall purpose is to deter infringement.

Americans have only one option for broadband internet service, Kaleigh Rogers, *More Than 100 Million Americans Can Only Get Internet Service from Companies that Have Violated Net Neutrality*, Vice: Motherboard (Dec. 11, 2017, 2:30 PM), https://perma.cc/JS6T-4FM3, being terminated by one provider is not just an inconvenience, but can mean the loss of internet access altogether.

Cutting users or entities off from the internet is especially problematic given how central the internet is to communication, public discourse, work, education, commerce, civic engagement, and more. The internet and social media "for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017); *see also* Frank La Rue, *Report of the Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, ¶ 85, U.N. Doc. A/HRC/17/27 (May 16, 2011), https://perma.cc/M8KC-Z9FT (noting that "the Internet has become an indispensable tool for realizing a range of human rights, combating inequality, and accelerating development and human progress"). The COVID-19 pandemic has reinforced the internet's importance: ISP subscribers now work via Zoom, order groceries online, "send" their children to virtual school, and litigate cases remotely, to name a few examples.

A loss of internet service, now more than ever, could seriously harm almost every aspect of an individual's personal and professional life. As the Supreme Court recognized in *Packingham*, "to foreclose access to social media altogether," even for a convicted criminal, "is to prevent the user from engaging in the legitimate exercise of First Amendment rights." 137 S. Ct. at 1737. To foreclose access to the entire internet based solely on notices of suspected copyright infringement—or possibly even the suspected infringement of others—is even harsher and more improper. Copyright enforcement mechanisms, particularly vicarious liability, should not lead to such unforgiving remedies.

Asking ISPs to act as enforcers makes little sense given that the internet already has well-established enforcers: copyright owners, content-providing websites, and platforms such as YouTube. These entities have direct control over the infringing material that a user can access and can take *proportional* measures to limit an individual's ability to continue infringing. In response to infringement, for example, they can temporarily cut off the individual from that particular website (rather than the entirety of the internet). Enforcement and deterrence at the ISP level would have far more negative consequences than enforcement and deterrence at the website and platform level. The Court should not impose socially detrimental obligations on ISPs under a flawed theory of vicarious liability where the Plaintiffs have chosen to target ISPs and not platforms and hosts.

13

## **CONCLUSION**

For the foregoing reasons, *amici* respectfully urge the Court to reverse the district court's decision regarding vicarious liability.

June 1, 2021                  Respectfully submitted,

By:  /s/ Phillip R. Malone

Phillip R. Malone
JUELSGAARD INTELLECTUAL PROPERTY AND
    INNOVATION CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel: (650) 725-6369
jipic@law.stanford.edu

*Attorney for Amici Curiae*

# APPENDIX

*Amici curiae* law professors are listed below. Affiliation is provided for identification purposes only. All signatories are participating in their individual capacity, not on behalf of their institutions.

**Professor John R. Allison**
McCombs School of Business, University of Texas at Austin

**Professor Ann Bartow**
University of New Hampshire Franklin Pierce School of Law

**Professor Michael A. Carrier**
Rutgers Law School

**Professor Andrew Chin**
University of North Carolina School of Law

**Professor Brian L. Frye**
University of Kentucky College of Law

**Professor Jim Gibson**
University of Richmond School of Law

**Professor Eric Goldman**
Santa Clara University School of Law

**Professor Stacey M. Lantagne**
University of Mississippi School of Law

**Professor Mark A. Lemley**
Stanford Law School

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Mark McKenna**
Notre Dame Law School

**Professor Viva R. Moffat**
University of Denver Sturm College of Law

**Professor Tyler T. Ochoa**
Santa Clara University School of Law

**Professor Blake E. Reid**
University of Colorado Law School

**Professor Guy A. Rub**
Michael E. Moritz College of Law, The Ohio State University

**Professor Pamela Samuelson**
University of California Berkeley Law School

**Professor Rebecca Tushnet**
Harvard Law School

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2021, I caused the foregoing **BRIEF OF**
**AMICI CURIAE INTELLECTUAL PROPERTY LAW PROFESSORS IN**
**SUPPORT OF APPELLANTS** to be served by electronic means via the Court's
CM/ECF system on all counsel registered to receive electronic notices.

June 1, 2021                          /s/ Phillip R. Malone

                                     Phillip R. Malone
                                     JUELSGAARD INTELLECTUAL PROPERTY
                                         AND INNOVATION CLINIC
                                     Mills Legal Clinic at Stanford Law School
                                     559 Nathan Abbott Way
                                     Stanford, CA 94305-8610
                                     Tel: (650) 725-6369
                                     jipic@law.stanford.edu

                                     *Attorney for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME</u>
## <u>LIMITATION, TYPEFACE REQUIREMENTS,</u>
## <u>AND TYPE STYLE REQUIREMENTS</u>

I hereby certify as follows:

1.     The foregoing **BRIEF OF *AMICI CURIAE* INTELLECTUAL PROPERTY LAW PROFESSORS IN SUPPORT OF APPELLANTS** complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 29(a)(5), as in effect on this case's docketing date. The brief is printed in proportionally spaced 14-point type, and the brief has 3,316 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)).

2.     The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

June 1, 2021                           /s/ Phillip R. Malone
                                       Phillip R. Malone

                                       *Attorney for Amici Curiae*