# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SONY MUSIC ENTERTAINMENT, ET AL., *Plaintiffs-Appellees*,

v.

COX COMMUNICATION, INC., AND COXCOM, LLC, *Defendants-Appellants*.

On Appeal from the United States District Court for the
Eastern District of Virginia
Case No. 1:18-cv-950-LO/JFA (Hon. Liam O'Grady)

## BRIEF OF NATIONAL MUSIC PUBLISHERS' ASSOCIATION, NASHVILLE SONGWRITERS ASSOCIATION INTERNATIONAL, AND SONGWRITERS OF NORTH AMERICA AS AMICI CURIAE IN SUPPORT OF APPELLEE

Danielle M. Aguirre
Kerry M. Mustico
Christopher A. Bates
NATIONAL MUSIC PUBLISHERS'
  ASSOCIATION
1900 N Street NW
Suite 500
Washington, D.C. 20036
(202) 393-6672

Ruthanne M. Deutsch
*Counsel of Record*
Hyland Hunt
Alexandra Mansbach
DEUTSCH HUNT PLLC
300 New Jersey Ave NW
Suite 900
Washington, D.C. 20001
(202) 868-6915
rdeutsch@deutschhunt.com

*Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

As called for under Federal Rule of Appellate Procedure 26.1, amici curiae hereby certify that they are not corporate entities, have no parent corporation and that no publicly held company owns 10% or more of their stock.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF AMICI CURIAE ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ................................................................................... 6

I.  Vicarious Liability For Copyright Infringement Does Not Require "Draw." ......................................................................... 6

    A.  The Purpose of Vicarious Liability Is to Place the Cost of Infringement on Those Who Profit and Are Able to Police It. ............ 7

    B.  Cox's Reading of "Direct Financial Interest" Contravenes Case Law and Congressional Intent. ........................................... 10

        1.  "Draw" originated as an *expansion* of the direct financial interest test. ............................................... 11

        2.  Case law demonstrates that "draw" is not required to prove direct financial interest. ............................... 15

        3.  Cox's crabbed direct financial interest test contradicts congressional intent. ............................................. 16

II.  The Jury's Statutory Damages Award Properly Awarded Damages For Works That Are Distinct In The Marketplace. ..................... 17

    A.  Sound Recordings Owned Separately from Musical Compositions Are Not Limited to a Single Award as "Derivative." ............................................................. 19

    B.  Separate Tracks Are Entitled to Statutory Damages, Even When in Albums. ............................................................. 23

CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ............................................................9, 12, 13

*Anderson v. Consolidation Coal Co.*,
 636 F. App'x 175 (4th Cir. 2016) .................................................................23

*Arista Records, Inc. v. Flea World, Inc.*,
 Civil Action No. 03-2670 (JBS), 2006 U.S. Dist. LEXIS 14988,
 (D.N.J. Mar. 31, 2006) ..............................................................................15, 16

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
 199 F. Supp. 3d 958 (E.D. Va. 2016) .............................................................10

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
 881 F.3d 293 (4th Cir. 2018) ...........................................................10, 11, 13

*Capitol Records, Inc. v. MP3Tunes, LLC*,
 821 F. Supp. 2d 627 (S.D.N.Y. 2011) .............................................................10

*Ellison v. Robertson*,
 357 F.3d 1072 (9th Cir. 2004) ........................................................12, 13, 14

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
 844 F.3d 79 (2d Cir. 2016) .........................................................................14, 24

*Famous Music Corp. v. Bay State Harness Horse
 Racing & Breeding Ass'n*,
 554 F.2d 1213 (1st Cir. 1977) .....................................................................15, 16

*Feltner v. Columbia Pictures Television, Inc.*,
 523 U.S. 340 (1998) ..........................................................................................17

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) ..................................................11, 12, 16

*Jennings v. Stephens*,
574 U.S. 271 (2015).................................................................20

*Leonard v. Stemtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016) ...............................................14

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).................................................7, 9, 13, 14

*Newton v. Diamond*,
204 F. Supp. 2d. 1244 (C.D. Cal. 2002) ...........................19

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) .............................................14, 15

*Polygram Int'l Publ'g, Inc. v. Nev./TIG, Inc.*,
855 F. Supp. 1314 (D. Mass. 1994)..................................8, 9

*Realsongs v. Gulf Broad. Corp.*,
824 F. Supp. 89 (M.D. La. 1993)........................................15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417, 435 (1984)........................................................7

*Shapiro v. H. L. Green Co.*,
316 F.2d 304 (2d Cir. 1963) ...............................6, 7, 8, 11

*Sony Music Entm't v. Cox Commc'ns. Inc.*,
2021 U.S. Dist LEXIS 68168 (E.D. Va. Jan. 12, 2021) ...................18

