# 21-1168

# United States Court of Appeals
### *for the*
# Fourth Circuit

---

SONY MUSIC ENTERTAINMENT, et al.,

*Plaintiffs/Appellees,*

– v. –

COX COMMUNICATIONS, INC. and COXCOM, LLC,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA
Case No. 1:18-cv-950
(The Honorable Liam O'Grady)

## BRIEF OF *AMICUS CURIAE* THE COPYRIGHT ALLIANCE IN SUPPORT OF APPELLEES AND AFFIRMANCE

NANCY WOLFF
SARA GATES
COWAN DeBAETS ABRAHAMS
  & SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, NY 10010
(212) 974-7474
nwolff@cdas.com

Date July 30, 2021

*Counsel for The Copyright Alliance*

CP COUNSEL PRESS • VA – (804) 648-3664

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _21-1168_    Caption: Sony Music Entertainment v. Cox Communications, Inc. and Coxcom, LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

The Copyright Alliance
(name of party/amicus)


who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:



3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: ___/s/ Nancy E. Wolff_____    Date: _____07/30/2021_____

Counsel for: __The Copyright Alliance_____

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ....................................................................1

SUMMARY OF ARGUMENT ...................................................................2

ARGUMENT ...............................................................................................5

    I.     COX AND ITS *AMICI* DEVALUE COPYRIGHT.............................5

    II.    THE DMCA PLAYS AN ESSENTIAL ROLE THAT
          WOULD BE DESTROYEDIF COX PREVAILS HERE .................13

    III.   ISPS AND COPYRIGHT OWNERS CAN
          CONTINUE TO OPERATE AND COEXIST
          WITHIN THE BOUNDARIES SET BY CONGRESS .....................21

CONCLUSION ..........................................................................................24

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
   881 F.3d 293 (4th Cir. 2018) ....................................................................*passim*

*Capitol Recs., LLC v. Vimeo, LLC*,
   972 F. Supp. 2d 500 (S.D.N.Y. 2013) ................................................................16

*Corbis Corp. v. Amazon.com, Inc.*,,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ...................................................16, 17

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994)............................................................................................10

*Hempton v. Pond5, Inc.*,
   No. 3:15-CV-05696-BJR, 2016 WL 6217113 (W.D. Wash. Oct. 25, 2016) .....17

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008)..............................................................17

*Mazer v. Stein*,
   347 U.S. 201 (1954)..............................................................................................6

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)..............................................................................................5

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
   464 F. Supp. 3d 795 (E.D. Va. 2020) ..................................................................8

*Twentieth Century Music. Corp. v. Aiken*,
   422 U.S. 151 (1975)..............................................................................................6

**Constitutional Provisions, Statutes, and Rules**

17 U.S.C. § 512................................................................................3, 16, 19, 22

Fed. R. App. P. 29 ....................................................................................1, 2

U.S. Const. art. I, § 8, cl. 8................................................................................5

**Legislative History**

H.R. Rep. 105-551, pt. 2 (1998) ..................................................................11, 15, 19

S. Rep. 105-190 (1998)........................................................................14, 15, 16, 19

**Other Sources**

Am. Intell. Prop. L. Ass'n,
  *Report of the Economic Survey 2019* (Sept. 2019) .....................................10–11

Amy X. Wang, *The Median U.S. Musician Is Still Making Under
  $25,000 a Year*, Rolling Stone (June 27, 2018),
  https://www.rollingstone.com/pro/news/the-median-u-s-musician-
  is-still-making-under-25000-a-year-666833 ...................................................6–7

Amy X. Wang, *Musicians Get Only 12 Percent of the Money the
  Music Industry Makes*, Rolling Stone (Aug. 7, 2018),
  https://www.rollingstone.com/pro/news/music-artists-make-12-
  percent-from-music-sales-706746 ..................................................................8–9

*Authors Guild Survey Shows Drastic 42 Percent Decline in Authors
  Earnings in Last Decade*, Authors Guild (Jan. 5, 2019),
  https://www.authorsguild.org/industry-advocacy/authors-guild-survey-
  shows-drastic-42-percent-decline-in-authors-earnings-in-last-decade ...............6

Christopher S. Stewart, *As Pirates Run Rampant, TV Studios Dial Up*, Wall
  St. J. (Mar. 3, 2013), https://www.wsj.com/articles/
  SB10001424127887324906004578292232028509990 .....................................7

*Copyright and the Internet in 2020: Reactions to the Copyright
  Office's Report on the Efficacy of 17 U.S.C. § 512 After Two
  Decades: Hearing Before the H. Comm. on the Judiciary*,
  116th Cong. (2020) (statement of Morgan Kibby)..............................................8

Eileen Kinsella, *A New Study Shows That Most Artists Make Very Little
  Money, With Women Faring the Worst*, Artnet (Nov. 29, 2017),
  https://news.artnet.com/market/artists-make-less-10k-year-1162295.................7

