No. 21-1168

Iɴ Tʜᴇ

# United States Court of Appeals for the Fourth Circuit

SONY MUSIC ENTERTAINMENT, ET AL.,

*Plaintiffs-Appellees*,

v.

COX COMMUNICATIONS, INC. and COXCOM, LLC,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:18-cv-950
(The Honorable Liam O'Grady)

## FINAL BRIEF OF PLAINTIFFS-APPELLEES

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, D.C. 20016
(202) 480-2999
matt@oandzlaw.com

Catherine E. Stetson
Jo-Ann Tamila Sagar*
Patrick C. Valencia
HOGAN LOVELLS US LLP
555 13th St. NW
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*\* Admitted only in New York. Supervised by
principals of the firm admitted in D.C.*

*Counsel for Plaintiffs-Appellees*

September 8, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES FOR REVIEW ....................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE...............................................................5

      A.    Copyright Infringement On High-Speed Internet Service ..................5

      B.    The Digital Millennium Copyright Act..................................................6

      C.    Plaintiffs Detect Rampant Infringement On Cox's Network And Notify Cox Of Specific Instances Of Infringement ..............................................................................6

      D.    Cox Devises A System To Enable Copyright Infringement .................................................................................9

            1.    P2P infringement on Cox's network was rampant ....................9

            2.    Cox loosened its infringement policies....................................10

      E.    Copyright Holders Sue To Hold Cox Accountable For Its Role In Its Subscribers' Infringement ..................................15

            1.    BMG's suit against Cox establishes that Cox is not entitled to DMCA safe harbor protection ................................15

            2.    A jury finds, in Plaintiffs' suit against Cox, that Cox is liable for secondary copyright infringement ................15

SUMMARY OF THE ARGUMENT ....................................................18

STANDARD OF REVIEW .................................................................19

ARGUMENT ....................................................................................20

## TABLE OF CONTENTS—Continued

**Page(s)**

I.   THE JURY CORRECTLY FOUND COX LIABLE FOR
     CONTRIBUTORY INFRINGEMENT .......................................................20

     A.   Cox Had The Requisite Knowledge Of Its Subscribers'
          Infringing Activity...............................................................21

          1.   The District Court correctly granted summary
               judgment to Plaintiffs...................................................21

          2.   Cox's "past acts" argument is both waived and
               foreclosed by *BMG* .....................................................23

          3.   Cox's other counterarguments are meritless............................25

     B.   Cox Materially Contributed To Its Subscribers'
          Infringing Conduct .............................................................27

          1.   This Court should not disturb the jury's finding
               that Cox materially contributed to its subscribers'
               infringement ...............................................................27

          2.   *Grokster* does not limit contributory liability to
               inducement ................................................................28

II.  THE JURY CORRECTLY FOUND COX LIABLE FOR
     VICARIOUS INFRINGEMENT ................................................................32

     A.   Cox Reaped Direct Financial Benefit From Its
          Subscribers' Infringing Conduct .......................................33

          1.   The jury's finding that Cox had a direct financial
               interest in the infringement is supported by
               substantial evidence .................................................33

          2.   "Draw" is not required under the law, and the jury
               had sufficient evidence to find "draw" in any event................34

     B.   Cox Had The Right And Ability To Supervise Its
          Subscribers' Infringing Activity.........................................37

**TABLE OF CONTENTS—Continued**

**Page(s)**

III.  COX'S "DOMINO THEORY" OF REVERSAL IS
      INCORRECT...................................................................39

      A.    Reversal On One Theory Of Liability Would Not
            Require Vacatur Of The Entire Verdict .............................39

      B.    Reversing The District Court's Summary Judgment
            Ruling Would Not Affect The Jury's Liability And
            Damages Findings .................................................42

IV.   THIS COURT SHOULD UPHOLD THE JURY'S DAMAGES
      AWARD ...................................................................44

      A.    The District Court Could Not Bypass The Jury's
            Findings And Reduce The Damages Award On Cox's
            Derivative-Works Theory .........................................46

            1.    Cox failed to present evidence to the jury of any
                  relationship between recordings and compositions
                  in suit..........................................................46

            2.    The jury's award comports with the plain text of
                  the statute ..................................................50

      B.    The District Court Could Not Bypass The Jury's
            Findings To Reduce The Damages Award On Cox's
            "Compilation" Theory ............................................51

            1.    Cox failed to present evidence to the jury that
                  Plaintiffs issued any of the works in suit only in
                  album form ..................................................52

            2.    The statute permits recovery for individual tracks
                  also issued on an album ....................................54

CONCLUSION.....................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ...........................................................................38

*Arista Recs., Inc. v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) .............................................................38

*Arista Recs. LLC v. Lime Grp. LLC*,
  No. 06-CV-5936-KMW, 2011 WL 1311771 (S.D.N.Y. Apr. 4, 2011) .............56

*Atl. Recording v. Media Grp. Inc.*,
  No. 00-CV-6122, 2002 Jury Verdicts LEXIS 52291 (C.D. Cal. Aug.
  23, 2002) ............................................................................................................17

*Barber v. Whirlpool Corp.*,
  34 F.3d 1268 (4th Cir. 1994) .....................................................................40, 41

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  199 F. Supp. 3d 958 (E.D. Va. 2016) ..............................................................57

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  881 F.3d 293 (4th Cir. 2018) ..................................................................... *passim*

*Bouchat v. Baltimore Ravens Football Club*,
  346 F.3d 514 (4th Cir. 2003) ............................................................................26

*Brundle v. Wilmington Tr., N.A.*,
  919 F.3d 763 (4th Cir. 2019) ............................................................................49

*Bryant v. Media Right Prods., Inc.*,
  603 F.3d 135 (2d Cir. 2010) ...........................................................20, 48, 55, 56

*Capitol Recs., Inc. v. MP3tunes, LLC*,
  48 F. Supp. 3d 703 (S.D.N.Y. 2014) ................................................................53

*Chretien By & Through Chretien v. General Motors Corp.*,
  959 F.2d 231 (4th Cir. 1992) ............................................................................47

iv

**TABLE OF AUTHORITIES—Continued**

<u>Page(s)</u>

*City of Richmond v. Madison Mgmt. Grp., Inc.*,
   918 F.2d 438 (4th Cir. 1990) ................................................................42

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
   259 F.3d 1186 (9th Cir. 2001) .......................................................17, 45

*CoStar Grp., Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ................................................................20

*Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*,
   36 F.2d 354 (7th Cir. 1929) ..................................................................39

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ...............................................33, 34, 37

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016) ......................................................45, 53, 56

*Feltner v. Columbia Pictures Television, Inc.*,
   523 U.S. 340 (1998)...............................................................................45

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ...........................................................*passim*

*Fraser v. Major League Soccer, LLC*,
   284 F.3d 47 (1st Cir. 2002).....................................................................43

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971) ................................................30, 31, 34

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
   327 F. Supp. 3d 606 (S.D.N.Y. 2018) ................................................17

*Lans v. Stuckey*,
   203 F. App'x 956 (11th Cir. 2006)......................................................43

*Long Term Care Partners, LLC v. United States*,
   516 F.3d 225 (4th Cir. 2008) ...............................................................37

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
   243 F.3d 789 (4th Cir. 2001) ................................................................44

*Matthew Bender & Co. v. West Pub. Co.*,
   158 F.3d 693 (2d Cir. 1998) ...............................................................29

*McKiver v. Murphy-Brown, LLC*,
   980 F.3d 937 (4th Cir. 2020) ..............................................................19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)..........................................................28, 29, 30, 32

*Minyard Enters., Inc. v. Southeastern Chem. & Solvent Co.*,
   184 F.3d 373 (4th Cir. 1999) ..............................................................23

*Ortiz v. Jordan*,
   562 U.S. 180 (2011)...........................................................................49

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .......................................................30, 31

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) .............................................................31

*R.R. ex rel. R. v. Fairfax Cnty. Sch. Bd.*,
   338 F.3d 325 (4th Cir. 2003) ..............................................................50

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
   316 F.2d 304 (2d Cir. 1963) .......................................................33, 34, 39

*South Atl. Ltd. P'ship of Tenn., L.P. v. Riese*,
   284 F.3d 518 (4th Cir. 2002) ..............................................................43

*Sullivan v. Flora, Inc.*,
   No. 15-CV-298-WMC, 2019 WL 7037790 (W.D. Wis. Dec. 20, 2019) ...........54

*Sullivan v. Flora, Inc.*,
   936 F.3d 562 (7th Cir. 2019) .......................................................54, 55

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Tattoo Art, Inc. v. TAT Int'l, LLC*,
   794 F. Supp. 2d 634 (E.D. Va. 2011) ............................................53, 56

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*,
   682 F.3d 292(4th Cir. 2012) .......................................................40, 41

*United States v. Herrera*,
   23 F.3d 74 (4th Cir. 1994) ..............................................................40

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) .............................................................6

*Wilson v. Muckala*,
   303 F.3d 1207 (10th Cir. 2002) .......................................................43

*Xoom, Inc. v. Imageline, Inc.*,
   323 F.3d 279 (4th Cir. 2003), *abrogated on other grounds by Reed
   Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)........................53, 55

**STATUTES:**

17 U.S.C. § 101 *et seq* ........................................................................1

17 U.S.C. § 102(a)(2)........................................................................50

17 U.S.C. § 102(a)(7)........................................................................50

17 U.S.C. § 504(c) ...........................................................................40

17 U.S.C. § 504(c)(1)...........................................................46, 50, 51

17 U.S.C. § 504(c)(2)........................................................................17

17 U.S.C. § 512(a) .............................................................................6

17 U.S.C. § 512(c)(3)(A) .....................................................................8

17 U.S.C. § 512(c)(3)(A)(ii) ..............................................................27

17 U.S.C. § 512(d) .............................................................................6

# TABLE OF AUTHORITIES—Continued

**Page(s)**

17 U.S.C. § 512(g)(3) ..................................................................26

17 U.S.C. § 512(h) ......................................................................32

17 U.S.C. § 512(j) ..........................................................................6

17 U.S.C. § 512(k)(2) ....................................................................6

17 U.S.C. § 512(i)(1)(A) .............................................................4, 6

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

28 U.S.C. § 1338(a) ......................................................................1

**RULE:**

Fed. R. Civ. P. 51 ........................................................................42

**LEGISLATIVE MATERIALS:**

H.R. Rep. 105-551(II) (1998) ........................................................6

S. Rep. No. 105-190 (1998) ..........................................................6

**OTHER AUTHORITIES:**

3 Nimmer on Copyright § 12.04(A)(4)(b) ....................................30

3 Nimmer on Copyright § 12.04(A)(5)(a) ....................................30

In The
## United States Court of Appeals for the Fourth Circuit

SONY MUSIC ENTERTAINMENT, ET AL.,

*Plaintiffs-Appellees*,

v.

