No. 21-1168

IN THE
# United States Court of Appeals for the Fourth Circuit

SONY MUSIC ENTERTAINMENT, ET AL.,
*Plaintiffs-Appellees*,

*v.*

COX COMMUNICATIONS, INC. and COXCOM, LLC,
*Defendants-Appellants*.

(see full caption on inside cover)

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:18-cv-950 (LO/JFA)
Hon. Liam O'Grady

## FINAL OPENING BRIEF FOR
## DEFENDANTS-APPELLANTS

Michael S. Elkin
Jennifer A. Golinveaux
Geoffrey P. Eaton
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
Sheila A. Baynes
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005

E. Joshua Rosenkranz
Christopher J. Cariello
Rachel G. Shalev
Alexandra Bursak
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellants*

September 8, 2021

SONY MUSIC ENTERTAINMENT; ARISTA MUSIC; ARISTA RECORDS, LLC; LAFACE RECORDS LLC; PROVIDENT LABEL GROUP, LLC; SONY MUSIC ENTERTAINMENT US LATIN LLC; VOLCANO ENTERTAINMENT III, LLC; ZOMBA RECORDINGS LLC; SONY/ATV MUSIC PUBLISHING LLC; EMI AL GALLICO MUSIC CORP.; EMI ALGEE MUSIC CORP.; EMI APRIL MUSIC INC.; EMI BLACKWOOD MUSIC INC.; COLGEMS-EMI MUSIC INC.; EMI CONSORTIUM MUSIC PUBLISHING INC., d/b/a EMI Full Keel Music; EMI CONSORTIUM SONGS, INC., d/b/a EMI Longitude Music; EMI FEIST CATALOG INC.; EMI MILLER CATALOG INC.; EMI MILLS MUSIC, INC.; EMI UNART CATALOG INC.; EMI U CATALOG INC.; JOBETE MUSIC CO. INC.; STONE AGATE MUSIC; SCREEN GEMS-EMI MUSIC, INC.; STONE DIAMOND MUSIC CORP.; ATLANTIC RECORDING CORPORATION; BAD BOY RECORDS LLC; ELEKTRA ENTERTAINMENT GROUP, INC.; FUELED BY RAMEN LLC; ROADRUNNER RECORDS, INC.; WARNER-TAMERLANE PUBLISHING CORP.; WB MUSIC CORP.; UNICHAPPELL MUSIC, INC.; RIGHTSONG MUSIC INC.; COTILLION MUSIC, INC.; INTERSONG U.S.A., INC.; UMG RECORDINGS, INC.; CAPITOL RECORDS, LLC; UNIVERSAL MUSIC CORP.; UNIVERSAL MUSIC – MGB NA LLC; UNIVERSAL MUSIC PUBLISHING INC.; UNIVERSAL MUSIC PUBLISHING AB; UNIVERSAL PUBLISHING LIMITED; UNIVERSAL MUSIC PUBLISHING MGB LIMITED; UNIVERSAL MUSIC – Z TUNES LLC; UNIVERSAL/ISLAND MUSIC LIMITED; UNIVERSAL/MCA MUSIC PUBLISHING PTY. LIMITED; POLYGRAM PUBLISHING, INC.; SONGS OF UNIVERSAL, INC.; WARNER RECORDS, INC., f/k/a W.B.M. Music Corp.,

*Plaintiff-Appellees*,

and

NONESUCH RECORDS INC.; WARNER BROS. RECORDS, INC.; WARNER/CHAPPELL MUSIC, INC.; W.B.M. MUSIC CORP.; UNIVERSAL-POLYGRAM INTERNATIONAL TUNES, INC.; UNIVERSAL – SONGS OF POLYGRAM INTERNATIONAL, INC.; UNIVERSAL POLYGRAM INTERNATIONAL PUBLISHING, INC.; MUSIC CORPORATION OF AMERICA, INC., d/b/a Universal Music Corporation; RONDOR MUSIC INTERNATIONAL,

*Plaintiffs*,

COX COMMUNICATIONS, INCORPORATED; CoxCom, LLC,

*Defendants-Appellants*.

## CORPORATE DISCLOSURE STATEMENT

Cox Communications, Incorporated, is the parent corporation of CoxCom, LLC.  Cox Communications, Incorporated, is owned by Cox DNS, Inc. and Cox Enterprises, Inc.  No Defendant-Appellant is a publicly held corporation, and no publicly held corporation owns 10% or more of either Defendant-Appellant.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION.................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 4

STATEMENT OF THE ISSUES............................................................. 4

STATEMENT OF THE CASE ................................................................ 5

    Peer-to-Peer Networks Make Online Infringement Easy And
    Policing Infringement Hard................................................... 5

    Cox Pioneers A Market-Leading System To Combat Online
    Infringement ......................................................................... 7

    In BMG, This Court Holds Cox Ineligible For The DMCA
    Safe Harbor, But Overturns The Secondary Liability
    Verdict ................................................................................ 11

    Plaintiffs Sue Cox And Win A $1 Billion Verdict ......................... 14

    The District Court Denies Post-Trial Motions ........................... 16

SUMMARY OF THE ARGUMENT ....................................................... 19

STANDARD OF REVIEW.................................................................... 24

ARGUMENT ...................................................................................... 25

I.    Cox Is Not Vicariously Liable For Subscribers'
    Infringement As A Matter Of Law. .................................... 25

    A.    As a matter of law, Cox did not profit directly
        from subscribers' infringement.................................. 27

    B.    As a matter of law, Cox was unable to supervise
        the internet activity of six million subscribers........... 32

II.    The Contributory Liability Judgment Should Be
    Vacated. ........................................................................... 35

    A.    The district court erred in granting Plaintiffs
        summary judgment as to Cox's knowledge. ............... 36

B.     As a matter of law, Cox did not materially contribute to every act of infringement for which it was held liable. ...................................... 43

C.     Vacating as to either theory of secondary liability requires vacatur of the entire verdict. ........................ 53

III.   The Statutory Damages Award Is Based On An Erroneously Inflated Number Of Works. ........................... 56

A.     The district court erred in allowing Plaintiffs to recover an extra $223 million for 2,235 derivative works. .................................................. 57

B.     The district court erred in allowing Plaintiffs to recover an extra $500 million for over 5,000 works that were parts of compilations. ..................... 66

CONCLUSION ...................................................... 73

ORAL ARGUMENT STATEMENT

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................. 62

*Atl. Recording v. Media Grp. Inc.*, 00-CV-6122, 2002 Jury
Verdicts LEXIS 52291 (C.D. Cal. Aug. 23, 2002) ................................. 18

*Barber v. Whirlpool Corp.*,
34 F.3d 1268 (4th Cir. 1998) .............................................................. 56

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018) ......... 12, 13, 21, 36, 37, 38, 39, 40, 43, 55

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) .............................................................. 65

*Bryant v. Media Right Prods.*,
603 F.3d 135 (2d Cir. 2010) ............................................... 60, 67, 68, 69

*Buck v. Jewell-La Salle Realty Co.*,
283 U.S. 191 (1931) .............................................................. 33

*Columbia Pictures Indus. v. Krypton Broad., Inc.*,
259 F.3d 1186 (9th Cir. 2001) ...................................................... 18, 59

*CoStar Grp. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) .................................................. 34, 36, 43

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) .................................................. 28, 29, 32

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) ........................................................... 28, 69

*Flava Works, Inc. v. Gunter*,
689 F.3d 754 (7th Cir. 2012) .............................................................. 46

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ............................................... 33

*Gamma Audio & Video, Inc. v. Ean-Chea*,
    11 F.3d 1106 (1st Cir. 1993) ............................................. 70

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971) ...................................... 27, 33

*Lack v. Wal-Mart Stores, Inc.*,
    240 F.3d 255 (4th Cir. 2001) ............................................ 25

*Leonard v. Stemtech Int'l Inc.*,
    834 F.3d 376 (3d Cir. 2016) ............................................. 28

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ............ 26, 27, 29, 32, 33, 36, 43, 44, 45, 46, 47, 54

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
    284 F.3d 505 (4th Cir. 2002) ............................................ 27

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .................................. 34, 47, 48, 50, 52

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ............................................ 28, 29, 39, 47

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007) ...................................... 26, 44

*Pleasants v. Fant*,
    89 U.S. (22 Wall.) 116 (1874) ........................................... 62

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet
Servs., Inc.*,
    351 F.3d 1229 (D.C. Cir. 2003) ........................................ 49

*Religious Tech. Ctr. v. Netcom On-Line Commc'ns
Servs., Inc.*,
    907 F. Supp. 1361 (N.D. Cal. 1995) .................................. 48

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
  316 F.2d 304 (2d Cir. 1963) ............................................................ 26

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
  137 S. Ct. 1002 (2017) ................................................................. 67

*Stone v. Instrumentation Lab. Co.*,
  591 F.3d 239 (4th Cir. 2009) ......................................................... 25

*Sullivan v. Flora, Inc.*,
  936 F.3d 562 (7th Cir. 2019) .......................................... 65, 70, 72

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*,
  682 F.3d 292 (4th Cir. 2012) ......................................................... 54

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
  888 F.3d 651 (4th Cir. 2018) ......................................................... 25

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019) ......................... 34, 47, 51, 65, 70, 72

*Walt Disney Co. v. Powell*,
  897 F.2d 565 (D.C. Cir. 1990) ....................................................... 70

*Xoom, Inc. v. Imageline, Inc.*,
  323 F.3d 279 (4th Cir. 2003) .................................... 24, 59, 68, 69, 71

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
  795 F.3d 1255 (11th Cir. 2015) ..................................................... 70

**Statutes**

17 U.S.C. § 101 ................................................. 57, 67, 69, 71

17 U.S.C. § 102(a)(2) ............................................................... 57

17 U.S.C. § 102(a)(7) ............................................................... 57

17 U.S.C. § 504(c)(1) .............. 16, 18, 23, 24, 55, 56, 57, 59, 66, 67, 68, 69

17 U.S.C. § 504(c)(2) ............................................................... 16

17 U.S.C. § 512(i)(1)(A) .......................................................... 12

28 U.S.C. § 1291 ...................................................................... 4

28 U.S.C. § 1331 ...................................................................... 4

28 U.S.C. § 1338(a) ................................................................. 4

**Other Authorities**

H.R. Rep. No. 94-1476 (1976) ............................................... 69

Lex Machina, *Copyright Litigation Report 2016* (Jan. 2017) ................ 18

Restatement (Second) of Torts § 314 ..................................... 46

S. Rep. No. 105-190 (1998) ............................................. 12, 28

Trial Transcript, *BMG Rts. Mgmt. (US) LLC v. Cox Enters., Inc.*, No. 14-cv-1611 (E.D. Va. Dec. 16, 2015), Dkt. 751 ................... 13

U.S. Copyright Office, Circular 56A, *Musical Compositions and Sound Recordings* (Rev. Mar. 2021), https://copyright.gov/circs/circ56a.pdf ............................... 16

U.S. Copyright Office, Circular 30, *Works Made for Hire* (Rev. Mar. 2021), https://copyright.gov/circs/circ30.pdf.................... 71

## INTRODUCTION

The music industry is waging war on the internet.

