No. 21-1168

IN THE

# United States Court of Appeals for the Fourth Circuit

SONY MUSIC ENTERTAINMENT, ET AL.,
*Plaintiffs-Appellees*,

*v.*

COX COMMUNICATIONS, INC. and COXCOM, LLC,
*Defendants-Appellants*.

(see full caption on inside cover)

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:18-cv-950 (LO/JFA)
Hon. Liam O'Grady

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

Michael S. Elkin
Jennifer A. Golinveaux
Geoffrey P. Eaton
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
Sheila A. Baynes
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005

E. Joshua Rosenkranz
Christopher J. Cariello
Rachel G. Shalev
Alexandra Bursak
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellants*

September 8, 2021

Sony Music Entertainment; Arista Music; Arista Records, LLC; LaFace Records LLC; Provident Label Group, LLC; Sony Music Entertainment US Latin LLC; Volcano Entertainment III, LLC; Zomba Recordings LLC; Sony/ATV Music Publishing LLC; EMI Al Gallico Music Corp.; EMI Algee Music Corp.; EMI April Music Inc.; EMI Blackwood Music Inc.; Colgems-EMI Music Inc.; EMI Consortium Music Publishing Inc., d/b/a EMI Full Keel Music; EMI Consortium Songs, Inc., d/b/a EMI Longitude Music; EMI Feist Catalog Inc.; EMI Miller Catalog Inc.; EMI Mills Music, Inc.; EMI Unart Catalog Inc.; EMI U Catalog Inc.; Jobete Music Co. Inc.; Stone Agate Music; Screen Gems-EMI Music, Inc.; Stone Diamond Music Corp.; Atlantic Recording Corporation; Bad Boy Records LLC; Elektra Entertainment Group, Inc.; Fueled By Ramen LLC; Roadrunner Records, Inc.; Warner-Tamerlane Publishing Corp.; WB Music Corp.; Unichappell Music, Inc.; Rightsong Music Inc.; Cotillion Music, Inc.; Intersong U.S.A., Inc.; UMG Recordings, Inc.; Capitol Records, LLC; Universal Music Corp.; Universal Music – MGB NA LLC; Universal Music Publishing Inc.; Universal Music Publishing AB; Universal Publishing Limited; Universal Music Publishing MGB Limited; Universal Music – Z Tunes LLC; Universal/Island Music Limited; Universal/MCA Music Publishing Pty. Limited; Polygram Publishing, Inc.; Songs of Universal, Inc.; Warner Records, Inc., f/k/a W.B.M. Music Corp.,

*Plaintiffs-Appellees*,

and

Nonesuch Records Inc.; Warner Bros. Records, Inc.; Warner/Chappell Music, Inc.; W.B.M. Music Corp.; Universal-Polygram International Tunes, Inc.; Universal – Songs of Polygram International, Inc.; Universal Polygram International Publishing, Inc.; Music Corporation of America, Inc., d/b/a Universal Music Corporation; Rondor Music International,

*Plaintiffs,*

*v.*

Cox Communications, Incorporated; CoxCom, LLC,

*Defendants-Appellants.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................. 2

    I.    The DMCA Neither Decides This Case Nor Prevents Its Devastating Consequences. ............................................ 2

    II.   Cox Is Not Vicariously Liable As A Matter Of Law. ............. 5

        A.    Cox did not profit directly from subscribers' infringement. ................................................................. 5

        B.    Cox was unable to supervise six million subscribers. ................................................................. 11

    III.  The Contributory Liability Judgment Should Be Vacated. ......................................................................... 13

        A.    The district court erred in granting Plaintiffs summary judgment as to Cox's knowledge. ............... 13

        B.    As a matter of law, Cox did not materially contribute to every act of infringement for which it was held liable. ...................................................... 18

        C.    Vacating as to either theory of secondary liability requires vacatur of the entire verdict. ......................... 22

    IV.  The Statutory Damages Award Must Be Reduced ............. 25

        A.    The district court erred in allowing Plaintiffs to recover an extra $223 million for 2,235 derivative works. ........................................................................ 26

        B.    The district court erred in allowing Plaintiffs to recover an extra $500 million for over 5,000 works that were parts of compilations. ....................... 31

CONCLUSION .............................................................................. 35

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...................................................... 11, 12

*Barber v. Whirlpool Corp.*,
34 F.3d 1268 (4th Cir. 1994) ...................................................... 25

*Beastie Boys v. Monster Energy Co.*,
66 F. Supp. 3d 424 (S.D.N.Y. 2014) ...................................................... 25

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018) ................................................... 13, 15, 16

*Braun v. Flynt*,
731 F.2d 1205 (5th Cir. 1984) ............................................................. 24

*Capitol Records, Inc. v. MP3Tunes, LLC*,
28 F. Supp. 3d 190 (S.D.N.Y. 2014) ...................................................... 30

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
259 F.3d 1186 (9th Cir. 2001) ............................................................. 26

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) ......................................... 17

*CoStar Group, Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ............................................................. 3

*E.I. du Pont de Nemours v. Berkley & Co.*,
620 F.2d 1247 (8th Cir. 1980) ............................................................. 23

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ...................................................... 6, 7

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) ............................................................. 29, 32

*Flowers v. Tandy Corp.*,
773 F.2d 585 (4th Cir. 1985) ............................................................ 24

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) .................................................... 7, 8, 20

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
443 F.2d 1159 (2d Cir. 1971) ............................................................. 7

*Matthew Bender & Co. v. West Publ'g Co.*,
158 F.3d 693 (2d Cir. 1998) ............................................................ 19

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ......................................................................... 19