*Sony Music Entm't v. Cox Commc'ns*,
464 F. Supp. 3d 795 (2020) ...............................................21

*Sullivan v. Flora, Inc.*,
936 F.3d 562 (7th Cir. 2019) ..............................................24

iv

## Statutes

17 U.S.C. § 101 ...........................................................................................22

17 U.S.C. § 102(a)(2) ..................................................................................19

17 U.S.C. § 102(a)(7) ..................................................................................19

17 U.S.C. § 115(a)(1) ..................................................................................22

17 U.S.C. § 115(a)(2) ..................................................................................22

17 U.S.C. § 504(c)(1) ............................................................................*passim*

17 U.S.C. § 512(i) .........................................................................................9

## Legislative Materials

H.R. Rep. No. 105-551, pt. 2 (1998) ........................................................10

S. Rep. No. 105-190 (1998) ...............................................9, 10, 16, 17

## Other Authorities

*History of Sound Recording*, https://tinyurl.com/fp75zzej ......................................23

Janko Roettgers, *Streaming Services Generated More Than 50% of
All U.S. Music Industry Revenue in 2016*, Variety (Mar. 30, 2017),
https://tinyurl.com/3fnnhdaj ...............................................................24

U.S. Copyright Office, Circular 14: Copyright in Derivative Works
and Compilations, https://www.copyright.gov/circs/circ14.pdf........................22

U.S. Copyright Office Circular 56: Copyright Registration for Sound
Recordings, https://copyright.gov/circs/circ56.pdf ...........................................20

U.S. Copyright Office Circular 56A: Copyright Registration of
Musical Compositions and Sound Recordings,
https://copyright.gov/circs/circ56a.pdf..................................19, 21, 22

U.S. Copyright Office, *What Musicians Should Know about Copyright*, https://www.copyright.gov/engage/musicians/ ................................19

*"Yesterday" The Most Covered Song Of All Time*, https://tinyurl.com/536t2ep9 ..............................................................................19

The National Music Publishers' Association ("NMPA") is the principal trade association representing the United States music publishing and songwriting industry. Over the last one hundred years, NMPA has served as the leading voice representing American music publishers before Congress, in the courts, within the music, entertainment and technology industries, and to the public. NMPA's membership includes "major" music publishers affiliated with large entertainment companies as well as independently owned and operated music publishers of all sizes representing musical works of all genres. Taken together, compositions owned or controlled by NMPA's hundreds of members account for the vast majority of musical compositions licensed for commercial use in the United States.

The Nashville Songwriters Association International ("NSAI") is the world's largest not-for-profit trade association for songwriters. NSAI was founded in 1967 by 42 songwriters including Eddie Miller, Marijohn Wilkin, Kris Kristofferson, Felice and Boudleaux Bryant, and Liz and Casey Anderson as an advocacy organization for songwriters and composers. NSAI has around 5,000 members and 100 chapters in the United States and abroad.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than amici, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

NSAI is dedicated to protecting the rights of songwriters in all genres of music and addressing needs unique to the songwriting profession. The organization recently created the first "group" copyright infringement insurance policy for songwriters and formed a partnership for affordable health care for its members. Governed by a Board of Directors composed entirely of professional songwriters, NSAI features a number of programs and services designed to provide education and career opportunities for songwriters at every level.

Songwriters of North America ("SONA") is a non-profit trade organization founded in 2015 by songwriting partners Michelle Lewis and Kay Hanley along with music attorney Dina LaPolt. SONA advocates on behalf of professional songwriters before Congress, in the courts, and in other arenas where songwriter interests are at stake. An overarching concern for SONA and its members has been the precipitous drop in songwriter income in the digital age.

This case presents a question of great importance to amici and their members, including songwriters, composers, and music copyright holders that suffer from the type of rampant infringement that Cox's lax policies allowed. Protecting copyrights in songwriting and music publishing has grown ever more challenging as the means of copying and distribution proliferate. Copyright law provides the tools to counteract such infringement, in part by requiring service providers to take reasonable steps to forestall known infringement that they can police, and from

which they benefit. The Court should resist Cox's invitation to dodge responsibility and thereby prompt a race to the bottom in infringement enforcement by the very platforms best positioned to put a halt to online piracy. There is no basis in law or fact to overturn the jury verdict here.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Music provides the soundtrack to our lives—the first dance, the power anthem before a big meeting, the song that never fails to keep the kids entertained in the backseat. Before we can sing along, someone had to create that melody and write those catchy lyrics—in copyright parlance, the musical composition. Then someone else, often a music publisher, had to get that great song into the hands of a fabulous performer who could create the sound recording we listen to, almost certainly on a phone or some other digital device, and almost certainly through a streaming service or from a digital download of a single song. Over the decades, technology has fundamentally shifted how we find, listen to, and pay for music. But the starting point has remained the same: a songwriter creating something from nothing, often far from the spotlight.