*Is the DMCA's Notice-and-Takedown System Working in the 21st Century?:
Hearing Before the Subcomm. of Intell. Prop. of the S. Comm. on the
Judiciary*, 116th Cong. (2020) (statement of Jonathan Berroya, Senior
Vice President and General Counsel, Internet Association) ............................20

*Is the DMCA's Notice-and-Takedown System Working in the 21st Century?:
Hearing Before the Subcomm. of Intell. Prop. of the S. Comm. on the
Judiciary*, 116th Cong. (2020) (oral statement of Don Henley).........................8

*Is the DMCA's Notice-and-Takedown System Working in the 21st Century?:
Hearing Before the Subcomm. of Intell. Prop. of the S. Comm. on the
Judiciary*, 116th Cong. (2020) (statement of Kerry Muzzey, composer) ..........11

*Is the DMCA's Notice-and-Takedown System Working in the 21st Century?:
Hearing Before the Subcomm. of Intell. Prop. of the S. Comm. on the
Judiciary*, 116th Cong. (2020) (statement of Jeffrey Sedlik)........................7, 10

John Blevins, *Uncertainty As Enforcement Mechanism: The New
Expansion of Secondary Copyright Liability to Internet Platforms*,
34 Cardozo L. Rev. 1821 (2013) ........................................................................15

Joshua P. Friedlander, *Mid-Year 2020 RIAA Revenue Statistics*, RIAA,
https://www.riaa.com/wp-content/uploads/2020/09/Mid-Year-2020-
RIAA-Revenue-Statistics.pdf (last visited July 29, 2021) ..................................8

Justin Antonipillai & Michelle K. Lee, *Intellectual Property and the U.S.
Economy: 2016 Update*, https://www.uspto.gov/sites/default/files/
documents/IPandtheUSEconomySept2016.pdf....................................................9

Matthew Sag, *Internet Safe Harbors and the Transformation of
Copyright Law*, 93 Notre Dame L. Rev. 499 (2017).............................13, 15, 20

Robert Stoner & Jéssica Dutra, Economists Incorporated, *Copyright
Industries in the U.S. Economy: The 2020 Report*,
https://www.iipa.org/files/uploads/2020/12/2020-IIPA-Report-
FINAL-web.pdf ....................................................................................................9

*Section 512 of Title 17: Hearing Before the Subcomm. on Courts,
Intell. Prop. & the Internet of the H. Comm. on the Judiciary*,
113th Cong. (2014) (statement of Maria Schneider)..........................................12

U.S. Copyright Office, *Section 512 of Title 17* (May 2020),
https://www.copyright.gov/
policy/section512/section-512-full-report.pdf ............................................*passim*

## <u>STATEMENT OF INTEREST</u>[1]

The Copyright Alliance is dedicated to advocating policies that promote and preserve the value of copyright and to protecting the rights of creators and innovators. It is a nonprofit, nonpartisan 501(c)(4) public interest and educational organization. The Copyright Alliance represents the copyright interests of over 1.8 million individual creators and over 13,000 organizations across the entire spectrum of creative industries, including graphic and visual artists, photographers, writers, musical composers and recording artists, journalists, documentarians and filmmakers, and software developers, as well as the small and large businesses that support them.

The Copyright Alliance's members rely heavily on copyright law to protect their works and provide them with the ability to commercialize their works and thereby continue to create and distribute their works to the public. As such, the Copyright Alliance and its members have a strong interest in the proper application of copyright law. The Copyright Alliance submits this *amicus curiae* brief to help the Court understand why this case carries significant implications for creators and Internet service providers, like Appellants, who do not meet the threshold statutory

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amicus curiae*, its members, or counsel, contributed money intended to fund preparation or submission of this brief.

requirements for one of the Digital Millennium Copyright Act ("DMCA") safe harbors and should not be allowed to get off scot-free when they knowingly facilitate infringement and financially benefit from the illegal activity. *Amicus curiae* submit this brief, on the consent of all parties,[2] in support of Appellees and affirmance of the district court's decision, pursuant to Fed. R. App. P. 29(a).

## SUMMARY OF ARGUMENT

Cox and its *amici* frame this litigation as a war between the music industry and the Internet. But this is a fallacy. The dispute is between copyright owners and those who facilitate infringement. On one side is Sony Music Entertainment, 15 other record companies, and 37 music publishing companies (collectively, "Sony"), which together represent the interests of thousands of copyright holders, and on the other is Cox Communications, Inc. and CoxCom, LLC (collectively, "Cox"), an Internet service provider ("ISP"), that seeks to evade liability from its role in facilitating massive infringement, despite the fact that it could have escaped liability by complying with the threshold requirements for the safe harbor available to ISPs under the DMCA. By misrepresenting Sony as hostile to the Internet and the rights of Internet users, Cox seeks to draw attention away from the failure of its own policies and actions. If Cox had simply adopted and implemented a DMCA-compliant repeat infringer policy—something that countless other ISPs have

---

[2] Counsel for both parties consented via email to the filing of this brief.

routinely done—it could have avoided being found liable for facilitating copyright infringement. Cox had an opportunity to absolve itself from liability and failed to take advantage of that opportunity. It is now asking this Court to ignore its failures and upset the careful balance of copyright law established by Congress by absolving Cox of secondary liability for its users' infringements despite its willful flouting of the law.