COX COMMUNICATIONS, INC. and COXCOM, LLC,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:18-cv-950
(The Honorable Liam O'Grady)

## FINAL BRIEF OF PLAINTIFFS-APPELLEES

### STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), because the action arose under the Copyright Act, 17 U.S.C. § 101 *et seq*. This appeal is from a final judgment, entered January 12, 2021. JA1053. Cox appealed on February 10, 2021. JA1054. This Court has jurisdiction under 28 U.S.C. § 1291.

### STATEMENT OF THE ISSUES FOR REVIEW

1. Whether the District Court correctly granted Plaintiffs summary judgment on Cox's knowledge of its subscribers' infringement and correctly sustained the jury's verdict finding Cox contributorily liable for that infringement, where Cox timely received hundreds of thousands of detailed notices about particular subscribers' serial infringement, continued to facilitate that infringement by

providing those subscribers with internet service, and failed to take any meaningful action to limit the infringement.

2. Whether the District Court correctly sustained the jury's verdict finding Cox vicariously liable for its subscribers' infringement, where the evidence established that Cox received direct financial benefit from that infringement while declining to exercise its right and ability to stop or limit the infringement.

3. Whether the District Court correctly sustained the jury's calculation of the number of works infringed for purposes of an award of statutory damages, where Plaintiffs proved the number of works infringed, Cox failed to present the jury with the necessary evidence to support Cox's more restrictive damages theories, and where Cox's theories are meritless in any event.

## INTRODUCTION

The story Cox tells in its brief—a beleaguered internet service provider, doing its best to police infringement on its system, targeted by copyright holders "waging war on the internet," Br. 1, line 1—is divorced from both the record and reality. Here is what this Court, the District Court, a federal jury, and Congress have already concluded:

1. This Court has already held that Cox acted so unreasonably in addressing its subscribers' known repeated copyright infringement that it was ineligible for the accommodating "safe harbor" provided by the Digital Millennium

Copyright Act (DMCA) for internet service providers accused of secondary liability for infringement. *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 305 (4th Cir. 2018).

2.    The District Court found it beyond reasonable dispute that Cox knew specific subscribers were using its system to repeatedly infringe Plaintiffs' works.

3.    The jury heard ample evidence that Cox created a safe haven for repeat infringers, forgiving infringement after infringement after infringement, and celebrating its contempt for copyright in emails like "F the dmca!!!"

4.    The jury heard ample evidence that Cox profited directly from infringement on its system.  Rather than suspend or terminate serial infringers' accounts, as it had the right and ability to do, Cox instead retained them as subscribers, and collected hundreds of millions of dollars in subscription fees from them.

5.    The jury's verdict was supported by a towering pile of evidence—much of it from Cox itself.

6.    The jury's damages award for the over 10,000 works found infringed fits comfortably within the statutory range.  It also acknowledges the significant value of Plaintiffs' works pirated by Cox's subscribers, the massive scope and viral nature of the infringement, and the billions in profits Cox made while disregarding Plaintiffs' rights.

7.     Congress made clear in the DMCA that internet service providers are *expected* to terminate repeat infringers "in appropriate circumstances." 17 U.S.C. § 512(i)(1)(A). During the time period at issue here, Cox terminated over 600,000 subscribers for not paying their bill. It terminated 32 for copyright infringement.

In addition to offering a narrative on appeal that does not square with the facts proven below, Cox introduces several arguments on appeal that it did not make or expressly disclaimed below. It forfeited and waived these arguments.

As for the arguments Cox preserved, the District Court made no error of law, and rightly sustained the jury's verdict. Despite receiving hundreds of thousands of infringement notices specifying the subscribers using its network to repeatedly infringe Plaintiffs' copyrights, Cox continued to provide those subscribers with unfettered high-speed internet access and failed to take meaningful action to limit the infringement. The District Court thus correctly sustained the jury's finding of contributory liability. And because Cox's own documents demonstrated its financial interest in turning a blind eye to the rampant known infringement on its network, and its refusal to exercise its ability to limit that infringement, the District Court correctly sustained the jury's finding of vicarious liability.

Finally, Plaintiffs established that Cox's subscribers serially violated over 10,000 of Plaintiffs' copyrighted works, and the jury awarded a mid-range statutory

damages award for each. Cox's complaints on appeal challenging the number of works at issue are too late and too little.

This Court should affirm.

## STATEMENT OF THE CASE

### A.     Copyright Infringement On High-Speed Internet Service

Online music piracy costs the music industry billions of dollars. And stealing music is easier and faster than ever. Historically, web services like Napster allowed infringers to download one recording at a time from one location using a centralized database. JA315; JA330. More recently, however, platforms using file-sharing protocols like BitTorrent and Gnutella have become the major channels for theft of copyrighted music. JA364-365; JA386. These so-called "peer-to-peer" (P2P) protocols allow individual users ("peers") to download and upload music files directly from and to multiple users simultaneously. JA312; JA368-376. They also don't rely on a single central repository that can be targeted or shut down. JA330-331. Peers can be identified only by their Internet Protocol (IP) addresses, which are assigned and known only by their Internet Service Providers (ISPs), like Cox. JA333-334. This process exponentially increases the efficiency and volume of online piracy—and thus fosters a staggering amount of infringement. JA325-327.

**B.     The Digital Millennium Copyright Act**

Enacted in 1998, the DMCA updated copyright law for the digital age.  *See*

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001).  Title II of

the Act shields from liability ISPs who "transmit potentially infringing material over

their networks," S. Rep. No. 105-190, at 2 (1998), while still preserving "strong

incentives" for ISPs to cooperate with copyright owners and to "deal with copyright

infringements . . . in the digital networked environment."  *Id.* at 20; H.R. Rep. 105-

551(II), at 49 (1998).  To achieve this balance, Congress "create[d] a series of 'safe

harbors[ ]' for certain common activities of service providers."  S. Rep. No. 105-

190, at 19; *see* 17 U.S.C. § 512(a).

To qualify for the safe harbor, an ISP must "adopt[ ] and reasonably

implement[ ] . . . a policy that provides for the termination in appropriate

circumstances of subscribers . . . who are repeat infringers."  17 U.S.C.

§ 512(i)(1)(A).  Compliance with these requirements guarantees ISPs protection

from monetary liability for copyright infringement resulting from the specified

activities.  17 U.S.C. § 512(a)-(d), (j), (k)(2).

**C.     Plaintiffs Detect Rampant Infringement On Cox's Network And
          Notify Cox Of Specific Instances Of Infringement**

Plaintiffs are the leading record companies and music publishers in the world;

they own the copyrighted works of some of the most iconic recording artists and

songwriters of our time.  Their businesses depend on developing musical talent and

6

protecting the sound recordings and musical compositions these artists and songwriters create.  JA280-283.

In an effort to combat online piracy, the record company Plaintiffs authorized their trade association, the Recording Industry Association of America (RIAA), to address infringement on P2P networks using BitTorrent and similar protocols. RIAA hired MarkMonitor, a respected anti-piracy company with expertise in P2P networks.  JA356; JA383-384.  MarkMonitor trains and consults with law enforcement, including the FBI and the Department of Homeland Security, on how to detect and monitor crime on P2P networks.  *Id*.  RIAA engaged MarkMonitor to identify instances of infringement on these networks and report them to the relevant ISP—here, Cox.  JA356.

MarkMonitor identified infringement by searching for potentially infringing files being copied and distributed on P2P networks.  (Cox complains about MarkMonitor's "bots," Br. 1, 14; that term doesn't appear in the trial record.)  The first time MarkMonitor found a potentially infringing file, it would download the full file and use digital fingerprinting technology to identify its contents.  For each

file verified as a match to one of Plaintiffs' copyrighted sound recordings, MarkMonitor logged the file's "hash value" in a database. JA356-361.[1]

MarkMonitor was able to report instances of infringement on P2P networks by connecting with the Cox subscriber to confirm that the subscriber was online, running a file-sharing program, and in the process of distributing a confirmed infringing file, as identified by its hash value. MarkMonitor would then send infringement notices to Cox. JA356-361.

Those notices added up in a hurry. Between February 2013 and November 2014 alone,[2] MarkMonitor sent Cox 163,148 infringement notices. JA389. The notices were submitted under penalty of perjury and contained the information the DMCA required, 17 U.S.C. § 512(c)(3)(A), including identifying the subscriber's specific IP address; the date and time of infringement; the infringing file identified by hash value; a representative sample of what was infringed; and the peer-to-peer network used. JA341; JA685.

---

[1] A cryptographic hash value is an alphanumeric representation of the contents of a digital file. Two files with the same hash value will almost invariably contain the same content. *See* JA1924.

[2] The claim period in this case is August 1, 2013 through November 26, 2014, for the Sony/ATV and EMI Publisher Plaintiffs, and February 1, 2013 through November 26, 2014, for the other Plaintiffs.

Those notices represent only a snapshot of the true scope of infringement on Cox's network. For one thing, Cox limited the number of notices it would receive from RIAA. *See infra* at 11. Given the viral and continuous nature of P2P file distribution, it is impossible to measure the true magnitude of infringement taking place. JA386; JA375-377. On a P2P network, a subscriber downloading a piece of a file automatically begins to distribute that piece to other users, such that every downloader becomes an uploader, and none of those transactions are recorded. JA694-701. Notwithstanding these limitations, Cox's own database still showed that Cox received nearly *5.8 million* infringement notices during the claim period. JA1505-09; JA494-495.

### D.    Cox Devises A System To Enable Copyright Infringement

The trial evidence showed that Cox continued to provide service to known serial infringers, and indeed took deliberate steps to ensure that infringement could continue unabated on its network so Cox could continue to collect subscription revenues from those known serial infringers.