Record companies have been struggling with internet piracy for at least two decades. At first, they sensibly targeted those most responsible for infringement. They sued thousands of individual infringers, threatening massive statutory damages awards (up to $150,000 per work). They also sued the "peer-to-peer" networks, like Napster, that enabled people across the globe to swap digital files over the internet. They proved that those platforms intentionally designed and marketed systems to promote and profit from every act of piracy, and they put those bad actors out of business. But other peer-to-peer networks emerged and grew more elusive. And the industry found that targeting ordinary consumers was expensive and unpopular.

So, 15 years after Napster, the music industry launched an aggressive new strategy: Attack the internet itself, suing the internet service providers (aka "ISPs")—the cable and phone companies, like Defendant Cox Communications, that deliver the internet. The record companies launch automated bots to crawl peer-to-peer networks for signs of infringement. Whenever they get a hit, they send a notice to

the ISP declaring that someone using a specified internet connection—could be the subscriber, but also could be a teenager, a houseguest, a coffee shop patron, or a hospital patient—used the ISP's wires to infringe. They claim the ISP is just as responsible as Napster, merely because it provided an internet connection.

But, unlike the offerings of Napster and its ilk, internet service is neither designed nor advertised to promote piracy. And on this record, 99% of Cox's internet users never put it to that use. Your cable company also cannot monitor your internet usage or block specific online activities, at least for now. So not only does Cox not encourage infringement, it cannot prevent infringement over its cables, any more than your phone company can prevent users from perpetrating frauds over telephone lines. Instead, Cox invests significant resources in education and deterrence. It was the first to develop an automated system for contacting subscribers upon receiving a notice of infringement. For 95% of accused subscribers—that is, 95% of the 1% who infringe—these warnings deter further infringing activity.

The music industry initially endorsed a system based on Cox's. But it now insists that an ISP must not only deter infringement, but

also terminate internet service entirely for any account that infringes more than once—and that failure to do so makes the ISP liable for every subsequent act of infringement on that account. On that basis, Plaintiffs won a $1 billion verdict for the infringing acts of 58,000 Cox subscribers. Even more stunning: Had subscribers paid the going rate of around $1 per download, Plaintiffs' total profits from all of the downloads at issue—and hence Plaintiffs' actual loss—would have been a mere $692,000.

Holding ISPs liable on such a large scale merely for providing internet access flouts settled copyright law. No circuit has ever adopted the theories on which the district court based liability, and several have rejected them. For good reason. Cox cannot monitor subscribers; it does nothing to encourage their infringing conduct; it actively seeks to deter it; it has no way of predicting which subscribers will ignore warnings not to infringe; and it makes not a penny more when they do. Cox is much further removed from subscribers' infringement than the peer-to-peer networks that exist to facilitate it, and is consequently less able to stop it and less culpable.

The legal rules Plaintiffs advocate put ISPs in an impossible spot. ISPs will have to boot entire households or businesses off the internet—cutting their lifelines, their livelihoods, and their social connections—based on a few isolated and potentially inaccurate allegations. Or they will have to invade our privacy by developing new capabilities to monitor our internet usage 24/7 to ferret out illegal activity. The internet will never be the same.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a). The court entered judgment on January 12, 2021. JA1053. Cox filed a timely notice of appeal on February 10, 2021. JA1054-57. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Did the district court err in holding that an ISP can be vicariously liable for subscribers' infringement even though (A) it derives no financial benefit from infringement because it charges the same flat fee for internet service regardless of infringement; and (B) it has no right or ability to supervise subscribers' online behavior?

4

2. On Plaintiffs' contributory liability claims, did the district court err in (A) granting Plaintiffs summary judgment on the question of Cox's knowledge of subscribers' infringement, despite factual disputes as to what Cox could have known, and when, as to the likelihood each user would infringe; and (B) holding that an ISP can materially contribute to subscribers' infringement simply by not terminating their internet service?

3. Did the district court err in inflating the damages award more than fourfold by (A) allowing Plaintiffs to collect duplicate awards for thousands of undisputedly derivative works even after finding that such awards are legally impermissible; and (B) ruling that songs on the same album are entitled to independent statutory damages awards despite a statutory provision limiting any compilation to one award?

## STATEMENT OF THE CASE

### *Peer-to-Peer Networks Make Online Infringement Easy And Policing Infringement Hard*

Cox provides internet, telephone, and cable television service for a flat monthly fee to 6 million homes and businesses in 18 states. JA395, 1124-25, 1613. Households across all income brackets rely on Cox's internet service. JA630-31, 1066-122. Cox's business subscribers run

the gamut, too, from small businesses to large universities to regional ISPs, from doctor's offices to hotels to fire departments.  JA425.

For all the internet's benefits, it can also be put to illegal uses.  One is music piracy.  This case involves four "peer-to-peer networks"—BitTorrent, Ares, eDonkey, and Gnutella—that facilitate sharing content ranging from songs to academic data.  JA316, 692-93.

The most popular, BitTorrent, is illustrative.  Users download software on their computers that allows them to search for other users (called "peers") who have copies of a desired song.  If peers are found, the user's computer will download pieces of the song from various peers and assemble them into a complete copy.  JA372-73; *see generally* JA692-701, 1658-67 (detailed technical explanation).

ISPs like Cox cannot selectively block a user from downloading peer-to-peer software or using it to download songs, any more than the phone company can block a user from plotting a crime using the phone.  JA422-23, 518-19, 530-31.  They cannot constantly track all subscribers' online activity.  And if they ever developed such tools they would be condemned for "a gross violation of … privacy."  JA531.  ISPs provide only the cables, machinery, and basic services necessary to let a

subscriber send and receive data on the internet.

### *Cox Pioneers A Market-Leading System To Combat Online Infringement*

Only a tiny proportion of Cox's subscribers use peer-to-peer networks to illegally download music—less than 1% of Cox's 6 million subscribers are accused here. JA264. Unable to prevent all infringement, Cox has invested extraordinary effort in a system designed to address infringing conduct, with interventions that succeed in deterring the vast majority of infringers.

To start, Cox's "Acceptable Use Policy" (AUP) prohibits "Intellectual Property Infringement" of any kind, JA1060-62, warning of "the immediate suspension or termination" of service for violations, JA1060.

Beyond threats, Cox was "the first ISP to build a system to handle copyright infringement complaints." JA427. Its system was called the Cox Abuse Tracking System, or CATS. JA531-32. When rightsholders like Plaintiffs believe that a user on a particular Cox account has infringed, they send a notice to Cox. *Id*. CATS processes over a million infringement notices per year. JA506. It does so through a "graduated response program"—a "series of escalating steps" to contact the

subscriber and prevent further infringement. JA535.

Why graduated? Because no one considers it reasonable to terminate the subscriber's access based on one or two infringement notices. JA322. To begin with, Cox is deluged with copyright accusations. Some "are false," JA538, but there is no non-intrusive way to determine which ones, JA535. Moreover, *subscribers themselves* are often in the dark; "the account holder might be a parent or somebody who has no idea" about the infringement. JA430-31. And even if Cox had certainty that an infringement took place, terminating internet access for an entire household or a business can have dire consequences, not just for the infringer but for anyone else who relies on that connection. JA422.

These challenges multiply when it comes to Cox's many business subscribers, which could have thousands of users, from employees infringing behind closed doors to coffee shop patrons infringing over lattes. And it is exponentially worse when it comes to the 15 regional ISPs that rent Cox's network to supply internet to "thousands or tens of thousands of customers." JA664. Cox cannot do anything to confirm the veracity of an infringement notice telling it that some anonymous

8

user has infringed through the regional ISP's account.  Even if it could, terminating the entire regional ISP's account would cut off the internet of tens of thousands of people, the vast majority of whom did nothing wrong.  JA667.

Given these considerations, no ISP kicks subscribers off the internet for a few infringement notices.  Cox instead attempts "to educate and … modify behavior," terminating internet only as a last resort.  JA421.  In the relevant period (2013 and 2014), Cox's CATS program had three phases.  *See generally* JA425-27, 736-38, 1064-65, 1643.  In phase one, Cox sent subscribers automated email warnings relaying the complaint, demanding removal of any infringing material, and providing educational resources on infringement.  *E.g.*, JA1126-30, 1354-58.  CATS started the warnings upon receipt of a second notice and repeated them for the next five notices.  These email warnings ended infringement 78% of the time.  JA536-37, 656-57, 1734.

When the warnings were not enough, Cox escalated to phase two: automatic suspension of internet service.  JA430, 1065.  Cox suspended thousands of subscribers in the relevant period.  JA1501-03.  Cox refused to restore service until the subscriber promised to stop

9

infringing—first on an online form, and then (if infringement continued) in a direct conversation with a team of Cox investigators who would interrogate the subscriber about whether, and how, the infringement occurred and how it would be stopped.  JA430, 437-38, 1065.  Phase two brought the success rate to 95%.  JA660, 1735.

If infringement continued, Cox proceeded to phase three: possible termination.  Termination was not automatic—"there weren't hard-and-fast rules."  JA434-35.  In practice, for reasons discussed above, Cox rarely resorted to that drastic step—a few dozen times in 2013 and 2014.  JA514-15.  And ultimately, the only accounts that continued to rack up more and more notices were all business accounts or regional ISPs, termination of which would have carried especially devastating consequences.  JA663-64, 1743.

For years, Plaintiffs and other content owners were satisfied with Cox's efforts.  They used CATS as a model to negotiate a similar anti-infringement system with most of the major ISPs.  JA680-82.  But those ISPs insisted on a weaker system than CATS.  JA682.  Their graduated response program issued fewer notices, less frequently.  JA1059.  And it never required an ISP to contemplate termination, no matter how many

10

times a subscriber infringed.  JA319.

### *In* BMG, *This Court Holds Cox Ineligible For The DMCA Safe Harbor, But Overturns The Secondary Liability Verdict*

By 2008, the music industry had grown weary of the ineffectiveness, expense, and unpopularity of its strategy of suing "individuals, students, … children, and grandmothers" for infringement. JA300.  And although suing the platforms that facilitated infringement had "dramatically reduce[d] piracy," those platforms had become increasingly elusive or judgment proof.  JA305, 316, 339.  So, the industry started deluging ISPs with infringement notices, insisting that ISPs were "obligat[ed] to enforce the law" by terminating subscribers. JA302.