*Niz-Chavez v. Garland*,
141 S. Ct. 1474 (2021) ..................................................................... 29

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ......................................................... 21

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ....................................................... 6, 11

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
316 F.2d 304 (2d Cir. 1963) .............................................................. 7

*Sullivan v. Flora, Inc.*,
936 F.3d 562 (7th Cir. 2019) ........................................................... 32

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*,
682 F.3d 292 (4th Cir. 2012) ..................................................... 22, 23

*UMG Recordings, Inc. v. Bright House Networks, LLC*,
No. 8:19-cv-00710-MSS-TGW (M.D. Fla.) ...................................... 5

*UMG Recordings, Inc. v. Charter Commc'ns, Inc.*,
No. 1:21-cv-02020-RM-KLM (D. Colo.) ........................................... 5

*UMG Recordings, Inc. v. Frontier Commc'ns Corp.*,
No. 1:21-cv-05050-AT (S.D.N.Y.) ..................................................... 5

iii

*UMG Recordings, Inc. v. Grande Commc'ns Networks LLC,*
   No. 1:17-cv-00365-DAE (W.D. Tex.) ....................................5

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC,*
   No. 3:19-cv-17272-MAS-TJB (D.N.J.) .................................5

*Warner Records Inc. v. Charter Commc'ns, Inc.,*
   No. 1:19-cv-874-RBJ-MEH (D. Colo.) .................................5

*Wratchford v. S.J. Groves & Sons Co.,*
   405 F.2d 1061 (4th Cir. 1969) ...........................................26

*Xoom, Inc. v. Imageline, Inc.,*
   323 F.3d 279 (4th Cir. 2003) .......................................32, 33

## Statutes

1 U.S.C. § 1 .......................................................................29

17 U.S.C. § 504(c) .......................................................25, 30

17 U.S.C. § 504(c)(1) .......................................24, 25, 28, 32

17 U.S.C. § 512 ...................................................................2

17 U.S.C. § 512(i)(1)(A) .....................................................4

17 U.S.C. § 512(b)(1) ..........................................................2

17 U.S.C. § 512(e) ...............................................................2

17 U.S.C. § 512(g)(4) ..........................................................2

17 U.S.C. § 512(*l*) ...............................................................3

## Other Authorities

4 Melville B. Nimmer & David Nimmer, *Nimmer on
   Copyright* § 14.04[E][1][b][i] .........................................30

2 Paul Goldstein, *Goldstein on Copyright* § 14.2.2.1 (3d ed.
   2021-22 Supp.) ..............................................................30

H.R. Rep. No. 94-1476 (1976).................................................. 29

S. Rep. No. 105-190 (1998) ..................................................... 6

# INTRODUCTION[1]

Plaintiffs do not deny it: If the judgment is affirmed, ISPs will be required to terminate any internet connection accused of infringement just once—exiling anyone using that connection, infringer or not—on pain of crushing damages. Amici representing a host of often-divergent interests have unified here to warn of the devastation this rule will wreak on the public. Plaintiffs don't dispute these consequences, because this is the legal regime they have been advocating for years. They want to replace the flexible, fault-based doctrines of secondary copyright liability with notice-and-terminate … or else.

That is not the law. Plaintiffs try to justify the result here with breathless accusations that Cox was an outlier among ISPs, "creat[ing] a safe haven for repeat infringers" and "celebrating its contempt for copyright." AB3. Plaintiffs launch the same broadsides against each of the multiple ISPs they have sued across the country. But all this rhetoric cannot obscure that the judgment is riddled with legal defects—from the district court's rash and radical summary judgment

---

[1] We cite Cox's Opening Brief "OB"; Plaintiffs' Answering Brief "AB"; and amicus briefs "___ Br.," according to the lead amicus.

ruling, to its illogical rule of vicarious liability, to its refusal even to resolve statutory damages issues that quadrupled the judgment.

This Court should reverse.

## ARGUMENT

### I.    The DMCA Neither Decides This Case Nor Prevents Its Devastating Consequences.

Plaintiffs treat the DCMA as both a basis of liability and a panacea.  It is neither.

On liability, Plaintiffs build their brief around a legal fallacy: that what "controls here," AB15, is this Court's holding in *BMG* "that Cox … was ineligible for the accommodating 'safe harbor' provided by the … [DMCA]," AB2-3.  They assert that "Congress made clear in the DMCA that internet service providers are *expected* to terminate repeat infringers."  AB4.

Congress said the opposite.  It repeatedly confirmed the DMCA is not a source of liability, but a "[l]imitation[] on liability."  17 U.S.C. § 512; *see id.* § 512(b)(1), (e), (g)(4).  Under the heading, "**Other Defenses Not Affected**," Congress declared:

> The failure of a service provider's conduct to qualify for limitation of liability under this section shall *not bear adversely* upon the consideration of a defense by the service provider that the service

2

provider's conduct is *not infringing* ….

*Id.* § 512(*l*) (emphasis added).

That is why this Court has emphasized that "despite a failure to meet … safe-harbor conditions[,] … an ISP is still entitled to all other arguments under the law—whether by way of an affirmative defense or through an argument that conduct simply does not constitute a prima facie case of infringement." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004). "[T]he DMCA is irrelevant to determining what constitutes a prima facie case of copyright infringement." *Id.* at 555. Yet Plaintiffs invoke the DMCA 26 times. AB2-3, 4, 6, 8, 10-13, 15-16, 21, 25, 26, 32, 37.

Plaintiffs' fixation with the DMCA is especially inapt because of the disconnect between *BMG*'s safe harbor ruling and this judgment. Cox lost the safe harbor in *BMG* because it failed to stop a small set of especially egregious infringers. But Plaintiffs have won a billion dollars for a vastly larger universe of infringement committed by tens of thousands of subscribers who infringed twice and then stopped upon hearing from Cox.