Copyright law ensures that songwriters can profit from their work, enabling them to invest time and effort into creating the music that moves us. Rampant online piracy—fostered by ever-increasing broadband speeds and Internet Service Providers that knowingly keep collecting revenue from highly-profitable data-

hungry infringers—threatens the ability of songwriters to make a living and thus to make music. Copyright law is not impotent in the face of such contributory and vicarious infringement. On the contrary, amici agree with Plaintiffs that the jury correctly found Cox liable on both theories of liability, and the verdict can be affirmed on either ground. Amici write separately to address two issues of particular importance to songwriters and the music publishers who represent them.

*First*, Cox's crabbed version of vicarious liability has no basis in precedent, congressional intent, or common sense. Vicarious liability places the cost of infringement on entities that financially benefit from it and can police it, thus encouraging them to clamp down. To be liable under the common law, a vicarious infringer must benefit financially from the underlying infringement. But this is a flexible test that is satisfied by a causal link between the infringing activity and any direct financial benefit. The concept of "draw"—which developed to expand, not limit, vicarious liability—is merely one way to show a causal link, not a gatekeeping requirement in every case. If Cox was correct that there could be "no financial benefit from infringement because [Cox] charges the same flat fee for internet service regardless of infringement," (Cox. Br. at 4) all ISPs would have to do to dodge liability is set flat fees. If it were that simple, Congress wouldn't need to provide safe harbors from liability to encourage ISPs to adopt explicit policies to

hinder repeat infringers' internet access. That flat-fee immunity view can't be right, and in any event, Cox does not have flat fees (Response Br. 34-35).

Cox's position is not, and has never been, the law. The district court rightly refrained from adopting an unprecedented, restrictive theory of financial benefit that would deprive songwriters and publishers of the ability to recover damages from entities that choose increased revenue over halting repeat infringement and knowingly enable and financially benefit from hundreds of thousands of infringing acts.

*Second*, the jury's damages verdict should be affirmed. Amici agree that Cox failed to make its case at trial, thereby forfeiting its challenges to the jury's statutory damages calculation. That alone is enough to affirm the damages award. But damages can also be affirmed because there is no legal basis for disturbing the jury's award. Sound recordings and musical compositions are separate works, each entitled to their own statutory damages when owned by separate rightsholders. Moreover, when (as here) those sound recordings are sold as individual tracks—as is overwhelmingly common in these days of iTunes downloads and streaming services—the Copyright Act authorizes recovery of statutory damages for each song, regardless of whether the song is also released on an album.

As for derivative works, § 504(c)(1) by its plain text limits only "*the* copyright owner," singular, to one statutory damages award for "any one work" that is

infringed, including "all the parts of a … derivative work." 17 U.S.C. § 504(c)(1) (emphasis added). Congress sensibly chose for this single-award limit to apply only when a musical composition and sound recording—two distinct works with their own unique copyrighting and licensing regime—are owned by the same rightsholder. When they are not, the distinctive nature of each work and the unique practical and legal relationship between them illustrates why Congress did not choose to treat a musical composition as only a mere "part[] of a … derivative work" in all cases.

As for compilations, every circuit to have so far considered the issue has rightly agreed that songs sold on an individual basis are separate works qualifying for separate statutory damages, even if they are also contained in an album. No circuit, whatever their approach, has adopted Cox's wooden reading of § 504(c)(1) to mean that a song contained in an album can never qualify for individual damages. Given Cox's failure to make its record, the Court need not even reach this issue. But if it does, under either of the tests used by other circuits, the statutory damages award should be affirmed.

## ARGUMENT

### I. Vicarious Liability For Copyright Infringement Does Not Require "Draw."

A party is vicariously liable for the copyright infringement of another if that party had both the "right and ability to supervise" the infringer and a "direct financial

interest" in the infringement. *Shapiro v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). The common law makes clear that "direct financial interest" is a broad, flexible test that can be satisfied in multiple ways, including by showing that the availability of the infringing work attracts or "draws" customers. But Cox alleges that the "draw" test is the *only* way to prove direct financial interest. Cox. Br. 29. Cox's rigid and illogical approach misunderstands the law (though amici agree that the evidence here established "draw" in any event, Response Br. 36-38).

## A. The Purpose of Vicarious Liability Is to Place the Cost of Infringement on Those Who Profit and Are Able to Police It.