A ruling in favor of Cox in this instance would create a dangerous precedent, as it would embolden other ISPs to abandon their efforts to comply with the DMCA safe harbor requirements. No ISP would take its DMCA obligations seriously, feel compelled to respond to proper notices of infringement, or terminate a repeat infringer—no matter how egregious the behavior. Crafted by Congress as a compromise between copyright owners and Internet services to encourage the growth of the Internet while ensuring an effective means of enforcing copyright law, the DMCA plays a significant role in the copyright regime. Section 512 exempts ISPs from liability for the infringements of their users through "safe harbors," so long as they meet certain requirements, including the "termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). ISPs can readily meet these requirements to protect them from liability for copyright infringement. Cox, however, could not qualify for safe harbor protection because of its numerous

failings, including capping the number of infringement notices it would accept from any given copyright owner and its faux termination policy. As the Fourth Circuit previously ruled, "[a]n ISP cannot claim the protections of the DMCA safe harbor provisions merely by terminating customers as a symbolic gesture before indiscriminately reactivating them within a short timeframe." *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 304 (4th Cir. 2018).

Cox and its *amici* greatly misrepresent the import of the district court's decision, erroneously claiming that the decision will compel ISPs to terminate accounts after receipt of a *single* notice and deprive Internet users of an essential service. But these hyperbolic arguments completely ignore the parameters set by Congress in the DMCA, which ISPs have used for over twenty years without issue as the de facto standard for dealing with claims of copyright infringement on or through their systems. Although Congress requires ISPs to terminate repeat infringers in "appropriate circumstances" in order to qualify for the Section 512 safe harbors, the case law interpreting this provision leaves considerable discretion to ISPs, and nothing in the precedent compels termination after a single notice. ISPs can avail themselves of the DMCA's safe harbor protections by meeting its requirements, and many do. While the Copyright Office has recognized that the balance struck by Congress when it enacted the DMCA has since tilted considerably in favor of ISPs, ultimately, it is Congress' domain to rebalance the DMCA to

4

adequately incentivize ISPs and copyright owners to cooperate and deal with online copyright infringements. Until then, having failed to meet the DMCA's safe harbor requirements, Cox has no sound basis to ask the Court to relieve it of all liability for its role in facilitating users' infringements. Such a ruling would eviscerate the DMCA and encourage other ISPs to follow Cox's lead and flout their requirements under the DMCA, which will only serve to open the flood gates to online piracy.

## ARGUMENT

### I.    COX AND ITS *AMICI* DEVALUE COPYRIGHT

Cox and its *amici* urge the Court to elevate Internet access above all else and to relegate copyright law to an inconsequential afterthought. Essentially, Cox believes that copyright owners should be treated as second-class citizens—a position that is incongruous with what both the framers and Congress intended. The underlying purpose of copyright enshrined in the Constitution ensures that authors are incentivized to create works for the ultimate promotion of "the progress of Science and useful Arts . . . ." U.S. Const. art. I, § 8, cl. 8. "[T]he limited grant is a means by which an important public purpose may be achieved," as "[i]t is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). So, while copyright's immediate effect is

to provide authors a fair return for their creation, the ultimate goal is to use the economic incentive of exclusive rights to stimulate the creation and distribution of works to benefit the public. *Twentieth Century Music. Corp. v. Aiken*, 422 U.S. 151, 155–56 (1975); *see also Mazer v. Stein*, 347 U.S. 201, 219 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors . . . .").

In seeking a reversal, Cox asks the Court to adopt a position that would upend this centuries-old balanced regime, and disregard both the economic goals of copyright as well the ultimate aim to stimulate creation for the benefit of the public. This position contravenes the objectives of copyright and devalues a significant component of our economy and American culture. Authors big and small depend on the grant of exclusive rights to monetize their creations. For individual artists and creators, in particular, who have seen their incomes decline and already struggle to support their livelihoods with their creative work, licensing and enforcement of their exclusive rights is critical. *See Authors Guild Survey Shows Drastic 42 Percent Decline in Authors Earnings in Last Decade*, Authors Guild (Jan. 5, 2019), https://www.authorsguild.org/industry-advocacy/authors-guild-survey-shows-drastic-42-percent-decline-in-authors-earnings-in-last-decade; Amy X. Wang, *The Median U.S. Musician Is Still Making Under $25,000 a Year*, Rolling Stone (June

27, 2018), https://www.rollingstone.com/pro/news/the-median-u-s-musician-is-still-making-under-25000-a-year-666833; Eileen Kinsella, *A New Study Shows That Most Artists Make Very Little Money, With Women Faring the Worst*, Artnet (Nov. 29, 2017), https://news.artnet.com/market/artists-make-less-10k-year-1162295.