### 1.    P2P infringement on Cox's network was rampant.

During the time period at issue here, nearly 13% of all traffic on Cox's network was attributable to P2P activity, JA572, and over 99% of P2P traffic was infringing, JA578-579. The head of Cox's own abuse team, Jason Zabek, confirmed as much: "Bittorrent is used for one thing only . . . and I would know. ;-)." JA1490.

As the rate of incoming DMCA notices increased exponentially each year, JA218, Cox knew it had a serious infringement problem. Cox's senior security architect, Matt Carothers, observed that "[w]e are getting crushed" by DMCA infringement notices. *Id.* According to Randall Cadenhead, the in-house lawyer responsible for overseeing Cox's DMCA program, Cox recognized that "customers were infringing and [those customers] almost certainly knew they were infringing and needed to stop." JA674; JA677.

### 2. Cox loosened its infringement policies.

As infringement on Cox's network skyrocketed, Cox's infringement policies grew more and more lax.

a. **Cox shrank its abuse team**. Cox's "abuse team" enforces its Acceptable Use Policy; it is charged with addressing copyright infringement and other issues like hacking, spam, and bandwidth overuse. JA464; JA563-566. Rather than expand the team to address the raft of infringement and DMCA notices, Cox slashed it, from 14, to nine, then to four members. JA1428; JA446-447; JA482. Cox also reduced the hours of its Technical Operations Center (TOC), JA447-448, and cut from five to two the corporate team overseeing the TOC, JA479.

b. **Cox ignored the first notice for each subscriber, imposed arbitrary caps on the number of notices it would accept, and deleted millions of notices**. Cox relieved its skeleton abuse team of some work by ignoring the first infringement

notice to each subscriber. JA218; JA522, JA524; JA541; JA544-545. But it couldn't ignore them all. Instead Cox imposed a daily cap on the number of notices it would accept from any one copyright holder and ignored all notices over the cap. JA344-347; JA498-500. As one Cox employee put it, Cox's approach was "TO CAP THESE SUCKERS!" JA1482; JA555.

Cox also blacklisted complainants based on its contention that a copyright holder's proposed settlement of infringement claims within a DMCA notice was an improper "shakedown." Under this policy, Cox "silently deleted" nearly 3.7 million notices—64% of all notices received—and blocked millions more from even being received. JA1506-09; JA1494; JA490-491; JA485-487.

c. **Cox set up sham policies and procedures ensuring infringement would continue**. In 2004, Cox's policy was to terminate subscribers caught infringing three times. JA1434-35; JA443. In the ensuing years, however, Cox increased this "three strike" policy for residential subscribers to 10, then 12, and ultimately 13 strikes before it would even *consider* termination. JA1369; JA1388; JA1419. By 2012, Cox had expanded its "graduated response" to residential customer infringement to 14 strikes, including: (i) combining multiple notices into one ticket; (ii) ignoring the first notice; (iii) sending automated warning emails for the next six notices; and (iv) issuing faux "suspensions" of customers for the next four notices to a so-called "walled garden," from which the customer could

11

reactivate service with a simple click-through or call.  *See* JA407-412; JA1430.

Shortly after announcing some of these changes, Zabek described them candidly to

his team:  "I think we didn't help anyone with this action (expect [sic] the law

breaking customers)."  JA1479.

For Cox Business customers, Cox's policy was all but illusory.  In 2013, Cox

swapped its four-strike policy, where "the account is terminated with no recourse to

get their HSI [High Speed Internet] service back," for a never-suspend, never-

terminate policy.  *See* JA548-552; JA1363-64; JA1373-75; JA1425-27; JA1353.

Cox acknowledged that "there may be excessive violations" but "[i]t is not likely

that we would terminate a [Cox Business] customer for DMCA violation."  JA1426.

Cox's "14-strike" policy was further neutered when the company set a per-

day maximum of 300 suspensions across all abuse types.  JA1475-76; JA475-476.

That limit was routinely hit by 9 a.m.  After that, subscribers who should have been

suspended got only a bland email warning.  JA1477.

d.    **Cox developed "unwritten semi-policies" to enable infringement**.

For years, Cox imposed "soft terminations"—terminations with immediate

reactivation—and a clean slate for infringers.  JA1484; JA467-469; JA558-559.  As

Zabek told his abuse team, "[a]s long as our process of warnings, suspen[s]ion, then

termination is followed, we can turn the customer back on and start the DMCA count

over."  JA1480.  "This is to be an unwritten semi-policy."  JA1484.

Cox eventually shifted from this "unwritten semi-policy." As Joseph Sikes, a supervisor in the abuse group, explained: "[n]ow, when we terminate Customers, we REALLY terminate the Customer (for 6 months)." JA1492. But this new policy came with another change. Cox simply stopped terminating infringing subscribers altogether. Cox received nearly 5.8 million infringement notices between February 2013 and November 2014. It terminated 32 subscribers for copyright infringement during that time. JA1511.

e. **Cox prioritized profits over limiting infringement**. Time and again, Cox prioritized collecting subscription fees from infringers over addressing its pervasive infringement problem.

Cox's abuse team demonstrated this in email after email: "This customer will likely fail again, but let's give him one more change [sic]. he pays 317.63 a month." JA1499. "This Customer pays us over $400/month and if we terminate their internet service, they will likely cancel the rest of their services." JA1498 (Sikes email). Cox was "'soft terminating' for DMCA because we didn't want to loose [sic] the revenue." JA1488 (Sikes again). Zabek instructed the abuse team to give repeat infringers a "clean slate" following Cox's soft termination and reactivation so that Cox could "collect a few extra weeks of payments for their account ;-)." JA1485. He instructed his team "to hold on to every subscriber we can" and to "keep customers and gain more RGU's" (i.e., revenue generating units, otherwise known

13

as subscribers). JA1484; JA1480. With this guidance, Zabek and Sikes "set the tone for the abuse group." JA441.

By contrast, Cox did not hesitate to terminate users when its revenues were at stake. In 2013 and 2014, Cox disconnected internet service for almost 620,000 subscribers—approximately *25,000 per month*—for failure to pay their bills. JA1512. In the same period, Cox terminated 32 subscribers for copyright infringement. JA1511.

By not terminating known repeat infringers, Cox received subscription revenues it would not have otherwise obtained, and avoided costs it would have otherwise incurred. JA587-616; JA716-721. For example, a Cox residential subscriber who was the subject of over 100 infringement notices was billed $8,594 from February 2013 through 2016—*after* Cox received at least 13 infringement notices for that subscriber. JA597-599; JA1713. Two Cox Business customers were billed $706,434 and $12,525, respectively, after those customers received 13 infringement notices. JA600-601; JA1714-15. Between February 2013 and December 2016, Cox received *$208 million* in revenue from subscribers caught infringing three or more times. JA593-594; JA1709.

Cox thus demonstrably and consistently prioritized cash over copyright. Zabek—the head of Cox's abuse team, remember—summed up the company's sentiment best: "F the dmca!!!" JA1495.

### E. Copyright Holders Sue To Hold Cox Accountable For Its Role In Its Subscribers' Infringement.

#### 1. BMG's suit against Cox establishes that Cox is not entitled to DMCA safe harbor protection.

In 2014, BMG, a music publisher, sued Cox for contributory and vicarious copyright infringement. In response, Cox pled the DMCA's "safe harbor" as an affirmative defense, which the District Court rejected on summary judgment. This Court affirmed, holding that Cox failed to do even the little that the DMCA's safe harbor provision requires: "Cox failed to qualify for the DMCA safe harbor because it failed to implement its policy in any consistent or meaningful way—leaving it essentially with no policy." *BMG*, 881 F.3d at 305. Although "Cox formally adopted a repeat infringer 'policy,'"—the thirteen-strike policy described above— Cox "made every effort to avoid reasonably implementing that policy. Indeed, in carrying out its thirteen-strike process, Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated the policy." *Id.* at 303.

This Court's decision that Cox is ineligible for the DMCA safe harbor from at least February 2012 through November 2014 controls here.

#### 2. A jury finds, in Plaintiffs' suit against Cox, that Cox is liable for secondary copyright infringement.

In July 2018, Plaintiffs sued Cox for contributory and vicarious infringement of over 10,000 of Plaintiffs' copyrighted sound recordings and musical

compositions.  Given this Court's prior ruling, Cox could not, and did not, plead the DMCA safe harbor.

After discovery, the parties cross-moved for summary judgment.  JA1752-99, JA1860-1906.  The District Court granted Plaintiffs' motion in part and denied Cox's.  JA230-255.

With respect to Plaintiffs' motion, the District Court concluded that "[n]o genuine issue of material fact remains" as to "the knowledge element of contributory liability," because Plaintiffs had shown "knowledge of specific conduct which allegedly infringed all sound recordings and musical compositions identified in suit."  JA250.  As the District Court explained, "MarkMonitor found an individual user on a P2P site, took specific data from that user, and then generated a detailed and time-stamped notice.  The resulting notice both documented a specific instance of infringement and notified Cox of that instance."  JA249.

Cox cross-moved for summary judgment, asking the court, among other things, to limit the number of works eligible for statutory damages based on (i) an alleged overlap between sound recordings and musical compositions, and (ii) tracks released as part of compilations.  JA255.  The District Court denied Cox's motion, concluding that "issues of material fact remain[ed]" for the jury.  *Id*.

The parties proceeded to trial.  The District Court instructed the jury in accordance with the traditional law of secondary copyright liability, as reflected in

pattern jury instructions and this Court's *BMG* decision. After twelve days of trial, the jury returned a special verdict finding Cox liable for willful contributory and vicarious copyright infringement of 10,017 of Plaintiffs' copyrighted works.

Plaintiffs had elected to seek statutory damages under 17 U.S.C. § 504(c)(2), which permits awards of up to $150,000 per work for willful infringement. The jury awarded Plaintiffs $99,830.29 for each of the 10,017 works—a total of $1 billion. Cox's brief goggles at the number, but the jury's per-work damages award is comfortably within the statutory range and comparable to other awards.[3] The verdict also acknowledges the value of Plaintiffs' many thousands of works that Cox's subscribers pirated, JA284-287; the massive scope of the infringement, JA386; JA375-378; and the $8.3 billion in net profits Cox made while disregarding Plaintiffs' rights, JA584.