Then, they sued.  The music industry chose to target Cox, despite its market-leading system.  In 2014, BMG Rights Management, a music publishing company, alleged that Cox was secondarily liable for its subscribers' infringement.  Before even confronting that theory, the plaintiffs had to prevail on a threshold issue: whether Cox's CATS protocol immunized it from liability under the Digital Millennium Copyright Act of 1998 (DMCA).  The DMCA grants ISPs a "safe harbor" from liability if they "adopt[] and reasonably implement[] … a policy …

for the termination in appropriate circumstances of subscribers … who are repeat infringers."  17 U.S.C. § 512(i)(1)(A); *see* S. Rep. No. 105-190, at 19 (1998).

BMG argued that Cox could not invoke the safe harbor because it did not terminate enough of the small fraction of subscribers who reached phase three.  *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 304 (4th Cir. 2018).  BMG cited evidence that, during a 10-month period, Cox employees reactivated subscribers after terminating them and reset them to the beginning of CATS's graduated response program.  *Id.* at 303-04.  It touted several emails in which two Cox employees implemented an "unwritten semi-policy":  "Once the customer has been terminated for DMCA, we have fulfilled the obligation of the DMCA safe harbor and can start over"—allowing Cox to "collect a few extra weeks of payments for their account.  ;-)."  *Id.* at 303.  Based on this evidence, this Court affirmed the *BMG* district judge's finding that "Cox failed to qualify for the DMCA safe harbor because it failed to implement its [termination] policy in any consistent or meaningful way—leaving it essentially with no policy."  *Id.* at 305.

Losing safe harbor protection does not, however, establish that an

ISP is *liable* for its subscribers' infringement.  BMG still had to prove

the elements of secondary liability.  And on that front, BMG failed.  One

form of secondary liability—BMG's claim of vicarious infringement—the

jury rejected outright.  *Id.* at 300.  The jury did find Cox liable for

contributory infringement, but it awarded only $25 million in statutory

damages, *id.*—a fraction of the $200 million BMG claimed.  *See* Trial

Transcript at 2194-95, *BMG Rts. Mgmt. (US) LLC v. Cox Enters., Inc.*,

No. 14-cv-1611 (E.D. Va. Dec. 16, 2015), Dkt. 751.

This Court then overturned that verdict.  It held that the district

court erred by instructing the jury that it could find for BMG if "Cox

knew or should have known of … infringing activity" "by users of Cox's

internet services."  881 F.3d at 307, 310.  The "should have known"

instruction was wrong because contributory infringement requires

actual knowledge or willful blindness.  *Id.* at 310 (quotation marks

omitted).  The instruction also incorrectly suggested that Cox could be

liable based on "generalized knowledge" that people infringe on its

network; instead, a plaintiff has to prove an ISP knew of the "specific

instances of infringement" for which it was being held liable.  *Id.* at 311-

12.

13

The parties settled before a retrial.  Stipulation of Dismissal, *BMG Rts. Mgmt.*, No. 14-cv-1611 (Aug. 24, 2018), Dkt. 1021.

### *Plaintiffs Sue Cox And Win A $1 Billion Verdict*

In July 2018, a month before *BMG* settled, record labels and publishers representing 80% of the music industry filed this copycat suit.  JA189-216.  Plaintiffs alleged that Cox is vicariously and contributorily liable for subscribers' infringement over peer-to-peer networks between February 1, 2013, and November 26, 2014—the same period at issue in *BMG*.  JA165.

Plaintiffs built their case on Cox's response to an avalanche of notices generated by bots.  A trade organization called the Recording Industry Association of America (RIAA) enlisted a service called MarkMonitor that uses bots to try to detect infringing files on peer-to-peer networks.  JA345.  Whenever the bot found a hit, it generated a notice and sent it to Cox, ostensibly on behalf of the RIAA as agent to the companies that own sound recording copyrights in their artists' songs.  JA350, 356.

During the relevant period, the RIAA sent over 163,000 infringement notices, pertaining to nearly 58,000 subscribers (on

average, 2.8 notices per accused subscriber).  JA389.  Based on these notices, Plaintiffs alleged that subscribers collectively infringed 10,017 individual sound recordings and compositions over Cox's network. Rather than basing their case on particularized evidence of specific subscribers' infringing acts, Plaintiffs built it largely on Cox's general approach to these automated notices.

On summary judgment, the district court gave Plaintiffs' strategy an enormous boost.  It held, as a matter of law, that an RIAA notice, standing alone, "established the knowledge element of contributory liability."  JA248-50.

At trial, Plaintiffs continued to press their case in gross, using the same general evidence to try to establish Cox's responsibility for each subscriber's infringement on the four peer-to-peer networks.  The jury found Cox liable for both vicarious and contributory infringement. JA822-23.  It also found that Cox had acted willfully, which the instructions permitted if the jury found that Cox had knowledge of infringement—the same issue on which the district court granted summary judgment.  JA804.  This finding raised the ceiling on available statutory damages from $30,000 per work to $150,000 per work.  17

U.S.C. § 504(c)(1), (2), ADD4-5; JA803.

Cox presented evidence at trial that Plaintiffs' total actual losses were just $692,000.  JA764, 767-69.  Plaintiffs nevertheless persuaded the jury to award an even $1 billion—$99,830 in statutory damages for each of the 10,017 works Plaintiffs claimed were infringed.

### The District Court Denies Post-Trial Motions

The district court denied Cox's post-trial motions as to liability, JA878-83, and its motion to reduce the award on constitutional or common-law grounds, JA914-36.

The court also denied Cox's motion to reduce the number of works eligible for statutory damages under 17 U.S.C. § 504(c)(1), ADD4.  That provision prohibits more than one award for "any one work."  And it provides that "all the parts of a compilation or derivative work constitute one work."  Cox argued that most of the 10,017 works at issue were parts of either derivative works or compilations.

As to derivative works, of the 10,017 copyrights at issue, 3,283 are copyrighted compositions (i.e., sheet music), JA1270-1351, and 6,734 are sound recordings (i.e., performances of songs), JA1131-1269.  *See generally* U.S. Copyright Office, Circular 56A, *Musical Compositions*

*and Sound Recordings* (Rev. Mar. 2021), https://copyright.gov/circs/circ56a.pdf. The court let the jury grant separate awards for each, even though thousands of the composition copyrights covered the same song as a corresponding sound recording copyright. Only after the verdict did the court conclude that this is impermissible: Overlapping compositions and sound recordings should yield only one statutory damage award (not two) because the recording is merely derivative of the composition. JA897-913.

The court ordered briefing to determine the number of derivative works to remove from the award. JA913. The parties agreed that the record established that at least 2,235 sound recordings are derivative works as a matter of law. *Compare* JA939.02-940 (Cox argues 2,370) *with* JA1040-42, 1046 (Plaintiffs challenge only 135 of them). The court refused, however, to reduce the number of works. It identified no factual disputes, but nevertheless held "the number of derivative works in play … was a question for the jury," and thought Cox had not adequately synthesized the undisputed record evidence for the jury. JA1052.

As to compilations, thousands of the sound recordings are

17

contained on albums.  Cox argued, based on § 504(c)(1), that they are

therefore "parts of compilations" entitled to one collective award.  The

court disagreed, holding that the provision "allowed separate statutory

damages for songs that the plaintiffs issued as singles, even if those

songs were also made available on albums."  JA896 (quotation marks

omitted).

The resulting judgment is more than seven times the largest

copyright statutory damages award to survive appeal ($136 million).

*See Atl. Recording v. Media Grp. Inc.*, 00-CV-6122, 2002 Jury Verdicts

LEXIS 52291 (C.D. Cal. Aug. 23, 2002).  As the chart below illustrates,

this award is also:

- 32 times the largest copyright statutory damages jury award against a secondary infringer ($31.2 million).  *See Columbia Pictures Indus. v. Krypton Broad., Inc.*, 259 F.3d 1186, 1191 (9th Cir. 2001).

- 40 times the $25 million award—imposed for identical conduct on Cox's part—that this Court vacated in *BMG*.  *Supra* 13.

- $431 million more than all copyright statutory damages awards awarded between 2009 and 2016 *combined* (approximately $569 million).  *See* Lex Machina, *Copyright Litigation Report 2016*, at Fig. 27 (Jan. 2017).



**SUMMARY OF THE ARGUMENT**

**I.** Plaintiffs failed to establish both elements of vicarious liability as a matter of law.

**A.** Cox receives no "direct financial benefit" from infringement. Its subscribers pay the same flat fee for internet services whether they infringe or not. Subscribers are in no sense acting in Cox's financial interest by downloading songs.

Other circuits have held that where a defendant receives only a flat fee, this element is not satisfied, except in the narrow circumstance where the plaintiff shows that the ability to infringe the plaintiff's works acted as a "draw"—and not merely an added benefit—for the

defendant's service.  Here, Plaintiffs offered no evidence that people subscribed to Cox to infringe their works.

The district court defied prevailing law in holding that Plaintiffs were not required to prove any of the above.  It further erred in finding that Cox received a direct financial benefit by not terminating—and continuing to receive subscription fees from—subscribers who infringed. Plaintiffs had to prove that Cox had a direct financial interest in the *infringing conduct itself*.  Because Cox's bottom line is unchanged whether subscribers infringe or not, it has no such interest.

**B.**  Cox also lacks the ability to supervise or control its six million subscribers.  It is undisputed that Cox cannot police or block infringing conduct.  The district court erroneously found that Cox has the power to supervise merely because it can punish subscribers retroactively by terminating their internet access.  Because Cox lacks power to supervise and control infringing activity in real time, it cannot be liable for that conduct.

**II.**  The contributory liability verdict also cannot stand—for two independent reasons.

**A.**  The district court erred in granting summary judgment on the

basis that notices of past infringements were sufficient, as a matter of law, to establish that Cox knew that all the infringements were likely to occur. This Court held in *BMG* that to have knowledge, a defendant must be "substantially certain" that an infringer "will in fact" use its service to infringe copyrights, such that it can "do something" to prevent it. *BMG*, 881 F.3d at 307, 309-12. Notice of past acts cannot provide that advance knowledge.

Plaintiffs tried to overcome this by limiting their claims to infringements by subscribers who had triggered at least two prior infringement notices. But taking the facts in the light most favorable to Cox, prior notices do not establish a substantial certainty of future infringement. In fact, Cox's evidence showed that the odds are against repeat infringement. And whether any particular subscriber would defy the odds would turn on numerous factual inquiries unique to that subscriber, resolution of which is inappropriate for summary judgment.

**B.** Independently, no reasonable juror could find that Cox materially contributed to each infringement for which it was held liable. The district court erroneously found that Cox materially contributed because internet access was necessary to each infringement. But

Supreme Court precedent requires culpable conduct, and merely providing internet access does not come close. Where, as here, a defendant provides a product or service capable of noninfringing uses, mere failure to take affirmative steps to prevent infringement does not give rise to liability.