That award has caused alarm across a swath of businesses and

3

public interest groups who have urged this Court to protect ISPs,

internet companies, and the American public from the devastating

consequences of Plaintiffs' "draconian" and "unwarranted extensions" of

secondary liability.  Internet Ass'n Br. 1; EFF Br. 4.  They protest that

millions of people will suffer "dangerous," "life-altering consequences"

from losing internet access often "based on unverifiable allegations."  IP

Law Profs. Br. 9; EFF Br. 3-4; Internet Ass'n Br. 10; NTCA Br. 4.  They

warn that ISPs will start "monitor[ing] internet traffic in a way that

erodes subscribers' privacy interests."  IP Law Profs. Br. 3.

Plaintiffs barely contest these concerns.  All they offer is a

footnote blithely assuring that the DMCA protects ISPs that take

"reasonable steps to address repeat infringement."  AB32 n.5.  That is

cold comfort because DMCA protection is rife with "uncertainty."  ICC

Br. 8-10.  A lay jury decides what is "reasonable"—whether an ISP has

correctly judged what are "appropriate circumstances" for "termination"

and whether the policy is "reasonably implemented."  17 U.S.C.

§ 512(i)(1)(A).  For all of Plaintiffs' hyperventilating about internal

emails and outlier infringers in *BMG*, they have never disputed that

Cox was an anti-infringement pioneer whose program was more robust

than the one the music industry negotiated with other ISPs.  OB7-11.  If Cox can lose the safe harbor, any ISP can.  And Plaintiffs have already targeted others with carbon copy accusations of unreasonable protections.[2]

The DMCA is no antidote for Plaintiffs' expansive theories of liability.

## II.  Cox Is Not Vicariously Liable As A Matter Of Law.

Plaintiffs invert the order of the liability issues.  They do not explain why, but the reason is obvious:  Their theory of vicarious liability conflicts with established law, and they could not find a single case endorsing it.

### A.  Cox did not profit directly from subscribers' infringement.

**1.**  Plaintiffs do not dispute that courts universally embrace Congress's view that "'receiving a one-time set-up fee and flat periodic

---

[2] *UMG Recordings, Inc. v. Grande Commc'ns Networks LLC*, No. 1:17-cv-00365-DAE (W.D. Tex.); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, No. 3:19-cv-17272-MAS-TJB (D.N.J.); *UMG Recordings, Inc. v. Bright House Networks, LLC*, No. 8:19-cv-00710-MSS-TGW (M.D. Fla.); *Warner Records Inc. v. Charter Commc'ns, Inc.*, No. 1:19-cv-874-RBJ-MEH (D. Colo.); *UMG Recordings, Inc. v. Charter Commc'ns, Inc.*, No. 1:21-cv-02020-RM-KLM (D. Colo.); *UMG Recordings, Inc. v. Frontier Commc'ns Corp.*, No. 1:21-cv-05050-AT (S.D.N.Y.).

5

payments for service … ordinarily would not constitute receiving a "financial benefit directly attributable to the infringing activity."'" *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (court's brackets omitted) (quoting S. Rep. No. 105-190, at 44 (1998)); *see* OB28-29 (citing cases). Nor do they dispute that to overcome this rule, courts ask "whether the infringing activity constitutes a draw for subscribers." *Ellison*, 357 F.3d at 1079; *see* OB28-29; IP Law Profs. Br. 3-9; ICC Br. 11-16.

Plaintiffs respond with semantics: "There is no such [draw] rule," AB34, by which they mean that there might be other ways to overcome the general rule concerning flat fees. That does not matter. All we have argued (OB28-29) is that proof of a "draw" is the only exception courts and Congress have recognized to the principle that a flat fee is not a direct financial benefit. So it does not matter whether this Court embraces the Ninth Circuit's "hold[ing] that [a plaintiff in a flat-fee case is] *required* to provide evidence that customers were drawn to [the defendant's] services because of the infringing … material at issue," *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017) (emphasis added), or concludes merely that that is the "central

6

question," *Ellison*, 357 F.3d at 1079. Plaintiffs have identified no case suggesting any other way of proving direct financial benefit where customers pay a flat fee for a service with non-infringing uses.

Plaintiffs' precedents offer no alternative. Their two Second Circuit cases do not involve defendants collecting flat fees. In one, the defendant received a cut of every infringing sale of a bootleg record. *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 306 (2d Cir. 1963). So the more sales, the more money it made. In the other, the defendant promoter likewise collected a share of the infringing band's profits, giving it an obvious financial interest in the band's activities. *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1160 (2d Cir. 1971).

Most surprising is Plaintiffs' invocation of *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), *the* seminal draw case. The defendant there operated a so-called "swap meet," which it purposely designed to "provide the environment and the market for counterfeit recording sales to thrive." 76 F.3d at 264. It accepted rental fees from vendors who paid to access that market. *Id.* at 263. It also received "admission fees, concession stand sales and parking fees, all of which

7

flow *directly from customers who want to buy the counterfeit recordings at bargain basement prices.*" *Id.* (emphasis added). All those benefits derived directly from the attraction of infringement—both vendors interested in selling infringing recordings and customers eager to purchase them. Those are quintessential draws.