Vicarious liability exists in copyright as a matter of common law because there are "circumstances in which it is just to hold one individual accountable for the actions of another." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984); *see also MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (vicarious liability in copyright "emerged from common law principles"). The seminal case for vicarious infringement is *Shapiro v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963). Copyright holders sued Green, the owner of department stores where "bootleg" records were sold by an independent concessionaire. Green received a commission on all records sold by the concessionaire. *Id.* at 306. In assessing Green's vicarious liability, the court began by explaining that the principles of agency law apply to copyright infringement, even in the absence of a "technical employer-employee relationship," because courts "have not drawn a rigid line" in

this area. *Id.* at 307. For support, the court examined the "dance hall" cases, where proprietors of dance halls were liable for the infringing music played by performing bands, regardless of whether the "bandleader is considered … an employee or an independent contractor, and whether or not the proprietor has knowledge of the compositions to be played or any control over their selection." *Id.*

Expanding the principles in the dance hall cases to fit the modern facts, the *Shapiro* court held that the "purposes of copyright law may be best effectuated" by imposing liability on a party that had both the "right and ability to supervise" the infringer and an "obvious and direct financial interest in the exploitation of copyrighted materials." *Id.* The court found that both criteria were met; the latter because Green received "a proportionate share of the gross receipts from [the concessionaire's] sales of phonograph records." *Id.* at 308. The court explained that "the imposition of vicarious liability … cannot be deemed unduly harsh or unfair" because "Green has the power to police carefully the conduct of its concessionaire" and the judgment against Green would "simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised." *Id.*

*Shapiro*'s reasoning, especially its reliance on Green's ability to police the infringing conduct, comports with the historic rationale for vicarious liability, which has its roots partially in enterprise theory. *Polygram Int'l Publ'g, Inc. v. Nev./TIG, Inc.*, 855 F. Supp. 1314, 1325 (D. Mass. 1994). Enterprise theory holds that "[w]hen

an individual seeks to profit from an enterprise in which identifiable types of losses [such as infringement] are expected to occur, it is ordinarily fair and reasonable to place responsibility for those losses on the person who profits." *Id.* As noted in *Shapiro*, 316 F.2d at 308, this has the "added benefit of creating a greater incentive for the enterprise to police its operations." *Polygram* at 1325; *cf. A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) ("To escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent.").

Such incentives to guard against infringement justify imposing vicarious liability on a party like Cox who, as the jury found here, is "profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. Under enterprise theory, because internet access will foreseeably result in some copyright infringement, those who profit from providing the internet (i.e., ISPs) should bear some of the costs of that expected infringement, including by policing the conduct.

This does not mean that ISPs are always left holding the bag for internet copyright infringement. The Digital Millennium Copyright Act of 1998 contemplates secondary infringement liability for ISPs under traditional common law principles of vicarious liability. S. Rep. No. 105-190, at 19 (1998) ("the Committee decided to leave current law [including vicarious liability] in its evolving

state"); *id*. at 55. Balancing the interests of copyright holders and ISPs, the DMCA provides ISPs with a 'safe harbor,' exempting them from vicarious liability so long as they meet certain requirements, chiefly adopting (and "reasonably implement[ing]") a repeat-infringer termination policy. 17 U.S.C. § 512(i). This safe harbor reflects enterprise theory, "preserv[ing] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements," S. Rep. 105-190, at 20, so that people "who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others [] know that there is a realistic threat of losing that access," H.R. Rep. No. 105-551, pt. 2, at 61 (1998). The DMCA's repeat-infringer-policy requirement is "essential to maintain[ing] the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011).

## B. Cox's Reading of "Direct Financial Interest" Contravenes Case Law and Congressional Intent.

Cox could perhaps have avoided liability here by implementing a reasonable repeat-infringer policy to reap the benefits of the DMCA safe harbor; instead it decided to "f the dmca" and ignore even its own lenient enforcement policy. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns., Inc.*, 199 F. Supp. 3d 958, 966-67 (E.D. Va. 2016), *aff'd in relevant part by BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns,*

*Inc.*, 881 F.3d 293 (4th Cir. 2018). Unable to rely on the safe harbor, Cox instead attempts to rewrite the direct financial interest prong of the vicarious liability test, arguing that financial interest exists *only* where the infringement is a "draw" such that there is "proof that customers were drawn to the service *specifically because* of infringing material owned by the Plaintiff." Cox Br. 29-31 (ellipses and quotation marks omitted); *see also* Brief of Amicus Curiae Internet Commerce Coalition 13. But Cox's rigid interpretation of financial benefit ignores the origins of "draw" and how it emerged as part of the historic *expansion* of the financial benefit test. And Cox's position conflicts with settled case law and with congressional intent for ISPs to bear some responsibility for copyright enforcement.