For example, photographer Jeffrey Sedlik testified before a Senate subcommittee that he makes a living creating and licensing photographs that appear in all different types of media. *Is the DMCA's Notice-and-Takedown System Working in the 21st Century?: Hearing Before the Subcomm. of Intell. Prop. of the S. Comm. on the Judiciary*, 116th Cong. 2 (2020) (statement of Jeffrey Sedlik) [hereinafter *DMCA Senate Hearing*]. Yet he spends his days and nights reporting infringements so that he can enforce his rights, because without enforcement his work would have no value and he would not be able to feed his family. *Id.* The effects of piracy are also felt by small business owners, who rely on the ability to monetize creative works in order to sustain their business and pay their employees. For example, Kathy Wolfe, the owner of an independent film company, reported that she lost over $3 million in revenue in one year from excessive pirating of her top 15 film titles, and due to the large losses, was forced to cut her employees' pay and discontinue her own salary. *See* Christopher S. Stewart, *As Pirates Run Rampant, TV Studios Dial Up*, Wall St. J. (Mar. 3, 2013), https://www.wsj.com/articles/SB10001424127887324906004578292232028509990.

Though piracy is a grave threat, Internet platforms play a large role in helping artists to monetize their creative work. Singer-songwriter Morgan Kibby testified before a House of Representatives committee that she relies on platforms to generate income, especially during the pandemic when she has not been able to tour in person. *Copyright and the Internet in 2020: Reactions to the Copyright Office's Report on the Efficacy of 17 U.S.C. § 512 After Two Decades: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. 4–5 (2020) (statement of Morgan Kibby). She testified that every dollar counts because something as small as $100 will keep the lights on in her studio. *Id.* Don Henley, founding member of the Eagles, echoed her sentiments and pointed out that, given how COVID-19 has decimated the industry, the only real source of income for musicians is from licensing digital music services. *DMCA Senate Hearing*, *supra*, at 1–2 (oral statement of Don Henley). Streaming revenues have increased, but musicians, singers, and songwriters often only see a nominal portion of these revenues through their share of royalties, so as Ms. Kibby noted, every dollar counts, and enforcement against unlicensed uses is all the more important. *See* Joshua P. Friedlander, *Mid-Year 2020 RIAA Revenue Statistics*, RIAA, https://www.riaa.com/wp-content/uploads/2020/09/Mid-Year-2020-RIAA-Revenue-Statistics.pdf (last visited July 30, 2021); Amy X. Wang, *Musicians Get Only 12 Percent of the Money the Music Industry Makes*, Rolling Stone (Aug. 7,

2018), https://www.rollingstone.com/pro/news/music-artists-make-12-percent-from-music-sales-706746.

Collectively, copyright industries contribute trillions in value to the U.S. gross domestic product ("GDP"). *See* Robert Stoner & Jéssica Dutra, Economists Incorporated, *Copyright Industries in the U.S. Economy: The 2020 Report* at 4, https://www.iipa.org/files/uploads/2020/12/2020-IIPA-Report-FINAL-web.pdf (reporting that copyright industries added more than $2.5 trillion to the U.S. economy in 2019); *see also* Justin Antonipillai & Michelle K. Lee, *Intellectual Property and the U.S. Economy: 2016 Update* at 22, https://www.uspto.gov/sites/default/files/documents/IPandtheUSEconomySept2016.pdf (estimating that IP-intensive industries, including copyright, patent, and trademark, accounted for $6.6 trillion in value added in 2014, with copyright and trademark industries driving the recent growth added). According to an annual report prepared for the International Intellectual Property Alliance in 2020, the value added by copyright industries to the U.S. economy has increased steadily over the last four years and, in 2019, accounted for 11.99 percent of the U.S. GDP. Stoner & Dutra, *supra*, at 4, 7. These copyright industries, together, employ approximately 11.7 million people. *Id.* at 11. Depriving copyright owners of a means to enforce their rights, as Cox insists in this instance, would inflict real damage on these industries that contribute greatly to the economy, as well as the employees that run them who, without the ability to

monetize and enforce their rights, will not be able to afford a basic living income. While creators are struggling to earn a living as professional artists, writers, and musicians, Cox reaps the benefits of its lax DMCA policies, with reported annual revenues greater than all the record companies and music publishers in the case combined. *See* Tr. 1763:10–1764:25.