In post-trial motions, Cox attacked the jury's liability finding and damages award. Denying each challenge, the District Court found sufficient evidence supporting the jury's liability findings, JA878-883; denied remittitur and rejected Cox's complaint about excessive damages, JA914-934; and concluded that Cox had

---

[3] *See, e.g.*, *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1191, 1193-94 (9th Cir. 2001) ($72,000 per work); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 634 (S.D.N.Y. 2018) ($100,000 per work; remittitur denied); *Atl. Recording v. Media Grp. Inc.*, No. 00-CV-6122, 2002 Jury Verdicts LEXIS 52291 (C.D. Cal. Aug. 23, 2002) ($89,828.27 per work).

failed to provide the jury with the evidence necessary to support Cox's claim that the number of works eligible for statutory damages was inflated, JA862-935, JA1047-52.

Cox appealed.

## SUMMARY OF THE ARGUMENT

I.     This Court should affirm the jury's judgment that Cox is liable for contributory copyright infringement.  The District Court correctly held on summary judgment that the hundreds of thousands of specific notices Cox received from Plaintiffs established that Cox knew enough about particular subscribers' serial infringement to be able to stop those subscribers from further infringing Plaintiffs' copyrights.  And the jury reasonably concluded that Cox materially contributed to its subscribers' infringement based on the substantial evidence at trial that Cox continued to provide known repeat infringers with high-speed internet service, without taking meaningful action to stop the infringement.

II.    This Court should affirm the jury's judgment that Cox is liable for vicarious copyright infringement.  The jury reasonably reached that conclusion based on the substantial evidence at trial that Cox failed to exercise its right and ability to stop the infringement—including terminating subscribers, where warranted, or through other reasonable measures—so that Cox could retain the fees paid by those high-value, high-usage infringing subscribers.

III.    This Court does not need to affirm both liability findings in order to affirm the judgment and damages.  Where, as here, the claims in the case are predicated on the same conduct and the maximum recovery for each is the same, only one theory of liability is necessary to sustain the judgment.

IV.    Cox's challenges to the jury's damages award are meritless.  To begin with, the District Court found disputed fact questions at summary judgment as to both of Cox's challenges to the measure of damages.  Cox failed to present the jury with evidence supporting its theories.  Its challenges are thus forfeited.  As to Cox's "derivative works" challenge, the statute makes clear that each owner is entitled to one award for each copyrighted work infringed.  And as to its "compilation" challenge, Cox's simplistic theory is not supported by precedent.

The judgment should be affirmed.

## STANDARD OF REVIEW

The District Court's grant of summary judgment on the knowledge element of contributory liability is reviewed de novo.  *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 953 (4th Cir. 2020).

The District Court's denial of Cox's motion for judgment as a matter of law is reviewed de novo, "with all evidence and reasonable inferences taken in the light most favorable" to Plaintiffs as the prevailing parties after a jury trial.  *Id.* at 965.

The District Court's determination of the number of "works" for purposes of an award of statutory damages is a mixed question of law and fact, reviewed de novo. *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010).

## ARGUMENT

## I.    THE JURY CORRECTLY FOUND COX LIABLE FOR CONTRIBUTORY INFRINGEMENT.

Cox is contributorily liable for its subscribers' infringement because "with knowledge of the infringing activity," Cox "materially contribute[d] to the infringing conduct" of its subscribers. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (internal quotation marks omitted).  The District Court granted summary judgment to Plaintiffs on knowledge because undisputed evidence showed that Cox knew of specific instances of infringement by subscribers who repeatedly infringed Plaintiffs' works.  The jury found Cox liable for contributory infringement because the evidence showed that Cox's subscribers directly infringed Plaintiffs' copyrights and that Cox materially contributed to that infringement by continuing to provide repeat infringers with the internet service that they used to infringe Plaintiffs' works.  Cox offers this Court no reason to disturb either conclusion.

### A.     Cox Had The Requisite Knowledge Of Its Subscribers' Infringing Activity.

#### 1.     The District Court correctly granted summary judgment to Plaintiffs.

This Court has explained that contributory infringement requires knowledge of "*specific* instances of infringement," such that Cox could identify "*which ones* [of its subscribers] were infringing" Plaintiffs' copyrights, and "*do* something about it." *BMG*, 881 F.3d at 311-312.  Plaintiffs offered undisputed evidence at summary judgment satisfying each point.

First, Plaintiffs offered undisputed evidence that Cox received notice from MarkMonitor of hundreds of thousands of "specific instances of infringement." JA1766, JA1772-73.   The infringement notices provided Cox with detailed information, including the Cox subscriber's IP address, a date- and time-stamp of the infringing conduct, a hash value identifying the underlying file with the infringing music, and a representative copyrighted work in that infringing file. JA1766.

Second, the undisputed evidence showed that, upon receipt of these DMCA-compliant notices, Cox could and did identify "which ones" of its subscribers were infringing.  *BMG*, 881 F.3d at 311.  JA1766.  Cox admitted that it maintained a database cataloging infringement notices for particular subscribers.  *Id.*  Cox even

21

produced documents correlating each RIAA notice to a particular subscriber. JA217-224, JA1808-18.

Third, the undisputed evidence showed that Cox could "*do* something" to curtail the infringement of the specific subscribers brought to its attention. *BMG*, 881 F.3d at 312. Cox's Acceptable Use Policy explicitly gave the company the right to terminate infringing subscribers. JA1768. Rather than exercise that authority when warranted, Cox took steps "to stem the flow" of infringement notices it would accept, JA217-224, JA1808-18, and provided a safe haven to repeat infringers, JA1769-72.

The District Court examined this undisputed evidence and, after carefully walking through *BMG*'s reasoning, concluded that the notices are "dispositive" as to "[t]he more specified knowledge required to satisfy this element in the Fourth Circuit." JA248-249. In *BMG*, this Court explained that evidence showing "*some number of its subscribers* were infringing" would be insufficient to establish the requisite knowledge absent evidence of "*which* [subscribers] were infringing." *BMG*, 881 F.3d at 311. In contrast, as the District Court explained, the proof of knowledge here was pointed and specific: The notices "documented a specific instance of infringement and notified Cox of that instance," and "accomplished far more than telling Cox that *some number* of subscribers were infringing. They told

Cox *which ones*." JA249-250 (internal quotation marks omitted). Cox plainly could "*do* something" about that. It just elected not to.

### 2. Cox's "past acts" argument is both waived and foreclosed by *BMG*.

Unable to escape this Court's prior ruling on the knowledge standard, Cox now argues that evidence of "*past* acts" of infringement falls short of "establishing that Cox knew that each of the 58,000 accused subscribers was 'substantially certain' to infringe again." Br. 39-40.

This argument is forfeited. Cox did not argue in the District Court that notice of past acts of infringement is insufficient evidence of knowledge. *See* JA1860-1906 (Cox SJ MOL), JA1964-2011 (Cox Opp. to Pls.' MSJ), JA2022-59 (Cox Reply ISO MSJ).[4] Accordingly, this Court need not address it. *See Minyard Enters., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 387 n.15 (4th Cir. 1999).

Cox's forfeited argument also misapprehends the facts and the law. The notices showed that Cox subscribers were engaged in ongoing acts of infringement—both by distributing the infringing content to countless others, JA1764-66, and by downloading the infringing content as well. In fact, some notices identified subscribers on successive dates with increasing percentages of the same

---

[4] The single reference to "past acts" in Cox's summary judgment briefing appears in Cox's discussion of its purported inability to supervise or control its subscribers, an element of vicarious liability. *See* JA2004; JA2052.

file, ultimately amassing 100% of the file, thereby literally catching them in the act. JA1923.

As for the law:  Even accepting Cox's characterization of the facts, this Court squarely held in *BMG* that a defendant-ISP's knowledge that particular subscribers have infringed in the past *is* knowledge that infringement is substantially certain to result from continued provision of service to those subscribers.  *See* 881 F.3d at 307-308, 311-312.  In insisting otherwise, Cox cherry-picks quotes from *BMG*'s discussion of "one-time sales," ignoring *BMG*'s discussion of "subscription services." *Id.* at 308.  But the distinction is significant. *Id.*  In the case of "one-time sales," *BMG* explains that a seller is liable for contributory infringement if she "sells a product that has lawful uses, but with the *knowledge* that the buyer *will in fact* use the product to infringe copyrights." *Id.* at 307.  By contrast, "in cases, like this one, that involve subscription services or rentals," the seller is liable for contributory infringement if she "learns that specific customers use their [service] to infringe," and "nonetheless renews the lease to those infringing customers." *Id.* at 308.

"Consider a company that leases VCRs, learns that specific customers use their VCRs to infringe, but nonetheless renews the lease to those infringing customers." *Id.*  In that circumstance, "the company knows that its action—renewing the lease of the VCR to these specific customers—is substantially certain to result in infringement, and so an intent to cause infringement may be presumed."

24

*Id*.  *BMG* thus could not be clearer:  In the subscription context, an ISP has knowledge of infringement sufficient for the imposition of contributory liability if the provider knows the identity of subscribers who have used the subscription (here, Cox's internet service) to infringe in the past.  That's precisely what happened here. Cox knew the subscribers who consistently infringed and continued to provide them with access to high-speed internet services.  *See, e.g.*, JA562 ("This customer is well aware of his actions and is upset that after years of doing this he is now getting caught."); JA221 (email reflecting decision not to terminate although "[t]his customer will likely fail again"); JA224 (email reflecting decision to reactivate subscriber described as "another example of an . . . habitual abuser").  Under *BMG*, Cox is presumed to know that "renewing the [subscription of] these specific customers" is "substantially certain to result in infringement."  881 F.3d at 308.

Cox's proposed foreknowledge standard, Br. 39-40, would effectively insulate ISPs outside the DMCA safe harbor from liability for the infringement of even "habitual abusers," even when the ISPs well know that a "customer will likely fail again" to comply with copyright law.  *BMG* does not support that position.