The Ninth Circuit stands alone in recognizing a narrow exception to this rule. This exception applies only where a defendant has, but declines to take, simple, reasonable, and feasible measures to stop infringement. Even the Ninth Circuit would not apply this rule to ISPs like Cox, which have no such measures available. Cox's only way to guarantee a subscriber does not infringe is to terminate internet access entirely—a draconian measure that is far from simple, reasonable, and feasible in most circumstances. And Cox did develop a robust and successful anti-infringement program that went far beyond what the Ninth Circuit's exception would require.

**C.** Vacating as to either theory of secondary liability requires vacatur of the entire verdict, because the doctrines of vicarious and contributory liability are intertwined, especially on these facts. And because the jury awarded a global damages figure without

22

distinguishing between claims, damages must also be retried if any basis for liability is overturned.

**III.** The $1 billion statutory damages award, based on 10,017 works, erroneously includes separate statutory damages awards for (A) over 2,200 works that are parts of derivative works; and (B) over 5,000 works that are parts of compilations.

**A.** Section 504(c)(1) of the Copyright Act provides that only one statutory damages award is available for the "parts of a … derivative work." ADD4.  It is undisputed that a sound recording and a composition for the same song are "parts of a derivative work."  And it is undisputed that 2,235 of the sound recordings for which Plaintiffs received a statutory damages award are in fact derivative of compositions for which Plaintiffs also received an award.  The district court therefore should have granted Cox's motion for judgment as a matter of law that Plaintiffs could not recover a separate statutory damages award for these works.

The district court declined to do so because it found the analysis of derivative work status to be "complex" and because Cox had not simplified the task for the jury.  But that is irrelevant to a JMOL

23

motion, which turns only on whether the evidence adduced at trial permits but one reasonable conclusion.  Here it did as to 2,235 works, so the damages award must be reduced accordingly.

**B.**  Section 504(c)(1) also permits only one award for "all the parts of a compilation."  ADD4.  It is undisputed that the sound recordings on an album are "parts of a compilation."  The plain language therefore limits Plaintiffs to one statutory damages award per album.  Yet, the district court held that sound recordings on an album can support separate awards if the copyright owner also issued and sold them as singles.  This "separate issuance test" conflicts with the plain meaning of the statute and with this Court's holding in *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), which recognized no exception for separately issued works.  This Court should remand and direct the district court to resolve the proper number of works.

## STANDARD OF REVIEW

The district court's order granting Plaintiffs partial summary judgment is reviewed de novo, viewing the "evidence in the light most favorable to the nonmoving party" (here, Cox) to determine whether

24

"there are any genuine factual issues." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659-60 (4th Cir. 2018) (quotation marks omitted).

The denial of Cox's motion for judgment as a matter of law is reviewed de novo, "viewing the facts in the light most favorable to the non-moving party" (here, Plaintiffs). *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001).

Questions of statutory interpretation are reviewed de novo. *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 242 (4th Cir. 2009).

## ARGUMENT

### I. Cox Is Not Vicariously Liable For Subscribers' Infringement As A Matter Of Law.

Plaintiffs do not claim that Cox itself infringed, only that its subscribers did. The liability judgment rests on two theories of secondary liability. The first—that Cox is vicariously liable for its subscribers' infringement—is invalid as a matter of law, for reasons discussed in this section. The second—that Cox contributed to the subscribers' infringement—should also be overturned, for reasons discussed in § II.A-B. Rejecting either ground requires outright reversal, or at least a new trial. § II.C.

25

The Copyright Act does not mention vicarious liability. Courts have imported it from common law "agency principles of *respondeat superior*." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007). A defendant is not vicariously liable for another's copyright infringement unless "the defendant [1] profits directly from the infringement and [2] has a right and ability to supervise the direct infringer." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005).

Hence the canonical examples: a department store that collects commissions from a concessionaire's infringing sales on its property, or a dance hall that draws crowds by hiring a band that plays infringing music. Both are vicariously liable under an agency theory because the infringer acts on their behalf: They invite the infringer onto their property to perform the infringing act, they can readily detect and prevent the infringement, and they directly profit from it. *See generally Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 306-08 (2d Cir. 1963).

In contrast, Cox's subscribers are not its agents, it gains nothing when they infringe, and it plays no role in monitoring or directing their

activities.  Plaintiffs' vicarious liability claim therefore fails as a matter of law on both elements of vicarious liability.

### A. As a matter of law, Cox did not profit directly from subscribers' infringement.

**1.**  The first prong requires proof that the defendant has a "direct financial interest in [the infringing] activities," *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002)—specifically, that the "defendant profit[ed] *directly from the infringement*," *Grokster*, 545 U.S. at 930 n.9 (emphasis added).  The store owner who collects commissions on infringing sales satisfies this standard.  So does a Napster or Grokster that creates a platform whose very purpose is to enable infringement, and whose business model is thus dependent upon it.

Cox does not.  All subscribers pay Cox a flat monthly fee for their internet access package no matter what they do online.  JA1124-25.  A tiny proportion of subscribers may profit from their *own* infringement by obtaining music for free.  But they are in no sense acting in Cox's financial interest by downloading songs.

27

That is why courts have universally agreed that "'receiving a one-time set-up fee and flat periodic payments for service … [ordinarily] would not constitute receiving a "financial benefit directly attributable to the infringing activity."'" *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (alteration in original) (quoting S. Rep. No. 105-190, at 44-45). They have recognized only one narrow exception to this rule, "'where the value of the service lies in providing access to infringing material'" and thus "the infringing activity constitutes a *draw* for subscribers." *Id.* (emphasis added) (quoting S. Rep. No. 105-190, at 44-45); *see Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673-74 (9th Cir. 2017) (relying on *Ellison*'s rule); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 389 (3d Cir. 2016) (same); *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016) (affirming jury instruction based on "draw" because "[a]n increase in subscribers or customers *due to copyright infringement* qualifies as" a direct financial interest (emphasis added)). That principle is known as the "draw" rule.

The draw rule requires proof that customers were drawn to the service *specifically* "*because* of infringing … material" owned by the plaintiff, *Giganews*, 847 F.3d at 674 (emphasis added); otherwise, there

is no "causal relationship between the infringing activity and any financial benefit a defendant reaps." *Id.* at 673 (quoting *Ellison*, 357 F.3d at 1079). A dance hall profits directly from a band's infringing performance—by selling tickets, food, and drinks—if the popular songs are what draw the audience to the hall. So too a website whose subscribers sign up to gain access to infringing material on the site, *id.* at 674, or, perhaps, a peer-to-peer portal that invites infringement to draw eyeballs to its advertising, *see Grokster*, 545 U.S. at 926.

But the draw rule is narrow. It is not satisfied where infringement is a mere "added benefit," *Ellison*, 357 F.3d at 1079—a feature people may use, even though it is not the reason they pay the flat fee. Nor is it satisfied by the allure of infringement generally; the plaintiff must prove a "causal link between the infringement *of the plaintiff's own copyrighted works* and any profit to the service provider." *Giganews*, 847 F.3d at 673 (emphasis added).

**2.** Plaintiffs failed to satisfy the draw rule because they offered no proof that customers chose to purchase Cox's service *because of* the ability to infringe their works. Plaintiffs offered no evidence, for example, that more people subscribed to Cox's service because it

29

enabled them to infringe Plaintiffs' works, or that subscribers were willing to pay more for that ability—let alone that enough were so willing that it could affect Cox's subscription fees.

Their own expert repeatedly conceded he had no information about "what subscribers all knew," JA619, or "why any individual subscriber did anything," JA622. Indeed, Plaintiffs performed no customer survey at all.

Nor did Plaintiffs present evidence that subscribers believed infringement was uniquely easy or tolerated on Cox's network. The evidence established the opposite: that infringement is less prevalent on Cox's network than elsewhere. *Compare* JA572 (12.5% of Cox's network traffic used for peer-to-peer activity in 2011) *with* JA569 (21% of all internet traffic was used for peer-to-peer activity in 2012). Indeed, Cox's CATS system was significantly more aggressive in seeking to deter infringement. *Supra* 10-11.

The only evidence in the record proved that consumers are in fact drawn to Cox's internet service because of the universe of *lawful* uses. Extensive consumer research proved subscribers value cost and internet speed, for legal uses like streaming. JA635-36, 638-43, 645, 1071, 1073.

30

Some subset of subscribers may well view illegal downloads as what the law terms an "added benefit" of internet service generally, just as it may be an added benefit of owning a computer or paying for electricity. But Cox's customers did not subscribe *because* of the ability to infringe either generally or to infringe Plaintiffs' works in particular.

**3.** In defiance of prevailing law, the district court held that Plaintiffs were "not required to prove 'draw'" in any of the above senses—or any sense ever recognized by any court. JA879. The court purported to identify a "causal relationship between the infringing activity and [Cox's] financial benefit" from nothing but certain employees' reference to "customers' monthly payments when considering whether to terminate them for infringement." JA879-81 (quotation marks omitted).

That is not causation, and it is certainly not what other circuits define as draw. Of course, any ISP would make less money if it cut off a subscriber's internet subscription—whether for infringement or spewing hate speech. But that does not somehow give all ISPs a direct financial interest in every unlawful act committed on the internet. "[B]usiness and revenue generation" alone do not suffice to establish

31

such an interest unless they flow from the *infringement itself*. *Ellison*, 357 F.3d at 1079.

Plaintiffs had to prove that Cox "profit[ed] *directly from the infringement*," *Grokster*, 545 U.S. at 930 n.9 (emphasis added)—from the subscriber's download of a song—as Grokster or Napster did (or a BitTorrent website might). If a diner at Denny's makes a scene during dessert, a restaurant manager may opt not to eject him because the restaurant wants him to pay the check. That does not mean Denny's has a direct financial interest in the diner's outburst. Nor does it mean that the ability to rant in public is built into the price of the burger, or that the diner was drawn to that restaurant because it tolerates rants.

Likewise, while Cox profited from the sale of internet service, in no sense did it have any interest in *the subscriber committing infringement*. Because Plaintiffs offered nothing to connect subscribers' infringing conduct to Cox's bottom line, this Court should reverse the vicarious liability verdict.

## B. As a matter of law, Cox was unable to supervise the internet activity of six million subscribers.

Plaintiffs' vicarious liability claim also fails because Cox does not have "a right and ability to supervise the direct infringer," as a

principal can supervise an agent. *Grokster*, 545 U.S. at 930 n.9. The iconic examples of vicarious liability illustrate the requisite level of policing. A venue owner is liable when an infringing orchestra is an "instrumenalit[y] under its control." *Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 201 (1931). And a flea market operator is liable where it has "pervasive participation" in the affairs of the personnel on its own property sufficient to "police the direct infringers." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996); *see Gershwin*, 443 F.2d at 1163 (similar).

Cox obviously does not have a comparable right or capability to supervise the internet activity of its six million subscribers. The district court here found that an ISP has virtually no capacity for "policing infringing conduct." JA872. It is undisputed that Cox had no right or capability to block access to peer-to-peer networks. JA422-23, 509-511, 518-19, 530-31, 728-33. When you're at your computer in the privacy of your own home, your internet provider has no idea what you are doing online (and you would be outraged if they developed that capability). No red alert goes off in Cox headquarters when a user is about to turn

from online shopping to an illegal download, just as AT&T has no idea when a phone call turns from conversation to conspiracy.