**2.** Plaintiffs suggest that this is the unique case in which they were able to prove an exception to the general rule without proving draw. They claim that they proved the requisite "causal link between Cox facilitating the infringing activity and receiving a direct financial benefit" merely because Cox decided "not to terminate accounts so it could continue to collect … subscription fees." AB33. We have explained the fallacy (OB32): Continuing to collect fees shows only that Cox has a financial interest in *selling internet service*. It does not prove what Plaintiffs must: that *the infringement* produced a direct financial benefit, such that Cox has a financial interest in *the infringement* occurring. Plaintiffs do not respond.

By Plaintiffs' logic, Cox and other ISPs are liable for every transgression on the internet if they fail to terminate the offender upon learning of the offense. In each instance, they "would have obtained

less revenue," AB33, had they terminated.  But that does not give Cox a financial interest in every download, transaction, insult, or lie that occurs through its pipes.

**3.**  As a last resort, Plaintiffs claim that they actually satisfied the draw rule they eschewed below.  The very notion is far-fetched because Plaintiffs do not dispute that Cox's subscribers—like all of us—need the internet for countless reasons, whether or not they can infringe.  And Plaintiffs identified no subscriber who subscribed *because of* the ability to infringe Plaintiffs' works.

Plaintiffs point to a "high volume of infringing activity" overall—i.e., generally, not with respect to their works.  AB36.  But they do not dispute that the volume is *lower* on Cox's network than elsewhere—13% of bandwidth on Cox's network versus 21% elsewhere.  OB30. Regardless, "high volume" does not prove draw.  Baseball fans consume high volumes of hot dogs, but no one buys a ticket to the game for access to overpriced franks.

Plaintiffs also falsely claim to have proven that "repeat infringers were particularly profitable," AB33-34, and that "subscribers were willing to pay more for the ability to infringe," AB36.  Their *hypothesis*

9

is that "P2P activity consumes significant bandwidth and creates the need for subscribers to purchase" high-bandwidth plans, which are "more expensive." AB33-34. But their *evidence* is merely that "residential subscribers who were the subject of 20 or more infringement notices"—a miniscule proportion of infringers—"paid Cox [8.4%] more per month, on average, than residential subscribers who were the subject of only 1 or 2 infringement notices." AB33-34; JA1718, 1736.

That comparison does not even begin to prove that Cox received any direct financial benefit from the vast majority of accused infringers here—those who received under 20 notices. And ultimately it proves nothing even as to those incorrigible infringers because it confuses correlation with causation. Subscribers buy fast internet for lawful streaming—like Netflix or Spotify—or because their households have many internet users. *See* JA634-35. Plaintiffs' expert conceded that "there are many … high tier subscribers that don't infringe." JA623. And he admitted, "I don't know why" anyone chose to purchase higher-tier service. JA622-24. To advance this theory, Plaintiffs had to prove that each accused infringer purchased high-speed internet *because* it

10

enabled each to infringe Plaintiffs' works. *See Giganews*, 847 F.3d at 673. But they presented no proof that even a single subscriber did so.

## B. Cox was unable to supervise six million subscribers.

**1.** Plaintiffs say little of substance on the other element, requiring proof that Cox can supervise the internet activities of its six million subscribers. OB32-35. Their only argument is that Cox could "take a variety of actions against infringement, including termination." AB38. What "variety"? The only action that could stop a subscriber from infringing is termination. But the power to impose a draconian punishment is no substitute for proving "supervision."

Contrary to Plaintiffs' suggestion, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), does not say that the power to terminate is enough. Plaintiffs quote (AB38) a sentence stating that Napster's "ability to block infringers' access to a particular environment" in that case was "evidence of the right and ability to supervise." 239 F.3d at 1023. But they ignore that, in the next breath, the court emphasized that the bare right to terminate access was relevant only *because* Napster could "control[] and patrol[]" users' activities under the "system's current architecture." *Id.* at 1023-24.

11

*Napster* does not help Plaintiffs because they do not dispute the district court's express finding that Cox *cannot* police the internet. OB33-34; JA872.  Unlike Napster, Cox cannot monitor infringement in real time, screen out infringing material, or "block … access to a particular environment."

Even further afield are cases from a century ago about dance hall managers who, as Plaintiffs themselves put it, have the right to "hire and fire" the bands who play on their stages.  AB38-39.  Cox does not pay its six million subscribers to provide a service and cannot monitor them in real time.

**2.**  Given the weakness of Plaintiffs' position, it is no surprise that they lead by arguing partial forfeiture.  Plaintiffs do not dispute that Cox made this exact argument about supervision.  *See* JA831-33. Plaintiffs merely say that Cox made this "vicarious liability [argument] for *Cox Business* subscribers[]," but not "the other 95% of its subscribers."  AB37.

Plaintiffs omit an important detail:  Cox invoked business subscribers because prevailing as to that subset as a matter of law was alone sufficient to upend the judgment as to *all* subscribers.  Why?

12

Because Plaintiffs never tried to apportion liability among the two categories. The issue on appeal is exactly the same across all subscribers, too—whether the bare right to terminate subscribers is sufficient. In short, it is the same argument challenging the same error and seeking the same relief. So it is preserved.

## III. The Contributory Liability Judgment Should Be Vacated.

### A. The district court erred in granting Plaintiffs summary judgment as to Cox's knowledge.

**1.** On the knowledge element, our opening brief explained (OB36-38) that this is aiding-and-abetting liability and Cox cannot be held liable for any particular act of infringement absent proof that Cox knew that the accused infringer was "*substantially certain to*" infringe because of Cox's own conduct. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311 (4th Cir. 2018) (emphasis added). Plaintiffs do not dispute that this is the controlling standard. Yet, they mention it only in passing. AB24. And they cannot explain how they have satisfied it as a matter of law. *See* OB38.