> 1. **"Draw" originated as an *expansion* of the direct financial interest test.**

The modern concept of "draw" originated in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996). Defendant Cherry Auction operated a flea market where vendors sold "bootleg" copies of music recordings owned by plaintiff Fonovisa. Cherry Auction argued that it obtained no direct financial benefit from its vendors' infringement because, unlike in *Shapiro*, it received no commission or profit "directly tied to the sale of particular infringing items." *Fonovisa*, 76 F.3d at 263. Cherry Auction requested that the court "restrict the financial benefit prong to the precise facts presented in *Shapiro*." *Id.* The court refused, instead expanding financial benefit to include the concept of "draw," whereby vicarious liability applies

when infringement makes the defendant's services more attractive to potential customers. *Id.* Such an expansion was warranted because Cherry Auction clearly reaped substantial benefits from flea market entrance fees, even if those fees were not directly tied to sales of particular infringing works. *Id.*

*Fonovisa* was further expanded in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004), the case upon which Cox chiefly relies. Harlan Ellison, an author, sued AOL for vicarious copyright infringement because AOL servers contained infringing copies of Ellison's work. *Id.* at 1074-75. The court first explained that to succeed on the vicarious liability claim, Ellison had to show that AOL "derived a direct financial benefit from the infringement." *Id.* at 1078. Quoting from *Napster*, 239 F.3d at 1023, which was in turn quoting *Fonovisa*, the *Ellison* court explained that such "[f]inancial benefit exists where the availability of infringing materials 'acts as a "draw" for customers.'" *Ellison*, 357 F.3d at 1078. The court did not hold, however, that "draw" is the only way to show financial benefit; instead, it simply held that financial benefit "*exists*" where "draw" exists. In other words, "draw" is sufficient to show direct financial interest, but it is not necessary. *Ellison*, 357 F.3d at 1078 (explaining that in *Fonovisa*, the "draw" was "*sufficient* to state the financial benefit element" (emphasis added)); *id.* at 1079 (the "central question of the 'direct

financial benefit' inquiry *in this case* is whether the infringing activity constitutes a draw for subscribers" (emphasis added)).[2]

Finally, the *Ellison* court held that AOL had no direct financial interest because the record "lack[ed] evidence that AOL attracted *or retained subscriptions* because of the infringement." *Id.* at 1079 (emphasis added). But here, Cox made repeated efforts to neuter its DMCA infringement enforcement, Response Br. 11-13, including via a policy of reinstating subscribers after pro forma termination following *thirteen* infringement strikes, *BMG Rights Mgmt.*, 881 F.3d at 303, due to Cox's financial interest in retaining infringing subscribers, *see* Response Br. 13-14 (describing emails where Cox team responsible for implementing repeat-infringer policy cited subscriber revenue as a reason to avoid termination). Such "[t]urning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability." *Napster*, 239 F.3d at 1023. Cox received substantial income it would not have otherwise collected by continuing to provide known repeat infringers with internet access so that they could continue to infringe. Cox therefore "profit[ed] from

---

[2] *Ellison*, moreover, emphasized that "draw" itself is an expansive concept, holding that the district court had read "draw" too narrowly and explaining that there is no "quantification requirement" for "any financial benefit a defendant reaps." *Id.* at 1078-79.

direct infringement while declining to exercise a right to stop or limit it," *Grokster*, 545 U.S. at 930, and is vicariously liable.[3]

None of the cases relied upon by Cox (Br. 29) establish that "draw" is a *sine qua non* of direct financial interest. *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376 (3d Cir. 2016), holds only that "draw" is one way of demonstrating financial benefit. *Id.* at 389 (quoting *Ellison* for the proposition that financial benefit "exists" when the infringing material acts as a draw). Moreover, in *Leonard* the court found "draw" solely based on testimony that the infringing photos added legitimacy to products; from there, the court "infer[red] that the images could have drawn customers to buy the product." *Id*. Similarly, in *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016), the court held only that financial interest "*may* be established" where infringing material acts as a "draw." *Id.* at 99 (emphasis added). It also stated that an "increase in subscribers or customers due to copyright infringement *qualifies* as an 'obvious and direct financial interest'"—not that it is a required showing. *Id.* (emphasis added). Finally, in *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017), the court rejected the plaintiff's theory that

---

[3] Amici Curiae Intellectual Property Law Professors argue (Br. 8) that Cox's choice not to terminate repeat infringers so it could collect their (often higher-than-average) fees cannot be a direct financial benefit because subscription fees are earned by Cox only *after* the infringement has occurred and Cox has failed to terminate service. But this ignores the financial benefit Cox receives in the form of fees from infringing subscribers who are *presently* choosing Cox because of its demonstrated (i.e., *past*) lax infringement enforcement.

Giganews' financial benefit from *any* infringement sufficed, instead requiring proof of financial benefit from the specific infringement of Perfect 10's copyright. *Id.* at 673-74. The issue in *Giganews* thus concerned the proper scope of "draw," not whether "draw" is the only way to show direct financial interest.