Adoption of Cox's position would also harm the public by having a chilling effect on the creation of new works. In addition to economic gains, copyright serves the fundamental purpose of stimulating creation to benefit the country's shared wealth of knowledge and creation. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994) ("[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works . . . ."). For individual creators and small businesses, who rely greatly on the monetary returns that copyright enables to sustain their creative work, the threat of extensive infringement without recourse hangs heavy. Such creators often do not have the resources or financial means to litigate, so they rely heavily on the DMCA notice and takedown process to enforce their copyrights by removing the infringing content, spending countless hours monitoring and policing online infringements, which, in turn, takes time away from their creative work, and provides no compensation for their efforts. *See, e.g.*, *DMCA Senate Hearing*, *supra*, at 2 (statement of Jeffrey Sedlik); *see also* Am. Intell. Prop. L. Ass'n, *Report of the Economic Survey 2019*, at I-208 (Sept. 2019) (estimating that

the mean cost of litigating a copyright infringement lawsuit, inclusive of all pre- and post-trial costs, including an appeal when applicable, is $397,000).

The position that Cox urges, which as discussed below would constitute an end-run around the DMCA, would chip away at creators' ability to enforce their rights, posing an acute threat to their livelihoods and ability to financially support their creative work.  The DMCA is an important tool that enables copyright owners to send notices to remove infringing content without bringing an expensive federal litigation.  While some creators may have the financial means to afford a copyright lawsuit that can cost hundreds of thousands of dollars, copyright owners cannot feasibly sue *all* infringers.  *See DMCA Senate Hearing*, *supra*, at 4 (statement of Kerry Muzzey, composer).  As composer Kerry Muzzey pointed out to a Senate subcommittee, he cannot file lawsuit against every video uploader, so if he has a right without a remedy, he has no right.  *See id.*

If such effects became widespread, the harm would be borne not just by copyright owners, but by the public, which would be deprived of the music, art, writing, and performance that can be created when creators and artists are able to monetize their rights and financially support their work.  *See* H.R. Rep. 105-551, pt. 2, at 35 (1998) ("Throughout our history, the ability of individual members of the public to access and to use copyrighted materials has been a vital factor in the advancement of America's economic dynamism, social development, and

educational achievement."). For example, Maria Schneider, an award-winning composer, testified before a House of Representatives subcommittee that she invested $200,000 of her savings into a new album to only discover her work had quickly been pirated through numerous file-sharing websites. *Section 512 of Title 17: Hearing Before the Subcomm. on Courts, Intell. Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 1–2 (2014) (statement of Maria Schneider). The resulting loss of income, and the necessary time and effort spent enforcing her rights against the widespread infringements, threatened her ability to continue creating music. *See id.*

The Court should not give credence to Cox and its *amici*'s self-serving arguments that undermine the value of copyright. Notably, Cox's *amici* appear to have a fundamental misunderstanding of what this case is about. NTCA paints Cox as a victim, arguing that it was "hit" with a large judgment merely "for not acting *expeditiously* in terminating large numbers of customers' access to the internet." Dkt. No. 30-1 ("NTCA Br.") at 19–20 (emphasis added). EFF likewise frames the "core question in this litigation" as whether Cox "was sufficiently *aggressive* in terminating the accounts of thousands of subscribers, and if not, the consequences of the policy decision." Dkt. No. 29-1 ("EFF Br.") at 3 (emphasis added). But this case is not simply about how expeditious or aggressive Cox acted. As apparent from the record available to the Court, and as detailed in Sony's brief, Cox did virtually

nothing to stop or limit specific, known infringers from continuing to infringe. *See* Dkt. No. 37 ("Sony Br.") at 9–15. A ruling for Cox would only reward Cox for taking affirmative steps to ensure infringement would continue and send a strong message to copyright owners and industries that their rights are subordinate.

## II.    THE DMCA PLAYS AN ESSENTIAL ROLE THAT WOULD BE DESTROYED IF COX PREVAILS HERE

Critical to this case are Cox's internal policies on how it receives notices of infringement and treats users accused of infringement. Cox claims that it is a market leader in this vein, even though the Fourth Circuit ruled that its repeat infringer policy from this time period was inadequate for DMCA safe harbor protection. *See BMG*, 881 F.3d at 303; Dkt. No. 27 ("Cox Br.") at 13, 15. Cox attempts to distract from the failings of its own policies by arguing that it should not be penalized because it only offers a passive connection. *See* Cox Br. at 49–50. But a ruling for Cox in this instance would effectively eviscerate the purpose and effectiveness of the DMCA.