### 3.    Cox's other counterarguments are meritless.

Attempting to create the appearance of a factual dispute where none exists, Cox serves up hypotheticals, statistics presented for the first time on appeal, and attorney argument.  But to secure reversal of the District Court's summary judgment

ruling, Cox needed to "set forth specific facts" that are "[n]either unsupported speculation, nor evidence that is merely colorable." *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 522, 525 (4th Cir. 2003) (cleaned up). Cox failed.

Cox claims the accuracy of the infringement notices was "hotly disputed," such that it was unreasonable for the District Court to conclude that the notices adequately informed Cox of its subscribers' infringement. Br. 41-42. That is wrong. Any factually disputed elements of the notices did not contribute to the District Court's summary judgment ruling. For example, Cox questioned where a subscriber caught illegally sharing a file had *initially* obtained that file. JA2062-67, JA2070. But that evidence was irrelevant to the knowledge element of contributory infringement; a subscriber illegally distributing copyrighted content is engaged in infringement regardless of the source of the content.

Similarly, Cox contends that "[m]any subscribers" contested "infringement accusations when Cox forwarded them." Br. 41. That is news. *None* of Cox's subscribers provided a counter-notification to Cox disputing the allegations. JA1925; *see* 17 U.S.C. § 512(g)(3). These infringement notices thus were not "unproven" or "unverified," as amici describe it. Law Professors Br. 11; NTCA/CTIA/USTelecom Br. 6. They were *uncontested*.

Finally, Cox contends that the notices "were inaccurate as to infringements" because they failed to name "most of the works on which Plaintiffs sought (and the

District Court granted) summary judgment." Br. 42. To begin, the DMCA permits a copyright owner to identify a representative listing of works infringed, 17 U.S.C. § 512(c)(3)(A)(ii). Plaintiffs did just that. JA1766. The District Court also struck the attorney argument and Rule 1006 summary forming the basis of Cox's claim that the notices failed to name certain works, *see* JA225-226; JA1889-90. Cox does not challenge that ruling here. And in any event, Cox's (very) graduated procedures did not vary depending on the work infringed. JA1924-25, JA1926, JA1927-28, JA1929. Cox's procedures—such as they were—focused on subscriber identity and the number of notices attributed to them. *Id.*

Cox's knowledge of its subscribers' specific infringing acts was evident at summary judgment. The District Court's reasoning flows inexorably from this Court's *BMG* decision. The District Court's grant of summary judgment to Plaintiffs on the knowledge element of contributory liability should be affirmed.

### B. Cox Materially Contributed To Its Subscribers' Infringing Conduct.

#### 1. This Court should not disturb the jury's finding that Cox materially contributed to its subscribers' infringement.

"[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability," especially where "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [defendant]." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76

27

F.3d 259, 264 (9th Cir. 1996).  The trial evidence showed that Cox did just that when it continued to provide known repeat infringers with high-speed internet service, without which its subscribers could not infringe.  The jury also heard testimony that P2P infringement on Cox's network was extensive and persistent, and that Cox's provision of high-speed internet service was the necessary ingredient for the massive quantity of infringement that occurred.  JA572; JA605-608; JA722; JA652-653; JA1448-74.  Nothing more is required.

### 2.    *Grokster* does not limit contributory liability to inducement.

Cox argues that this Court should vacate the jury's finding that Cox materially contributed to its subscribers' infringement because the District Court purportedly "eliminated the essential ingredient of 'culpable . . . conduct'" in secondary liability, and "violated the rule that copyright law generally 'bar[s] secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful uses.'"  Br. 44 (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937, 933 (2005)).  This challenge reprises the arguments Cox raised—and lost—in *BMG*, 881 F.3d 293. "[C]ontrary to Cox's argument, the fact that its technology can be substantially employed for a noninfringing use does not immunize it from liability for contributory copyright infringement."  *Id.* at 307.  This Court should not disturb the jury's finding.

a.    Cox's argument relies on a misunderstanding of *Grokster* and its application here.  In *Grokster*, the Supreme Court applied the patent law concept of "inducement" to a claim of contributory infringement.  545 U.S. at 936-937.  This case is about material contribution.   Inducement and material contribution are alternative bases for the imposition of contributory liability.  *See Matthew Bender & Co. v. West Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998).  As the Supreme Court explained, inducement "premises liability on purposeful, culpable expression and conduct," such that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Grokster*, 545 U.S. at 936-937.  Material contribution, in contrast, does not require intent.   To establish material contribution, plaintiff must show that the defendant had knowledge of the infringing activity and provided the tools facilitating infringement.  *Matthew Bender*, 158 F.3d at 706.

Consequently, a material-contribution theory could support liability where an inducement theory would not.   *Grokster* itself is an example.   In stating the inducement test, *Grokster* makes clear that, although a defendant's intent to encourage infringement generally is a required element of inducement liability, there is no requirement that the defendant be aware of specific infringements resulting from that inducement.  Indeed, the Court expressly rejected—as "error"—the view

29

that inducement-based liability must be premised on the defendant's "'specific knowledge of infringement at a time at which they contributed to the infringement.'" *Grokster*, 545 U.S. at 933-934. It was enough in the inducement context to point to a defendant's "statements or actions directed to promoting infringement." *Id*. at 935. In contrast, as this Court held in *BMG*, a material-contribution theory requires knowledge of specific infringements. 881 F.3d at 311.

      b.     The *Grokster* Court "did not suggest that a court must find inducement to impose contributory liability under common law principles." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 n.11 (9th Cir. 2007). To the contrary, *Grokster* re-affirmed the formulation in *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.* of the "doctrines of secondary liability,"—which predicates contributory infringement on "induce[ment] . . . *or* material contribut[ion]," 443 F.2d 1159, 1162 (2d Cir. 1971) (emphasis added)—as "common law principles" that are "well established in the law." 545 U.S. at 930. *See also id*. at 931, 934-935 (explaining that "*Sony* did not displace other theories of secondary liability" and "was never meant to foreclose rules of fault-based liability derived from the common law").

     Post-*Grokster* cases continue to impose contributory infringement liability where a defendant knows of and materially contributes to infringement. *See* 3 Nimmer on Copyright § 12.04(A)(4)(b), (5)(a) (collecting cases); *see also BMG*, 881

30

F.3d at 306 ("Google's image search engine 'substantially assists websites to distribute their infringing copies' of copyrighted images, and thus constitutes a material contribution, even though 'Google's assistance is available to all websites, not just infringing ones'") (quoting and explaining *Amazon*, 508 F.3d at 1172).

c.      Because Cox incorrectly reads *Grokster* to require inducement evidence, Cox surmises (at Br. 46-47) that Plaintiffs are relying instead on the Ninth Circuit's "simple measures" rule, which assigns liability to defendants who don't take "simple measures" to "prevent further damage to copyrighted works." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671 (9th Cir. 2017) (internal quotation marks omitted). Having projected this argument onto Plaintiffs, Cox and one of its amici attack it, arguing that terminating a subscriber's internet access is not a "simple measure" but a terrible and draconian one, "nuclear option," "digital death penalty." Br. 49-50; Internet Ass'n Br. 8-12.

How odd. It was Cox who advocated for the application of the simple-measures rule below. *See* JA1890; JA821; JA854. Flip-flop aside, Cox's position that termination is no "simple measure" cannot be squared with the evidence. Cox's Acceptable Use Policy makes clear that customers' accounts may be terminated for many different reasons. And terminate Cox did—just not for copyright violations. Its termination decisions were money-driven. In 2013 and 2014, Cox terminated over 600,000 residential and 20,000 business customers for nonpayment—over 800

terminations *a day*.  JA761; JA1512.  In Cox's view, the occasional termination for repeated and flagrant copyright infringement is "downright monstrous."  Br. 50. Termination for nonpayment?  Downright common.

The DMCA also makes clear that Congress viewed termination, in appropriate circumstances, as a reasonable means of preventing further damage to copyrighted works when the activity did not cease after repeated infringement notices.  17 U.S.C. § 512(h).  It has already been established that Cox did not do even the minimum necessary to entitle it to the DMCA's safe harbor.[5]  *BMG*, 881 F.3d at 305.  "Instead, the evidence shows that Cox's decisions not to terminate . . . were based on one goal: not losing revenue from paying subscribers."  *Id.*

## II.    THE JURY CORRECTLY FOUND COX LIABLE FOR VICARIOUS INFRINGEMENT.

Cox is vicariously liable for its subscribers' infringement because it "profit[ed] from direct infringement while declining to exercise a right to stop or limit it."  *Grokster*, 545 U.S. at 930.  Cox disputes both elements of Plaintiffs' vicarious liability claim.  But the jury was properly instructed and correctly found Cox liable, based on substantial record evidence.

---

[5] One of Cox's amici fears that "uncertainty" of safe-harbor protection, coupled with the damages award here, will lead to harsh termination policies.  ICC Br. 9.  There is nothing "uncertain" about the protection here.  Cox flouted the safe harbor's requirements by knowingly assisting, while financially benefitting from, rampant, viral infringement.  Cox now reaps the consequences.  This is not a case involving an ISP that took reasonable steps to address repeat infringement.

### A. Cox Reaped Direct Financial Benefit From Its Subscribers' Infringing Conduct.

#### 1. The jury's finding that Cox had a direct financial interest in the infringement is supported by substantial evidence.

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004); *see also Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963). Plentiful evidence supported the jury's finding of that causal link between Cox facilitating the infringing activity and receiving a direct financial benefit.

The trial evidence showed that Cox kept loosening (and ignoring) its policies to avoid having to terminate paying subscribers. *See* JA1434-35; JA443 (3 strikes); JA1369 (10 strikes); JA1388 (13 strikes). The evidence further showed that Cox routinely determined not to terminate accounts so it could continue to collect those infringers' subscription fees. *See supra* at 13-14. Had Cox addressed infringement by terminating accounts or enforcing suspensions, Cox would have obtained less revenue and its service would have been less attractive for would-be infringers. *See* JA609-612; JA648-649; JA720; JA758.

The trial evidence also showed that repeat infringers were particularly profitable. Cox's business model is built on charging customers increased fees for higher speeds and data usage. *See* JA603-605; JA569-570; JA757. And ample

33

evidence showed that infringing P2P activity consumes significant bandwidth and creates the need for subscribers to purchase more expensive plans, with higher monthly payments for Cox. JA605-608; JA722; JA1448-74. Subscribers with greater numbers of infringement tickets paid Cox more, on average, than subscribers with fewer infringement tickets. *See* JA609-610. For example, residential subscribers who were the subject of 20 or more infringement notices from 2012-2014 paid Cox more per month, on average, than residential subscribers who were the subject of only 1 or 2 infringement notices. JA1696-1722.