That is why this Court has recognized that ISPs play a passive role in internet activity. *CoStar Grp. v. LoopNet, Inc.*, 373 F.3d 544, 550-51 (4th Cir. 2004). Unlike some content *hosts* (think YouTube), ISPs generally lack the "technical ability to screen out" infringing content or even view the content of transmitted files. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019). And unlike owners of brick-and-mortar stores or even websites, ISPs are not in charge of the premises Plaintiffs would have them police—ISPs own neither the internet nor their subscribers' computers. That leaves ISPs without the "practical ability to police the infringing activities," *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007). That should end of the inquiry, as it did in *VHT* and *Amazon.com*.

The district court concluded that Cox has the power to supervise merely because, upon receiving a notice of infringement from RIAA, Cox can cut off a subscriber's internet access. JA878-79. In so ruling, the court confused a retroactive punishment with an ongoing power to

34

supervise and control the infringing activity in real time. An ISP does not turn a subscriber into its agent merely by not cutting the cord. No Circuit has ever suggested that an ISP is automatically liable for a subscriber's infringement just because it failed to take that drastic measure. This Court should not be the first.

***

Affirming here would not only yield a conflict with the way other circuits apply the draw rule, *supra* 28-32, it would also radically expand the scope of vicarious liability. It would effectively make ISPs strictly liable for every act of infringement on the internet, from downloads to social media posts. And given the threat of crushing liability, ISPs would have no choice but to terminate subscribers the moment they are accused of a single infringement, stranding countless subscribers in an internet exile.

## II. The Contributory Liability Judgment Should Be Vacated.

The contributory liability judgment is equally untenable. Contributory liability does not attach just because a service can be used to infringe. Companies sell all sorts of products that *can* be used to infringe—such as photocopiers, DVRs, and laptops. But "the mere

35

understanding that some of one's products will be misused" is not enough. *Grokster*, 545 U.S. at 932-33. Contributory liability is akin to aiding and abetting. *BMG*, 881 F.3d at 309. A plaintiff has to prove that the accused business engaged in "purposeful, culpable … conduct" to help the infringer infringe, as Grokster did, 545 U.S. at 937, or as BitTorrent portals and their ilk now do.

That means Cox cannot be liable based on "generalized knowledge" that people infringe on its network; instead, Plaintiffs had to prove Cox knew of the "specific instances of infringement" for which it was being held liable. *BMG*, 881 F.3d at 311-12. That is, Plaintiffs had to prove that Cox (1) had "knowledge of [each subscriber's] infringing activity"; and (2) made itself an accomplice by "induc[ing], caus[ing] or materially contribut[ing] to the[ir] infringing conduct." *CoStar*, 373 F.3d at 550 (quotation marks omitted).

The district court committed legal error on both elements.

## A.    The district court erred in granting Plaintiffs summary judgment as to Cox's knowledge.

On summary judgment, the district court ruled that Cox's receipt of RIAA infringement notices was "dispositive" of knowledge for each of

thousands of infringing acts.  JA248.[1]  That ruling misapprehends the legal rule on *what* Cox had to know and *when* Cox had to know it.

**1.**  Consider a single infringement committed by a single subscriber:  Suzie Subscriber illegally downloads Bob Dylan's *Hurricane*.  To hold Cox liable, what would copyright holder Universal Records need to prove Cox knew and when?  *BMG* answers both questions.  As to *what*, Universal would have to prove Cox knew, subjectively, that Suzie's illegal download of *Hurricane* was "*substantially certain* to result" from granting Suzie internet access. *BMG*, 881 F.3d at 311 (emphasis added).

And *when*?  Universal would have to prove that Cox knew Suzie was substantially certain to infringe *before* she downloaded the song— and with sufficient notice to try to prevent it.  That is the only way to prove that Cox provided internet service with "*knowledge* that [Suzie] *will in fact* use the product to infringe copyrights," *id.* at 307.

The legal standard does not change just because Plaintiffs banded together to allege not one subscriber's single infringement, but

---

[1] Record citations in this section are from the summary judgment record.

thousands of infringements by 58,000 subscribers. The Copyright Act has no volume discount. Whether there is one offending Suzie or thousands, proving that Cox got subsequent notice of each subscriber's past act of infringement does not prove Cox knew ex ante that the same subscriber was "substantially certain" to infringe again—and certainly it does not prove it *as a matter of law*.

**2.** The district court nevertheless found that each RIAA notice "both documented a specific instance of infringement and notified Cox of that instance." JA249. But notice of those *past* acts fell far short of establishing that Cox knew that each of the 58,000 accused subscribers was "substantially certain" to infringe again—a requirement the court failed even to mention. JA244-50.

The district court thought it could override this legal requirement because *BMG* at one point explained that "the proper standard requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." JA245 (quoting *BMG*, 881 F.3d at 311-12). But that statement appeared on the same page as the holding that the plaintiff must prove that a particular infringement was "*substantially certain* to result" from the defendant's activities, *BMG*,

38

881 F.3d at 311 (emphasis added), and four pages after its holding that the plaintiff must prove "*knowledge* that the [subscriber] *will in fact* use the product to infringe copyrights," *id.* at 307.

It is therefore not enough to say, as the district court did, that Cox could do something "*[a]fter* receiving a notice from RIAA," like "evaluate[] the subscriber's overall activity or terminate[] that subscriber." JA250 (emphasis added). The question is whether Cox had the requisite certainty to easily "prevent"—and therefore avoid contributing to—any expected next infringement. *Giganews*, 847 F.3d at 671 (no liability unless defendant had "specific" knowledge it could use "to prevent" infringement (quotation marks omitted)).

**3.** Plaintiffs tried to overcome the district court's error by limiting the trial to infringement on accounts that had triggered at least two prior RIAA notices. JA1821-22. The notion seems to be that once Cox learned that someone using Subscriber X's account infringed twice, it knew that someone using that account was "substantially certain" to infringe again. Far from embracing that theory, the district court rejected its premise when it *denied* summary judgment on the issue whether each of the accused subscribers *directly* infringed. JA255. The

39

court necessarily found that the infringement notices could not definitively prove that any particular subscriber had actually infringed. If fact issues precluded summary judgment on whether a particular subscriber had infringed, even with the benefit of hindsight and discovery, then surely there was a fact question as to whether Cox could have predicted with "substantial[] certain[ty]" that this same infringement would occur.

The problem with Plaintiffs' two-strikes theory is that it impermissibly resolves numerous factual disputes on summary judgment, as to both (1) the reliability of any particular notice and (2) the certainty that additional infringements would follow.

To take the latter first, an RIAA notice that someone on Subscriber X's account infringed is not indisputable proof that Cox had "knowledge that [the subscriber] will in fact … infringe" again to the requisite degree of "certain[ty]." *BMG*, 881 F.3d at 307. Rather, the odds are *against* a repeat offense. On summary judgment, the court was required to accept as true Cox's evidence that:

- Nearly half (49.2%) of subscribers who get one notice never get another. JA2014, 2020.

- More than two-thirds (68.3%) never get past two notices. JA2020.

- More than three-fourths (77.9%) of subscribers never get past the third notice.  JA2014.

A coin toss gives better odds of predicting another act of infringement than Plaintiffs' two-strikes approach.

How would Cox *know* whether Subscriber X will defy the statistics and be "substantially certain" to commit the next act of infringement? Cox—and any jury evaluating Cox's knowledge—would have to assess countless factors unique to that subscriber, such as the nature of the subscriber (massive business versus household), the volume of past infringements, when they occurred, how many users use the account, and what interventions Cox had already tried.  Even a jury could not resolve that issue in gross, for tens of thousands of alleged infringements.  Certainly, a court could not do it on summary judgment.

All this assumes that the RIAA notices accurately identified infringers.  But that too was hotly disputed.  Many subscribers vehemently contested infringement accusations when Cox forwarded them.  JA2016-17.  Cox presented evidence that MarkMonitor's automated notices were highly error-prone.  It is undisputed, for example, that MarkMonitor never determined whether a user who had

41

a copy of a recording was on Cox's network when she downloaded the song; the user could have taken her laptop to the coffee shop or downloaded it on her iPhone through her cellular network. JA2062-67, 2070.

Not only were the snapshot RIAA notices inaccurate as to infring*ers*, they also were inaccurate as to infringe*ments*. As Cox explained and Plaintiffs did not contest, the notices failed even to name most of the works on which Plaintiffs sought (and the district court granted) summary judgment as to Cox's knowledge. JA248 (district court recognizing that the notices did not name all works at issue). This made it all the more impossible for Cox to determine not just what had been downloaded previously, but what a subscriber could re-upload. Cox could not have had knowledge, *as a matter of law*, of the full scope of infringement if it was not even informed as to most of the works infringed.

In light of all these factual disputes, the grant of summary judgment was inappropriate and must be reversed.

**B.    As a matter of law, Cox did not materially contribute to every act of infringement for which it was held liable.**

This Court should also reverse for the independent reason that, as a matter of law, Cox did not "materially contribute[] to [each accused subscriber's] infringing conduct." *CoStar*, 373 F.3d at 550 (quotation marks omitted).  To prevail on their material contribution theory, Plaintiffs needed proof that Cox provided "substantial assistance" to every infringer in committing every act of infringement, *BMG*, 881 F.3d at 309, and that this assistance amounted to "culpable … conduct" equivalent to aiding and abetting the infringement, *Grokster*, 545 U.S. at 936-37.  *See BMG*, 881 F.3d at 309 (recognizing aiding and abetting "analog to contributory infringement" (quotation marks omitted)).  As a matter of law, Plaintiffs did not satisfy this element as to *any* infringement at issue—let alone for *every one* of them.

**1.**  The district court was flatly wrong in asserting that Cox provided a material contribution because "high-speed internet services were necessary to the infringing actions" such that "Cox was indispensable to each instance of [peer-to-peer] infringement on its network." JA882.  On this rationale, Cox substantially assisted every

43

infringement merely by providing internet access for each accused subscriber—and also substantially assists literally everything any subscriber ever does on the internet, innocent or not, by providing that same basic internet access.

That is wrong. "Substantial assistance" is not a but-for test. Electricity and a computer were just as "indispensable to each instance of infringement." But that did not make Dominion Energy and Dell material contributors to infringement.