We catalogued multiple categories of evidence, each of which raises at least a jury question as to whether Cox had the requisite knowledge as to every accused infringer. OB39-42. Plaintiffs leave

13

almost all of it unrebutted.  For example, we emphasized that "[n]early half (49.2%) of subscribers who get one notice never get another" and "[m]ore than two-thirds (68.3%) never get past two notices."  OB40-41.  Plaintiffs do not dispute that we accurately portrayed this evidence or that it was squarely before the district court on summary judgment.  JA1971-72, 2014, 2020.  Nor can they dispute its consequence:  A reasonable fact-finder could conclude that a notice or two failed to provide Cox with "substantial[] certain[ty]" that each of those subscribers would infringe again.  This alone requires reversal.

Plaintiffs also fail to address the ramifications of the district court's earlier conclusion (in *denying* summary judgment on direct infringement) that a notice *alleging* infringement cannot establish *an act* of infringement as a matter of law.  OB39-40.  Plaintiffs do not explain how those same notices could have established that Cox *knew* any particular infringement allegation to be true (much less all of them).  *See* NTCA Br. 19.

They can't.  There were rampant disputes as to the accuracy of the infringement notices.  Plaintiffs retort, "That is news."  AB26.  No, it's not.  We presented to the district court subscriber emails contesting

14

infringement accusations, citing them in our opening brief. OB41-42.
Those protests raise disputes, even where subscribers opted not to file
formal "counter-notification[s]" under the DMCA. AB26.

**2.** Plaintiffs justify ignoring these disputes only because they
replace the controlling standard with a different legal rule. They argue
that it is enough to show that: (1) they sent Cox millions of
infringement notices sufficiently "detailed" to identify "which"
subscribers were accused of infringement; and (2) Cox could "do
something" by "terminat[ing]" them all. AB21-22. Under this bright-
line approach, Plaintiffs have to adduce just one allegation of
infringement. They do not have to prove *any* likelihood that a
subscriber will infringe again—much less a "substantial[] certain[ty]" of
it. And if Cox does not terminate the subscriber upon receiving an
unproven notice, Cox is liable not only for every subsequent act of
infringement, but also for that past act.

This rule erases not just the "substantial[] certain[ty]" standard,
but the foundational requirement of a culpable "purpose and intent" to
assist a specific subscriber's infringement. *BMG*, 881 F.3d at 307
(quotation marks and citation omitted). Plaintiffs point to no case

15

adopting their standard.

Contrary to Plaintiffs' assertion, *BMG* did not adopt some special rule "[i]n the subscription context" that an ISP has "knowledge … sufficient" to trigger liability, *as a matter of law*, whenever it "knows the identity of subscribers who have used the subscription … to infringe in the past." AB24-25. In the passage Plaintiffs cite, *BMG* recognized the uncontroversial point that a factfinder *can* rely on past conduct to predict future conduct. 881 F.3d at 307-08. A factfinder could readily conclude that a subscriber who infringes 100 times is "substantially certain" to infringe a 101st. But *BMG* never held that a factfinder *must* conclude, based on one or two infringement allegations, that that same subscriber will certainly infringe again. Any such prediction depends on a variety of factors (OB40-41), which Plaintiffs never address.

**3.** One dimension of Plaintiffs' proposed test is especially bizarre: By their rule, as a matter of law, a plaintiff has proven that an ISP had knowledge that an infringement was "substantially certain" to occur simply because the ISP *subsequently* received a notice alleging that the infringement *had occurred*. Neither Plaintiffs nor the district court

16

have ever explained how that is logically possible.

Plaintiffs label this side point our "past acts argument" and assert that it "is forfeited." AB23. To be clear, Plaintiffs do not dispute that Cox preserved its primary argument pressed above—call it the "future acts argument"—that "repeat infringement cannot be imputed merely from the receipt of notices of infringement." JA1998 (quoting *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1105-06 (W.D. Wash. 2004) (emphasis omitted)); *see* JA1971-72 (featuring statistics on repeat infringement and citing those reprinted above, JA1971). Plaintiffs are wrong that Cox forfeited an a fortiori "past acts argument" merely because its summary judgment opposition did not use the magic words "past acts." AB23 & n.4. Cox captured the point when it said that contributory infringement "requires proof that the defendant had sufficient knowledge of the specific acts of infringement to have contributed to or induced them." JA1995.

Notably, the magic words do not appear in Plaintiffs' motion either. Why? Because not even *Plaintiffs* argued below that Cox could be retroactively liable for aiding and abetting an infringement that occurred before it got any notice. That was the *district court's*

17

innovation.  JA249; *see* OB36-39.

Plaintiffs' only substantive response to this oddity is the colorful assertion that "*some*" subscribers were "literally ca[ught]t … in the act" of downloading.  AB23 (emphasis added).  They presented literally *two* examples of this—out of millions of notices.  AB23 (citing JA1923, which cites JA1945-46).  That could not justify this sweeping grant of summary judgment.

**B.    As a matter of law, Cox did not materially contribute to every act of infringement for which it was held liable.**

Plaintiffs also fail to show how Cox could have materially contributed to any infringement when it did nothing but provide the internet, an essential service with countless non-infringing uses.  OB43-46.

**1.**  Plaintiffs' defense of the material contribution finding rests on a single proposition of law:  "Material contribution … does not require intent" or, apparently, any culpable act beyond supplying internet service.  AB29.  Plaintiffs do not dispute that culpability is required for vicarious liability and they concede that the Supreme Court said it is required to prove contributory liability, at least where the theory of

18

liability is *inducing* infringement. AB29. But they insist that when contributory liability is based on *materially contributing* to infringement, culpable conduct is not required. AB29-30.