### 2. Case law demonstrates that "draw" is not required to prove direct financial interest.

The judgment below is consistent with myriad cases that have found direct financial benefit without any evidence of "draw." For example, in *Realsongs v. Gulf Broad. Corp.*, 824 F. Supp. 89 (M.D. La. 1993), the owners of a radio station were sued for vicarious copyright infringement after a group of ministers rented air time from the station and broadcast infringing works. The radio station owners argued that "they only received a per minute fee from the ministers for air time, and had no direct [financial] interest in the infringing activity." *Id.* at 92. The court rejected this argument, explaining that "courts have not interpreted the 'direct financial interest' requirement so narrowly." *Id.* Instead, the court held that defendants "have a direct financial interest in the infringing activity if the station is a for-profit enterprise and defendants benefit from its operation." *Id.* The concept of "draw" was irrelevant to the court's analysis or finding of vicarious liability. Similarly, in *Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n*, 554 F.2d 1213 (1st Cir. 1977), the court found a racetrack vicariously liable for the music played by an independent contractor who filled time between races, *id.* at 1214, even though it

strains credulity to imagine that any patrons were drawn to the track "specifically because" (Cox Br. 29) of the background music between races.

Other cases make explicit that "draw" is simply one possible means of showing direct financial interest. For instance, in *Arista Records, Inc. v. Flea World, Inc.*, Civil Action No. 03-2670 (JBS), 2006 U.S. Dist. LEXIS 14988, *38 (D.N.J. Mar. 31, 2006), the court explained that *Fonovisa* "rejected the requirement that the financial benefit ... be tied directly to the sale of infringing music by way of a commission on infringing goods or otherwise." It considered two "alternative" theories of direct financial benefit, only one of which was "draw." *Id.* at *38-40 (holding that financial benefit existed because the owner of the flea market received booth rental fees from infringing vendors and "alternatively" because the infringing CDs were a "draw" to the market). Congress intended that, "[i]n determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one." S. Rep. 105-190, at 44. The district court here, like other courts before it, did just that.

### 3. Cox's crabbed direct financial interest test contradicts congressional intent.

Deeming "draw" essential to vicarious liability contravenes congressional intent as well as precedent. Cox and its amici essentially argue that there can be no vicarious liability for ISPs because it is "obviously not" true that "the value of flat-rate internet access lies in providing access to infringing material." Brief of Amicus

Curiae Internet Association 5 (quotation marks and citation omitted); *see also* Cox Br. 30-31. But this argument proves too much. In Cox's understanding, ISPs can never be liable for vicarious copyright infringement because subscribers do not choose ISPs *because* of the ability to infringe a *specific* work. Cox Br. 30 (financial interest exists only where there is a "causal link between the infringement *of the plaintiff's own copyrighted works* and any profit to the service provider" (citation omitted; emphasis added by Cox)); *see also id.* 32. But Congress clearly intended vicarious liability to be possible for ISPs in some circumstances: the safe harbors "protect qualifying service providers from liability for all monetary relief for … vicarious … infringement." S. Rep. 105-190, at 20. Without potential liability for ISPs, the safe harbors would be unnecessary and ISPs would have no incentive to police infringers. Accepting Cox's understanding of "draw" would eviscerate the DMCA and effectively eliminate vicarious copyright liability for ISPs in *all* circumstances, even when (as here) the ISP failed to meet the safe harbor by taking reasonable steps to stop repeat infringers.

## II.    The Jury's Statutory Damages Award Properly Awarded Damages For Works That Are Distinct In The Marketplace.

Statutory damages under § 504 are for the jury to determine. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998). As Plaintiffs persuasively recount, by failing to present the necessary evidence at trial, Cox forfeited any claim that the damages award overcounted the number of works.

Response Br. 47-50 (derivative works); *id.* 52-54 (compilations). The district court properly held that "Cox's failure to present evidence of its own calculation to the jury at trial is determinative." *Sony Music Entm't v. Cox Commc'ns. Inc.*, 2021 U.S. Dist LEXIS 68168, *10 (E.D. Va. Jan. 12, 2021). The damages judgment may be affirmed on that basis alone, without reaching legal issues about how to define derivative works and compilations for the purpose of statutory damages. *See* Response Br. 46-47.

But if this Court does engage with the legal issues, two points bear emphasis. First, the district court's legal reasoning on derivative works is suspect on multiple levels. As Plaintiffs explain (Response Br. 50-52), § 504(c)(1) provides for separate statutory damages when music compositions and sound recordings, which are separately copyrighted, are also separately owned. The rule of separate awards when these separate works are separately owned comports not only with the statute's text, but also with the realities of how the distinct artistic works of musical compositions and sound recordings are protected and marketed in practice.