If the Court relieves Cox of its monetary liability, there would be no incentive for other ISPs to adopt and implement repeat infringer policies or comply with any of the requirements for DMCA safe harbor protection. *Cf.* Matthew Sag, *Internet Safe Harbors and the Transformation of Copyright Law*, 93 Notre Dame L. Rev. 499, 513–14 (2017) (discussing how the DMCA requirements are "optional, in the sense that platforms could ignore the safe harbors and simply accept the risk of

copyright infringement claims in relation to user content, but almost none elect to do so" because the safe harbor conditions have become a "de facto standard"). ISPs that do not wish to terminate users, which may affect their bottom line, could simply use Cox's approach as a road map to inform their own strategy to avoid liability, rather than complying with the DMCA's safe harbor provisions. A decision approving of Cox's tactics would result in significant threats to creators' rights and revenues. While large corporations and copyright industries may have the resources to monitor and pursue instances of piracy, small businesses and individual creators often do not and therefore would have no recourse for widespread infringements of their copyrights permitted by ISPs. *Cf.* U.S. Copyright Office, *Section 512 of Title 17* at 35–41 (May 2020) [hereinafter Section 512 Report], https://www.copyright.gov/policy/section512/section-512-full-report.pdf. This is precisely what Congress sought to avoid with its enactment of the DMCA. *See* S. Rep. 105-190, at 8 (1998).

To be clear, Cox did not assert a DMCA defense in this case, and therefore the outcome does not turn on Cox's eligibility—or lack thereof, *see BMG*, 881 F.3d at 301–05—for the DMCA safe harbor. That said, the DMCA looms large over this case, and Cox's self-inflicted failure to qualify for the safe harbor is the primary reason it finds itself in its present predicament. Had Cox taken the steps necessary to qualify for the Section 512(a) safe harbor, by even adopting a reasonable policy,

14

it could have shielded itself from infringement claims and would not need to be before this Court making arguments that, if accepted, would eviscerate copyright owners' ability to enforce their rights online, and effectively render the DMCA itself a nullity. Cox must not be rewarded for its own failings.

The DMCA plays an integral role in balancing the interests of Internet platforms, users, and copyright owners. Enacted in 1998, the legislation served as a compromise between copyright owners and Internet platforms to encourage the growth of the Internet while also ensuring that copyright owners have an effective means to protect their valuable intellectual property on the Internet. *See* H.R. Rep. No. 105-551, pt. 2 at 21 ("[T]he Committee believes it has appropriately balanced the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet."); *see also* Sag, *supra*, at 506–10; John Blevins, *Uncertainty As Enforcement Mechanism: The New Expansion of Secondary Copyright Liability to Internet Platforms*, 34 Cardozo L. Rev. 1821, 1834–35 (2013). Congress crafted Section 512, which provides limitations on liability for ISPs, to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. 105-190, at 20. Reviewing and drawing from case law on the liability of service providers, Congress also intended for

Section 512 to clarify liability and "provide[] greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." *Id.*

To qualify for any one of the four categories of services subject to safe harbor protection, in addition to the requirements of a particular safe harbor, service providers must first meet the threshold statutory requirements, which include, most notably, adopting and reasonably implementing a repeat infringer policy. *See* 17 U.S.C. § 512(i). The statute allows ISPs to develop their own internal policies for termination of repeat infringers. *Id.*; *see also Capitol Recs., LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 513 (S.D.N.Y.) (agreeing that "the threshold requirement of the adoption of a repeat infringer policy should not be an overly burdensome one to meet"), *amended on reconsideration in part*, 972 F. Supp. 2d 537 (S.D.N.Y. 2013), *and aff'd in part, vacated in part, remanded*, 826 F.3d 78 (2d Cir. 2016); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1101 (W.D. Wash. 2004) ("The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined.").

Courts considering such policies have often shown leniency to ISPs, granting ISPs wide latitude in determining who they consider to be a "repeat infringer" and how they "reasonably implement" their policy. *See* Section 512 Report, *supra*, at

16

95–109 (discussing comments from rightsholders groups criticizing courts'
approaches in holding ISPs to a lax standard).  For this reason, the arguments of one
of Cox's *amici* regarding the "uncertainty of safe harbor protection" is overblown.
*See* Dkt. No. 32-1 ("ICC Br.") at 27.  Courts have routinely found service providers
eligible for the DMCA's safe harbors in a variety of circumstances, construing the
statute broadly in favor of service providers.  *See, e.g.*, *Hempton v. Pond5, Inc.*, No.
3:15-CV-05696-BJR, 2016 WL 6217113, at *6 (W.D. Wash. Oct. 25, 2016)
(concluding that the defendant had met the statutory requirements even where it did
not have a specific repeat infringer policy); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586
F. Supp. 2d 1132, 1145 (N.D. Cal. 2008) (finding that the service provider had
reasonably implemented its repeat infringer policy even where it did not track users
to see if they set up different accounts); *Corbis Corp.*, 351 F. Supp. 2d at 1100–01
(holding that a service provider need not publicly specify what constitutes a "repeat
infringer").