> **2.    "Draw" is not required under the law, and the jury had sufficient evidence to find "draw" in any event.**

a.    Cox argues that Plaintiffs needed to present proof of "draw" to demonstrate the required financial benefit—that is, "proof that customers chose to purchase Cox's service *because of* the ability to infringe their works." Br. 29, 30. There is no such rule. *Ellison*, upon which Cox heavily relies, states that "draw" is "sufficient to state the financial benefit element of the claim for vicarious liability"— not that it is *necessary*. 357 F.3d at 1078; *see also, e.g.*, *Shapiro*, 316 F.2d at 308 (defendant department store liable for infringing sale of pirated records manufactured and sold by concessionaire because store profited from concessionaire's sales "whether 'bootleg' or legitimate"); *Gershwin*, 443 F.2d at 1163 (defendant promotor held liable even though paid the same fee regardless of the amount of infringement by the artist).

34

That a showing of "draw" is not necessary to find financial benefit is clear from *Fonovisa*, 76 F.3d 259, the case from which *Ellison* derives the concept of "draw," *see* 357 F.3d at 1078-79. In *Fonovisa*, defendant Cherry Auction operated a swap meet where vendors sold counterfeit copies of Latin music recordings owned by Fonovisa. 76 F.3d at 261. In reversing the dismissal of Fonovisa's complaint, the Ninth Circuit explained that "[t]he plaintiff has sufficiently alleged direct financial benefit," because "[t]he facts alleged by Fonovisa . . . reflect that the defendants reap substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices." *Id*. at 263. Even though infringers and non-infringers alike paid a Cherry Auction admission fee, just as Cox's infringing and non-infringing subscribers alike pay subscription fees, the court still found financial benefit. Cox thus cannot be right that a flat subscription fee absolves it from reaping financial benefit from infringing subscribers.

Moreover, only *after* having held that Fonovisa had "sufficiently alleged direct financial benefit" because of those Cherry Auction flat admission and parking fees did the Ninth Circuit state that its "*conclusion is fortified* by the continuing line of cases, starting with the dance hall cases, imposing vicarious liability on the operator of a business where infringing performances enhance the attractiveness of the venue to potential customers." *Id.* (emphasis added). Put differently, the fact

that "the sale of pirated recordings at the Cherry Auction swap meet is a 'draw' for customers" was an *additional* reason for the *Fonovisa* court's holding—not a necessary component of it. *Id*.

b.     Even though evidence of draw is not necessary to show that Cox benefited from its subscribers' infringement, Plaintiffs supplied the jury with that evidence anyway.  The jury learned that roughly 13% of Cox's network traffic was attributable to P2P activity, and over 99% of P2P usage was infringing.  *See* JA572; JA578-581; JA1513-1612.  Even with its capping notices and blacklisting complainants, the evidence showed that Cox received millions of infringement notices, including hundreds of thousands from Plaintiffs involving the works in suit. JA1504-09; JA494-495; JA1352.  This high volume of infringing activity supports the reasonable inference that the ability to infringe was a draw—especially as to subscribers who, after countless notices, understood that there would be no consequence to their continued infringement.

Additionally, evidence regarding Cox's revenues showed that subscribers were willing to pay more for the ability to infringe.  Cox argues that "[a]ll subscribers pay Cox a flat monthly fee for their internet access package no matter what they do online." Br. 27.  But Cox had a tiered pricing structure; it charged subscribers higher monthly fees for increased data allowances.  JA569-570.  The evidence also showed that subscribers consuming more data paid higher monthly fees.  JA570; JA607-608.

The jury further heard that P2P activity was bandwidth-intensive, that more data usage requires more speed, and that Cox aggressively advertised its network speeds as an enhancement to subscribers' ability to download music. JA605-608; JA722; JA652-653; JA1448-74. The jury also saw and heard evidence that if Cox terminated the accounts of known repeat infringers, it would have lost those subscription revenues. *See, e.g.*, JA1487 (explaining that a "soft termination" is "a suspension that is called a termination with the likelihood of reactivation" "for DMCA [because] we don't want to loose [sic] the revenue"). That suffices as draw. *See Ellison*, 357 F.3d at 1079 (finding no financial benefit without evidence that AOL "attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement").

### B.     Cox Had The Right And Ability To Supervise Its Subscribers' Infringing Activity.

Cox argues that it lacked the ability to supervise its subscribers because it cannot police infringing activity "in real time." Br. 34-35; *see also id*. 32-35. This argument is (again) forfeited. In post-trial motions, Cox raised specific arguments challenging its vicarious liability for *Cox Business* subscribers' infringement. It did not challenge the sufficiency of Plaintiffs' evidence that Cox possessed the right and ability to stop or limit the infringement by the other 95% of its subscribers. *See* JA844-846; JA856. Cox cannot make this new argument now. *See, e.g.*, *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 237 (4th Cir. 2008) (rejecting

party's argument that its waiver of a "generalized claim" should be excused because it had raised a "narrow[er]," related claim below).

Regardless, Cox's argument is wrong. "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001); *Arista Recs., Inc. v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (same). Cox plainly could do so. Cox's Acceptable Use Policy explicitly permitted Cox to take a variety of actions against infringement, including termination, JA1389-1408; JA398-401; JA1511. And while Cox terminated for infringement only once in a blue moon, *see supra* at 13, it was positively profligate with terminations for nonpayment, *see supra* at 14, 31-32; JA761; JA1512.

The "dance hall" cases are instructive here. "[T]he cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Shapiro*, 316 F.2d at 307. That is so "whether the bandleader is considered, as a technical matter, an employee or an independent contractor, and whether or not the proprietor has knowledge of the compositions to be played or any control over their selection." *Id.* In some of the cases, dance hall owners even expressly warned the bands not to perform copyrighted works without a license from the copyright owners. *See, e.g.*,

*Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354, 355 (7th Cir. 1929). The dance hall cases establish that the ability to hire and fire the bandleader is sufficient to show that the dance hall proprietor had the ability to supervise the band—regardless of whether the dance hall proprietor could control the set list once the band started playing. So too here. Cox's ability to provide—and limit—internet access to its subscribers is sufficient to show that Cox had the ability to supervise its subscribers' infringement.

## III. COX'S "DOMINO THEORY" OF REVERSAL IS INCORRECT.

### A. Reversal On One Theory Of Liability Would Not Require Vacatur Of The Entire Verdict.

The District Court correctly held on summary judgment that the deluge of specific notices Cox received from Plaintiffs established Cox's knowledge about particular subscribers' serial infringement such that it could stop those subscribers from further infringing Plaintiffs' copyrights. And the jury reasonably found, after hearing 12 days' worth of evidence at trial, that Cox materially contributed to, directly profited from, and failed to supervise its subscribers' infringement, rendering Cox liable for contributory and vicarious infringement. Yet Cox argues that "[i]f this Court agrees with Cox's position on *any one* of the liability arguments, it should order a new trial on all issues." Br. 54.

Again, Cox waived this argument. Cox proposed, in its own jury instructions and verdict form, a unified per-work damage award "for each work contributorily *or*

vicariously infringed," without distinguishing between theories. JA258 (emphasis added); JA229 (Cox's proposed instruction 32: "If you find that Cox contributorily or vicariously infringed any of Plaintiffs' copyrighted works, then Plaintiffs are entitled to an award."). *See, e.g.*, *United States v. Herrera*, 23 F.3d 74, 75-76 (4th Cir. 1994) (invited-error doctrine barred defendant's challenge to jury instruction where defendant had requested the instruction). And the District Court ultimately approved that verdict form. JA822-823.

In any event, Cox is wrong. A reversal on one theory of liability would not require vacatur of the entire verdict. Plaintiffs' contributory and vicarious liability claims are predicated on common conduct, and the statutory damages available for those claims are identical, *see* 17 U.S.C. § 504(c). A new trial is "unnecessary" where, as here, "the claims in th[e] case are predicated on the same conduct, and the maximum recovery for each claim is the same." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 313-315 (4th Cir. 2012) (per curiam) (internal quotation marks omitted).

That fact renders *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1994)—the lone authority Cox cites in support of its argument, *see* Br. 56—inapposite. The *Barber* plaintiff brought two different claims (intentional infliction of emotional distress and malicious prosecution) based on two separate events (a meeting at his employer's premises and his subsequent prosecution for theft) that

resulted in two different sets of damages (those occurring before and after the criminal prosecution was instituted). 34 F.3d at 1275-78. This Court reversed the judgment as to the intentional-infliction claim. *Id.* at 1276. The jury's unified damage award had not "apportion[ed] damages between the claims of intentional infliction of emotional distress and malicious prosecution," meaning that with the reversal on the former, the jury's award might have impermissibly included damages for acts and harms pre-dating the sole act—the plaintiff's criminal prosecution— providing a valid basis for relief. *Id*. at 1278. Here, Plaintiffs' claims are based on the same set of facts and result in the same damages—as Cox itself acknowledged in its jury instructions and verdict form.

Paradoxically, Cox contends that the similarity between the contributory and vicarious liability claims supports its argument that reversal on one claim would require a new trial on both. *See* Br. 54 (citing *Tire Eng'g*, 682 F.3d at 314). But as this Court explained in *Tire Engineering*, a court can be "reasonably certain that the jury was not significantly influenced by issues" not properly before it when "the claims in th[e] case are predicated on the same conduct, and the maximum recovery for each claim is the same." 682 F.3d at 314 (internal quotation marks omitted). That is this case.

**B.    Reversing The District Court's Summary Judgment Ruling Would Not Affect The Jury's Liability And Damages Findings.**

Cox insists that "[o]verturning the summary judgment ruling as to Cox's knowledge . . . would unravel much of the case," because the knowledge instruction essentially "foreordained" the jury's verdict as to the other elements of vicarious and contributory liability, as well as the jury's willfulness finding. Br. 54-55; *id.* at 55. Cox objects specifically to the District Court's statement that "Plaintiffs have also established the knowledge element of their contributory infringement claim," because "plaintiffs have established that Cox had specific enough knowledge of the infringement occurring on its network that Cox could have done something about it." JA800.