In reasoning otherwise, the district court violated two basic rules of secondary liability. First, it eliminated the essential ingredient of "*culpable … conduct.*" *Grokster*, 545 U.S. at 937 (emphasis added). Second, it violated the rule that copyright law generally "bar[s] secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use." *Grokster*, 545 U.S. at 933. This second rule may not be dispositive where a service is "designed" to "provide a forum for easy copyright infringement"—like a peer-to-peer network. *Visa*, 494 F.3d at 799-800 n.10. But it is dispositive for a service, like Cox's, with countless noninfringing uses, even if "the distributor knows [the

44

product] is in fact used for infringement." *Grokster*, 545 U.S. at 933.
Were it otherwise, businesses would be automatically liable for
providing any product or service with knowledge that some small set of
customers may use it, in part, to infringe—whether it is FedEx
shipments, photocopiers, laptops, or telephone and electrical service.

The district court's premise is breathtaking, particularly when
combined with its resolution of the knowledge element. It means that
receipt of a notice for past infringement (which was the court's only
basis for a knowledge finding) automatically makes every ISP liable for
that act of infringement (which it could never have prevented) and for
any subsequent act by the same subscriber. It also means that Cox
automatically reached the requisite level of culpability as an accomplice
without regard to what it did to prevent further acts of infringement.
By the district court's standard, it does not matter that Cox succeeded
in deterring further infringement by the 77.9% of subscribers who
stopped infringing by the third notice (or earlier). *Supra* 41. The court
found Cox sufficiently culpable for those subsequent downloads merely
because it did not cut the cord upon receipt of the first notice.

Supreme Court precedent forecloses this approach. The Court has

45

said that "mere[] … failure to take affirmative steps to prevent infringement" is insufficient to establish secondary liability. *Grokster*, 545 U.S. at 939 n.12. This principle accords with contributory liability's aiding-and-abetting foundation. It also accords with the common-law rule that even a defendant who knows a tort is about to occur does not contribute to the tort merely by failing to prevent it. *See* Restatement (Second) of Torts § 314; *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 759 (7th Cir. 2012) (noting that material contribution "invokes common law notions"). And it accords with the commonsense notion that ISPs are not accomplices in everything their subscribers do online.

**2.** Because Plaintiffs can point to no affirmative assistance that Cox offered subscribers, their only hope is to persuade this Court to adopt an exception to the Supreme Court's rule against imposing liability on a business that provides a device or service with mainly noninfringing uses. They press an exception that only one Circuit has recognized—but stretch it beyond recognition.

The Ninth Circuit alone has held that even in the absence of an affirmative act, a defendant may be liable "if it has actual knowledge that specific infringing material is available using its system, *and can*

46

*take simple measures* to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Giganews*, 847 F.3d at 671 (emphasis altered) (quoting *Amazon.com*, 508 F.3d at 1172).

The Ninth Circuit's "simple measures" exception is difficult to square with the Supreme Court's rule requiring *culpable conduct* and its direction that "mere[] … failure to take affirmative steps to prevent infringement"—whether simple or complex—is insufficient to establish secondary liability. *Grokster*, 545 U.S. at 939 n.12. But this Court need not decide whether to embrace the Ninth Circuit standard here. It can reject the approach in this case simply because Plaintiffs (and the district court) have stretched the exception far beyond its rationale.

In the Ninth Circuit's estimation, a "simple measure[]" is one that is so "reasonable and feasible" that culpability can be inferred from failing to deploy it. *Amazon.com*, 508 F.3d at 1172-73. That court has applied its "reasonable and feasible" test in only one context: where a platform or website knows that its own servers provide ready access to a specific infringing work (e.g., a copyrighted photo). *See, e.g.*, *VHT*, 918 F.3d at 745-46. Under those circumstances, the act of removing or disabling access to the particular work is costless, technologically basic,

47

and exactly proportional to the infringing act that resulted in the unlawful copy or distribution of the work. So, the logic goes, failure to take that simple step to address infringement demonstrates complicity in it, and therefore amounts to a culpable contribution. *Amazon.com*, 508 F.3d at 1172-73; *see Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs., Inc.*, 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) (genesis of "simple measures" test).

Whatever the merit of this approach in that context, its rationale cannot be stretched to hold an ISP liable for infringement that occurs through its network. The ISP does not have any measures to take that are comparably "reasonable," "feasible," and narrowly tailored to eliminating the anticipated infringement. ISPs do not host infringing content on their servers. They offer only a passive connection that can be used for innumerable purposes. For reasons already discussed (at 6-7, 34-35), ISPs cannot "polic[e] infringing conduct," JA872, nor block websites, control online content, or otherwise monitor subscribers' activities, JA422-23, 509-11, 518-19, 530-31, 728-33. And "[n]o matter what information the copyright owner may provide, the ISP can neither 'remove' nor 'disable access to' the infringing material…." *Recording*

48

*Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1235 (D.C. Cir. 2003). An ISP's failure to do what it cannot do could never give rise to the requisite inference of culpability.

**3.** Even if the "simple measures" test could apply to an ISP, neither Plaintiffs nor the district court identified any "simple measure" tailored to ending the infringement that Cox failed to take—and certainly did not identify one that Cox should have taken as to every infringement at issue.

There is only one way for an ISP to guarantee that an account stops infringing: the nuclear option of terminating the account completely. That does not "simply" end the infringing activity. It cuts off all the infringer's internet access for any purpose *and also* terminates the access of everyone else who innocently uses that account. If the subscriber is an elderly couple whose grandson abuses their hospitality, they are out. *E.g.*, JA2015-17. If the infringer uses a regional ISP, Cox must root out the infringement by terminating the digital lifeline of tens of thousands of businesses and households. JA668.

However "simple" it may be to flip a switch to impose a digital

49

death penalty, that does not make that option so "reasonable and
feasible" that culpability can be inferred from failing to deploy it.
*Amazon.com*, 508 F.3d at 1172-73.  Based on just a handful of disputed
and indefinite infringement notices, it is decidedly *un*reasonable and
highly *in*feasible to disconnect a household's internet access—a step
that might cut a child off from schooling, get a parent fired from her job,
or shut a disabled person off from the entire outside world.  And it
would be downright monstrous to cut off a regional ISP's tens of
thousands of users, or a hospital's, for the infringing acts of one user.
Treating that measure as a last resort hardly bespeaks culpability.  And
no court has ever suggested that an ISP can be categorically liable for
failing to take the nuclear option.

Short of pulling the plug, all an ISP can do is develop an anti-
infringement program designed to limit infringement—again, no
"simple" task at all.  Cox did just that.  There is no dispute that Cox's
CATS program dramatically reduced repeat infringement—nor that
Cox's program was among the most robust in the industry.  *Supra* 9-11.
Whatever critiques one might have of the choices Cox made in
designing or implementing its notice system or its graduated response

program, both go far beyond "simple measures."

Nevertheless, the district court thought a jury could have found that Cox materially contributed to each act of infringement if it determined that Cox's anti-infringement program was inadequate. JA882-83.  But this is accomplice liability, not a billion-dollar inquest into the optimal anti-infringement program.  Even under the Ninth Circuit's test, a defendant has no affirmative obligation to develop or invest in new technology or increase staffing to stop infringement.  *See VHT*, 918 F.3d at 745 (rejecting arguments that a website was required to take a litany of steps to remove the infringing photos or prevent infringement).  The court erred by finding that a jury could treat an ISP as an accomplice for all infringement on the internet based on nothing but a conclusion that it was possible to design a better anti-infringement system.[2]

**4.**  Even if, as a general matter, contributory liability could turn

---

[2] Relatedly, the court thought it relevant that the jury found Cox's secondary infringement to be "willful."  JA882-83.  But the willfulness instruction in this case was satisfied merely if Cox "had knowledge that its subscribers' actions constituted infringement of plaintiffs' copyrights," JA804, which, owing to the court's grant of summary judgment on knowledge, the court instructed the jury that Cox did, JA801.  So the jury's finding of willfulness was, in effect, directed.

51

on either Cox's decision not to terminate subscribers or the jury's assessment of CATS's efficacy, the evidence still could not sustain liability as to the *77.9%* of accounts that were subject to three or fewer notices. *Supra* 41. Plaintiffs offered no evidence that it was "reasonable and feasible" to cut the cord on those accused accounts. *Amazon.com*, 508 F.3d at 1172-73. Nor did they offer evidence that the calculus changed for the fourth notice, or the fifth. At a minimum, plaintiffs had to adduce some evidence of when a subscriber crossed the boundary, such that the nuclear option became a simple, reasonable, and feasible response to the problem.

Plaintiffs instead spotlighted the outliers—the 49 accounts that drew hundreds of notices. Forty-six of these were regional ISPs, universities, hotels, or other business accounts with hundreds, thousands, or even tens of thousands of end users. JA663-64, 1743. Plaintiffs also harped on Cox's reluctance (shared by every other ISP) to terminate accounts, and on the handful of colorful employee emails revealing that reluctance (as well as disdain for the crush of DMCA notices they faced). *See, e.g.*, JA268-69, 271, 809-810, 813; *supra* 11-13.

But Cox's conduct with respect to these outliers does not prove

52

Plaintiffs' case as it relates to the vast majority of infringing acts here. Even if Cox's failure to adequately punish a few dozen infringers gave rise to liability for those infringers' conduct, it cannot support the entire verdict.

***

Whether based on the district court's notice-and-terminate regime or Plaintiffs' two-strike rule, the contributory infringement verdict puts ISPs in the untenable position of mediating disputes between internet users and other parties, a job for which ISPs are ill-equipped. Even worse is the devastation this approach will wreak on innocent people. ISPs will be forced to cut off entire accounts after any notices for fear of incurring $150,000 for the next unlawful download. No case holds that it is reasonable to require an ISP to permanently terminate an entire account based on such sparse allegations of infringement by one of its users. And no case should.

## C.    Vacating as to either theory of secondary liability requires vacatur of the entire verdict.

If this Court concludes that Cox is entitled to judgment as a matter of law on both vicarious (§ I) and contributory liability (specifically, § II.B, regarding the material contribution requirement), it

53

should reverse and direct entry of final judgment in Cox's favor.  If this Court agrees with Cox's position on *any one* of the liability arguments, it should order a new trial on all issues (plus other relief, depending on the issue).

"[T]he lines between … contributory infringement and vicarious liability are not clearly drawn" and the "arguments and case law" are intertwined.  *Grokster*, 545 U.S. at 930 n.9 (quotation marks omitted).  So, for example, a jury that wrongly concluded that Cox had a direct financial interest in subscriber infringement (on vicarious liability) would be more likely to find that Cox culpably caused that infringement (on contributory liability).  The issues are so intertwined that any error on one would have "significantly influenced" the other.  *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 314 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours v. Berkley & Co.*, 620 F.2d 1247, 1258 & n.8 (8th Cir. 1980)).

Overturning the summary judgment ruling as to Cox's knowledge (§ II.A) would unravel much of the case.  First, it would require a new trial on material contribution.  Based on the summary judgment ruling, the court instructed the jury that "plaintiffs have established that Cox

54

had specific enough knowledge of the infringement occurring on its network that Cox could have done something about it." JA800. That virtually foreordained the jury's verdict, on material contribution, that Cox should have "done" that very "something." And instructing the jury that Cox "could have done something about [infringement]" tainted the vicarious liability verdict as well, effectively directing a verdict that Cox could have supervised and controlled subscriber behavior.