That is wrong. Under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, *every* theory of secondary liability depends on "culpable … conduct," because they all turn on "rules of fault-based liability." 545 U.S. 913, 934, 937 (2005). *Grokster* was addressing all forms of "contributory liability" when it held: "[I]n the absence of other *evidence of intent*, a court would be unable to find *contributory infringement liability* merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses." *Id.* at 939 n.12.

*Matthew Bender & Co. v. West Publishing Co.*, the case Plaintiffs cite most (AB29), says the same thing. 158 F.3d 693 (2d Cir. 1998). There, the Second Circuit *rejected* any contributory liability because the defendant's product had "substantial noninfringing use" and "the alleged contributory infringer did not *influence or encourage* unlawful copying with the equipment it provided." *Id.* at 706 (emphasis added). In short, no culpable conduct.

19

Plaintiffs also extract from *Fonovisa*—the swap-meet case discussed above (at 7-8)—the quote that "providing the … facilities for known infringing activity is sufficient to establish contributory liability." AB27 (quoting 76 F.3d at 264). But it matters what *Fonovisa* was describing as "providing the … facilities": The defendant "strives to provide the environment and the market for counterfeit recording sales to thrive." 76 F.3d at 264. That *is* evidence of culpable intent, per *Grokster*, not what *Fonovisa* calls "passive" conduct, *id.*, which *Grokster* confirms is insufficient.

This Court can ignore the rest of Plaintiffs' three-page exegesis on *Grokster* (AB29-31) because it rebuts arguments we are not making. Our argument is not that "*Grokster* … require[s] inducement evidence." AB31. Nor that material contribution is no longer a viable theory. AB29-31. Nor that there is some "immun[ity] from liability" for "technology [that] can be substantially employed for a noninfringing use." AB28. Our argument is that culpability is the touchstone. Plaintiffs cite no case that has ever said otherwise.

**2.** Our opening brief noted that the Ninth Circuit stands alone in carving out a questionable exception from the Supreme Court's

command that affirmative assistance is necessary to prove culpable conduct. OB46-47. The Ninth Circuit applies the exception where the defendant "can take simple measures" to prevent known infringement. OB46-47 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172-73 (9th Cir. 2007)).

Plaintiffs disavow that exception, insisting that we are "project[ing] this argument onto Plaintiffs." AB31. Thus, they offer no justification for this Court to follow a rule that contradicts an explicit Supreme Court holding. Nor do they refute our argument that the Ninth Circuit's "rationale cannot be stretched to hold an ISP liable for infringement that occurs through its network." OB48.

Skipping over those basics, Plaintiffs assert that they have satisfied the test in any event. AB31-32. They do not dispute that this requires proof that the measure they demand is not just "simple," but also "reasonable and feasible." *Amazon.com*, 508 F.3d at 1172; *see* OB47-48. The measure Plaintiffs demand, though, is terminating any account that receives a single infringement notice—including regional ISPs with tens of thousands of innocent subscribers. OB49. They never explain why that is "reasonable" or "feasible."

21

Their main argument is the apples-and-oranges rhetorical point that Cox has "terminated" many "customers for nonpayment." AB31-32. That happens only after 90 days of non-payment. JA762-63. Most any business would consider it reasonable to stop providing service to someone who has not paid for three months. Plaintiffs do not explain how this shows that it is equally reasonable to terminate any subscriber accused of downloading one or two infringing songs. Against a veritable chorus of amici—from consumer advocates, to libraries, to internet companies, to other ISPs—explaining why Plaintiffs' proposed rule is utterly disastrous, Plaintiffs offer nothing but sarcasm. This Court should reverse.

### C.    Vacating as to either theory of secondary liability requires vacatur of the entire verdict.

If this Court vacates the judgment as to only one theory of liability, it should order a new trial as to the other—or at a minimum as to willfulness and damages.

**1.** As to liability, we have demonstrated (OB53-56) that the issues are so intertwined that one cannot be "reasonably certain" that the verdict would have been the same on one ground in light of the errors infecting the other. *Tire Eng'g & Distrib., LLC v. Shandong Linglong*

*Rubber Co.*, 682 F.3d 292, 314 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours v. Berkley & Co.*, 620 F.2d 1247, 1258 & n.8 (8th Cir. 1980)).

Plaintiffs fail to explain how one could have that level of confidence. They mainly recast Cox's JMOL and summary judgment arguments as objections to the jury instructions and argue they are forfeited. AB39-42. We are not challenging the jury instructions. If, for example, the summary judgment ruling on knowledge was correct, there was nothing wrong with "the form" of the Court's instruction explaining the consequence of that ruling. AB42. Our argument is that incorrectly directing a verdict that Cox knew about every act of infringement had inevitable ripple effects. OB55.

On that topic, Plaintiffs ignore the "reasonable certain[ty]" standard, insisting that they can avoid a new trial merely because the bases for liability "are predicated on the same conduct, and the maximum recovery for each claim is the same." AB41 (quoting *Tire Eng'g*, 682 F.3d at 314). That can be a factor, but Plaintiffs have not even tried to demonstrate that that alone proves the requisite level of certainty.

**2.** Similarly, Plaintiffs do not dispute that willfulness was

23

foreordained once the court directed a verdict on knowledge. OB54-55.

Under the *BMG*-approved instruction, willfulness if proven merely by

"knowledge that … subscribers' actions constituted infringement."

JA804.

Instead, Plaintiffs again pretend that our only complaint is about

instructions. AB43-44. This panel cannot entertain a challenge to the

instructions *BMG* approved. Hence the footnote preserving the

challenge for later review. OB55 n.3. Again, our point is that if it was

wrong to declare knowledge established, there must be a new trial as to

willfulness (and consequently damages).