As for compilations, every circuit to have considered the issue has rightly held that separately sold individual tracks are eligible for individual statutory damages, even when also issued as part of an album. Cox's mechanistic reading of § 504(c)(1)—that because albums are compilations, individual tracks can never be entitled to damages—would be rejected under any circuit's approach. This Court

should resist the invitation to break new ground by adopting an inflexible rule that is fundamentally at odds with the reality of how music is promoted and sold in the modern market.

### A. Sound Recordings Owned Separately from Musical Compositions Are Not Limited to a Single Award as "Derivative."

A basic principle of copyright law is that musical compositions and sound recordings are distinct works with separate copyrights. *See* 17 U.S.C. § 102(a)(2), (7); *see also, e.g.*, *Newton v. Diamond*, 204 F. Supp. 2d. 1244, 1248-49 (C.D. Cal. 2002). Musical compositions are the music and any accompanying lyrics, typically created by composers or songwriters. *See* U.S. Copyright Office Circular 56A: Copyright Registration of Musical Compositions and Sound Recordings, at 1, https://copyright.gov/circs/circ56a.pdf. Sound recordings are a series of sounds fixed in a recording medium, typically created by performers and producers. *Id.*; *see also* U.S. Copyright Office, *What Musicians Should Know about Copyright*, https://www.copyright.gov/engage/musicians/ (describing "the two types of work").

A musical composition is often re-recorded by various artists over time. The beloved Beatles' song "Yesterday," for example, has the most cover versions of any song ever written, with more than 1,600 separately recorded versions. *See* *"Yesterday" The Most Covered Song Of All Time*, https://tinyurl.com/536t2ep9. Whether recorded by a thousand different artists or a single singer, the copyrights for a musical composition and sound recording are often separately owned.

Under the plain terms of § 504(c)(1), "*the* copyright owner" (singular) may elect "*an* award" of statutory damages for infringements "with respect to any one work," including derivative works. 17 U.S.C. § 504(c)(1) (emphasis added). As Plaintiffs explain (Response Br. 50-51), this means that when the same rightsholder owns both the musical composition and the sound recording, that owner is limited to a single award. But when the musical composition and sound recording are separately owned, each "copyright owner" is entitled to recover for the infringement of her "one work." Any other reading would lead to perverse results and inefficient multiple suits. And the Court can affirm on this legal basis, even though the district court ruled otherwise. *See Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (clarifying when affirmance on alternative grounds is appropriate even in the absence of a cross-appeal).

The special nature of musical compositions and sound recordings—and the relationship between them—reinforces why Congress sensibly chose to limit statutory damages to a single award only when one rightsholder owns both works. As the Copyright Office explains, "[t]he copyright in a sound recording covers the recording itself. It does not cover the music, lyrics, words, or other underlying content embodied in that recording." U.S. Copyright Office Circular 56: Copyright Registration for Sound Recordings, at 2, https://copyright.gov/circs/circ56.pdf.

Sound recordings and musical compositions are thus "considered two separate works for copyright purposes." Circular 56A at 1.[4]

What's more, special copyright rules for musical works help explain why it would make little sense for Congress to treat musical compositions as "parts of" sound recordings, 17 U.S.C. § 504(c)(1), when they are owned by different owners than the sound recording. The district court rightly recognized that these music-specific rules are outside the scope of this litigation. *Sony Music Entm't v. Cox Commc'ns*, 464 F. Supp. 3d 795, 826, n. 21 (2020). But the unique rules for copyrighting musical works nonetheless alter the relationship between owners of copyrights in musical compositions and creators of the sound recordings that embody those works. The upshot is that musical composition owners do not have the same relationship to sound recordings that embody their works as do copyright owners of other artistic works to true derivative works, such as a translation of a novel or a revision to a previously published book. This further explains why two damages awards make economic and practical sense for separately owned music compositions and sound recordings.

---

[4] Circular 56A (at 2) explains that one copyright application may be used "to register a sound recording and an underlying musical composition when (1) the musical composition and sound recording are embodied in the same phonorecord and (2) the claimant for both the musical composition and sound recording are the same." In those single-owner circumstances, one statutory damages award makes more sense given Congress's apparent purpose in avoiding duplicative statutory damages awards.

As Circular 56A explains, Circular 56A, at 2, musical composition owners, like other copyright holders, have the exclusive right to authorize musical arrangements, which are true "derivative works" that are "recast, transformed, or adapted," based on the original composition, 17 U.S.C. § 101; *see also id.* § 115(a)(2) (musical arrangement protected "as a derivative work" only with "express consent of the [musical composition] copyright owner").[5] But with respect to sound recordings that embody the composition, but do not transform it, musical composition owners have only the right to authorize the first fixation and distribution of a sound recording embodying the composition. *See* 17 U.S.C. § 115(a)(1)(A)(i) & (ii)(I). After that, anyone who wishes to make a sound recording may do so under a compulsory license. *Id.* § 115(a)(1)(A).