　　　While Cox tries to portray a legal regime that imposes undue burdens on ISPs,
the U.S. Copyright Office has a starkly different view.  In its recent comprehensive
report on Section 512, the Copyright Office recognized that the balance struck by
Congress when it enacted the DMCA has since tilted considerably in favor of ISPs.
*See* Section 512 Report, *supra*, at 84 ("Over the decades, the shift in the balance of
the benefits and obligations for copyright owners and OSPs under section 512 has

resulted in an increasing burden on rightsholders to adequately monitor and enforce their rights online, while providing enhanced protections for OSPs in circumstances beyond those originally anticipated by Congress."), 197 ("The Copyright Office concludes that the balance Congress intended when it established the section 512 safe harbor system is askew."); *see also id.* at 109, 136.

Despite the wide latitude afforded, Cox has failed to adequately avail itself of the DMCA's safe harbor protection. Although Cox had a policy to receive and process infringement notices, as detailed in Sony's brief, Cox failed in many respects: Cox capped the number of notices it would accept from any given copyright owner, capped the number of suspensions it would implement per day, did not accept notices from certain rights holders because it did not like the DMCA-compliant notices, and ignored the first notice that it received relating to each subscriber. *See* Sony Br. at 11. Cox's thirteen-strike policy also did not sufficiently address repeat infringements. As the Fourth Circuit previously held in a case considering Cox's policy during the same time period, Cox was "very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy." *BMG*, 881 F.3d at 303. Rather, as both the *BMG* court and the district court have observed, Cox's terminations for infringement were rare. *See id.*; *Sony Music Ent. v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 807 (E.D. Va. 2020). So, while Cox

may have had a policy, its failure to implement it in "any consistent or meaningful way" left it essentially with no policy. *BMG*, 881 F.3d at 305.

Cox frames its position as a Catch-22, claiming that it is presented with the impossible choice of booting households or businesses off the Internet or developing new capabilities to monitor Internet usage to ferret out illegal activity. *See* Cox Br. at 4. But the record in this case shows that Cox had no problem terminating the accounts of large numbers of subscribers when they failed to pay their bills. Sony Br. at 4, 14, 32. Moreover, this is a choice that Congress contemplated when it enacted Section 512 and required ISPs to adopt and implement repeat infringer policies but did not require ISPs to undertake affirmative efforts to monitor their services for infringing activity in order to qualify for the safe harbors. *See* 17 U.S.C. § 512(i), (m); *see also* S. Rep. 105-190, at 52; H.R. Rep. 105-551, pt. 2 at 61. Numerous other ISPs have successfully implemented policies to comply with the safeguards set out by the DMCA. *See, e.g.*, ICC Br. at 8 (stating that all members of the Internet Commerce Coalition "maintain systems to process third-party claims of infringement received under the DMCA, have established response systems to review such claims, and have established policies for termination of repeat infringers"). Indeed, these ISPs generally sing the praises of the DMCA, affirming that the balance crafted by Congress has proven to be durable and has allowed for increased innovation and economic growth. *See* Section 512 Report, *supra*, at 73–

19

76 (quoting comments). For example, in its comments to the Copyright Office, the Electronic Frontier Foundation, which submitted an *amicus* brief to this Court, pointed out how the safe harbors have led to the emergence of new businesses, which in turn have become profitable platforms for artists. *See id.* at 75. Similarly, in testimony before a Senate subcommittee, the Internet Association (which also submitted an *amicus* brief) affirmed that the current structure of the DMCA is effective because ISPs are in the best position to know the circumstance of when to remove access. *Is the DMCA's Notice-and-Takedown System Working in the 21st Century?: Hearing Before the Subcomm. of Intell. Prop. of the S. Comm. on the Judiciary*, 116th Cong. 9–10 (2020) (statement of Jonathan Berroya, Senior Vice President and General Counsel, Internet Association).

Even though Cox has failed where many others have succeeded, it urges the Court to narrow copyright law so that it may escape liability despite its failings. Such a ruling would only serve to embolden other ISPs to abandon the DMCA and adopt Cox's approach. DMCA safe harbor protections are not obligatory—*i.e.*, service providers may decide not to take the steps necessary to avail themselves of the safe harbors, and instead rely on other defenses when accused of infringement— but they have become the de facto standard for how Internet platforms deal with claims of copyright infringement, especially when case law may not be clear. *See* Sag, *supra*, at 513–14. However, if the Court permitted Cox to escape all liability

for user infringements where it refused to terminate repeat infringers, there would be no incentive for ISPs to meet the optional requirements. It is essential that the Court consider the dangerous precedent it would create if it rules in favor of Cox.