Once again, Cox forfeited this argument. Cox did not object to the knowledge instruction. *See* Fed. R. Civ. P. 51. Cox may urge the Court to overlook its forfeiture considering the prior summary judgment, but that does not help Cox. Cox argues here that it was prejudiced by the form, not the substance, of the instruction. *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 453 (4th Cir. 1990). Nothing in the summary judgment ruling "suggests that the court was hostile to the notion of a jury instruction precisely defining" knowledge in the way Cox preferred. *Id*. Consequently, "a reading of Rule 51 loose enough to permit preservation of the point would effectively delete Rule 51." *Id*. If Cox objected to a jury instruction that "Cox had specific enough knowledge . . . that Cox could have done something about

42

it," Br. 54-55 (internal quotation marks omitted), then Cox should have done something about it.

In any event, Cox's argument fails. Given the jury's determination that Cox was vicariously liable for its subscribers' infringement, any error in granting summary judgment for Plaintiffs on the knowledge element of contributory infringement was harmless. *See, e.g.*, *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002) (holding that grant of summary judgment, even if erroneous, was harmless in light of later determinations by jury); *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 60-61 (1st Cir. 2002); *Lans v. Stuckey*, 203 F. App'x 956, 959-960 (11th Cir. 2006) (per curiam) (similar).

Moreover, the knowledge instruction on which Cox relies for its material contribution and supervision arguments, Br. 54-55, is a direct quote from this Court's decision regarding the appropriate jury instructions for the knowledge element of contributory infringement. *See BMG*, 881 F.3d at 311-312. Because the jury instructions accurately stated the law, Cox was not prejudiced. *See South Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 532 (4th Cir. 2002). And because Cox was not prejudiced by accurate instructions, reversal of the District Court's grant of summary judgment on knowledge does not justify reversal of the jury's findings.

Cox's secondary objection to the willfulness instruction, Br. 55 n.3, also cannot justify reversal of the jury's verdict. Cox argues that the District Court "erroneously conflate[d] Cox's knowledge that subscribers' actions may violate the law with knowledge that Cox's actions may violate the law," *id.* (emphases omitted), when the District Court instructed the jury that "Cox's contributory or vicarious infringement is considered willful if . . . Cox had knowledge that its subscribers' actions constituted infringement of plaintiffs' copyrights, acted with reckless disregard for the infringement of plaintiffs' copyrights, or was willfully blind to the infringement of plaintiffs' copyrights," JA804. But as Cox acknowledges, this willfulness instruction was approved by this Court in *BMG*. Br. 55 & n.3 (citing *BMG*, 881 F.3d at 312-313). Then, as now, the instruction accurately captures the applicable law because "[c]ontributorily (or vicariously) infringing with knowledge that one's subscribers are infringing is consistent with at least reckless disregard for the copyright holder's rights," and "willfulness in copyright law is satisfied by recklessness." *BMG*, 881 F.3d at 312-313; *see, e.g.*, *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) (copyright infringement is willful if the defendant "recklessly disregards a copyright holder's rights").

## IV.  THIS COURT SHOULD UPHOLD THE JURY'S DAMAGES AWARD.

Parties in copyright cases have "a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the

amount itself." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998). This includes how many works were infringed. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016) (affirming jury's finding that "each song was available for purchase as a single on the date of infringement"); *Sullivan v. Flora, Inc.*, No. 15-CV-298-WMC, 2019 WL 7037790, at *2 (W.D. Wis. Dec. 20, 2019) (noting that outstanding factual disputes on a compilation issue, if any, would require a jury).

Cox complains that the jury based its damages award on an inflated number of copyrighted works. It argues some sound recordings were derivative of musical compositions also in suit (and thus were double-counted) and that some works were issued also as part of compilations (and thus should not have been separately counted). Cox made these same arguments at summary judgment, and the District Court found them to present disputed fact questions for the jury. JA254.[6] Yet Cox chose to try its case without supplying the jury with the evidence necessary to determine whether, and which, works were derivative of other works in suit or were part of a compilation. Cox is bound by that strategic choice, and its challenges to the damages award are forfeited. They are also meritless.

---

[6] Cox argues that courts often do resolve on summary judgment the question of how many works are independently eligible for a statutory damages award. Br. 59. Indeed they do—where there are "no underlying factual disputes for the jury to resolve," just as in any summary judgment posture. *Columbia*, 259 F.3d at 1193-94.

### A.     The District Court Could Not Bypass The Jury's Findings And Reduce The Damages Award On Cox's Derivative-Works Theory.

Cox contends that the damages award is inflated because 2,235 sound recordings were derivative of musical compositions in suit.  The Copyright Act provides that one copyright owner may recover one award per action for all infringements of "one work," and "one work" for statutory damages includes "all the parts of a . . . derivative work."  17 U.S.C. § 504(c)(1).  Cox interprets this as limiting all owners of derivative works to one shared award.  Even if Cox's limiting interpretation is correct (*but see infra* at 50-51), Cox failed to present any evidence at trial that would have permitted the jury to discern where an alleged overlap occurred.  Without that evidence, Cox's theory fails.

### 1.     Cox failed to present evidence to the jury of any relationship between recordings and compositions in suit.

When the District Court denied Cox's motion for summary judgment on the derivative-works issue, Cox was on notice that this issue would be "resolved at trial" "because issues of material fact remain."  JA255.  Cox's counsel acknowledged as much at trial, stating he "hadn't forgotten about putting on evidence with regard to" the number of works in suit.  JA710.  Yet Cox never did.

When Cox filed its pre-jury-verdict motion for judgment as a matter of law, Cox acknowledged a need for further evidence to support its theory:  "Because we prepare this Memorandum in advance of the trial testimony of December 17, Cox

cannot currently cite to [it].  Suffice it to say that we expect that testimony to support this calculation."  JA818.  But when the trial concluded, no fact witness had offered testimony on the point, and the District Court properly denied Cox's eleventh-hour attempt to present it through its last expert witness because it was beyond the bounds of the expert's report and disclosures.  *See* JA754.

The District Court's decision not to instruct the jury on Cox's damages theory underscores the key point here:  Cox failed to present evidence to the jury sufficient to support the instruction.  The District Court expected Cox would do so; it even had delayed its decision on the relevant instruction.  JA785.  But at the end of trial, with no evidence having come in on where alleged overlap might occur, the District Court had no choice but to decline to instruct the jury on the point.  JA784.  *See Chretien By & Through Chretien v. General Motors Corp.*, 959 F.2d 231, at *2 (4th Cir. 1992) (unpublished table opinion).

Because it failed to present evidence at trial to permit the jury to make the finding it now argues was necessary, Cox tries to rehabilitate the evidence that *was* before the jury.  Cox repeatedly acknowledged below that a mere side-by-side comparison of the sound recording list (PX1) to the musical compositions list (PX2) would not sufficiently identify derivative works.  *See, e.g.*, JA818; JA940, JA941 n.16, JA942 n.17; JA1027-31; JA1032-38.  Cox now argues to this Court that PX1

47

and PX2 sufficed.  Br. 57-59.  Cox was right the first time.  Its evidentiary failure has consequences.

Cox also maintains that it does not "matter whether the court instructed the jury on the legal issue; the law, not the instructions, controls JMOL." Br. 65.  That is wrong.  The District Court decided the legal question whether a plaintiff is entitled to statutory damages for derivative works.  (Incorrectly, in Plaintiffs' view; *see infra* at 50-51.)  But *which works, if any,* were derivative was a question of fact for the jury.  *See Bryant*, 603 F.3d at 140.

The analysis included in Cox's *post*-verdict submissions speaks volumes.  There, Cox sought to shoehorn in new evidence and belatedly conduct a detailed factual review.  Cox's post-trial submissions included extensive spreadsheets and thousands of cited exhibits.  *See, e.g.*, JA946-1026; JA1027-31; JA1032-38.  It amounted to the same expert analysis Cox was precluded from presenting at trial, because the expert had neither performed nor disclosed that analysis in his expert report.  *See* JA860.  The analysis required more than mere comparison.  It required judgment calls assessing varying factors—which is to say, factual findings.  *See, e.g.*, JA944-945 (Cox's submission analyzing and purporting to diagnose derivative status based on information like artist name, album name, ownership information, and publication date); JA1051 (District Court's conclusion that the process of determining derivative works was not ministerial because it required "judgment

calls"). Those factual considerations were never presented to the jury and never subject to cross-examination.

Ultimately, as the District Court explained, it would be "improper" "to now somehow expect the jury to pluck out the works that are both sound recordings and music compositions," JA784-785, "without any guidance from testimony in the record." JA1051. Failing to present that evidence to the jury, Cox sought to present it post-trial. Too late. Both parties made strategic choices at trial. They chose the facts and expert opinions they presented to the jury. Cox should not get a second chance to make a new case here. *See Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 781-782 (4th Cir. 2019); *see also Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (focus on appeal after trial is on "the trial record, not the pleadings nor the summary judgment record" nor the post-trial record) (internal quotations omitted). Because of these strategic choices, Cox's derivative-works theory fails.[7]

---

[7] Cox also argues Plaintiffs conceded that a majority of the works in suit are derivative. Br. 61-63. But it was Cox's burden to present evidence at trial sufficient to support its arguments. And Plaintiffs had no need to respond to Cox's intricate post-trial calculations because they were based on extra-record information and methodologies never subject to cross-examination. *See* JA857-860; JA1040-41, JA1043-44.

## 2. The jury's award comports with the plain text of the statute.

Cox's legal theory is wrong, in any event.[8]  Copyright protection in a sound recording is not a mere duplicate of copyright protection in the underlying musical composition.  The Copyright Act protects each as distinct copyrights.  *See* 17 U.S.C. § 102(a)(2), (a)(7).  When these separate copyrights are infringed, "the copyright owner may elect . . . an award of statutory damages for all infringements involved in the action, with respect to any one work."  *See* 17 U.S.C. § 504(c)(1).  The Act thus plainly provides that "*the* copyright owner," singular, may recover "*an* award," singular, for all infringements involved in "*the* action," singular, with respect to "any one work" infringed, and "one work" comprises any derivative works.  *Id.* (emphases added).