Overturning summary judgment on knowledge also requires vacatur of the willfulness finding, and therefore damages. As noted above (at 51 n.2), the district court essentially directed a verdict on willfulness when it instructed the jury, over Cox's objection, that Cox was willful "if plaintiffs prove … that Cox *had knowledge* that its subscribers' actions constituted infringement of plaintiffs' copyrights."[3] JA804 (emphasis added). And since the willfulness verdict is tainted, so too is the jury's decision to award an amount that far exceeds the $30,000 limit for non-willful infringement. *See* 17 U.S.C. § 504(c)(1).

---

[3] This Court approved the district court's instruction in *BMG*. 881 F.3d at 312-13. Cox preserves its objection that such an instruction erroneously conflates Cox's knowledge that *subscribers'* actions may violate the law with knowledge that *Cox's* actions may violate the law. JA704, 744-45.

55

In a similar vein, even if vacating any element of liability did not require a new trial on other aspects of liability, a "new trial is necessary on the damages issue," because the jury awarded a "global figure without distinguishing the amount attributable to each claim." *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1998); JA822-23. The district court itself recognized, in comparing the damages award here to *BMG*, that, unlike the *BMG* jury, "[t]he jury in the instant case found Cox liable for both" vicarious and contributory infringement. JA925. The district court rightly appreciated that the jury's assessment of damages was influenced by its finding of two bases of liability. If one basis is removed, the damages award must therefore be retried.

## III. The Statutory Damages Award Is Based On An Erroneously Inflated Number Of Works.

Even if the Court sustains liability or remands, it should cure another foundational error that allowed Plaintiffs to collect statutory damages for a number of works that was four times what the law permits. Section 504(c)(1) provides that "all the parts of a compilation or derivative work" must be counted together as "one work" entitled to one statutory damages award. ADD4. The district court committed legal error in erroneously permitting separate $100,000 awards

56

apiece—to the tune of over $720 million—on (A) over 2,200 works that are parts of derivative works and (B) over 5,000 works that are parts of compilations.

### A. The district court erred in allowing Plaintiffs to recover an extra $223 million for 2,235 derivative works.

The recording of a single song embodies two distinct works subject to copyright protection: (1) a "musical work[]," often called a "composition," 17 U.S.C. § 102(a)(2), ADD3; and (2) a recorded performance of that composition, called a "sound recording[]," *id.* § 102(a)(7), ADD3.  The Copyright Act provides that a sound recording of a musical composition is a "derivative work."  *Id.* § 101, ADD1.  So, under § 504(c)(1), separate copyrights on compositions and sound recordings of the same song constitute "parts of a … derivative work" for which Plaintiffs can secure only one award.  ADD4.

The district court acknowledged all this.  JA897-910.  Yet it allowed Plaintiffs to recover an additional $223 million for 2,235 sound recordings that Plaintiffs conceded were derivative of compositions for which Plaintiffs also received awards.  This was legal error.

**1.** The 10,017 works at issue in this case include 6,734 sound

57

recordings and 3,283 compositions.  The court admitted into evidence

lists of each, as PX-1 (sound recordings) and PX-2 (compositions).

JA1131-1269 (PX-1); JA1270-1351 (PX-2).  It also admitted the

copyright registrations for each sound recording and composition.

JA751.  From this evidence, determining how many sound recordings

and compositions overlap was straightforward, albeit tedious.

Step 1:  Compare the titles on PX-1 and PX-2.  For example, PX-1

contains this sound recording:

| 5513 | Bruno Mars | Locked Out of Heaven |
|------|------------|----------------------|

JA1244.  And PX-2 contains this composition:

| 3052 | Locked Out of Heaven |
|------|----------------------|

JA1341.  For each such match, it is highly likely—and certainly more

likely than not—that the sound recording is the same song as the

composition with the corresponding title.  After all, Bruno Mars's

*Locked Out of Heaven* wound up on PX-1 because a Cox subscriber

allegedly downloaded or uploaded that sound recording; if a Plaintiff

also owned the corresponding composition, one would expect it to be

listed on PX-2.  It is *possible* that the same names on PX-1 and PX-2 are

different songs.  Plaintiffs, in the face of evidence showing matching

titles, were free to try to overcome it to obtain separate awards.  Absent

such proof, though, the only reasonable conclusion is that the sound

recording and composition overlap.

Any doubt can be resolved at Step 2:  Compare the two copyright

registrations.  The two registrations for *Locked Out of Heaven* both list

Bruno Mars as the artist, both associate the song with the album

*Unorthodox Jukebox,* and both state a publication date of December 11,

2012.  JA985; *see* JA1615, 1617.  These obviously are the same song.

Because no reasonable factfinder could find otherwise, the composition

and sound recording are "parts of a … derivative work" as a matter of

law.

Courts routinely apply this approach to resolve the number of

derivative works under § 504(c)(1) as a matter of law on summary

judgment.  *E.g.*, *Columbia Pictures Television, Inc.*, 259 F.3d at 1193

("the question whether [a work] is a separate work is a question of law"

where "there are no underlying factual disputes for the jury to resolve");

*Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003)

(number-of-works issue resolved at summary judgment), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Bryant v. Media Right Prods.*, 603 F.3d 135, 140-42 (2d Cir. 2010) (same).

Cox urged the district court to resolve the number of works before, during, and after trial. JA1903 (summary judgment); JA816-820 (Rule 50(a) motion); JA833-835 (Rule 50(b) motion); JA939.02-941 (further post-trial briefing). And, strikingly, Plaintiffs never disputed that many of the sound recordings in suit were recordings of a composition in suit. Nonetheless, the court refused to address this factually undisputed issue before trial.

In deciding Cox's Rule 50(b) motion, the court seemed poised to resolve the issue. It agreed that the number of derivative works was amenable to resolution as a matter of law. It acknowledged that Cox could "identify[] which copyrights in PX 1 correspond with which copyrights in PX 2," JA913—Step 1 above. It acknowledged Step 2, as well: "[T]he question of overlapping copyrights in a single work can—or should be able to—be determined by the requisite copyright registration," JA911-12. The court directed that Cox "propose a new

60

number of works in suit" in a supplemental brief and "include

supporting documentation," JA913, whereupon Plaintiffs could raise

disputes, *id*.

After applying Steps 1 and 2, Cox identified 2,370 instances in

which a sound recording was derivative of a composition as a matter of

law. JA939.02-940. Of these 2,370, Plaintiffs did not contest that 2,235

of the sound recordings on which the statutory damages award is based

are in fact derivative works beyond any conceivable doubt. Plaintiffs

claimed only that "Cox's proposed removals overreach by 135 unique

works"—or 6%. JA1042, 1046. (To be clear, even here Plaintiffs did not

argue that these 135 overlaps were not parts of derivative works, but

only that the copyright registrations in the record did not definitively

prove it.)

**2.** The parties' agreement as to those 2,235 sound recordings

meant that they were as indisputably derivative as *Locked Out of*

*Heaven*—so that the jury granted duplicative awards to 94% of the

sound recordings. "[U]nder the governing law, there [was] but one

reasonable conclusion as to the verdict" on those works, entitling Cox to

judgment as a matter of law as to them. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986).  The court had "the duty [to] … protect [Cox] from [an] unjust verdict[] … by setting aside a verdict which [wa]s unsupported by evidence or contrary to law." *Pleasants v. Fant*, 89 U.S. (22 Wall.) 116, 121-22 (1874).

But the court abdicated its duty.  After receiving the parties' supplemental briefing, the court declared that its earlier Rule 50(b) ruling had been "wrong that [a] re-calculation could be made on the trial record by the Court performing a ministerial act."  JA1051.  It now thought Cox's analysis entailed "many steps" that "required Cox to make judgment calls," presenting "questions of fact that must be answered by a jury."  *Id*.  The only "steps" the district court pointed to were "examining the names of the artist, the name of the album, ownership information, and publication date," *Id.*—in other words, reviewing copyright registrations, the very exercise the district court had previously endorsed.  But the court now thought that "the number of derivative works in play" should have been resolved at trial.  JA1052.

That was error.  The court had no discretion to deny JMOL once the parties agreed that "there can be but one reasonable conclusion" as to 2,235 of the works.  *Anderson*, 477 U.S. at 250.  As to those works,

62

there was no "question[] of fact" for the jury to resolve and no act required of the court beyond ordering JMOL on that portion of the judgment. The court was not permitted to deny JMOL as to that 94% on the basis of unspecified "judgment calls" that Plaintiffs themselves could not discern.

These basic JMOL rules do not depend on whether the analysis can be characterized as "ministerial" or requiring "judgment." JA1051. If by that, the court meant that JMOL is limited to issues that are easy to tabulate mechanically, that is obviously wrong—most JMOL motions are not about tabulation. Nor was it permissible for the court to deny JMOL because the exercise was "complex." *Id.* Plaintiffs made the extraordinary choice to pack thousands of sound recordings and compositions into a single case. That choice did not relieve them of the Copyright Act's limitation on receiving more than one statutory damages award per work, nor did it allow the district court to lighten the resulting workload by depriving the *defendants* of the normal JMOL rules.

Regardless, it was not actually that much work; the parties performed the two-step analysis for 94% of the arguably derivative

works, narrowing the dispute to only 135 that even arguably required any judicial consideration.

**3.** The court also erred in suggesting that Cox "forfeited the right to challenge the number of works." JA1049.

Throughout the litigation, Cox urged the court to resolve the legal dispute over whether Plaintiffs could recover two awards for overlapping compositions and sound recordings. JA1903. The district court declined to resolve it at summary judgment. This meant that, heading into trial, the parties did not even know whether the distinction between compositions and sound recordings would be legally material.

Cox nevertheless ensured that the trial record contained the evidence necessary to demonstrate overlap—PX-1, PX-2, and the registrations. It moved for judgment as a matter of law on the issue under Rule 50(a) and sought a jury instruction on it, too. JA785. Still the court declined to resolve the legal question or submit it to the jury.

By deferring the issue repeatedly, the district court hamstrung Cox's presentation of the issue at trial, only then to fault *Cox* for that very presentation. At least two Circuits, in similar situations involving

64

the same statutory damages provision, have declined to fault

defendants for procedural murkiness of the district court's own making.

*See VHT*, 918 F.3d at 747-48 (remanding where the district court

declined to resolve the number of works as a matter of law, but also did

not submit the question to the jury); *Sullivan v. Flora, Inc.*, 936 F.3d

562, 567-69, 572 (7th Cir. 2019) (remanding where "the [defendant]—

throughout the litigation—had made its position on statutory damages

abundantly clear").