**3.** At a minimum, a new trial on damages is required. A new trial

is the default rule for a general verdict where one basis falls. *Flowers v.*

*Tandy Corp.*, 773 F.2d 585, 591 (4th Cir. 1985). That rule's rationale

applies any time there is an "impossibility of knowing" what a jury

would have done, *id.*—indeed, unless this Court is "totally satisfied"

that the verdict was not any different as a result of the faulty claim,

*Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984).

No such certitude is possible here because any decision on what

award is "just," 17 U.S.C. § 504(c)(1), depends on highly subjective

considerations, such as relative culpability or the need to deter.  *See Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1994); *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 464 (S.D.N.Y. 2014) (statutory damages under § 504(c) are "necessarily … subjective and fact-intensive").  Indeed, the district court expressly recognized that the dual bases of liability made "a significant difference" in the jury's damages calculation.  JA925.  We made this point in our Opening Brief (OB56) and Plaintiffs do not even try to argue otherwise.

## IV.  The Statutory Damages Award Must Be Reduced.

Whatever the result on liability, the $1 billion damages award cannot stand.  Plaintiffs do not dispute either that 2,235 sound recordings are derivative of musical compositions in suit or that 5,000 tracks they separately claim are parts of compilations (i.e., albums). Because § 504(c)(1) limits Plaintiffs to one award for "all the parts of a compilation or derivative work," this Court should vacate the damages award and remand for the district court to recalculate the number of works eligible for an award of statutory damages.

**A.    The district court erred in allowing Plaintiffs to recover an extra $223 million for 2,235 derivative works.**

**1.**  Plaintiffs concede that "courts" must resolve "how many works are independently eligible for a statutory damages award" "where there are 'no underlying factual disputes for the jury to resolve.'"  AB45 n.6 (quoting *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1193-94 (9th Cir. 2001)); *see* OB62-63, 65-66.  Given this concession, it does Plaintiffs no good to insist they had a "right to a jury trial" on fact issues.  AB44-45 (citation and internal quotation marks omitted).  "[T]he Seventh Amendment[] assigns" to the jury only "decisions of *disputed* questions of fact." *Wratchford v. S.J. Groves & Sons Co.*, 405 F.2d 1061, 1065 (4th Cir. 1969) (emphasis added).  So the only question here is the one this Court asks in any JMOL posture:  Based on the evidence admitted at trial, was there only one reasonable determination of the derivative status of particular works at issue?  OB57-66.  The answer is yes.

Plaintiffs concede that PX-1 and PX-2 are "evidence that *was* before the jury."  AB47.  And they do not dispute (though they repeatedly ignore) that thousands of registrations were in evidence.

26

OB59, 66.  Plaintiffs also do not contest that we have accurately described the two-step process by which a jury (or court) could apply this record evidence to determine whether any particular sound recording was derivative.  OB57-59.

They accuse Cox of flipflopping as to whether Step 1—comparing unique titles across PX-1 and PX-2—was enough.  AB47-48.  But our position has always been that Step 1 establishes a prima facie match, and that Step 2—consulting the registrations—resolves any ambiguity.  JA779 (demonstrating the method at trial); JA938-39, 943-44.  Plaintiffs generally agree:  They disputed the match for only 135 works, leaving 2,235 undisputed.  OB61.  Plaintiffs cannot excuse their failure to dispute those 2,235 on the ground that they "had no need to respond" to "extra-record information," AB49 n.7, when what they failed to respond to *was* record information.

Plaintiffs suggest that a jury could not have performed the necessary analysis without the "new evidence" presented in "Cox's *post*-verdict submissions."  AB48.  What "new evidence"?  The "thousands of cited exhibits" Plaintiffs mention (AB48) were the registrations, which *were* in evidence.  Plaintiffs point to "spreadsheets."  AB48.  But the

spreadsheets merely summarized the registrations, tabulating the title and artist, album, or publication date of each work. *See* JA1028-31. Any jury (or court) could have performed that comparison, without exercising any "judgment" or resorting to expert testimony. AB48-49.

**2.** As an alternative ground for affirmance, Plaintiffs assert that the district court erred in concluding that the Copyright Act forbids Plaintiffs from double-counting parent and derivative works. The provision says in relevant part:

> [T]he copyright owner may elect … to recover … an award of statutory damages for all infringements involved in the action, with respect to any one work …. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

17 U.S.C. § 504(c)(1).

Plaintiffs concede that this provision "limits a single copyright owner to one damage award … even if that owner holds copyrights in … both the musical composition and sound recording." AB50 (emphasis omitted). Yet, they insist that two awards are permitted when different owners own what the Act treats as "one work." Their only textual support is that the provision refers to "'the copyright owner,' singular." AB50. So, Plaintiffs say, each owner can collect the statutory

maximum.

If that is what Congress had meant, it would have said "each owner of a copyright may elect to recover its own award of statutory damages." Or it would have limited the "one work" rule to situations where the owners of the parent and derivative works are the same.

But that cannot be what Congress meant. By Plaintiffs' reading, if five different people share ownership of "one work," they each would be eligible for separate awards—of up to $150,000—for the same act of infringement. That is a scenario Congress explicitly rejected. H.R. Rep. No. 94-1476, at 162 (1976). Plaintiffs forget that "[w]hen reading the U.S. Code," courts must "assume 'words importing the singular include and apply to several persons, parties, or things,' unless statutory context indicates otherwise." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021) (quoting 1 U.S.C. § 1).