These legal features of the relationship between musical compositions and sound recordings have practical implications in the marketplace: Songwriters and other musical composition rightsholders lack the leverage that other artistic copyright holders wield to capture returns from derivative works. In other artistic spheres, if a single award must be split between the owner of the preexisting work and the derivative work (counter to the plain text of § 504(c) that allows each owner a recovery for their own work), the owner of the preexisting work would at least still

---

[5] *See also* U.S. Copyright Office, Circular 14: Copyright in Derivative Works and Compilations, at 1, https://www.copyright.gov/circs/circ14.pdf, which omits sound recordings from its otherwise extensive listing of derivative works.

have some leverage at the outset in approving the creation of the derivative work. Not so for musical composition rightsholders.

These music-specific rules and their practical consequences reinforce why it is highly questionable that Congress would have chosen to limit statutory damages for owners of musical compositions and sound recordings to a single award when the works have separate owners, distinct economic value, and are treated as distinct for every other purpose under the Act. For these reasons, and because Cox's plain failure to make the necessary record to support its flawed arguments makes reaching the issue unnecessary, amici respectfully urge the Court to take pains not to endorse the district court's reasoning in this complicated area of law, *see Anderson v. Consolidation Coal Co.*, 636 F. App'x 175, 183 n.5 (4th Cir. 2016) (declining to decide a preemption issue that was an alternative basis for affirmance while noting the "significant" questions raised).

**B.      Separate Tracks Are Entitled to Statutory Damages, Even When in Albums.**

In 1978, when the Copyright Act's current statutory damages provision, 17 U.S. § 504(c), took effect, music audiences were listening to records on gramophones and cassette tapes on car stereos and boomboxes.[6] Fast forward to current times, where smart phones and, overwhelmingly, digital streaming options

---

[6] *History of Sound Recording*, https://tinyurl.com/fp75zzej.

have taken over. By 2016, sales revenues from music streaming accounted for more than half of total music revenue and surpassed permanent downloads and physical albums as the industry's leading revenue source.[7]

In 1978 audiences might have consumed music almost exclusively in album form, with just a few songs released as "singles," and a court therefore might arguably have concluded that an album of music constituted one "work" for statutory damages purposes. But the market reality today compels the result that each song on an album is a separate work for the purpose of damages, at least if the songs can be streamed (e.g. through internet radio or streaming services like Spotify or Pandora) or purchased independently (e.g. on iTunes, AppleMusic, or other platforms). Every court to have reached the issue has agreed. *See Sullivan v. Flora, Inc.*, 936 F.3d 562, 569-571 (7th Cir. 2019) (adopting the "substantive economic inquiry" test and summarizing circuit law).

The district court here adopted the Second Circuit's "separate issuance" test from *EMI Christian*, 844 F.3d at 101. Other circuits have adopted a "substantive economic inquiry" test. *See Sullivan*, 936 F.3d at 569-71. Because the record here supports statutory damages under either test, Response Br. 54-55, there is no need to choose which one to apply to affirm. And of course, the Court need not reach the

---

[7] Janko Roettgers, *Streaming Services Generated More Than 50% of All U.S. Music Industry Revenue in 2016*, Variety (Mar. 30, 2017), https://tinyurl.com/3fnnhdaj.

legal issue at all due to Cox's own failure to put the necessary evidence before the jury. If this Court does get there, however, because *no* circuit has adopted Cox's argument that individual songs that have ever appeared on any album together are not separate works for purposes of § 504(c), this Court should reject it too.

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed.

Date: July 30, 2021

Respectfully Submitted,

By: s/ Ruthanne M. Deutsch
Ruthanne M. Deutsch
Hyland Hunt
Alexandra Mansbach
DEUTSCH HUNT PLLC

Danielle M. Aguirre
Kerry M. Mustico
Christopher A. Bates
NATIONAL MUSIC PUBLISHERS'
        ASSOCIATION

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Counsel for Amici Curiae certifies:

1.      This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Fourth Circuit Rule 32(b). This brief contains 5,875 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: July 30, 2021                                    Respectfully Submitted,


                                                        By: s/ Ruthanne M. Deutsch
                                                        Deutsch Hunt PLLC

                                                        *Counsel for Amici Curiae*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system on July 30, 2021. In accord with the Court's Updated Access and Operating Procedures in Response to COVID-19 of June 11, 2021, no paper copies have been filed with the Court. All participants in the case are registered CM/ECF users and so will be served by the CM/ECF system, which constitutes service pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Fourth Circuit Rule 25(a)(4).

Date: July 30, 2021

Respectfully Submitted,

By: s/ Ruthanne M. Deutsch
Deutsch Hunt PLLC

*Counsel for Amici Curiae*