## III. ISPS AND COPYRIGHT OWNERS CAN CONTINUE TO OPERATE AND COEXIST WITHIN THE BOUNDARIES SET BY CONGRESS

The Court should not be persuaded by Cox and its *amici*'s hyperbolic arguments regarding draconian measures and stranding users in Internet exile, all of which have no footing, and in any event, are better addressed to Congress. *See* Cox Br. at 36, 51; Dkt. No. 28-1 ("IA Br.") at 1, 3, 9, 11; EFF Br. at 3, 28–29; NTCA Br. at 6; ICC Br. at 7, 9; Dkt. No. 33-1 ("IP Law Profs Br.") at 11–13. Cox and its *amici* warn of the supposedly dire consequences that ISPs will face if the Court affirms the decision, proclaiming that ISPs will be forced to cut off entire accounts, including all household or business users, after the receipt of a *single* notice for fear of incurring substantial monetary liability. *See* Cox Br. at 36, 55; EFF Br. at 3–4; NTCA Br. at 4–6. But there is no such requirement imposed by either the district court's decision or the DMCA. Cox's concern is unwarranted and is also belied by the facts in the record, which show that Cox had no issue terminating both residential and business accounts (and all the users) when doing so benefitted Cox, *e.g.*, when users fail to pay Cox for their Internet service. Sony Br. at 4, 14, 32.

Similarly, Cox and its *amici* aggrandize fears over privacy concerns, claiming that risk of liability will lead ISPs to monitor Internet traffic in a way that erodes

subscribers' privacy interests.  Cox Br. at 4, 6–7; IP Law Profs Br. at 10–11.  Cox's

contention is hard to believe.  As Congress expressly set out in the DMCA, an ISP

is not obligated to undertake efforts to "monitor[] its service or affirmatively seek[]

facts indicating infringing activity . . . ."  17 U.S.C. § 512(m)(1).  ISPs need only

follow the de facto standard set out in the DMCA to shield themselves from liability.

Terminating the account of a repeat infringer, or taking other action to limit that

infringer's infringement, does not require the ISP to "control what their subscribers

can access" or "monitor the content that subscribers send and receive on their

networks."  IP Law Profs Br. at 10–11.

Cox's *amici* also argue that ISPs should not have to terminate a user's account

based on "unproven allegations of infringement," "mere allegations of civil

copyright liability," or "unverified allegations."  IP Law Profs Br. at 11; ICC at 7;

NTCA at 6.  Yet *amici* ignore the Court's prior ruling in *BMG*, in which the Court

held that an ISP cannot bury its head in the sand, proclaiming that it will act only

upon receipt of a court order adjudicating the subscriber's infringement.  *BMG*, 881

F.3d at 301–03.  The DMCA does not support this position, and there is no reason

to impose such a requirement in assessing underlying liability.

Congress enacted express rules by which ISPs may operate in order to

immunize themselves from monetary liability for the copyright infringements of

their users.  ISPs must only choose whether or not to follow those rules.  Ultimately,

as the Copyright Office has recognized, the existing DMCA regime favors ISPs, which have overwhelmingly reported satisfaction with the current operation of the safe harbors. Section 512 Report, *supra*, at 73–76, 197. As ISPs have acknowledged in comments to the Copyright Office, the DMCA has allowed companies to build Internet-based businesses without facing uncertain exposure from secondary liability. *See id.* (citing comments from Application Developers Alliance, Consumer Technology Association, Facebook, and Verizon). Beyond the guardrails set out in the DMCA, ISPs also have the option to work with copyright owners to combat infringements and further reduce risks of liability borne by ISPs—whether in the form of voluntary agreements, private initiatives, or DMCA+ systems. *See id.* at 35–50, 152–59.

For copyright infringers, Cox could have simply followed the lead of countless other ISPs and met the requirements of the DMCA. *See* ICC Br. at 27–28 (acknowledging that ISPs have an alternative to compelled termination and may rely on safe harbor protection). ISPs like Cox should not be permitted to enjoy the benefits of the DMCA safe harbors, which courts generally construe in favor of ISPs, and then cry foul after they receive an adverse ruling under the DMCA because they have not met the minimal requirements. A ruling for Cox on this appeal would further evidence the imbalance in the DMCA in favor of ISPs and send a strong

message to copyright owners and industries that their rights are subordinate. Copyright law does not countenance such a result.

## CONCLUSION

For the reasons set forth above, the Copyright Alliance, as *amicus curiae*, respectfully requests that the Court affirm the district court's decision.


Dated: July 30, 2021                    COWAN, DeBAETS, ABRAHAMS &
                                        SHEPPARD LLP

                                        ____/s/ Nancy E. Wolff_____
                                        Nancy E. Wolff
                                        Sara Gates
                                        41 Madison Avenue, 38th Floor
                                        New York, New York 10010
                                        Tel.: (212) 974-7474
                                        Fax: (212) 974-8474
                                        nwolff@cdas.com

                                        *Attorneys for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7) because this brief contains 5,747 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by Microsoft® Word 2020, the word processing software used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2020, Times New Roman, 14 point.

/s/ Nancy E. Wolff
Nancy E. Wolff

Dated: July 30, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/ Nancy E. Wolff<br>Nancy E. Wolff