The Act thus limits a single copyright owner to one damage award for all infringements prosecuted in a single action, even if *that owner* holds copyrights in (for example) both the musical composition and sound recording.  But if the owner of copyright in a sound recording and the owner of copyright in a musical

---

[8]  Cox does not address this legal issue beyond a passing reference, because Cox prevailed on it below.  Br. 57.  But this Court has authority to "affirm the district court's judgment on any ground properly raised below," and Plaintiffs "seek[] to preserve, and not to change, the judgment."  *R.R. ex rel. R. v. Fairfax Cnty. Sch. Bd.*, 338 F.3d 325, 332 (4th Cir. 2003) (internal quotation marks omitted).

composition are different, each can recover one award if their separate works are infringed.

Cox's interpretation, pluralizing "copyright owner" to limit all rightsholders to one award when they own separate copyrights but sue jointly, produces inefficiency and an absurd result. Under Cox's theory, if a music publisher and a record company brought separate lawsuits relating to the same infringer's conduct, each could collect a separate damages award for the infringement of the works it owned. But if those two copyright owners sue jointly, by Cox's lights, they are limited to one award between them. That makes no sense. Evidence showed the sound recordings and compositions were commercialized independently. JA274-277; JA297. So where, as here, there is one action involving separate works—some sound recordings and some musical compositions—with separate value and separate copyright owners, each owner is entitled to a statutory damage award for its copyrighted work. The District Court's judgment on the derivative-works issue can be affirmed on this basis as well.

### B.    The District Court Could Not Bypass The Jury's Findings To Reduce The Damages Award On Cox's "Compilation" Theory.

Section 504(c) provides that "all the parts of a compilation . . . constitute one work." 17 U.S.C. § 504(c)(1). Cox argues the jury inflated the number of works by over 5,000 because damages were awarded on a per-track basis for infringed sound recordings issued both as singles and on albums. This is wrong twice over. First,

Cox failed (again) to rebut Plaintiffs' proof that the recordings in suit were monetized as individual tracks. Second, Cox's legal theory, which restricts a rightsholder to one damages award per-album except for those tracks *not released on albums at all*, is meritless.

### 1. Cox failed to present evidence to the jury that Plaintiffs issued any of the works in suit only in album form.

Unrebutted trial testimony from music industry executives and from Cox's own expert established that Plaintiffs' works were commercialized as individual tracks. JA284-285 (Kooker, Sony Music Entertainment executive) (works "typically would be available as individual tracks or *also* as albums") (emphasis added); JA775-776 (Cox's expert "understood that [Plaintiffs'] tracks were available for purchase on an individual basis on iTunes" and even performed his damages analysis using record company data for sales of the works as singles); JA461 (Flott, Warner Music Group executive). Trial testimony further showed Plaintiffs' catalogs were available for streaming, which necessarily involves one individual track at a time. JA275-276; JA276; JA290-291 (Kooker); JA308-309 (Kokakis, Universal Music Publishing Group executive); JA454, JA457-458 (Flott testimony regarding U.S. Recorded Music Revenues by Format, 2000 to 2014, JA1614, showing the industry-wide shift from albums to downloading and streaming).

Plaintiffs thus presented copious evidence indicating the works in suit were separately available as individual tracks.[9]  And more to the point, Cox presented no rebuttal evidence that Plaintiffs published or monetized or otherwise issued *any* of their works only in album form.  Just as with its derivative-works theory, then, Cox failed to present evidence to the jury sufficient to support an instruction on its compilations theory.  *See* JA707-710; JA782-785.  Without that evidence, the jury properly found each work eligible for a statutory damages award.

Hamstrung by its lack of supporting trial evidence, Cox focuses on registration status.  Br. 70-71.  But this Court has already explained that registering multiple works in one registration does not dictate a per-album award only.  *See Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 & n.8 (4th Cir. 2003) (rejecting the contention that there can be "only one award of statutory damages per registration"), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Tattoo Art, Inc. v. TAT Int'l, LLC*, 794 F. Supp. 2d 634, 652-654 (E.D. Va. 2011).

The jury could only make findings based on the evidence presented to it. Plaintiffs' evidence demonstrating that its works were commercialized on an

---

[9]  Specific evidence as to each and every work's availability as an individual track was not required.  *See Capitol Recs., Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 722 & n.13 (S.D.N.Y. 2014), *aff'd in relevant part sub nom*. *EMI*, 844 F.3d at 101.

individual track basis went unrebutted. That is the end of the road for Cox's compilations theory.

### 2. The statute permits recovery for individual tracks also issued on an album.

Cox's statutory argument goes like this: Section 504(c) of the Copyright Act states that for purposes of statutory damages, all the parts of a compilation constitute one work. Albums are compilations. QED. Br. 67.

That is wrong again. Section 504(c) permits recovery for tracks issued as part of an album, *so long as* they were also issued individually.

Courts of appeals take two approaches to the compilation issue. On one side, courts apply a broader, functional, "substantive economic inquiry." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 569-571 (7th Cir. 2019) (confronting the circuit split and following the broader approach, also followed by the First, Ninth, Eleventh, and D.C. Circuits). If the work has distinct, discernable, "independent economic value" to the copyright holder, regardless of whether it is sold only as a unit with other works, it is entitled to stand-alone statutory damages under § 504(c)(1). *Id.* at 572. The Second Circuit applies a more limited approach, which focuses on whether the rightsholder issues the works "as individual works or as a compendium of works." *Id.* at 571. If the works are issued *only* as a compendium, then the rightsholder is entitled to just one statutory award. *Id.* at 569.

This Court has yet to squarely discuss the split, but its analysis in *Xoom*, at a minimum, rejects Cox's theory. 323 F.3d at 285 (noting that "the language of the Copyright Act does not bar multiple awards for statutory damages when one registration includes multiple works."). *Xoom* involved two bundles of electronic clip-art images. *Id.* at 281. "SuperBundle" contained over 1,500 individual clip-art selections; "Master Gallery" contained over 9,000. *Id.* Each bundle was distributed exclusively as a collection on a CD-ROM. *Id.* This Court determined that the bundles were eligible for statutory damages on a per-bundle basis only. *Id.* at 285.

Cox emphasizes this conclusion in support of its "album = compilation = we win" argument. But the rightsholder in *Xoom* did not offer its SuperBundle other than as a SuperBundle; it did not issue piecemeal clip art. It was the bundle or nothing. "[G]iven the facts" in *Xoom*, the copyright holder was limited to a per-bundle award. *Id.* *Xoom* did not address the situation here, where constituent parts of a compilation were also independently commercialized.

Although this Court has yet to address this issue on a different set of facts since *Xoom*, other courts have. Their conclusions are instructive.

In *Bryant v. Media Right Productions, Inc.*, the Second Circuit awarded damages on a per-album basis because the copyright holder had only ever sold the infringed tracks as albums. 603 F.3d at 141. Though the tracks were later available individually, that was only because the *infringers* digitally copied the albums, then

sold individual songs online.  *Id.* at 138-139.  The court rightly focused on how the copyright holder commercialized the works at issue.

Presented with different facts six years later in *EMI*, the Second Circuit reached a different conclusion with consistent reasoning.  Focusing its inquiry on whether the *copyright holder* commercialized its works separately, and citing *Bryant* for support, the court found the plaintiff eligible for damages on a per-track basis because "there was evidence at trial that all the songs in question were made available as singles on the date of infringement."  *EMI*, 844 F.3d at 101.

District courts since *Xoom* and *Bryant* are similarly resolute in their rejection of Cox's simplistic rule.  In *Arista Records LLC v. Lime Group LLC*, the works in suit included over 9,000 sound recordings, many of which also appeared on albums.  No. 06-CV-5936-KMW, 2011 WL 1311771, at *3 (S.D.N.Y. Apr. 4, 2011).  The court found per-track statutory damages appropriate because plaintiff had released the tracks individually, observing that "[n]either the Copyright Act, nor any judicial decision" after *Bryant* preclude per-track damages simply because the recordings happen also to be included on an album.  *Id.* at *4.

A district court applying *Xoom* to a different set of facts similarly determined that the key question is how a rightsholder sells or otherwise commercializes the works.  *See Tattoo Art*, 794 F. Supp. 2d at 654.  There the rightsholder created "tattoo flash sheets" to organize his designs, with each sheet containing several individual

tattoo images. *See id.* at 639. But he sold them only in books of 50 sheets. *See id.* at 654. The *Tattoo Art* court reasoned that, no matter how the works were registered, plaintiff was "entitled to one statutory damage award per Book infringed" because the plaintiff sold the books of tattoo flash sheets only *as a unit*. *Id.* Indeed, the same district judge in this case already determined in *BMG* that the focus should be on whether the rightsholders make their tracks available individually, and Cox did not appeal that determination. *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 983-984 (E.D. Va. 2016), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018).

The relevant compilations inquiry is whether the rightsholder issued its works separately, or only together in one unit. Other courts, including the District Court, interpreting *Xoom* and other key decisions agree. *See* JA890-895. And because ample evidence supported the jury's conclusion that each work was its own unit, the damages verdict should be upheld in its entirety.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

September 8, 2021

Respectfully submitted,

/s/ Catherine E. Stetson

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, D.C. 20016
(202) 480-2999
matt@oandzlaw.com

Catherine E. Stetson
Jo-Ann Tamila Sagar*
Patrick C. Valencia
HOGAN LOVELLS US LLP
555 13th St. NW
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Admitted only in New York.  Supervised by principals of the firm admitted in D.C.*

*Counsel for Plaintiffs-Appellees*

58

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,778 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Malwarebytes Anti-Malware was run on the file containing the electronic version of this brief and no viruses were detected.

September 8, 2021

/s/ Catherine E. Stetson
Catherine E. Stetson
HOGAN LOVELLS US LLP
555 13th St. NW
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on September 8, 2021. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

September 8, 2021     /s/ Catherine E. Stetson
             Catherine E. Stetson
             HOGAN LOVELLS US LLP
             555 13th St. NW
             Washington, D.C. 20004
             (202) 637-5491
             cate.stetson@hoganlovells.com

             *Counsel for Plaintiffs-Appellees*