In any event, none of this tortured procedural history has any

legal relevance to the appropriateness of JMOL.  The only question on a

JMOL motion is whether the evidence in the trial record was sufficient

to support judgment in favor of the verdict-winner.  If not, the court was

required to grant JMOL.  And if not, it does not matter whether Cox

could have introduced additional evidence, or further synthesized that

evidence, to make the jury's job easier.  Nor does it matter whether the

court instructed the jury on the legal issue; the law, not the

instructions, controls JMOL.  *See Boyle v. United Techs. Corp.*, 487 U.S.

500, 513-14 (1988).

To be sure, JMOL is limited to *evidence* introduced at trial (or of

which a court could take judicial notice). But Cox followed that rule. It

based its JMOL motion on evidence that was undisputedly admitted:

the two lists—PX-1 and PX-2—and the copyright registrations. Since,

as demonstrated above, there is no dispute that this trial evidence

resolves the issue as to 2,235 works, the court was required to resolve

the motion. This Court should direct entry of judgment as a matter of

law in Cox's favor as to the 2,235 overlaps on which there is no dispute.

**B.    The district court erred in allowing Plaintiffs to recover an extra $500 million for over 5,000 works that were parts of compilations.**

Section 504(c)(1) also permits only one statutory damages award

for "parts of a compilation." The court violated this rule when it

permitted separate awards for *each song* rather than for *each album*—

further inflating the number of awards by over 5,000, or over

$500 million.

**1.** The district court treated compilations differently from

derivative works, even though § 504(c)(1) treats them the same: When

a plaintiff elects statutory damages "with respect to *any one work*, … *all

the parts of a compilation or derivative work constitute one work*."

ADD4 (emphasis added). A "compilation," in turn, is defined to

"include[] *collective works*."  17 U.S.C. § 101, ADD1 (emphasis added).

And a "collective work" is "a work, such as a[n] … anthology, … in

which a number of contributions, constituting *separate and independent*

*works* in themselves, are assembled into a collective whole."  *Id.*

(emphasis added).

Plaintiffs do not dispute that albums are "collective works" and

therefore "compilations."  JA1921-22 (repeatedly labeling an album "a

compilation or collective work").  Nor could they.  "An album is a

collection of preexisting materials—songs—that are selected and

arranged by the author in a way that results in an original work of

authorship—the album."  *Bryant*, 603 F.3d at 140-41.

That should be the whole analysis:  If a sound recording is

contained on an album, it is part of a compilation; and "[f]or the

purposes of" § 504(c)(1), "all the parts of a compilation" are treated

together as "one work."  ADD4.  Because the text allows only one

answer, the court should "begin and end [its] inquiry with the text."

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010

(2017).

This Court did just that the only time it applied § 504(c)(1).  *Xoom*

67

involved bundled "clip-art" images. 323 F.3d at 285. The plaintiff had published two bundles of such images. *Id.* at 281. This Court acknowledged that each image had been individually copyrighted. *Id.* at 283-84. Even so, the copyright holder could not recover separate statutory damages awards for each underlying image, because the bundles were compilations. *Id.* at 283-85. Section 504(c)(1) thus permitted only one award. *Id.*

The Second Circuit initially followed *Xoom*'s approach in *Bryant*, 603 F.3d 135, which involved sound recordings. The analysis was equally simple. Albums are compilations. *Id.* at 141-42. "Based on a plain reading of the statute, therefore, infringement of an album should result in one statutory damage award." *Id.* at 141. *Bryant* is the inevitable consequence of applying *Xoom* in the context of sound recordings, *id.* at 141 n.6 (citing *Xoom*), although a later Second Circuit panel veered in another direction, as discussed immediately below.

As these cases confirm, the plain language yields a simple approach here: If album, then compilation, hence one award.

**2.** Instead of following the plain text and this Court's binding authority, the district court applied an atextual carveout: that sound

recordings compiled into an album can nevertheless garner separate

awards merely because the copyright owner *also* marketed and sold

individual songs separately—i.e., as singles.  JA896.  The court drew

this rule—the so-called "separate issuance" test—from *EMI Christian

Music Group*, 844 F.3d at 101, which the Second Circuit released after

*Bryant*.

　　This contradicts the plain text of the statute.  When Congress

declared that "all the parts of a compilation … constitute one work" for

purposes of § 504(c)(1), it did not say, "unless the plaintiff also issued

those works separately."  It explicitly said the opposite:  A "collective

work"—which is automatically a "compilation"—deserves one award

even if the "collective whole" includes "*separate and independent works

in themselves.*"  17 U.S.C. § 101, ADD1 (emphasis added).

　　Moreover, this Court in *Xoom* (to which the Second Circuit in *EMI*

owed no fealty) rejected the logic underlying the carveout when it held

that "[a]lthough parts of a compilation or derivative work may be

'regarded as independent works for other purposes,' for purposes of

statutory damages they constitute one work."  323 F.3d at 285 (citing

H.R. Rep. No. 94-1476, at 162 (1976)); *see Bryant*, 603 F.3d at 141

(citing same).[4]

**3.** This Court should remand to the district court to determine the correct number of works. The trial record permits a determination on compilations as a matter of law just as easily as for derivative works. That is because the admitted registrations alone supply ample evidence of compilation status, in two respects.

First is the inclusion of multiple sound recordings on the same registration. The 6,734 sound recordings at issue here are contained on 1,453 unique registrations. JA939.01; *see* JA1131-1269 (list of sound recordings and registration numbers). Plaintiffs have not disputed that they register groups of sound recordings together on single registration statements when the sound recordings are contained on albums. *See* JA1917. Indeed, many registrations specifically state the name of an

---

[4] Other circuits have adopted the so-called "independent economic value" test, which permits separate awards for works that can "live their own copyright life." *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990); *accord Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1115-18 (1st Cir. 1993); *Sullivan*, 936 F.3d at 570-72 (7th Cir.); *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1282 (11th Cir. 2015); *cf. VHT*, 918 F.3d at 747 (treating independent economic value as one of several factors in Ninth Circuit). The district court properly rejected this atextual test, JA886, but then adopted one of its own.

album, like the ones for *Locked Out of Heaven*.  *Supra* 58-59.

Second, nearly all those registrations also reflect that the groups of sound recordings were registered as "works made for hire."  "Work made for hire" status is available only for certain types of works.  17 U.S.C. § 101, ADD2.  When it comes to the musical works at issue here, the only two possible bases for indicating that status are that the work is a "compilation" or that it is a "collective work" (which is also a "compilation" by definition, *supra* 66-67).  *See* U.S. Copyright Office, Circular 30, *Works Made for Hire* 2-3 (Rev. Mar. 2021), https://copyright.gov/circs/circ30.pdf.  So where a registration indicates that a work is made for hire, that is an admission that the works listed on the registration are indeed parts of a compilation.

The district court rejected both categories of evidence merely because *Xoom* (and other courts) held that listing multiple works on one registration does not always "dispositive[ly]" prove that the works comprise a compilation.  JA891; *see* JA884; *Xoom*, 323 F.3d at 285 & n.8.  But Cox was not pressing a categorical rule.  It took a position based on facts *Plaintiffs* chose not to dispute and a legal inference that necessarily flows from *Plaintiffs'* decision to file registrations as works

71

made for hire. This Court should remand and direct the district court to resolve the number of works based on this undisputed record. *See VHT*, 918 F.3d at 747-48 (remanding for district court to resolve number of works); *Sullivan*, 936 F.3d at 568-69, 572 (same).

***

The district court's errors have resulted in an award of historic proportions. *Supra* 18-19. The $1 billion judgment is entirely untethered from both the harm it caused—$692,000 in displaced downloads, JA767-69—and Cox's culpability. Cox, after all, did not directly infringe any of Plaintiffs' works, encourage anyone to infringe, or create or supply the peer-to-peer protocols and platforms that enabled that infringement.

Instead, Cox's liability rests on the theory that it should have been a more active bystander by cutting off infringing subscribers' internet connections sooner—a delicate calculus based on competing duties to copyright holders and customers. JA415; *supra* 8-9, 49-51. If sustained, this judgment would elevate the interests of the music industry over those of ordinary, and often blameless, people who depend on the internet. The consequences will be devastating.

72

## CONCLUSION

The judgment should be reversed or, at a minimum, vacated.

Respectfully submitted,

/s/ E. Joshua Rosenkranz

Michael S. Elkin
Jennifer A. Golinveaux
Geoffrey P. Eaton
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
Sheila A. Baynes
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005

E. Joshua Rosenkranz
Christopher J. Cariello
Rachel G. Shalev
Alexandra Bursak
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellants*

September 8, 2021

## ORAL ARGUMENT STATEMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Local Rule 34(a), Cox respectfully states that oral argument is warranted. In light of the number and complexity of the issues raised, Cox believes that oral argument would assist the Court in resolving the appeal.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), as enlarged by order of this Court dated April 13, 2021, Doc. 24, because this brief contains 13,862 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
*Counsel for Defendants-Appellants*

# STATUTORY ADDENDUM

## 17 U.S.C. § 101 Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

…

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

…

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

…

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless

of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

…

A "work made for hire" is—

**(1)** a work prepared by an employee within the scope of his or her employment; or

**(2)** a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment—

**(A)** shall be considered or otherwise given any legal significance, or

**(B)** shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

ADD2

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

...

\*\*\*\*\*\*\*\*\*\*

## 17 U.S.C. § 102 Subject matter of copyright: In general

**(a)** Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

**(1)** literary works;

**(2)** musical works, including any accompanying words;

**(3)** dramatic works, including any accompanying music;

**(4)** pantomimes and choreographic works;

**(5)** pictorial, graphic, and sculptural works;

**(6)** motion pictures and other audiovisual works;

**(7)** sound recordings; and

**(8)** architectural works.

**(b)** In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

ADD3

**********

## 17 U.S.C. § 504 Remedies for infringement: Damages and profits

**(a) In General.**—Except as otherwise provided by this title, an infringer of copyright is liable for either—

**(1)** the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

**(2)** statutory damages, as provided by subsection (c).

**(b) Actual Damages and Profits.**—The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

**(c) Statutory Damages.**—

**(1)** Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

**(2)** In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe

ADD4

that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118(f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

**(3)(A)** In a case of infringement, it shall be a rebuttable presumption that the infringement was committed willfully for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the infringement.

**(B)** Nothing in this paragraph limits what may be considered willful infringement under this subsection.

**(C)** For purposes of this paragraph, the term "domain name" has the meaning given that term in section 45 of the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes" approved July 5, 1946 (commonly referred to as the "Trademark Act of 1946"; 15 U.S.C. 1127).

**(d) Additional damages in certain cases.**—In any case in which the court finds that a defendant proprietor of an establishment who claims as a defense that its activities were exempt under section 110(5) did not have reasonable grounds to believe that its use of a copyrighted work was exempt under such section, the plaintiff shall be entitled to, in addition to any award of damages under this section, an additional award of two times the amount of the license fee that the proprietor of the establishment concerned should have paid the plaintiff for such use during the preceding period of up to 3 years.