The Second Circuit agrees that "Congress did not intend for separate statutory damages awards for derivative works such as sound recordings, even when the copyright owner of the sound recording differs from the copyright owner of the musical composition." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 95 (2d Cir.

2016).  Even commentators who are sympathetic to Plaintiffs' view acknowledge that it conflicts with the "literal[]" text of the statute.  2 Paul Goldstein, *Goldstein on Copyright* § 14.2.2.1 (3d ed. 2021-22 Supp.); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[E][1][b][i].

Plaintiffs cannot contradict the plain language by arguing that it would be "absurd" to limit two owners to one award in a joint suit—or "inefficien[t]" because it would incentivize those owners to sue separately.  AB51.  It was perfectly reasonable for Congress to decide not to penalize defendants double just because two different owners happen to own the parent and derivative work.  As for efficiency, "the Rules of Civil Procedure provide ample means to avoid parallel and duplicative litigation."  *Capitol Records, Inc. v. MP3Tunes, LLC*, 28 F. Supp. 3d 190, 192 (S.D.N.Y. 2014) (holding that § 504(c)'s cap would apply to collective recovery even in separate suits).  And Congress was justified in assuming that owners of different rights in the same work will typically save more by litigating together than they would gain from litigating apart.

**B.    The district court erred in allowing Plaintiffs to recover an extra $500 million for over 5,000 works that were parts of compilations.**

**1.**  Plaintiffs make the compilations question simpler by not even pretending to reconcile their position with the statutory text.  Plaintiffs accurately restate Cox's reading:  "Section 504(c) of the Copyright Act states that for purposes of statutory damages, 'all the parts of a compilation … constitute one work.'  Albums are compilations."  AB54 (internal quotation marks and alterations added); *see* OB66-67.  They respond with three letters: "QED."  AB54.

Glibness is no substitute for textual analysis.  Plaintiffs do not dispute the premise, that albums are compilations.  Nor do they explain how they avoid the conclusion—that multiple songs on an album "constitute one work."  So, yes, QED.  It *has* been demonstrated.

What has *not* been demonstrated is how Plaintiffs can read the text as if it added the proviso: "except where songs on albums were also issued individually, in which case each song shall be treated as an individual work and receive a separate award of statutory damages."  *See* AB54.  There is no statutory language that exempts certain "parts of a compilation," much less a music-specific exception for songs

31

compiled into albums.  And Plaintiffs do not address the statutory text that specifically contemplates, and rejects, Plaintiffs' "separate issuance" test.  OB66-69.

Plaintiffs urge this Court to skip over the statute and choose the minority position among circuits that have adopted different atextual exceptions.  *See* AB54-55 (acknowledging that only one circuit has adopted Plaintiffs' position and five have rejected it).  Those circuits do not tether their positions to the text either.  *E.g.*, *EMI Christian Music Grp.*, 844 F.3d at 101 (reasoning from precedent).  Some explicitly refuse to give "controlling weight to the last sentence of § 504(c)(1)." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 570, 572 (7th Cir. 2019).  This Court should follow the statute Congress wrote—especially since any decision here will deepen a circuit conflict anyway, and Plaintiffs have never explained why the statute Congress wrote is so wrong that courts must step in to rewrite it.

The textual approach has the added benefit of being the only one that comports with this Circuit's precedent.  We explained (OB69-70) that this Court declined to adopt any carveout when it addressed the "one work" limitation in *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285

32

(4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).  Plaintiffs respond with two contradictory assertions:  "*Xoom* did not address the situation here," yet "*Xoom* … rejects Cox's theory."  AB55.

As to the first, even *Xoom*'s supposed silence is telling.  This Court held that the copyright owner could recover only one award per bundle of images because each bundle was a compilation.  323 F.3d at 283-85.  The Court did *not* ask if the images nevertheless had some separate status.

*Xoom* certainly did not "reject[] Cox's theory."  AB55.  *Xoom* observed that "the Copyright Act does not bar multiple awards for statutory damages" just because "one registration includes multiple works."  323 F.3d at 285.  We have never argued that listing works on the same registration automatically makes them a compilation limited to one award.  *Id.* at 285 & n.8; *see* AB53.  Our point—which Plaintiffs have never disputed—is that *albums* are compilations, and that the registrations reflect which songs are compiled into albums.  OB67-68.

**2.**  Plaintiffs assert that Cox's position is "wrong twice over."  AB51-52.  But their second reason is the same as the first:  "Cox failed

33

to present evidence to the jury that Plaintiffs issued any of the works …
only in album form." AB52 (bold omitted). No such proof is required if,
as we have demonstrated, there is no such carveout. Cox was required
to present proof only of which songs were together on albums.

Plaintiffs do not dispute that Cox did that. All agree that
Plaintiffs registered sound recordings together when they were part of
an album; that many registrations identify the album on which the
sound recordings appear; and that Plaintiffs registered thousands of
songs as works-for-hire, a status that, on the undisputed facts,
necessarily means they were parts of compilations. OB70-72. Plaintiffs
even conceded that "[t]here's been testimony" that many works in suit
were "also sold as albums." JA741.

This Court should remand for the district court to determine the
correct number of works based on the undisputed evidence.

## CONCLUSION

The judgment should be reversed or, at a minimum, vacated.

Respectfully submitted,

/s/ *E. Joshua Rosenkranz*

Michael S. Elkin
Jennifer A. Golinveaux
Geoffrey P. Eaton
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
Sheila A. Baynes
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005

E. Joshua Rosenkranz
Christopher J. Cariello
Rachel G. Shalev
Alexandra Bursak
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellants*

September 8, 2021

35

## CERTIFICATE OF COMPLIANCE

This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,483 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
*Counsel for Defendants-Appellants*