IN THE
# United States Court of Appeals for the Fourth Circuit

SONY MUSIC ENTERTAINMENT, ET AL.,
*Plaintiffs-Appellees*,

*v.*

COX COMMUNICATIONS, INC. and COXCOM, LLC,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:18-cv-950 (LO/JFA)
Hon. Liam O'Grady

## CORRECTED JOINT APPENDIX VOLUME II OF VII
### JA260–JA814

Catherine E. Stetson
Jo-Ann Tamila Sagar
Patrick C. Valencia
HOGAN LOVELLS US LLP
555 13th St. NW
Washington, DC 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellees*

E. Joshua Rosenkranz
Christopher J. Cariello
Rachel G. Shalev
Alexandra Bursak
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

*Counsel for Defendants-Appellants*

## Additional Counsel

Matthew J. Oppenheim
Scott A. Zebrak
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave., N.W., 5th fl.
Washington, D.C. 20016
(202) 480-2999
matt@oandzlaw.com

*Counsel for Plaintiffs-*
*Appellees*

Michael S. Elkin
Jennifer A. Golinveaux
Geoffrey P. Eaton
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
Sheila A. Baynes
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005

*Counsel for Defendants-*
*Appellants*

# JOINT APPENDIX INDEX

**VOLUME I**

Docket, Eastern District of Virginia, No. 1:18-cv-00950-LO-JFA ....... JA1

Complaint and Jury Demand, July 31, 2018, Dkt. No. 1 ................ JA159

First Amended Complaint and Jury Demand, April 23, 2019,
Dkt. No. 136 .................................................................................... JA189

Declaration of Jeffrey M. Gould in Support of Plaintiffs' Motion for
Summary Judgment, August 30, 2019, Dkt. No. 325-1

      Exhibit 22 (PX-240), Email to CCI – DAB Abuse Team
      from Matt Carothers re DAB Abuse Call Meeting
      Minutes, January 12, 2010 ............................................ JA217

      Exhibit 39 (PX-19) List of Ticket Data History
      (**Digital Media Volume**) ............................................... JA219

      Exhibit 55 (PX-347), Email to HRD-TOC and
      CCI – Abuse Corporate from Andrew Thompson re
      Termination Review – 19029047, June 12, 2014 .......... JA220

      Exhibit 62 (PX-277), Email to HRD-TOC and
      CCI – Abuse Corporate from Jason Zabek re
      CATS 7442149, March 5, 2011 ..................................... JA223

Order Granting Motions to Strike Declarations, dated
October 23, 2019 Dkt. No. 521 ........................................................ JA225

Appendix A, Cox's Proposed Jury Instructions, dated
October 25, 2019 Dkt. No. 606-1, *excerpted* .................................... JA227

Amended Memorandum Opinion and Order, November 27, 2019,
Dkt. No. 610 .................................................................................... JA230

Cox's Proposed Verdict Form, December 2, 2019,
Dkt. No. 617, *excerpted* .................................................................. JA256

**VOLUME II**

**Excerpts from Trial Transcript, December 2, 2019, Dkt. No. 628** ................................................................. JA260

    Opening Statement by Plaintiffs' Counsel ............................ JA263

    Direct Examination of Dennis Kooker.................................... JA273

    Cross Examination of Dennis Kooker.................................... JA289

**Excerpts from Trial Transcript AM, December 3, 2019, Dkt. No. 629** ................................................................. JA293

    Direct Examination of David Kokakis.................................... JA296

    Cross-Examination of David Kokakis.................................... JA299

    Redirect Examination of David Kokakis ............................... JA312

    Direct Examination of Alasdair McMullan ........................... JA314

    Cross-Examination of Alasdair McMullan ............................ JA321

    Direct Examination of Steven Marks .................................... JA324

**Excerpts from Trial Transcript PM, December 3, 2019, Dkt. No. 630** ................................................................. JA336

    Direct Examination of Steven Marks .................................... JA338

    Cross-Examination of Steven Marks .................................... JA349

**Excerpts from Trial Transcript AM, December 4, 2019, Dkt. No. 637** ................................................................. JA352

    Direct Examination of Barbara A. Frederiksen-Cross........... JA355

**Excerpts from Trial Transcript PM, December 4, 2019, Dkt. No. 638** ................................................................. JA379

    Direct Examination of Samuel Bahun ................................... JA382

**Excerpts from Trial Transcript PM, December 5, 2019, Dkt. No. 640** ................................................................. JA391

    Direct Examination of Linda Trickey .................................... JA394

**Excerpts from Trial Transcript AM, December 6, 2019, Dkt. No. 641** ................................................................. JA403

    Direct Examination of Linda Trickey .................................... JA406

**Excerpts from Trial Transcript PM, December 6, 2019, Dkt. No. 642** ................................................................. JA417

    Cross-Examination of Linda Trickey .................................... JA420

    Direct Examination of Roger L. Vredenburg ......................... JA440

**Excerpts from Trial Transcript AM, December 9, 2019, Dkt. No. 649** ................................................................. JA450

    Direct Examination of Matthew J. Flott .............................. JA453

    Cross-Examination of Matthew J. Flott ............................... JA460

    Direct Examination of Jason Zabek (via deposition) ............. JA463

**Excerpts from Trial Transcript PM, December 9, 2019, Dkt. No. 650** ................................................................. JA471

    Direct Examination of Jason Zabek (via deposition) ............. JA474

    Direct Examination of Brent Beck ....................................... JA484

**Excerpts from Trial Transcript AM, December 10, 2019, Dkt. No. 653** ................................................................. JA502

    Cross-Examination of Brent Beck ........................................ JA505

Redirect Examination of Brent Beck ..................................... JA515

Direct Examination of Carothers........................................... JA517

**Excerpts from Trial Transcript PM, December 10, 2019, Dkt. No. 654** ................................................................. JA526

Cross-Examination of Matt Carothers ................................. JA529

Redirect Examination of Matt Carothers............................. JA540

Direct Examination of Joseph Sikes (via deposition)............. JA547

Direct Examination of Jorge C. Fuenzalida (via deposition) . JA568

**Excerpts from Trial Transcript AM, December 11, 2019, Dkt. No. 655** ................................................................. JA574

Direct Examination of William H. Lehr ............................... JA577

Cross-Examination of William H. Lehr ............................... JA616

**Excerpts from Trial Transcript PM, December 11, 2019, Dkt. No. 656** ................................................................. JA626

Direct Examination of Siddhartha Negretti.......................... JA629

Cross-Examination of Siddhartha Negretti ......................... JA647

Direct Examination of Lynne Janet Weber, Ph.D................. JA655

**Excerpts from Trial Transcript AM, December 12, 2019, Dkt. No. 657** ................................................................. JA670

Direct Examination of Randy Cadenhead (via deposition).... JA673

**Excerpts from Trial Transcript PM, December 12, 2019, Dkt. No. 658** ................................................................. JA687

Direct Examination of Nick Feamster................................... JA690

Jury Instruction Conference ................................................. JA703

iv

**Excerpts from Trial Transcript AM, December 16, 2019, Dkt. No. 659** ................................................................ JA712

    Cross-Examination of William Christopher Bakewell ........... JA715

**Excerpts from Trial Transcript PM, December 16, 2019, Dkt. No. 660** ................................................................ JA724

    Direct Examination Kevin Christopher Almeroth ................ JA727

    Cross Examination of Kevin Christopher Almeroth .............. JA739

    Jury Instruction Conference .................................................. JA740

**Excerpts from Trial Transcript AM, December 17, 2019, Dkt. No. 672** ................................................................ JA747

    Preliminary Matters Outside Jury's Presence ...................... JA750

    Cross-Examination of Sanford Mencher ............................... JA756

    Direct Examination of Christian D. Tregillis ........................ JA763

**Excerpts from Trial Transcript PM, December 17, 2019, Dkt. No. 673** ................................................................ JA771

    Cross-Examination of Christian D. Tregillis ......................... JA774

    Discussion outside Presence of Jury ..................................... JA781

    Court's Jury Instructions ...................................................... JA787

**Excerpts from Trial Transcript, December 18, 2019, Dkt. No. 674** ................................................................ JA805

    Closing Argument by Mr. Oppenheim ................................... JA808

    Rebuttal Argument by Mr. Oppenheim .................................. JA812

**VOLUME III**

Cox's Initial Motion for Judgment as a Matter of Law Under
Federal Rule of Civil Procedure 50(A), December 17, 2019,
Dkt. No. 651, *excerpted*.................................................................. JA815

Verdict Form, December 19, 2019, Dkt. No. 669............................ JA822

Cox's Memorandum of Law in Support of its Renewed Motion for
Judgement as a Matter of Law or, in the Alternative, a New Trial
Under Federal Rules of Civil Law Procedure 50(B) and 59(A),
January 31, 2020, Dkt. No. 682, *excerpted* ...................................... JA824

Memorandum in Opposition to Cox's Renewed Motion for Judgment
as a Matter of Law or New Trial, dated February 28, 2020,
Dkt. No. 699, *excerpted*.................................................................. JA855

Memorandum Opinion & Order, June 2, 2020, Dkt. No. 707 ......... JA862

Cox's Post-Trial Response Brief Regarding Derivative and Dropped
Works, August 3, 2020, Dkt. No. 711, *excerpted*.............................. JA937

    Schedule 1, Derivative Works With Unique Track Names,
    August 3, 2020 Undated Dkt. No. 711-3................................ JA946

    Schedule 2, Non-Derivative Works With Unique Track
    Names, August 3, 2020, Dkt. No. 711-4.............................. JA1027

    Schedule 3, Derivative Works With Non-Unique Track
    Names, August 3, 2020 Dkt. No. 711-5 ............................... JA1032

Plaintiff's Post-Trial Brief Pursuant to This Courts' June 2 Order,
October 2, 2020, Dkt. No. 718, *excerpted* ...................................... JA1039

Order, Jury Determination of Number of Works Infringed Stands,
January 12, 2021, Dkt. No. 721 ................................................... JA1047

Judgment, January 12, 2021, Dkt. No. 723.................................. JA1053

Cox's Notice of Appeal, February 10, 2021, Dkt. No.732 .............. JA1054

**VOLUME IV**

**Trial Exhibits**

DX-63, Memorandum of Understanding, July 6, 2011, *excerpted*  JA1058

DX-114, Cox Communications Policies,
updated October 18, 2011, *excerpted* ............................................ JA1060

DX-210 Cox Customer Safety and Abuse Operation, Residential
Abuse Ticket Handling Procedures, *excerpted* ............................. JA1063

DX-239, Opportunities to Maximize Demand for Residential
Internet Service – Non-Conjoint Report, Draft Report,
August 19, 2014............................................................................. JA1066

DX-337, Cox rate card, 2013 and 2014 List Prices........................ JA1123

DX-496 Email to Cox Customer Safety re Notice of Copyright
Infringement, February 4, 2013..................................................... JA1126

PX-1, List of Record Company Plaintiffs' Copyrighted Sound
Recordings, undated....................................................................... JA1131

PX-2, List of Music Publisher Plaintiffs' Copyrighted
Compositions, undated................................................................... JA1270

PX-14, Produced in Native Format Slip Sheet, Excel Spreadsheet,
List of Infringement Detected, undated
(**Digital Media Volume**)............................................................ JA1352

PX-19, Produced in Native Format Slip Sheet, Excel Spreadsheet,
List of Ticket Data History, undated (**Digital Media Volume**).. JA1353

PX-32A, Email from Cox Customer Safety re Notice of Copyright
Infringement, undated ................................................................... JA1354

PX-164, Cox Communications, Abuse Department CBS Ticket
Handling Procedures Release 1.0, January 17, 2007, *excerpted*... JA1359

PX-165, Cox Communications, Abuse Department Ticket Handling
Procedures Release 1.6, September 18, 2008, *excerpted* ............... JA1365

PX-172, Cox Communications, Abuse Department CBS Ticket
Handling Procedures Release 1.0, November 1, 2010, *excerpted* .. JA1370

PX-174, Cox Communications, Abuse Department Ticket Handling
Procedures Release 3.4, August 24, 2011, *excerpted* ...................... JA1376

PX-175, Cox Communications Policies, Cox High Speed Internet
Acceptable Use Policy, November 18, 2011 ................................. JA1389

**VOLUME V**

PX-179, Cox Communications, Customer Safety and Abuse
Operations, Residential Abuse Ticket Handling Procedures,
October 18, 2012, *excerpted* ............................................. JA1409

PX-181, Cox Communications, Customer Safety & Abuse
Operations Cox Business Abuse Ticket Handling Procedures
Release 3.0, November 1, 2012, *excerpted* ..................................... JA1420

PX-197, State of Customer Safety 2011, Residential Customer
Safety, undated, *excerpted* ............................................. JA1428

PX-203, CATS, What is Abuse?, undated, *excerpted* ..................... JA1431

PX-213, Cox High Speed Internet Data Usage Assessment
Appendix, April 19, 2011, *excerpted* ................................. JA1437

PX-214, Cox High Speed Internet Data Usage Assessment Final
Readout, April 19, 2011 ................................................. JA1448

PX-235, Email to Jason Zabek from Christopher Burns re Abuse
Suspensions, January 6, 2010 ......................................... JA1475

PX-237, Email to Jason Zabek from Andrea Dameri re
Suspensions, January 7, 2010 ......................................... JA1477

PX-240, Email to CCI – DAB Abuse Team from Matt Carothers
re DAB Abuse Call Meeting Minutes, January 12, 2010 .............. JA1478

PX-242, Email to CCI- Abuse Toc from Jason Zabek re Changes to
Abuse Handling – CATS – Walled Garden, dated January 13, 2010
................................................................................. JA1479

PX-245, Email to Andrea Dameri and CCI – Abuse Corporate from Jason Zabek re Account, dated January 17, 2010, *excerpted* ........ JA1480

PX-251, Email to Brent Beck from Joseph Sikes re DMCA Blast from Fox on Monday, March 10, 2010 .................................................... JA1482

PX-253, Email to Michael Moy from Roger Vredenburg re DMCA Terminations, April 10, 2010 .......................................................... JA1484

PX-266, Email to Andrea Dameri and CCI – Abuse Corporate from Jason Zabek re Customers Terminated for DMCA, August 11, 2010 .............................................................................. JA1485

PX-303, Document, Conversation with JoeSikesAtl at Fri 27 Jan 2012 06:46:44 PM EST on G Chaos L2 (aim), dated January 27, 2012, *excerpted* ...................................................................................... JA1487

PX-305, Document, Conversation with JoeSikesAtl at Fri 27 Jan 2012 05:54:13 PM EST on G Chaos L2 (aim), January 27, 2012 ............................................................................ JA1488

PX-318, Email to Steven Wimmer from Jason Zabek re Archer Incident IR-155: Possible BitTorrent Use on Internal Network – Closed, October 16, 2012 .............................................. JA1490

PX-322, Email to Andrea Dameri from Joseph Sikes re Termination Review CATS Ticket 12056367, December 12, 2012 ...................................................................... JA1492

PX-335, Email to Joseph Sikes from Brent Beck re DMCA Complaint Spike?, February 19, 2014, *excerpted* .......................... JA1494

PX-342, Email to Joseph Sikes, HRD-TOC and CCI – Abuse Corporate from Martin Mathews re Request for Termination – CATS Ticket 18640554, March 27, 2014, *excerpted* ................................. JA1496

PX-347, Email to HRD-TOC and CCI – Abuse Corporate from Andrew Thompson re Termination Review – 19029047, dated June 12, 2014, *excerpted* ...................................................................................... JA1499

PX-351, Defendant Cox Communications, Inc.'s First Supplemental Responses to Plaintiffs' First Set of Interrogatories, dated March 25, 2015, *excerpted* .............................................................................. JA1500

PX-353, Defendant Cox Communications, Inc.'s Third Supplemental Responses to Plaintiffs' First Set of Interrogatories, July 24, 2015, *excerpted* ......................................................................... JA1504

PX-365, Cox's Second Supplemental Responses to Plaintiffs' First Set of Interrogatories (Nos. 1-12) to Defendants, March 29, 2019, *excerpted* ............................................................ JA1510

PX-439, David Price, Dir. Of Piracy Analysis, NetNames, *Sizing the Piracy Universe*, September 2013 .................................................. JA1513

PX-451, Cox Communications Fact Sheet, April 4, 2019 .............. JA1613

PX-486, Chart of U.S. Recorded Music Revenues by Format, 2000-2014 ...................................................................................... JA1614

PX3305 - Certificate of Registration for Bruno Mars "Unorthodox Jukebox" ......................................................................................... JA1615

PX3651 - Certificate of Registration for Bruno Mars Unorthodox Jukebox........................................................................................... JA1617

Dr. Kevin C. Almeroth Demonstrative ......................................... JA1619

Dr. Nick Feamster Demonstrative.................................................. JA1646

William Lehr Demonstrative .......................................................... JA1696

Dr. Lynne Weber Demonstrative.................................................... JA1723

**DIGITAL MEDIA VOLUME VI**

Gould Exhibit 39 (PX-19) List of Ticket Data History, produced in native form ................................................................... JA219

PX-14, List of Infringements Detected, undated, produced in native form ............................................................... JA1352

PX-19, List of Ticket Data History, undated,
produced in native form ................................................................. JA1353

## VOLUME VII (SEALED)

Memorandum in Support of Plaintiffs' Motion for Summary
Judgment, August 30, 2019, Dkt. No. 325.................................... JA1752

Declaration of Jeffrey M. Gould in Support of Plaintiffs' Motion
for Summary Judgment, August 30, 2019, Dkt. No. 325-1 ........... JA1800

      Exhibit 40 (PX-23), List of Copyright Infringement – Notice
      ID Numbers, undated, *excerpted* ................................. JA1808

Declaration of George P. McCabe, August 26, 2019,
Dkt. No. 325-2 .............................................................................. JA1819

Defendant's Memorandum of Law in Support of Their Motion for
Summary Judgment, August 30, 2019, Dkt. No. 330, *excerpted*... JA1860

      Declaration of Thomas Kearney in Support of Defendants'
      Motion for Summary Judgment, August 30, 2019,
      Dkt. No. 330-1, *excerpted* ...................................... JA1907

Plaintiffs' Memorandum in Opposition to Defendants' Motion for
Summary Judgement, September 24, 2019, Dkt. No. 392,
*excerpted* ..................................................................................... JA1918

Declaration of Jeffrey M. Gould, September 24, 2019,
Dkt. No. 392-8

      Exhibit 11 Declaration of Barbara Frederiksen-Cross,
      dated September 24, 2019, Dkt. No. 392-19........................ JA1930

Defendants' Memorandum in Opposition to Plaintiffs' Motion for
Summary Judgment, September 24, 2019, Dkt. No. 394.............. JA1964

Declaration of Thomas Kearney in Support of Cox's Opposition to Plaintiffs' Motion for Summary Judgment, September 24, 2019, Dkt. No. 400

    Exhibit K25, Rebuttal Expert Report of Lynne J. Weber, Ph.D., May 15, 2019, Dkt. No. 403-4, *excerpted* .............................. JA2012

Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, October 11, 2019, Dkt. No. 454................... JA2022

    Declaration of Dr. Nick Feamster in Support of Cox's Reply in Support of its Motion for Summary Judgment, October 11, 2019, Dkt. No. 454-1 ...................................................................... JA2060

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,          :
                                :
     -vs-                        :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.          :
                                :
--------------------------------:
```

VOLUME  1

TRIAL TRANSCRIPT

December 2, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

FOR THE PLAINTIFFS:                MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
                                   MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
                                   LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
                                   Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
                                   5th Floor
                                   Washington, D.C. 20015


FOR THE DEFENDANTS:                THOMAS M. BUCHANAN, ESQ.
                                   Winston & Strawn LLP
                                   1700 K Street, N.W.
                                   Washington, D.C. 20006-3817
                                     and
                                   SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
                                   THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
                                   Winston & Strawn LLP
                                   200 Park Avenue
                                   New York, NY 10166-4193
                                     and
                                   JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
                                   Winston & Strawn LLP
                                   101 California Street, 35th Floor
                                   San Francisco, CA 94111-5840
                                     and
                                   MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
                                   35 West Wacker Drive
                                   Chicago, IL 60601
                                     and
                                   DIANA HUGHES LEIDEN, ESQ.
                                   Winston & Strawn LLP
                                   333 South Grand Avenue
                                   Suite 3800
                                   Los Angeles, CA 90071

INDEX

OPENING STATEMENTS BY:


    MR. OPPENHEIM                                        27
    MR. ELKIN                                            62



WITNESS                          EXAMINATION          PAGE


  DENNIS KOOKER

                                 DIRECT               95
                                 CROSS                120



CLOSING ARGUMENTS BY:




COURT'S JURY INSTRUCTIONS


    THE COURT                                          18

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1    held liable for the actions of its users, remember there is a

2    legal way for companies like Cox to avoid these lawsuits, but

3    Cox can't take advantage of that here.

4           Let me turn to the infringement evidence in this

5    case.  At the heart of this case is Cox's continued provision

6    of service to subscribers that were illegally distributing

7    music using peer-to-peer networks.  So what is a peer-to-peer

8    network?  It's basically an online network that enables

9    strangers to distribute an endless number of digital copies of

10   anything from books to software to music to movies, anything

11   you want, across the internet.

12          Now, in this case, a large number of Cox customers

13   were using peer-to-peer networks to illegally copy and

14   distribute plaintiffs' music.  Now, we have no idea how many

15   Cox customers were using peer-to-peer because peer-to-peer

16   activity is done privately, and Cox didn't track what its user

17   were doing and didn't maintain records, so there's no idea how

18   many Cox subscribers were actually infringing.

19          When a Cox customer is distributing on a peer-to-peer

20   network, they are essentially running the equivalent of a

21   digital record store.  I know there are very few record stores

22   anymore, but if you remember, there used to be record stores.

23   And so when a Cox subscriber is using a peer-to-peer network to

24   distribute music, they're essentially a digital record store

25   where they're providing an unlimited number of perfect digital

1    copies of recordings, and they keep no records of how many

2    copies they give out, and you can't possibly see how many

3    people go in the store to get them.

4         So while we do not know the exact numbers, you will

5    hear evidence of over 57,000 Cox subscribers who were

6    infringing on plaintiffs' copyrights during the period at issue

7    in this case, 2013 to 2014.  That is over 57,000 private

8    digital record stores on Cox's network distributing plaintiffs'

9    music for free without permission.

10        Now, Cox knew that its network was being used for

11   piracy.  For years, Cox had been measuring what its subscribers

12   were doing on the network.  Cox had detailed data that

13   demonstrated that peer-to-peer piracy was one of the primary

14   uses of its network and that it was a -- that peer-to-peer

15   activity was, in fact, driving increased bandwidth demand at

16   Cox.  Now, Cox liked this because they could sell their

17   customers who needed more bandwidth a higher tier of service

18   and make more money from those customers.

19        So while Cox liked peer-to-peer piracy, it didn't

20   fare well for the record industry.  In fact, peer-to-peer

21   piracy had a devastating effect on the music industry.  Between

22   2004 and 2012 -- excuse me, 2004 and 2014, the use and

23   enjoyment of music went through the roof.  People were

24   discovering things, new devices and iPads and iPods to listen

25   to music in ways they never had before.  You could listen to

39

1   music on your phone.  You could listen to music in -- on your

2   computer.  There were lots and lots of ways to listen to music,

3   and so consumption was going up and up and up, and so you would

4   have expected that's great for the music industry.

5           No, it wasn't.  And, in fact, what you see is that

6   between 2004 and 2014, because of peer-to-peer piracy, annual

7   revenues went down year after year and were cut in half, cut in

8   half.

9           You can imagine that if you go to work every day and

10  you do the same thing and you get paid a little less and a

11  little less and a little less, so ten years later you're making

12  half of what you were before, ten years before, that's what was

13  happening to the record industry.  And yet everybody was

14  listening to their product.

15          So in 2008, the record industry began sending

16  infringement notices to Cox.  These infringement notices

17  informed Cox about specific Cox subscribers who were infringing

18  on music copyrights.  These were the people running the digital

19  music record stores.

20          And as you will hear, there were many other content

21  companies that were also sending infringement notices to Cox.

22  It wasn't just the record industry.  It was movie studios, game

23  companies, lots and lots of others.

24          Well, the record industry used a company, a very

25  well-known and well-respected company, antipiracy vendor called

1   Cox knew its subscribers were infringing but it didn't want to

2   know -- it didn't want to hear it.  It didn't want to have to

3   deal with it.  That's more evidence of willfulness.

4            Over time, the RIAA, the Recording Industry

5   Association, asked to increase the cap, and eventually and

6   begrudgingly, Cox did agree to increase the cap to 600 per day.

7   This is from a multi-billion-dollar company with all the

8   resources in the world behind it if it wanted to actually deal

9   with this issue.

10           Earlier I mentioned that the RIAA or MarkMonitor sent

11  270,000 notices.  That's 270,000 with the cap in place.

12           Now, Cox will try to characterize the caps as there

13  was -- try to say there was an agreement to the cap, but as you

14  hear the evidence, you'll see there was no agreement.  There

15  was an e-mail that the RIAA sent back that said:  Thanks.

16           They were being polite.  Last time I checked, being

17  polite doesn't mean you've entered into an agreement.

18           Cox will also try to distract from its own misconduct

19  by pointing out that after Cox begrudgingly increased the cap

20  to 600, the RIAA didn't send all the way up to the cap all the

21  time.  And while it is true that they did not hit the cap all

22  the time, it is a classic example of blaming the victim.  The

23  evidence speaks for itself, and you should listen to what it

24  says.

25           The fifth way that Cox gamed the system was

Opening Statement by Plaintiff's Counsel - Oppenheim

1   say it all, and that's why we are here.  Cox was breaking the

2   law, and they knew it but did it anyway.

3           Now, unfortunately, Cox is not going to bring

4   Mr. Sikes or Mr. Zabek to this trial.  They were the two

5   individuals at the heart of what happened.  You can reach your

6   own conclusions about why those witnesses will be missing.

7   However, we will have an opportunity to see them -- see many of

8   their e-mails and see them responding to questions under oath

9   by video.

10          So just to recap where we are, Cox extended its

11  graduated response from 3 ultimately to 14 and then added

12  5 cheats on top of it, but in August of 2009, Cox decided to

13  make a mockery of the law.  Mr. Zabek sends an e-mail to the --

14  his abuse group, and it starts by saying:  Proprietary info.

15  This is not to be shared outside of Cox.

16          Already now I'm interested.

17          Then it goes on and says:  We want to hold on to

18  every subscriber we can.

19          Okay.  Next he says:  If a customer is terminated for

20  DMCA, you are able to activate them after you give them a stern

21  warning.  In other words, if they hit that 14th step and you

22  have to terminate them, you just reactivate them next.

23          And he explains:  We still must terminate in order

24  for us to be in compliance with the safe harbor.

25          Remember we discussed the safe harbor protection

1  blacklisting.  In some instances, Cox simply refused to accept

2  any notices from a rights owner.  In the case of a company

3  called BMG Music, who is not a plaintiff in this case, Cox

4  blacklisted their antipiracy company called Digital Rightscorp,

5  or DRC, and you'll see some e-mails about that.  The records

6  show that Rightscorp sent Cox over a million notices.  Cox

7  simply refused to accept any of them.  It's hard to imagine

8  greater willfulness than that.

9          As the number of infringement notices increased, Cox

10 made change after change to be more lenient towards the

11 infringement, and the effect of the five cheats, or the five

12 ways that Cox was gaming the system, had a dramatic impact.

13 What Cox was telling the public was:  We take it seriously.

14 What Cox was doing internally was not taking it seriously.

15         As part of the charade internally at Cox -- as part

16 of its charade internally at Cox, the department charged with

17 implementing graduated response was called the abuse group.

18 The group is later renamed the safety department, but as you

19 will see, it really was an abuse group.

20         The abuse group was at the heart of Cox's effort to

21 avoid implementing its so-called no infringement policy.

22 Rather than stopping the infringement on Cox's network and

23 protecting the law and the rights of artists, the abuse group

24 dedicated itself to protecting Cox's customers by not

25 terminating those who were caught over and over again.

50

1    For many years, the abuse group was run by an

2  individual by the name of Jason Zabek, and his lieutenant was

3  Joseph Sikes.  Mr. Zabek and Mr. Sikes were long-time valued

4  employees at Cox.  Unfortunately for the music industry,

5  Mr. Zabek and Mr. Sikes were the proverbial foxes guarding the

6  henhouse.  They were responsible for overseeing the department

7  that handled the infringement notices.

8    Mr. Zabek and Mr. Sikes saw little value in

9  copyrights or in copyright owners, but don't take my word for

10 it.  Here's an e-mail that demonstrates the point.  In response

11 to a question from another ISP, Mr. Zabek made his views of the

12 copyright law clear:  F the DMCA.

13   In this e-mail chain, they are discussing

14 infringement notices from Digital Rightscorp, who I mentioned a

15 moment ago, who had been blacklisted.  So in response to

16 Mr. Zabek, Mr. Sikes added his two cents:  So, yeah, F the DRC.

17   Matt Carothers, who is Cox's principal security

18 architect, responded to this e-mail.  Now, his response was

19 not:  Hey, Cox needs to respect the copyright law and the

20 copyright owners.

21   What did he say?  He says:  Sorry to be Paranoid

22 Panda here, but please stop sending out e-mails saying F the

23 law or F some company.  If we get sued, those e-mails are

24 discoverable and would not look good in court.

25   Mr. Carothers was right.  Incredibly, those few words

1  no idea whether its subscribers stopped infringing or not

2  because Cox wasn't watching.  All Cox was doing was looking at

3  the notices that were coming in, right?

4        And we know they blacklisted so they wouldn't get

5  some notices, they capped so they wouldn't take others, right?

6  And there's a limit to the number of notices that the content

7  companies can send.  So when they say that these subscribers

8  stopped, think about whether that's accurate.

9        And the second thing to think about when Cox claims

10 that they stopped the majority of the infringement is that this

11 case is not about the infringers who stopped after one notice

12 or two.  This is a case about the subscribers who infringed

13 after they were caught and reported over and over and over

14 again.

15       Though it may not seem possible, Cox's handling of

16 infringement by its business customers was even more

17 problematic.  The classic rule of follow the money applies

18 here.  These are the customers that were paying Cox the most,

19 sometimes between 15 and 20,000 dollars a month.

20       In 2012, Cox implemented the following policy.  Cox

21 would ignore the first notice that it received, again, put it

22 in the trash, but for every notice after the first, Cox was

23 supposed to call or e-mail its customer to discuss

24 infringement.

25       This was a toothless, never terminate policy, giving

1    months.

2             Critically, however, this policy came with another

3    change.  Cox simply stopped terminating.  Remember earlier I

4    said we're going to talk about how Cox exercised its

5    discretion?  Well, this is how they exercised its discretion.

6             So did Cox start terminating for real?  Not really.

7    What happened under this new policy was, and the evidence will

8    show, that during the claim period of this case, Cox terminated

9    the sum total of 13 infringing subscribers.  Remember, the

10   record company sent notices on 57,600 infringers.  Cox

11   terminated 13.  This slide would probably better read:  Does

12   Cox start terminating for real?  And the answer really should

13   be no.

14            Cox has claimed in this case that it was trying to

15   stop the infringement.  The witnesses may testify that its

16   policies were developed to stop the infringement and how hard

17   they were trying or that their system worked, but just saying

18   something doesn't make it true.  You'll get to see the internal

19   e-mails, and you'll be able to decide whether they're just

20   saying that on the stand now, and you'll be able to decide

21   whether the internal e-mails indicate that's not accurate.

22            Cox will also claim that it stopped the majority of

23   the infringement because so much subscribers were only the

24   subject of one infringement notice.  When Cox makes this

25   argument, keep two things in mind.  First, Cox has absolutely

1    no idea whether its subscribers stopped infringing or not

2    because Cox wasn't watching.  All Cox was doing was looking at

3    the notices that were coming in, right?

4           And we know they blacklisted so they wouldn't get

5    some notices, they capped so they wouldn't take others, right?

6    And there's a limit to the number of notices that the content

7    companies can send.  So when they say that these subscribers

8    stopped, think about whether that's accurate.

9           And the second thing to think about when Cox claims

10   that they stopped the majority of the infringement is that this

11   case is not about the infringers who stopped after one notice

12   or two.  This is a case about the subscribers who infringed

13   after they were caught and reported over and over and over

14   again.

15          Though it may not seem possible, Cox's handling of

16   infringement by its business customers was even more

17   problematic.  The classic rule of follow the money applies

18   here.  These are the customers that were paying Cox the most,

19   sometimes between 15 and 20,000 dollars a month.

20          In 2012, Cox implemented the following policy.  Cox

21   would ignore the first notice that it received, again, put it

22   in the trash, but for every notice after the first, Cox was

23   supposed to call or e-mail its customer to discuss

24   infringement.

25          This was a toothless, never terminate policy, giving

D. Kooker - Direct

100

1    gets -- gives you goosebumps.

2          I think about my daughter, who is away at college,

3    and we've connected with Adele's cover of "Love Song."  And

4    whenever we need that kind of virtual hug, when one of us is

5    down, you put that song on and it immediately makes us think of

6    each other.

7          I also think about how music is just the soundtrack

8    of our lives.  And, you know, as I'm going through the material

9    for this case and I see The Clash, it immediately invokes

10   "Train in Vain."  I'm thinking about, you know, in the car with

11   my friends in high school when that song was really breaking,

12   hadn't heard it before, how amazing it was on our way to the

13   gym, you know, every weak.

14   Q.   Have you had the opportunity to become familiar with

15   Sony's music that's part of this case?

16   A.   I have.  And actually, I prepared a short medley to give

17   some examples.

18         MR. ZEBRAK:  Your Honor, with the Court's permission,

19   we would like to play a very short medley of some of the music

20   in the case.

21         THE COURT:  Do you have any objection?

22         MR. ELKIN:  No objection, Your Honor.

23         THE COURT:  All right, go ahead.

24         MR. ZEBRAK:  Mr. Duval.

25         NOTE:  A music clip is played.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

D. Kooker - Direct

1    BY MR. ZEBRAK: (Continuing)

2    Q.   Mr. Cooker, why was it that you wanted the jury to hear

3    some of that music today?

4    A.   Well, I think it just is a good example of, you know,

5    exactly what I was talking about, that emotion, passion, that

6    connection.  You know, hopefully at least one of those songs

7    brought you back or reminded you of something that was

8    important or made you feel better.

9         Again, it's that emotional connection.  And,

10   obviously, these are some of the most important recordings

11   in -- in our company.

12   Q.   So I would like to explore some basic music industry

13   terms.  Could you start by explaining what is the record

14   industry?

15   A.   Sure.  The record industry is primarily focused on working

16   with artists to create, market, and distribute their

17   recordings.  And, you know, to give you an example or explain

18   that more clearly, you know, when you think of the biggest

19   single of the year, "Old Town Road" with Lil Nas X, or you

20   think about the two recent number one albums we had with Celine

21   Dion, or with country star Luke Combs, or you think of Elvis

22   Presley, it's the artists who you're thinking about, those are

23   the people that we work with to market, distribute, and sell in

24   the recording -- in the recording industry.

25   Q.   And where is it within the overall music industry that the

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1   record industry fits?

2   A.   So again, that part is, you know, the exploitation of

3   working with the performing artists.  There is also the music

4   composition, which is the songwriter actually writing the song.

5   Sometimes that is the same as the artist performing, often it

6   is not, there's a separate songwriter that contributes to it.

7          But beyond that, you know, there are retail partners,

8   there are digital service providers, there are live

9   performances in live venues, and an entire live industry, live

10  music industry around that.

11         In addition to, you know, thinking about studios and

12  recording studios and studio musicians and union employees, et

13  cetera, that make up the overall music industry.

14  Q.   So you mentioned -- I think you said digital service

15  provider.  But could you explain what you meant by that.

16  A.   Yeah, sorry.  I fall into that habit of using acronyms.

17  So a digital service provider is really services that most

18  people think about going and either listening to music or

19  watching a movie or a film.

20         So, for example, Apple Music, Amazon, Spotify are

21  examples of digital service providers.

22  Q.   And what is a music publisher?

23  A.   A music publisher is a company that works with the

24  songwriter.

25  Q.   And just to be clear, is there -- is a digital service

1   provider, or DSP, the same thing as Cox?

2   A.   No.  A digital service provider is a retail -- or a

3   platform that ultimately is either selling or streaming music

4   to consumers.

5   Q.   So a DSP is different than an ISP?

6   A.   DSP is different than an ISP, exactly.

7   Q.   This is the Washington area where we're famous for our

8   acronyms.

9   A.   Sorry.  So is the music industry.  Sorry.

10  Q.   And just so we have some clear terminology, what is a

11  music download?

12  A.   A music download is a track or an album that has been

13  downloaded for purchase from a digital store, one of those

14  DSPs.

15  Q.   And what does music streaming refer to?

16  A.   Music streaming is when a consumer is listening to music

17  via a streaming service, like Spotify or Apple Music, where

18  ultimately the music is -- is typically not downloaded or

19  purchased by the consumer, but is experienced either through

20  add supported or a subscription type of payment method.

21  Q.   And what does the term "sound recording" refer to?

22  A.   Sound recording is the recording of a composition by an

23  artist or a band.  You know, in that medley I played, it ended

24  with Adele's "Rolling in the Deep."  "Rolling in the Deep" is a

25  sound recording.

D. Kooker - Direct

104

1   Q.   Thank you.  And you've referred to songwriters.  Would you

2   explain what a music composition is.

3   A.   Sure.  The music composition is the lyrics and the

4   composition of the song that is ultimately performed by the

5   artist.

6   Q.   And who generally owns music compositions?

7   A.   Typically the publishers own music compositions.

8   Q.   Do record companies generally own musical compositions?

9   A.   Generally they don't.

10  Q.   So besides the music publishers and the record companies

11  and the digital service providers, could you explain who some

12  of the other major participants are in the overall music

13  industry.

14  A.   Yeah.  I think, you know, back to some of the examples of,

15  you know, live venues, you know, there's a live business that

16  supports the music industry.  You know, recording studios,

17  engineers, studio musicians.

18  Q.   Okay.  And I promise one last term for you to define.

19  A.   Sure.

20  Q.   What does the term "A&R" refer to?

21  A.   A&R is artists and repertoire.  It's the area of our

22  company that focuses primarily on the creative side of the

23  artist relationship.

24  Q.   So could you expand on what you mean by A&R involves the

25  creative side.

D. Kooker - Direct

1   A.   Yes.  So A&R ultimately is the team that is working with

2   the artists in the studio.  First, often talent scouting,

3   finding the artist, signing and developing those artists,

4   working with them in the study to ultimately make the sound

5   recordings.

6   Q.   Thank you.

7         MR. ZEBRAK:  I would like to show the witness

8   plaintiffs binder one, specifically the first tab.

9         We would like to show PX 1 from plaintiffs' binder of

10  the exhibits to the witness.

11        THE COURT:  Mr. Elkin, do you need a moment to find

12  that binder?

13        MR. ZEBRAK:  It's the overall set of exhibits in the

14  case.  It is Plaintiff's Exhibit No. 1.  It's a straightforward

15  exhibit --

16        THE COURT:  It's an exhibit which identifies the

17  overall number of exhibits you have?  Is that what you're

18  saying?

19        MR. ZEBRAK:  No, Your Honor.  This -- if I could

20  identify what it is.  It's the list of the record companies'

21  list of sound recordings in the case.  It's the first exhibit

22  in the plaintiffs' exhibits.  We would like to show it to the

23  witness.  Cox has copies.

24        THE COURT:  All right.  Any objection?  Any

25  objection?

D. Kooker - Direct

106

1      MR. ELKIN:  No objection, Your Honor, now that I know

2  what it is.

3      THE COURT:  All right.  Thank you, sir.

4      Please go ahead.  It's received.

5      MR. ZEBRAK:  Thank you.

6  BY MR. ZEBRAK: (Continuing)

7  Q.   Let's start again, Mr. Kooker.

8  A.   Sure.

9  Q.   So if you could turn your attention to the first tab in

10 that -- in that document.

11 A.   Yes.

12 Q.   And do you recognize what's there?

13 A.   Yes.  This is a list of the plaintiffs' copyrighted sound

14 recordings in this case.

15      MR. ZEBRAK:  Your Honor, with the Court's permission,

16 we would like to move PX 1 into evidence.

17      THE COURT:  It's received.

18      MR. ZEBRAK:  Thank you, Your Honor.

19 BY MR. ZEBRAK: (Continuing)

20 Q.   Mr. Kooker, how many record companies' sound recordings

21 are on that list that you have at Plaintiffs' PX 1 in front of

22 you?

23 A.   6,734.

24 Q.   Thank you.  And if you could also look at that document

25 and tell me, how many Sony Music sound recordings are on that

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

D. Kooker - Direct

1    list of sound recordings in this case?

2    A.    3,225.

3    Q.    Thank you.  You can turn the binder closed for now.  Thank

4    you.

5            So let's -- let's explore a little more about the

6    background in the music industry.  Could you tell the jury

7    something about the different types of jobs that there are in

8    the record industry.

9    A.    Sure.  So I touched a little bit on the creative -- some

10   of the creative-oriented jobs from talent scouts to producers

11   and engineers.  But in addition to that, we have marketing and

12   promotion staff, sales teams, and then support functions like

13   Human Resources, legal and business affairs, finance.

14   Q.    And are these jobs all within record companies?

15   A.    These are jobs that are typical within record companies,

16   yes.

17   Q.    And could you describe the value that record companies add

18   to the creation of music.

19   A.    Yes, it's very significant.  You know, I think about --

20   you know, when I think about the value that we add, I think

21   about the 5,000 employees who literally wake up every day

22   focussed on our artists, our roster, to maximize what

23   ultimately -- you know, the creative works that they are

24   putting into the marketplace.

25   Q.    So you mentioned your roster.  What does it mean for an

D. Kooker - Direct

108

1   artist to be signed by a record company?

2   A.   It's very significant.  I think it's, you know, a

3   recognition that they have achieved a very significant level in

4   the development of their career if they're serious about being

5   a musical artist for their career.

6   Q.   And what's the impact on the artist of being signed by a

7   record company?

8   A.   Especially when it's the first time for an artist, it's

9   pretty incredible.  And I can think of an example in the last

10  couple of months where we had a new and developing artist that

11  had been signed to one of our labels, they came into our

12  building, we have a giant billboard screen as you walk in the

13  building, and it said congratulations to the artist for signing

14  to the label.  And she immediately broke into tears, took a

15  picture, sent it to mom.  It's a really big deal.

16  Q.   And what happens with the artist, generally speaking,

17  after they have been signed to a deal?

18  A.   Really that's the beginning.  You know, from that

19  standpoint then we start focusing on making records, making

20  singles, making albums.  And at the point in time when the

21  creative process is completed, then a marketing plan will be

22  put together, a sales strategy.

23        So that signing is really just the beginning of all

24  of the hard work that is yet to come.

25  Q.   And then walk the jury, please, through what happens in

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

D. Kooker - Direct

1    terms of the recording process and then thereafter.

2    A.    Sure.  So, you know, the recording process will be, you

3    know, working with an artist, putting them in a studio,

4    matching them up with collaborators, potentially with

5    songwriters if necessary if they haven't written all of their

6    own music.  And also with talented engineers, with talented

7    studio musicians to ultimately make a recording.

8    Q.    And then what happens once the recording is made?

9    A.    Once the recording is made, then typically what would

10   happen is a marketing plan would be put together, which would

11   be really planning to release that new music into the

12   marketplace.  A sales strategy and sales plan working with all

13   of our retail partners would then accompany that marketing

14   plan.

15         And those two components would really lead the

16   release into the market when consumers like us hear it for the

17   first time.

18   Q.    Could you explain what are generally the core assets of

19   record companies?

20   A.    Yeah.  First and foremost, it's the music.  The music is

21   our asset.  It is how we generate our revenue.  It is the life

22   blood of the business.  But beyond that, you know, for me, and

23   especially coming from the business side of things, it was

24   important to understand that our business is built on artists.

25   Our most important stakeholder is the artists.

1            But in addition to that, you know, we work with a

2    very unique product.  It is not a hard good.  You know, the

3    product that we are working with is ultimately a human being,

4    very talented human beings.

5            And because of that, you know, those 5,000 people at

6    Sony Music that wake up each day thinking about that have very

7    unique skill sets.  You know, so that is also a key asset to

8    ultimately running and being a successful company in a creative

9    industry.

10   Q.   So Cox has made the argument that record companies just

11   collect money for themselves and not their artists.  Did you

12   have a reaction to that?

13   A.   Yeah.  I could not disagree more.  Ultimately, you know,

14   my job is doing what I do on behalf of our artists.  And if I

15   don't do it well, then artists stop signing to me.  And in

16   today's world, an artist has many, many choices in the

17   marketplace.

18           And so, you know, ultimately I have to deliver for

19   that artist.  And that means that I have to look out for what's

20   best for them.  I have to protect their intellectual property,

21   their copyrights, and I have to maximize the commercial

22   opportunity for those copyrights in the marketplace.

23   Q.   Sure.  And you used the term "royalties" before.  Could

24   you explain what royalties are with respect to the record

25   company's relationship.

1  A.   Yeah.  So royalties are the term that is used to designate

2  the payment that is made from the record company to the artist.

3  It's usually based on a contractual relationship between the

4  record company and the artists.  And it's usually paid as a

5  percentage of the revenues that are collected on behalf of that

6  artist.

7  Q.   Are copyrights among the core assets of record companies?

8  A.   Copyrights ultimately are absolutely the core asset of the

9  company.  They are the music.  They are the thing that protects

10  the music, that allows us to enforce that protection, and

11  ultimately it is what we are monetizing and commercially

12  delivering in the marketplace that generates revenue for the

13  company and for the artist.

14  Q.   What relationship, if any, is there between protection of

15  copyright and the royalties that artists obtain?

16  A.   I think they go hand in hand.  If there is no protection

17  of the copyright, then ultimately no one is -- there is no

18  remuneration, there is no payment being made, and ultimately

19  the artist is not able to get paid a royalty.

20  Q.   Sure.  Let's talk a little bit about how record companies

21  generally make money for themselves and the artists.

22  A.   Sure.

23  Q.   Could you explain how that has worked historically.

24  A.   Yes.  So historically, you know, all the way back to the

25  '50s and '60s, you know -- and the business has gone through a

D. Kooker - Direct

1   lot of change in how you actually generate revenue and make

2   money.  But it was a 45s business.  It was a singles business

3   on vinyl which eventually moved to LPs, eight-tracks, if any of

4   us remember that, to cassettes, to CDs, to digital downloads,

5   and now to streaming.

6           And so, you know, there has been a lot of different

7   ways to legally obtain music throughout the years.  And that

8   has changed dramatically from the way that consumers actually

9   listen to and experience music.

10          But all of those different components, even today,

11  other than maybe eight-tracks and cassettes, still make up, you

12  know, how we make money in the business, including vinyl.

13  Q.   And you referred to downloads.  How are sound recordings

14  available for sale as downloads in this era?

15  A.   So they would be available in a download store, it would

16  be a retail environment for purchase.  And they typically would

17  be available as individual tracks or also as albums.

18  Q.   And for what length of time has that been the case,

19  roughly speaking?

20  A.   Roughly, early 2000s.  I mean, the biggest, most prominent

21  store that everyone recognizes is the Apple iTunes store,

22  download store.

23  Q.   I would like to explore with you now some of the costs

24  that record companies typically incur.  Can you at a high level

25  list the more significant categories of those costs.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

D. Kooker - Direct

1   A.   Yeah.  At a very high level, I will break them into three

2   categories.  There is the talent-related costs, which are the

3   costs, you know, in and around artists and signing artists and

4   making recordings.

5          There is marketing and promotion-related costs, which

6   is really about marketing the music as it enters the market

7   place.

8          And then there is overhead costs.  That is the

9   employees, the 5,000 employees that I mentioned earlier.  You

10  know, the costs of actually running the company and paying the

11  employees who ultimately are working to generate the revenue.

12  Q.   Sure.  Can you add a little bit more detail, walk us

13  through the nature of recording costs.

14  A.   Sure.  So typically there are advances that are paid for

15  recording.  There are advances paid to the artists for living

16  expenses.

17         And so, those type of expenses, including studio

18  time, paying for engineers, paying for studio musicians, and

19  also paying royalties make up the majority of talent-related

20  costs.

21  Q.   And what at a high level are artist advances?

22  A.   Artist advances are advances that we pay to the artist

23  typically at the time that we would sign a deal, sometimes at

24  delivery of certain materials within a contract, like when they

25  delivery a single or an album.  But they are typically payments

**JA286**

D. Kooker - Direct

114

1    made ahead of actually releasing music into the marketplace.

2    Q.   And what benefit, if any, does an artist receive from an

3    artist advance?

4    A.   A few things.  You know, most importantly they have the

5    surety of what they are going to earn out of an individual

6    project.  And most importantly, they have money in their pocket

7    to be able to cover some of the expenses and also to cover

8    living expenses.

9    Q.   And once the sound recording is made, what are some of the

10   costs involved in bringing that artist's work to a public

11   audience?

12   A.   So on the marketing and promotion side, you know,

13   everything from publicity to digital advertising and media,

14   radio, and actually getting the artist out in front of

15   consumers, be that on television through television shows, or

16   radio promotion tours, all of those are the types of costs that

17   go into marketing and promotion leading up to and after the

18   release of an album.

19   Q.   And given all these costs that you have been describing,

20   how would you characterize the investment risk that record

21   companies undertake?

22   A.   Well, it's substantial.  And the reason being that a lot

23   of those costs are actually incurred before any of the music is

24   actually in the public.  So the majority of the talent costs

25   happen before the release is actually made.  And a significant

D. Kooker - Direct

1  part of the initial marketing and promotion costs are actually

2  made before the music is in the marketplace.

3  Q.   And at that time does a record company know what will

4  achieve commercial success or not?

5  A.   Absolutely not.  And especially if it's a new and

6  developing artist that doesn't have a track record.

7  Q.   I would like to direct some questions to you about Sony

8  Music more specifically.  What is Sony Music's role in the

9  industry?

10 A.   We are one of the largest recorded music companies in the

11 industry.  We have operations in over 60 markets around the

12 world and a roster of tens of thousands of artists.

13 Q.   Could you name for the jury a handful of some of the more

14 well-known and famous Sony artists, Sony Music artists?

15 A.   Sure.  Some that were sampled earlier, Adele,

16 Bruce Springsteen, Elvis Presley, Aerosmith, to name a few.

17 Q.   And for every well-known, famous star like some of the

18 ones you have just mentioned, you know, how many more other

19 artists are there on Sony Music's roster?

20 A.   Many, many thousands.  You know, in fact, our -- one of

21 our primary goals is really breaking and developing new

22 artists, getting them to that established -- in that superstar

23 level.

24      And so, you know, at any given time the majority of

25 our active new signing roster will be artists that are yet

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

D. Kooker - Cross

121

1   A.   I am aware, yes.

2   Q.   And would you -- do you have an understanding as to

3   whether or not the number of those lawsuits, for example,

4   exceeded 5,000 complaints?

5   A.   I don't believe so.

6   Q.   Do you have any recollection at all as to how many

7   lawsuits were actually filed during that period of time?

8   A.   Sorry, I don't.

9   Q.   Would it surprise you to learn that through public

10  database we were able to pull some 5,000 complaints that Sony

11  Music filed against individual file sharers at this point --

12  during this point in time?

13  A.   That's possible, yeah.

14  Q.   With respect to enforcement of copyright, have you ever

15  heard of the program called the Copyright Alert System?

16  A.   Yes, I've heard of it.

17  Q.   And Sony had signed on to the Copyright Alert System,

18  correct?

19  A.   We participated in that, yes.

20  Q.   You are not aware of any individual lawsuits that Sony

21  filed against any individual file sharers using the Cox

22  service, are you?

23  A.   I am not.  I am not aware, no.  I am not aware personally,

24  no.

25  Q.   Is it fair to say that Sony stopped suing individual file

D. Kooker - Cross

122

1  sharers in or around 2009 because it was not very good PR?

2  A.  I don't know if that was the motivation.  I am not sure.

3  Q.  You did participate -- I think you said in your direct

4  examination that you participated, part of a team, including

5  the general counsel, correct?

6  A.  Yes.  On the leadership team, yes.

7  Q.  Yes.  Was there any -- do you recall having any

8  discussions at an executive level with regard to why a decision

9  was made not to continue to pursue individual file sharer suits

10  after 2009?

11  A.  I remember that there were conversations.  And I remember

12  that there were multiple reasons ultimately that played into

13  that.

14  Q.  But Sony just stopped after that time; is that correct?

15  A.  Yes, we stopped after that time.

16  Q.  Let me take you back to the 2013 and 2014 timeframe, if

17  you can harken back to that.

18       Were digital revenues from Sony Music, including

19  revenues from streaming services, the primary revenues that you

20  depend on to continue in making substantial investments

21  required to operate a recorded music company?

22  A.  Sorry, could you ask the question again?

23  Q.  Sure.  During the timeframe 2013 and '14, did you form a

24  belief that digital revenues of -- are and would remain the

25  primary revenues that Sony would depend on to continue to make

D. Kooker - Cross

1  substantial investments required to operate a recorded music

2  company?

3  A.    Digital revenues were a major component, yes.

4  Q.    Okay.  And that included streaming services as well,

5  correct?

6  A.    That did, yes.

7  Q.    And part of it is because people just stopped buying CDs

8  around that time, right?

9  A.    Well, no, I don't think people stopped buying CDs around

10  that time.  I think CDs have been declining in sales since

11  around 2000.

12  Q.    And -- now, today the majority of the revenues for Sony

13  Music are through streaming, streaming activities, correct?

14  A.    In the U.S., that's correct.

15  Q.    And did you form a belief in and around 2014 that then in

16  the last several years you believed there was an explosion in

17  online streaming services?

18  A.    I honestly don't recall exactly where my head was at in

19  2014.

20  Q.    Okay.  Do you recall forming a view that the streaming

21  services represent the second largest component of digital

22  music business enabling users to access millions of songs from

23  their personal computers or mobile devices without actually --

24  without actually buying the music?

25  A.    Yeah, it was very clear that we were going through a

D. Kooker - Cross

124

1   transition, and that streaming was something that was very

2   popular with consumers and will be an important part of the

3   future for the industry.

4   Q.   And this was back in 2014, correct?

5   A.   I don't know if it was exactly 2014, but --

6   Q.   Well, would it refresh your recollection if I were to tell

7   you that you provided testimony to that effect before the

8   Copyright Royalty Board when you testified in 2014?

9   A.   That wouldn't surprise me.

10  Q.   Okay.  Did you also form a belief at or around that time,

11  2014, that the growth of streaming over the last several years,

12  leading up to 2014, was staggering?

13  A.   From a very low base, yeah, it was a big percentage, but a

14  very little number.

15  Q.   But you would agree that you characterized it as

16  staggering, right?

17  A.   I honestly don't remember that, but I guess you have that.

18  Q.   Does that --

19  A.   Staggering is not a word that I typically use, so --

20  but --

21  Q.   Okay.  Well, let's take -- let's take a look.

22        MR. ELKIN:  I am going to hand to you my binder for

23  cross exhibits for Mr. Kooker.

24        Your Honor, I'm handing -- I'm having handed to the

25  witness a binder of potential cross exhibits.

139

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,          :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.          :
                                :
--------------------------------:
```

VOLUME  2  (A.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

140

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:   MATTHEW J. OPPENHEIM, ESQ.
           SCOTT A. ZEBRAK, ESQ.
           JEFFREY M. GOULD, ESQ.
           MICHAEL J. DRUCKMAN, ESQ.
           ANDREW L. GUERRA, ESQ.
           LUCY G. NOYOLA, ESQ.
           JIA RYU, ESQ.
           Oppenheim + Zebrak, LLP
           4530 Wisconsin Avenue, N.W.
           5th Floor
           Washington, D.C. 20015


FOR THE DEFENDANTS:   THOMAS M. BUCHANAN, ESQ.
           Winston & Strawn LLP
           1700 K Street, N.W.
           Washington, D.C. 20006-3817
            and
           SEAN R. ANDERSON, ESQ.
           MICHAEL S. ELKIN, ESQ.
           THOMAS P. LANE, ESQ.
           CESIE C. ALVAREZ, ESQ.
           Winston & Strawn LLP
           200 Park Avenue
           New York, NY 10166-4193
            and
           JENNIFER A. GOLINVEAUX, ESQ.
           THOMAS J. KEARNEY, ESQ.
           Winston & Strawn LLP
           101 California Street, 35th Floor
           San Francisco, CA 94111-5840
            and
           MICHAEL L. BRODY, ESQ.
           Winston & Strawn LLP
           35 West Wacker Drive
           Chicago, IL 60601
            and
           DIANA HUGHES LEIDEN, ESQ.
           Winston & Strawn LLP
           333 South Grand Avenue
           Suite 3800
           Los Angeles, CA 90071

**JA294**

INDEX


<u>OPENING STATEMENTS BY:</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| DAVID KOKAKIS | | |
| | DIRECT | 144 |
| | CROSS | 164 |
| | REDIRECT | 203 |
| ALASDAIR McMULLAN | | |
| | DIRECT | 218 |
| | CROSS | 243 |
| STEVEN MARKS | | |
| | DIRECT | 268 |

<u>COURT'S RULINGS</u>

D. Kokakis - Direct

153

| | |
|---|---|
| 1 | So that's why we have so many different companies |
| 2 | under the single umbrella. |
| 3 | Q.   Thank you. |
| 4 | Mr. Duval, you can take that down. |
| 5 | I'd like to talk about UMPG's licensing activities. |
| 6 | What are the different types of licenses that Universal Music |
| 7 | Publishing Group negotiates on behalf of its songwriters? |
| 8 | A.   Certainly.  Well, I already mentioned licenses for film |
| 9 | and TV projects.  Those are commonly known as synchronization |
| 09:32:36 10 | licenses.  We issue licenses for the use of lyrics, as I |
| 11 | mentioned, in merchandise or in karaoke-based product, in sheet |
| 12 | music.  We issue licenses for the performance of songs in, as I |
| 13 | mentioned, bars, restaurants, concert venues, dance studios. |
| 14 | And more commonly, we issue what's known as a |
| 15 | mechanical license, which is for the use of a song in a sound |
| 16 | recording. |
| 17 | Q.   And what are the different types of sound recordings that |
| 18 | may fall under mechanical licensing? |
| 19 | A.   Well, there are different media types that sound |
| 09:33:11 20 | recordings can be exploited through.  You could have vinyl. |
| 21 | You could have -- I remember vinyl back in the day.  I remember |
| 22 | cassettes.  I remember 8-tracks.  Those were kind of clunky. |
| 23 | More recently, we see digital downloads.  And we see |
| 24 | streaming now, which is the preferred or more common method of |
| 25 | distribution of sound recordings on services like Spotify and |

D. Kokakis - Direct

154

1    Apple and Pandora and Amazon.

2    Q.   Why is that license called a mechanical license?

3    A.   It's called a mechanical license because it refers to the

4    physical or mechanical embodiment of a song on a sound

5    recording.  And it dates back to many decades ago where you had

6    mechanical piano rolls, right, the scrolls with the -- you

7    know, with the grooves in them.  And those would sit inside of

8    a piano and turn and actually play the song.  They would click

9    the keys.

09:34:11 10        So that's how the phrase or name "mechanical royalty"

11   came about.

12   Q.   Are the licensing opportunities generated from -- like --

13   for -- by licensings for musical compositions the same as those

14   generated for sound recordings?

15   A.   Sometimes they're the same and oftentimes they're

16   different because they're unique rights types that are

17   attributable to songs that aren't attributable to sound

18   recordings.

19        For instance, the public performance of a song

09:34:46 20   generates a royalty for the songwriter.  Lyrics are unique to

21   songs.  Those licenses would bear a royalty for the songwriter,

22   but not for the recording artist.

23        So there are some distinct areas for song royalties

24   that don't overlap with sound recording royalties.

25   Q.   We've been talking about royalties.  Can you give us a

D. Rokakis - Direct

155

1    sense of a royalty rate for, say, downloading a song?

2    A.   Certainly.  It's prescribed by law under the Copyright

3    Act.  And it's something that fluctuates over time.  But at the

4    moment, the prevailing rate is 9.1 cents per song per download.

5    Q.   And what portion of the royalties does a songwriter get

6    from that royalty?

7    A.   It depends on the underlying contract between the music

8    publisher and the songwriter.  But generally the songwriter

9    will get the bulk of that money, anywhere from 90 percent down

09:35:47 10   to perhaps 50 percent.  More commonly in the 75 percent to

11   90 percent range goes to the songwriter.

12   Q.   So a dime per download.  How is a songwriter supposed to

13   make a living off of a dime per download?

14   A.   Well, it's a numbers game.  It's a volume game.  So it's a

15   very low margin, low cost transaction that over time adds up.

16   It's a pennies business, even a micro pennies business these

17   days.

18         So one of the responsibilities that we're charged

19   with as the music publisher in representing a songwriter is to

09:36:23 20   go out and collect all the micro pennies.  And, you know, if

21   all goes well, that adds up to something that a songwriter can

22   make a living from.

23   Q.   I'd now like to -- now that we have this background, I'd

24   now like to turn to the UMPG musical compositions that are at

25   issue in this case.  Are you familiar with them?

1   individual subscribers?

2   A.    Did you Universal Publishing Group?

3   Q.    Yes.

4   A.    Not to my recollection, no.

5   Q.    So do you recall ever suing individual subscribers?

6   A.    When you say "individual subscribers," I need that

7   clarified, if you don't mind.  I don't know if you mean to Cox

8   or to --

9           MS. NOYOLA:  Objection, Your Honor.

10          THE COURT:  I am sorry, the objection?  What's the

11   objection?

12          MS. NOYOLA:  Who are the individual subscribers?

13          MR. OPPENHEIM:  Subscribers to what?

14          MS. NOYOLA:  To what?

15   BY MR. BUCHANAN: (Continuing)

16   Q.    Subscribers to Internet service providers, the people who

17   download the music illegally.  File sharers.

18          THE COURT:  Go ahead.

19   A.    Within the Cox echosystem or outside of it?  Because there

20   are individuals who we take issue with who we send claim

21   letters to.  Many of them operate on YouTube, on Facebook, on

22   Twitter.

23          Specific to Cox?  I can't recall any.

24   Q.    So I direct you to page 14 of your deposition.  Why don't

25   you start at line 10.  It says:  Were any of these lawsuits

D. Kokakis - Cross

174

1    directed at entities that provide file sharing services, such

2    as BitTorrent, or PirateBay, or entities such as that?  Not

3    directly, no.  Were any directed at individual users of the

4    Internet, people?  Some, yes.

5             So how many?

6    A.   I don't know how many.  And I can tell you that, as I

7    mentioned, in the normal course we try not to go after

8    individuals when there is a large multibillion dollar

9    corporation behind the scenes driving the getaway car.  And

10   that's what's at case here.

11            I mean, yeah, we could go after tens of millions of

12   individuals, students, and children, and grandmothers.  That's

13   not a prudent use of our resources or something that we want to

14   do.

15   Q.   Okay.  So the people that are actually doing the

16   downloading, as you just described, are students, grandmothers,

17   and children.  So they are the ones that do it.

18            And so what you're saying is that Cox, on behalf of a

19   notice that you didn't send, should terminate --

20            MS. NOYOLA:  Objection, Your Honor.

21   Q.   --grandmothers, children, and students.

22            THE COURT:  Hold on.  Stop.  Hold on.

23            If there is an objection, make it louder so that Mr.

24   Buchanan can hear it over his asking his own question.

25            And it's overruled.

D. Kokakis - Cross

```
1              Can you answer the question?
2              THE WITNESS:  If you could repeat the question, I
3    would appreciate it.
4    BY MR. BUCHANAN: (Continuing)
5    Q.   So you just said that UMPG, which is part of a $30 billion
6    conglomerate, makes a decision --
7              MS. NOYOLA:  Objection, Your Honor.
8    Q.   -- not to sue --
9              MS. NOYOLA:  Objection, foundation.
10             THE COURT:  The fact is not in evidence.  Just ask
11   the specific question in response to his last answer.
12   BY MR. BUCHANAN: (Continuing)
13   Q.   The question is, you just testified that you did not
14   pursue children, grandmothers, and students because you wanted
15   to pursue the one that was driving the getaway car.
16             So, however, you're saying that when they get a
17   notice, a single notice of a copyright from UMPG or anybody
18   else, that Cox should then terminate the student, the child, or
19   the grandmother; is that right?
20   A.   No, I didn't say any of that.  But I will explain if you'd
21   like because I see where you're going with it.
22   Q.   I just --
23   A.   Well, no, I didn't -- you're putting words in my mouth.  I
24   did not say that they get one notice and they should be
25   terminated.
```

D. Kokakis - Cross

176

```
 1              THE COURT:  Okay, next question.
 2   Q.   Okay.  So two notices and you cut off the child and the
 3   family?
 4   A.   I didn't say that either.
 5   Q.   Three notices?
 6   A.   I didn't say that either.  However, I will say --
 7   Q.   How about for a military base or a hospital, how many
 8   notices should we send them and then terminate them?  After how
 9   many notices?
10   A.   Sir, the law is quite clear on this.  Cox had an
11   obligation to enforce the law, and it failed to do so.  And we
12   have recourse because of that, irrespective of who may have
13   actually been file sharing, Cox still had an obligation legally
14   and it did nothing.  And that's what's at issue here.
15              THE COURT:  Next question.
16   A.   Not the grandmother or the child who might be engaging --
17              THE COURT:  Next question.
18              THE WITNESS:  Sorry, sir.
19   BY MR. BUCHANAN:  (Continuing)
20   Q.   So the children and the grandmother and the student, these
21   people when they're copying your works, they're not doing
22   anything illegal?
23   A.   I didn't say that, no.
24   Q.   Okay.
25   A.   No, not at all.  They are doing something illegal.
```

D. Kokakis - Cross

1    Q.    Okay.

2    A.    The party against whom we choose to enforce our rights is

3    our choice to make.  That's --

4    Q.    Oh, really?

5    A.    Yes, absolutely.

6    Q.    Selectively, you can just select who you want to sue?

7    A.    Well, if somebody is breaking the law, we have the right

8    to go after that party.

9    Q.    Right.  And you had the right --

10   A.    And in this case we're talking about Cox breaking the law,

11   so we decided to go after Cox --

12   Q.    But you talk about --

13   A.    -- to facilitate the --

14           THE COURT:  Yeah, all right.

15           THE WITNESS:  Sorry, sir.

16           THE COURT:  All right.  Only one person can speak at

17   a time or we don't get the recording.  And now you're just --

18   you've completely lost the jury.  You're just arguing the law.

19   It's not your job to argue what the law is or what it's not.

20           Mr. Buchanan, ask questions that are factual in

21   nature that you want to get the answer to, and let's move on.

22   BY MR. BUCHANAN:  (Continuing)

23   Q.    So you would agree that in residential households where

24   grandmothers, or children, or kids are downloading music

25   illegally, they are the ones that are actually doing the

1    after?  Name me one that you went after.

2    A.    On the Cox --

3    Q.    An individual thief.

4    A.    On the Cox platform during this --

5    Q.    No, just any platform, Verizon, Comcast, Time Warner.  Who

6    were thieves out there that you just identified and did you sue

7    them?

8    A.    I can give you a list, if the Court would please, of

9    everyone we've sued during this period and beyond if you would

10   like.  I can't recall specific names.  There are a lot of them.

11   So excuse me for not being able to name names.

12          But I could tell you that in most instances when

13   there is an individual involved, and we go and issue a

14   take-down notice, or we issue a cease and desist letter,

15   they're responsive and they comply.  Okay.  In instances when

16   they refuse to engage with us, then we have to escalate

17   matters.

18          The reason that we choose not to typically go after

19   individuals is because there are millions of them and it's

20   untenable.  So why not go to the source of the problem, which

21   is the platform facilitating rampant and blatant theft?  That's

22   what makes sense to us.  And that's why we chose to name Cox as

23   the defendant to sue in this case.

24   Q.    What about the platforms, the piracy networks?

25   BitTorrent, have you sued them?

D. Rokakis - Cross

180

1   A.   There have been instances when companies like Megaupload

2   were sued, yes.  And that is a direct BitTorrent site that was

3   the subject of protracted litigation.

4   Q.   So in fact, you testified in another proceeding that when

5   platforms like LimeWire, or Megaupload, or PirateBay are taken

6   out, that dramatically reduces piracy and drives up sales;

7   isn't that true?

8   A.   That's accurate, yes.

9   Q.   Okay.  So in this case we have Ares, we have eDonkey, we

10  have Gnutella, and BitTorrent.  Which one of those entities,

11  the platforms that were providing the access to do the

12  downloading by the grandmothers, and the children, and the

13  students --

14  A.   And the thieves.

15  Q.   And how many of those entities have you suited?

16          MS. NOYOLA:  Objection, Your Honor.

17          THE COURT:  Overruled.

18  A.   Universal Music Publishing Group has not sued any of those

19  specific platforms.  LimeWire was the subject of litigation.

20  PirateBay was the subject of litigation.  Megaupload was the

21  subject of litigation.  The record labels, as in this case,

22  took the lead on those litigations and we didn't have to take a

23  proactive role because we knew that our rights were being

24  implicated as well and our copyrights were involved in those

25  cases.

D. Rokakis - Cross

181

1    Q.    So what record label companies have sued the platforms

2    that provide the access to do the unlawful downloading, the

3    peer-to-peer sharing that we're talking about here, eDonkey,

4    Ares, Gnutella, and BitTorrent?  Which of the --

5    A.    Of those specific companies?

6    Q.    Have sued them.  Tell me -- tell me who else has sued them

7    that that is a plaintiff in this case?

8    A.    Those specific companies?

9    Q.    Yes.

10   A.    I'm not aware of any.  I don't have personal knowledge of

11   that.

12   Q.    But you just said you piggybacked on lawsuits, suggesting

13   that the record label companies had gone after them.  So what

14   you're saying is they have not?

15   A.    No, that's not what I'm saying.  I said that they went

16   after LimeWire, Megaupload, and PirateBay.

17   Q.    Okay.  When did they go after PirateBay?

18   A.    Those are the three biggest -- I don't recall the year.  I

19   don't recall --

20   Q.    When did they go after LimeWire?

21           THE COURT:  Stop.

22   A.    Sir, I'm not an encyclopedia.

23           THE COURT:  Let me answer the question and ask your

24   next question, or we can't get this down on --

25   BY MR. BUCHANAN: (Continuing)

D. Kokakis - Cross

196

```
            1    scope.
            2            THE COURT:  Overruled.
            3            MR. BUCHANAN:  I just have a few questions on these,
            4    Your Honor.
            5    BY MR. BUCHANAN: (Continuing)
            6    Q.   So if you look at page 21, it's down in the right-hand
            7    corner.
            8    A.   I am on 21.
            9    Q.   Okay.  And it says revenues in EBITDA and under that, is
10:27:05   10    this correct, Universal Music Group's revenues were 4.8 billion
           11    for this period?
           12            MS. NOYOLA:  Objection, Your Honor.
           13            THE COURT:  What's your objection?
           14            MS. NOYOLA:  Foundation.  He is reading from a
           15    document that is not in evidence.
           16            THE COURT:  Lay a foundation.
           17    BY MR. BUCHANAN: (Continuing)
           18    Q.   You were shown this document in your 30(b)(6) deposition,
           19    were you not?
10:27:24   20    A.   I believe that's accurate, yes.
           21    Q.   And do you believe that information is accurate?
           22    A.   If it is in an official Vivendi report.  Then, yes, it
           23    would be accurate.
           24            THE COURT:  Go ahead.
           25    Q.   I want to know if this is also true.  It says:  As the
```

D. Kokakis - Cross

197

| | |
|---|---|
| 1 | decline in physical -- |
| 2 | MS. NOYOLA:  Objection, Your Honor. |
| 3 | THE COURT:  Overruled. |
| 4 | BY MR. BUCHANAN: (Continuing) |
| 5 | Q.   It says:  As the decline in physical sales was offset by |
| 6 | the growth in digital and other revenues with subscription and |
| 7 | streaming revenues increasing by approximately 75 percent over |
| 8 | the prior year, for the first time in 2013 yearly digital sales |
| 9 | exceeded physical sales. |

10:28:01 10      That's true, is it not?

11   A.   I believe that's accurate, yes.

12            THE COURT:  What year are you referring to?

13            MR. BUCHANAN:  2013, 2013.

14            THE COURT:  Thank you.

15   BY MR. BUCHANAN: (Continuing)

16   Q.   I would like you to turn to the next tab.

17   A.   Tab 4?

18   Q.   Yes.  And page 24.  Do you see that?

19            And it has columns 2014, 2013.  It has revenue.  Do

10:28:35 20   you see that?

21   A.   Yes, I see that.

22   Q.   Okay.  And is it correct that for the year 2014 from music

23   publishing, the revenue went from 655 million for the prior

24   year to 673 million just for the UMPG?

25   A.   Yes, I see that.

D. Rokakis - Cross

198

```
       1   Q.   And that was an increase of 4 percent?

       2   A.   Yes.

       3   Q.   Okay.  And this had to do with streaming, a lot of

       4   streaming happening, replacing the old type of digital sales or

       5   CD sales?

       6   A.   That's accurate, yes.

       7   Q.   Now, you said you weren't sure of the worth of Universal

       8   Music Group.  Could you turn to tab 5.

       9        Are you familiar with "Rolling Stone Magazine"?

10:29:25 10  A.   I am, yes.

      11   Q.   Okay.  I assume you read that.  I know you have a great

      12   interest in music.

      13   A.   No, I don't.

      14   Q.   Okay.  So it reports here, and tell me if this is wrong,

      15   maybe it refreshes your recollection, that UMG is worth 33.25

      16   billion?

      17   A.   "Rolling Stone" is not an authority on the valuation of

      18   corporations.

      19   Q.   So if you read that, it says:  On Monday Deutsche Bank

10:29:59 20  said in a report that it believes UMG is worth --

      21        THE COURT:  Stop.  Sustained.  The objection is

      22   sustained.  You can ask him whether his recollection is

      23   refreshed by the number, but you're, again, testifying into the

      24   record on an exhibit which is not in evidence and hasn't been a

      25   foundation laid.
```

D. Kokakis - Cross

199

1           So ask him his question.

2    BY MR. BUCHANAN:  (Continuing)

3    Q.   So you are familiar with Deutsche Bank?

4    A.   I know of Deutsche Bank.

5           THE COURT:  No.  Ask him whether he believes that the

6    information coming from Deutsche Bank is accurate or not.

7    Q.   Okay.  So do you --

8           I was just laying a foundation if he thought Deutsche

9    Bank was reliable.

10:30:42 10         THE COURT:  You are right.  I apologize.  Can you

11   answer that question?

12          THE WITNESS:  If Deutsche Bank is a reliable

13   resource?

14   BY MR. BUCHANAN:  (Continuing)

15   Q.   Yes.

16   A.   Yes, I believe it would be.

17   Q.   So if they reported that the company was worth

18   33.25 billion, you would you rely on that?

19   A.   If it was a valuation commissioned by Universal and

10:31:05 20   reflected accurate and independent information, then I would

21   likely say it's reliable.

22   Q.   Streaming revenue has increased dramatically, has it not,

23   over the years?

24   A.   Yes, it has.

25   Q.   And that has benefited UMPG and all the other music

D. Kokakis - Cross

202

1   increase Spotify's already quite large 8-plus billion

2   enterprise value, which will inure to the benefit of Spotify

3   and its owners/investors when it completes its highly

4   publicized initial public offering.  While Spotify's IPO will

5   likely make its owners very wealthy, the songwriters and

6   publishers who have fueled Spotify's rise will not receive

7   payment from the IPO; is that right?

8   A.   That's my personal opinion of what the strategy is.  I

9   don't have knowledge what their actual strategy may be.  But

10:34:53  10   this is what I believe to be the case.

11   Q.   Okay.  And your company, UMG, owned stock in Spotify and

12   benefited greatly from the IPO, did it not?

13   A.   Universal has not sold its stock in Spotify.  So I don't

14   know if it stands to benefit greatly from it.

15   Q.   Okay.  Well, the IPO was enormous, was it not?

16   A.   That's a relative term.

17   Q.   Okay.  It was successful?

18   A.   It was successful, to my knowledge.

19   Q.   And your company invested in that IPO?

10:35:25  20   A.   Universal Music Group has stock in Spotify, as do many

21   other music companies and individuals and private equity firms.

22   Yes, we have lots of investments.

23   Q.   And Sony owned 5 percent of Spotify, did it not?

24   A.   I don't know what Sony's ownership interest was in

25   Spotify.

D. Kokakis - Redirect

203

```
        1    Q.   You don't follow that?  If you own 5 percent, you have got

        2    to report it to the SEC?

        3    A.   I don't Google things nearly as much as you think I do.

        4    No, I don't know.

        5         THE COURT:  Just answer.  If you don't know, you

        6    don't know.

        7         THE WITNESS:  I don't know, sir.

        8         MR. BUCHANAN:  Okay.  I have no further questions.

        9         THE COURT:  All right.  Thank you.

10:35:59 10         All right, redirect.

       11         MS. NOYOLA:  Yes, Your Honor.

       12       REDIRECT EXAMINATION

       13    BY MS. NOYOLA:

       14    Q.   Just a few questions, Mr. Kokakis.  Are you familiar with

       15    the difference between a platform and a protocol?

       16    A.   A platform and a protocol?  No, I am not sure I do.

       17    Q.   Mr. Buchanan earlier referred to a BitTorrent platform.

       18    A.   Yes.

       19    Q.   Is BitTorrent a platform --

10:36:32 20    A.   Well, it's --

       21    Q.   -- or a --

       22    A.   It's actually a -- torrent refers to a type of

       23    file-sharing platform, typically peer-to-peer.

       24    Q.   Sorry.  Is BitTorrent a platform or a protocol?

       25    A.   It's a protocol.
```

D. Rokakis - Redirect

204

1   Q.   And would you send -- are takedown notices sent to

2   protocols?

3   A.   No.  They are sent to service providers and platforms.

4   Q.   Are infringement notices sent to platforms -- or sorry --

5   protocols?

6   A.   No, they are not.

7   Q.   And is BitTorrent similar to an entity like Cox?

8   A.   No, very different.

9           MR. BUCHANAN:  I am going to object to the leading

10:37:08 10  questions.  And it is way beyond -- I didn't ask anything about

11  protocols, and I didn't say anything about sending notices --

12          THE COURT:  You have asked him to specific companies

13  and --

14          MR. BUCHANAN:  Right --

15          THE COURT:  -- whether they were sent notices.  So

16  I'm going to allow the line of questioning.

17          It was leading, and so that objection is sustained on

18  leading grounds.  You may reask the question.

19  BY MS. NOYOLA: (Continuing)

10:37:32 20  Q.   How is BitForm -- BitTorrent similar to Cox?

21  A.   I'm not certain that it is.

22  Q.   And do you remember your testimony about LimeWire?

23  A.   Yes.

24  Q.   And is -- how is BitTorrent similar or different to

25  LimeWire?

A. McMullan - Direct

227

1   Q.   Let me interrupt you.  When you say "one-to-one," what do

2   you mean by that?

3   A.   Well, like a copy would be made in a factory or somewhere

4   and it had to get into someone's hand.  With Internet piracy,

5   peer-to-peer piracy, unlimited copies can be generated and

6   distributed across the Internet.

7   Q.   Can you describe, at a consumer level, how peer-to-peer

8   piracy works?

9   A.   So if -- well, at a user level, someone might have a copy

11:32:07 10  of the recording on their computer, on their hard drive, as

11   well as software that allows them to connect into a

12   peer-to-peer system.  And it allows them to distribute a copy

13   of that recording to anyone else who has that peer-to-peer

14   software client installed and connected to that system.

15           So that user can upload it into a system where

16   millions of people can have illegal access to the recording.

17   Q.   When -- strike that.

18           I think you said earlier that the business of UMG is

19   to sell recordings; is that right?

11:32:52 20  A.   Yeah, to sell, distribute, license, market recordings.

21   Q.   When UMG sells recordings through a service like iTunes or

22   Amazon, what rights does UMG give the consumer to distribute

23   the recordings on a peer-to-peer service?

24   A.   The consumer gets no rights to do that.

25   Q.   Why not?

A. McMullan - Direct

228

1    A.   Because that would allow a consumer to be in direct

2    competition with our legitimate sales of that music.

3    Q.   In the course of your personal work and time within the

4    music industry, how has peer-to-peer piracy impacted the

5    companies you've worked at?

6    A.   It had a very severe impact.  I was at a record company at

7    the time that the first peer-to-peer service launched, it was

8    called Napster, and then multiple other large services allowing

9    millions and millions of people to illegally distribute our

11:33:56 10  recordings developed.

11        And it had a devastating impact on our business, on

12   the finances of our business, on our ability to invest in new

13   content.  And it was all happening at a time when we were

14   trying to figure out what's the best and safest way to sell,

15   market, distribute music through the Internet.  And here we

16   were doing it in competition with millions of folks who were

17   giving it away and taking it for free.

18   Q.   When these peer-to-peer networks were first launched, how

19   did the record industry deal with it?

11:34:32 20  A.   We sued Napster.  And then we sued another set of

21   services, Kazaa and Grokster.  That case actually went to the

22   Supreme Court.  And then we sued another company called

23   LimeWire.

24        We engaged in educational programs to try to educate

25   consumers that they shouldn't be doing this.  And we worked

A. McMullan - Direct

229

1    hard to develop a legitimate business to try to compete with

2    this distribution of free music illegally.

3    Q.   You mentioned a moment ago that Grokster and Kazaa went to

4    the Supreme Court.  What happened there?

5    A.   We won that case unanimously.  And, you know, each of

6    those companies and businesses, Napster, Grokster, Kazaa,

7    LimeWire, they were all eventually shut down through an

8    expensive legal process.

9    Q.   Are you familiar with the peer-to-peer networks at issue

11:35:27 10   in this case?

11   A.   I am.

12   Q.   Can you list them?

13   A.   I think there is BitTorrent, Ares, eDonkey -- BitTorrent,

14   Ares, eDonkey -- there might be others.  Those are the ones I

15   remember.

16   Q.   With respect to those --

17   A.   Gnutella, I think, is one.

18   Q.   So eDonkey, Ares, Gnutella, and BitTorrent.  With respect

19   to those four peer-to-peer networks at issue in this case, why

11:35:56 20   hasn't the music industry just sued those entities?

21   A.   There's no company to sue.  There's no entity.  This is

22   now -- peer-to-peer moved to a decentralized model where,

23   again, consumers have software on their computers and simply

24   communicate with each other.  Nothing goes through a central

25   server.  There's no central company to sue.

A. McMullan - Direct

230

1          MR. BUCHANAN:  Your Honor, can we approach?

2          THE COURT:  Yes, sir.

3          NOTE:  A sidebar discussion is had between the Court

4    and counsel out of the hearing of the jury as follows:

5    AT SIDEBAR

6          MR. BUCHANAN:  So I just wanted to make sure that

7    this witness -- none of the testimony of the prior witness was

8    revealed to this witness before he testified.

9          MR. OPPENHEIM:  No.  If you think that we haven't

11:36:54 10    discussed this issue for ten years with these witnesses, you'd

11    be kidding yourself.

12          MR. BUCHANAN:  It just seemed to me --

13          THE COURT:  Well, what do you want me -- you want me

14    to have Mr. Oppenheim ask whether he spoke to Mr. --

15          MR. BUCHANAN:  Well, if he represents that he didn't

16    talk to him before he -- just now and testifying and discussed

17    with him Mr. Kokakis' testimony, then I accept that.

18          MR. OPPENHEIM:  Okay.  I did not disclose any of

19    Mr. Kokakis' testimony to Mr. McMullan.

11:37:23 20          MR. BUCHANAN:  All right.

21          THE COURT:  Okay.  Thank you.

22          NOTE:  The sidebar discussion is concluded; whereupon

23    the case continues before the jury as follows:

24    BEFORE THE JURY

25          THE COURT:  Please proceed.

A. McMullan - Direct

237

1    they got these notices.

2    Q.    What do you mean by "interact with them"?

3    A.    I guess it might put up -- if you tried to use your

4    Internet, it might put up a page saying, you've gotten this

5    infringement notice and, you know, click here and acknowledge

6    it.

7          They had a call center where they might require

8    people to call in.  Part of what CAS was was operating a, you

9    know, a call center to field questions.

11:48:04  10          And then there were, I guess, what you call

11   mitigation measures if it escalated further that might throttle

12   down your bandwidth of your Internet connectivity or slow it

13   down, something to get a user's attention even more.

14   Q.    And do you recall how many steps there were within the CAS

15   graduated response?

16   A.    I think there were these sort of three areas of education,

17   acknowledgement, mitigation.  But I think it took you

18   through -- it could be either five or six steps.  The

19   parameters were given, but each ISP could implement them in a

11:48:45  20   slightly different way based upon what they were interested in,

21   and that would give different learnings on how consumers might

22   react to different methods of communications to them.

23   Q.    When the record industry was sending notices in CAS, did

24   you know how many steps the infringer in the notice had already

25   gone through?

A. McMullan - Direct

238

1    A.    No.

2    Q.    Can you explain that?

3    A.    Well, we were identifying that an infringement occurred

4    and sending that notice to the ISP.  But it is the ISP that

5    knows, well, who that infringer is and how many times they have

6    been caught doing this before.

7    Q.    Well, if you didn't know, was it possible -- do you

8    understand it was possible that an ISP may have received a

9    notice for a subscriber which would have been past the sixth

11:49:53 10   step?

11   A.    They could easily have gotten notices past the sixth step.

12   Q.    And what did you understand that CAS obligated the ISPs --

13   excuse me.  What did you understand that the ISPs had to do

14   with notices that were past the sixth step?

15   A.    Past the sixth step, CAS didn't deal with it.  CAS was

16   looking at with these six steps, what has occurred and what can

17   we learn from that.  Past the sixth step, the ISPs had to

18   comply with the law.

19          Just like they had to comply with the law for notices

11:50:31 20   they might be getting from other copyright holders like the

21   publishers outside of CAS.

22   Q.    What obligations did an ISP participating in CAS have to

23   terminate repeat infringers?

24   A.    Well, CAS' six steps didn't have anything to do with

25   terminating infringers.  That's not what it was looking at.

A. McMullan - Direct

239

But all of these companies had policies that noted that users

could be terminated if they engaged in repeat infringement.

Q.   In the course of the discussions to create CAS, do you

recall there ever being a discussion about having a 14-step

graduated response policy?

A.   That I don't recall.

Q.   Do you -- do you recall how many steps the record industry

wanted CAS to have?

A.   I believe we wanted three steps.  We believed three steps

11:51:36 was something that we had seen in graduated response programs

in other countries that had been effective.

Q.   Can you describe that a little more.

A.   There were certain countries, in France there was a

program called HADOPI that mandated three steps before

termination.  And the learnings we received from that was that

greatly reduced peer-to-peer piracy across networks that were

participants in HADOPI.

I think there were similar programs in New Zealand

and some other countries.

11:52:15 Q.   Sorry, I didn't mean to interrupt you.

A.   That's okay.

Q.   Do you think CAS was effective?

A.   I don't think CAS proved to be a solution to anything.

Some learnings may have come out of it that were useful.  If it

were -- if it were highly effective, we would still be

A. McMullan - Cross

250

1    A.    I think there were lawyers involved at the trade

2    associations.  I think they kept lawyers informed at their

3    trade association members, and I assume the ISPs had lawyers

4    involved.

5    Q.    Right.  And the Recording Industry Association of America,

6    who represents the sound recording companies, they were

7    involved?

8    A.    They were involved.

9    Q.    Okay.  And then actually, ultimately, a new entity was

12:06:11 10  created, right?  The Center for Copyright Infringement?

11   A.    That was --

12             MR. OPPENHEIM:  Objection.  If I heard that right,

13   that's certainly not the name of it.  And it's an inappropriate

14   question.  It wasn't the Center for Copyright Infringement,

15   which is what I heard.  Maybe I misheard it.

16             THE COURT:  Okay.

17             THE WITNESS:  It would be a terrible name for any

18   kind of business.

19   BY MR. BUCHANAN:  (Continuing)

12:06:32 20  Q.    Center for Copyright Information?

21   A.    Okay.

22   Q.    Was that -- you're familiar with that?

23   A.    Yes, something was created that had a --

24   Q.    And they were located in Washington, D.C.?

25   A.    I assume that's where they were located.

A. McMullan - Cross

251

| | |
|---|---|
| 1 | Q.   Do you know who was the head of it? |
| 2 | A.   I don't off the top of my head, no. |
| 3 | Q.   But it was funded by all these entities that were part of |
| 4 | CAS? |
| 5 | A.   I think it was funded half by the content owners and half |
| 6 | by the -- |
| 7 | Q.   Right. |
| 8 | A.   -- Internet service providers. |
| 9 | Q.   And so, you said that you wanted them to do three, at |
| 12:06:59 10 | least do -- take three notices and then terminate; is that |
| 11 | right? |
| 12 | A.   We think a three-notice graduated response would be very |
| 13 | effective in curbing infringement of this nature. |
| 14 | Q.   Okay.  So three notices and then what?  That's what I |
| 15 | don't get.  What happens after three? |
| 16 | A.   Well, after three, if a subscriber simply will not stop |
| 17 | using these peer-to-peer systems to infringe our content, we |
| 18 | think that the Internet service provider should terminate them. |
| 19 | Q.   So you said three.  And if they continued, how many more |
| 12:07:41 20 | infringement notices before you really think they should shut |
| 21 | down the family, or the hospital, or the military base, |
| 22 | whatever might -- |
| 23 | MR. OPPENHEIM:  Objection. |
| 24 | THE COURT:  Sustained.  Ask the question, |
| 25 | Mr. Buchanan. |

A. McMullan - Cross

252

1          MR. BUCHANAN:  Okay.

2     BY MR. BUCHANAN: (Continuing)

3     Q.   So we're talking about a residential home, okay?  At what

4     point should they cut off their Internet service?

5     A.   I think that if the ISP takes appropriate action to notify

6     and inform its customer what's happening on the system that

7     through their household is illegal and shouldn't happen, we

8     think that if that continues to occur and it occurs three

9     times, I do think it might be appropriate to terminate that

10    customer.

11         But we would hope it doesn't get to that.  We're not

12    here to require terminations.  We want responsible companies to

13    do responsible things, to work with their customers to stop

14    infringements.

15         And certainly in the -- as to what Cox did, they fell

16    down on that responsibility entirely.

17    Q.   Okay.  So I want to get back to the three.  What you

18    negotiated under CAS was six steps, or alerts rather, right?

19    A.   I think --

20    Q.   Each step had an alert with it that got a little bit

21    different, depending on the content owner?

22    A.   The alert was what the ISP sent to its customer.

23    Q.   Right.  That was a notice, right?

24    A.   No, the notice was what we sent to the ISP.

25    Q.   Yeah.  So do you know, did the alert attach the notice?

S. Marks - Direct

275

1    activities that the RIAA engages in.

2    A.    There are a number of different things.  One would be

3    litigation to bring cases when necessary.  There are also

4    contacting sites before litigation.  Or if it's offline in

5    the -- you know, previous to digital, it focused a lot on CD

6    plants that were manufacturing CDs without authorization,

7    counterfeit goods that would show up either in stores or in

8    flea markets and things like that.

9           So there's that kind of enforcement.  There is --

10   there are notice programs.  The litigation I mentioned.

11   Participating on panels and in important industry and

12   interindustry discussions about the threats facing the industry

13   at any given time.  Those are some of the things.

14   Q.    What about law enforcement, does the RIAA work with any

15   law enforcement efforts in the antipiracy realm?

16   A.    Yeah.  I should have mentioned that one.  The copyright

17   law has a provision for criminal copyright violations.

18   Somebody can be prosecuted under the criminal law for willfully

19   infringing copyrights for financial gain.

20          Sometimes in our investigations to -- with CD plants

21   or others that were involved in that kind of activity, we would

22   make referrals to law enforcement.  Other times law enforcement

23   would contact us based on things that they were working on for

24   victim impact statements and things like that.

25   Q.    What's a CD plant?  I think you just mentioned a CD plant.

12:40:11 appears at line 10
12:40:57 appears at line 20

S. Marks - Direct

276

1   What is that?

2   A.   Yeah.   That's a manufacturing facility for the bright,

3   shiny disks that everybody used to buy back in the '80s and

4   '90s.

5   Q.   Counterfeit?

6   A.   Right.   So the enforcement actions against those plants or

7   facilities was that they were manufacturing CDs without

8   authorization and trying to sell them as authorized CDs.

9   Q.   And you mentioned lawsuits or litigations.   I want to talk

12:41:52 10   about some of that history.

11        At a high level, what kinds of lawsuits does the RIAA

12   engage in with respect to copyrights?

13   A.   So it takes many different forms.   Principally the

14   litigations or the lawsuits are directed toward those that our

15   members feel are infringing upon their -- the intellectual

16   property that I was describing earlier.

17        So that did occur against manufacturing facilities

18   like CD plants over time, individual lawsuits, lawsuits against

19   individual sites online that were selling music without having

12:42:37 20   any authorization.   We had a number of lawsuits against

21   peer-to-peer companies as digital piracy grew.

22        So it's a variety of things depending on, you know,

23   what's happening at the moment.

24   Q.   Now, you talked about these CD plants or counterfeit CDs.

25   Have you seen in -- a change in the manner of piracy with the

S. Marks - Direct

277

1    evolution of digital distribution of music as people are

2    getting their music more and more online?

3    A.    Yeah, it changed pretty dramatically.  You know, when you

4    were dealing with a manufacturing facility and there were hard

5    goods, you could, you know, intercept those goods or halt the

6    manufacture of them and it was done.

7         With digital and online, what we saw was that any

8    individual could, in effect, be a worldwide publisher of all

9    the music that they had, owned, or didn't own, and distribute

12:43:40 10    it worldwide.

11         So it was vastly different.  And the other main

12    difference was that the copies that were being distributed

13    were, and are to the extent this still continues as it does,

14    perfect digital copies.

15         So unlike back in the day when people made, you know,

16    tapes for each other, or copied a tape from tape to tape, then

17    there was a loss of quality.

18         With digital, you can maintain that quality.  So

19    you're basically giving away or distributing or copying

12:44:20 20    recorded copies of the files that otherwise should be sold, you

21    know, on an -- in an iTunes store or other kinds of stores

22    online.

23    Q.    In what kind of networks did the RIAA start to see this

24    distribution of pirated music?

25    A.    It started with companies that were called peer-to-peer

S. Marks - Direct

278

```
         1   networks.  They were -- there were technology protocols that

         2   were developed, peer-to-peer networks, and then companies that

         3   would use those to provide individual users the ability to copy

         4   and distribute without authorization.

         5   Q.   Is there a way, Mr. Marks, that you can analogize a

         6   peer-to-peer distribution model to an old school record store

         7   that you would walk into?

         8   A.   Sure.  It would be as if an individual could walk into any

         9   record store, choose every recording that they liked, and just

12:45:22 10   walked out with all of that.  Except they didn't actually have

        11   to go to the store, they could just do it from home at their

        12   computer.

        13        So they could get access to every recording in the

        14   history of U.S. recorded music from their desk at their

        15   computer without paying anything, and then distributing it to

        16   others.

        17   Q.   Does that impact the RIAA?

        18   A.   It impacted us in the industry very significantly.

        19   Industry sales fell off a cliff within a couple of -- within a

12:46:01 20   few years.  The industry decline was down to 50 percent.

        21        So you had what was a mature, healthy, growing

        22   business over time suddenly, you know, go from that to falling

        23   right off -- right off of a cliff.  And continued to fall for

        24   many years.

        25   Q.   What about RIAA?  You were there a long time.  Did you see
```

S. Marks - Direct

279

1    impact at the RIAA?

2    A.    Yeah.  We had to mobilize to address that infringement.

3    And that meant retooling in antipiracy to figure out new

4    strategies and new processes for dealing with it.

5         You know, sending investigators out to look for CDs

6    that were being manufactured paled in comparison to the breadth

7    and scope of the infringement that occurred on these networks.

8    Q.    Was there impact to the staff or the size of the RIAA?

9    A.    Yes.  Several years after this started, as the industry

12:47:03 10  was declining -- I mean, at our member companies, all of our

11   member companies had huge layoffs.  They slashed artist

12   rosters, meaning that they had to drop artists that were on the

13   roster.  They weren't really able to invest the same amount of

14   money in new and developing artists.

15        And RIAA went through the same kind of layoffs that

16   many of the record companies did.  RIAA was about 125 people

17   before this started or around that time, and went all the way

18   down to 50.

19   Q.    Now, you mentioned that the RIAA needed to -- I forget

12:47:41 20  your word -- retool or rethink enforcement methods because they

21   were no longer just looking for CD plants, correct?

22   A.    Correct.

23   Q.    How do you do that?

24   A.    Well --

25   Q.    Starting from scratch with this new delivery model.

S. Marks - Direct

280

1    A.   It was started from scratch.  I mean, we had to create an

2    entire online antipiracy department.  Bring in people who

3    understood that environment.  Determine strategies for

4    addressing the companies that were facilitating this and

5    inducing it and contributing to it, as well as, you know, the

6    individuals who were engaged in it.

7    Q.   When was the first time you heard or learned about

8    peer-to-peer piracy?

9    A.   It was in the late '90s.  I can't remember whether it was

12:48:36 10   '97 or '98 or '99, but when Napster -- that was the first

11   well-known and widely used P2P network.

12   Q.   And what did the music industry do in response to

13   Napster's launch?

14   A.   Well, we first contacted Napster and expressed our very

15   significant concern that they were enabling this very

16   widespread infringement of literally billions of music files

17   that were being copied and then distributed and made available

18   publicly.

19           And it was so easy to use.  And as I was saying

12:49:22 20   before, the digital copies were basically the same as you would

21   get from a store.  The entire industry was basically competing

22   with free.

23   Q.   Did Napster agree to fix the problem?

24   A.   No, they didn't.  And, unfortunately, we had to sue them.

25   Q.   What was the outcome of that effort?

S. Marks - Direct

281

1    A.   After several years of litigation, Napster was ordered to

2    keep all the copyrighted content off or shut down.  Which it

3    did.

4    Q.   You said it shut down?

5    A.   Yes.

6    Q.   And after Napster shut down, did the peer-to-peer

7    infringement stop?

8    A.   Unfortunately not.  There were other companies that came

9    on afterward.

12:50:00 10  Q.   Do you recall the names of some of those others that

11   popped up?

12   A.   Kazaa, Grokster, Morpheus, AudioGalaxy.  There's several

13   others.  Aimster.  Those are some of them, not all of them.

14   Q.   What was Grokster?

15   A.   So Grokster was a software that was made available on what

16   was called a decentralized P2P network.

17          So the way Napster had worked was Napster maintained

18   a central server or directory of all of the recordings that

19   were being traded or distributed, you know, between individual

12:50:42 20  peers, people on the network.

21          The decision to shut down Grokster, the court

22   decision talked a lot about having that central directory.

23          And so, what others did was, to get around that, they

24   developed what were called decentralized P2P protocols.  And

25   that meant there wasn't a central server, but they basically

S. Marks - Direct

282

1    worked the same way.  You would go on, you would use the

2    software, you would find the recording you want, you could copy

3    it, and then distribute to others.

4    Q.    I think you said Napster had the central?

5    A.    Yeah.

6    Q.    And then you were talking about Grokster after that?

7    A.    Yes.  Grokster was decentralized, right.

8    Q.    Was there litigation over Grokster?

9    A.    There was litigation over Grokster.  That litigation went

12:51:29 10   all the way to the U.S. Supreme Court, which decided

11   unanimously in 2005 that Grokster was, in fact, liable for

12   infringement.

13   Q.    Was the RIAA involved in that Grokster case?

14   A.    Yes.  We coordinated on behalf of the entire recording

15   industry.

16   Q.    Do you recall the music industry's response to a unanimous

17   Supreme Court decision shutting down Grokster in 2005?

18   A.    It was huge.  I mean, you know, we had been litigating

19   against them, not only for a long time, but there were all

12:52:06 20   these other companies that were based on this same principle of

21   it being decentralized.

22          And so, winning that lawsuit, especially in a

23   9/nothing decision from the U.S. Supreme Court, it set the

24   record pretty straight about what was legal and what was not.

25          And so, while it was a long, hard battle, we really

S. Marks - Direct

283

1   couldn't have asked for a better result.

2   Q.   So surely with that kind of decision from the Supreme

3   Court, the peer-to-peer infringement must have stopped?

4   A.   You would have thought so.  But, unfortunately, it didn't.

5   You know, the way I would describe a number of the companies

6   that were P2P companies is that they were essentially

7   short-term profiteers.  They knew that at some point they

8   wouldn't be able to continue it, but they were making a

9   tremendous amount of money.  And the way they made the money

12:53:03 10  was that they would sell advertising to be shown to everybody

11  using it.

12       Now, you're only able to sell advertising if you have

13  a lot of people.  And they had a lot of people and billions and

14  billions of files.  And so, advertisers flocked there because

15  there were, you know, a lot of people using that software, and

16  they would advertise, and the operators and owners of those

17  companies were earning a lot of money annually, millions and

18  millions of dollars every year.

19  Q.   At some point in this history of battling peer-to-peer

12:53:39 20  piracy, did the RIAA try to enforce copyrights against

21  individual peer-to-peer users?

22  A.   Yes.  In about 2004 we had made the decision that as part

23  of the strategy or effort to deal with this widespread

24  infringement, we felt it was necessary to sue the individuals

25  who were actually the ones copying and distributing the

S. Marks - Direct

284

1    recorded music using the P2P software.

2           So we felt that this was a very complex problem, and

3    it required a number of different strategies and kind of a

4    multifaceted approach.  So we clearly had to enforce against

5    those that were making the networks available, and they were

6    fully aware of what was going on.  Then there were the

7    individuals that were using it, needed to do that.  As well as,

8    you know, other things at the same time.

9    Q.   What was the time frame, generally, for the lawsuits

12:54:42 10  against individuals?

11   A.   It started in '04 and lasted about four years into '08.

12   Q.   And could you just tell us a little bit, what did those

13   individual enforcement efforts entail?

14   A.   Well, they weren't as straightforward as you might think

15   because we did not know who the -- the identity of the people

16   using the software.

17          So we could go on and see which computers were

18   involved because every computer has what is called an IP

19   address or Internet protocol address.  So it's, you know,

12:55:26 20  basically a long string of numbers.

21          We could -- we could see that.  And that related back

22   to a person, but we needed to get that information so that we

23   could move forward with the lawsuit.

24   Q.   And how could you find out who an individual was that was

25   associated with an IP address?

S. Marks - Direct

285

1    A.    Internet service providers had that information because

2    those individuals were the Internet service provider's

3    subscribers.  And each Internet service provider, or ISP, had

4    that information about which IP address related to which

5    account.

6    Q.    Was the RIAA -- were you able to figure out who some of

7    the folks were associated with those infringing activities?

8    A.    Eventually we were.  And then -- and we moved forward

9    with -- it was a lawsuit program, but it was premised around

12:56:17 10   actually trying to settle before filing the actual lawsuit

11   against the individual.  So, yeah.

12   Q.    Do you recall trying to figure out the identities of any

13   Cox subscribers in the time frame of this end user lawsuit

14   period?

15   A.    Yes.

16   Q.    And what was that like?  How did that go?

17   A.    When we went to Cox, we thought, okay, they have this

18   information, there's no reason for them not to give it.  We've

19   got proof that infringement is occurring.

12:56:52 20        But Cox told us that they wouldn't voluntarily give

21   up -- give the information over and needed us to get a court

22   order of some kind to force it to give that information.

23   Q.    Do you recall generally whether Cox was cooperative in

24   these efforts?

25        MR. ELKIN:  Objection.

S. Marks - Direct

286

| | |
|---|---|
| 1 | THE COURT:  Yeah, sustained.  Ask him -- next |
| 2 | question. |
| 3 | BY MR. GOULD: (Continuing) |
| 4 | Q.   Do you recall generally how many of the end user suits |
| 5 | were filed? |
| 6 | A.   We contacted thousands of individuals.  Most of those |
| 7 | individuals settled without us having to actually file -- you |
| 8 | know, go through with a lawsuit against them. |
| 9 | So the numbers that went past that stage, my |
| 12:58:01 10 | recollection is, you know, probably in the hundreds from, you |
| 11 | know, a much larger group. |
| 12 | Q.   I think you said that that -- the end user lawsuits ended |
| 13 | around 2008? |
| 14 | A.   Correct. |
| 15 | Q.   Why did you stop that approach? |
| 16 | A.   We felt that the program had basically run its course. |
| 17 | You know, one of the main things that we wanted to get out of |
| 18 | it -- this wasn't about punishment so much.  It was about |
| 19 | awareness and education, for people to understand that that |
| 12:58:32 20 | activity, which had become very normal to a lot of people, was |
| 21 | actually not legal. |
| 22 | And when we -- before filing -- before starting that |
| 23 | program, you know, we had tried a number of different ways to |
| 24 | educate, and found that education really doesn't work with |
| 25 | something like this unless there's a consequence.  You have to |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
              Plaintiffs,      :
                               :
      -vs-                     :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
              Defendants.      :
                               :
-------------------------------:
```

VOLUME 2 (P.M. Portion)

TRIAL TRANSCRIPT

December 3, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

292

1

2                                      INDEX

3     WITNESS                          EXAMINATION        PAGE

4

      STEVEN MARKS  (Resumed)
5                                      DIRECT             294
                                       CROSS              349
6                                      REDIRECT           390
                                       RECROSS            395
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Marks - Direct

295

|  | 1 | Q.    What kind of lawsuit or legal claim was brought against |
|  | 2 | Napster? |
|  | 3 | A.    Contributory and vicarious -- contributory infringement |
|  | 4 | and vicarious infringement liability. |
|  | 5 | Q.    And what kind of lawsuit or legal claim was brought |
|  | 6 | against Grokster? |
|  | 7 | A.    Principally, the same. |
|  | 8 | Q.    And what were those? |
|  | 9 | A.    Contributory infringement and vicarious infringement. |
| 02:10:37 | 10 | Q.    You were also asked some questions about lawsuits against |
|  | 11 | end users.  Do you recall that? |
|  | 12 | A.    Yes. |
|  | 13 | Q.    Did RIAA try to find out some of the Cox subscribers? |
|  | 14 | A.    Correct. |
|  | 15 | Q.    How did Cox respond? |
|  | 16 | A.    They -- |
|  | 17 | MR. ELKIN:  Objection. |
|  | 18 | THE COURT:  Yeah, it was already asked and answered. |
|  | 19 | You're retreading old ground now.  Let's move forward. |
| 02:11:05 | 20 | MR. GOULD:  Understood. |
|  | 21 | THE COURT:  Okay.  Thank you. |
|  | 22 | BY MR. GOULD: |
|  | 23 | Q.    Has the RIAA ever sued BitTorrent? |
|  | 24 | A.    No.  It's not really possible to sue BitTorrent because |
|  | 25 | BitTorrent is a protocol, not an actual company or service. |

S. Marks - Direct

296

1    Q.    What about eDonkey?

2    A.    Same thing.

3    Q.    What about Ares?

4    A.    Same.

5    Q.    And Gnutella?

6    A.    The same.

7    Q.    Has the record industry ever sued ISPs, other ISPs for

8    contributory infringement, copyright infringement?

9    A.    Yes.  There are a number of additional suits against other

02:11:45  10    ISPs that I think are either currently pending.  I'm not in the

11    role anymore, so I don't know the exact stage, but they include

12    Grande, Charter, RCN, Bright House, and maybe one or two

13    others.

14    Q.    I want to turn to the period starting around 2008, when

15    you said the end user lawsuits ended.  Did the RIAA shift its

16    approach to battling peer-to-peer infringement at that time?

17    A.    Yeah.  As I explained earlier, suing individuals was not

18    something that could stop all of the infringement because there

19    were just too many people engaged in it, and so as part of, you

02:12:36  20    know, our effort to deal with the problem, we decided to create

21    what we called a notice program where we would send notices to

22    ISPs with information about specific instances of infringement

23    by subscribers on their networks.

24    Q.    Why did you take that approach?

25    A.    Well, as -- one is that the ISPs have responsibility for

S. Marks - Direct

301

1    into a notice that we could send to the ISP.

2    Q.   I want to back up just two questions just to clarify what

3    you meant by "immunity" before.

4    A.   Yeah.  Immunity is just, sorry, a way of saying no

5    liability or not being sued.

6    Q.   Is that -- you're referring to the safe harbor?

7    A.   Yes.

8    Q.   Why did RIAA select MarkMonitor?

9    A.   MarkMonitor was known to be a very sophisticated and

02:20:03 10  reputable vendor for these kinds of services.  There weren't a

11   lot of these services that existed, and MarkMonitor had the

12   best reputation as far as we knew and could tell.

13   Q.   When did RIAA start sending infringement notices to Cox?

14   A.   2008, I believe.

15   Q.   Were there any discussions with Cox about getting that off

16   the ground?

17   A.   Yes.  We wanted to make sure, for example, that the

18   notices we were sending were going to be accepted, because

19   they -- you know, just to make sure that they were in the right

02:20:37 20  form and we were sending them according to a certain file

21   format and things, and we wanted that to go smoothly.

22   Q.   Were you able to figure that out?

23            MR. ELKIN:  Objection.

24            THE COURT:  Well, it's a pretty broad, general

25   question.  Why don't you ask a more specific question, please.

S. Marks - Direct

302

BY MR. GOULD:

Q.   Did you come to a point where you were able to send notices to Cox?

A.   Eventually, yes.

Q.   Did you understand Cox would accept the format of those notices?

A.   Yes, yes.

Q.   Do you recall what information was included in the notices?

02:21:15 A.   Well, the notice identified -- it had the IP address, which, as I was saying earlier, is the way to identify the computer, the device being used.  It had the name of the recording, for example, that was one of our members' recording that was being infringed.

It, it had, you know, a certain format.  We were required, for example, to state everything under penalty of perjury, and so all of that information was there.  I mean, in short, it was all the information that Cox needed to be able to address the infringement that we were giving them notice about.

02:21:59 MR. GOULD:  Your Honor, if I may approach to hand the witness a binder?

THE COURT:  No, Mr. Ruelas will be happy to do that for you.

MR. GOULD:  Thank you, sir.

BY MR. GOULD:

| | |
|---|---|
| 1 | Q.   Mr. Marks, if you could turn to tab 5 in your binder, |
| 2 | please.  Do you recognize this document? |
| 3 | A.   Yes. |
| 4 | THE COURT:  Is it one of plaintiff's exhibits |
| 5 | separately? |
| 6 | MR. GOULD:  Yes.  Thank you, Your Honor.  For the |
| 7 | record, this -- I'm directing the witness to PX 537. |
| 8 | THE WITNESS:  Yes, I recognize it. |
| 9 | MR. GOULD:  I would move to admit 537, plaintiff's. |
| 02:22:39 10 | MR. ELKIN:  No objection. |
| 11 | THE COURT:  It's received. |
| 12 | MR. GOULD:  Could we please publish 537 for the |
| 13 | Court? |
| 14 | BY MR. GOULD: |
| 15 | Q.   Mr. Marks, what did you say this exhibit is? |
| 16 | A.   This is a notice that Jeremy Landis in the RIAA antipiracy |
| 17 | department sent to Cox identifying a specific act of |
| 18 | infringement. |
| 19 | Q.   And I just want to take a look visually at an overview |
| 02:23:12 20 | here first.  What's the format of this? |
| 21 | A.   The format is -- I'm sorry? |
| 22 | Q.   It looks like an e-mail. |
| 23 | A.   Oh, yeah.  Sorry.  Yeah, it's an e-mail that was sent from |
| 24 | a dedicated antipiracy account at RIAA to the dedicated account |
| 25 | that Cox had.  This would have been part of the discussion that |

S. Marks - Direct

316

|          |    |                                                                              |
|----------|----|------------------------------------------------------------------------------|
|          | 1  | MR. ELKIN:  Objection.                                                       |
|          | 2  | MR. GOULD:  Withdrawn.                                                        |
|          | 3  | THE COURT:  If he knows.                                                      |
|          | 4  | MR. GOULD:  Yeah, withdrawn.                                                  |
|          | 5  | THE COURT:  Ask your next question.                                          |
|          | 6  | MR. GOULD:  Turn to the next slide, please.  Thank                           |
|          | 7  | you.                                                                         |
|          | 8  | BY MR. GOULD:                                                                |
|          | 9  | Q.   And what does the second slide show?                                    |
| 02:43:23 | 10 | A.   It's the same -- it's showing basically the same thing                  |
|          | 11 | except instead of looking just at the one day, it's looking at               |
|          | 12 | a complete year.  So we had found more than 366,000                          |
|          | 13 | infringements on the Cox network, and we were only able to send              |
|          | 14 | 84,000 notices during that year period.  So, you know, it's                  |
|          | 15 | roughly -- well, it's less than a quarter, 20 to 22 percent or               |
|          | 16 | 23.  I'm not sure of the exact amount, but, again, a small                   |
|          | 17 | fraction.                                                                    |
|          | 18 | Q.   Do you know if the RIAA always sent up to the full amount               |
|          | 19 | of the cap?                                                                  |
| 02:44:07 | 20 | MR. ELKIN:  Objection.  Foundation.                                          |
|          | 21 | THE COURT:  Yeah, lay a foundation.                                          |
|          | 22 | BY MR. GOULD:                                                                |
|          | 23 | Q.   You were involved to some degree with the RIAA notice                   |
|          | 24 | program?                                                                     |
|          | 25 | A.   Yes.                                                                    |

S. Marks - Direct

317

1 Q.   And had some involvement in understanding the nature of

2 that program and the number of notices sent?

3 A.   Yes.

4 Q.   Did you have an understanding of -- do you know as you sit

5 here today whether Cox was sending the full amount under the

6 caps?  I'm sorry, strike that.

7        Do you know as you sit here today if RIAA was sending

8 the full amount Cox permitted under the cap?

9 A.   I think there were times during that -- the period over

02:44:54 10 those years that we were and some times where we were not.

11 Q.   Do you know why?

12 A.   Yeah.  We, we had a mistake on our end.  When Cox did

13 agree to go from 400 to 600, internally it was not communicated

14 to our vendor that it could be increased all the way up to that

15 level.  I didn't know that at the time and found out about it

16 much later.

17 Q.   I want to turn back to 234, please.

18        Excuse me, I apologize.  I'd like to call up PX --

19 excuse me.

02:46:02 20        Mr. Marks, could you turn to tab 4 in your binder?

21 A.   Sure.

22 Q.   Do you recognize this PX 327?

23 A.   Yes.

24        MR. GOULD:  I move to admit PX 327.

25        THE COURT:  Any objection?

S. Marks - Direct

318

| | | |
|---|---|---|
| | 1 | MR. ELKIN:  No objection. |
| | 2 | THE COURT:  Received. |
| | 3 | BY MR. GOULD: |
| | 4 | Q.   And what is PX 327? |
| | 5 | A.   So it's a request some years later than the previous |
| | 6 | e-mails we were looking at, about three years later, asking for |
| | 7 | an increase from the 400 per day limit to something higher, and |
| | 8 | it was, it was requested again directly from Ms. Sheckler on my |
| | 9 | team to Mr. Cadenhead. |
| 02:47:02 | 10 | Q.   And remind the jury, who's Ms. Sheckler? |
| | 11 | A.   She's -- her title is deputy general counsel at RIAA.  So |
| | 12 | she, she was on the legal team and reported directly to me. |
| | 13 | MR. GOULD:  And if you could scroll up to -- all |
| | 14 | right.  Pull up the bottom e-mail, please. |
| | 15 | BY MR. GOULD: |
| | 16 | Q.   And what does Ms. Sheckler ask here? |
| | 17 | A.   She's asking for that increase from 400.  So we'd like to |
| | 18 | increase the number of P2P notices that we send to Cox.  The |
| | 19 | current limit is 400 per day, and we'd like to increase it. |
| 02:48:03 | 20 | MR. GOULD:  And can we scroll up to Mr. Cadenhead's |
| | 21 | response? |
| | 22 | BY MR. GOULD: |
| | 23 | Q.   Could read that for the jury, please? |
| | 24 | A.   We have a fairly hard limit on the number of calls from |
| | 25 | customers that our team can handle in a day, but within those |

S. Marks - Direct

319

1    parameters, we would be happy to discuss the number of notices

2    that we accept from you.  Can you give me some sense of what

3    you are thinking?

4    Q.   And Ms. Sheckler replies?

5    A.   She, she said:  How about 500 or 600 per weekday?

6    Q.   Was this before or after the pie charts we just looked at?

7    A.   It was after.

8         MR. GOULD:  And if you scroll up to Mr. Cadenhead's

9    response?

10   BY MR. GOULD:

11   Q.   And could you read what he says?

12   A.   I've checked with our technical team.  We do want to be as

13   helpful as we can, but we have to be mindful of the call volume

14   that notices generate.  They think that we can try accepting

15   600 per day, subject to unexpected call concerns that might

16   arise.  Does that sound okay?

17   Q.   And do you see how Ms. Sheckler responds?

18   A.   Yes.  She said:  Thanks.

19   Q.   Was this an agreement in your mind, sir?

02:49:34 20        MR. ELKIN:  Objection.

21        THE COURT:  Yeah.  What's his understanding of this

22   negotiation?  Sustained.

23   BY MR. GOULD:

24   Q.   Mr. Marks, what was your understanding of this discussion?

25   A.   Well, again, we're operating in a world where Cox was

S. Marks - Direct

320

1    giving us crumbs to address, you know, not to use the pie chart

2    again, but a lot of -- a big pie of infringement, and, you

3    know, we had made a request to bump that up modestly.

4            I mean, I've gotta say when we get this e-mail back

5    from Mr. Cadenhead saying we want to be helpful, but we have to

6    be mindful of call volume, so basically, this is a

7    multi-billion-dollar company with huge profits from -- and a

8    huge amount of infringement on its network, and they're

9    basically saying, well, we can try to go up to 600 if there

02:50:48  10  aren't too many phone calls that come in from customers,

11   because that might, you know, increase our costs.

12           I mean, I didn't know why they just couldn't, you

13   know, I mean, there are call centers, you could hire one or two

14   more people on a part-time basis.  There are all kinds of ways

15   to address this, and in light of the amount of infringement

16   that was going on and the fact that, you know, Cox itself could

17   be sued if they didn't take appropriate action with respect to

18   that infringement, it just -- again, it just didn't seem like a

19   very cooperative way to work together.

02:51:19  20  Q.   Do you have an under- -- did you understand whether this

21   was an agreement in your mind?

22           MR. ELKIN:  Objection.

23           THE COURT:  I think he's just explained what it was.

24   I'll sustain that.

25           MR. OPPENHEIM:  Sustained or overruled?

S. Marks - Direct

321

| | |
|---|---|
| 1 | THE COURT:  I sustained it, yeah. |
| 2 | BY MR. GOULD: |
| 3 | Q.   I want to turn to tab 1 in your binder, please.  This is |
| 4 | PX 7. |
| 5 | A.   Yes. |
| 6 | Q.   Do you recognize this, Mr. Marks? |
| 7 | A.   Yes. |
| 8 | MR. GOULD:  I move to admit PX 7. |
| 9 | MR. ELKIN:  No objection, Your Honor. |
| 02:52:09 10 | THE COURT:  It's received. |
| 11 | MR. GOULD:  You can publish, please. |
| 12 | BY MR. GOULD: |
| 13 | Q.   Mr. Marks, could you identify the to and from on this |
| 14 | e-mail? |
| 15 | A.   This was an automatic response from that abuse@cox.net |
| 16 | e-mail address, which is titled "Cox Customer Safety," and it |
| 17 | was sent to the RIAA antipiracy address. |
| 18 | Q.   I want to call up a sentence in the second paragraph, |
| 19 | starting with:  Cox Communications takes all reports of abuse |
| 02:52:51 20 | seriously. |
| 21 | A.   Yes. |
| 22 | Q.   Do you agree with that based on what you knew about the |
| 23 | Cox system? |
| 24 | A.   Well, no.  I mean, first of all, they were limiting our |
| 25 | ability to report complaints, knowing that there was a lot more |

1    A.    I just want to be clear that I understand when you're

2    talking about general notice program and the CAS program,

3    because those were two different things.

4    Q.    Right.  I understand that.  I referred to the notice

5    program, and now I'm referring to the CAS program.

6    A.    Okay.  So, I'm sorry, could you repeat your question about

7    the CAS?

8    Q.    Yeah, I'm getting to that right now actually.

9    A.    Okay.

04:11:22 10   Q.    Thank you for that.

11          So the CAS program, I think you described toward the

12   end of your testimony as being experimental.  Do you remember

13   that testimony?

14   A.    Yes.

15   Q.    And that's over, right?

16   A.    Yes.

17   Q.    And now you're suing -- now the RIAA is suing the ISPs,

18   right?  What's going to be the next experiment?

19   A.    I don't know.  I don't -- I don't work there anymore.  I

04:11:44 20   wouldn't have knowledge of that.

21   Q.    Okay.  I think you testified to this:  Just to be clear,

22   the RIAA represents record companies, right?

23   A.    Correct.

24   Q.    And it's authorized to enforce the copyright of its record

25   company members, right?

S. Marks - Cross

357

```
         1   A.   Correct.
         2   Q.   And that would include the record labels that are part of
         3   this case, right?
         4   A.   Yes.
         5   Q.   The RIAA is not a trade association for the music
         6   publishers, right?
         7   A.   Correct.
         8   Q.   And it's not authorized -- or RIAA is not authorized to
         9   enforce the copyrights of the music publishers, right?
04:12:31 10  A.   That's generally correct, yes.
        11   Q.   And the RIAA, to your knowledge, hasn't filed any lawsuits
        12   seeking to enforce the copyrights of any music publishers,
        13   correct?
        14   A.   I don't believe so.  I mean, there has been joint
        15   litigation together from time to time.
        16   Q.   I'm not suggesting that there aren't.  I'm suggesting that
        17   RIAA never filed any claims on behalf of the music publishers
        18   in the past; is that correct?
        19   A.   I believe so.
04:13:01 20  Q.   And to your knowledge, the RIAA hasn't sent any
        21   infringement notices on behalf of any of the music publishers,
        22   right?
        23   A.   Correct.
        24   Q.   Now, the music publishers have their own trade
        25   association, right?
```

```
 1    A.    Yes.

 2    Q.    The National Music Publishers Association, right?

 3    A.    Yes.

 4    Q.    Now, you testified at length about the Copyright Alert

 5    System on direct.  Is it true that you knew that there was

 6    repeat infringement on every network and that you were trying

 7    to address it the best way possible through the MOU?

 8    A.    Yes.  We knew that there was repeat infringement on all --

 9    you mean ISP networks?

04:13:59 10   Q.    Let me, let me repeat the question.  You knew that there

11    was repeat infringement on every network, and you were trying

12    to address it in the best way possible through the MOU; is that

13    correct?

14    A.    I'm just asking whether "network" is referring to P2P

15    networks or ISP networks.

16    Q.    So if I use that word "network," you have no idea what I'm

17    talking about?

18    A.    It could be -- it's not that I don't have any idea.  I

19    have two ideas.  It could be P2P or the ISPs' network.  So I

04:14:30 20   was just asking for a clarification.

21    Q.    But standing alone, you don't understand what I'm saying;

22    is that correct?

23          THE COURT:  He's answered your question.

24          MR. ELKIN:  Okay.

25          THE COURT:  Ask your next question.
```

399

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  3  (A.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

400

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
 3                                JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
 4                                ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
 5                                JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
 6                                4530 Wisconsin Avenue, N.W.
                                  5th Floor
 7                                Washington, D.C. 20015


 8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA 90071
23

24

25
```

401

1

2                              INDEX

3
     WITNESS                      EXAMINATION      PAGE
4
5     BARBARA A. FREDERIKSEN-CROSS
                                  DIRECT           405
6                                 CROSS            498

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

417

1          MR. ZEBRAK:  Yes, Your Honor.  In the analysis of

2    computer software and computer-generated data.

3          THE COURT:  All right.  Any objection?

4          MR. BRODY:  I have no objection to her opining, Your

5    Honor.  I do have an objection as to -- I mean, we can do it,

6    too, but normally I would object to asking the Court to

7    certify her as an expert.

8          THE COURT:  I didn't hear the last couple of words.

9    Serving as --

10          MR. BRODY:  I have no objection to her opining,

11    giving opinion testimony.

12          THE COURT:  All right.

13          MR. BRODY:  I -- and we can do this with all the

14    experts if that's the practice, but normally I would object to

15    the Court -- asking the Court to certify the witness as an

16    expert.

17          THE COURT:  All right.  I understand now.  Thank

18    you.

19          I find that Ms. Frederiksen-Cross has the

20    educational and professional qualifications to testify on the

21    subjects that she's been asked to testify on.

22          All right.  Go ahead.

23          MR. ZEBRAK:  Thank you, Your Honor.

24    BY MR. ZEBRAK:

25    Q.   Ms. Frederiksen-Cross, are you familiar with the name

1  MarkMonitor?

2  A.    I am, Counsel.

3  Q.    And what is your understanding of what MarkMonitor is?

4  A.    MarkMonitor is an antipiracy company, amongst other

5  things, and in the context of this case, their role was to

6  attempt to detect illicit trading of files on peer-to-peer

7  networks and to provide e-mailed notification of the events

8  that they detected to Cox.

9  Q.    And what is your understanding of why MarkMonitor was

10  engaged in that activity?

11  A.    They were engaged on behalf of the RIAA to provide that

12  information so that Cox would be able to take action upon

13  those notices.

14  Q.    And we're going to talk about this in much more detail in

15  a while, but these were notices of what?

16  A.    They were notices where MarkMonitor had detected Cox

17  subscribers who were using the peer-to-peer network on the

18  internet to copy and distribute files which belonged to the

19  recording companies.

20  Q.    And when you say files that belong to the recording

21  companies, what do you mean by that?

22  A.    Music files that were being traded using these

23  peer-to-peer networks.

24  Q.    And --

25  A.    Copyrighted music files specifically.

419

1    Q.   And why was MarkMonitor reporting that to Cox

2    specifically?

3    A.   Well, because in the case of those particular detections,

4    Cox had been identified as the internet service provider who

5    was giving those individuals access to the internet.

6    Q.   All right.  So -- by internet service provider, I presume

7    you -- we're going to by shorthand just call that an ISP; is

8    that all right?

9    A.   That would be great.

10   Q.   Now I'm violating the rule of -- I'm going from the long

11   phrase to an acronym.  Before, I asked you to go the other

12   direction.

13          What is an ISP?

14   A.   An internet service provider, or ISP, is a company that

15   provides access to the internet for its customers so that they

16   are able to connect their computers, their home or their

17   business computers to the internet.

18   Q.   And do you have an understanding of when MarkMonitor sent

19   the notices relevant to this case to Cox on behalf of the

20   RIAA?

21   A.   I think that the time period of greatest interest is 2013

22   and 2014.  The evidence I have received was actually notices

23   for a little broader period, from 2012 through 2015.

24   Q.   And I believe you made a reference to MarkMonitor

25   monitoring for certain music files on peer-to-peer networks.

B. Frederiksen-Cross - Direct

420

1  Was that correct?

2  A.   That is correct.

3  Q.   Which specific peer-to-peer networks was MarkMonitor

4  trying to detect the sharing of music files on?

5  A.   There are four particular networks that MarkMonitor was

6  monitoring.  Those are BitTorrent, Ares, eDonkey, and

7  Gnutella, G-n-u-t-e-l-l-a.

8  Q.   Thank you.

9       And in the course of your work in this matter, did

10  you have the opportunity to review the MarkMonitor system that

11  was used to detect the sharing of these music files and report

12  that to Cox?

13  A.   Yes, I did.

14  Q.   And at a high level, what did your review consist of?

15  A.   I reviewed the source code for those systems, that is to

16  say, the human readable form of their computer programs.  I

17  also had the opportunity to interview MarkMonitor engineers,

18  and I was provided some documents that gave me some background

19  about the systems in anticipation of those reviews.

20       I also reviewed evidence that is produced or

21  collected by those systems, that is to say, the

22  contemporaneous records that those systems generate as they go

23  about their business.

24  Q.   And is that a complete recitation of everything you've

25  looked at, or is that just a summary?

B. Frederiksen-Cross - Direct

421

1    A.    That's just a summary.  There was a lot of material.  You

2    know, I've also seen deposition transcripts from some of --

3    and declarations from some of the MarkMonitor personnel and

4    other personnel who were involved in software used in these

5    systems.

6    Q.    And you mentioned, I believe you said you spoke with

7    MarkMonitor engineering employees.  Was that correct?

8    A.    Yes, with some of their engineers.

9    Q.    Did you speak with anyone else at MarkMonitor?

10   A.    There were two specific individuals, Sam Bahun and a

11   gentleman whose last name I'm sure I will mangle with a

12   Russian last name.

13   Q.    That's okay.  And, I'm sorry, I know you mentioned source

14   code and you gave a bit of a short description of what that

15   is, but could you please give the jury a little more of an

16   understanding of what source code is?

17   A.    Sure.  When programmers write a program, they do so in a

18   computer language that's designed specifically to facilitate

19   giving that instruction to the computer, and it's an

20   artificial language, but it has a syntax and verbs and nouns

21   you create and data structures, and you write out the

22   instructions that the computer is to perform.  Those then get

23   translated into the form that the computer actually uses.

24   Q.    And are you familiar with the name Audible Magic?

25   A.    I am.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

B. Frederiksen-Cross - Direct

422

1   Q.   And what is Audible Magic?

2   A.   Audible Magic is one of the leading content

3   identification services.  I believe they are the leader in the

4   Western world at least.  And the services they provide,

5   amongst other things, are the identification of sound

6   recordings and movies and other types of electronic content,

7   but as they relate to this case, it's sound recordings.

8   Q.   And what do you mean by an "identification of sound

9   recordings"?

10  A.   Well, you can submit a recording that maybe you don't

11  know what the title and artist is to them or even a snippet of

12  a recording, and they are able using a proprietary and

13  patented technology to figure out what artist and title that

14  is and whether it's a copy of a, of a particular song.

15  Q.   And could you please explain at a high level your

16  understanding of Audible Magic's relationship to this case?

17  A.   Yes.  Audible Magic is a company that is used by

18  MarkMonitor to provide song identification services.  So when

19  MarkMonitor collects a song from one of these peer-to-peer

20  networks, in order to verify that that song is what they think

21  it might be, they submit it to Audible Magic to get an

22  identification.

23  Q.   And did you do any investigation in the course of your

24  work in this case with respect to the Audible Magic system?

25  A.   I did.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

B. Frederiksen-Cross - Direct

423

1   Q.   And did you come to any conclusions about the Audible

2   Magic system?  Just a yes or no question.

3   A.   Yes, yes.

4   Q.   And are you prepared to discuss those today?

5   A.   I am.

6   Q.   Thank you.

7        And did you come to conclusions with respect to the

8   overall MarkMonitor system?

9   A.   Yes, I did.

10  Q.   And are you prepared to discuss those today?

11  A.   Yes, I am.

12  Q.   At a high level, what was your conclusions about the

13  MarkMonitor system, including the Audible Magic system used as

14  part of it?

15  A.   Based on the evidence I've reviewed and examined, it's my

16  opinion that that system both accurately detects acts of

17  copying and distribution on the internet on these peer-to-peer

18  systems, and it also provides and produces accurate notices

19  that can be sent to an ISP like Cox to notify them of that

20  activity.

21  Q.   Thank you.

22        Ms. Frederiksen-Cross, were you in the courtroom on

23  Monday for the parties' opening statements?

24  A.   I was, Counsel.

25  Q.   And did you hear Cox's counsel argue that, in very stark

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

B. Frederiksen-Cross - Direct

424

1  terms, that there's no evidence of infringement in this case?

2  A.   I heard that argument.

3  Q.   And what do you think about that?

4  A.   I completely disagree.  I think that the amount of

5  evidence in this case is overwhelming that there were Cox

6  subscribers who were copying and distributing the plaintiffs'

7  music files on the internet.

8  Q.   And we're going to discuss the basis for your opinion in

9  much more detail today, but at a high level, would you please

10  explain why you believe what you just said?

11  A.   It is based first on a foundation of my understanding of

12  these peer-to-peer technologies, how they operate and the way

13  in which they allow the distribution and copying of content,

14  and then upon the specific evidence that I reviewed with

15  respect to the activity of Cox subscribers, and finally on my

16  inspection of the source code as well to understand exactly

17  how that worked and how it was able to do this detection and

18  how the notices were provided.

19  Q.   And finally, I believe you said you did some work with

20  respect to reviewing the Cox CATS system; is that correct?

21  A.   That is correct, Counsel.

22  Q.   And, generally speaking, what is the CATS system?

23  A.   CATS stands for the Cox Abuse Tracking System, and it's a

24  system that's designed to receive e-mails that are abuse

25  complaints and then to take the actions that Cox has

**JA362**

B. Frederiksen-Cross - Direct

433

1   distribution system that's also used on the network.  And I

2   have a few slides about peer-to-peer that might help

3   illustrate that as well.

4   Q.   And what's being illustrated in this slide?

5   A.   One of the principal differences between client server

6   and peer-to-peer is that in a peer-to-peer network, any

7   computer that's in that network can be sending or receiving

8   information from any other computer.  So it -- the boundaries

9   of who's the sender and who's the receiver are, are less

10  clearly defined because each computer is both a sender and a

11  receiver.  That's why they're called peers.  They're equal

12  within the network.

13  Q.   And you've used the phrase "peer-to-peer protocol" and, I

14  believe, "peer-to-peer network."  Is there a difference

15  between the two?

16  A.   The protocol is what enables the exchange -- and that's

17  the proper technical term really -- but these are often

18  referred to as peer-to-peer networks because it's a group of

19  computers who are intercommunicating, and so in that sense, it

20  is a network.  They're networking.

21  Q.   So the network are the groups of computers or peers

22  communicating with each other on that protocol; is that

23  correct?

24  A.   That's correct.

25  Q.   Are you familiar with the term "file share"?

B. Frederiksen-Cross - Direct

434

1    A.    Yes, I am.

2    Q.    And what does that refer to?

3    A.    A file sharing network is a network that uses a protocol

4    in order to facilitate the -- typically the copying and

5    distribution of files.  Sometimes it's used for files that

6    just -- or for networks that just distribute.  But in this

7    context that we're going to talk about here, it's a network

8    that's used to both copy and distribute.

9    Q.    Now, you mentioned that -- you mentioned BitTorrent,

10   Ares, Gnutella, and eDonkey.  Are those file sharing networks?

11   A.    They're file sharing protocols whose users together form

12   the networks.

13   Q.    And, you know, when I think of the term "sharing," I

14   think of maybe loaning someone a book that I just bought from

15   the bookstore.  Is that -- is that how it works in file

16   sharing?

17   A.    No.  With electronic file sharing, a copy is distributed

18   such that -- like, if I have a file and I, I share a copy with

19   you, I'm actually creating a copy of that work and providing

20   you with that copy I've created.  So I still have my copy, and

21   now you have a copy, too.

22   Q.    Now, you mentioned that MarkMonitor monitored four

23   peer-to-peer file sharing networks for the RIAA; is that

24   correct?

25   A.    That is correct, yes.

B. Frederiksen-Cross - Direct

435

1    Q.   With respect to the notices that MarkMonitor sent to Cox,

2    was -- did they relate to each of those four networks equally,

3    or was -- did the notices involve one network at a higher

4    level?

5    A.   The primary network was BitTorrent.  That is to say, it

6    had the largest volume of notices, in the order of 60 to 65

7    percent of the notices were BitTorrent, and then followed by

8    Ares, which had roughly 30 percent of the notices, and then

9    the others were much smaller.

10   Q.   Okay.  Are you prepared today to talk about these four

11   networks, though?

12   A.   I am, yes.

13   Q.   All right.  I'm going to advance the slide, if that's all

14   right.

15   A.   Yes, please.

16   Q.   Okay.  So just to be clear, these are different file

17   sharing systems; is that correct?

18   A.   Yes.  They each have their own peculiarities and

19   protocols, but they operate in essentially the same fashion

20   and for the same purpose.

21   Q.   What do you mean by that?

22   A.   Well, the purpose of each of these protocols is the

23   efficient and robust distribution of copies of files.  I mean,

24   that's what they were designed to do, is to allow people to

25   copy and distribute content using their specific protocol.

B. Frederiksen-Cross - Direct

436

```
1   Q.   And is there a common technique upon which these
2   peer-to-peer file sharing systems each rely?
3   A.   Well, they have several common characteristics.
4   Obviously, they're all designed to operate on the internet, so
5   they all rely on internet connections to be able to carry out
6   the distribution.  They also all rely very heavily on a
7   technique called hashing for file identification and for
8   authentication of content.
9   Q.   Could you elaborate on what hashing is?
10  A.   Yeah.  I think if we go to the next slide, I'd like to
11  introduce an icon here that I'll be using throughout too.
12  This little fingerprint icon is going to be used when I talk
13  about hashing, just to help to remind you about that, but
14  hashing is a technique -- or a hash is a technique that was
15  developed by the U.S. government.  It's based on a specific
16  calculation of the file's contents, and it uniquely identifies
17  what a file's contents are.
18          So if you have a hash that you have gotten from one
19  file and you see that hash again, you know that the file --
20  the second file with that same hash has got the same contents.
21  Q.   And if you could turn your attention back to the image on
22  this, on this slide, it looks like there's a fingerprint with
23  a little icon in the lower right.  What is that depicting?
24  A.   This is the hash that represents a particular file.  So I
25  have combined the fingerprint, because sometimes these are
```

B. Frederiksen-Cross - Direct

444

1    different tastes in music, but would you explain when you said

2    ZZ "Legs," what were you referring --

3    A.   ZZ Top "Legs."

4    Q.   Okay.  And that's a band and a song by them?

5    A.   Yeah.

6    Q.   Okay.  Thank you.

7         And -- okay.  And then what's being depicted here in

8    the third slide -- in the third step in a little more detail,

9    please?

10   A.   Well, as soon as you open that torrent file in your

11   client software, it automatically goes and gets this

12   information, goes out and begins establishing the connection

13   with those peers that will allow you to copy that content to

14   your machine and actually to distribute it to others as well.

15   Q.   Now, there's three steps listed here.  Does this mean if

16   I don't -- every time if I'm someone that wants to go get my

17   music from one of these peer-to-peer sites, that I have to do

18   each of these steps every time?

19   A.   No.  You just install the software once, and you could go

20   out to a site and download a whole bunch of torrents at once

21   if you want to, or you could download a torrent whenever you

22   want to go get some new music.

23   Q.   And generally speaking, I know you said it doesn't cost

24   anything to download the software.  Does it generally speaking

25   cost anything to download torrent files?

B. Frederiksen-Cross - Direct

445

```
1    A.    No.   That's free.
2              MR. BRODY:  Objection, Your Honor.
3              THE COURT:  Overruled.
4    BY MR. ZEBRAK:
5    Q.    I'm sorry.  So -- and does it cost anything to download
6    and distribute files with peers?
7    A.    No.  That's free, too.
8    Q.    And what's happening in that process at a very high
9    level?
10   A.    The peers are creating copies and distributing copies of
11   the particular song that's represented or songs.  It could be
12   a whole album or even a collection of albums that that torrent
13   file represents.
14   Q.    Okay.  And I know there's three steps, and I know you
15   said that you don't have to download the software each time,
16   but once you have the software on your, on your computer, is
17   it a complicated process to download the torrent files?
18   A.    No, not at all.  It's -- you go to Google and run a
19   search, or you go to one of these sites like Pirate Bay and
20   run a search, and then you download the torrent.  It's a
21   couple of clicks.
22   Q.    And -- okay.  Thank you.
23              Now, you mentioned and provided a little bit of an
24   overview of these torrent files.  Are you prepared to explain
25   those in a little bit more detail?
```

**JA368**

1    A.    Sure.

2    Q.    I believe you have a -- there we go.

3    A.    Thank you.

4    Q.    And so what -- could you explain what this slide is

5    depicting?

6    A.    Yeah.  One of the really important things to understand

7    about a torrent file is it does not contain the music or the

8    software or the movie, whatever it is you're downloading.

9    Rather, it's just information that helps you locate it.  And

10   that's part of what makes it so hard to take any effective

11   action against a torrent-providing site, because there's

12   really nothing illegal they have in their file.

13   Q.    Well, let's explore that in a little more detail.  So --

14          MR. BRODY:  Your Honor, may I approach?

15          THE COURT:  Yes, sir.

16          MR. BRODY:  I have an objection.

17          NOTE:  A sidebar discussion is had between the Court

18   and counsel out of the hearing of the jury as follows:

19   AT SIDEBAR

20          THE COURT:  Yes, sir.

21          MR. BRODY:  I object to him asking her for an

22   opinion about legal strategy and how to pursue these people.

23          MR. OPPENHEIM:  I didn't hear it.

24          THE COURT:  The comment on BitTorrent, that it's

25   hard to detect.  There's nothing on BitTorrent that is being

B. Frederiksen-Cross - Direct

447

1   stored, so -- is that what you're talking about?

2          MR. BRODY:  Maybe I misheard the question.  I

3   thought the question was:  Is that a reason why it's hard to

4   pursue these people?

5          MR. ZEBRAK:  No, sir, that's not what I asked.

6          THE COURT:  He didn't ask it.  She offered it on her

7   own there.  It was a little bit off the target of the

8   question, but she sua sponte, as they say, did that.

9          All right.  Let's move along.  The jury, we've got a

10  good jury.  They understand things.

11         MR. ZEBRAK:  You think they understand that?

12         THE COURT:  You know, and you keep saying "at a high

13  level," and we're going to get to the real specifics, but

14  you're actually getting to the specifics.

15         MR. ZEBRAK:  Okay.  Yes, sir.  And I don't mean to

16  make it sound like there's a large thing to follow.  I think

17  we're moving along at a fast clip, sir.

18         THE COURT:  Okay.  Thank you.  So, I mean, are you

19  moving to strike it?  I don't think it was --

20         MR. BRODY:  I don't think it needs to be -- if I

21  misheard, I misheard.  I thought he was asking her to draw --

22  to opine about why it would be difficult to sue people.

23         THE COURT:  Yeah.  No.

24         MR. BRODY:  Okay.  Then if we're not going there,

25  we're not going there.

B. Frederiksen-Cross - Direct

448

1          THE COURT:  Good.  Thank you, sir.

2          MR. BRODY:  Thank you.

3          NOTE:  The sidebar discussion is concluded;

4   whereupon, the case continues before the jury as follows:

5   BEFORE THE JURY

6   BY MR. ZEBRAK:

7   Q.   Thank you.

8          So you're explaining what a torrent file is, and I

9   believe you said it's not the content but it's -- and then you

10  were in the middle of explaining.

11  A.   Right.  It contains a couple of key pieces of information

12  that help the software that's running on your computer locate

13  the music files you're looking for.  So one of them is the

14  location of a computer called a tracker, and the other is

15  information about the music files you're seeking.  So that

16  includes the hash of the music file -- or the hash of this

17  particular collection of music files, it's not the hash for an

18  individual file, and other information that's used so that

19  when you collect that file, it can be verified to be an

20  accurate copy.

21  Q.   Does the person who's downloaded the software on their

22  computer need to understand how these torrent files work?

23  A.   Not at all.  All they need to know how to do is to

24  download a torrent file and to open it in their client.

25  Q.   And then just at a very high level, what's the function

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

B. Frederiksen-Cross - Direct

449

1   of a tracker?

2   A.   A tracker provides to the computer that's seeking music

3   or seeking this file a list of those other peers who are

4   sharing that particular file at that particular point in time.

5   It's not all the peers that are sharing it, but you get a nice

6   set of them.

7   Q.   Sure.  And then so what happens next in the process?

8   A.   If we can go to the next slide.

9           So on my computer, I've downloaded a torrent file,

10  and I've drug it into my torrent window or opened it from the

11  torrent software, and what will happen at that point without

12  any other activity on my part if I'm using the normal settings

13  is my computer will reach out to the tracker and get a list of

14  peers that I show over here on the left-hand side of the --

15  or, I'm sorry, on the right-hand side of the screen, and it

16  will begin requesting the music I want from those peers so

17  that it can assemble that file, and it can get a piece from

18  each peer or it can download the file in multiple pieces from

19  multiple peers at the same time, which makes the process

20  really fast, and it also makes it really robust because if one

21  of those peers goes away, well, there's somebody else I can

22  ask for the piece.  So it's a really efficient way to transfer

23  and copy data.

24  Q.   Sure.  You've used the phrase "piece."  What do you mean

25  by that?

B. Frederiksen-Cross - Direct

450

1   A.   Well, the sound file or files that I'm looking for will

2   be broken up into pieces, and one of the pieces of information

3   that the torrent has is what the size of that piece is.

4   Q.   And --

5   A.   And each of these peers that's using the same torrent to

6   exchange that same file will have the same size pieces, and it

7   will have whatever part of that song they currently have in

8   those pieces, and the torrent file helps you put them back

9   together.

10  Q.   Okay.  And so what's being depicted on the left side of

11  this slide?

12  A.   That's the computer that's just about to open a torrent.

13  Q.   Okay.  And in this example, the box around it, does that

14  illustrate how they're connected to the internet?

15  A.   Right.  In this case, Cox is providing that connection to

16  the internet.

17  Q.   Okay.  And what -- what's depicted in the -- so there's

18  different percentages on the computers on the right side of

19  the screen.  What is that?

20  A.   Well, at any point in time, as soon as you have a piece

21  that's been verified, your computer can be distributing that

22  piece to others.  It doesn't wait with BitTorrent until it has

23  the entire file.

24          So in this group of peers, some may have 100

25  percent, some may be just like you starting out with

B. Frederiksen-Cross - Direct

451

1   0 percent, and others might have some other number of pieces.

2   Q.   Okay.  So in this example, does the empty -- the user

3   connected through Cox, is the idea that that user doesn't have

4   anything at that point?

5   A.   That's right.

6   Q.   Okay.  Okay.  And then so what happens when the user has

7   the software on their computer and opens up a torrent file?

8   A.   The computer -- the user's computer will go out and do

9   what's called a handshake with each of these peers on this

10  forum so that, you know, do you have this file?

11          Yeah, I have this file.

12          And then they will begin exchanging pieces of the

13  file.

14          So if you could click here and watch the -- watch

15  what happens in the box on the computer.  You see that as it

16  collects those pieces, it very quickly is able to collect and

17  assemble all of the pieces, and at the same time, the peers on

18  the other side are also exchanging pieces with each other so

19  that they can all build complete copies of that file as well.

20  Q.   And then what happens?

21  A.   Well, once the, the, all of the pieces are collected, the

22  torrent file allows them to be reassembled in the proper

23  sequence so that the music can be played by the user.

24  Q.   And does the user have to do anything to put those pieces

25  together?

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

B. Frederiksen-Cross - Direct

452

1    A.   No, no.  That all happens automatically, just like the

2    distribution.  You know, as soon as a user computer gets a

3    piece, it can be sharing that piece with others, and as soon

4    as it gets all the pieces, a little icon pops up that that

5    song is fully assembled, and you can play it now.

6    Q.   And I see a reference on the slide to a peer swarm.  What

7    does that refer to?

8    A.   Well, this -- there's only so much room on a slide.  You

9    know, I showed four peers here.  A typical swarm is larger

10   than that, and the actual number of computers that might be

11   trading in a particular piece of music at a particular time

12   can be in the tens of thousands.

13   Q.   I see.  And you -- this slide depicts -- now it depicts

14   more computers.

15   A.   A few more joined the swarm.

16   Q.   And do you have an understanding about the number of

17   users that are on the BitTorrent network?

18   A.   The most recent reputable study I found was by IEEE, and

19   it's a few years old.  It indicates that at any one point in

20   time, there'll be between maybe 15 and 27 million peers

21   exchanging content on the internet, and it's -- that's at any

22   one point in time.

23   Q.   Is there an official place one can go to see exact

24   measurements of how many users there are on the BitTorrent

25   network?

B. Frederiksen-Cross - Direct

453

1    A.    No, there is not.

2    Q.    And why is that?

3    A.    Well, the communication for any of these computers -- any

4    of the peers is between the peers, and some of these

5    peer-to-peer systems use a tracker, so if you were to put a

6    test tracker up with the right monitoring stuff, you could see

7    the transactions maybe that were going to that tracker, but

8    you still couldn't see everything else that was going on in

9    the network.

10   Q.    So, so there's nowhere you can go to see the number of

11   users on the network overall; is that correct?

12   A.    That's correct.  By design, these systems are extremely

13   robust and these machines talk directly to each other without

14   central control.

15   Q.    What about if I went to the Cox user that downloaded and

16   is then distributing files to others?  Could I uncover the

17   number of times that Cox user distributed files from a review?

18   A.    Not in any practical way, no.

19   Q.    What do you mean by that?

20   A.    Well, if you just went to a user's computer and inspected

21   it forensically, you might have some evidence of their

22   activity, but you would not have evidence of all of their

23   activity.

24   Q.    Let me ask you --

25   A.    And you would, you would have to actually do a forensic

B. Frederiksen-Cross - Direct

454

1    examination of that machine to get any information.

2    Q.    Let me ask it to you this way:  Are logs kept with --

3    from the software otherwise of the number of times that user

4    distributes a file?

5    A.    No.

6    Q.    Okay.  Can you explain a little bit about the other three

7    peer-to-peer networks that were identified in MarkMonitor's

8    infringement notices to Cox?

9    A.    Sure.  Can we go on to the next slide?

10   Q.    Okay.  And so these are the other three?  Is that the

11   Ares logo?

12   A.    Yes, Ares, Gnutella, and eDonkey.

13   Q.    Okay.  And I see again the, the file hash value image

14   we're using.  Why is that there?

15   A.    Again, all of these systems rely on hash to authenticate

16   and identify files.  That's a really important technology.

17   That's one of the foundation technologies of these systems.

18   Q.    And there's a bunch of icons under file types.  What is

19   that meant to convey?

20   A.    Again, these networks can be used to distribute any kind

21   of file.  Anything that's in an electronic form can be

22   transmitted on BitTorrent, so electronic books, movies, music,

23   if I want to send a video of my dog chasing her tail, any of

24   that can be distributed on the -- using BitTorrent across the

25   internet to others.

B. Frederiksen-Cross - Direct

455

1    Q.   Sure.  And why is there the internet cloud on this, this

2    slide?

3    A.   They all rely on the internet for connection to each

4    other, for the peers to be able to connect to each other and

5    to be able to search for music, to download music, and to

6    distribute copies of music.

7    Q.   What, what happens if, if the peer that's downloading and

8    distributing the music file is disconnected from the internet?

9    Can they still engage in that, that activity at that moment?

10   A.   No.  When a peer is disconnected from the internet, it

11   can neither send nor receive files from any other computer on

12   the -- across the internet.

13   Q.   And did you when you were listening to Cox's counsel's

14   opening statement see a box saying Cox has no control over the

15   infringement?

16   A.   I remember seeing that, yes.

17   Q.   And, and what's your reaction to that?

18   A.   I disagree, and I disagree for two reasons.  One is that

19   Cox is the only party who can take an internet -- an IP

20   address and determine what customer was using that internet

21   address at that point in time, so they're the only ones who

22   can actually forward that notice to an actual customer who

23   might be able to affect the behavior.

24             MR. BRODY:  Your Honor, I have an objection.

25             THE COURT:  What's your objection?

538

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  3  (P.M. Portion)

TRIAL TRANSCRIPT

December 4, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

FOR THE PLAINTIFFS:        MATTHEW J. OPPENHEIM, ESQ.
SCOTT A. ZEBRAK, ESQ.
JEFFREY M. GOULD, ESQ.
MICHAEL J. DRUCKMAN, ESQ.
ANDREW L. GUERRA, ESQ.
LUCY G. NOYOLA, ESQ.
JIA RYU, ESQ.
Oppenheim + Zebrak, LLP
4530 Wisconsin Avenue, N.W.
5th Floor
Washington, D.C. 20015


FOR THE DEFENDANTS:        THOMAS M. BUCHANAN, ESQ.
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
  and
SEAN R. ANDERSON, ESQ.
MICHAEL S. ELKIN, ESQ.
THOMAS P. LANE, ESQ.
CESIE C. ALVAREZ, ESQ.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
  and
JENNIFER A. GOLINVEAUX, ESQ.
THOMAS J. KEARNEY, ESQ.
Winston & Strawn LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
  and
MICHAEL L. BRODY, ESQ.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
  and
DIANA HUGHES LEIDEN, ESQ.
Winston & Strawn LLP
333 South Grand Avenue
Suite 3800
Los Angeles, CA 90071

540

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| BARBARA FREDERIKSEN-CROSS | | |
| | CROSS | 556 |
| | REDIRECT | 587 |
| SAMUEL BAHUN | | |
| | DIRECT | 605 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

S. Bahun - Direct

609

```
 1  Q.    Is it more than just football?

 2  A.    Yes.

 3  Q.    Does MarkMonitor also do work in the film and television

 4  space?

 5  A.    Yes.

 6  Q.    And what kind of work does MarkMonitor do there?

 7  A.    Again, kind of a variety.  For film and TV content, we

 8  provide services related to peer-to-peer piracy, Web piracy,

 9  piracy that's made available on search engines.  There are a
```
16:10:05 10  number of areas.  Really virtually any area that we see piracy
```
11  occurring, we provide services to identify that and take

12  action.

13  Q.    Are there other content industries that MarkMonitor does

14  work for in the antipiracy space beyond movies and television?

15  A.    Yeah, yes.  So I think virtually all the media types.  We

16  work with film, TV, music, publishing, video games, software,

17  all the different categories you would assign to that content,

18  yeah.

19  Q.    And what types of antipiracy services does MarkMonitor
```
16:10:45 20  offer with respect to peer-to-peer networks?
```
21  A.    The main focus is in monitoring the infringing activity

22  that is taking place.  So identifying the infringement that is

23  occurring, collect evidence, and send notices to the ISPs to

24  inform them of it.

25  Q.    And how many ISPs does MarkMonitor send notices to?
```

S. Bahun - Direct

610

1    A.    Globally, it's in the thousands.  In the U.S., hundreds.

2    Q.    So you have mentioned a lot of large companies and

3    industries that retain MarkMonitor.  Based on your experience

4    in talking to them, do you have a sense of why MarkMonitor is

5    retained by all these companies?

6    A.    Yeah.  I mean, our reputation, our history and our

7    reputation that we maintain in this area is impeccable.  I

8    mean, we have become in many ways kind of the leaders in this

9    space.  And the services that we provide are critical for

16:11:58 10    content owners to identify and understand the level of

11    infringement that is taking place and, you know, do something

12    about it.  So ...

13    Q.    In the course of your antipiracy work, do you have any

14    background in working with law enforcement?

15    A.    Yes.  So, yeah, in addition to all the stuff we have

16    already talked about, I have assisted the Department of Justice

17    in conducting training with their agents, as well as FBI and

18    Homeland Security.

19          I have also worked in kind of a consultative role

16:12:38 20    with the Royal Canadian Mounted Police in their efforts to

21    identify and address things like human trafficking, child

22    exploitation, that kind of thing.

23          As well as I have done kind of ongoing -- I

24    occasionally do work with local and state law enforcement and

25    teams of prosecuting attorneys.

S. Bahun - Direct

1  Q.   And when you're doing work with law enforcement like this,

2  is this just sales work, or is it something different?

3  A.   No, actually, none of that would be considered sales.  It

4  is more related to training and consulting those groups to help

5  them understand, you know, the technology that is involved and

6  the crimes that they're working with and, you know, helping

7  them understand how to -- how to monitor it and how to interact

8  with those issues, yeah.

9  Q.   Do you also work with state law enforcement from time to

16:13:35 10  time?

11 A.   Yes.

12 Q.   When did you start working on peer-to-peer networks?

13 A.   So I started -- back at the beginning of my career, I

14 actually started my career in antipiracy on a team that was

15 hired to work with the music industry related to Napster.  So

16 at the very beginning of peer-to-peer.

17 Q.   And what role did your team play in the Napster case?

18 A.   So we were hired at that time to collect data on the

19 infringing activity taking place and provide evidence that

16:14:14 20  supported the various enforcement efforts that were going on at

21 that time.

22 Q.   Over the course of the last -- over the course of the time

23 that you have been working on peer-to-peer activities, roughly

24 how much of your time is dedicated to peer-to-peer versus other

25 types of piracy?

S. Bahun - Direct

612

1    A.   Probably -- I mean, it has been continuous throughout the

2    16-and-a-half years.  But I would -- I would estimate about

3    half of my time.  I mean, it's a big portion of what I do,

4    yeah.

5    Q.   At a high level, over the course of your time working with

6    peer-to-peer, can you describe for me, consumer perspective,

7    what a peer-to-peer network is for?

8    A.   Yes.  So, I mean, at a high level, peer-to-peer networks

9    predominantly are used to gain access to pirated content.

16:15:19 10  Q.   Can peer-to-peer -- based on your understanding, can

11   peer-to-peer be used for other purposes?

12   A.   Sure, yes.

13   Q.   And what experience do you have in seeing peer-to-peer

14   used for non-piracy purposes?

15   A.   I mean, there are -- there are some examples where

16   software companies and others have been able to leverage the

17   technology as a means to distribute content, you know, across

18   different groups of people.

19        Most of the time, I think, the legitimate -- or, you

16:15:58 20  know, the legitimate uses of it, it's often integrated in the

21   background of a piece of software.  So the people don't even

22   know that it is leveraging that.

23        But that is, you know, one example that I can think

24   of where peer-to-peer software can be used in a legitimate

25   manner.

S. Bahun - Direct

613

1   Q.   And are you aware of the four peer-to-peer networks at

2   issue in this case?

3   A.   Yes.

4   Q.   And what are they?

5   A.   BitTorrent, eDonkey, Gnutella, and Ares.

6   Q.   And in your experience, to what extent of the content on

7   those networks is infringing or is piratical?

8           COURT REPORTER:  I am sorry, counsel?

9           MR. BRODY:  Objection.

16:16:38 10         MR. OPPENHEIM:  I said piratical, but I'll go with

11   piracy.  Maybe that's a little easier.

12          THE COURT:  All right.  Overruled.

13          THE WITNESS:  I'm sorry.  Can you repeat the

14   question?

15   BY MR. OPPENHEIM: (Continuing)

16   Q.   In your experience on those four networks --

17   A.   Yeah.

18   Q.   -- to what extent is the content piracy?

19   A.   It'd be difficult for me to quantify it.  But the

16:16:58 20   overwhelming majority of the content we see on those networks

21   is pirated content.

22   Q.   In the course of your work, do you monitor what's

23   happening on peer-to-peer networks?

24   A.   Yes.

25   Q.   And how do you do that?

S. Bahun - Direct

614

1   A.   So we've developed proprietary technology at MarkMonitor

2   that interacts with the peer-to-peer networks in very similar

3   ways to a typical user.  But our technology allows us to do it

4   at a much larger scale.

5        And so, we use the scanning technology that we've

6   developed to monitor that activity.

7   Q.   And do you ever monitor it just to get a sense of the

8   total measure of what's happening on the networks?

9   A.   Yes.

16:17:53 10   Q.   And how often do you do that?

11   A.   So we have kind of an ongoing monitoring project that we

12   run independent of any of our customers.  It focuses -- it's --

13   there's so much content on those networks, it's difficult to

14   cover everything.  So we developed a methodology that

15   identifies kind of a -- in a consistent manner, a sample set of

16   the most popular film, TV, and music content.  And we monitor

17   on an ongoing basis for that content.

18   Q.   And what do -- does that monitoring generate reports or

19   information in some way?

16:18:35 20   A.   Yeah.  So the data that we -- the data we collect from

21   that gives us kind of an accurate view, at least in a

22   consistent way from a statistical standpoint, on how much

23   pirated activity we see taking place on those popular titles.

24        And so, we use it in a number of ways.  Some

25   customers purchase that data for their own types of analysis.

S. Bahun - Direct

666

1              NOTE:  A music excerpt is played.

2    BY MR. OPPENHEIM: (Continuing)

3    Q.   Mr. Bahun, do you recognize that recording?

4    A.   Yes, I do.

5    Q.   You recognize that recording?

6    A.   Yes.

7    Q.   Now, was that Taylor Swift or Lady Gaga?

8    A.   That was -- that was Lady Gaga.

9    Q.   Let's turn to PX 12, please.  I am sorry.

10             Did you -- just the first page of it.

11             So we have a stipulation on the first page of PX 12.

12             THE COURT:  All right.

13             MR. OPPENHEIM:  So if you could publish just the

14   first page, please, Mr. Duval.

15   BY MR. OPPENHEIM:  (Continuing)

16   Q.   Do you recognize this document, Mr. Bahun?

17   A.   Yes.

18   Q.   Can you describe what it is?

19   A.   This is a summary of the notices that we sent to Cox

17:39:51 20   between 2012 and 2015.

21   Q.   And did you assist in the preparation of this summary?

22   A.   Yes.

23   Q.   And can you describe the difference between the column

24   that says Full Data Set and the column that says February 1,

25   2013, to November 26, 2014?

S. Bahun - Direct

667

1   A.   Sure.  So the full data set is -- we provided data from

2   January 1 of 2012 through March 31 of 2015.

3          So the first column -- or the full data set column

4   there represents a summary of the numbers involved with those

5   notices.

6          And then the other one is kind of a subset, it's

7   trimmed down.  And basically within the time frame specified,

8   those are the corresponding numbers.

9   Q.   And you said the time frame specified.  Do you understand

17:40:47 10   that that's the claim period of this case?

11   A.   Yes.

12   Q.   Okay.  And can you just describe the notices sent in the

13   full data set.

14   A.   Yes.  So during -- or in the full data set, we had 284,444

15   notices sent.

16   Q.   To whom?

17   A.   To Cox.

18   Q.   And what kind of notices?

19   A.   Infringement notices.

17:41:09 20   Q.   And then within the claim period, how much infringement

21   notices were sent to Cox?

22   A.   163,148.

23   Q.   And all of them came from the antipiracy2@riaa e-mail

24   address?

25   A.   Yes.

668

1    Q.    And where did all of them go to?

2    A.    They were all sent to abuse@cox.net.

3          MR. OPPENHEIM:   No further questions.  We will pass

4    the witness.

5          THE COURT:   All right.  I think that we will end the

6    testimony for tonight now and go to cross-examination tomorrow

7    morning.

8          So thank you all for your patience.  It was a long

9    day.

17:41:51 10          On Monday afternoon, when I initially instructed you,

11   I talked about infringement and using the word "infringement"

12   and "infringement notices."  And you have seen the words.  And

13   we have talked about it a lot during the course of the trial.

14          I just wanted to remind you that the ultimate

15   decision on whether Cox is liable for infringement is yours.

16   It's an issue of -- ultimately an issue of fact.  And what you

17   have been hearing is evidence in support of that or non-support

18   of that.

19          So I just want you to keep that in mind.  I know it

17:42:28 20   was just a day-and-a-half ago, but I am sure it seems like

21   quite a bit longer than that.

22          So have a good evening.  Again, no research, no

23   investigation, please don't speak to anybody about the case.

24   Thank you.

25          We will see you tomorrow at 9 o'clock.

807

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
          Plaintiffs,          :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
          Defendants.          :
                               :
-------------------------------:
```

VOLUME  4  (P.M. Portion)

TRIAL TRANSCRIPT

December 5, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
 3                                JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
 4                                ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
 5                                JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
 6                                4530 Wisconsin Avenue, N.W.
                                  5th Floor
 7                                Washington, D.C. 20015


 8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA 90071
23

24

25
```

809

1

2                                    INDEX

3

WITNESS                              EXAMINATION        PAGE

4

5    GEORGE P. McCABE

                                     DIRECT             810
6                                    CROSS              816
                                     REDIRECT           865
7

     LINDA TRICKEY

8                                    DIRECT             877

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

880

1    Q.   Do you see that document?

2    A.   Yes.

3    Q.   And that's a document that you can tell from the top came

4    from Cox.com, correct?

5    A.   It appears to, yes.

6            MR. OPPENHEIM:  Your Honor, we'd like to move Exhibit

7    PX 452 into -- excuse me -- 451 into evidence.

8            THE COURT:  Any objection?

9            MR. ELKIN:  No objection, Your Honor.

04:06:15  10            THE COURT:  All right.  It's received.

11            MR. OPPENHEIM:  If we could maybe just zero in on the

12   top.

13   MR. OPPENHEIM:

14   Q.   So this is a document at the very top, it says, "News

15   Room/About Us."  Do you see that?

16   A.   Yes.

17   Q.   And it's a fact sheet, right, of some sort about Cox

18   Communications?

19   A.   Yeah.  It looks like something put out by our public

04:06:45  20   affairs department.

21   Q.   Okay.  And at the top, it says:  Cox Communications is a

22   broadband communications and entertainment company.  Correct?

23   A.   Yes.

24   Q.   And it says that it provides advanced digital video,

25   internet, telephone, home security, and automation services,

L. Trickey - Direct

881

1    correct?

2    A.    Yes.

3    Q.    And then it goes on to say that Cox is the largest private

4    telecom company in the U.S., right?

5    A.    Yes.

6    Q.    And it says that Cox serves more than 6 million residences

7    and businesses, right?

8    A.    Yes, that's what it says.

9    Q.    And if we skip down to the company stats, about halfway

04:07:29  10    down, could you just read the first two bullets, please?

11    A.    Cox has approximately 6 million total residential and

12    commercial customers.  Total revenues of 11 billion in 2016.

13          Do you want me to read on?

14    Q.    And then let's skip down to the fourth bullet point, if

15    you would.

16    A.    Cox has approximately 20,000 employees nationwide.

17    Q.    All right.  And the next bullet point, if you could?  I'm

18    sorry.

19    A.    I'm sorry.

04:08:00  20    Q.    Do you need some water up there?

21    A.    No, no.  I've just got the remnants of a cold still, so --

22    Q.    My apologies.

23    A.    Thank you.

24    Q.    Could -- I'm sorry, could you read the bullet point that

25    starts with the word "Approximately"?

L. Trickey - Direct

882

1    A.   Approximately two-thirds of our customers are in a bundle,

2    approximately one-third of customers are triple play.

3    Q.   And the term "bundle" refers to Cox customers who use two

4    or three different Cox services between television, telephone,

5    and internet, correct?

6    A.   Yes.

7    Q.   And if we could skip down to the second-to-the-last bullet

8    point, if you would?

9    A.   Cox Communications is 55 years old and remains a wholly

04:08:48  10  owned subsidiary of Cox Enterprises, a privately held

11   family-owned corporation with 20 billion in annual revenues for

12   2016.

13   Q.   So that -- do you understand that to mean that the

14   corporate entity Cox Communications is owned entirely by Cox

15   Enterprises?

16   A.   Well, it says wholly owned subsidiary.

17   Q.   So that's how you would understand it?

18   A.   Yes, I believe so.

19   Q.   And that Cox Enterprises is then privately held by a

04:09:18  20  family-owned corporation, is that correct?

21   A.   Yes.

22   Q.   And that Cox Enterprises has annual revenues in 2016 of

23   $20 billion, is that correct?

24   A.   That's what it says.

25        MR. OPPENHEIM:  You can take that down, please,

L. Trickey - Direct

885

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:13:08 | 10 |
| | 11 |

1   they're struggling with it.  Were you able to get to it?

2          MR. ELKIN:  No objection.

3          MR. OPPENHEIM:  We'd move it into evidence, Your

4   Honor.

5          THE COURT:  175 is received.

6   BY MR. OPPENHEIM:

7   Q.   Do you recognize this document, Ms. Trickey?

8   A.   Yes.

9   Q.   What is it?

04:13:08  10   A.   This is the Cox High Speed Internet Acceptable Use Policy,

11   dated November 18, 2011.

12   Q.   And at the beginning of this document, it says:  CoxCom,

13   LLC, and its affiliates and/or distribution partners

14   (collectively "Cox") are pleased that you have chosen Cox High

15   Speed Internet service.

16          Do you see that?

17   A.   Yes.

18   Q.   And would the -- would the CoxCom -- excuse me.

19          Would the CoxCom, LLC, and its affiliates include Cox

04:14:03  20   Communications, Inc.?

21   A.   You know, I'm not positive of the organizational

22   structure, but I believe CoxCom, LLC, is a subsidiary of Cox

23   Communications, Inc., I think.

24   Q.   So Cox Communications would be affiliated as a subsidiary,

25   correct?

L. Trickey - Direct

886

```
     1   A.    Yes, I believe so.

     2   Q.    And this AUP is the agreement that all high speed internet

     3   subscribers to Cox must agree to, correct?

     4   A.    It's one of them.

     5   Q.    One of the agreements they must agree to.

     6   A.    Right.

     7   Q.    Okay.  And in fact, if a subscriber is unwilling to agree

     8   to this, they're not allowed to use the service; is that right?

     9   A.    Yes.  I mean, they, they have to agree to it if they want
```
04:14:54 10   to use the service.
```
    11   Q.    So can we skip down to halfway through the first

    12   paragraph, there's a sentence that begins with the word "All,"

    13   and it may be easier to see on the screen.

    14   A.    Oh, okay.

    15   Q.    If that's easier for you.  It's your choice.

    16   A.    Yes, I see that.

    17   Q.    Could you read that sentence and the next sentence,

    18   please?

    19   A.    All users of the Service must abide by this AUP.
```
04:15:19 20   Violation of any term of this AUP may result in the immediate
```
    21   suspension or termination of either your access to the Service

    22   and/or your Cox account.

    23   Q.    And so by that, you understand it's a condition of use of

    24   the service, correct?

    25   A.    To abide by the AUP.
```

L. Trickey - Direct

887

1   Q.   Yes.

2   A.   Yes.

3   Q.   And can you go to the first sentence of the next

4   paragraph, please?  And could you read that?

5   A.   By using the Service, you agree to abide by, and require

6   others using the Service via your account to abide by the terms

7   of this AUP.

8   Q.   So this means that not only does the subscriber have to

9   agree to the AUP, but others using the service also have to

04:16:04   10   agree to it, correct?

11   A.   Yes.  They don't actually -- I mean, a family member

12   doesn't necessarily agree to the terms, but they are supposed

13   to abide by the terms.

14   Q.   Correct.  And then could you read the sentence in all caps

15   in that paragraph, please?

16   A.   Beginning with "If"?

17   Q.   Yes, please.

18   A.   If you do not agree to be bound by these terms, you should

19   immediately stop the use of the services and notify the Cox

04:16:35   20   Customer Service Department so that your account may be closed.

21   Q.   And by this, it means exactly what it says, that if a

22   subscriber is unwilling to agree to these, they should have

23   their account closed, correct?

24   A.   Yeah, or stop use of the service.

25   Q.   And then in the next paragraph, it lists prohibited

888

1    activities, correct?

2    A.    Yes.

3    Q.    And could you read the, the first sentence of prohibited

4    activities, please?

5    A.    You may not use the Service in a manner that violates any

6    applicable local, state, federal, or international law, order

7    or regulation.

8    Q.    All right.  And let's turn to the page to No. 2, please.

9    And could you read the first sentence of No. 2, including the

04:17:26  10   title?

11   A.    No. 2, Intellectual Property Infringement.  You may not

12   use the Service to post, copy, transmit, or disseminate any

13   content that infringes the patents, copyrights, trade secrets,

14   trademark, moral rights, or propri- -- I think that's a typo --

15   proprietary rights of any party.  Cox assumes no

16   responsibility, and you assume all risk regarding the

17   determination of whether material is in the public domain, or

18   may otherwise be used by you for such purposes.

19   Q.    You would agree that paragraph 1 that we read on the first

04:18:04  20   page would prohibit using the service for copyright

21   infringement, correct, because that would be a violation of

22   federal law?

23   A.    Yeah.  I mean, reading it with Section 2 as well.

24   Q.    And Section 2 essentially repeats that by saying you can't

25   commit copyright on the service, correct?

L. Trickey - Direct

889

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | A.   It's more specific.                                      |
|       | 2  | Q.   Right.  Two different ways customers are told you cannot |
|       | 3  | commit copyright infringement on the network, correct?       |
|       | 4  | A.   Yes.                                                     |
|       | 5  | Q.   And neither of these provisions have any exceptions to   |
|       | 6  | them, correct?                                                |
|       | 7  | A.   No.                                                      |
|       | 8  | Q.   Nothing in this agreement says it's okay to commit a     |
|       | 9  | little bit of copyright infringement, right?                  |
| 04:18:45 | 10 | A.   No.                                                   |
|       | 11 | Q.   It says not allowed to commit any copyright infringement, |
|       | 12 | correct?                                                      |
|       | 13 | A.   I mean, the document says what it says.                  |
|       | 14 | Q.   Right.  So --                                            |
|       | 15 | A.   Yeah.                                                    |
|       | 16 | Q.   -- absolutely no copyright infringement, right?          |
|       | 17 |       Now, this document that we looked at was dated          |
|       | 18 | November 18, 2011, correct?                                   |
|       | 19 | A.   Yes.                                                     |
| 04:19:13 | 20 | Q.   Could we please --                                    |
|       | 21 | A.   Yes, yes.                                                |
|       | 22 | Q.   I'm sorry, I didn't mean to interrupt you.               |
|       | 23 |       Can you please turn to PX 184?  Do you have that        |
|       | 24 | there, Ms. Trickey?                                           |
|       | 25 | A.   Yes, I'm there.                                          |

L. Trickey - Direct

890

| | | |
|---|---|---|
| | 1 | Q.   Now, do you recognize this document? |
| | 2 | A.   Yes. |
| | 3 | Q.   Is this an updated version of the Acceptable Use Policy? |
| | 4 | A.   Yes.  This is the Acceptable Use Policy dated November 20, |
| | 5 | 2013. |
| | 6 | MR. OPPENHEIM:  Your Honor, we would offer -- |
| | 7 | MR. ELKIN:  No objection, Your Honor. |
| | 8 | THE COURT:  All right.  It's received. |
| | 9 | BY MR. OPPENHEIM: |
| 04:20:04 | 10 | Q.   And, Ms. Trickey, are you familiar with this Acceptable |
| | 11 | Use Policy? |
| | 12 | A.   Yes. |
| | 13 | Q.   And would you agree that all of the provisions that we |
| | 14 | just looked at in the 2011 policy remain in this 2013 policy? |
| | 15 | A.   Yes. |
| | 16 | Q.   And under this policy in 2013, it still prohibited all |
| | 17 | infringement, correct? |
| | 18 | A.   Yes. |
| | 19 | Q.   It didn't allow a little bit.  It prohibited it all |
| 04:20:35 | 20 | together, correct? |
| | 21 | A.   Yeah. |
| | 22 | Q.   If we could please look at PX 183.  Do you have that in |
| | 23 | front of you, Ms. Trickey? |
| | 24 | A.   Yes. |
| | 25 | Q.   And what is the title of that document? |

924

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  5  (A.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:           MATTHEW J. OPPENHEIM, ESQ.
                          SCOTT A. ZEBRAK, ESQ.
                          JEFFREY M. GOULD, ESQ.
                          MICHAEL J. DRUCKMAN, ESQ.
                          ANDREW L. GUERRA, ESQ.
                          LUCY G. NOYOLA, ESQ.
                          JIA RYU, ESQ.
                          Oppenheim + Zebrak, LLP
                          4530 Wisconsin Avenue, N.W.
                          5th Floor
                          Washington, D.C. 20015


FOR THE DEFENDANTS:           THOMAS M. BUCHANAN, ESQ.
                          Winston & Strawn LLP
                          1700 K Street, N.W.
                          Washington, D.C. 20006-3817
                            and
                          SEAN R. ANDERSON, ESQ.
                          MICHAEL S. ELKIN, ESQ.
                          THOMAS P. LANE, ESQ.
                          CESIE C. ALVAREZ, ESQ.
                          Winston & Strawn LLP
                          200 Park Avenue
                          New York, NY 10166-4193
                            and
                          JENNIFER A. GOLINVEAUX, ESQ.
                          THOMAS J. KEARNEY, ESQ.
                          Winston & Strawn LLP
                          101 California Street, 35th Floor
                          San Francisco, CA 94111-5840
                            and
                          MICHAEL L. BRODY, ESQ.
                          Winston & Strawn LLP
                          35 West Wacker Drive
                          Chicago, IL 60601
                            and
                          DIANA HUGHES LEIDEN, ESQ.
                          Winston & Strawn LLP
                          333 South Grand Avenue
                          Suite 3800
                          Los Angeles, CA 90071

926

INDEX

OPENING STATEMENTS BY:

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| LINDA TRICKEY | | |
| | DIRECT | 930 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

L. Trickey - Direct

930

1    apologize for bringing you in and having you sit.  But I think

2    it's -- I'm beginning to think it's a genetic problem.

3            All right.  We have Ms. Trickey back on the stand to

4    continue her testimony.

5            And, Mr. Oppenheim, please proceed.

6            MR. OPPENHEIM:  Good morning.  Thank you, Your Honor.

7            LINDA TRICKEY, called by counsel for the plaintiffs,

8    having been previously duly sworn, continues to testify and

9    state as follows:

11:16:30 10      DIRECT EXAMINATION

11   BY MR. OPPENHEIM:

12   Q.   Good morning, Ms. Trickey.

13   A.   Good morning.

14   Q.   Feeling a little better?

15   A.   Still dripping.  Sorry.

16   Q.   Sorry.  If you need a break, let me know.

17           May I ask whether you spoke to your counsel about the

18   case, either last night or this morning?

19   A.   No.

11:16:49 20  Q.   Last night -- or yesterday afternoon, we spoke about the

21   three-strike policy, some documents that are a three-strike

22   policy.  And we spoke about PX 165, which was a 2008 policy for

23   residential customers.

24           I'd like to now turn to PX 174, please.

25   A.   I'm sorry, 174?

931

```
         1   Q.   Yes.

         2            MR. OPPENHEIM:  Any objection?

         3            MR. ELKIN:  No objection, Your Honor.

         4            THE COURT:  All right.  It's received.

         5            MR. OPPENHEIM:  Could we publish that, please,

         6   Mr. Duval?

         7   BY MR. OPPENHEIM: (Continuing)

         8   Q.   Ms. Trickey, is this a 2011 version of Cox's graduated

         9   response for residential customers?

11:17:52 10  A.   Yes.

        11   Q.   And if we turn to page -- I'm going to go with 12 of 87.

        12   We literally have four different pages on this.

        13            Do you see where 12 of 87 is?

        14   A.   Yes.

        15   Q.   And that's the section that's -- it says:  Copyother;

        16   right?

        17   A.   Yes.

        18   Q.   That was Cox's internal reference at this point in time

        19   for copyright; is that correct?

11:18:19 20  A.   Yes.

        21   Q.   And under this 2011 policy, if we go to the next page, it

        22   says that when Cox received its first notice with respect to a

        23   particular subscriber, that it would, it says here:  Note

        24   ticket, hold for more and close.

        25            Do you see that?
```

L. Trickey - Direct

932

```
         1   A.    Yes.

         2   Q.    Now, you don't know why Cox implemented that policy,

         3   correct?

         4   A.    I'm not positive why, but I have an idea.

         5   Q.    Well -- and when I asked you in your deposition, in fact,

         6   that I took of you back in April, I believe, April 15, 2019,

         7   you indicated you didn't know, right?

         8   A.    I may have.

         9   Q.    What's that?

11:19:27 10  A.    I said I may have.  I don't recall exactly what I said,

        11   but --

        12   Q.    But you now believe you do know why?

        13   A.    Well, I'm not positive, again, but I have -- you know,

        14   I -- as I've reviewed documents, I, you know, believe I have an

        15   idea, but I can't say for certain.

        16   Q.    So at the time you didn't know.  But now having reviewed

        17   some documents, you think you may know?

        18   A.    Again, I'm not positive.

        19   Q.    Okay.  Back when you were work -- doing work for the abuse

11:19:57 20  group, did you know?

        21   A.    So back when this policy was done in 2011, I was not the

        22   primary lawyer working on graduated response.  That would have

        23   been Mr. Cadenhead.

        24   Q.    But subsequently you were, and there was the same

        25   provision in subsequent policies, right?
```

1    A.    Yes.

2    Q.    So at the time that you were providing legal counsel to

3    the group, right, and they had this policy, did you know why it

4    was implemented?

5    A.    You know, I wasn't positive.  I believe I probably did

6    know at that time and just don't recall it today, or did not

7    recall it in my deposition.  But, you know, I probably knew at

8    one time.

9    Q.    Okay.  So you think you knew what it was back when you

11:20:43 10   were doing the work for that group, you didn't know it when I

11   took your deposition, and now you think you may know; is that

12   right?

13   A.    Well, again, I'm trying -- I have a recollection of

14   something, but I can't say for certain.

15   Q.    Okay.  But you don't know for sure, is what you're saying?

16   A.    Right.

17   Q.    Okay.  And then after the first step, the first notice

18   that Cox would receive with respect to any particular notice,

19   they would -- Cox would send a warning to the subscriber,

11:21:17 20   right?  And that's under Second right there?

21   A.    You're talking about section 6?

22   Q.    Yes.

23   A.    Yes, that was -- that's the warn by e-mail that we talked

24   about yesterday.

25   Q.    And what we're about to go through is only in those

L. Trickey - Direct

934

1  instances where Cox had an e-mail address for the subscriber,

2  right?

3  A.   Yes.  At that time, that's right.

4  Q.   So the second notice resulted in an e-mail warning to the

5  customer, as did the third, the fourth, the fifth, the sixth

6  and the seventh, right?

7  A.   Yes.

8  Q.   Okay.  So Cox receives six notices, and all they do is

9  send the same e-mail out, right?

11:21:51 10  A.   So they would send a warning e-mail that would, you know,

11  try to coach the customer, yes.

12  Q.   Okay.  And then after that, Cox would -- it says here:

13  Suspend (Tier 2) CATS - Auto - with Self-Reactivation Option;

14  right?

15  A.   Yes.

16  Q.   Now, the colloquial term that Cox uses internally for that

17  is it's a soft-walled garden, right?

18  A.   Yes.

19  Q.   Okay.  And what a soft-walled garden was was a situation

11:22:25 20  where Cox would suspend the customer's ability to surf the

21  Internet, and there would be a pop-up on the screen that the

22  subscriber was supposed to read and the subscriber could click

23  a button and reactivate the service, correct?

24  A.   Yes.  So it would quarantine them from being able to go

25  further in whatever activity they were trying to do, and it

 1  would bring up information for them to read about the

 2  complaints, and then there was a button for them to reactivate

 3  once they read it.

 4  Q.   But all the customer had to do to reactivate was click

 5  "okay," right?

 6  A.   Right.

 7  Q.   Okay.  And that's exactly what the customer had to do on

 8  the ninth notice as well, right?

 9  A.   Yes.

11:23:09 10  Q.   So copyright owners now complain ten times about

11  infringement, and there -- there have been do nothing, there

12  have been seven warnings, and two suspensions they can click

13  out; is that right?

14  A.   If they had an e-mail address on file with us, which not

15  every customer did.

16  Q.   And then on the tenth, then Cox would actually suspend the

17  user, correct?

18  A.   Yes.

19  Q.   And the user could call into a customer call center and

11:23:44 20  get reactivated, right?

21  A.   Yes.

22  Q.   And that was what happened as well on the 11th, only they

23  had to call to a different customer call center, correct?

24  A.   Right.

25  Q.   And it wasn't until the 12th notice that Cox would -- the

L. Trickey - Direct

936

1    12 infringement complaint for that particular subscriber that

2    Cox would terminate the subscriber, right?

3    A.   They were eligible for termination at that point, yes.

4    Q.   Well, you said:  Eligible for termination.  Can you go

5    down to Section 7 of that document, please.

6    A.   Yes.

7    Q.   Under No. 3 in Section 7, could you read that, please.

8    A.   Yes.  If DMCA complaints continue after the third

9    suspension/final warning, the account is terminated.  HSI

11:24:34 10   service should only be restored with the approval of Corporate

11   Abuse (Manager, Jason Zabek).

12   Q.   So what it says here is the account is terminated and

13   Mr. Zabek had the ability to restore it, right?

14   A.   That's what it says.

15   Q.   Let's turn to PX 179.

16   A.   179?

17   Q.   179, I apologize.

18            Any objection?

19            MR. ELKIN:  No objection, Your Honor.

11:25:27 20            THE COURT:  Thank you.  179 is received.

21   BY MR. OPPENHEIM: (Continuing)

22   Q.   Now, Ms. Trickey, this is yet another Cox policy and

23   procedure manual for how to handle graduated response for

24   residential customers, correct?

25   A.   Yes.

L. Trickey - Direct

937

1    Q.   And this one is dated, it's a little small, but it looks

2    like October 18, 2012; is that correct?

3    A.   Yes.

4    Q.   If we can turn, please, to page 9 of the document.  You

5    see that that's where the copyright section begins again?

6    A.   Yes.

7    Q.   And Cox again use the term "copyother," correct?

8    A.   Yes.

9    Q.   By the way, have you ever heard the term "copyother" other

11:26:26 10    than its use in Cox?

11   A.   I think this is just how they termed it in CATS.  I don't

12   know why it changed.

13   Q.   Copyright isn't -- excuse me.  "Copyother" is not a term

14   that as a lawyer you've ever heard other lawyers use outside of

15   Cox, right?

16   A.   No.

17   Q.   So if we turn to page 10, it says at the bottom of that

18   page, again, that on the receipt of the first notice Cox would

19   hold the notice for further complaints, correct?

11:27:00 20   A.   Yes.

21   Q.   So this is, again, the same thing that existed in the last

22   policy, that for the first notice Cox would not send the

23   infringement notice to the customer, right?

24   A.   Yeah.  It looks like that it would -- they would ticket it

25   though, it would be assigned a ticket, and then it would be

942

1    just to the TALK.  It was a different group.

2    Q.   Right.  I'm going to -- I'm going to get there.

3         So in this October 2012 policy, there's then three

4    instances where the customer is then suspended and they have to

5    call the TALK or the Atlanta group, correct?

6    A.   In the 2012?

7    Q.   Yes.

8    A.   There's one, two, three, four, five where they have to

9    call in.  You said the Atlanta group.  That's the 404 number

11:33:13 10    too.

11   Q.   Correct.  So there are five suspensions, but the

12   suspensions are slightly different, right?  The first two under

13   the policy, you call Cox's -- what you called your Tier 2 call

14   center, correct?

15   A.   Right.

16   Q.   And then the next three you called a higher level or a --

17   I should just say a different call center or different group

18   which was the TALK group that was based in Atlanta, right?

19   A.   Right.

11:33:36 20   Q.   Okay.  And so, we've added two more steps than what

21   existed in the last policy, correct?  Two more suspensions?

22   A.   Yes.

23   Q.   And what it says then -- and you don't know why Cox added

24   those two additional steps in this policy, correct?

25   A.   Well, I think this was an evolving policy.  So, you know,

L. Trickey - Direct

943

|   |   |
|---|---|
| 1 | as the internet was evolving and usage was evolving, and I |
| 2 | think that this was constantly evolving as well too, so -- you |
| 3 | know, this was a balance, this was a balance between competing |
| 4 | interests of, you know, customers who need access to the |
| 5 | Internet and copyright holders. |
| 6 | So this was, you know, an evolving process. |
| 7 | Q.   Again, Ms. Trickey, when I asked you about this in your |
| 8 | deposition, you didn't know why -- |
| 9 | A.   Well -- |
| 11:34:33 10 | Q.   -- two more steps were -- |
| 11 | A.   Well, not specifically, but I do understand now from |
| 12 | looking at all the documents this was an evolving process. |
| 13 | Q.   Okay.  But when you were questioned by me under oath in |
| 14 | this case and I asked you the exact same question I just asked |
| 15 | you, you didn't -- you didn't recall why two more steps had |
| 16 | been added? |
| 17 | A.   Not those specific two steps. |
| 18 | Q.   And now under this 2012 policy, the termination language |
| 19 | has changed, hasn't it? |
| 11:35:09 20 | A.   Yes. |
| 21 | Q.   Now it says:  Account will be reviewed and considered for |
| 22 | termination, correct? |
| 23 | A.   Yes. |
| 24 | Q.   And in the last policy it said the account would be |
| 25 | terminated and Mr. Zabek could reactivate it, right? |

```
 1    A.    That's what it says.

 2    Q.    So it's changing and providing discretion to other Cox

 3    employees to not terminate, correct?

 4    A.    Yes.

 5    Q.    And in this version of the policy, if you turn to the next

 6    page, under General Guidelines, Cox recognized that these

 7    copyright notices, in fact, could be coming from peer-to-peer

 8    file sharing applications, including Torrent, LimeWire, Kazaa,

 9    and eDonkey among others, right?

10    A.    Yeah.  These are similar guidelines of the steps,

11    different steps of trouble-shooting and education that they

12    would do for customers.

13    Q.    We've just reviewed -- you can put that aside if you

14    like -- a number of different Cox policies over time for

15    residential subscribers, correct?

16    A.    I'm sorry.  Can you repeat the question?

17    Q.    Between yesterday afternoon and this morning, we've just

18    reviewed a number of different policies that Cox had for its

19    graduated response for residential customers, correct?

20    A.    Yes.

21    Q.    Did Cox expect its team to follow those policies?

22    A.    Yes.

23    Q.    Okay.  I'd like to turn -- I want to turn from the

24    residential side to Cox's business side if we can.

25          Can we please look at PX 478.
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
      -vs-                      :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  5  (P.M. Portion)

TRIAL TRANSCRIPT

December 6, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:         MATTHEW J. OPPENHEIM, ESQ.
                                 SCOTT A. ZEBRAK, ESQ.
 3                               JEFFREY M. GOULD, ESQ.
                                 MICHAEL J. DRUCKMAN, ESQ.
 4                               ANDREW L. GUERRA, ESQ.
                                 LUCY G. NOYOLA, ESQ.
 5                               JIA RYU, ESQ.
                                 Oppenheim + Zebrak, LLP
 6                               4530 Wisconsin Avenue, N.W.
                                 5th Floor
 7                               Washington, D.C. 20015

 8
     FOR THE DEFENDANTS:         THOMAS M. BUCHANAN, ESQ.
 9                               Winston & Strawn LLP
                                 1700 K Street, N.W.
10                               Washington, D.C. 20006-3817
                                   and
11                               SEAN R. ANDERSON, ESQ.
                                 MICHAEL S. ELKIN, ESQ.
12                               THOMAS P. LANE, ESQ.
                                 CESIE C. ALVAREZ, ESQ.
13                               Winston & Strawn LLP
                                 200 Park Avenue
14                               New York, NY 10166-4193
                                   and
15                               JENNIFER A. GOLINVEAUX, ESQ.
                                 THOMAS J. KEARNEY, ESQ.
16                               Winston & Strawn LLP
                                 101 California Street, 35th Floor
17                               San Francisco, CA 94111-5840
                                   and
18                               MICHAEL L. BRODY, ESQ.
                                 Winston & Strawn LLP
19                               35 West Wacker Drive
                                 Chicago, IL 60601
20                                 and
                                 DIANA HUGHES LEIDEN, ESQ.
21                               Winston & Strawn LLP
                                 333 South Grand Avenue
22                               Suite 3800
                                 Los Angeles, CA
23

24

25
```

JA418

<u>INDEX</u>

<u>OPENING STATEMENTS BY:</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| LINDA TRICKEY | | |
| | CROSS | 1015 |
| | REDIRECT | 1054 |
| | RECROSS | 1095 |
| ROGER L. VREDENBURG | | |
| | DIRECT | 1101 |

<u>CLOSING ARGUMENTS BY:</u>

<u>COURT'S RULINGS/JURY INSTRUCTIONS</u>

been designed to protect our service, our subscribers, and the

internet community from inappropriate, illegal, or otherwise

objectionable activities.

Q.   And what's your understanding as to the purpose of that

statement?

A.   Well, that's to -- you know, there are many parties in the

internet ecosystem, and so this was to put customers on notice

that the, what we have said in the AUP is designed to protect,

you know, us and our network as well as them and the internet

14:22:00  community from activities that they shouldn't be doing.

Q.   Okay.  If you skip the next sentence, could you read the

following sentence that begins with:  Violation of any term?

A.   Violation of any term of this AUP may result in the

immediate suspension or termination of either your access to

the Service and/or your Cox account.

Q.   Okay.  What is your understanding as to the purpose of

that statement?

A.   That's to put customers on notice that if they misuse the

service, that they could lose the privilege of the service.

14:22:35  Q.   And does Cox believe that this statement obligates Cox to

suspend or terminate a subscriber's access to the internet if

they violate any term of the AUP?

A.   No, I think the word "may" is in there because the

circumstances will, will vary, and so this is to put them on

notice that you, you could lose your service.

L. Trickey - Cross

1021

1  Q.   So in circumstances where a customer violates the AUP, do

2  you have an understanding as to what steps Cox will take?

3  A.   Yes.

4  Q.   And what are they?

5  A.   So if they violate the AUP and we become aware of it,

6  typically the, the goal is to reach out and to educate and to

7  modify behavior, to coach, to help them try to figure out

8  what's going on, how they can, you know, fix the problem, close

9  the open WiFi.  I mean, there's a lot of things that we walk

14:23:31 10 through.  So we try to educate and get them to, you know,

11 change behavior.

12 Q.   Okay.  On direct, I think there were questions that were

13 put to you as to the AUP related to a, I think, a zero

14 tolerance policy.  How did you view the AUP relative to any

15 notion of zero tolerance?

16 A.   Well, the -- you want to make sure your subscribers

17 understand in strong language, you know, what they can and

18 can't do using the service, but I did not believe that the AUP

19 required a zero tolerance because there are a variety of

14:24:12 20 circumstances that could be at play.

21 Q.   Well, wouldn't it have been easier if Cox just terminated

22 these subscribers if there was a violation of the AUP?

23 A.   Well, not really because, you know, internet access is a

24 very important part of our society, and people need it to, you

25 know, work, to shop, to do all kinds of things online.  Now we

L. Trickey - Cross

1022

1    have streaming media that has risen so much.  So, you know, it

2    is a very serious thing -- as I stated earlier this morning,

3    it's a very serious thing to terminate someone's internet

4    access.

5    Q.    Do you have an understanding as to whether the AUP gives

6    Cox the right to watch what its customers are doing online?

7    A.    No.  We do not spy on what our customers do online.

8    Q.    Why don't you do that?

9    A.    Because we believe they have a privacy right in what

14:25:11 10  they're doing online, and we do not track or spy, you know, the

11   websites that they go to.

12   Q.    Okay.  Now, during the two thousand and -- I'm sorry --

13   2013 and 2014 time frame, absent cybersecurity reasons, do you

14   know whether Cox could block websites or throttle bandwidths?

15   A.    No.

16   Q.    Could they do that?

17   A.    No.

18   Q.    Why not?

19   A.    Well, first of all, I think technically we didn't have the

14:25:45 20  ability to do it, but in any event, you know, there was the

21   concept of net neutrality, which is still very much in the news

22   these days, and is -- the concept is that ISPs, being the

23   gatekeeper to the internet, should not be artificially blocking

24   or deciding, like, what traffic gets through and doesn't get

25   through.

1      So -- and so we, we don't block or throttle, slow

2  down the service artificially.

3  Q.   Does Cox have other types of customers besides

4  residential?

5  A.   Yes.  So as I talked about this morning, we have a wide

6  variety of business customers as well.

7  Q.   Okay.  I'd like for you to turn to tab 3 in your binder.

8  That's Defendants' Exhibit 103.

9  A.   Okay.  I'm there.

14:26:40 10  Q.   Can you recognize -- do you recognize Defendants' 103?

11  A.   Yes.

12  Q.   What is it?

13  A.   These are Cox Business policies -- pardon me -- including

14  the Cox Business Acceptable Use Policy is included in this.

15  Q.   Did you contribute to the content of these documents?

16  A.   Yes.

17      MR. ELKIN:  Your Honor, I would offer Defendants' 103

18  into evidence.

19      THE COURT:  Any objection?

14:27:15 20      MR. OPPENHEIM:  My apologies, Your Honor.

21      No objection, Your Honor.

22      THE COURT:  It's received.

23  BY MR. ELKIN:

24  Q.   Could you take the jury through what Cox Business policies

25  are covered in this exhibit?

L. Trickey - Cross

1024

1   A.   Well, let's see.  It starts out with your privacy rights.

2   There's an annual privacy notice that's actually included, and

3   then --

4   Q.   I'm sorry to interrupt you.  That was a bad question.

5   A.   Oh.

6   Q.   Let me direct you to the first page of the exhibit.  This

7   Cox Business policies, do you see the effective date of when

8   this particular policy went into effect?

9   A.   It says it was updated November 18, 2011.

14:28:00 10   Q.   And then let me direct your attention to the fourth page

11   of this exhibit.  In the middle of the page, do you see any

12   other new effective policy AUP for the business for Cox?

13   A.   Yes.  There's a Cox Business Acceptable Use Policy.  It

14   says it was updated October 1, 2012.

15   Q.   Do you know whether or not these were the Cox Business

16   AUPs that were in effect during the 2013 and 2014 time frame?

17   A.   I think so, yes.  I don't think there was a later business

18   one after this.

19   Q.   Does Cox view the business AUP violations differently than

14:28:50 20   residential AUP violations?

21   A.   Well, so how we treat the potential violations, we do have

22   different processes.

23   Q.   Why is that?

24   A.   Well, because business customers are very different from

25   residential customers, and as I stated earlier this morning,

1    business customers range from, you know, a very small business

2    up to very large businesses, but they are businesses, and they

3    are largely reliant on their internet service.

4         You also have many businesses that have users of the

5    internet service who they may not even know who the person

6    actually is, because they could be a doctor's office that

7    offers WiFi, or it could be -- you know, we talked about a

8    hospital.  We've got government buildings, you know, police,

9    fire, all kinds of different buildings, and so you don't always

14:29:45 10  know who the actual -- the identity of who the actual users

11   are.

12   Q.   Okay.  You can take that down, James.

13        I want to turn to a different subject, if I may.  Do

14   you know whether there was a particular group at Cox that dealt

15   with copyright infringement claims during 2013 and 2014?

16   A.   Yes.  That was the customer safety team.

17   Q.   And what was the customer safety team's role and

18   responsibility for this?

19   A.   So that, that team would ingest the complaints that came

14:30:21 20  in from the copyright holders into our -- what we called our

21   CATS system, the Cox abuse tracking system.  It would sign a

22   ticket, and they were responsible for carrying out the

23   graduated response.

24   Q.   Do you know what the focus of the customer safety team was

25   in dealing with customers who were accused of copyright

L. Trickey - Cross

1026

1   infringement?

2   A.   Yes.  Their role was very much based around education, and

3   it didn't -- wasn't just around copyright infringement.  There

4   were other activities that were considered to be abuses that

5   they tried to help the customers understand and troubleshoot.

6   So it was a, very much of an educational role, hey, here's

7   what's going on.  We need to help you with this.

8   Q.   You testified in your direct a little bit about Cox's

9   graduated response program.  Can you explain the -- what that

14:31:16 10   is for the jury, please?

11   A.   Yes.  So graduated response is the process of dealing with

12   the complaints that were coming in from the copyright holders,

13   and so it could be, you know, as we talked about this morning,

14   you could do warnings via e-mail, and then the reason it's

15   called graduated response is because if the activity continued,

16   then how we handle it got stricter.

17        So, of course, you know, if there was no response to

18   sort of the e-mail warnings, then we would suspend their

19   service to what we called the soft-walled garden, and they had

14:31:57 20   information to read to explain why their internet access had

21   been suspended, and then they could go to the bottom and click

22   through, and hopefully that got their attention, but if it

23   didn't, then ultimately they could be also suspended to a, what

24   we called the hard-walled garden, which they couldn't click out

25   of.  They had to actually talk to a human being who would help

1    coach and educate, and that really created a lot of friction

2    for them.

3              And then ultimately, there could be circumstances

4    where we would terminate as well.

5    Q.   Thank you.  I'm going to in a few minutes show you a

6    document and have you take the jury through the specific steps,

7    but before we do that, can you let us know based on your

8    knowledge when Cox actually began this graduated response

9    program, roughly?

14:32:52 10   A.   I think it was in the early 2000s, because Cox originally

11   offered its internet service through, you know, a third party;

12   I think it was called "Excite@Home"; and that was before I got

13   to Cox, but then when I got to Cox, they had started building

14   out their own network at that point.

15             So I think soon thereafter, we were actually the

16   first ISP to build a system to handle copyright infringement

17   complaints.  So I think it was maybe 2003-'4, somewhere in

18   there.

19   Q.   Okay.  Why were -- you mentioned a few minutes ago that

14:33:30 20   there were various steps along the way of graduated response.

21   Why were there multiple escalation steps in the process?

22   A.   Because again, it's to, it's to educate.  And so, you

23   know, if you're sending e-mails, you hope they get to the right

24   place.  There were some customers -- back then we actually

25   didn't even have a lot of e-mail addresses for our customers

1    because some of them had cox.net e-mails, but others did not,

2    and we wouldn't have an e-mail address on file for them, and

3    so, you know, we would -- I'm sorry, I forgot the question now.

4    Q.   Why there were multiple escalation steps.

5    A.   Oh, why there were multiple escalation steps.  Okay.  Yes.

6    Because you wanted to have an opportunity to have that touch

7    with the customer to try to educate and change their behavior.

8    Q.   Okay.  Now, to what extent did the graduated response

9    system become automated?

10   A.   Yeah.  At some point, and I don't know exactly what year

11   it was, but they automated the system so that when the

12   complaints came in, they could handle them in a more automated

13   fashion, up to the point where people were suspended and had to

14   talk to a human being.

15   Q.   I think you made reference to this early in your

16   testimony.  You've heard of the term "CATS," or the copyright

17   abuse tracking system?

18   A.   Yes.

19   Q.   What is that?

20   A.   So that's the actual system that Cox built to ingest and

21   handle abuse issues and keep track of them.

22   Q.   And to what extent is it a ticketing system?

23   A.   So it essentially is a ticketing system.  It's a ticketing

24   and tracking system, I guess, is the way I think of it.  So

25   when the complaints would come in, at least for copyright

1030

1      a lengthy document covering all sorts of situations, not just

2      copyright.

3      Q.    Was this in effect during the 2013-2014 time frame?

4      A.    Yes.

5      Q.    So beginning on page 10 of this document, at the bottom of

6      that page, there's something reference 6.0, Resolution -

7      Repeated Offenses.

8             Do you see that?

9      A.    Yes.

14:37:22 10    Q.    And it goes on to the next page.  What is this page, page

11     11?

12     A.    These are the various steps of the graduated response

13     process at that time.

14     Q.    So now that we have this document open, could you take the

15     jury now through step by step with regard to this process?

16     A.    Sure.  So the -- as we talked about this morning, the

17     first step was held to close for more to see if there were any,

18     any additional complaints that came in, and if other additional

19     complaints come in, the second through the seventh steps, the

14:38:04 20    customer would receive an e-mail warning if we had their e-mail

21     address on file.

22            On the eighth and ninth steps, that's when they ended

23     up going into a soft-walled garden, where they had information

24     that was to read that would explain to them why their service

25     was sort of interrupted, and then they would have a bottom -- a

L. Trickey - Cross

1031

1   button at the bottom that they could click through to

2   reactivate and move on.

3        If additional complaints were received after that,

4   they would get -- on the 10th and 11th steps, they would be

5   suspended to what we called our Tier 2 team, which was an 800

6   number, and there they had to call in if they wanted to get

7   their internet service back up and running.  They could not

8   reactivate it on their own, so they had to do the dreaded call

9   into, into the company.

14:38:57 10       And then the 12th and 13th and continued offense

11   steps, they would be suspended again, and this time it was to

12   sort of the higher-level abuse team number, which was we called

13   it the Atlanta 404, 404 being the area code.  And -- but -- and

14   then at each step, of course, there was education and

15   explanation going on.

16   Q.   So what would happen if there were further copyright

17   infringement notices affecting a subscriber on or past

18   continued offenses?

19   A.   Yes.  So at that point, they would be -- continue to be

14:39:40 20   suspended to 404, and they would be considered for termination

21   after step 13.

22   Q.   Why were there multiple warning steps?

23   A.   Well, because, you know, for residential customers, you

24   know, not everybody -- some people in the house were more

25   sophisticated than others, and so often the accountholder might

L. Trickey - Cross

1032

1   be a parent or somebody who has no idea what's going on that

2   their, you know, teenager might be engaging in, and so, you

3   know, if they get the e-mail, if they even see the e-mail, you

4   know, hopefully they can try to address it, but they, they

5   weren't always aware or didn't always understand the

6   technology.  Like, they would get a warning with some sort of

7   title on it and they're like, I've never heard of this song,

8   or, you know, I don't know what this is.

9          So, again, this was an opportunity to try to educate,

14:40:33 10   and so that's why there are, you know, guidelines in here, too,

11   about make sure you ask the customer these certain types of

12   questions to try to troubleshoot what's going on.

13          MR. OPPENHEIM:  Objection, Your Honor.  We'd move to

14   strike the hearsay in that answer, please.

15          THE COURT:  Overruled.

16   BY MR. ELKIN:

17   Q.   You made reference in your direct to the fact that Cox

18   subscribers who were accused of copyright infringement, as they

19   progressed through a graduated response, eventually had

14:41:08 20   resulted in the subscribers receiving fewer notices or, or not

21   at all.  Do you know if Cox ever observed that allegations of

22   infringement as relating to suspected subscribers decreased

23   after these different steps?

24          MR. OPPENHEIM:  Objection.  Can you lay a foundation,

25   please?

L. Trickey - Cross

1     MR. ELKIN:  That's what I'm trying to do right now.

2     THE COURT:  Ask her whether she knows.  Yeah,

3  overruled.  You may answer the question.

4     THE WITNESS:  Okay.  I mean, yes.  I believe that the

5  process was effective and -- in reducing the number of repeat

6  offenses that we would receive.

7     MR. OPPENHEIM:  Your Honor, there's no foundation for

8  that testimony.

9     THE COURT:  Yeah, let's approach the bench, please.

10     NOTE:  A sidebar discussion is had between the Court

11  and counsel out of the hearing of the jury as follows:

12  AT SIDEBAR

13     THE COURT:  Do you expect this witness to testify

14  that she tracked the data and understood contemporaneously that

15  this program was effective?  Is that what she's going to

16  testify to?

17     MR. ELKIN:  No, Your Honor.  Let me just be clear so

18  there's no wrong impression.  As I mentioned earlier in the

19  proceedings, Mr. Carothers will be testifying with respect to

14:42:41 20  the specific steps that he took --

21     THE COURT:  Right.

22     MR. ELKIN:  -- as well as Mr. Beck.

23     But as part of her regular course of work at Cox in

24  terms of advising on graduated response -- and she's already

25  testified to this on direct, that the company was, was

L. Trickey - Cross

1037

1  safety team, because it seemed like it was working well.

2  Q.  Who -- what members of the safety team did you interact

3  with during that period?

4  A.  So I would have interacted with Jason Zabek, Joe Sikes,

5  Andrew Thompson.  I don't know that I interacted with anyone in

6  the Virginia office or not, but primarily those three.

7  Q.  What about Brent Beck?

8  A.  Oh, well, Brent, of course.  He was more the technical guy

9  who ran the system, yes.

14:46:53 10  Q.  And did you interact with Matt Carothers at any time

11  related to the system?

12  A.  Yeah, yeah, some.  Yeah.

13  Q.  And did you have occasion in your interactions with the

14  safety team to form any conclusions with regard to whether the

15  graduated response system worked?

16  A.  Yeah.  I mean, it seemed to -- it seemed to work.  It

17  seemed to have the, the desired effect, particularly as you got

18  further into the steps.

19       THE COURT:  Did you actually speak with them about

14:47:28 20  the graduated response program?

21       THE WITNESS:  Oh, absolutely, yeah.

22       THE COURT:  Okay.  All right.  Go ahead.

23       MR. ELKIN:  Thank you, Your Honor.

24  BY MR. ELKIN:

25  Q.  Now, I may have lost the thread, so if you don't follow

L. Trickey - Cross

1038

1    me, just let me know, but what if after repeated warnings, Cox

2    continued to receive notices of infringement pertaining to the

3    same customer accounts?  What would happen?

4    A.   Well, I mean, you know, as we -- as it says in here, I

5    mean, at that point, they would probably do a final discussion,

6    and then some of those accounts would be considered for

7    termination.  Some would be terminated.

8    Q.   And were customers automatically terminated when they hit

9    the last step?

14:48:22 10   A.   No.  I mean, this, this safety team had a lot of knowledge

11   in working with customers, and, you know, they had discretion

12   to decide what was appropriate, and so it wasn't an automatic

13   termination, but they would decide whether, whether the

14   circumstances were appropriate to terminate.

15   Q.   And what was your understanding as to why Cox didn't

16   automatically terminate subscribers when they hit that point?

17   A.   Well, because these, you know, these again -- these were

18   guidelines, and so, you know, the whole graduated response -- I

19   mean, you know, to my knowledge, when the law was passed, it

14:49:01 20   never set for requirements for specific steps or anything like

21   that that you had to do.  So each ISP had to decide what was an

22   appropriate process for them to implement that would balance

23   the needs of their customers, and I said this earlier, their

24   customers as well as the needs of the other parties in the

25   whole internet ecosystem.  So this was a balancing.

L. Trickey - Cross

1039

| | |
|---|---|
| 1 | Q.   So aside from the automation, do you have an understanding |
| 2 | as to whether the graduated response steps were hard-and-fast |
| 3 | rules? |
| 4 | A.   No.  I mean, they weren't hard-and-fast rules.  They were, |
| 5 | they were, you know, guidelines and procedures. |
| 6 | Q.   Mr. Oppenheim, plaintiffs' counsel, on direct took you |
| 7 | through some earlier versions of the ticket handling procedures |
| 8 | pertaining to copyright infringement.  Do you remember that? |
| 9 | A.   Yes. |
| 14:49:56 10 | Q.   And do you remember that some of those versions had fewer |
| 11 | steps related to graduated response as it pertained to |
| 12 | copyright infringement?  Do you remember that? |
| 13 | A.   Yes. |
| 14 | Q.   And first of all, do you know whether or not those |
| 15 | procedures were in effect during the 2013-2014 time frame? |
| 16 | A.   I, I think no.  I think the ones we went through were |
| 17 | earlier than that. |
| 18 | Q.   Did -- now, with regard to the steps that were in place |
| 19 | during this claims period, do you know whether Cox decided to |
| 14:50:40 20 | increase the number of steps so that it wouldn't have to send |
| 21 | more notices out to Cox customers about copyright infringement? |
| 22 | MR. OPPENHEIM:  Leading, Your Honor. |
| 23 | THE COURT:  Well, I'm allowing him to lead. |
| 24 | THE WITNESS:  I'm sorry, I'm not sure I understand |
| 25 | the question. |

L. Trickey - Cross

1040

1          THE COURT:  Well, you know, you're right; I

2  apologize.  You can answer that question, but let's try not to

3  lead.

4          MR. ELKIN:  Sure.

5  BY MR. ELKIN:

6  Q.   So the steps in the version of, of graduated response

7  during the claims period --

8  A.   Right.

9  Q.   -- had more steps than the prior -- did they have more

14:51:17 10  steps than the prior versions?

11  A.   Oh, yes.

12  Q.   Was that designed to, to permit more copyright

13  infringement on Cox's system?

14          THE COURT:  Yeah, ask her why that was designed that

15  way.

16  BY MR. ELKIN:

17  Q.   Why was it designed that way?

18  A.   Well, I mean, I think I said earlier I didn't know exactly

19  why they had added the additional steps, but I am assuming that

14:51:40 20  this, you know, team had based it upon, you know, some kind of

21  data or something and -- but, again, as I stated before, too,

22  this was an evolving process.  So you're not going to launch

23  something in 2002 or '3 or '4 and have it look completely the

24  same 15 years later or 10 years later.

25          So I think this was just an evolving process.  It

L. Trickey - Cross

1    wasn't designed to, you know, hide or do anything.  It was

2    just, again, balancing the needs of the internet ecosystem from

3    the subscribers in -- to the copyright holders, and we were

4    stuck in the middle.

5    Q.   Could you describe the staffing levels at Cox with regard

6    to handling residential copyright notices during 2013 to 2014?

7    A.   So if a, if a customer got a complaint via e-mail or

8    somehow, then if they called in, some people would maybe call

9    what we call our Tier 1 customer care, which is our general

14:52:44 10   customer care support.  They probably could answer very basic

11   questions but really weren't highly trained to deal with these

12   kinds of issues, but they did number in, you know, the

13   hundreds.

14        You know, typically, they would end up going to,

15   like, what we called our Tier 2, which was a group of

16   persons -- I can't remember, I think they were in multiple

17   locations, maybe there were multiple dozen of them.  Then we

18   also had a group called Tier 2.5, which was a smaller group but

19   also had more experience in these areas, and then ultimately,

14:53:26 20   we also had this group in Atlanta we called the safety team,

21   the Atlanta 404.

22        So there was -- there were quite a few people who

23   could handle these kinds of things.

24   Q.   So during 2013 and 2014, are you aware of approximately

25   how many people Cox employed in these groups?

L. Trickey - Cross

1042

1    A.   Well, I mean, again, the Tier 1 was not really -- there

2    was a large number of Tier 1, but they really weren't very

3    sophisticated in dealing with customers on this issue, so they

4    probably would have put them to Tier 2.  I think Tier 2 maybe

5    had -- I'm not sure exactly, but I think maybe around 80-ish or

6    so persons that could deal with abuse issues in general.

7    Tier 2.5, I think, was around maybe four or five people, and

8    then we also had the safety team in Atlanta.

9    Q.   Okay.  Now, I'm going to turn to business customers, Cox

14:54:28  10    Business customers.  Did Cox also receive and process copyright

11    infringement notices for Cox Business customers?

12    A.   Yes.

13    Q.   Was there a particular group that handled copyright

14    tickets for the Cox Business accounts?

15    A.   The safety team.

16    Q.   Okay.  And was there any special call center that was set

17    up to address them?

18    A.   Well, there was a -- there was a call center in Las Vegas

19    that was called the NSC, and they, they would field a lot of

14:54:58  20    different kinds of business calls, but they could also field

21    the calls that business customers would make regarding

22    copyright infringement.

23    Q.   Okay.  Now, did Cox's graduated response program for

24    business subscribers differ from how it handled copyright

25    infringement notices for its residential customers?

L. Trickey - Cross

1043

1   A.    Yes.

2   Q.    Why was that?

3   A.    Well, with business customers, again, they're heavily

4   reliant on the internet service for their actual business, and

5   so, you know, you wouldn't want to just immediately suspend

6   their service because you could disrupt their entire business

7   operations, and so -- and we had a smaller number of business

8   customers, too.

9         So we had -- the process was to reach out directly to

14:55:50 10  the business customer to, to try to figure out what was going

11  on.

12  Q.    And were these processes laid out in any company

13  documents?

14  A.    Yeah.  They had a procedures document for Cox Business.

15  Q.    Okay.  Turn, please, to tabs 5 and 6 in your binder.

16        MR. ELKIN:  And, Your Honor, this is Defendants'

17  Exhibit 106 and Defendants' Exhibit 107.

18        THE COURT:  Any objection?

19        MR. OPPENHEIM:  No, Your Honor.

14:56:14 20        THE COURT:  All right.  It's received -- or they're

21  received.

22        Sometimes you're going to get a plaintiffs' exhibit

23  that will be the same as a defendants' exhibit.  It may have

24  maybe a modest tweak to it, but that's why we're doing it this

25  way.  Thank you.

R.L. Vredenburg - Direct

1107

1   Q.   Including copyright violations that came to Cox's

2   attention?

3   A.   Yes.

4   Q.   And during your time, isn't it right, sir, that the bulk

5   of the abuse complaints that you dealt with in your time had to

6   do with copyright abuse violations?

7   A.   Yes, I would say the bulk were copyright.

8   Q.   And sometimes you could resolve those issues on your own,

9   correct?

16:45:43 10   A.   Yes.

11   Q.   And other times you would want to escalate those and ask

12   someone else about them?

13   A.   About copyright?

14   Q.   If you had a question or an issue or you weren't sure what

15   to do, you might escalate and ask somebody else for -- what

16   they thought?

17   A.   We would contact Atlanta.

18   Q.   You would contact Atlanta.  And Atlanta was typically

19   Mr. Zabek and Mr. Sikes?

16:46:07 20   A.   Correct.

21   Q.   And you took direction from Mr. Zabek and Mr. Sikes?

22   A.   Yes.

23   Q.   And you looked to Mr. Zabek and Mr. Sikes to make -- to

24   help make decisions about how to handle certain kinds of abuse

25   issues?

R.L. Vredenburg - Direct

1108

| | | |
|---|---|---|
| | 1 | A.    Yes. |
| | 2 | Q.    Including at times whether to terminate the service of |
| | 3 | repeat copyright infringers, correct? |
| | 4 | A.    That's correct. |
| | 5 | Q.    When you weren't sure whether to terminate a customer who |
| | 6 | might have been at that stage of consideration in the graduated |
| | 7 | response, you might reach out to Mr. Sikes and say, what should |
| | 8 | I do here? |
| | 9 | A.    Correct. |
| 16:46:38 | 10 | Q.    Those gentlemen, Mr. Zabek and Mr. Sikes, set the tone for |
| | 11 | the abuse group, correct? |
| | 12 | A.    Yes. |
| | 13 | Q.    Mr. Zabek and Mr. Sikes provided guidance and the |
| | 14 | direction for the TOC team handling abuse issues on a |
| | 15 | day-to-day basis, correct? |
| | 16 | A.    Correct. |
| | 17 | Q.    Now, when you started at Cox in 2004 as a 2.0 tech -- as a |
| | 18 | 2.0 tech, you said?  I am sorry, let me ask -- |
| | 19 | A.    Tier 2. |
| 16:47:07 | 20 | Q.    Tier 2.  Thank you. |
| | 21 | And when you first started with Cox around 2004, |
| | 22 | there was a three-strike policy for copyright infringement and |
| | 23 | the customers were terminated, correct? |
| | 24 | A.    No. |
| | 25 | Q.    Mr. Vredenburg, there was a three-strike policy for |

JA441

R.L. Vredenburg - Direct

1109

1    copyright infringement notices when you started and the

2    customer was terminated; is that correct?

3    A.   As far as I remember, there was never a three-strike

4    policy.  We had our graduated response system, but I don't ever

5    remember it being called a three-strike policy.

6              THE COURT:  Was it three warnings and then

7    termination?

8              THE WITNESS:  No.

9              THE COURT:  Is that the terminology?

16:48:04 10              THE WITNESS:  No, it would go up by steps.

11              THE COURT:  Okay.

12   BY MR. GOULD: (Continuing)

13   Q.   Mr. Vredenburg, do you recall -- do you recall testifying

14   at a trial in a prior case involving Cox Communications?

15   A.   Yes, sir.

16   Q.   And issues arose in that case related to Cox's graduated

17   response system?

18   A.   Yes, sir.

19   Q.   And when you gave that testimony, you swore to tell the

16:48:31 20   truth, right?

21   A.   Yes.

22   Q.   Just like you raised your right hand and swore to tell the

23   truth today?

24   A.   Absolutely.

25              MR. GOULD:  Page 871, line 6, of his BMG testimony.

1110

1    MR. BUCHANAN:  Got it.

2    MR. OPPENHEIM:  Tab 13.

3    MR. BUCHANAN:  Show it to him?

4    MR. GOULD:  No.

5    THE COURT:  He is impeaching him, not trying to

6  refresh his recollection.

7  BY MR. GOULD: (Continuing)

8  Q.   Mr. Vredenburg, in your sworn -- that was in December

9  2015 --

16:49:04 10    THE COURT:  Just ask him what question he was asked

11  and what his answer was.

12  BY MR. GOULD: (Continuing)

13  Q.   Were you asked this question and did you give this answer,

14  Mr. Vredenburg:  And when you started -- excuse me -- all

15  right.  So when you started in 2004, you were a 2.O TOC; is

16  that correct?

17    When I started in 2004, I was 2.0 tech.

18    And when you started, there was a three-strike policy

19  for copyright infringement notices and the customer was

16:49:28 20  terminated; is that correct?

21    As far as I know, yes, there was a three-strike.

22    Are you changing your testimony, sir?

23  A.   No, I am not changing.  There was never an actual

24  three-strike policy.

25  Q.   And you recall over time Cox's graduated response was

R.L. Vredenburg - Direct

1111

1    extended out quite a bit beyond three strikes?

2    A.   Correct.

3    Q.   At one point it became a ten-strike policy, correct?

4    A.   I don't recall the exact count, sir.  Sorry.

5    Q.   That's okay.  And then do you recall it later became a

6    12-strike policy?

7    A.   I don't recall this.

8    Q.   And I guess you also don't recall that it later became a

9    13- or 14-strike policy?

16:50:09 10   A.   Barely.  If I can put a clarification on the Acceptable

11   Use Policy -- or not the Acceptable Use Policy policy, the

12   three-strike policy --

13   Q.   I think I will just ask my questions.  I appreciate it.

14   A.   All right, sir.  Not a problem.

15   Q.   Your counsel will be certainly free to ask you any

16   questions he would like to clarify.  Thank you.

17   A.   Absolutely.

18   Q.   Do you recall over time, Mr. Vredenburg, an increase in

19   the number of copyright infringement notices that Cox was

16:50:38 20   receiving over time?

21   A.   Yes, sir.

22   Q.   And you heard the phrase "DMCA" or "DMCA notices"?

23   A.   Correct.

24   Q.   And in your work at Cox, that would typically refer to

25   copyright infringement notices, correct?

**JA444**

R.L. Vredenburg - Direct

1114

```
              1              THE COURT:  190 what?

              2              MR. GOULD:  197.  Your Honor, I took you at your word

              3    that you didn't want another binder.  I apologize, it's

              4    inconvenient.

              5              THE COURT:  I have the binder.  I just need to get to

              6    it.

              7    BY MR. GOULD: (Continuing)

              8    Q.   Mr. Vredenburg, you said you were part of the abuse team

              9    in 2011, correct?

  16:54:22   10    A.   Yes.

             11    Q.   And do you recall a period of time in 2011 when the TOC

             12    abuse team, the 2.5 level team out of Hampton Roads, was

             13    substantially reduced in size?

             14    A.   Yes, I remember.

             15    Q.   Do you recall seeing any documents discussing that at the

             16    time?

             17    A.   I don't recall seeing any documents.

             18    Q.   Let me just back up for a moment.

             19              Do you recall in the years around 2010 there were

  16:55:13   20    about 14 Tier 2 reps?

             21              THE COURT:  At multiple locations or any one

             22    location?

             23              MR. GOULD:  If you will allow me a little leeway,

             24    Your Honor.

             25              THE COURT:  Yes, go ahead.
```

**JA445**

BY MR. GOULD: (Continuing)

Q.   Do you recall testifying previously that there were around

14 Tier 2 reps in 2010?

A.   Are you referring to Tier 2 or TOC reps?

Q.   I am sorry.  Do you recall testifying previously that

there were around 14 Tier 2.5 reps in 2010?

          MR. BUCHANAN:  When he is referring to testifying,

today or --

          THE COURT:  Yeah.  I interrupted the line of

questioning.  So start again.  Just ask him does he recall

whether -- how many reps there were on a date that you want to

use.

BY MR. GOULD: (Continuing)

Q.   Mr. Vredenburg, you recall there were about 14 Tier 2.5

reps around the year 2010, correct?

A.   Yes, sir, that sounds quite right.

Q.   And at that time, 2010, the TOC or the level 2.5 group was

staffed around the clock, 24 hours, seven days a week, correct?

A.   Yes.

Q.   And then there came a time in 2011 when the TOC, the tier

2.5 group, was really slashed materially, wasn't it?

A.   Yes.

Q.   And you said in 2010 it was about 14.  So now we get to

sometime -- do you recall it was about April of 2011 that that

group was cut to four people?

R.L. Vredenburg - Direct

1116

1    A.   I don't believe -- I don't know the exact date, but, yes,

2    it was cut to four people.

3    Q.   It was cut to four.  You agree with that part?

4    A.   Yes, sir.

5    Q.   And 14 to four is -- I'm no mathematician, but more

6    than -- I won't embarrass myself with math.  Let's leave it at

7    that.

8            It is a reduction of eight -- no, see, I did it.

9    It's a reduction from 14 to 4.  I will leave it at that.

16:57:22 10          MR. OPPENHEIM:  Ten.

11   Q.   It's ten, correct?

12   A.   Yes.

13           MR. OPPENHEIM:  Sorry, Your Honor.

14           THE COURT:  Friday evening.

15           MR. GOULD:  It's late on a Friday, I apologize.

16   BY MR. GOULD: (Continuing)

17   Q.   And after the reduction of the TOC from -- down to four,

18   the hours changed too, correct?

19   A.   If I remember correctly, yes, they did.

16:57:41 20   Q.   So while it was once 24/7 people could reach the TOC and

21   get access to customer service, those hours were reduced to

22   something less than that, right?

23   A.   Yes.

24   Q.   And all of those changes meant you're going to have to

25   work a little bit harder to keep up with the work loads, right?

R.L. Vredenburg - Direct

1117

1   A.   Correct.

2   Q.   You had to work harder because you had to do more with

3   less?

4   A.   Correct.

5   Q.   If you could turn to Tab 1 in your binder, please.

6        Do you recognize the document -- PX 10 for the

7   record.  Do you recognize the document at tab 1 of your binder,

8   PX 10?

9   A.   This particular document?

16:58:41 10   Q.   This type of document.

11   A.   This type of document, yes.

12   Q.   And what is it?

13   A.   It looks like a record of abuses by a customer.

14   Q.   It's a CATS ticket, right?

15   A.   CATS ticket, correct.

16   Q.   When you open up CATS to go work tickets, this is what you

17   see, right?

18   A.   Pretty much, yes.

19        MR. GOULD:  I move to admit PX 10, Your Honor.

16:59:08 20        THE COURT:  Any objection?

21        MR. BUCHANAN:  No, Your Honor.

22        THE COURT:  It's received.

23   BY MR. GOULD: (Continuing)

24   Q.   Now, in your work as a Level 2.5 rep, when you log into

25   CATS to go work a ticket, you see something that looks like

R.L. Vredenburg - Direct

1118

1  this, correct?

2  A.   Yes.

3  Q.   Now, I want to go through this to make sure that I

4  understand and the jury understands what is going on here, what

5  these things mean, because I want to understand the process.

6  Okay.

7            This particular customer that is referenced in this

8  one isn't one of the subscribers that received a notice from

9  the plaintiffs, but it's important that the jury understands

16:59:59 10  the process, sir.

11            THE COURT:  Ask your questions.  We don't need

12  testimony.  Ask your questions.

13            MR. GOULD:  Thank you, Your Honor.

14  BY MR. GOULD: (Continuing)

15  Q.   At a high level, the CATS ticket shows a bunch of

16  descriptive information at the top, correct?

17  A.   Yes.

18  Q.   And then if you scroll down, you see a long list of

19  historical tickets associated with this customer, correct?

17:00:23 20  A.   Correct.

21  Q.   And then if you keep scrolling down, keep scrolling down,

22  keep scrolling, right there, you see the infringement notice

23  that triggered this particular ticket, correct?

24  A.   Are we talking about here or here?

25  Q.   I'm sorry, I was looking at the screen, but if you prefer

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
      -vs-                     :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  6  (A.M. Portion)

TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1139

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:   MATTHEW J. OPPENHEIM, ESQ.
          SCOTT A. ZEBRAK, ESQ.
          JEFFREY M. GOULD, ESQ.
          MICHAEL J. DRUCKMAN, ESQ.
          ANDREW L. GUERRA, ESQ.
          LUCY G. NOYOLA, ESQ.
          JIA RYU, ESQ.
          Oppenheim + Zebrak, LLP
          4530 Wisconsin Avenue, N.W.
          5th Floor
          Washington, D.C. 20015


FOR THE DEFENDANTS:   THOMAS M. BUCHANAN, ESQ.
          Winston & Strawn LLP
          1700 K Street, N.W.
          Washington, D.C. 20006-3817
           and
          SEAN R. ANDERSON, ESQ.
          MICHAEL S. ELKIN, ESQ.
          THOMAS P. LANE, ESQ.
          CESIE C. ALVAREZ, ESQ.
          Winston & Strawn LLP
          200 Park Avenue
          New York, NY 10166-4193
           and
          JENNIFER A. GOLINVEAUX, ESQ.
          THOMAS J. KEARNEY, ESQ.
          Winston & Strawn LLP
          101 California Street, 35th Floor
          San Francisco, CA 94111-5840
           and
          MICHAEL L. BRODY, ESQ.
          Winston & Strawn LLP
          35 West Wacker Drive
          Chicago, IL 60601
           and
          DIANA HUGHES LEIDEN, ESQ.
          Winston & Strawn LLP
          333 South Grand Avenue
          Suite 3800
          Los Angeles, CA 90071

JA451

1140

INDEX

OPENING STATEMENTS BY:

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| ROGER L. VREDENBURG | | |
| | CROSS | 1152 |
| | REDIRECT | 1172 |
| | RECROSS | 1185 |
| MATTHEW J. FLOTT | | |
| | DIRECT | 1188 |
| | CROSS | 1201 |
| | REDIRECT | 1230 |
| JASON ZABEK - via video deposition | | |
| | EXAMINATION | 1236 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

JA452

M.J. Plott - Direct

1193

1    So brings back a lot of good memories.

2  Q.   And how -- what do these sound recordings represent to

3  Warner Music Group?

4  A.   They're some of the most iconic songs in our catalog and,

5  you know, we want to make sure they're protected.

6  Q.   Have you listened to any of the infringing music files in

7  this case?

8  A.   I have.

9  Q.   How many?

10:18:19 10  A.   I listened to 100.

11  Q.   And how were those 100 selected?

12  A.   It was a random statistical sample.

13  Q.   And why did you listen to a sample of the infringing music

14  files in this case?

15  A.   I wanted to make sure that I familiarized myself with what

16  was being infringed and whether they were in fact our songs.

17  Q.   And what did you conclude after listening to those files?

18  A.   That they are in fact our songs listed within the exhibit.

19  Q.   All right.  Let's turn to the revenues generated from

10:18:55 20  Warner Music's -- Warner Music Group's sound recordings.

21    What are the different ways that Warner Music makes

22  money from its sound recordings?

23  A.   We will sell our music in various formats to customers.

24  And we will also license music into sound tracks, into

25  commercials, films.

1194

1          We will license them to competitors in some cases to

2     put together compilations and other works.

3          It will also lead to what we call artist services and

4     expanded rights.  So those are other ancillary rights that we

5     might have in concert promotion, in merchandise, and some other

6     areas like that.

7     Q.   You mentioned formats.  What are the different types of

8     formats that Warner Music Group sells with sound recordings?

9     A.   Sure.  We sell records in a physical format, so that would

10:20:01 10  be either a compact disc or a vinyl record.  They may also come

11    in a box set.  We sell it in digital formats, downloads, and

12    streaming.  We also sell it in mobile formats, ring back tones.

13         Those are the primary formats that we sell music in.

14    Q.   What is Warner Music Group's view on paying its artists?

15    A.   We see it as fundamental to our business.  Our initial

16    relationship is with the artist.  We have to build the trust

17    that they know that we're going to help them develop their

18    careers and that they know that they will be -- they will be

19    paid for the sales that we do on their behalf and our behalf.

10:20:56 20  Q.   How would you react if someone said that the Warner Music

21    Group record labels are not collection agents for their

22    artists, but that they actually just collect money for

23    themselves?

24    A.   I would say they're misinformed and patently wrong.

25    Fundamental to how and why we've been in business for the

M.J. Plott - Direct

1195

1    decades that we've been in business and, you know, our

2    competitors in some cases longer than that, if we didn't have

3    the trust of our artists that they were going to get paid, then

4    we wouldn't be able to continue to sign and develop and attract

5    artists year in and year out.

6    Q.    In your role as executive vice-president and chief

7    financial officer, are you familiar with peer-to-peer piracy?

8    A.    I am.

9    Q.    Has Warner Music Group been impacted by peer-to-peer

10:22:01 10   piracy?

11   A.    We have.

12   Q.    What has been that impact?

13   A.    It has been -- it's been enormous and significant.  In a

14   period of time when music consumption has risen year in and

15   year out, as an industry we've seen revenues decline over that

16   period, over a period of time from its peak to where we are

17   today.

18   Q.    What were the consequences of this revenue decline to the

19   music industry as a whole?

10:22:46 20   A.    Well, first and foremost, you know, artists were not

21   getting paid.  Copyright holders weren't getting paid, as well

22   as union members, as well the musicians working on those

23   records.

24         We, as Warner Music Group, had to rationalize our

25   infrastructure or the labels that we had, and we've had to go

1196

1   through at different points in time and either close labels

2   down, merge them together.

3         Probably the clearest example I could give you would

4   be two of our kind of founding labels of Atlantic and Elektra

5   being merged together to rationalize their costs simply because

6   of the revenue decline.

7         You know, Elektra is the home of artists like "The

8   Doors" and "The Eagles" and "Anita Baker" and others like that.

9   So we also had to lay off people just in terms of looking at

10:23:57 10  what our revenue base could afford and what we wanted to return

11  to our owners.

12  Q.   I'd like to hand up the witness a copy of an exhibit

13  that's been premarked as PX 486.  Thank you.

14        Mr. Flott, have you seen this document before?

15  A.   I have.

16  Q.   And at a high level, what is this document?

17  A.   It reflects the revenues of the U.S. recorded music

18  business over a period of time.

19  Q.   Where does this document come from?

10:24:39 20  A.   It comes from the RIAA, which is our U.S. industry

21  association.

22  Q.   And how is it that you come across this type of document?

23  A.   It is regularly published, and it's a document that I look

24  at on a regular basis.

25        With the RIAA, we do a regularly quarterly call where

M.J. Flott - Direct

1197

1    we go through performance.  It's also on their Web site as

2    well.

3              MS. NOYOLA:  I'd like to move PX 486 into evidence.

4              THE COURT:  Any objection?

5              MR. BUCHANAN:  No, Your Honor.

6              THE COURT:  It's received.

7    BY MS. NOYOLA: (Continuing)

8    Q.   Mr. Flott, can you describe what this chart shows.

9    A.   This chart is reflecting the U.S. recorded music revenues.

10:25:28 10   If I look at the left most column, that's marked as the year

11   2000 where industry revenues were in excess of $14 billion.

12             It continues to the right to 2014 where the revenues

13   are just under $7 billion.

14   Q.   And is this chart specific to Warner Music Group?

15   A.   No, it's the U.S. recorded music revenues.

16   Q.   Tell us what these different colors on this chart show.

17   A.   Each color represents a different format.  So the largest

18   color that you see on the left side of the page being orange,

19   that's the compact disc.

10:26:15 20             And as you move to the right, you'll see other

21   formats as they came into play.  So in 2004, you start to see

22   purple.  That is the -- that's a download, and the different

23   shades are the different forms of whether it was a single or an

24   album.

25             And then we start to see in 2005 green start to come

1   in.  And that is streaming and the different types of streaming

2   revenues that come through.

3   Q.   Are you familiar with the term "music consumption"?

4   A.   Yes, I am.

5   Q.   What does that term mean?

6   A.   Music consumption means the number of hours that a

7   consumer is -- generally commits to listening to music.

8   Q.   And in your day-to-day work, have you become familiar with

9   the volume of music consumption over this time frame of 2000 to

10:27:19 10   2014?

11   A.   Yes.

12   Q.   And how so?

13   A.   In additional reports that either I've seen come from the

14   RIAA or other published articles, there's reference made to the

15   number of hours that a consumer, you know, has committed and

16   how it's grown from 2000 through to today.

17   Q.   What is your understanding of the volume of music

18   consumption from 2000 to 2014?

19   A.   It has continued to increase year over year, and I think

10:27:58 20   towards the end of this chart, I believe consumers are

21   committing almost a week a year -- a week a -- sorry.  A day a

22   week to consuming music.

23   Q.   So how does that trend of music consumption compare to the

24   trend that's shown here about -- on recorded music revenues?

25   A.   Well, in a normal business model, you would expect -- as

M.J. Plott - Direct

1199

1  consumption grows, you would expect revenues to grow in line

2  with it.  There may be some shifts as things go, but generally

3  the trend that we've seen with other formats as they've come in

4  is that you've seen revenue growth, not revenue decline.

5  Q.   So how do you explain the revenue decrease over this time

6  period if music consumption is increasing over the same time

7  period?

8  A.   At this same point in time where we made the turn of the

9  century is really when peer-to-peer piracy was starting to grow

10:29:04 10  at just increasing rates.  And peer-to-peer piracy, by its

11  nature, is not a sale.  It's actually -- it's stealing music.

12  None of those tracks that are being shared peer-to-peer are

13  being paid for.

14         And as a byproduct, artists, copyright holders,

15  union, and the rest of the people within the music industry

16  aren't being paid for those illegal transactions.

17  Q.   And has Warner Music Group ever tried to calculate its

18  harm from peer-to-peer piracy?

19  A.   We've not, other than on a macro -- you know, a macro

10:29:54 20  basis.

21  Q.   And why haven't you calculated -- why haven't you been

22  able to calculate Warner Music Group's harm?

23  A.   The nature of peer-to-peer piracy is it's viral, and

24  probably maybe the best way I can try and explain how viral it

25  works is if we use an example of a pebble going into a pond and

M.J. Plott - Cross

1224

1    is irrelevant to the question of the deterrence of Cox.

2           The peer-to-peer piracy may be the reason that

3    downloads are down.  I mean, they could elicit that.  But going

4    into what a new format is is entirely irrelevant.

5           All they are trying to do is say, look, these

6    companies are now making a lot of money because they are

7    finding ways to deal with the piracy that we're allowing.

8    That's not a place this case should go.

9           THE COURT:  Well, it is of marginal relevance.  I'll

11:21:07 10  allow you to ask whether he is aware of the revenues, whether

11   they have recovered using different methods, and then let's

12   move on.  Okay?

13          All right, thank you.  Your exception is noted --

14          MR. OPPENHEIM:  Thank you, Your Honor.

15          THE COURT:  -- Mr. Oppenheim.

16          All right.  Let's get our jury, Joe.

17          NOTE:  At this point the jury returns to the

18   courtroom; whereupon the case continues as follows:

19   JURY IN

11:22:02 20  THE COURT:  All right.  Please have a seat.

21          And let's continue, Mr. Buchanan.

22   BY MR. BUCHANAN: (Continuing)

23   Q.   A few more questions, sir.

24          On this chart, it starts in 2000, correct?

25   A.   Yes.

M.J. Plott - Cross

1225

1    Q.    And 1999 was the advent of Napster; is that correct?

2    A.    In that area, yes.

3    Q.    Okay.  And in 2001 you had iTunes and Apple?

4    A.    No, it -- iTunes started late 2003, early 2004.

5    Q.    Okay.  And that led to what they call the disaggregation

6    of the album, the CD album, correct?

7    A.    It created a different format.

8    Q.    Right.  And the format was you could now pick and choose

9    whatever individual song you wanted, you didn't have to go buy

11:23:01 10   a CD with 26 songs that cost 25 bucks; isn't that right?

11   A.    If a consumer chose to do that, yes, but they still had

12   the ability to buy music in whichever way that they wanted to.

13   Q.    Right.  But they could make a choice between going on to

14   iTunes and paying a dollar for their favorite song versus going

15   to a record store and paying $25 for an album that had 25 songs

16   and really only wanted one, right?

17   A.    That is -- was their option, yes.

18   Q.    So one of the other things that, as I understand it, that

19   your company did to counter the loss of CD sales due to piracy

11:23:42 20   and downloading was to sign artists up to what they call

21   360 deals; is that right?

22   A.    That's correct.

23   Q.    And they involved basically trying to find artists at the

24   beginning of their career and then expanding the rights that

25   your company would own vis-à-vis that artist, right?

1226

A.   We approached artists, not just at the beginning of their
career, but during their career as well.

Q.   But the 360 deals, didn't you sort of use those to expand
the rights that would be owned by your company versus the
artists' rights, right?

A.   They still were the artists' rights, we just created
whatever the contractual relationship would be as to how much
they would get paid from us working those rights for them.

Q.   Okay.  So it basically -- and I read this in the financial
statement about these expanded rights, what it meant was that
you then would have a greater return of the return on their
product, correct?

A.   That's not necessarily the case.  You would have to look
at each right and how we shared those different revenues.

Q.   Okay.  So -- but isn't it true that under these 360 deals,
you went to artists and you then tried to capture an interest
in more of what you were doing for them to increase revenues
for your company?

A.   We didn't do anything that any business would do.  We were
trying to acquire the maximum amount of rights that we could --

Q.   Okay.

A.   -- and they benefit both the artist and ourselves.
Ultimately, it's the artist's decision as to whether they
wanted to sign up with us and have us work those rights for
them.

J. Zabek - By Deposition

1244

1     at Cox?

2     A.    No.

3     Q.    And in what years did you not receive bonuses?

4     A.    Bonuses at the time were only given to managers and above.

5     So before -- before, I was a manager, I did not -- I got a

6     turkey for Thanksgiving, which was cool, but not a bonus during

7     that time.

8     Q.    So since the time you became a manager, did you receive a

9     bonus every year?

11:48:45 10   A.    Yes, I did.

11    Q.    So for how many years did you serve as the manager or the

12    person responsible for the abuse group?

13    A.    Oof.  As a manager, I believe it was four to five years.

14    Q.    So roughly 2011 to 2016?

15    A.    Somewhere around there.

16    Q.    Okay.  And before that, you were part of the abuse team,

17    just not the manager, correct?

18    A.    Yes.

19    Q.    Okay.  And so, you're very familiar with the abuse team at

11:49:20 20   Cox, correct?

21    A.    At that time, yeah.

22    Q.    And you understood that the abuse team was primarily

23    responsible for the enforcement of Cox's Acceptable Use Policy,

24    correct?

25    A.    Correct.

J. Zabek - By Deposition

1245

1    Q.   And the Acceptable Use Policy is part of Cox's agreement

2    with its Internet account holders and governs the way in which

3    account holders are authorized to use or are prohibited from

4    using Cox's service, correct?

5    A.   That is my understanding, that it is the way our clients

6    would act while using our service.

7    Q.   Cox's Acceptable Use Policy provides that Cox may

8    terminate an account holder's Internet service for copyright

9    infringement, and the abuse team manages the methods,

11:50:06 10  procedures, and processes by which Cox enforces that provision,

11   correct?

12   A.   Our Acceptable Use Policy gives right where we may

13   terminate someone's service for violations on any of them,

14   including copyright.

15   Q.   And that the abuse team would manage that, correct?

16   A.   For our team, yes, we'd manage that.

17   Q.   Cox's abuse ticket handling procedures set forth how Cox

18   handled different types of abuse, correct?

19   A.   We would be our -- our guides, yeah.

11:50:40 20  Q.   And Cox refers to the steps for handling complaints as the

21   graduated response procedure or policy, correct?

22   A.   We did have a graduated response for those.

23   Q.   And you understand that the Cox Abuse Tracking System is

24   referred to as CATS, C-A-T-S, correct?

25   A.   Yes, we did refer to it as CATS.

J. Zabek - By Deposition

1246

1    Q.    The graduated response procedure encompasses actions by

2    customer service reps, automatic actions by CATS, and actions

3    by the abuse team working with CATS and customer service

4    representatives, correct?

5    A.    Yes.   That was the system that our folks would work in to

6    track allegations and complaints that came in from the

7    Internet.

8    Q.    And the Cox abuse ticket handling procedures instruct the

9    abuse team and Cox's customer safety representatives about how

11:51:47 10  to respond to different types of problems, correct?

11   A.    With those are -- with our -- the things that we give our

12   folks, they were our guidelines on how they could handle

13   something that was coming in if -- so they weren't confused

14   when it came in.

15   Q.    And specifically, the document that is referred to

16   internally at Cox called the Cox Abuse Ticket Handling

17   Procedures instruct Cox's representatives on how to handle

18   incoming complaints, including copyright infringement

19   complaints, correct?

11:52:21 20  A.    It was our guidelines for those people on the phones that

21   would be talking to customers or handling tickets.

22   Q.    And a Tier 1 customer service rep is the first level of

23   customer service representative at Cox, correct?

24   A.    If I remember correctly, the Tier 1 was the first person

25   answering the phone call.

**JA465**

J. Zabek - By Deposition

1274

1    group, correct?

2    A.    The people on this list.

3    Q.    We looked at three different versions of Cox's graduated

4    response policies, correct?

5    A.    Yes.

6    Q.    The 2010, 2011, and 2012 versions, correct?

7    A.    Okay.  I believe so.

8    Q.    There was nothing in those written policies indicating

9    that a subscriber could be reactivated immediately after being

12:33:20 10  terminated, correct?

11   A.    I would have to go back to review, but I believe there is

12   not.

13   Q.    I'm going to hand you, Mr. Zabek, what's been marked as

14   Plaintiff's Exhibit 263, which is Bates labeled

15   Cox_Sony_00005514, which includes an e-mail from you on

16   August 12, 2009, to CCI - Abuse TOC.

17         Do you see that?

18   A.    Yes.

19   Q.    Do you know that e-mail address CCI - Abuse TOC?

12:34:28 20  A.    Yes.

21   Q.    And was that an e-mail address that went to the abuse

22   group?

23   A.    Yes, it would go down to our TOC personnel.

24   Q.    So this was an e-mail that you blasted out to the Cox TOC

25   group?

**JA466**

```
         1   A.    People handling the tickets or phone calls coming in.
         2   Q.    And the subject of the e-mail was DMCA Terminations,
         3   correct?
         4   A.    Yes.
         5   Q.    And by DMCA, you were referring to copyright infringement?
         6   A.    It was interchangeable as we would speak.
         7   Q.    The DMCA was interchangeable for copyright infringement?
         8   A.    Yeah.
         9   Q.    And in this e-mail you headed off in bold language --
12:35:17 10  bolded -- excuse me -- language, that says:  Proprietary Info!
        11   This is not to be shared about outside of Cox or abuse reps.
        12   It is not to be passed to Tier 1 or Tier 2.  This info stays
        13   within Tier 2.5 only; correct?
        14   A.    That is what it stated.
        15   Q.    So this was a document that you were sending out that was
        16   not only internal to Cox, but internal to just Cox 2.5 reps,
        17   correct?
        18   A.    It would be to our highest level of reps.
        19   Q.    And in this document you go on to indicate that:  As we
12:36:00 20  move forward in this challenging time, we want to hold on to
        21   every subscriber we can; correct?
        22   A.    It does state that.
        23   Q.    And by we, you're referring to Cox, correct?
        24   A.    In this one I believe I am.
        25   Q.    And then you say:  With this in mind, if a customer is
```

J. Zabek - By Deposition

1276

1    terminated for DMCA or copyright infringement, you are able to

2    reactivate them after you give them a stern warning about

3    violating our AUP and the DMCA.

4              Do you see that?

5    A.    I do.

6    Q.    And that's what you wrote, right?

7    A.    That's what I typed out, yeah.

8    Q.    And then you went on to tell the team that:  We still must

9    terminate in order for us to be in compliance with safe harbor,

12:36:50 10   but once the termination is complete, we have fulfilled our

11   obligation; correct?

12   A.    That is what is stated there.

13   Q.    And then you say that:  After you reactivate them, the

14   DMCA counter restarts; the procedure restarts with the sending

15   of warning letters, just like a first offense; correct?

16   A.    That is stated there.

17   Q.    And by that, what you meant was that after somebody was

18   terminated, if they were reactivated, they wouldn't be

19   suspended or terminated for another notice, they would be

12:37:24 20   subject to another e-mail, and potentially seven other e-mails,

21   before they would be suspended again, correct?

22   A.    Not in every case.  Again, we had given the flexibility to

23   our folks that they could absolutely suspend off another single

24   one.  Things that we had talked about within our weekly

25   meetings.  You know, again, if anything wasn't clear and they

**JA468**

J. Zabek - By Deposition

1277

1    would ask on them, we would clear it up later.

2    Q.    But here what you were saying was that the procedure was

3    to restart with warning letters?

4    A.    That we could restart.

5    Q.    It doesn't say, could, does it?

6          It says:  The procedure restarts with sending of

7    warning letters.

8          Right?

9    A.    It does say that.

12:38:03 10    Q.    It doesn't say, use your best judgment to do what's best

11    for the copyright holders, does it?

12    A.    It does not say that specifically.

13    Q.    Well, it doesn't even infer it, does it?

14    A.    Yes.

15    Q.    Yes, it doesn't?

16    A.    Correct.

17    Q.    And this e-mail says:  This is to be an unwritten

18    semi-policy; right?

19    A.    Yes.

12:38:28 20    Q.    We do not talk about it or give the subscriber any

21    indication that reactivating them is normal; right?

22    A.    Correct.

23    Q.    Now, this new policy you say in here only pertains to

24    copyright infringement, not to spammers or hackers, correct?

25    A.    In this case, yes.  Our folks would not be able to look at

J. Zabek - By Deposition

1278

1  a spammer or a hacker and make a judgment using their best

2  judgment to turn them back on.  They were empowered in these

3  cases.

4  Q.  So the reactivation policy that was set out in your

5  August 12, 2009, e-mail only applied to copyright infringement

6  violations, not to other violations of the AUP, correct?

7  A.  In this -- in this message?

8  Q.  Yes.

9  A.  Yes.

12:39:33 10  Q.  When you say in the beginning of this e-mail, as we move

11  forward in this challenging time, what do you mean by

12  "challenging time"?

13  A.  I couldn't tell you.  Unfortunately, it's too long ago, I

14  am sorry.

15  Q.  Was it a reference to the increasing number of DMCA

16  notices or infringement notices that the abuse group was

17  receiving?

18  A.  I wouldn't want to guess.

19  Q.  This e-mail you didn't want to be shared with customers,

12:40:09 20  correct?

21  A.  That would be correct.

22  Q.  And you didn't want it to be shared with reps other than

23  abuse group, correct?

24  A.  Other than our 2.5 representatives.

25  Q.  And in fact, the reason that you said that you sent this

1293

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME 6 (P.M. Portion)

TRIAL TRANSCRIPT

December 9, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1294

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:        MATTHEW J. OPPENHEIM, ESQ.
                                SCOTT A. ZEBRAK, ESQ.
                                JEFFREY M. GOULD, ESQ.
 4                              MICHAEL J. DRUCKMAN, ESQ.
                                ANDREW L. GUERRA, ESQ.
 5                              LUCY G. NOYOLA, ESQ.
                                JIA RYU, ESQ.
 6                              Oppenheim + Zebrak, LLP
                                4530 Wisconsin Avenue, N.W.
 7                              5th Floor
                                Washington, D.C. 20015
 8

 9   FOR THE DEFENDANTS:        THOMAS M. BUCHANAN, ESQ.
                                Winston & Strawn LLP
10                              1700 K Street, N.W.
                                Washington, D.C. 20006-3817
11                                and
                                SEAN R. ANDERSON, ESQ.
12                              MICHAEL S. ELKIN, ESQ.
                                THOMAS P. LANE, ESQ.
13                              CESIE C. ALVAREZ, ESQ.
                                Winston & Strawn LLP
14                              200 Park Avenue
                                New York, NY 10166-4193
15                                and
                                JENNIFER A. GOLINVEAUX, ESQ.
16                              THOMAS J. KEARNEY, ESQ.
                                Winston & Strawn LLP
17                              101 California Street, 35th Floor
                                San Francisco, CA 94111-5840
18                                and
                                MICHAEL L. BRODY, ESQ.
19                              Winston & Strawn LLP
                                35 West Wacker Drive
20                              Chicago, IL 60601
                                  and
21                              DIANA HUGHES LEIDEN, ESQ.
                                Winston & Strawn LLP
22                              333 South Grand Avenue
                                Suite 3800
23                              Los Angeles, CA

24

25
```

**JA472**

1295

1                           I N D E X

2

3    WITNESSES ON BEHALF OF
      THE PLAINTIFFS:
4

5    JASON ZABEK (Cont'd. Video Deposition)

6    Examination by Mr. Oppenheim:        Page 1297
      Examination by Mr. Elkin:      Page 1349
7    Further Examination by Mr. Oppenheim:    Page 1385

8

9    BRENT BECK

      Direct Examination by Mr. Gould:      Page 1389
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA473**

J. Zabek deposition - Examination

1312

1    exponentially, you know, if we got 400 more in, it was going to

2    be 400 more calls.

3    Q.   But you agree that more notices meant more call center

4    volume, right?

5    A.   It's absolutely possible.

6    Q.   And so by capping the number of notices, that meant less

7    call, call center volume, right?

8    A.   Could mean a steady call volume coming in.

9    Q.   And less notices also meant fewer terminations, correct?

02:30:41 10  A.   No, not necessarily, because the -- when the, the notices

11   came in, we did hold onto those, but you could get less

12   terminations for those, too.

13   Q.   Yeah.  So you'd end up with less terminations, right?

14   A.   It's possible.

15   Q.   Right.  And if there were less terminations, that would

16   mean that Cox would retain more revenue, right?

17   A.   That we would retain those customers and they would, yes,

18   still pay their bills on a monthly basis.

19   Q.   In addition -- so we've talked about a number of things

02:31:11 20  already that was not contained within the written graduated

21   response policy, or I think you referred to it as the M&Ps.  We

22   talked about auto- -- we talked about reactivations.  We talked

23   about caps.  We talked about blacklisting.  I now want to talk

24   about auto-suspend limits.

25   A.   Okay.

J. Zabek deposition - Examination

1313

1    Q.    Do you know what an auto-suspend limit is?

2    A.    I've heard -- yeah, I've heard the term.  Absolutely.

3    Q.    Was an auto-suspend limit the -- a limit on the number of

4    suspensions that Cox would implement in a day?

5    A.    Yes, for those.  Yes.

6    Q.    I'm sorry.  I didn't want to cut you off.  For those --

7    A.    For any abuse issue.

8    Q.    Right.  So an auto-suspend limit would cap the number of

9    suspensions that Cox would do in a day across all types of

02:32:06  10  abuse, right?

11   A.    Yes.

12   Q.    And if Cox received an infringement notice that would have

13   normally called for a suspension under the graduated response

14   policy but the auto-suspend limit had been hit, then Cox would

15   just send an e-mail to the customer instead of doing a

16   suspension, right?

17   A.    I gotta tell you, I'd have to go back through the

18   procedures.  It's been a while since I've even looked at those.

19   I'm sorry.

02:32:38  20  Q.    The normal auto-suspend limit was set at 300 suspensions

21   per day, right?

22   A.    Okay.  The number sounds familiar, but I can't be a

23   hundred percent.

24   Q.    Mr. Zabek, you've been handed what's been previously

25   marked as Plaintiffs' 74, which is an e-mail exchange among

JA475

J. Zabek deposition - Examination

1314

1    people in the abuse department in December of 2009, and if

2    we -- if you start at the back of the e-mail exchange --

3    A.    Um-hum.

4    Q.    -- you'll see Chris Burns is e-mailing Brent Beck and you,

5    and he says:  We've been hitting the 300 suspension limit

6    fairly regularly now.

7          Do you see that?

8    A.    I do.

9    Q.    Does that refresh your recollection that the auto-suspend

02:33:59 10   limit was normally set at 300 suspensions per day?

11   A.    Back in 2009, yes.  Yes.

12   Q.    And that in this e-mail exchange, in fact, Mr. Burns is

13   complaining that there was going to be a decrease in staffing

14   over the next several days?

15   A.    Um-hum.

16   Q.    And that there was a problem with handling the call

17   volume, and asked whether or not the auto-suspend limit could

18   be reduced to 250 per day, right?

19   A.    Um-hum.  That's what he is requesting here, yes.

02:34:38 20   Q.    And you go ahead and you authorize the auto-suspend limit

21   to be dropped to 250, correct?

22   A.    I do.

23   Q.    And then in January, you ask whether or not it can be

24   raised back up to 300 again, right?

25   A.    Asking Chris Burns, yes.  Again, with these, these are

J. Zabek deposition - Examination

1315

1    auto suspensions.  We can still suspend manually as other

2    issues were coming in.  Our auto suspension was one thing,

3    again, that was automatic.  If a DOS attack came in or anything

4    else, we could actually manually suspend them with these folks,

5    too.  So it wasn't just 250 or 300.  Those were just the auto

6    suspends.  But we did have the ability to do manual

7    suspensions.

8    Q.   And --

9    A.   So if somebody was attacking the network, you know, from

02:35:47  10   our -- inside of our network, we could take action on those.

11   Q.   And even though there was an auto-suspend limit that would

12   have covered all abuse situations, it's your testimony that if

13   there were suspensions that should have occurred for reasons

14   other than copyright infringement, that might still happen?

15   A.    It could be for any reason actually.  Even as Chris says

16   at the top, some San Diego agents are continued to process past

17   the 250, meaning we were doing manual suspensions for some type

18   of issue that really required it.

19   Q.   Are you aware of a single instance where there was a

02:36:19  20   manual suspension of a copyright infringement notice that was

21   over the cap?

22   A.    Ten years ago, I could not recall.  I'm sorry.

23   Q.   Mr. Zabek, you've been handed what's been marked as

24   Plaintiffs' 270, which is Bates labeled COX_SONY_974255 through

25   257, and this is in August of 2000 -- this is an e-mail

J. Zabek deposition - Examination

1325

1    who I was.  I wasn't always a nice guy, you know.  I didn't

2    beat people up or anything like that, but they knew, you know,

3    in my youth, I wasn't as solid as I felt I was in my later

4    years.

5    Q.   Mr. Zabek, when you began with the abuse group, it

6    originally had five members and then was reduced down to two.

7    Correct?

8    A.   Five?  Yes.  At our corporate office, there were five

9    people, not including the manager, Matt Carothers.

02:50:55  10  Q.   Okay.  And when did the reduction from five to two occur?

11   A.   To two?  I'm sorry, I can't recall.  If you can refresh my

12   memory on that?  To two?

13   Q.   Are you disputing or disagreeing that you -- that the

14   abuse group was reduced down to two members?

15   A.   I don't remember that number two.  I'm sure it could be,

16   but it doesn't sound familiar right now.

17   Q.   I'm going to ask you, Mr. Zabek, to look at your prior

18   deposition testimony, please.

19   A.   Sure.

02:51:52  20  Q.   This is deposition testimony that you provided under

21   oath --

22   A.   Um-hum.

23   Q.   -- on June 2, 2015, correct?

24   A.   Yes, yes.

25   Q.   I'd ask you to please turn to page 54, and starting on

J. Zabek deposition - Examination

1326

1   line 5, you were asked the question:  How many employees were

2   in the abuse group prior to you BMG manager?

3        Your answer:  Five.

4   A.   Um-hum.

5   Q.   Question:  Do you know why -- or do you have an

6   understanding of why the number of employees in the abuse group

7   was reduced from five to two?

8        Answer:  No.

9        Question:  Who made a decision to reduce the number

02:52:44 10   of employees in the abuse group?

11       Answer:  Somebody well above me, and it came down

12   through my leadership that the change was happening.

13       Question:  It came down through whom?

14       Answer:  Matt Carothers.

15       Does that -- was that testimony true and accurate

16   when you gave it?

17  A.   Yes, that does help to refresh.

18  Q.   Was that testimony accurate when you gave it?

19  A.   Yes.  To the best of my knowledge, yes.

02:53:12 20  Q.   The abuse team, the one that had been reduced from five to

21  two, would handle escalations from the TOC and from NSC,

22  correct?

23  A.   Yes.

24  Q.   As the manager of the abuse team, you would inform the TOC

25  and NSC of policies and procedures for handling infringement

J. Zabek deposition - Examination

1327

1    notices, correct?

2    A.    Yeah.   Any of the team in their corporate office could, of

3    course.

4    Q.    And the technical operations center, or the TOC, was run

5    by Cox, right?

6    A.    Yes.

7    Q.    And it would handle all the calls generated from

8    infringement notices, among other things, right?

9    A.    Yeah, and then several other things, yes.   Yes.

02:54:01 10   Q.    Cox as a general proposition didn't like it when

11   customers' calls weren't answered, right?

12   A.    In general, yeah, we did not want to have a customer hang

13   up, waiting, things like that.   We wanted to make sure that we

14   were handling their issue and helping them.

15   Q.    You didn't want dropped calls, among other things, right?

16   A.    Yes.

17   Q.    So one of the key issues for Cox was making sure that it

18   had an adequately sized TOC staff for whatever number of calls

19   would come in, right?

02:54:35 20   A.    That was to be the goal.

21   Q.    And then the number and type of customer facing actions

22   that Cox took in response to infringement notices would impact

23   the staffing needed in the TOC, right?

24   A.    It could.

25   Q.    Or put another way, Cox needed to make sure that the

J. Zabek deposition - Examination

1329

1   like that, but we did get more personnels as we moved forward

2   in the TOCs, dedicated resources and even with Cox Business

3   also, too.  So there were other areas, maybe not directly under

4   my control, that we would get assistance with.

5   Q.   And one --

6   A.   And again, our automation was pretty stellar in a lot of

7   areas.  It was nice.

8   Q.   At one point, you went to Mr. Metz and sought to increase

9   the size of your abuse team, right?

02:56:53 10   A.   Yes.

11   Q.   My question was Mr. Metz rejected your request, correct?

12   A.   Mr. Metz was unable to provide us more help.

13   Q.   He rejected your request, Mr. Zabek?

14   A.   Yes.

15   Q.   Okay.  And then you went to a Mr. Williams on a different

16   occasion, correct?

17   A.   He was after Mr. Metz had left.

18   Q.   And this was a separate request or a different request to

19   increase the size of the abuse team, correct?

02:57:12 20   A.   It was a separate request.

21   Q.   I'm sorry, if you'd please turn to page 112.

22   A.   Okay.

23   Q.   Line 12, you were asked the question:  So Mr. Williams --

24   did Mr. Williams tell you that it would be nice to expand the

25   abuse group?

J. Zabek deposition - Examination

1330

1           Answer:  Yes.

2           Question:  But was the abuse group expanded?

3    A.    Um-hum.

4    Q.    Answer:  I'd have to go back to look to be accurate.

5           Question:  To be accurate about whether the abuse

6    group was expanded?

7           Answer:  Oh, maybe I misunderstood the question.  I'm

8    sorry.

9           Question:  Was the abuse group expanded?

02:57:50 10          Answer:  My apologies.  No.

11          And was that testimony that you provided in June of

12   2015 accurate?

13   A.    To my knowledge, yes.

14   Q.    And, in fact, quite apart from the abuse group, in 2011,

15   Cox downsized the TOC, or the technical operations center,

16   correct?

17   A.    They did reduce the numbers, yes.

18   Q.    And this was during a period when the number of

19   infringement notices was fairly high, correct?

02:58:36 20  A.    I was going to say they were always high.  But yes, they

21   were, they were one of our larger issues coming in.

22   Q.    In, in -- specifically in April of 2011, Cox reduced the

23   number of TOC employees handling abuse complaints from nine to

24   four, correct?

25   A.    During that time, yes.

J. Zabek deposition - Examination

1331

1    Q.   And as you sit here today, do you have any understanding

2   about why Cox made that reduction?

3    A.   Really, unfortunately, I can't remember exactly why they

4   would have made it, why they made it.  It put us into more

5   automation at that time, which was, which was nice.  We got a

6   lot more complaints and issues out to the customers and

7   everything, knowing that we had, you know, smaller personnel.

8    Q.   Are you now trying to claim that the reduction was nice?

9    A.   No.  No.  Like I said before, I always want other -- I

02:59:38 10   would always want many hands; they make light work definitely;

11   but I think part of it was we were being forced to say what can

12   we do now here; and that's where we really started kicking in

13   automation.

14    Q.   Even apart from people letting go, you were unhappy about

15   the reduction in the staffing to address abuse notices,

16   correct?

17    A.   Well, any reduction in staffing --

18          Any reduction of our staff was a bummer.

19    Q.   And this reduction was going to reduce -- reduce abuse

03:00:07 20   call center staffing to 44 percent of its prior level, right?

21    A.   Yes, approximately.

22    Q.   And, and it was a 75 percent reduction in the workforce

23   for residential abuse, correct?

24    A.   If those numbers were accurate, yes.

25    Q.   I'm going to hand you what was previously marked,

B. Beck - Direct

1390

```
 1    A.    Indeed.

 2    Q.    Thank you for being here.

 3          Mr. Beck, you work at Cox Communications, correct?

 4    A.    Yes, that's correct.

 5    Q.    And your primary role there is to support CATS, correct?

 6    A.    Yes.

 7    Q.    In fact, you're the primary person responsible for

 8    managing CATS?

 9    A.    Yes, that's correct.

04:51:45 10    Q.    And you're the lead developer and engineer for CATS?

11    A.    Yes.

12    Q.    You develop software for CATS?

13    A.    Yes.

14    Q.    You fix software bugs, try to fix software bugs in CATS?

15    A.    Yes.

16    Q.    And you write and add new software feature in CATS?

17    A.    Yes, I do.

18    Q.    You don't have any degrees in software development, do

19    you, sir?

04:52:07 20    A.    Degrees in software development, I do not.

21    Q.    And what about programming?

22    A.    Programming --

23    Q.    You don't have any degrees in programming, do you?

24    A.    Not in computer software programming.

25    Q.    When Cox receives an infringement notice by e-mail at
```

B. Beck - Direct

1391

1     cox@abuse.net -- let me strike that.

2            Cox receives infringement notices at cox@abuse.net,

3     correct?

4     A.   Abuse@cox.net.

5     Q.   And CATS, the copyright abuse -- excuse me, the Cox abuse

6     tracking system then pulls e-mails from that inbox into CATS,

7     correct?

8     A.   That is our general flow.

9     Q.   Now, focusing on the 2012 to 2014 time frame, CATS didn't

04:52:57 10   actually pull all the incoming infringement notices from that

11    abuse inbox; isn't that correct?

12    A.   Did not pull all of them from the inbox.  One could say

13    that, yes.

14    Q.   And, in fact, starting in 2011, Cox didn't pull any

15    e-mails from that inbox from an entity named Rightscorp or

16    Digital Rights Corp; isn't that correct?

17    A.   I do not remember the exact timeline.

18    Q.   Approximately 2011, give or take?

19    A.   I don't recall the timeline exactly, but --

04:53:32 20   Q.   And Rightscorp is an antipiracy vendor who sent copyright

21    infringement notices to Cox on behalf of a music publisher;

22    correct?

23    A.   I understand they sent complaints on behalf of a music

24    publisher.

25    Q.   Those notices never made it into Cox's inbox because Cox

B. Beck - Direct

1392

1    just blocked them at the e-mail level, right?

2    A.   There was a time where they were rejected at the e-mail

3    server level.

4    Q.   So this wasn't an instance where the e-mail came in, you

5    looked at it, did something with it, and then said we don't

6    want to do this.  For the Rightscorp notices, they just -- they

7    never even made it into the e-mail inbox, right?

8    A.   At a particular period in time, yes, that became

9    necessary.

04:54:15  10    Q.   And you're aware, Mr. Beck, that Rightscorp claims that in

11    the 2012 to 2014 period, it sent Cox over 9 million copyright

12    infringement notices?

13    A.   In the -- can you repeat the time frame, please?

14    Q.   You're aware that in the 2012 to 2014 time frame,

15    Rightscorp claims to have sent Cox over 9 million infringement

16    notices?

17    A.   That's quite a lot.

18    Q.   You're aware that that's their position, right, that

19    they've said that?

04:54:44  20    A.   I believe I have heard that.

21    Q.   In fact, didn't you state that in a sworn declaration in a

22    prior matter?

23    A.   Possibly.

24    Q.   But you can't verify that number, can you?

25    A.   How many they had sent to us?  So if they were rejected at

B. Beck - Direct

1393

|    |    |
|----|----|
| 1  | the mail server level, then that wouldn't have been something I |
| 2  | would have spoke to in a, in a declaration, I don't think. |
| 3  | Q.   But you can't verify it, can you, whether it's right or |
| 4  | wrong? |
| 5  | A.   That would have to be at -- I mean, I'm inside the mail |
| 6  | server basically.  So, I mean, I'm on the other side of the |
| 7  | mail server, so I wouldn't have visibility to do that if |
| 8  | they're rejected at that level. |
| 9  | Q.   I want to make sure I understand.  Cox blocked these at |
| 10 | the mail server level, which means the inbox -- it never popped |
| 11 | up in the inbox, correct? |
| 12 | A.   Yeah, they were rejected by the mail server. |
| 13 | Q.   And because they never popped up in the inbox, Cox just |
| 14 | doesn't know how many were blocked in that manner, right? |
| 15 | A.   CATS certainly would not know. |
| 16 | Q.   CATS wouldn't know.  You don't know? |
| 17 | A.   I don't know. |
| 18 | Q.   So you can't verify or dispute the number of notices that |
| 19 | Rightscorp sent, correct? |
| 20 | A.   Once the reject rule was put in place, no. |
| 21 | Q.   I'm sorry, did you say no? |
| 22 | A.   Once the mail server reject rule was put in place, I have |
| 23 | no way to verify further inbound volume. |
| 24 | Q.   I didn't mean to interrupt.  I apologize. |
| 25 | A.   No worries. |

04:55:34 (line 10)
04:56:00 (line 20)

B. Beck - Direct

1394

1    Q.    Now, setting aside the number of notices that Rightscorp

2    may have sent, Cox didn't forward any of those to its

3    customers, correct?

4    A.    Sorry, setting aside -- can you repeat that?

5    Q.    Setting side whether it was 1 million or 10 million or

6    50 million, Cox didn't forward to customers the blocked

7    Rightscorp notices, correct?

8    A.    No.  Those were, those were blocked for reasons, yes.

9    Q.    It didn't send them to the customers?

04:56:44 10  A.    Correct.

11   Q.    And Cox didn't suspend any subscribers based on

12   infringement allegations received from Rightscorp, correct?

13   A.    No, not if they were blocked.

14   Q.    And Cox didn't ask any customers or subscribers to call in

15   and talk to the abuse department about allegations of

16   infringement based on Rightscorp notices that Cox blocked,

17   correct?

18   A.    No, not if the notices were blocked.

19   Q.    And Cox didn't take any customer facing action at all with

04:57:11 20  respect to those --

21        THE COURT:  Well, they weren't received, so naturally

22   that's the answer.  So let's move on.

23   BY MR. GOULD:

24   Q.    Cox doesn't know what customers were referenced in those

25   infringement notices, does it?

B. Beck - Direct

1395

1   A.   Not in those particular notices if they were blocked.

2   Q.   Including whether those infringement notices implicated

3   any of the same subscribers that received infringement notices

4   from plaintiffs, correct?

5           MS. GOLINVEAUX:  Objection, Your Honor.

6           THE COURT:  He doesn't know the answer to any of your

7   questions, you've made that pretty clear, because the e-mails

8   never were received.  Thank you.  Let's move on.

9           MR. GOULD:  If we could pull up, actually in your

04:57:52 10  binder, tab 11?  PX 335.

11          MR. OPPENHEIM:  Does the witness have a binder?

12          MR. GOULD:  I'm sorry.

13          THE COURT SECURITY OFFICER:  All right, counsel.

14  Thank you, sir.

15          All right, Mr. Beck.

16          THE WITNESS:  Thank you.

17  BY MR. GOULD:

18  Q.   At tab 11, sir.

19  A.   Did you say 11?

04:58:25 20  Q.   11, yeah.

21  A.   Thank you.

22  Q.   Mr. Beck, do you recognize this e-mail?

23  A.   Take a quick look over this.

24  Q.   If it helps, sir, I'm just going to focus on the top

25  e-mail from you on the front page.

B. Beck - Direct

1396

1    A.    Okay.  Yes.

2              MR. GOULD:  I move PX 335 into evidence.

3              THE COURT:  Any objection?

4              MS. GOLINVEAUX:  No objection, Your Honor.

5              THE COURT:  It's received.

6              MR. GOULD:  If you could pull up the top e-mail from

7    Mr. Beck.

8    BY MR. GOULD:

9    Q.    Mr. Beck, this is an e-mail chain from February 2014 with

05:00:19 10   several of your colleagues and folks at CenturyLink, some --

11   and this continues from a chain earlier.  I want to focus on

12   your language at the top, starting with "Sources."  You say:

13   Sources like Digital Rights Corp are blacklisted with us, so we

14   silently delete the e-mail messages without any

15   parsing/ticketing/etc.  As soon as our POP3 client recognizes

16   the From address in the headers as blacklisted, we delete the

17   message without retrieving its message body."

18              Do I read that correctly?

19   A.    I believe so, if I followed along.

05:00:57 20   Q.    Now, Mr. Beck, you're asking describing a different kind

21   of blacklisting than we talked about a few minutes ago with

22   Rightscorp, aren't you here?

23   A.    Earlier we discussed rejecting at the mail server

24   platform.

25   Q.    Earlier we discussed rejecting at the mail server

B. Beck - Direct

1397

1    platform, and here you're describing the blacklist process

2    where you actually receive e-mails and then delete them, right?

3    A.    They're received to the inbox.

4    Q.    And then silently deleted?

5    A.    They are deleted if the sender matches the -- a

6    blacklisted sender.

7    Q.    And you wrote here that they're silently deleted; is that

8    right?

9    A.    That is the phrasing, yes.

05:01:31 10   Q.    And this process relates to other blacklisted parties but

11   not to Rightscorp, right?

12   A.    This, this applied to Rightscorp initially.

13   Q.    For a short time until they moved to blocking at the mail

14   server level?

15   A.    Yes.

16   Q.    So respectively, at this point in time, there were two

17   kinds of blacklists, one for blocking e-mails coming in and one

18   for receiving and deleting e-mails?

19   A.    So rejecting in the mail server was specifically in

05:01:58 20   regards to an event with Rightscorp.  It wasn't really

21   something that we had built and designed to do that.  It's not

22   something we applied to any other sender at any time.  So that

23   was more of a, a failure mitigation step.

24        The blacklisting method within CATS, where we're

25   actually seeing the messages in the inbox, that has been

B. Beck - Direct

1398

1    applied to other senders.

2    Q.    They are two separate processes, one blocked at the e-mail

3    and one received and deleted, correct?

4    A.    Yeah.  One is rejected by the mail platform.  The others

5    comes into the inbox and then are considered.

6    Q.    And we talked about with the Rightscorp blocked notices,

7    but with these received and deleted e-mail messages, Cox --

8    excuse me -- CATS also did not retrieve the body of the e-mail,

9    correct?

05:02:45  10  A.    Yes, that's correct.  The blacklisting was based on the

11   sender.

12   Q.    And so like the Rightscorp notices, the blacklisted

13   deleted e-mails also didn't make it into CATS, didn't generate

14   a customer action, correct?

15   A.    Yes, that's correct.  That was the intent of the

16   blacklist.

17   Q.    One difference, though, is that with the deleted messages,

18   you actually have some logs about how many came in and were

19   deleted; isn't that right?

05:03:08  20  A.    I can't speak to what logs the mail servers would have

21   had.  I can only speak to the CATS platform.  So for the CATS

22   platform, we could see how many we were -- how many were

23   hitting that blacklist.

24   Q.    So for that second category of blacklist, we might be able

25   to find some numbers about how many came in and were deleted in

B. Beck - Direct

1404

1    Notices Not Stored in CATS," the second one, deleted notices,

2    those are the notices that Cox deleted, correct?

3    A.    Those were deleted by CATS, yes.

4    Q.    And the notices from Rightscorp that were blocked don't

5    appear in these charts?

6    A.    That's correct.

7    Q.    Okay.  And then this third column, it looks like it's a

8    small exception about a small number that I think we can just

9    move past.

05:11:53  10          Now, the last sentence of the narrative says that for

11   a particular month, the sum of those columns reflect all e-mail

12   notices received at abuse@cox.net in that month that relate to

13   alleged copyright infringement, correct?  Basically, you could

14   do the math horizontally and figure out the total notices per

15   month?

16   A.    Yes.  Yes, that should be correct.

17   Q.    Now, if we could just go to the chart, please, and just

18   kind of -- let's go to the next page and zoom up a little bit,

19   and then just kind of scroll down slowly, and let's look and

05:12:41  20   eyeball the figures in the first two columns:  notices in CATS

21   and deleted notices, and do you see that over time, Mr. Beck,

22   keep going, the deleted notices start to increase?

23          Let's go to the next page, please.

24          Do you see that by 2013, the deleted notices starting

25   in February 2013 start to increase a bit more into the 114,000,

B. Beck - Direct

1405

1    123,000, 109,000?  Do you see that?

2    A.    Yes.

3    Q.    And you see that as the months continue, that the deleted

4    notices actually exceed the number of notices that CATS

5    accepted?

6    A.    That is the case for some of the months, yes.

7    Q.    Isn't it the case for all of the months there shown in

8    2013, sir?

9    A.    No, it's not.

05:13:53 10   Q.    No, it's not?  Is there one that you see where the deleted

11   notices are smaller than the accepted notices?

12            Oh, you're right.  May 2013, there were about 10,000

13   more accepted than deleted.  And the other months, the deleted

14   exceeded the accepted, correct?

15   A.    Yes.  That matches what I'm seeing.

16   Q.    Now, I've done the math here, and I counted the number of

17   deleted notices in the years shown in this chart, and it's

18   about 5 million.  And is there any reason to doubt my math?

19   A.    I would have to run the numbers myself to speak to that.

05:14:37 20   Q.    Okay.  And then I did the same for the claims period.

21            And if we could pull up the first slide of the

22   demonstrative?

23            What this slide shows, sir, is the claim period,

24   February 2013 through November 2014, for the information we

25   just looked at, including the accepted notices, the deleted

B. Beck - Direct

1406

1    notices, and the total notices.

2            Do you see that the total number of notices was about

3    5.7, 5.8 million that Cox received in this time period?

4    A.   Based on the document, yes.

5    Q.   Assuming the math is correct.

6    A.   That's right.

7    Q.   And do you see that the number that Cox accepted was just

8    over 2 million, and that comes to about 36 percent of that

9    total?

05:15:31 10  A.   I see.

11   Q.   And do you see, Mr. Beck, that the number that Cox deleted

12   is about 3.68 million, which comes to about 63 percent of the

13   notices?

14   A.   I see that.

15   Q.   So according to this sworn information that Cox provided,

16   Cox deleted over 63 percent of the infringement notices it

17   received in 2013 and 2014, correct?

18   A.   Based on the numbers we're looking at.

19   Q.   And not one of those would have received a customer facing

05:16:03 20  action of any kind, correct?

21   A.   For the deleted notices.  They may have received notices

22   from non-blacklisted senders, however.

23   Q.   Of those 3.68 million, not a single customer faced any

24   action, correct?

25   A.   For those particular notices.

B. Beck - Direct

1407

1    Q.   And you don't know how many of those millions of notices

2    pertain to the subscribers who are identified in the notices

3    from plaintiffs, do you?

4    A.   I just know if they are deleted, then we do not have

5    copies of those.

6    Q.   Now, I want to talk a little bit about what CATS does when

7    it receives a copyright infringement notice from a

8    non-blacklisted party.  So first CATS automatically scans the

9    notice for information.  You call it parsing; is that right?

05:16:54 10  A.   That's a general term I would use, yes.

11   Q.   And CATS tries to figure out what type of abuse complaint

12   it is?

13   A.   Yes.

14   Q.   So it tries to figure out is this a copyright infringement

15   complaint?

16   A.   Yes, that's correct.

17   Q.   And it looks for an IP address, a date, and a time related

18   to the instance of infringement identified, correct?

19   A.   Yes.  Those are some of the things we look for.

05:17:15 20  Q.   And that allows CATS to match that infringement notice to

21   a particular customer?

22   A.   Those are some of the key values we would use.

23   Q.   So that's a process that CATS does.  It matches that

24   information to try and find the customer, right?

25   A.   Yes, that's part of the flow.

B. Beck - Direct

1411

```
        1   A.   Right.  2012, 2013, 2014.

        2   Q.   And just in this limited time frame, do you recall that

        3   there were approximately 315,000 tickets in this document?

        4   A.   That sounds -- that matches what I recall, yes.

        5   Q.   You've reviewed this.  You remember it.  That sounds about

        6   right?

        7   A.   Yeah.  315,000 tickets in here.

        8   Q.   Now, if we look at column H in the ticket data, it's a

        9   column called "Action."  Do you see that?

05:22:02 10   A.   Um-hum.

       11   Q.   And we can filter it in different ways to figure out how

       12   many, how many times Cox took different kinds of actions,

       13   correct?

       14   A.   That column does show what the action was taken.

       15   Q.   For example, we could filter on column H for sent reply.

       16        Why don't we do that, Mr. Duval.  Sent reply.  There

       17   you go.

       18        And you see on the bottom left, there's a number

       19   there that tells you how many records came up after you

05:22:46 20   filtered in that way?

       21   A.   I see.

       22   Q.   And what's that number?  What's that number, sir?

       23   A.   The number showing here is roughly 48,000.

       24   Q.   So 48,018, is that correct?

       25   A.   Yep, out of the 570,000-plus total.
```

B. Beck - Direct

1412

1    Q.    But that's out of 315,000 tickets, right?

2    A.    Yes.  570,000 is the count of the number of actions, and a

3    given ticket could have multiple action entries.

4    Q.    Sometimes a ticket has multiple entries because it might

5    say sent a reply for one entry and then closed the ticket on

6    another entry?

7    A.    That is correct.  That is one possible.

8    Q.    So in order to understand the number of actions taken out

9    of the number of tickets, we really want to look at it out of a

05:23:32  10   function of 315,000, correct?

11   A.    Possibly.  It depends on what we're looking at.

12   Q.    Let's do that.  So we have 48,000 instances of sent reply

13   out of these 315,000 tickets.  Now, "sent reply" is the

14   language that Cox and CATS uses typically when CATS receives an

15   e-mail that exceeds a given sender's hard cap limit, correct?

16   A.    Depends on the action content form here.

17   Q.    And you see on the action content form in column I, they

18   all look like hard limit complaints?

19   A.    For this particular page, yes.

05:24:09  20   Q.    I think there might be a couple of other ones, but let's,

21   let's do this:  Let's unselect and just select hard limit

22   complaints.  So for all of those hard limit complaints, it's

23   46,997?

24   A.    Yes.

25   Q.    Okay.  So just about 47,000 times that Cox sent a hard

B. Beck - Direct

1413

1    limit reply to a sender.  Am I correct, sir, that means that

2    Cox sent an e-mail back to whoever sent it, closed the ticket,

3    and did nothing as to the customer?

4    A.   I can't say that we did nothing, but yes, we did not take

5    a customer facing notification at that time.

6    Q.   So you took no customer facing notification.

7    A.   Correct.

8    Q.   Didn't send the customer a warning for those 47,000,

9    correct?

05:24:53 10   A.   No, but it will serve as their first step in our graduated

11   response program if they haven't received any other complaints.

12   Q.   So this might replace the ignore hold for all?

13   A.   The hold for more, yes.

14   Q.   So this might replace the ignore hold for more, but other

15   than that exception, this doesn't bump them up in the graduated

16   response step, correct?

17   A.   No.  It can take the place of the hold for more, but

18   there's no additional customer facing action on those.

19   Q.   This would not give the customer a warning e-mail, would

05:25:25 20   it?

21   A.   No.

22   Q.   They wouldn't be suspended based on this, right?

23   A.   No.  That would be a customer facing.

24   Q.   There would be no customer call, correct?

25   A.   That would be customer facing action.

B. Beck - Direct

1414

| | |
|---|---|
| 1 | Q.    There would be no suspension? |
| 2 | A.    Also customer facing action. |
| 3 | Q.    And no termination? |
| 4 | A.    That would be very much a customer facing action. |
| 5 | Q.    And as for the graduated response, I want to make sure I |
| 6 | understand how that works.  So ordinarily, when CATS receives a |
| 7 | notice that it takes a customer facing action, it might bump up |
| 8 | the customer in the graduated response, correct? |
| 9 | A.    Conversationally speaking, yes. |

05:25:54 10   Q.    Conversationally speaking.  That's -- that works for me.

11           Say a customer is on their fifth ticket under the

12   graduated response and then they get their sixth ticket.

13   Ordinarily if it it's a notice -- if it's a ticket that Cox

14   processes and recognized, it would bump that customer up to the

15   sixth step, correct?

16   A.    Yes.

17   Q.    Okay.  But if it's a hard limit reply, that customer just

18   stays at the fifth?

19   A.    Yes.

05:26:20 20   Q.    They essentially get a free pass on the graduated

21   response, don't they?

22   A.    I don't know that I would call it a free pass.  The

23   complainant can resend the complaint at a later time if they

24   have a lower volume spot.

25   Q.    Can we pull up -- actually in your binder, please, take a

B. Beck - Direct

1415

1     look at 310, PX 310, tab 10.  PX 310.

2           Mr. Beck, this is a two-page e-mail that you're

3     included on.  Let me know if you can -- if you recognize that,

4     sir.

5     A.    Okay.  Give me just a moment to review.

6     Q.    Sure.

7     A.    Okay.

8           MR. GOULD:  I'd move to admit PX 310.

9           THE COURT:  Any objection?

05:27:43  10        MS. GOLINVEAUX:  No objection, Your Honor.

11          THE COURT:  It's received.

12          MR. GOULD:  So if we pull that up and start at the

13    second page, please, just zoom in on the whole e-mail, if you

14    could.

15    MR. GOULD:

16    Q.    So, Mr. Beck, here you're sending an e-mail to the

17    corporate abuse and data ops - CATS teams, and the subject is

18    High Complaint volume for Universal Studios, correct?

19    A.    Yes.

05:28:05  20  Q.    And you say:  We have a "hard limit" of 200/day applied

21    for Universal's complaints to us, but we're seeing quite a bit

22    more than that coming in.  In general it isn't a big deal

23    really (we create closed tickets once the limit is exceeded

24    each day), but this complainant in particular has had daily

25    complaint volumes as high as 3,700+ lately.  Does that seem

1429

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
           Plaintiffs,          :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
           Defendants.          :
                                :
--------------------------------:
```

<u>VOLUME  7  (A.M. Portion)</u>

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
                                  JEFFREY M. GOULD, ESQ.
4                                 MICHAEL J. DRUCKMAN, ESQ.
                                  ANDREW L. GUERRA, ESQ.
5                                 LUCY G. NOYOLA, ESQ.
                                  JIA RYU, ESQ.
6                                 Oppenheim + Zebrak, LLP
                                  4530 Wisconsin Avenue, N.W.
7                                 5th Floor
                                  Washington, D.C. 20015
8

9    FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                  Winston & Strawn LLP
10                                1700 K Street, N.W.
                                  Washington, D.C. 20006-3817
11                                  and
                                  SEAN R. ANDERSON, ESQ.
12                                MICHAEL S. ELKIN, ESQ.
                                  THOMAS P. LANE, ESQ.
13                                CESIE C. ALVAREZ, ESQ.
                                  Winston & Strawn LLP
14                                200 Park Avenue
                                  New York, NY 10166-4193
15                                  and
                                  JENNIFER A. GOLINVEAUX, ESQ.
16                                THOMAS J. KEARNEY, ESQ.
                                  Winston & Strawn LLP
17                                101 California Street, 35th Floor
                                  San Francisco, CA 94111-5840
18                                  and
                                  MICHAEL L. BRODY, ESQ.
19                                Winston & Strawn LLP
                                  35 West Wacker Drive
20                                Chicago, IL 60601
                                    and
21                                DIANA HUGHES LEIDEN, ESQ.
                                  Winston & Strawn LLP
22                                333 South Grand Avenue
                                  Suite 3800
23                                Los Angeles, CA

24

25
```

1431

1

2                                    INDEX

3

WITNESSES                         EXAMINATION        PAGE

4

5    BRENT BECK (Resumed)

                                   DIRECT            1434
6                                  CROSS             1456
                                   REDIRECT          1528
7                                  RECROSS           1542

8    MATT CAROTHERS

                                   DIRECT            1544
9                                  CROSS             1568

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B. Beck - Cross

1460

1    time that I shifted over to a software engineer title, the

2    whole thing just kind of being a slow evolution really, rather

3    than sort of, you know, stair-step responsibility changes.  It

4    just sort of evolved and grew over time.

5    Q.   Sure.  And, Mr. Beck, what is your current position at

6    Cox?

7    A.   I think officially at the moment, I am considered a

8    software engineer 2.

9    Q.   Okay.  And can you describe generally what you do in your

09:46:10 10    current role?

11    A.   My current role, I handle pretty much all of the technical

12    aspects for the CATS platform, so everything from support to

13    architecture and design, software development, engineering.

14    Q.   And was that also your role during the 2013 and 2014 time

15    period?

16    A.   Yes, it was.

17    Q.   Okay.  And, Mr. Beck, we've heard from a number of folks

18    about CATS, about Cox's CATS system.  What is CATS at a high

19    level?

09:46:45 20    A.   So I guess CATS, to start, is the Cox abuse tracking

21    system, and that's an in-house-built system that was stood up

22    to, to be able to handle -- pardon me, abuse complaints related

23    to our customer internet services.  So generally speaking,

24    abuse complaints are sent to abuse@ whatever, you know, the

25    domain is.  And so abuse@cox.net or any other Cox domains we

1    have tend to flow into the front of CATS, and CATS can pick up

2    those complaints, document them, take actions, so forth.

3    Q.    Okay.  And, Mr. Beck, putting aside for the moment the

4    blacklisted complainants that Mr. Gould asked you about, can

5    you give us a sense of the volume of copyright complaints that

6    CATS processed during the 2013 and 2014 time period?

7    A.    Yes.  If I remember correctly, we -- in that time frame,

8    I think 2013 was probably just over a million; 2014 was about

9    1.4 million.

09:47:59 10    Q.    I'm sorry?

11    A.    I believe it was about 1.4 million for 2014, a little over

12    a million for 2013.

13    Q.    All right.  And, Mr. Beck, do you know approximately how

14    many abuse complaints total, including copyright complaints,

15    CATS processed in the 2013 and 2014 time period?

16    A.    Yeah.  So including all of the abuse types that we deal

17    with in CATS, that would have been on average about in excess

18    of 3 million per year average in that time range.

19    Q.    All right.  Mr. Beck, have you heard of an entity called

09:48:37 20    the Recording Industry Association of America, which is also

21    referred to as the RIAA?

22    A.    Yes, I have.

23    Q.    And to your knowledge, did Cox receive copyright notices

24    from the RIAA during the 2013 and 2014 time period?

25    A.    Yes, we did.

B. Beck - Cross

1462

1   Q.   And did Cox keep copies of all the notices it received

2   from the RIAA during that period?

3   A.   Yes.

4   Q.   As part of this lawsuit, were you asked to retrieve copies

5   of those notices that Cox received from the RIAA?

6   A.   Yes.

7   Q.   How did you retrieve them?

8   A.   Performed inquiries into the CATS database, so that's --

9   you know, we have a database at the, at the heart of the CATS

09:49:17 10   platform is a database, and that's where all the information is

11   stored, you know, in a structured fashion.

12        So querying the database is basically, you know,

13   there's an SQL language.  I don't want to get too technical,

14   but there's a programming like language you can formulate

15   advanced searches or filters and ways to retrieve out

16   particular data, so I performed database queries using that

17   method to find that information.

18   Q.   And what is -- you referred to database queries.  What is

19   a -- what is a query?  Can you explain that for us, please?

09:49:51 20   A.   Sure.  It's just a -- it's a special way of formulating

21   commands to tell the database, you know, which information

22   you're looking for in this particular case.  In this particular

23   example, pulling the complaints here, I would be able to write

24   a small snippet of code that basically says, you know, grab all

25   of the records where, you know, the dates are between this date

1    know, of the complaint.  It can't actually tell what's happened

2    or verify that, no.  We're basically just taking the complaint,

3    you know, at face value, you know, someone is saying this is

4    happening.

5    Q.   And once CATS determines that this is -- this incoming

6    e-mail is a copyright notice, what does it do next?

7    A.   So once we have determined this is a copyright notice,

8    we're going to continue parsing the body, try to extract some

9    key information out of there, especially like IP port, time

10:02:51 10   stamp, run some back inquiries and see if we can take that

11   information and match it up to a customer account hopefully,

12   and even if we don't match it up to a customer account, we're

13   most likely going to move on and create a ticket, and then from

14   that ticket, we can take customer-facing actions as

15   appropriate.

16          Those could be automated.  They could be done

17   manually by a Cox representative, either way.

18   Q.   Okay.

19   A.   But generally, we're going to parse it, get some

10:03:23 20   information, and create a ticket in the CATS system.

21   Q.   Okay.  And you mentioned CATS would try to match this

22   notice up to a customer account.  How, how does it do that?

23   A.   So to match it up to a customer account, we may perform a

24   series of queries within Cox.  Most of the time, we're looking

25   for DHCP records, but we're going to take that -- the IP

B. Beck - Cross

1    address from the complaint.

2          And since IPs can change over time, they are

3    technically dynamic, for the most part, they -- almost all of

4    them are going to typically be dynamic.

5          Then we're going to use that date and time that the

6    complaint says the event occurred, and we're going to use that

7    combined with the IP and possibly the port and see if we can

8    match up, you know, find a record where the IP at that

9    particular time, you know, which device was that associated

10:04:20  10    with, which customer account is that, in turn, associated with.

11    So that's typically the flow that we're going to follow.

12    Q.   And, Mr. Beck, does determining the account also determine

13    the user that engaged in the alleged behavior?

14    A.   No, that's not really possible.

15    Q.   Why not?

16    A.   That's -- it's not really a technically possible sort of

17    thing.  I mean, we can -- the IP will match up to most likely a

18    cable modem or something of that nature, and then that modem

19    is, of course, you know, associated to a particular customer

10:04:56  20    account.  But, you know, within a customer's home, you know,

21    there could be multiple people.  We don't really know who's

22    actually using the internet at that time.  It could be any

23    number of situations.  I mean, typically, it's going to have

24    multiple people in it.

25          Basically if you see a car speed down the road, you

1  can report the tag, but you don't really know if the owner of

2  the car was driving or their spouse or their kid or their

3  neighbor or their guest.

4  Q.   Well, and is it possible for someone other than a family

5  or household member to use an account service?

6  A.   Oh, certainly.  So, you know, you could have people

7  visiting, of course.  You could have guests in the home.  You

8  could have a neighbor on the WiFi, especially if you, you know,

9  bought a new router, plugged it in, and didn't realize that the

10:05:50 10  default password was "password."  That happens.  So your

11  neighbors may figure that out and get on there and think that

12  they get free internet by just riding on top of yours.  So

13  there are certainly cases where that can happen, and that's

14  just in the residential space.

15       If we get into other use cases, you could see

16  certainly other people involved with business use cases, that

17  sort of thing.

18  Q.   Well, does Cox have both residential and business

19  subscribers for its internet service?

10:06:23 20  A.   Absolutely.  We certainly do.

21  Q.   And does CATS receive copyright notices directed to Cox

22  Business subscribers as well as residential subscribers?

23  A.   Certainly.  Absolutely.

24  Q.   And might a business account also have multiple users?

25  A.   Even more so, I would say.  Absolutely.

B. Beck - Cross

1474

1  Q.   Can you give us an example?

2  A.   Sure.  I mean, even if we just start with a small

3  business, you know, all of their employees.  It could be -- you

4  know, any of those employees could be using the internet.  I

5  would imagine most of them probably would just in day to day.

6       But, I mean, working up the, up the line with

7  business, you have all sorts of these cases.  So they may offer

8  guest WiFi services, you know, maybe they have a guest WiFi in

9  their waiting room and -- or it's a small restaurant or

10:07:05  10  something, maybe they have WiFi in their cafe.

11       But then you get into larger use cases with

12  commercial, too.  So you could have situations like

13  universities.  You could have situations like military bases.

14  You could have hospitals.  We certainly have a number of

15  hospitals as customers.

16       So even -- there are even hospitality cases like

17  convention centers.  That's going to be a huge number of users

18  really.  So there are definitely some, some situations like

19  that.

10:07:41  20  Q.   Now, once CATS identifies the subscriber, is Cox able to

21  contact the subscriber?

22  A.   Yeah, typically.  A customer account is going to typically

23  have contact information on it, yeah.

24  Q.   And once a ticket is created in CATS, what does CATS do

25  with the complaint?

B. Beck - Cross

1475

A.   So once a ticket is created in CATS, the complaint is

associated to that ticket.  So, you know, if anyone brings up

that ticket in CATS, you'll see the complaint directly beneath

the ticket details.  So it's directly associated to the ticket.

Q.   And does CATS ever associate a copyright notice with an

existing ticket?

A.   It can, yes, under certain circumstances.

Q.   And what circumstances?

A.   So a complaint can be associated to an existing CATS

10:08:38  ticket where we're kind of looking to see if it's in the same

time frame.  So if we get a -- probably an example is the

easiest.  If we get a complaint and they say, you know, an

incident happened at 9:00 and we create a ticket and we notify

the customer, and, you know, an hour later, we get another

complaint, and it says, you know, same type of abuse, same

customer, in or around 8:58 or 9:15 or maybe, you know, three

hours prior to that or anything along those lines, it'll say

hey, you know, this happened, we may see that there's an

existing ticket right around that same time frame, and we've

10:09:27  notified this customer about this type of behavior.  So we're

going to take this complaint and attach it to that ticket as

supplemental evidence.  And then if a rep goes in and looks at

the ticket, then they'll see that it has multiple complaints

attached to it, and they'll be able to see each of those.

Q.   Is that sometimes referred to as "rolling up"?

B. Beck - Cross

1526

1    issue.

2              MR. OPPENHEIM:  Well, except then the question is do

3    I ask Mr. Carothers the question -- I mean, somebody has to --

4    it seems obvious that that has to be why it happened, Your

5    Honor, at least the implication.

6              THE COURT:  We're not going -- we're not going there

7    based on just that document.  Okay?  I mean, that would open up

8    BMG.  It's too significant.

9              MR. OPPENHEIM:  Would it be simpler to just not show

11:47:05 10   him that quarter?

11             THE COURT:  Do you want to ask him the totals for the

12   year?

13             MS. GOLINVEAUX:  Sure.  That's fine, Your Honor.

14             THE COURT:  Why don't you do it that way.

15             MR. GOULD:  Ask for 2013 and '14?

16             THE COURT:  And '14, yeah.

17             MR. GOULD:  Without the document?

18             THE COURT:  Without the document.

19             MR. GOULD:  Thank you.

20             NOTE:  The sidebar discussion is concluded; whereupon

21   the case continues before the jury as follows:

22   BEFORE THE JURY

23   BY MS. GOLINVEAUX:

24   Q.   So, Mr. Beck, in connection with this litigation, were you

25   asked to provide information about the total number of Cox

B. Beck - Cross

1527

1  subscribers that Cox terminated for AUP violations for the

2  years 2013 and 2014?

3  A.   Yes.

4  Q.   And do you recall the total number of subscribers that Cox

5  terminated in those years?

6  A.   The total number was low 30s.  I feel like it was 31, 32,

7  33.  I can't remember the exact number, but it was in the 31 to

8  33 range, if I remember correctly.

9  Q.   And that's the total number of subscribers that Cox

11:48:29 10 terminated for violations of its AUP during the years 2013 and

11  2014?

12  A.   Yes, that's correct.

13  Q.   And, Mr. Beck, of those 31, 32, or 33 terminations, do you

14  know how many were for -- in connection with a customer getting

15  a copyright notice?

16  A.   They were all for copyright.

17  Q.   All of them?

18  A.   Yes, that's correct.

19  Q.   And, sir, of those terminated subscribers, do you recall

11:48:52 20 how many had received copyright notices specifically from the

21  RIAA?

22  A.   I believe it was 13.  I believe it was 13, if I'm

23  remembering correctly.

24  Q.   If we pull up the ticket action report and sort on

25  terminations, would we get that number?

1528

```
        1   A.   Yes.  The ticket action history report would reflect

        2   termination actions.  We could sort by action.

        3            MS. GOLINVEAUX:  James, could you pull the ticket

        4   action report and sort on terminations?

        5   Q.   Mr. Beck, how many does this show?

        6   A.   Thirteen.

        7   Q.   Okay.  So does that tell you 13 subscribers who received

        8   RIAA notices during the period were terminated by Cox?

        9   A.   Yes.

11:49:53 10            MS. GOLINVEAUX:  Thank you.

       11            Your Honor, no further questions.

       12            THE COURT:  All right.  Thank you.  Redirect?

       13            MR. GOULD:  Yes, please.

       14            MS. GOLINVEAUX:  Pass the witness, Your Honor.

       15            THE COURT:  All right.  Thank you.

       16                   REDIRECT EXAMINATION

       17   BY MR. GOULD:

       18   Q.   Mr. Beck, you were asked a number of questions and talked

       19   at some great length about forged copyright infringement

11:50:23 20   notices.  Do you recall that?

       21   A.   Yes, I do.

       22   Q.   There's no suggestion here that any of the RIAA notices

       23   are forged, is there?

       24   A.   No.  None of RIAA notices were forged, to my knowledge.

       25   Q.   You testified about instances of infringement where
```

1    someone else using the customer's account might be the one

2    doing the infringement, correct?  Do you recall that?

3    A.   Yes.  That can happen a number of ways.

4         MR. GOULD:  Can we pull up PX 184, please?  This is

5    already in evidence.

6    Q.   This is Cox's Residential Acceptable Use Policy.  Are you

7    familiar with this, sir?

8    A.   Generally.

9    Q.   And if we could -- we looked at this the other day.  If we

11:51:13 10  could scroll down to on the second page and highlight or call

11   out the content under -- keep going, please -- under User

12   Content, just blow up that whole paragraph?

13        And, sir, do you see that this user AUP that Cox

14   requires every subscriber to agree to says:  You -- and that

15   means the subscriber -- are solely responsible for any

16   information that is transmitted from your IP address or your

17   account on the web or other internet services.  You must ensure

18   that the recipient of the content is appropriate and must take

19   appropriate precautions to prevent minors from receiving

11:51:52 20  inappropriate content.

21        Are you familiar with that?

22   A.   I see that.

23   Q.   This means that the customer, the subscriber is

24   responsible for whatever happens to their IP, correct?

25   A.   I don't know that I'm in a position to interpret the legal

M. Carothers - Direct

1545

1    You're currently employed at Cox?

2    A.   I am.

3    Q.   And you've been with Cox for approximately 18 years; is

4    that right?

5    A.   A little over, yeah.

6    Q.   And between the years of 2001 and 2007, you were part of

7    the abuse group, correct?

8    A.   Yes.

9    Q.   And in 2007, you transitioned to a different role in the

12:15:16 10   security engineering department or group, correct?

11   A.   Yes.

12   Q.   So it's been 12 years since you were in the abuse group,

13   correct?

14   A.   Correct.

15   Q.   So you're now more involved in security than you are

16   abuse; is that correct?

17   A.   Well, abuse is part of security.

18   Q.   One of the tools that you use to detect security threats

19   on the Cox network is called Procera, correct?

12:15:51 20   A.   Yes.

21   Q.   And Procera is what is referred to as a deep packet

22   inspection tool?

23   A.   Yes.

24   Q.   Often people use the acronym DPI, deep packet inspection

25   tool, for it?

M. Carothers - Direct

1546

```
         1   A.    That's correct.
         2   Q.    And a deep packet inspection tool looks at network traffic
         3   going back and forth across Cox's network, identifying broadly
         4   what types of traffic is there, and then stores statistics
         5   about that traffic, right?
         6   A.    That's correct.
         7   Q.    And among the things that the deep packet inspection can
         8   do is determine the volume of BitTorrent traffic on Cox's
         9   network?
12:16:36 10  A.    That is correct.
        11   Q.    And so Cox can monitor the amount of BitTorrent traffic
        12   that a specific subscriber uses on a particular day?
        13   A.    We can.
        14   Q.    I'm sorry, did you say, "We can"?
        15   A.    We can.
        16   Q.    If Cox identified that a -- let me back up for a minute.
        17         You understand that many users of BitTorrent will
        18   access sites like ThePirateBay to initiate their, their
        19   downloading process, correct?
12:17:11 20  A.    Yes.
        21   Q.    And as head of security, you're aware that Cox can block
        22   subscribers from being able to access particular sites,
        23   correct?
        24   A.    No, that's not correct.
        25   Q.    Well, isn't it true that Cox has the technical capability
```

1547

1    of blocking sites?

2    A.    Not really, no.

3    Q.    Mr. Carothers, I took your deposition, right?

4    A.    Yes.

5    Q.    And I took your deposition on April 25, 2019, right?

6    A.    Correct.

7    Q.    And during that deposition, you were sworn under oath,

8    were you not?

9    A.    Yes.

12:17:56  10    Q.    And you swore that you would tell the truth in that

11    deposition, right?

12    A.    I did.

13    Q.    And in that deposition, on page 303, line 16 to 19, I

14    asked you the following question and you gave the following

15    answer:

16          So you're technically capable of doing a block, but

17    you choose not to do so, but you don't block any -- strike

18    that.  Excuse me.

19          Starting at line 14, I apologize, on page 305:

12:18:30  20          You technically could block a torrent site, correct?

21          Answer:  There is a technical capacity, but there is

22    not a right to do so.

23          Was that -- was that your testimony when I took your

24    deposition?

25    A.    May I see the testimony?

M. Carothers - Direct

1548

1        MR. ELKIN:  May we approach, Your Honor?

2        THE COURT:  Yes.

3        NOTE:  A sidebar discussion is had between the Court

4   and counsel out of the hearing of the jury as follows:

5   AT SIDEBAR

6        THE COURT:  Yes, sir.

7        MR. ELKIN:  Thank you.  This is another situation

8   where I believe counsel may be trying to elicit some statement

9   that Mr. Carothers had in his deposition, and if you read

12:20:11   10   through at a couple of pages, he specifically says they can't

11   block because of net neutrality, and there is a portion where

12   he gets him to say you can't block a torrent site.

13        You can't possibly look at his testimony unless you

14   read two or three pages in.  It's not a clean admission.  And I

15   don't know what Mr. Carothers had in his mind when he answered

16   that question, but he clearly said that they can't block it

17   because of net neutrality.  It's misleading.

18        MR. OPPENHEIM:  That's an unfair --

19        THE COURT:  Okay.  You have a chance to respond.

12:20:45   20   MR. OPPENHEIM:  The question and answer is very

21   clear.  I asked the question about the technical ability.  Now,

22   he can answer we may have had the technical ability, but we

23   felt as though legally we couldn't, and I'm happy to get into

24   that issue, but whether or not they have the technical ability

25   is a very clean question.  I'm happy to show you the

**JA520**

1558

1          THE COURT:  Overruled.

2          THE WITNESS:  Well, again, we didn't use that

3    specific language.

4    BY MR. OPPENHEIM:

5    Q.  He didn't use any language that it was even remotely close

6    to speaking about daily spikes, did he?

7    A.  Actually, at the very end of this e-mail, he says:  We're

8    going to hold off on limiting the number of complaints that we

9    can accept per day for now and see how this affects our

12:35:13 10  suspension counts.

11   Q.  In fact, doesn't that support that he -- that the meeting

12   wasn't about addressing daily issues, if anything?

13   A.  No, he says "per day" right there.

14   Q.  He says:  We're going to hold off on limiting the number

15   of complaints that we can accept per day for now and see how

16   that affects our suspension, right?

17   A.  Yeah, but he's clearly talking about per day.

18          THE COURT:  All right.  Let's move on.

19   BY MR. OPPENHEIM:

12:35:40 20  Q.  Let's turn back, Mr. Carothers, to PX 240, and let's look

21   at what it is that you said Cox was going to do to stem the

22   flow.  So in this e-mail, you describe three things that Cox

23   was going to do to stem the flow, right?

24   A.  Yes, that's correct.

25   Q.  And the first thing that Cox was going to do was to allow

1   two self-reactivations in the walled garden before requiring a

2   call-in, right?

3   A.   Yes, that's correct.

4   Q.   So that's extending the graduated response by two more

5   steps, correct?

6   A.   By one more step.

7   Q.   By one more step?

8   A.   Yes.

9   Q.   And then the next thing that Cox said it was going to

12:36:25 10  do -- I'm sorry, and that was soft-walled garden, correct?

11  A.   Yes, that's correct.

12  Q.   And the soft-walled garden is where a user can just look

13  on their computer and click on an "okay" and get back on the

14  internet, correct?

15  A.   They can see the list of infringing works and acknowledge

16  that they've seen it in order to click themselves out, yes.

17  Q.   One click, suspension is gone, right?

18  A.   That's correct.

19  Q.   Okay.  The next thing that you say Cox is going to do to

12:36:53 20  stem the flow is to ignore auto-close the first complaint

21  against each customer, even if they have a cox.net e-mail

22  address, right?

23  A.   Yes, that's correct.

24  Q.   So previously under Cox's policy, if Cox had a cox.net

25  e-mail address, Cox would forward the notice, right?

# INTENTIONALLY LEFT BLANK

M. Carothers - Direct

1560

1    A.    Yeah, that's correct.

2    Q.    But now, at this meeting, you decided in order to stem the

3    flow, you were going to ignore the first notice, right?

4    A.    Yes.

5    Q.    Okay.  And you actually explain in the e-mail that you

6    only do it for -- you currently only do it for customers

7    without a cox.net e-mail and so now you're extending it, right?

8    A.    Yes.

9    Q.    Okay.  The third thing that you guys decide to do is to

12:37:46 10    institute hard limits for all senders, right?

11   A.    That's correct.

12   Q.    And so you go on to explain that you had only high -- hard

13   limits on certain senders before this, but now you're going to

14   have hard limits on everybody, right?

15   A.    Yes.

16   Q.    And you say that any notice over that limit will be

17   automatically closed with a response back to the sender, right?

18   A.    Yes.

19   Q.    And if we look at Cox -- excuse me, CATS, C-A-T-S, data,

12:38:21 20    when -- under this new policy, if somebody had sent in -- if a

21   copyright owner or a vendor had sent in too many notices, there

22   would be a reply to the rights owner that said hard limit for

23   sender.  That's what you see in CATS data, right?

24   A.    Yes.

25   Q.    And there would be no notification whatsoever of the

M. Carothers - Direct

1561

1    infringement to the subscriber when that happened, right?

2    A.    That's correct.

3    Q.    You're familiar with an entity called Digital Rightscorp,

4    correct?

5    A.    I am.

6    Q.    Also often referred to in the shorthand as either

7    Rightscorp or DRC, right?

8    A.    Yes.

9    Q.    And you know that Rightscorp sent infringement notices to

12:39:27 10    Cox, correct?

11    A.    I do.

12    Q.    And they did so on behalf of BMG Music Publishing,

13    correct?

14    A.    Yes.

15    Q.    Among others maybe, right?

16    A.    BMG is the one I'm familiar with.

17    Q.    Let's turn to PX 336, please.  I may have the wrong --

18    A.    I don't have a 336.

19    Q.    Pardon me.

12:40:16 20         THE COURT:  Did you say 366?

21         MR. OPPENHEIM:  One moment, Your Honor.  I -- we may

22    have the wrong --

23         MR. GOULD:  It's already in evidence.

24         MR. OPPENHEIM:  It's already in evidence.  So

25    let's -- it's already in evidence.  Can we just pull it up,

1581

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  7  (P.M. Portion)

TRIAL TRANSCRIPT

December 10, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                             SCOTT A. ZEBRAK, ESQ.
                             JEFFREY M. GOULD, ESQ.
                             MICHAEL J. DRUCKMAN, ESQ.
                             ANDREW L. GUERRA, ESQ.
                             LUCY G. NOYOLA, ESQ.
                             JIA RYU, ESQ.
                             Oppenheim + Zebrak, LLP
                             4530 Wisconsin Avenue, N.W.
                             5th Floor
                             Washington, D.C. 20015


FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                             Winston & Strawn LLP
                             1700 K Street, N.W.
                             Washington, D.C. 20006-3817
                               and
                             SEAN R. ANDERSON, ESQ.
                             MICHAEL S. ELKIN, ESQ.
                             THOMAS P. LANE, ESQ.
                             CESIE C. ALVAREZ, ESQ.
                             Winston & Strawn LLP
                             200 Park Avenue
                             New York, NY 10166-4193
                               and
                             JENNIFER A. GOLINVEAUX, ESQ.
                             THOMAS J. KEARNEY, ESQ.
                             Winston & Strawn LLP
                             101 California Street, 35th Floor
                             San Francisco, CA 94111-5840
                               and
                             MICHAEL L. BRODY, ESQ.
                             Winston & Strawn LLP
                             35 West Wacker Drive
                             Chicago, IL 60601
                               and
                             DIANA HUGHES LEIDEN, ESQ.
                             Winston & Strawn LLP
                             333 South Grand Avenue
                             Suite 3800
                             Los Angeles, CA 90071

1583

<u>INDEX</u>

<u>OPENING STATEMENTS BY:</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| MATT CAROTHERS | | |
| | CROSS | 1584 |
| | REDIRECT | 1606 |
| JOSEPH SIKES via video deposition | | |
| | EXAMINATION | 1628 |
| JORGE C. FUENZALIDA via video deposition | | |
| | EXAMINATION | 1692 |
| | EXAMINATION | 1705 |

<u>CLOSING ARGUMENTS BY:</u>

<u>COURT'S RULINGS/JURY INSTRUCTIONS</u>

**JA528**

1584

1       NOTE:  The afternoon portion of the case on December

2  10, 2019, begins in the absence of the jury as follows:

3  JURY OUT

4       THE COURT:  All right.  Ready for our jury?

5       MR. ELKIN:  Yes, Your Honor.

6       THE COURT:  Okay.  Joe, let's get the jury, please.

7       NOTE:  At this point the jury returns to the

8  courtroom; whereupon the case continues as follows:

9  JURY IN

10      THE COURT:  All right.  Please have a seat.

11      We -- I guess we just need our witness, huh.

12      All right.  Please proceed.

13      MR. ELKIN:  Thank you, Your Honor.

14      MATT CAROTHERS, called by counsel for the plaintiffs,

15  first being duly sworn, testifies and states:

16      CROSS-EXAMINATION

17  BY MR. ELKIN: (Continuing)

18  Q.   Good afternoon, Mr. Carothers.

19  A.   Good afternoon.

20  Q.   Does Cox track what its users are doing online with Cox's

21  broadband system?

22  A.   It doesn't.

23  Q.   Why not?

24  A.   Two reasons.  One is lack of a technical capability to do

25  so.  And the second is that we have very strong privacy

M. Carothers - cross

1585

1  policies.

2  Q.   I am going to take you back to the years 2013 and 2014.

3         Outside of any cyber security concerns, do you know

4  whether Cox blocked subscribers' access to any Web sites?

5  A.   It didn't.

6  Q.   And again, during this same time frame, again outside of

7  any cyber security concerns, did Cox reduce or throttle

8  subscribers' bandwidth or connection speeds?

9  A.   It didn't.

10  Q.   Why not?

11  A.   A couple reasons.  One is, again, a lack of technical

12  capacity.  And also, our lawyers advised us that we couldn't do

13  any sort of site blocking because it would be a violation of

14  the network neutrality laws.

15  Q.   Now, does Cox track what its customers upload and

16  distribute using it service?

17  A.   It doesn't.

18  Q.   Do you know whether Cox subscribes to and uses the

19  technology that would permit it to track what Cox users upload

20  and distribute on the Internet?

21         MR. OPPENHEIM:  Objection.

22         THE COURT:  Yeah, it's leading.  Let's ask

23  non-leading questions.

24  BY MR. ELKIN: (Continuing)

25  Q.   All right.  Do you know of any technology that would

**JA530**

1586

1    permit Cox to track what its customers are doing?

2    A.    No.  No such technology exists.

3    Q.    Now, Mr. Oppenheim referred you to Procera or deep packet

4    inspection.  Do you remember that line of questioning?

5    A.    Yes.

6    Q.    Do you know whether deep packet inspection would permit

7    Cox to track copyright infringement of its users -- of its

8    users?

9    A.    No, it wouldn't do that.

10   Q.    Do you know whether Cox would use such a technology if it

11   was available?

12   A.    It wouldn't.

13          MR. OPPENHEIM:  Your Honor, can we stop with the

14   leading questions, please?

15          THE COURT:  Well, no, I will allow that question.

16   He's said he's familiar with it, and I think that's a fair

17   follow-up question.  Thank you.

18          You may answer the question.

19   A.    No, we wouldn't use such a technology if it existed.

20   BY MR. ELKIN: (Continuing)

21   Q.    Why not?

22   A.    It would be a gross violation of our customers' privacy.

23   Q.    Now, have you ever heard of a system referred to as CATS,

24   C-A-T-S?

25   A.    I have.

M. Carothers - cross

1587

```
 1    Q.    How did you hear about it?

 2    A.    I invented it.

 3    Q.    When did you do that?

 4    A.    This would have been 2002-ish.

 5    Q.    What does it stand for, CATS?

 6    A.    CATS is the Cox Abuse Tracking System.

 7    Q.    Why did you decide to develop that system?

 8    A.    The volume of e-mails that comes into that abuse@cox.net

 9    mailbox we talked about earlier is huge.  It is way too much

10    for people to handle manually.  So we needed an automated

11    system.

12    Q.    And what types of notices was CATS originally designed to

13    handle?

14    A.    All of them.

15    Q.    Such as?

16    A.    Denial of service attacks, spam, hacking, port scanning,

17    threats and harassments, copyright allegations, of course.

18    Q.    Do you know whether CATS has evolved over time?

19    A.    It has.

20    Q.    How so?

21    A.    It has gotten more and more automated.

22    Q.    Could you describe that a little bit.

23    A.    Sure.  It has the ability to automate a lot of the tasks

24    that a security engineer would want to do, such as figuring out

25    who was using an IP address at a time, figuring out what type
```

**JA532**

M. Carothers - cross

1   of abuse that is being complained about, and even taking

2   automated action, such as sending warning e-mails or taking

3   subscribers offline.

4   Q.   Who operated CATS, if you know, during the 2013-2014 time

5   frame?

6   A.   That was Brent Beck.

7   Q.   And to what extent did you interact or consult with

8   Mr. Beck about CATS during that time?

9   A.   Regularly.

10  Q.   Were you aware of how Mr. Beck was running the program at

11  that time?

12  A.   I was.

13  Q.   Could you describe -- we have had a lot of testimony on

14  this, so I'm going to be very brief, but could you explain to

15  the jury how CATS processes incoming notices on an automated

16  basis?

17  A.   Sure.  The e-mail arrives in the abuse@cox.net mailbox.

18  CATS downloads it.  It looks for some information about the

19  allegations, such as the IP address, the time of the offense,

20  and the list of infringing works.  It then looks up the

21  subscribers' IP address to see if we can identify who it is.

22  And then takes action appropriately.

23  Q.   And what kind of information does CATS extract from

24  incoming notices?

25  A.   So it gets the IP address that's being complained about.

M. Carothers - Cross

1589

1    It gets the timestamp when the offense allegedly took place.

2    And it gets the list of infringing works.

3    Q.   Do you know whether CATS can recognize a notice of

4    copyright infringement?

5    A.   It can.

6    Q.   Have you ever heard of the term "copyother"?

7    A.   I have.

8    Q.   Who came up with that term?

9    A.   That was me.

10   Q.   What does it mean?

11   A.   So every ticket within the CATS system has a tag on it

12   that just describes what the type of complaint is.  It's a

13   short one or two-word phrase, usually an abbreviation.

14          So, for example, if the complaint is that the

15   customer sent spam intentionally, the tag on the ticket would

16   be Spam UCE.  UCE stands for unsolicited commercial e-mail.

17          If it was, on the other hand, spam that we thought

18   was sent from malware, it would be Spam Trojan to differentiate

19   the two.

20          At the beginning of the program the copyright

21   complaints that we got were almost entirely about an old system

22   called Usenet.  So the tag for those tickets was Copy Usenet.

23          And then we had a catchall bucket for all other types

24   of copyright complaints that was Copy Other.

25   Q.   Mr. Carothers, do you know whether CATS can determine from

**JA534**

1    a notice of copyright infringement whether an actual copyright

2    infringement has taken place?

3    A.   It can't.

4    Q.   Why can't it?

5    A.   There is no way to verify that the traffic was there, what

6    the contents of that traffic were, or whether or not the

7    customer held some copyright.

8    Q.   To what extent does handling copyright infringement

9    tickets require human intervention?

10   A.   It is almost entirely automated.

11   Q.   Has CATS ever been configured to automatically terminate a

12   customer in response to a copyright infringement complaint?

13   A.   It has not.

14   Q.   Why not?

15   A.   Termination is a very serious step.  It is something that

16   always requires human review.

17   Q.   Have you ever heard of the term "graduated response

18   program"?

19   A.   I have.

20   Q.   What is graduated response?

21   A.   Graduated response is a series of escalating steps that we

22   take to contact a subscriber, use the subject of copyright

23   allegations.  Each step is increasingly more intrusive in order

24   to get that contact with the customer.

25   Q.   Do you have an understanding of where the graduated

1    response program at Cox originated?

2    A.   I do.

3    Q.   Could you tell the jury.

4    A.   I invented it.

5    Q.   And why did you develop this?

6    A.   It's the most effective way of communicating with

7    subscribers.

8    Q.   When did you develop it?

9    A.   Early 2000s, probably 2002/2003 time frame.

10   Q.   What is the purpose of engaging in escalating steps with

11   customers related to copyright infringement?

12   A.   We need to make sure that we reach the actual account

13   holder, and sometimes that can be tricky.

14   Q.   And what, if anything, have you done to determine whether

15   the graduated response at Cox was effective?

16   A.   I have run a number of queries in the CATS database to

17   check repeat offense rates.

18   Q.   When did you do that?

19   A.   I did it throughout my time.  It was something that I did

20   just as the normal course of my job.

21   Q.   How often would you do it?

22   A.   It wasn't a set schedule, but I would say quarterly,

23   probably.

24   Q.   And what did you observe when you ran those queries?

25   A.   The program was very effective.  The vast majority of

1   customers never made it past the e-mail warning stage.

2   Q.   Now, how do you know that?

3   A.   I ran the numbers myself.

4   Q.   Does CATS sometimes aggregate complaints or notices into a

5   single ticket?

6   A.   It does.

7   Q.   What does that mean, to aggregate complaints?

8   A.   So when the first allegation comes in against a

9   subscriber, it generates a ticket in the CATS system.  And then

10  for 24 hours any subsequent allegations that we get are

11  appended to that one ticket rather than generating a new

12  ticket.

13  Q.   But why does CATS aggregate complaints rather than

14  treating each one as a separate incident?

15  A.   Fairness for the customers.  If every single notification

16  generated a new ticket, then we could potentially have someone

17  go through all steps of the program up through termination

18  within a few minutes before they had even had a chance to look

19  at the issue.

20  Q.   How many copyright notices will CATS aggregate?

21  A.   There is no set limit.

22  Q.   Do you know whether Cox also has a limit on the number of

23  customers CATS can automatically suspend?

24  A.   It does.

25  Q.   Why was there -- why was a suspension limit imposed, if

M. Carothers - Cross

1   you know?

2   A.   A couple of reasons.  First is that we have seen issues of

3   false allegations against subscribers.  So we have documented

4   cases where complaints came in against IP addresses that

5   weren't even in use in our network.  So we know that some

6   portion of the complaints that we get are false accusations.

7   So --

8   Q.   Do you know why -- I am sorry, did you finish?

9   A.   Eh.

10  Q.   Okay.  Do you know why Cox doesn't automatically suspend

11  users past a certain limit?

12  A.   Yes.

13  Q.   Why?

14  A.   Well, a couple of reasons.  One is that we are concerned

15  about a haywire system or someone deliberating attacking the

16  system.

17          When we give a computer system the ability to take

18  our subscribers offline, that's a big deal.  We want to make

19  sure it's secure.  We want to make sure that someone can't game

20  the system and cause a situation that would take all of our

21  subscribers offline.

22  Q.   What was the auto suspend limit in 2013 and 2014?

23  A.   It was 300.

24  Q.   I want to refer now to some non-customer-facing actions.

25  Are there types of actions other than customer-facing actions

M. Carothers - Cross

1594

1   that CATS can take automatically?

2   A.   There are.

3   Q.   Such as?

4   A.   Well, for example, there is the hold for more, which I am

5   sure you all have heard about.

6   Q.   What is hold for more?

7   A.   Hold for more means that the very first allegation we

8   receive against a customer generates a ticket in the CATS

9   database, then that ticket is closed without taking customer-

10  facing action.

11  Q.   Now, I believe Mr. Oppenheim asked you a question

12  regarding when that happens.  Did you refer to it in that 2010

13  e-mail as ignoring the notice?

14           Can you comment on that.

15  A.   Yes, I did use that phrase.

16  Q.   Is that accurate?

17  A.   The notice isn't actually ignored.  It still generates a

18  ticket.  It is still there in the database.  And it's still

19  there for future reference if there are any subsequent

20  complaints.

21  Q.   And who at Cox decided to implement hold for more?

22  A.   That was a combination of myself and our legal counsel.

23  Q.   Can you describe the work that you did leading up to the

24  implementation of the hold for more rule?

25  A.   Yes, absolutely.  So we had a group of customers who did

M. Carothers - Cross

1609

1            Now, Mr. Carothers, as you look at steps two through

2    seven, that means the second time there is a notice with

3    respect to a subscriber, a third time there is a notice with

4    respect to the same subscriber, fourth time, fifth time, sixth

5    time, seventh time, there is no steps up, correct?  It's the

6    exact same e-mail that goes out each time, right?

7    A.   Yes.

8    Q.   So that is not more intrusive, is it?

9    A.   I meant that warnings, suspensions, and hard suspensions,

10   each one of those was more intrusive than the last.  Not that

11   the individual e-mails were more intrusive than each other.

12   Q.   So it would be more intrusive, Mr. Carothers, right, if it

13   was a warning, a suspension, and then a termination, right?

14   Each step would be more intrusive, correct?

15   A.   Yes.

16   Q.   I believe you testified in response to Mr. Elkin's

17   question that the reason that Cox set suspension limits was

18   because of false allegations that it had received with respect

19   to particular subscribers; is that correct?

20   A.   That's one reason.

21   Q.   You've never indicated to anybody that the RIAA complaints

22   or notices were false allegations, have you?

23   A.   I have not.  I suspect that they could be, but I don't

24   have evidence to that.

25   Q.   Based on what you knew when Cox received those

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

M. Carothers - Cross

1    allegations, you took those allegations to be fair and proper

2    infringement notices, correct?

3    A.    Yes.

4    Q.    If Cox is receiving false allegations from a rights owner,

5    those false allegations could concern the first notice, the

6    second notice, the third notice, it could concern any notice

7    with respect to a particular subscriber, correct?

8    A.    Technically possible, yeah.

9    Q.    So you have no information as you testify today to suggest

10   that it's more likely to have a false allegation with respect

11   to the first notice with respect to a subscriber than you would

12   the tenth notice with respect to a subscriber, correct?

13   A.    No, that's not correct.

14   Q.    In your response to Mr. Elkin's questions you indicated

15   that the term "ignore" for describing the decision to hold for

16   more on the first notice was inaccurate, correct?

17   A.    Yes.

18   Q.    But that was your term, right?

19   A.    It was.

20   Q.    You used the term "ignore" in your e-mail, correct?

21   A.    I did use that word, yeah.

22   Q.    Now, you testified that you did some analysis to decide to

23   engage in the decision to ignore and hold for more, correct?

24   A.    That's correct.

25   Q.    When did you do that analysis?

Norman B. Linnell   OCR-USDC/EDVA   (703)549-4626

M. Carothers - Cross

1611

1  A.   I have done it more than once.  The first time that sticks

2  out was 2007, and probably again in 2009.

3  Q.   So was this an important analysis to you?

4  A.   It was.

5  Q.   But you didn't capture it in writing anywhere, did you?

6  A.   That's not true.  I sent it in e-mails.

7  Q.   You sent e-mails about this analysis?

8  A.   I did.

9        MR. OPPENHEIM:  Your Honor, we would like a sidebar,

10  please.

11        THE COURT:  Yes, sir.

12        NOTE:  A sidebar discussion is had between the Court

13  and counsel out of the hearing of the jury as follows:

14  AT SIDEBAR

15        MR. OPPENHEIM:  Well, we are here again, and I

16  apologize for that, but --

17        THE COURT:  So you didn't get the --

18        MR. OPPENHEIM:  -- absolutely nothing was produced on

19  this.  And so, he's now testifying it was so important, he did

20  memorialize it.  It wasn't a study that was produced.

21        This is improper.  This is exactly why I didn't want

22  to be where we are now.

23        MR. ELKIN:  Clearly, if there are e-mails setting

24  forth analysis, we would produce it because it helps our case,

25  to say the very least.  I am dying to see them myself.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

M. Carothers - Cross

1   didn't elicit this testimony.  He volunteered it on his own.

2   He has raised the question of Mr. Zabek's character.  Cox here

3   has clearly demonstrated that they disagree with what

4   Mr. Carothers has said.  I should have an opportunity to

5   introduce this and ask him whether or not, you know, he agrees

6   or disagrees with what Cox -- with what Mr. Zabek's review

7   said.

8          MR. ELKIN:  The review is outside the claims period

9   anyway.

10         MR. OPPENHEIM:  But it's in direct response to his

11  activities within the claims period.  They did it after the BMG

12  trial, Your Honor.

13         THE COURT:  Okay.  All right.  Your exception is

14  noted.  I am going to -- I am not going to allow it.  I don't

15  think the door has been opened far enough.  And that is pretty

16  opaque in what he's talking about, and it's a different

17  individual than this witness.

18         So your exception is noted.  You may ask him those

19  questions that we just talked about and see what his answer is.

20  And if I need to instruct the jury that there has been no

21  e-mail produced because all the parties agree that that's the

22  case, then I will do that depending upon his answer.  Okay.

23         MR. ELKIN:  Thank you, Your Honor.

24         MR. OPPENHEIM:  Thank you, Your Honor.

25         NOTE:  The sidebar discussion is concluded; whereupon

**JA543**

M. Carothers - Cross

1615

1    the case continues before the jury as follows:

2    BEFORE THE JURY

3            THE COURT:  All right.  Please proceed.

4    BY MR. OPPENHEIM: (Continuing)

5    Q.   Mr. Carothers, a moment ago you indicated that your

6    analysis was contained within e-mails; is that right?

7    A.   That's correct.

8    Q.   Were you asked to provide those e-mails to counsel for

9    purposes of this case and producing them to plaintiffs?

10   A.   I wasn't.

11   Q.   Other than containing them within e-mails, did you

12   otherwise memorialize this study in any way?

13   A.   I don't think so.  I think I only spoke about it verbally.

14           THE COURT:  Just for the record, there were no

15   e-mails produced which contained any analysis that

16   Mr. Carothers had authored.

17   BY MR. OPPENHEIM: (Continuing)

18   Q.   To be clear, Mr. Carothers, no documentation has been

19   provided to plaintiffs or this Court to support the fact that

20   you claim that you did an analysis that supported this hold for

21   more decision, correct?

22   A.   Correct.

23   Q.   And, in fact, the document we looked at from January 2010

24   says that you decided to ignore the first notice because you

25   were trying to stem the flow, right?

**JA544**

M. Carothers - Cross

1616

1   A.   That was part of it.

2   Q.   Can we pull up PX 32A, please.  And scroll down.  I

3   believe it is the third paragraph we are looking for.

4        Can you please highlight that third paragraph,

5   please.

6        Mr. Carothers, can you read that paragraph, please,

7   out loud.

8   A.   As an Internet service provider, Cox is responsible under

9   the Digital Millennium Copyright Act, DMCA, to advise when we

10  receive a notice asserting infringement by you.  We are also

11  required to take appropriate action if further complaints are

12  -- excuse me, if further claims are received that you do not

13  resolve.

14  Q.   So when Cox decides to ignore the first notice, Cox is not

15  doing what this e-mail from Cox says it will do, correct?

16  A.   I wouldn't say that.

17  Q.   Well, this e-mail very clearly says that as an ISP Cox is

18  responsible to advise when it receives a notice asserting

19  infringement, right?

20  A.   It does.

21  Q.   And yet when Cox receives the first notice with respect to

22  any particular customer, Cox does not advise the customer of

23  that infringement, correct?

24  A.   That is true.

25  Q.   Nor does Cox provide any notice to a customer of

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

M. Carothers - Cross

1617

1    infringement when there are multiple notices in a day, right?

2    A.   Well, we provide the one notice.  We don't provide

3    additional notices for the additional complaints.

4    Q.   So the customer may be told, you have been identified

5    infringing, hypothetically, Bruce Springsteen, "Born to Run,"

6    but you wouldn't tell the customer, by the way, you've also

7    been identified as infringing a movie, a book, a piece of

8    software, or any other type of content, correct?

9    A.   That's correct.

10   Q.   Earlier you indicated that -- you answered some questions

11   in response to Mr. Elkin on the issue of caps, right?

12   A.   Yes.

13   Q.   And you said that what Cox wanted was a steady flow,

14   right?

15   A.   That's correct.

16   Q.   And that Cox was doing it out of a sense of fairness,

17   correct?

18   A.   Yes.

19   Q.   I apologize.  You indicated in response to those caps

20   e-mails, that when the RIAA asked, that Cox increased the caps,

21   correct?

22   A.   Yes.

23   Q.   Can we please pull up PX 234, please.  234, I believe.

24        Have you seen this e-mail exchange before,

25   Mr. Carothers?

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1640

1    upon what period of time you're referring to.

2    Q.   I'm generally talking about the 2012 to 2014 period.

3    A.   I don't recall in 2012 to 2014 if I was handling bandwidth

4    concerns.

5    Q.   Bandwidth is one of the issues that the abuse department

6    dealt with in terms of complaints about customers' use,

7    correct?

8    A.   There were multiple types of bandwidth abuse that I dealt

9    with in my time at Cox.  At some point they implemented a

10   process that was fully automated to address customers that were

11   using excessive amounts of bandwidth and impacting service to

12   other customers.

13   Q.   The abuse team was involved in addressing abuse complaints

14   for both residential and Cox Business customers, correct?

15   A.   Correct.  There was a residential abuse team and a Cox

16   Business abuse team.

17   Q.   Which team were you on?

18   A.   I helped with both teams.  I was in the corporate abuse

19   team in Atlanta under Jason.

20   Q.   And did you interact with Cox Business customers in

21   response to abuse complaints?

22   A.   Occasionally, yes.  I talked to some Cox Business

23   customers directly.  I also joined calls with our Cox Business

24   abuse team and Cox Business customers.

25   Q.   So the corporate abuse team involving you, Mr. Zabek, and

**JA547**

J. Sikes - Video Deposition

1641

1    Mr. Thompson handled both residential and Cox Business abuse

2    complaints, correct?

3    A.   Correct.  We -- yes.

4    Q.   Were you also involved in the decisions of whether to

5    terminate the service of Cox Business customers?

6    A.   There -- yes.  Not for copyright infringement, but for --

7    if we had cases of Cox Business customers that were basically

8    spammers, and Jason handled a lot of those because Jason came

9    from the Cox Business side of Cox.

10         So -- but, yes, I was involved in terminating at

11    least one Cox Business subscriber.

12    Q.   For what?

13    A.   For, for being a spammer.  For basically setting up mail

14    servers and blasting spam all over the Internet.

15    Q.   Do you recall a Cox Business customer ever being

16    terminated for abuse complaints related to copyright

17    infringement?

18    A.   No.

19    Q.   Do you know why Cox wasn't terminating business customers

20    for copyright infringement abuse?

21    A.   I don't know exactly -- well, that was just -- that was

22    the longstanding policy.  We didn't suspend Cox Business

23    customers either unless we couldn't get in touch with them.

24         But in most cases a lot of our Cox Business customers

25    were hotels, universities, resellers of Cox service.  So, you

**JA548**

J. Sikes - Video Deposition

1642

1    know, we -- we generally would not terminate those, those

2    businesses.

3            Also, in my experience, I found that a lot of Cox

4    Business customers were highly responsive when you speak to a

5    manager or the owner of a business, and usually they have an IT

6    staff or someone to help them trouble-shoot or identify the

7    issue.

8            I mean, there wasn't -- in most cases that I was

9    aware of, there -- Cox Business customers were highly

10   cooperative and compliant.

11   Q.   It was Cox's policy not to terminate or suspend Cox

12   Business customers for copyright infringement abuse, correct,

13   during the 2013/'14 time frame?  Yes or no?

14   A.   I don't know.  So what I do know when I started assisting

15   with Cox Business abuse concerns in around maybe 2006, I was

16   just told, we don't suspend.

17           No one has ever said, we don't terminate Cox Business

18   customers for copyright infringement.  That was never told to

19   me.  I never read any documents that said that, or I don't

20   remember any, but I do remember being told, we do not suspend

21   the customer, we call them for every abuse complaint.

22   Q.   Mr. Sikes, I've handed you what's marked as Exhibit 116.

23   Do you recognize it?

24   A.   Yes.

25   Q.   This is a Customer Safety and Abuse Operations Ticket

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1643

1  Handling Procedures for Cox Business abuse, correct?

2  A.   Correct.

3  Q.   And the revision history on the front page shows that this

4  was last revised in May 2013, correct?

5  A.   Yes.

6  Q.   You and your team had oversight of the Cox Business abuse

7  team that implemented these procedures, correct?

8  A.   We consulted with them, yes.

9  Q.   Were you involved in developing the Cox Business abuse

10 ticket handling procedures?

11 A.   I contributed to this document.

12 Q.   How did you contribute?

13 A.   I don't recall.

14 Q.   If you would turn to page 8.  It shows Copyother.  Does

15 that refer to copyright infringement abuse?

16 A.   Yes.

17 Q.   On page 9 at the top, it describes action items for

18 resolving copyright infringement notices to Cox Business

19 customers, correct?

20 A.   Correct.

21 Q.   And the first step is to -- within a six-month period is

22 to hold for more and close the ticket, correct?

23 A.   Correct.

24 Q.   That's the same process that we saw earlier which

25 Mr. Carothers described as ignoring the first ticket, correct?

**JA550**

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1644

1  A.   Correct.

2  Q.   And then at 6.0 it shows that for the second complaint and

3  beyond, and it has some action items.  Do you see that?

4  A.   Yes.

5  Q.   And do you see at the top of that box for second complaint

6  and beyond, those are the procedures for -- that would be for

7  the second complaint, correct?

8  A.   Yes.

9  Q.   And the third?

10  A.   Yes.

11  Q.   And the tenth, correct?

12  A.   Assuming so, yes.

13  Q.   And the 50th complaint, correct?

14  A.   Perhaps, yes.

15  Q.   It would indicate a serious problem to you if a Cox

16  Business customer received 50 takedown notices, correct?

17  A.   Yes.  And it would indicate a serious problem to the

18  customer as well.  I don't think any business would want to

19  have thousands of complaints caused by activity on their

20  network.

21  Q.   Are you aware that there are Cox Business customers who

22  received hundreds of copyright infringement notices?

23  A.   I don't remember.

24  Q.   Are you aware that there are Cox Business customers in the

25  2012 to 2014 time frame who received thousands of copyright

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1   infringement abuse notices?

2   A.   I don't seem to recall that, no.

3   Q.   Would it concern you if you learned that a Cox Business

4   customer was the subject of hundreds or thousands of copyright

5   infringement notices?

6   A.   Yes.

7   Q.   Do you think Cox should be doing something about that?

8   A.   Absolutely.

9   Q.   Like what?

10  A.   Work with that customer.  Work with that customer to

11  identify the source of the issue and offer suggestions to

12  mitigate the problem.  Because, like I said, I don't think any

13  Cox Business customer would want that level of complaints being

14  caused by activity from their network.

15           I mean, first of all, it could -- you know, it sounds

16  like they could have a serious virus or compromise on their

17  network.  Anyway, there's a lot of -- there's a lot of concerns

18  in addition to the large volume of copyright infringement

19  complaints.

20  Q.   You don't know if there is something Cox could have done

21  to prevent thousands of instances of copyright infringement

22  occurring by its Cox Business customers through Cox's network?

23  A.   What I do know is that Cox can work with a customer and

24  consult with the customer on identifying the issue.  If the

25  customer, himself or herself, is the one that's causing that

J. Sikes - Video Deposition

1646

1    level of infringement, then that customer is terminated from

2    the network.

3           But, yeah, if a large hotel or reseller of Cox

4    service was -- had thousands of complaints originating from the

5    network, the only thing that I can think of right now is that

6    Cox could -- would consult with that customer.

7    Q.   If you turned off -- if Cox turned off the Internet

8    service for a Cox Business customer, wouldn't that stop

9    infringement that's occurring through that service?

10   A.   It would stop all Internet activity coming from that

11   customer.

12   Q.   Including copyright infringement occurring on that

13   network, correct?

14   A.   Sure.

15   Q.   Cox Business has many customers, correct?

16   A.   Correct.

17   Q.   They are not all hospitals, are they?

18   A.   No, of course not.

19   Q.   And they are not all emergency service providers, are

20   they?

21   A.   True.

22   Q.   In fact, Cox Business provides service to all variety of

23   businesses, correct?

24   A.   Correct.

25   Q.   Commercial businesses, correct?

**JA553**

J. Sikes - Video Deposition

1652

1    A.    Yes.

2    Q.    And the agent has access to the customer's ticket history

3    for other complaints, correct?

4    A.    Correct, yes.

5    Q.    And the customer's -- the TOC rep also has access to a

6    bandwidth meter showing how many megabytes the customer has

7    been uploading and downloading, correct?

8    A.    I -- at some point I remember there was something called a

9    bandwidth meter.  I don't know if that was available at this

10   time or not.

11   Q.    I've handed you Exhibit 122, which is Cox_Sony_520018 to

12   520019.  This is a March 2010 e-mail exchange between you and

13   Brent Beck and Jason Zabek and others on distribution lists?

14   A.    Yes.

15   Q.    In the first e-mail on 122, Brent Beck describes reaching

16   the limit on daily suspensions.  Do you see that?

17   A.    Yes.

18   Q.    And he talks about processing up to 500 complaints per day

19   for Fox, correct?

20   A.    Yes.

21   Q.    And then he replies -- you reply and say:  Unbelievable,

22   exclamation point.

23          Do you recall this?

24   A.    I don't -- no, I don't recall this conversation.

25   Q.    And Brent replies and says:  We can add a hard limit for

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1653

1    Fox, if desirable?

2    A.   Yes, I see that.

3    Q.   You respond to Brent's idea of adding a hard limit and

4    say:  We will see what Jason says; correct?

5    A.   Yes.

6    Q.   You say:  I'm sure he will agree.

7         And then you say in all caps, in all capital letters:

8    We need to cap these suckers, exclamation point.

9    A.   Yes.

10   Q.   Do you know what you meant there?

11   A.   I was being playful, being crass.  I don't remember.

12   Q.   Didn't you mean set a hard limit on the number of DMCA

13   complaints that Cox would receive from Fox?

14   A.   Yeah, I mean, assuming that's what he's talking about with

15   the hard limit.  But before we would set any limit, we would

16   discuss it with the complainant.

17        So it wasn't like it was just, ahh, we're going to

18   cap those suckers right now.

19        I mean, basically anytime we would cap a complainant,

20   as I recall, we would reach out to them, talk to their legal

21   counsel.  Basically we come to an agreement.

22        So I don't remember what happened with Fox, if we

23   actually did cap them, but -- but, yeah, that was -- for --

24   Q.   Let me ask you the question.  What does it mean to

25   blacklist a copyright complainant?

**JA555**

1654

1  A.   So, basically, if a particular copyright complainant

2  doesn't send a notice containing -- or containing what we

3  require in a notice, or containing beyond what we require in a

4  notice, or containing anything such as marketing or settlement

5  offers -- and these are the things -- there may be other

6  conditions.  But basically if the complainant is not complying

7  with our requirements for a copyright infringement notice --

8  you know, and, again, we discuss all this with the complainant.

9  And most complainants that I recall working with had no problem

10 with our caps or what we asked for in their complaints.

11 Q.   When Cox blacklisted copyright claimants from sending in

12 notices, that meant it would not accept and receive and process

13 DMCA notices from them, correct?

14 A.   I can't remember if they would get processed in CATS at

15 all or if they just get dropped or if they'd go into -- I don't

16 know what would happen to them.

17        All I know is we wouldn't -- we not take action on

18 them.  Or customer -- we would not take customer-facing action

19 on them.

20 Q.   Mr. Sikes, I've handed you a document marked in a previous

21 deposition in this case as Exhibit 76.

22 A.   Yes.

23 Q.   Have you seen this document before?

24 A.   Yes, I have.

25 Q.   Do you recall what's going on here?

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1675

1  A.  Yes.  Basically a suspension that is called a termination

2  with the likelihood of reactivation for DMCA.  We don't want to

3  loose the revenue.

4  Q.  And then looking down further at 7:00 and 13 seconds, you

5  explain this further.  Can you read what you said there?

6  A.  This is a relatively new process that we've been doing for

7  the past year, again, to retain revenue.

8  Q.  Exhibit 132, Mr. Sikes, is an e-mail chain from

9  December 2012, Bates number Cox_Sony_513220 to 513221 in which

10  you are a sender and recipient based on your personal address

11  or through an abuse corporate distribution group, correct?

12  A.  Correct.

13  Q.  Any reason to think you didn't send and receive -- send or

14  receive the e-mails in Exhibit 132?

15  A.  No.

16  Q.  The e-mail starts with an e-mail from Mr. Mathews, who is

17  a TOC Level 2.5 rep, correct?

18  A.  Yes.

19  Q.  And the subject is:  Termination Review CATS Ticket, and

20  it lists the ticket number, correct?

21  A.  Correct.

22  Q.  He says:  The customer was warned the next infraction

23  could result in termination of service, lists the ticket

24  number.

25         And it says:  Please advise.

**JA557**

J. Sikes - Video Deposition

1676

1      Do you see that?

2    A.   Yes.

3    Q.   And this time Mr. Zabek says:  Do it, they've had plenty

4    of chances.

5      Do you see that?

6    A.   Yes.

7    Q.   And Ms. Dameri, another TOC Level 2.5 rep, correct?

8    A.   Yes.

9    Q.   Replies and says:  Please ensure when terminating a

10   customer for real that we remove the CHSI charges, correct?

11   A.   Yes.

12   Q.   CHSI is Cox high-speed Internet?

13   A.   I believe so, yes.

14   Q.   And then you reply December 12, 7:33 p.m.  And could you

15   read your response, please.

16   A.   Yep.  Good point, Andrea.  Now when we terminate

17   customers, we really terminate the customer (for six months).

18   Q.   And REALLY is in all caps, is that why you emphasized it

19   in your reading?

20   A.   Yes, as in the service is removed from the customer's

21   account, the HSI service is removed, as Andrea mentions below.

22   Q.   And you describe that as a real termination or really

23   terminating, correct?

24   A.   It's not a -- it's not a soft termination.  And I -- I

25   regret to use that word because, like I said, that's my own --

J. Sikes - Video Deposition

1677

1    that's not our process?  But, yes, it's a -- it's a termination

2    where the high-speed Internet service was removed from the

3    account.

4    Q.   So you're making a distinction in Exhibit 132 between a

5    soft termination and a real termination, correct?

6    A.   Well, a soft termination, I mean, you know, as we

7    discussed, basically there is a possibility that the customer

8    may be reactivated.

9         So this -- in this case, this customer apparently

10   had -- had been through the process however many times and was

11   a candidate to have their service cut off.  Basically we worked

12   with them, exhausted all efforts and, you know, had to make the

13   decision to -- to terminate them from the Cox network and cut

14   them off from Internet services.

15   Q.   So just to be clear, when you talk about really

16   terminating in 132, you're drawing a distinction between a soft

17   termination and a real termination, correct?

18   A.   Correct, yes.

19   Q.   And so, by looking at a real termination, that gives you

20   some context to understand what you were describing as a soft

21   termination before, correct?

22   A.   Correct.  Yes.  The CHSI service was removed from their

23   account.

24   Q.   But continued offenses occurred -- the continuing offenses

25   section of the procedures occurred on the 14th notice, correct?

J. Sikes - Video Deposition

1678

1   Started on the 14th notice, correct?

2   A.   Yes.

3   Q.   And sometimes you would give another warning to that

4   customer and reactivate them, correct?

5   A.   Correct, yes.  Depending on the circumstances.

6   Q.   Something you called special circumstances?

7   A.   Special circumstances, yes.

8   Q.   What -- what would special circumstances be?

9   A.   Well, I guess for the example of the customer that had the

10  mentally disabled child and that we had -- well, Cox had sent

11  them a brand new router and secured it for them.

12         We -- I mean, there were cases where the customer

13  clearly didn't understand what the cause or where the source of

14  the alleged infringement was.

15  Q.   I've handed you what's marked Exhibit 134.  It's a

16  one-page e-mail, Cox_Sony_511299 from March 2014, with the

17  subject:  Termination Review.  In which you are a recipient or

18  a sender either individually or through a distribution group,

19  correct?

20  A.   Yes.

21  Q.   Mr. Mathews says:  Customer's son has once again

22  reinstalled the BitTorrent program and resumed file sharing

23  again.  Customer was informed last time that I talked to her

24  that further complaints could result in termination of service.

25  This will be the third time that her son has reinstalled the

J. Sikes - Video Deposition

1684

1    share programming on the last call; correct?

2    A.   Yes.

3    Q.   Mr. Mathews says:  This is the third time to the (404)

4    number; correct?

5    A.   Yes.

6    Q.   In the 2012 procedure, the third time to the (404) number

7    is the continued offenses section on the 14th notice, correct?

8    A.   Okay, yes.

9    Q.   And you reply -- and can you read your answer, please.

10   A.   Yes.  Since the customer knows it's "his fault," please

11   ask this customer what he will do to prevent this from

12   happening again and note it in the ticket work log.  Then let

13   him know that one more complaint will result in a six-month

14   termination.  Please also note this in the work log.  Thanks

15   Martin.

16   Q.   You reference that this customer knows it's his fault,

17   correct?  Yes or no?

18   A.   That's what I said, yeah.

19   Q.   Yeah.  And is there anything to indicate to you in

20   Exhibit 135 that there are special circumstances that would

21   warrant another reactivation?

22   A.   Not that I am aware of.  I don't remember this particular

23   case.  I might have had more information on it than what's in

24   this e-mail, but --

25   Q.   I've handed you what's marked Exhibit 136, it's an e-mail

J. Sikes - Video Deposition

1685

1    with a Bates number Cox_Sony_511291 dated June 5, 2014.

2              Do you see that either individually or as a recipient

3    from an e-mail distribution group you are a recipient or sender

4    of this e-mail?

5    A.   Yes.

6    Q.   And once again, Mr. Mathews begins an e-mail chain subject

7    titled:  Termination Review.

8              Do you see that?

9    A.   Yes.

10   Q.   And Mr. Mathews says:  This customer is well aware of his

11   actions and is upset that after years of doing this he is now

12   getting caught.  Customer was advised to stop sharing, check

13   his wireless, and remove his P2P programs.

14             Did I read that correctly?

15   A.   Yes.

16   Q.   Can you read your response.

17   A.   Please advise this customer that this is their final

18   suspension and reactivation.  If we receive one more complaint,

19   we will regretfully not be able to provide them with data

20   service for six months.

21   Q.   Isn't this the poster child for termination, Mr. Sikes?

22   A.   Yes.  And if they continued after this point, they would

23   be terminated, yes.

24   Q.   So given that termination review on the 13th infringement

25   notice, it's still not enough?

J. Sikes - Video Deposition

1686

1    A.   Well, I don't know if this is the 13th step or not.  I

2    mean, the thing is -- like I said, termination review could

3    happen sooner than the 13th step.  You've been fixated on this

4    13th step, 12th step, 14th -- I mean, I don't know.  I wasn't

5    pulling out a procedure and saying, okay, well, here we have

6    got the 14th step, it's time -- you know, like I said, this

7    customer said, hey, you know, either cut it out or get the heck

8    off our network.  I mean, that was basically where this

9    customer was at.

10   Q.   Mr. Sikes, I want to ask you some questions comparing

11   Cox's abuse handling procedures for a copyright infringement on

12   the one hand compared to Cox's handling of other abuse types.

13   Do you understand?

14   A.   Yes.

15   Q.   Let's pull out Exhibit 33, which is the October 2012 abuse

16   ticket handling procedures for residential.

17        We've looked at the copyright graduated response at

18   length, do you recall?

19   A.   Yes.  Yes.

20   Q.   13 steps for termination review, and then continued

21   offenses get additional termination review, correct?

22   A.   Yeah.

23   Q.   Let's take a look at bandwidth.  Bandwidth -- overuse of

24   bandwidth is one of the issues that the abuse department dealt

25   with at times, correct?

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1687

1    A.    Correct, yes.

2    Q.    If you turn to page 5 to 7, it describes the procedures

3    for addressing bandwidth abuse issues?

4    A.    Yes.

5    Q.    Exhibit 43 describes two processes, one for DUAE, which is

6    defined as data usage allowance education, correct?

7    A.    Correct.

8    Q.    And one for excessive user, which is defined as a

9    subscriber who is grossly abusing their bandwidth limitation

10   using two times more their allotted bandwidth within a single

11   billing cycle?  On the next page.

12   A.    Yes.  That's a definition that's provided.  This wasn't

13   always accurate.  I just want to note that they were just --

14   sometimes they literally pulled them off Wikipedia, some of

15   these things here.

16          But, yeah, I guess that's more or less an accurate

17   description.

18   Q.    That's what the procedures defined it as, correct?

19   A.    Yes.

20   Q.    And excessive users are those that are using two times or

21   more their allotted bandwidth, correct?

22   A.    That's what it says, yes.

23   Q.    And looking at the excessive user process at 4.0, it says:

24   Excessive user will be a mostly automated, hard three-strike

25   process -- three-strike process.  It will be automated up to

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J. Sikes - Video Deposition

1688

1    termination.  CATS will automatically suspend the subscriber

2    for the first two strikes.  The third complaint within a

3    180-day period will result in a six-month termination.

4           Did I read that correctly?

5    A.   Yes.

6    Q.   And was it your understanding that as of late 2012,

7    excessive use was a hard three-strike rule for terminating

8    customers who were identified as excessive users?

9    A.   I recall something to that effect, yes.

10   Q.   Something to the effect of a hard three-strike rule to

11   terminate excessive users?

12   A.   Yes.

13   Q.   If you could turn to page 22, I want to look at hacking.

14          On page 22 of Exhibit 43, that's the 2012 abuse

15   handling procedures.  This procedure defines the steps to

16   respond to complaints of hacking and unauthorized access

17   attempts, correct?

18   A.   Yes.

19   Q.   And on page 23 it lists the procedure for first and repeat

20   offenses, correct?

21   A.   Correct.

22   Q.   And you see here for hacking, Cox's procedure in 2012 was

23   to suspend on the first offense, correct?

24   A.   Yes.

25   Q.   And to suspend again on the second and third complaints,

**JA565**

J. Sikes - Video Deposition

1689

1    correct?

2    A.   Correct.

3    Q.   And to terminate on the fourth complaint, correct?

4    A.   Correct.

5    Q.   Turn to page 35, please.  I want to look at something

6    called Open Relay.

7         The Open Relay section describes the purpose as --

8    this procedure defines steps for responding to spam complaints

9    as a result of open relay; is that correct?

10   A.   Yes.

11   Q.   This relates to a process for handling abuse related to

12   viral spam that occurs on the network?

13   A.   Yes.

14   Q.   The open relay procedure is describing how Cox handles

15   abuse related to certain types of viral spam, correct?

16   A.   Correct, yes.

17   Q.   And it describes the process as three suspensions,

18   correct?

19   A.   Yes.

20   Q.   And on the fourth complaint terminating the customer's

21   Internet account, correct?

22   A.   Correct.

23   Q.   We just looked at several abuse types and the abuse team's

24   graduated response for handling those types of abuses, correct?

25   A.   Correct.

J. Sikes - Video Deposition

1690

1   Q.   For excessive use violations, Cox had a hard three-strike

2   procedure leading to termination, correct?

3   A.   Correct.

4   Q.   And for hacking, we saw that Cox -- the guideline for Cox

5   was to terminate on the fourth complaint, correct?

6   A.   Yes, that was the guideline.

7   Q.   And for copyright infringement, we saw that termination

8   review occurred on the 13th or later notice, correct?

9   A.   Correct.

10  Q.   Are you aware of the existence of technology that would

11  permit the blocking of peer-to-peer traffic?

12  A.   So, I mean, you can block -- you can block ports on a

13  firewall.  You can block -- you can block all the ports except

14  for, you know, Internet ports like port 80, and 443, and

15  e-mails.  Like I think what mentions in the document, 25 and

16  587.

17       I mean, you can -- you can block ports, but it

18  doesn't necessarily mean that you're blocking the peer-to-peer

19  protocol.  And, also, if you're -- I mean, not all peer-to-peer

20  traffic is infringing traffic.

21       So just blocking peer-to-peer in and of itself is

22  not -- is not something that Cox would do or that any Internet

23  service provider would do.

24  Q.   You don't know what any other service provider would do,

25  do you?  You couldn't possibly testify about that, could you?

J.C. Fuenzalida - Video Deposition

1701

```
 1   A.    Yes.

 2   Q.    That consumer education didn't concern whether the

 3   category of online behavior was lawful versus unlawful,

 4   correct?

 5   A.    No.

 6   Q.    But as part of this project, Cox did break data

 7   consumption down based on activity type, correct?

 8   A.    Yes.

 9   Q.    Sir, could you turn your attention back to the document

10   numbered Exhibit 88, please.

11   A.    Okay.

12   Q.    This is the Mid-Term Readout, correct?

13   A.    Yes.

14   Q.    And is this for the average Cox user across the board, or

15   is this for those Cox high-speed Internet subscribers that

16   engage in P2P usage?

17   A.    Neither.  So this is a, first of all, Mid-Term Readout.

18   So these are initial findings.  Many, if not nearly all of

19   them, would have changed or evolved between this readout and

20   the final readout.

21         And what this is is an industry view to -- to get

22   back to our scope, is to assign a level of usage for a low, a

23   medium, and a high user category customer for each service.

24         In this case, the assumptions that -- or the analysis

25   that was presented here changed as well before the final.
```

J.C. Fuenzalida - Video Deposition

1702

1     Q.    Okay.

2     A.    So these were not the final numbers.

3     Q.    Okay.  And if you could turn to page 4 of this same

4     exhibit, please.  This is a slide labeled Executive Summary.

5     There is a sub-bullet that says:  P2P is the most bandwidth

6     intensive category.

7           Then it says: (13 percent of all broadband

8     households) on average use 82 gigabytes a month, accounting for

9     21 percent of all Internet traffic.

10          Do you see that sub-bullet?

11    A.    Yes.

12    Q.    Could you explain what that means?

13    A.    Yeah.  This means for the U.S., and a lot of our analysis

14    was done for profiling the United States user base and then

15    applying it to Cox.

16          So this would mean that 13 percent of all broadband

17    households across the country engaged in P2P.  And those that

18    do, use an average of 82 gigabytes per household per month for

19    peer-to-peer.

20          And that total then extrapolated out accounts for

21    21 percent of all Internet traffic.

22    Q.    So at the time of this Mid-Term Readout, this was 2012,

23    correct?

24    A.    Yes.

25    Q.    And here you're indicating that Cox has five different

**JA569**

1    tiers of high-speed Internet service; is that correct?

2    Ultimate, Premier, Preferred, Essential, and Starter?

3    A.    Yes.

4    Q.    And is the idea that each of those tiers has a different

5    monthly data allowance?

6    A.    Yes.

7    Q.    And the idea is that the more data a customer consumes,

8    the higher the tier they need to move into unless they stop --

9    stop the usage, correct?

10   A.    Yes.

11   Q.    What online activities besides streaming or downloading a

12   video account for higher bandwidth usage than peer-to-peer?

13   A.    Okay, just give me a second.

14         Okay.  So if you refer to page 18 in the same

15   document, in terms of the overall, you'll see video streaming

16   of two different flavors, SD and HD, absorb more bandwidth.

17         So then on this slide, it would show that

18   peer-to-peer is third.  But what it doesn't show is the other,

19   which contains many other services.

20         So those detailed breakdowns are not there.

21   Q.    Okay.  So after video streaming, peer-to-peer represents

22   the category that consumes the most bandwidth usage by

23   subscribers that engage in that activity, correct?

24   A.    Yeah.  I would have to look at what's in Other, right?

25   Because Other is 17 percent.  So what I don't know is whether

J.C. Fuenzalida - Video Deposition

1704

1  there's something that's 6 or 7 or 8 inside of that.

2  Q.   And it says the data set was validated against Cox

3  high-speed Internet Procera data.

4        Could you explain what that means?

5  A.   Yes.  So the -- I'm just checking the year.  Yeah, it says

6  2011.  It's not -- it's not labeled there.

7        So this is basically our what we'll call, outside-in

8  view that I've described with leveraging some of the

9  third-party data.

10       The middle column is our estimate as to what we

11  believe Cox's demand would be.  Right?

12  Q.   Uh-hum.

13  A.   So we had taken the national -- the national forecasts,

14  came up with our own view, and possibly adjusted it thinking

15  about Cox's footprint.  So that was a view that we developed,

16  you know, entirely or almost entirely on our own.

17  Q.   And is it correct that this data that inCode provided to

18  Cox showed Cox that at least in terms of the forecast, was that

19  the downstream data consumption for those that engage in

20  peer-to-peer was forecast to increase in each of the years from

21  2011 through 2015, correct?

22  A.   Correct.

23  Q.   And in this data that inCode provided to Cox, with respect

24  to upstream traffic, it reflects that in each of the years from

25  2011 to 2015 data consumption demand for those that engaged in

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

J.C. Fuenzalida - Video Deposition

1705

1    peer-to-peer usage was forecasted to increase year over year?

2    A.    Yes.

3    Q.    And if you could turn to the High Household Profile

4    section of this excerpt.

5          Do you see that?

6    A.    Yes.

7    Q.    Does this reflect that inCode forecasted to Cox that for

8    those that engage in peer-to-peer activity, that their overall

9    data consumption for peer-to-peer would increase in each of the

10   years for 2011 to 2015?

11   A.    Yes.

12   Q.    In 2011 the Procera data showed that 12-and-a-half percent

13   of the data of Cox's network was being used for peer-to-peer

14   file -- file usage, correct?

15   A.    Yes.

16         EXAMINATION

17   BY MS. LEIDEN:

18   Q.    Could you first turn to the document that Mr. Zebrak

19   marked earlier as Exhibit 94.  That's the hard copy of the

20   spreadsheet that you were looking at electronically.

21   A.    Okay.

22   Q.    Just a couple of clarifying questions on this data.  If

23   you flip to the second tab after the first blue page, the page

24   titled Summary of Data Usage.

25   A.    Yes.

J.C. Fuenzalida - Video Deposition

1706

1   Q.   And I believe that you testified earlier that this

2   broadband consumption analysis took place predominantly in

3   2012, correct?

4   A.   Yes.

5   Q.   And does the 2011 data here reflect actual data?

6   A.   No.  This is our view of what actual data would be.  It

7   was then subsequently compared against Cox's Procera tool, but

8   this is our outside-in view, as you call it.

9   Q.   And when you say, outside-in view, is that because the

10  data is based on information from the third-party sources?

11  A.   Yes.

12  Q.   Such as Cisco?

13  A.   Yes.

14  Q.   And for the other years on this spreadsheet, 2012 through

15  2015, you testified that those were forecasts that inCode had

16  come up with, correct?

17  A.   Yes, based on, you know, the third-party research.

18  Q.   And going back to the 2011 data, and specifically talking

19  about this page of this spreadsheet for now, was any of this

20  data under 2011 a reflection of the broadband consumption of

21  Cox subscribers specifically?

22  A.   Well, the -- the -- in a few of the fields we gained

23  insights from Cox to help form this.  Okay.  I believe in the

24  peer-to-peer session usage, I'll call it, as I pointed out

25  earlier, and there may have been others, but it was more of

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1713

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
             Plaintiffs,        :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
             Defendants.        :
                                :
--------------------------------:
```

VOLUME  8  (A.M. Portion)

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

FOR THE PLAINTIFFS:                MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
                                   MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
                                   LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
                                   Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
                                   5th Floor
                                   Washington, D.C. 20015


FOR THE DEFENDANTS:                THOMAS M. BUCHANAN, ESQ.
                                   Winston & Strawn LLP
                                   1700 K Street, N.W.
                                   Washington, D.C. 20006-3817
                                     and
                                   SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
                                   THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
                                   Winston & Strawn LLP
                                   200 Park Avenue
                                   New York, NY 10166-4193
                                     and
                                   JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
                                   Winston & Strawn LLP
                                   101 California Street, 35th Floor
                                   San Francisco, CA 94111-5840
                                     and
                                   MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
                                   35 West Wacker Drive
                                   Chicago, IL 60601
                                     and
                                   DIANA HUGHES LEIDEN, ESQ.
                                   Winston & Strawn LLP
                                   333 South Grand Avenue
                                   Suite 3800
                                   Los Angeles, CA 90071

1715

INDEX

OPENING STATEMENTS BY:


WITNESS                              EXAMINATION        PAGE


     WILLIAM H. LEHR


                                     DIRECT             1730
                                     CROSS              1799
                                     REDIRECT           1854



CLOSING ARGUMENTS BY:




COURT'S RULINGS/JURY INSTRUCTIONS

1 timeframes, they come up with very different estimates. But

2 all of them are big.

3 Q. Now, you said the word "papers." What do you mean that

4 you've reviewed papers? What are these papers?

5 A. Oh, sorry. A number -- what economists or an analyst

6 looking at this field does is you look at sort of the

7 literature. And one of the first things you look at in terms

8 of the literature is, you know, the academic peer-reviewed

9 press. And there's many different publications.

09:49:23 10     But, you know, the typical pattern by which academics

11 publish their research is they submit it to a journal that has

12 an audience of folks that are interested in that, which is

13 usually other professionals. And then before the journal will

14 publish that, they send it out to peer review.

15     And then there's also conferences that are attended

16 by other experts and this sort thing.

17     So that's how the professional sort of academic world

18 works.

19 Q. And did any of the articles that you reviewed discuss the

09:49:52 20 impact on revenue received by the recording industry?

21 A. Yes. I mean, the ones I directly cited were all directly

22 relevant to this question, the 24 -- or whatever it was -- so

23 between 20 and 30 publications I cited in my reports.

24 Q. And did you observe a general consensus or agreement in

25 the literature on the issue of harm?

W.H. Lehr - Direct

1747

1   A.   Yeah.  I mean, one of the more recent or latest -- I

2   forget the precise date of it, reviews of the literature, but

3   it was -- I believe it was after the 2014, said that they found

4   26 studies of whether or not there was economic harm to rights

5   holders, and they found that something like 23 out of those --

6   out of the 26 studies found significant economic harm.

7         Now, when you say "significant," what you mean is

8   that you're actually able to demonstrate it within the dataset

9   using statistical methods to basically sort of pass muster.

09:50:52 10        So it's not like I found evidence, but it's not

11   statistically significant.  So it doesn't mean that's

12   meaningless, it just means that, you know, it doesn't cross

13   that higher bar that academics try and set for themselves in

14   published literature.

15         So when they say 23 out of 26 studies found

16   significant harm, that's -- you know, I would say, you know, a

17   demonstration of almost universal consensus in the profession.

18   Q.   And did you agree with that consensus?

19   A.   Absolutely.  And I think all the other evidence I

09:51:25 20   considered in this matter just goes to confirming that.

21   Q.   Have you prepared a slide excerpting one of the studies

22   you reviewed?

23   A.   Yes.

24   Q.   Could you tell us about this study and why you've put this

25   slide here, Dr. Lehr?

A.    Yeah.  This is one of the studies that I cited, and the title of the study is Quantifying Global Transfers of Copyrighted Content Using BitTorrent.

And it's by Alexandria Mateus and John Peha.  And I've highlighted, you know, excerpts from this.  So the first excerpt is that 10.7 songs were transferred using BitTorrent for every song sold.

And then also, that the vast majority of music and video content transferred using BitTorrent is copyrighted.

And they find that only .55 percent, less than, you know, 1 percent, about half a percent of the content in BitTorrent is not copyright infringing and potentially legitimate.

So they conclude that BitTorrent transfers result in hundreds of millions of copyright violations worldwide per day, and the copyright holders fail to realize significant revenues as a result.

What these guys did in the study was they looked in some detail and care at actually what's going on in BitTorrent traffic.  And, you know, it's a fairly comprehensive study, I think, in doing that.

And what they're saying here is essentially this research says that the number of illegal copies that are out there -- because almost all these copies that are going by BitTorrent are illegal, that's what this is saying, is that

W.H. Lehr - Direct

1749

1    it's copyrighted material that are being shared over the

2    BitTorrent network -- it's ten times what the legal sales are.

3    Q.   Now, Dr. Lehr, there is a document in front of you,

4    PX 439.

5    A.   Yes.

6    Q.   Do you recognize that?

7    A.   Yes.

8           MR. GOULD:  I'd move to admit PX 439.

9           THE COURT:  Any objection?

09:53:32  10           MR. BUCHANAN:  Yes, Your Honor, I would -- no

11   objection.

12           THE COURT:  All right.  Your exception is noted

13   previously.

14           MR. GOULD:  If we could pull up--

15           THE COURT:  The exhibit is received.

16           MR. GOULD:  Actually, you know what, I have got a

17   slide, so it's fine.

18   BY MR. GOULD: (Continuing)

19   Q.   Dr. Lehr, what is PX 439?

09:53:47  20   A.   This is another one of the, you know, documents that I

21   reviewed in reaching my opinions.  It was, you know, a study

22   that looked at -- it was another study also looking at some of

23   the same issues that were touched on in the paper I just saw,

24   looking at what's actually in BitTorrent traffic.

25           And so, what they did was they only identified out of

W.H. Lehr - Direct

1    the torrent files, out of 12,500 torrents analyzed, there were

2    only two files that they offered -- or two torrents that --

3    files that offered non-infringing content.  So that results in

4    them including that 99.97 percent of content was infringing.

5           So this is another example of research of the sort

6    that was relied upon by analysts and academics trying to think

7    about this question of does, you know, peer-to-peer file

8    sharing result in piracy that harms rights holders?

9           And, you know, it goes to the point of, you know,

09:54:52 10  people that actually looked at this, documents what was, I

11   would say, commonly known by people that were thinking about

12   these issues at the time that, you know, of course, the

13   traffic, peer-to-peer traffic is almost all illegal copyright.

14   Q.   So how does this -- how do these two articles and the body

15   of literature tie in with your opinion that this peer-to-peer

16   infringement causes economic harm?

17   A.   Well, what the peer-to-peer does is it basically makes it

18   extremely easy.  So it is kind of like piracy on steroids.

19   While piracy did happen and has been a problem forever -- you

09:55:35 20  know, when people did discs, you know, did copyright CDs, that

21   just wasn't quite the same thing.

22          But if someone can put on the Internet a copy via

23   broadband connection, especially via a high-speed broadband

24   connection a copy, the number of times that can be shared is

25   potentially unlimited.

**JA581**

W.H. Lehr - Direct

1751

1    So the viral nature of file sharing and the way

2    peer-to-peer networks work means that it's an extremely

3    dangerous, you know, from the perspective of rights holders,

4    vehicle for, you know, producing illegal copies.

5    Q.   Now, moving to your second opinion that the quantity is --

6    you can't quantify the harm.  Could you walk us through the

7    basis for that opinion.

8    A.   Yeah.  So the first, you know, opinion is that, you know,

9    the evidence and, you know, sort of universally the people that

09:56:37 10  have looked at it, the economists and other analysts, have

11   concluded that there is a really significant harm to rights

12   holders.

13          It turns out that, you know, if you want to try and

14   quantify that in dollar terms, like what is the economic damage

15   that plaintiffs would suffer in a case like this, that data

16   just doesn't exist.

17          To an economist trying to estimate something like

18   economic harm, what you're trying to do is figure out, here is

19   the way the world exists today, so I know what sales are in

09:57:11 20  today's world, but what would sales have been in the but-for

21   world where the piracy problem that I'm worried about did not

22   exist.

23          So I'm trying to estimate what the profits and

24   revenues might have been to rights holders in a world where

25   piracy did not exist.  And I fundamentally do not have the data

W.H. Lehr - Direct

1758

1  own internal profit and loss statements.  So these are their

2  statements that describe what are the revenues coming in from

3  the customers by product line, and then what are the costs that

4  are directly attributable to those product lines that are, you

5  know, variable.  And then also, what are all the fixed costs.

6  So, what are all the operating costs that are associated.  And

7  then that, you know, down to the bottom.

8          And then after I've done my -- those are the

9  documents that I considered, and I got that both for their

10:07:08 10  residential customers when I did my original first report, and

11  then later, we got additional similar information on their

12  commercial customers.  And that's the principal data.

13          And then after my all reports were finished, we

14  finally got access to their complete audited, financial audited

15  statements.  A thing that looks like an annual report that

16  normally would be publicly available and you could download

17  from the Securities and Exchange Commission site.  You know,

18  that -- the version of the report that looks like that.

19  Q.   Talk us through -- talk the jury through, please, if you

10:07:44 20  could, what you observed and concluded in terms of Cox's

21  revenues and profits from its residential and business

22  customers.

23  A.   Right.  So to make even more concrete what I was

24  explaining before, you can see that, you know, Cox had revenues

25  in 2013 of $9.5 billion.  Revenues in 2014 of $10 billion.  For

W.H. Lehr - Direct

1759

1   a total of $19.5 billion.

2           So round numbers, they're basically a $10 billion

3   company.  And that comports with sort of what you would expect

4   given sort of what I have already said.

5           The other point to recognize, and this slide

6   demonstrates, is they're a quite profitable company.  So when

7   you take -- using Cox's financial internal documents, you take

8   off all the costs, except for taxes and interest that Cox

9   incurs in realizing those revenues -- so they have to maintain,

10:08:45 10   you know, a networking engineering department, and marketing

11  department, and they have to have people doing their accounting

12  and personnel, take all those costs out, in 2013, they earned

13  $4 billion.  And in 2014 they earned $4.3 billion.  For a total

14  of $8.3 billion.

15          So the profit margin, just talking about the cash

16  flow that's flowing to the business and that they can then, you

17  know, use to invest in the business or do other things with,

18  that's, you know, a margin around 43 percent.

19  Q.   So I want to understand a couple of terms you used.  What

10:09:26 20  is revenue just at a high level?

21  A.   Revenue was the total receipts they get from their

22  subscribers.

23          So as I said, they send bills to subscribers, and

24  some of the subscribers have discounted service for the first

25  couple of months or whatever.  And so, that's all factored in.

W.H. Lehr - Direct

1760

1  It's what the customers actually pay.  That's the money coming

2  in.

3          And then money that goes out is what they have to pay

4  their employees to make this whole engine work and --

5  Q.   And what is net profit?

6  A.   Net profit the revenues minus those costs.  And it's --

7  here, what net profit is is the operating cash flow.  So it's

8  taking out their operating costs.  It's not taking out their --

9  the interest expenses and some things that, you know,

10:10:15 10  accountants may use if they're computing something like net

11  income.

12  Q.   And you used another term, "margin."  What does margin

13  mean, and how does that relate to this slide?

14  A.   Margin, again, is just a measure of profitability.

15  There's many ways in which one might assess profitability.  So

16  margin, here, is just very simply net profit divided by

17  revenue.  It gives you an idea.

18          The higher that number is, it tells you, if I get a

19  dollar in and my margin's really high, I'm going to keep most

10:10:41 20  of that dollar that I get in and be able to flow it down to the

21  bottom line, and then use it to build my business or make the

22  people that gave me the money to run the business happy to go

23  do whatever they want to do.

24  Q.   Now, did you consider any other measure of profitability?

25  I think this might be on your next slide.

W.H. Lehr - Direct

1769

1    59.8 percent.

2            The next most profitable service is their voice

3    service, which has a margin of 52.5 percent.

4            And then the least profitable of these services is

5    their video or television service, which still has a margin of

6    21.5 percent.  Compare that to the 8.6 percent that the record

7    industries get.  The reason it's 21.5 percent and the reason

8    the video business in that sense is more expensive for Cox is

9    because Cox has to pay for the programming it delivers to the

10:22:41 10   subscribers on a per subscriber basis.

11           So some of that $4.2 billion is going to the -- you

12   know, people like HBO and other folks that are providing the

13   programming.

14   Q.   Now, Dr. Lehr, does the understanding of this business and

15   Cox's financials tie into your next opinion about Cox's

16   economic incentives in this case?

17   A.   Yeah, absolutely.  You can see that the basic business

18   here is to acquire subscribers, sell them a bunch of services,

19   and keep them on your network.  So Cox has a strong incentive

10:23:19 20   to do that.

21           And Cox likes to keep all subscribers that are

22   profitable on its network.  As in, if you pay your bills,

23   you're profitable, in this business.  And there is evidence

24   from Cox's own billing records that keeping infringing

25   subscribers on its network was very profitable to Cox.

W.H. Lehr - Direct

1770

1    Q.   Now, could you just walk through the bases for your

2    opinion on incentives here, and then we'll go through each one.

3    So at this step just touch on them, please.

4    A.   Sure.  So first off, there is evidence in this case about

5    the, you know, subscribers who are -- have been identified as

6    infringing.  And those subscribers, Cox billed $307 million, so

7    we're talking about a lot of money, between February 2013 and

8    2016.

9         Two, there is evidence from multiple sources that

10   suggests that Cox infringers actually paid more for Internet

11   service on average and are likely to have purchased more

12   expensive Internet plans than your average subscriber.

13        Three, that Cox saved costs by not addressing the

14   copyright infringement.  I talked a little bit about that at

15   the very beginning, you know.  And so these -- this is

16   referring to the costs that Cox avoided as opposed to the costs

17   that the plaintiffs incurred in trying to do their -- you know,

18   what they could to fight privacy.  But Cox saved costs by not

19   addressing copyright infringement.

20        And that by not addressing copyright infringement,

21   Cox was able to maintain a larger subscriber base over time

22   than they would have had they been more aggressive in dealing

23   with the infringement by subscribers on the Cox network.

24   Q.   So let's turn to your first opinion that Cox billed

25   subscribers 307 million in the time frame you've identified.

10:24:21  10

10:25:05  20

1        Can you -- what information did you consider in

2  forming this opinion?

3  A.   So I actually -- in this case I actually got, it was

4  closed, a subsample of Cox's data about the levels of

5  infringement.  So excerpts from their CATS system that

6  documented the -- you know, matched the tickets to subscriber

7  accounts from 2012 to 2014.

8        So I know what -- how many tickets and when those

9  tickets arrived for those subscribers in that data.

10:26:11 10        I also received for that subsample of subscribers

11  from Cox's billing system all of the bills that were billed and

12  paid by Cox subscribers identified in the CATS data, that

13  subsample we got, from 2012 to 2016.

14        So I have like month by month this is how much they

15  paid for the services they got.  So I had that data and I

16  matched that up.

17        And when you match that data up -- there were a few

18  missing records, you know, in terms of things, but basically

19  there were 57,279 subscribers that were identified as

10:27:05 20  infringing.  In other words, they had received at least one

21  ticket, for which I had billing data.

22  Q.   And for those 57,000-odd subscribers, what did you

23  determine Cox billed those customers?

24  A.   Well, then having matched those datasets up, you can go

25  through and you can sum the revenue over whatever period you

W.H. Lehr - Direct

1772

1    want.  And the period that I summed it over for this table was

2    from February 2013 to December 2016.  And that number for all

3    those subscribers in that -- those 57,279, it is $307 million

4    that were billed.

5    Q.   Now, this time frame that you've identified here, why did

6    you use that time frame?

7    A.   I used that time frame because I think it's -- one, it's

8    the claim period in this case and it's illustrative of this.  I

9    could have used a different time period.  I mean, I could have

10:28:02 10   shown even more, the numbers would be bigger.

11          And I didn't -- I wouldn't -- I didn't -- I stopped

12   at 2016 because that's all the data I had.  I believe a number

13   of these subscribers were still subscribers and were still

14   producing revenue.  So that would drive the number up if I had

15   been given data up to the present.

16          And presumably also, since the ticket data ends at

17   2014, a number of those subscribers received additional tickets

18   and it's possible that additional, you know, subscribers would

19   have been provided.

10:28:32 20          So this number here is what the data is.  I am

21   showing you what's in the data and give you an idea of what

22   it's telling you.

23   Q.   I'll turn to 3+ and 5+ in a moment.  But I want to

24   understand what do the amounts that Cox billed and collected

25   from these customers tell you about Cox's incentives or

W.H. Lehr - Direct

1773

1  benefits in respect to infringement or infringing customers?

2  A.   Well, there is various standards one might have to

3  determine, you know, what's infringing.  But this is evidence

4  that I believe -- I think the evidence in this case

5  demonstrates credibly that Cox knew they had a significant

6  number of infringing subscribers on their network.

7          And we will talk about other things.  Like for

8  example, they knew they had a lot of peer-to-peer traffic on

9  their network.  And they also knew that peer-to-peer traffic is

10:29:29 10  almost all infringing traffic.

11          But this is data from their own billing system of

12  subscribers that were identified to them by the RIAA in the

13  messages sent to them as these are subscribers engaging in

14  infringement.  And Cox continued to bill these subscribers even

15  though they were infringing, deriving a direct financial

16  benefit from these subscribers that is in the hundreds of

17  millions of dollars.

18  Q.   Why have you included in your slide here, Dr. Lehr, an

19  entry showing direct infringers with just one ticket?  How does

10:30:08 20  that demonstrate Cox's economic incentives versus a direct

21  infringer who had just one ticket in Cox's system?

22  A.   Well, first off, I think to understand what's going on

23  here, you ought to have some sense of the dataset.  So the

24  dataset begins with infringers that have one or more tickets.

25  So I think that's the first reason you absolutely want to show

W.H. Lehr - Direct

1774

1       it.

2              But the other is because you're trying to get a

3       handle on evidence that shows that Cox actually benefitted,

4       that its incentives -- what the theory tells you comports with

5       what the evidence actually shows and is demonstrated by Cox's

6       actual behavior.

7              So the theory tells you that a business operates to

8       generate profits and do the right things.  And so, it's in

9       Cox's incentive to retain profitable subscribers.

10:31:00 10            Cox, indeed, retained profitable subscribers.  And it

11      chose to retain and earn significant revenues and profits from

12      subscribers that were identified as infringing.

13             Now, you know, whether or not these -- you should

14      say, oh, you know, those subscribers that only got one ticket

15      weren't really infringing, I'm not arguing with that.  Although

16      the data suggests that the fact that they got one ticket, given

17      what I said earlier and given what we know about the nature of

18      the sampling of the data, means that there is maybe a bunch of

19      people that never got a ticket that were infringing merrily.

10:31:42 20      They got one ticket and they infringed a lot more, but didn't

21      get subsequent tickets.  And we don't know how many

22      infringements are associated with the subscriber that got

23      identified.

24             So I'm not trying to tell you how to map to a number

25      of infringements.  That's not my testimony here.  It's about

W.H. Lehr - Direct

1775

1  what is their economic incentive to knowingly tolerate having

2  infringing subscribers on their network.

3       And I believe the $307 million gives you an idea that

4  they had a very large economic and financial incentive from

5  that.

6  Q.   Now, when Cox would have considered the value of these

7  direct infringing subscribers in the context of this economic

8  incentive opinion, would Cox have considered just some of the

9  value of that customer, or more of the value of that customer,

10 or the entire value of that customer?

11 A.   Cox is in a continuous business of trying to get

12 customers, trying to hold on to the customers it has.  And

13 that's especially valuable because it costs money to acquire

14 customers.  And if you already have them, it is much more

15 profitable to keep them.  And so Cox was continuously doing

16 that.  And so, as I said, the economic basic data shows that.

17       This data shows that in fact they were capturing

18 significant revenue from infringing subscribers.  And the fact

19 that I catch you at some certain point in your career doesn't

20 mean you weren't infringing before.  I don't have ticket data

21 about what -- some of these subscribers that may have been

22 subscribers before 2012.  I only have data of these subscribers

23 and the tickets they received between 2012 and 2014.  That's a

24 sliding window.  And I don't have the revenue from before.

25       So, these subscribers and the benefit to Cox is

W.H. Lehr - Direct

1776

1   greater than the evidence that I have here.

2   Q.    Now, looking again at the time frame.  If you had limited

3   this to just the claim period, February 2013 to November 2014,

4   would that impact your opinion?

5   A.    Well, it wouldn't impact my opinion that Cox had a very

6   significant economic benefit.  It would change the numbers

7   because, for example, it would make the billing charges that

8   are reported here go down.

9         And just one other point here.  These numbers are the

10:33:58 10   billing charges.  The evidence shows and the testimony by Cox

11   is that the actual revenues received by Cox were almost

12   99 percent of what was billed.

13        So it's not like this is what was billed, but maybe a

14   bunch of these people didn't pay their bills.  No, most of

15   these people did pay their bills.  And so, the difference

16   between what was actually received and the billing charges,

17   it's very close.

18   Q.    Okay.  So I just want to make sure we understand.  What

19   does the 3+ and 5+ show?

10:34:36 20   A.    So, again, my purpose with this is to sort of give you

21   some sense of what is going on in the data and what we see.

22        So if you say, take that dataset and then only look

23   at the total billings associated with the subset of subscribers

24   that had three or more DMCA tickets, the 57,279 subscribers

25   goes down to 31,514 subscribers.  And then the billed charges

1       also goes down to 208 million.

2               And then if you ask the question about, okay, well,

3       what about 5+ DMCA subscribers, that number goes down to 20,189

4       subscribers, and their total billed charges were $164 million.

5       So, you know, still a very large number.

6       Q.   And so, the 5+ is direct infringers who received -- are

7       there 20,000 direct infringers with 5+ tickets?

8       A.   Identified in the subsample of total infringements by the

9       RIAA that is already, you know, by all reasonable estimates

10:35:45  10  expected to be a subsample of the total amount of infringing

11      activity and infringing subscribers that exist on Cox's

12      network.

13      Q.   You talked earlier, sir, about the bundling of products.

14      How does that factor into this analysis?

15              Can you tell the jury what kinds of services the

16      customers represent in this slide, subscribed to and paid for.

17      A.   Well, this, again, is looking at all the services those

18      subscribers paid for.  So it's not just looking at, you know,

19      what revenue did they get from these subscribers associated

10:36:16  20  with their high-speed Internet service.  Because that's not how

21      the service is sold.

22              Customers buy a bundled service.  When you buy a

23      bundled service, you get a different price.  In fact, you get a

24      discount.  And consumers want to buy bundled services because

25      it gives them one point of contact, because it's simpler, they

W.H. Lehr - Direct

1778

get a lower price.  And that's how Cox wants to sell the
service.

           And typically when subscribers move, if they decide,
oh, I don't like this, they move often everything.

           So the reason it's appropriate, I believe, to look at
the total bills to these customers is because that represents a
measure of the value to Cox of retaining these subscribers on
its network.

Q.   Did you consider any of Cox's internal writings or e-mails
or communications in connection with this opinion that Cox had
an economic incentive to tolerate infringement?

A.   Sure.  So like I said, from the basic number, they have an
incentive.  But their internal documents, some of which -- you
know, when I was sitting in court the other day, I heard
testimony about -- you know, showed that when they thought
about like whether or not they should address the
infringement -- like whether or not, for example, they should
terminate particular subscribers, they definitely considered,
you know, how profitable these subscribers were.

           So these are excerpts from two e-mails.  One, the
first one from March 27, 2014, from Joe Sikes who worked in
their -- you know, the group that was supposed to be addressing
copyright abuse.  He said:  This customer pays us over $400 a
month.  And if we terminate their Internet service, they will
likely cancel the rest of their services.

W.H. Lehr - Direct

1           So this is a statement from Sikes saying they

2    recognize what was commonly known in the business, that

3    basically you sell and attract customers on the basis of a

4    Triple Play.

5           And also, it's worth noting this guy is paying over

6    $400 a month.  The average revenue captured from the average

7    subscriber at Cox was like $130 per month in 2014.  This is

8    $400.  So this more than, you know, a regular number.

9           And so, don't terminate this subscriber, that's what

10:38:31 10   this e-mail tells me they were saying.

11          The second one also from him is -- well, this is an

12   e-mail.  This is a communication that was documented, is

13   talking about the soft termination.

14          So Cox did have, you know, a plan they said was how

15   they dealt with copyright abuse.  And that called for

16   terminating subscribers after some number of messages and back

17   and forth.

18          But what they actually did was, evidence suggests is

19   they would -- if they terminate a subscriber, they wouldn't

10:39:07 20   actually like -- basically, okay, that subscriber is no longer

21   ours, you know, get them out of the system.

22          No, they would basically turn off his service and

23   then turn it right back on again.  That was what they meant by

24   soft termination.

25          And it says:  For DMCA, we don't want to lose/loose,

W.H. Lehr - Direct

1780

1    you know, finger typing, you know, the revenue.

2            So basically they're caring about how much revenue a

3    subscriber is delivering, how profitable a subscriber is, when

4    they are evaluating whether or not they should adhere to their

5    own public statements of what they do about copyright

6    infringers.  And --

7    Q.   Now -- I'm sorry, I didn't mean to interrupt.

8    A.   Yeah, sorry.  You know, he says, it's a new policy, this

9    soft termination is a relatively new way for them to not have

10:39:55 10   to deal with losing customers who are actually -- you know,

11   that they have knowledge of, significant knowledge of being

12   repeat infringers.

13   Q.   Now, we looked at the aggregate value of the direct

14   infringers in a slide a couple moments ago.  Did you also

15   consider the value of individual subscribers that Cox would

16   have considered in forming your view of economic incentive to

17   tolerate infringement?

18   A.   Yes, I did.  So when I described that dataset, visualizing

19   what that looks like might be a little bit problematic for

10:40:34 20   people.  So you can look at individual records.  I mean, if you

21   really want to, you can look at 57,000 records that have month

22   by month by month by month the revenues and when the tickets

23   came in.

24           But I've -- you know, just to give you an idea of

25   sort of what some of the customers that are in that dataset

1    looked like, I pulled a couple of examples.  And I pulled

2    examples for subscribers that had at least 13 tickets

3    because -- you know, as I'll explain in a minute.  So this --

4    Q.   So, Dr. Lehr, can you explain for us what's shown in this

5    slide 17?

6    A.   Okay.  So this chart is just showing by month -- so months

7    are on X axis, the lower axis going from 2012 to 2016.  And

8    then on the Y axis is showing you dollar amounts.  And the cap

9    here on this slide is $250.  And so, it's basically showing the

10   cash flows by month.

11         And then it's -- I've marked out in these black flags

12   highlighted when in the dataset it shows they had received a

13   certain number of tickets.

14         So this customer is identified as Customer ID

15   580702666207, was a residential subscriber that in the

16   dataset -- within the dataset from 2012-2014, had received 101

17   tickets associated -- DMCA tickets that were in the CATS

18   database that Cox maintained.  They had received the fifth

19   ticket already by early in 2012, and the 13th ticket already

20   relatively early in 2012.

21   Q.   And why did you highlight those ticket numbers, the 13th

22   in particular?

23   A.   Well, there's some discussion about what Cox's graduated

24   response or way of dealing with this was.  And one of -- you

25   know, a later version of this was that, well, after 13 tickets,

W.H. Lehr - Direct

1782

1    this is a customer that, you know, we think should be

2    terminated.  And then, you know, we -- you know, the other one

3    says, they had this sort of soft termination process.  But the

4    details of that, that changed over time.

5          But basically, even by Cox's admissions, it's hard to

6    argue that a subscriber that has gotten 13 tickets, Cox is --

7    doesn't think is a repeat infringer, you know, and that they

8    don't have a knowledge of this.  Yet they're continuing to bill

9    that subscriber.  They could have been billing this subscriber

10:43:00 10   since before 2012.  They were certainly billing them through

11   this period of time.

12         But what I'm showing you here in these bars is

13   starting in February 1, 2013 -- and you can see in each month,

14   those bars, and they're relatively flat, around $200.  There's

15   one out here where there's an arrow, that means that it was --

16   that month, they billed that subscriber more than $250 and

17   something up there.

18         But that if you add up all those bars in there, that

19   subscriber was billed $8,594 by Cox.

10:43:34 20   Q.    So this is just one residential subscriber?

21   A.    This is one residential subscriber.

22   Q.    So how does looking at one residential subscriber tie into

23   your earlier opinion about the aggregate value of all of the

24   direct infringers?

25   A.    Well, you can -- you know, there's a number like this for

W.H. Lehr - Direct

1783

1    each of the different subscribers.  And there are some that

2    billed lower amounts and some that billed higher amounts.  And,

3    you know, this is a subscriber that billed a fair amount.

4           It turns out that this amount is not that different

5    than sort of what you might think the average value of

6    subscriber would be over their lifetime.  You know, it's order

7    of magnitude.  It's okay, it's a little bit more valuable.  So

8    this is -- you know, this also would go to a thing of like,

9    geez, a 101 ticket subscriber also billed $8,594 in the

10   subsample of the data that I'm showing.

11          You know, that shows this is an infringing subscriber

12   that Cox is deriving a direct financial benefit from.  And they

13   were close to 60,000 subscribers that have a different number

14   like this.

15          But, you know, you look at them and I showed other

16   ways to think about that with the --

17   Q.   But this is a residential.  Did you consider a couple of

18   business customers to demonstrate?

19   A.   Yeah, the business -- yes, I did, and the next one is the

20   business subscriber.  The business subscribers were, as I said,

21   a smaller number, but they account for a lot more dollars per

22   account typically.  And this one was one of the observations

23   that had one of the highest numbers of tickets in the whole

24   dataset to give you an idea.

25          So this one got eventually 4,074 tickets.  And they

W.H. Lehr - Direct

1784

1   also had received their 13th ticket by early in 2012.  And this

2   particular account is a reseller of Cox's broadband services.

3   So it might -- you know, it could be like one of these like

4   WiFi resellers that's selling, you know, access.  Cox billed

5   that customer $706,000.

6          And if you look at this, there are some things that

7   look a little strange.  So you see these arrows like around

8   2015, and then the numbers drop way down.  We don't know

9   precisely what's going on there.  But what it looks like is

10:45:48  10   that this customer prepaid for like a year of service.  And so,

11   they didn't get billed in subsequent months because they had --

12   that's sort of what I would interpret that means.

13          But this is what the data looks like.

14   Q.   And did you look at another business customer?

15   A.   Sure.

16   Q.   And what does this show us?

17   A.   Well, this just shows you, again, this turns out to be a

18   fraternity, surprise, surprise, that had 67 tickets and had

19   gotten its 13th ticket in 2012, also.  That Cox billed, you

10:46:18  20   know, from February 2013 to 2016, $12,525 to this account, you

21   know.  So --

22   Q.   And why did you select these examples, Dr. Lehr?

23   A.   Because I understand there has been testimony here about,

24   you know, characterize the nature of their business customers

25   and their residential customers.  And the fact of the matter

1785

1   is, is that Cox wants to sell service to all the customers that

2   it can make money from and is profitable.  That's a normal

3   business, you know, proposition, and Cox does that.

4         And it sells it to its infringing customers, and many

5   of its business customers and many of its residential customers

6   are, you know, all kinds of different businesses, and there's a

7   lot of heterogeneity.  The thing that's clear is that the vast

8   majority of their customers, including their infringing

9   customers, are highly profitable to Cox.  Some are more

10  profitable than others.  But almost all of them are profitable

11  to Cox.

12  Q.  Now, I want to turn to your next opinion, Dr. Lehr, that

13  repeat infringers are --

14        THE COURT:  Let me stop you there.

15        The -- let's take our morning break now.  So let's

16  take 15 minutes and we'll come back and continue our testimony.

17  Thank you all.

18        NOTE:  At this point the jury leaves the courtroom;

19  whereupon the case continues as follows:

20  JURY OUT

21        THE COURT:  All right.  I got the signal from one of

22  the jurors that it was time for a break.

23        Anything before we go?

24        All right.  Let's take 15 minutes then.  We're in

25  recess.

1786

1           NOTE:  At this point a recess is taken; at the

2   conclusion of which the case continues in the absence of the

3   jury as follow:

4   JURY OUT

5           THE COURT:  All right.  Joe, let's get our jury,

6   please.

7           NOTE:  At this point the jury returns to the

8   courtroom; whereupon the case continues as follows:

9   JURY IN

11:09:45  10           THE COURT:  All right.  Please be seated.

11           Mr. Gould, continue, sir.

12           MR. GOULD:  Thank you, Your Honor.

13   BY MR. GOULD:  (Continuing)

14   Q.   Dr. Lehr, did you reach any conclusions about the relative

15   value and benefit to Cox of retaining repeat infringing

16   subscribers?

17   A.   Yes, I did.  There's -- I considered several types of

18   evidence to -- regarding this matter.

19   Q.   And could you walk us through the basis for this opinion.

11:10:11  20   A.   Yeah.  First off, when Cox sells its broadband service, it

21   doesn't have just a single, you know, broadband service.  It

22   offers different tiers.  You know, like a -- you know, a low

23   tier service that's less expensive, provides a lower data rate

24   and tells the customers that, you know, their data allowance is

25   going to be less.  And that's suitable for people that are

W.H. Lehr - Direct

1787

1       going to be really light broadband users.

2               And then it has higher tiers.  And the higher the

3       tier, the higher the price for the service, the more you get.

4               So it's like a lot of things.  So it is sort of if

5       you want to get a fully-loaded car, you pay more for the

6       extras.  You want to have broadband that runs really fast and

7       has a big data cap, supports multiple users in your household,

8       these sorts of things, you get a higher tier service.  So --

9       Q.   You talked about data, but you also just mentioned speed.

11:11:08 10   What does this -- how does the speed impact the tiers?

11      A.   Well, they --

12      Q.   Or relate to the tiers.

13      A.   They -- when they define the nature of the service, they

14      also tell you what its likely performance is going to be, you

15      know, so what -- they'll say a data rate up to this certain

16      speed, and sort of what's the average data rate you could

17      expect.

18              And so, for certain activities, for example,

19      downloading files, having something like BitTorrent work and

11:11:34 20   having a usable experience, you need -- the faster your service

21      is, the faster the files will download, the better the

22      experience you'll have if, for example, you're using it to

23      infringe, which is what it's principally used for, and the

24      better the experience other subscribers in the BitTorrent, you

25      know, world will have when they pull the file from you, you

1788

1    know.

2             So if you try to basically, you know, download a file

3    and the connection is too small, it's like trying to drive on

4    the highway in a Model T Ford, you know.  It's not going to be

5    a pleasant experience.

6             You know, whereas if you have a very fast speed

7    service, you'll download files quickly, you can download more

8    of them.  And you'll also, you know, have -- it won't interfere

9    with other things that you're doing.

11:12:23 10   Q.   Now, on this notion of -- the second and third point:  P2P

11   consumes more bandwidth and was a key driver of Cox's

12   bandwidth.

13             Did you prepare a slide showing some of the

14   information you considered?

15   A.   Yeah, I did.  I mean, what's important to understand is

16   that it -- you know, the broad -- the companies that provide

17   broadband service have to manage their network and provision

18   their network for the peak traffic loads.  And they also want

19   to look at sort of what people are doing and what -- you know,

11:12:55 20   what kind of services they have so they can give those

21   customers the experience those customers, you know, want and

22   expect.

23             And so, they look at the different types of traffic.

24   And if you have someone that all they're doing is e-mail

25   occasionally, they're not moving a lot of data and they're

W.H. Lehr - Direct

1789

1       not -- they don't need a very fast high speed service.

2               If someone's doing something like peer-to-peer,

3       that's one of the most intensive -- bandwidth intensive

4       services, both on the upload and the download, that broadband

5       subscribers do.

6               And this slide is -- you know, pieces out of a

7       consultancy report that was prepared by this company, inCode

8       that, you know, provided advice to Cox on sort of, you know,

9       what they should be expecting in the future, what traffic

11:13:45  10  looked like in the Internet, what traffic looked like, and what

11      other, you know, broadband providers around the country were

12      doing.

13              And what this one says is basically what I've been

14      saying.  Is that peer-to-peer is the most bandwidth intensive

15      category.  And this one shows that, you know, peer-to-peer

16      households were 13 percent of all broadband households.  Which

17      is a much higher number, for example, than the 60,000

18      subscribers that have been identified here relative to the

19      4.5 million broadband subscribers that Cox had.

11:14:19  20          So 60,000 over 4.5 million is well less than

21      13 percent.  Which would suggest and is consistent with the

22      inference I make that we were only observing a subset of the

23      actual infringement that was happening on the network.

24              But this is -- this one is showing that this is a

25      heavy use thing.

W.H. Lehr - Direct

1790

1    Now, the lower chart is showing the forecast that

2  these consultants prepared for sort of the typical household's

3  monthly usage.  And so, there are three lines here.  There's a

4  yellow line, a red line, and a green line.  And in its models

5  for coming up with these forecasts, it characterizes what these

6  firms -- you know, what these types of households do.

7    So the yellow lines are households that are doing --

8  you know, using the Internet relatively lightly.  And their

9  bandwidth demand is relatively low.  And they're candidates for

11:15:11 10  this Starter or Essential tier, the lower priced services, you

11  know, these lower dark blue bands that run across.

12    But if you're in the red band, you need to be in the

13  Preferred tier.

14    And if you're a green type of customer, you need to

15  be the Premiere band or the Ultimate tier because your

16  utilization doesn't fit with the experience you have.

17    Now, the users of peer-to-peer are most likely to be

18  in this green band or the red band, but certainly not in this

19  yellow band.

11:15:39 20    So just understanding the character of what

21  peer-to-peer is and what people are doing, and understanding

22  that peer-to-peer is almost all infringing activity, Cox is,

23  you know, listening to and knows -- this is evidence that Cox

24  internally knew that the customers that were doing peer-to-peer

25  were more likely to be customers and candidates for its more

W.H. Lehr - Direct

1791

1    expensive broadband services.

2         So that's a piece of evidence.  That's some of the

3    evidence that goes with the general understanding of how the

4    business operates.

5    Q.   And how does this tie in, Dr. Lehr, to your opinion that

6    Cox had an economic incentive to tolerate infringement?

7    A.   Well, these customers that are providing and are in the

8    higher tier services are more profitable than the lower tier

9    services because almost all the costs of providing the service

11:16:28 10   to the customers is fixed, it doesn't really depend upon the

11   actual use of the customers.

12        So, for example, when customers are heavy users, they

13   may not be heavy users during the peak period, which is when

14   they size the network.

15        It's like you figure out how big a pipe do I need

16   during my busiest hour to make sure that the customers that I

17   promised service to get the service they expect.  But if

18   customers use that pipe when it's not particularly busy, then

19   that doesn't cost me anything because I have the pipe there

11:17:00 20   anyways.

21   Q.   Now, did you have any access to Cox data that reported the

22   actual tier, the actual tier that the direct infringing

23   subscribers in this case subscribed to?

24   A.   No, I don't, because the ICOMS billing data just says what

25   they were billed, but it doesn't tell me what tier those

W.H. Lehr - Direct

1    customers were in.  And so, I didn't have that data, but I do

2    have the ICOMS data and the ticket data.  So there are things I

3    can infer from that.

4    Q.   So just remind us, sir, what's the ICOMS data?

5    A.   The ICOMS data is the internal billing system.  So they

6    keep this for all their subscribers.  But, you know, the subset

7    of the data we got was for those subscribers who had been

8    identified as infringing subscribers in the CATS data with one

9    or more DMCA tickets.  And then we had their revenue payments

11:17:55 10   from 2012 to 2016.

11   Q.   And were you able to look, sir, at the Cox billing data

12   for the direct infringers in this case and draw conclusions

13   about their relative value?

14   A.   Yeah.  So one of the things you can do is you can say,

15   let's look at the data payments.  So not all the revenues they

16   billed, but the data payments which shows up in two different

17   elements within the dataset for each customer.  And you can

18   say, what was the average of only those subscribers, the

19   average billing per month for only those subscribers that

11:18:32 20   received one to two tickets?  And we can -- can we compare it

21   to subscribers that received more tickets.

22        And so, for example, can we compare it to subscribers

23   who got 20 or more tickets?  So if you got 20 or more tickets,

24   the evidence is showing you are, by the evidence, assuming the

25   evidence straightly maps directly to your infringing behavior,

1    that you're a heavier infringer.

2           When you do that comparison and you apply statistical

3    tests, you find that there is a statistically significant

4    increase in the data billed and revenues paid by the more heavy

5    infringers.

6           So this is data from a limited subsample of Cox's own

7    internal billing of these infringing subscribers that have been

8    identified as infringing that statistically shows that there is

9    a large, 8 percent increase in the data billings to those

11:19:30 10   subscribers.

11          And that, you know, goes as consistent with the other

12   stuff, stuff their internal documents and what you would

13   otherwise infer.

14   Q.   What do you mean by statistically significant?

15   A.   You apply statistical tests and say, given the size of the

16   sample I have and the variability in that sample, is this a

17   difference that looks as if it could be explained as just

18   random, or does it look like it's actually, you know,

19   statistically significant.

11:19:56 20   Q.   And it looks like -- the 8.4 percent increase, what

21   charges does that relate to?

22   A.   That's just the charges associated with their payment for

23   data services.

24   Q.   And it looks like it's about a six-and-a-half or so dollar

25   incriminate.  $6 doesn't seem like that big of a difference.

1794

1  Why does that matter here?

2  A.   Well, first off, you know, as an economist and someone who

3  cares about looking at the data, it is statistically

4  significant.  So that matters.  8 percent is a big difference.

5  That is more an trivial amount.

6          And six bucks does make a difference.  It makes a

7  difference to individual subscribers.  I would certainly care

8  if my bill was $6 more or less for this.

9          And if you have 60,000 subscribers that there might

11:20:45 10  be this kind of difference or incentive, or, you know, some

11  number of subscribers -- you remember, Cox is dealing in

12  subscriber numbers that are in the millions, hundreds of

13  thousands, tens of thousands.  You multiple that, that's a big

14  number.  That's a big additional incentive.

15          It's not like the subscriber that charges 43 bucks or

16  even 30 bucks a month in data services isn't profitable for Cox

17  and Cox doesn't want to retain that subscriber.  It's just that

18  they really want to retain these subscribers that are more

19  valuable.  And if they're higher infringing, it looks like

11:21:19 20  they're valuable.

21  Q.   How does that tie into your opinion that Cox benefited

22  from retaining these direct infringers?

23  A.   Well, it speaks to the economic incentive that Cox had to

24  retain, you know, repeat infringers on its network even when it

25  knew, you know, that it had -- these were repeat infringers,

1  and that it's incentives were greater when these repeat

2  infringers -- there is evidence suggesting that they were even

3  heavier infringers.

4  Q.   I want to move to the next part of this opinion.

5       You said that Cox saved by not addressing

6  infringement.  What do you by that, sir?

7  A.   Well, I talked a little bit about that in my opening

8  statement.  So had Cox addressed the infringement more

9  aggressively, you know, they would have probably had to deal

11:22:10 10  with more customer service calls.  They would have had to mail

11  more notices and had more interactions to deal with

12  subscribers.  They would have incurred direct costs associated

13  with the response.

14       They probably couldn't have gotten away with reducing

15  the personnel of the department that was dealing with the abuse

16  stuff, as they actually -- as I understand they actually did.

17       But, you know, so they would have incurred additional

18  costs.

19  Q.   Were able to quantify the costs saved by Cox by not

11:22:44 20  addressing the infringement?

21  A.   I wasn't able to quantify these because, first off, I'm

22  not offering an opinion here about what more and specifically

23  Cox should have done.  And what Cox specifically might have

24  done would affect what the incremental costs would have been.

25       But certainly they should have done more than they

1  did do.  My opinion is that their economic incentive was not to

2  do anything, that's what I am testifying about.  And part of

3  that is to avoid the costs, but I don't have an estimate of

4  what those costs would have been.

5  Q.  And moving to your last point, Dr. Lehr:  Cox maintained a

6  larger subscriber base.

7      How does this tie into your economic incentive

8  opinion?

9  A.  Well, you know, in any sort of business like this, there

10 is a certain amount of churn.  Customers move, customers leave,

11 and sometimes you have an incentive to get rid of customers.

12      In my comments today I have emphasized that Cox has a

13 strong financial economic incentive to retain subscribers on

14 their network that are profitable.

15      So Cox doesn't want to retain subscribers on their

16 network that are not profitable.

17      And so, it's also worth looking at, was Cox willing

18 and able without, for example, rocking the boat of their

19 general cost structure, able to terminate numbers of

20 subscribers when it wasn't in their interest.

21      And so, I looked also at Cox termination behavior

22 between 2013 and 2014.  And I did this for a couple reasons.

23 First off, the evidence shows that between 2013 and 2014, Cox

24 was willing to terminate and did terminate over 600,000

25 subscribers for non-payment of their bills.  619,711

W.H. Lehr - Direct

1797

1    subscribers were terminated.

2            Of those, 597,796 were residential subscribers, and

3    21,915 were business subscribers.

4            So like any business, if you're selling to someone a

5    repeat service and they stop paying their bills, the reasonable

6    thing to do is stop selling them service.  And Cox does that.

7    Cox has to do that on a fairly regular basis because not

8    everybody pays their bills.  This is on the order of 25,000 a

9    month, is sort of what their terminations are.

11:25:10 10          And they were able to do that level of terminations

11   and still come up with the profit and loss accounting data that

12   I looked at.

13           So terminating customers, you know, at some number,

14   you know, that's below 25,000 a month, is probably not going to

15   move their costs much because they've accounted for that.

16           It's also worth comparing that to what they actually

17   did for copyright infringement.  So over that period, they only

18   terminated 32 customer accounts.  32 of them were residential,

19   0 were business.

11:25:47 20          And of those 32, I believe the ones that are

21   associated with the 60,000 notices, roughly 60,000 notices that

22   are associated with the RIAA, was 13.  So 13 of something like

23   57,000, that's all the terminations they did for copyright.

24           So this is additional evidence that I believe

25   supports the contention that Cox is more than willing to make

W.H. Lehr - Direct

1798

1    decisions about termination when they see a clear financial

2    benefit to doing that.

3         When they see it's copyright infringement, apparently

4    they don't see it in their best interest to terminate those

5    subscribers.  But they are more than willing to do that when

6    there is evidence that it's not in their financial benefit,

7    like, for example, when those customers are not paying their

8    bills.

9    Q.   I think you said out of 57,000 notices.  Did you mean out

10   of 57,000 direct infringing customers?

11   A.   Sorry.  Out of 57,000 subscribers that are identified with

12   the, you know, 270,000 or whatever it is notices that they

13   received.

14   Q.   Dr. Lehr, can you just briefly summarize.

15   A.   Yeah.  So what I have been explaining here is that

16   evidence, I believe, shows very clearly that copyright

17   infringement causes very significant harm to copyright holders.

18   This is I think, you know, by any reasonable basis, the

19   consensus opinion that comports with what you would expect

20   theoretically and what is demonstrated in the empirical

21   evidence.

22        And having said that, it's also the case that you

23   can't precisely quantify what that financial harm is to the

24   plaintiffs in a particular case.

25        The second point is that Cox's business, when you

W.H. Lehr - Cross

1    understand it, is quite profitable and is throwing off a lot of

2    money when they retain subscribers.  And they have a strong

3    economic incentive, I believe the evidence shows, to tolerate

4    the infringement on their network, to retain infringers for

5    which they have significant evidence are repeat infringers.

6    And to, you know, continue that -- those business practices.

7            MR. GOULD:  Thank you, Dr. Lehr.  No further

8    questions at this time.

9            I would move to admit PX 521, which I forgot to do

11:28:10 10    earlier.  That's the Mateus and Peha study that Dr. Lehr looked

11    at.

12           THE COURT:  All right.  Any objection?

13           MR. BUCHANAN:  No, Your Honor.

14           THE COURT:  All right.  It is received.

15           All right.  Mr. Buchanan.

16       CROSS-EXAMINATION

17   BY MR. BUCHANAN:

18   Q.   Good afternoon, Dr. Lehr.

19   A.   Good afternoon.

11:28:58 20   Q.   So you mentioned that by not taking more action as to

21   infringement, Cox saved itself money with regard to customer

22   calls and mailing more notices; is that right?

23   A.   I think that's close to right.  It avoided incurring costs

24   that it would have incurred had it addressed the copyright

25   infringement more aggressively than it did.

W.H. Lehr - Cross

1800

1   Q.    Such as --

2   A.    I mean, I wouldn't call that saving revenues, but --

3   Q.    Okay.  Avoiding costs?

4   A.    The costs they would have incurred, had they adopted a

5   more effective strategy, were contingent costs.  And they

6   avoided incurring those contingent costs.

7   Q.    Okay.  So you said, mailing more notices, that was an

8   example.  Do you know that they did not mail notices, they

9   e-mailed them?  Did you know that?

11:30:07 10   A.    Yes.

11   Q.    Okay.  So what is the cost to e-mail a notice through the

12   CATS system?

13   A.    I don't know precisely.  I know that, were one to think

14   about that, one would want to consider the fully loaded costs.

15   So what are the costs of the personnel and systems that are

16   operating and all of that.  Once you've got those costs

17   incurred, the incremental costs of selling -- sending an

18   individual e-mail might be relatively low.

19          But the repercussions of sending such a communication

11:30:42 20   to a customer is likely to translate into additional customer

21   service calls and all that sort of stuff.  I did not have data

22   to allow me to estimate precisely what those effects would be.

23          And so, I didn't because I wouldn't know exactly what

24   the content or text of the e-mail would be.

25          So, for example, if you were to mail a customer

W.H. Lehr - Cross

1847

1    A.   But that hypothetically could happen, it's my

2    understanding of the process at the level which I understand

3    it.  Whether it did or didn't happen, I'm not a sufficient

4    expert.

5    Q.   Okay.  So you're not -- are you saying that the ticket

6    data indicates the content?

7    A.   It's my understanding the ticket data began to identify

8    the number of songs.  But, for example, it wouldn't always

9    identify all of the songs that might have been infringing.  It

12:39:32 10  might, for example, identify only some of them.

11           So it's not a complete index.  And that there's a

12   much more complicated bunch of testimony and expert to

13   understand exactly how that process works.

14   Q.   All right.

15   A.    And so, the hypothetical -- or the, sorry, the

16   characterization of the question as Your Honor described, I

17   believe that that is something that could have happened.  But

18   I'm not testifying if in fact it did or the extent to which

19   that may have happened.

12:39:59 20  Q.   Okay.  So just to get it clear, you're testifying that the

21   ticket data that you looked at identifies the songs?

22           MR. GOULD:  Wait.  Your Honor, objection.

23           THE COURT:  Mischaracterizes his testimony.

24   BY MR. BUCHANAN:  (Continuing)

25   Q.   Okay.  Is that your understanding, though?  Do you have an

W.H. Lehr - Cross

1848

1  understanding whether the tickets identify the content?

2          THE COURT:  You may answer if you know.

3  A.   I -- as I sit here right now, I don't remember

4  specifically what was on the tickets.

5          THE COURT:  Okay.  All right.  Go ahead.  Move on.

6  BY MR. BUCHANAN:  (Continuing)

7  Q.   So are you aware that if -- under Cox's contract with its

8  subscribers, if you exceeded your data limits, you were charged

9  more?  Were you aware of that?

12:40:53 10  A.   I saw evidence that suggests that Cox did not in fact

11  enforce its data limits by charging its subscribers more.

12  Q.   Okay.  So are you aware that that was something that

13  subscribers were aware of, that were attracted to Cox, because

14  they could get high-speed Internet service and Cox wouldn't

15  charge them more if they happened to exceed it on a monthly

16  basis?

17  A.   Well, the fact -- I don't know what subscribers all knew.

18  Certainly the fact that Cox was advertising data limits would

19  suggest to me, and I would infer as an economist, that some

12:41:37 20  subscribers believed that it would be enforced.  Whether, in

21  fact, it was or was not, you know, they would not necessarily

22  know, unless they exceeded that data limit.  And then they

23  might find out, gee, they're not enforcing it, that's great.

24          And it's my understanding that Cox did, in fact, not

25  charge customers that overexceeded their data limits for

W.H. Lehr - Cross

1849

1 exceeding their data limits.

2 Q.   So there are lots of Internet-based activities that

3 consume data, right?

4 A.   Yes, in various amounts, yes.

5 Q.   Streaming Netflix?

6 A.   Yes.

7 Q.   Streaming Spotify?

8 A.   Yes.

9 Q.   Watching HBO Go, Hulu, playing on video games?

12:42:19 10 A.   Yes, to engage in streaming activities are data intensive.

11 Q.   Okay.  In your analysis, did you attempt to determine, you

12 know, Cox's habits or their subscribers' habits with regard to

13 those particular activities?

14 A.   Well, I considered the evidence that was available to

15 generally characterize, you know, the behavior of, you know,

16 customers.  Some of that was based on sort of average broadband

17 subscribers' behavior and not Cox specific.

18 Q.   Okay.  So did -- you didn't account for the amount of

19 video streaming a video consumes per hour in your analysis, did

12:43:04 20 you?

21 A.   Yes, I did.

22 Q.   Okay.  And what is that?

23 A.   Well, I mean, when you say I accounted for it, I accounted

24 for the fact that if you were a heavy high speed user of video

25 services, then you would need to be probably in one of the

W.H. Lehr - Cross

1850

1       higher tiers.  And that there's evidence that there's a

2       significant amount of the traffic -- in fact, the most

3       significant growth in the traffic is associated with streaming

4       video.

5               However, the false inference some people make from

6       that is that peer-to-peer traffic disappeared.  And that's

7       not -- in fact, the evidence doesn't show that.

8               And so, I considered what was happening with video

9       traffic because what also matters is peer-to-peer.  And my

12:43:46  10    focus here was really what was going on peer-to-peer.  But I

11      did need to consider what was going on with video.

12      Q.   But we're speaking of these people that have 20-plus

13      tickets.  You don't know if they were seeking a higher Internet

14      service and a higher tier because they did a lot of streaming

15      video?  Did you consider that?

16      A.   Well, yes, I mean, in the sense that the Cox subscribers

17      would have needed to be at a higher tier to do the

18      peer-to-peer.  If they also, while they were infringing, wanted

19      to watch a lot of TV -- and most Internet users that do a lot,

12:44:23  20    do a lot of everything -- then they also would need the higher

21      tier.  They'd be even more valuable to Cox.

22      Q.   Okay.  So you're saying that you needed -- every Cox

23      subscriber needed the higher tier of service to do peer-to-peer

24      file sharing?  Is that what you're saying?

25      A.   No, because you said "every," and I definitely didn't say

W.H. Lehr - Cross

1851

1    "every."

2    Q.   So these 22 -- again, the people that have the 20-plus

3    tickets, do you know why they purchased a higher tier of

4    service?  Was it because they wanted to do video?  They wanted

5    to play games?  They wanted to, you know, download streaming

6    music?  Any of those things?

7         Do you actually know, as you sit here under oath, why

8    any of those people, the 20-plus, why they purchased the higher

9    tier?

10   A.   I don't know why any individual subscriber did anything.

11   Q.   Okay.  And that's -- so did you account, when you did this

12   analysis, as to whether the people that had these 20-plus

13   tickets, whether some were more concentrated in an area like

14   Connecticut, or Las Vegas, or Oklahoma, and Connecticut where

15   it would cost more to buy the same package that you might get

16   somewhere else?

17   A.   I believe I did check whether or not the distribution was

18   representative over the customer, you know, sort of sample in

19   this, but I don't recall if -- you know, there are -- I don't

20   recall if I did that calculation.

21   Q.   And you would agree that there are likely many subscribers

22   who have top tier service and have never infringed and

23   subscribers with bottom tier service who do infringe?  You

24   would agree with that, right?

25        MR. GOULD:  Objection, Your Honor.  There is no

W.H. Lehr - Cross

1852

```
         1   foundation.

         2           THE COURT:  If you can answer, go ahead.

         3   A.   Well, I don't know for a fact.  But since they have

         4   4.5 million broadband subscribers, and we're only talking about

         5   60,000 subscribers here, you know, and even by other estimates,

         6   the estimates is the majority of subscribers don't appear to

         7   engage in infringing activity.  But a significant number do.

         8           So I'm interested in the significant number that do,

         9   not the majority.

12:46:44 10  BY MR. BUCHANAN:  (Continuing)

        11   Q.   That wasn't the question.  The question was, weren't there

        12   many subscribers who have top tier service who never infringe

        13   and some subscribers at the bottom tiers that do?

        14   A.   And my answer was that I don't know that.

        15   Q.   Okay.

        16   A.   But I infer that from the data.  That there are many, you

        17   know, high tier subscribers that don't infringe --

        18   Q.   Okay.  I'm going to --

        19   A.   -- and there are some low tier.  But I did testify if you

        20   were --

        21           THE COURT:  Okay.  All right.  Stop, stop.

        22   BY MR. BUCHANAN:   (Continuing)

        23   Q.   Sir, I am going to read your answer to that same question

        24   from your deposition, transcript 355, 12 through 17.

        25           THE COURT:  I think he is agreeing with you.  Did you
```

W.H. Lehr - Cross

1853

1 listen to the answer?  He said, I don't disagree with you that

2 in this statistical numbers, that that's possible.

3          If you want to -- go ahead, if you want --

4          MR. BUCHANAN:  I just want --

5 BY MR. BUCHANAN: (Continuing)

6 Q.   There's certainly a number of subscribers --

7          MR. GOULD:  Your Honor -- excuse me, Your Honor,

8 objection.

9          THE COURT:  I'm sorry, your objection?

12:47:39 10          MR. GOULD:  Improper impeachment.  He wants to

11 refresh his recollection.  The witness agreed with him.

12          THE COURT:  Well, I don't know whether he did or not

13 based on the -- what he said in his deposition.  So go ahead.

14 BY MR. BUCHANAN: (Continuing)

15 Q.   There is certainly a number of subscribers that got one to

16 two tickets that don't, you know, and there are probably a

17 bunch of subscribers that don't infringe at all that have the

18 top tier service.  And so, they're going to bias these numbers.

19          Right?  In that's talking about those numbers, the

12:48:06 20 20-plus tickets, right?

21 A.   As I sit here right now, I don't remember exactly in the

22 context of what that was.  I mean, I could imagine that that

23 would be consistent with the answer I just gave to the

24 question.

25          But, you know, when you look at these numbers, the

W.H. Lehr - Redirect

1854

1   reason why sometimes I don't -- I don't feel I can just give a

2   yes or no answer is because they are very nuanced.  And I am

3   trying not to opine about quantity numbers unless I'm

4   reasonably precise about what exactly those quantity numbers

5   are and what I'm relying on about them.

6           MR. BUCHANAN:  No further questions.

7           THE COURT:  All right.  Redirect?

8           MR. GOULD:  Thank you, Your Honor.

9       REDIRECT EXAMINATION

10  BY MR. GOULD:

11  Q.   Dr. Lehr, ending on the last point.  You don't know, sir,

12  whether subscribers are -- strike that.

13          Apart from the infringement evidence you have looked

14  at in this case, you don't know what Cox's other subscribers

15  are doing, do you?

16          MR. BUCHANAN:  Objection, leading.

17          THE COURT:  Well, it is leading.  Rephrase the

18  question.

19  BY MR. GOULD: (Continuing)

12:49:14 20  Q.   Apart from the evidence you have looked at in this case,

21  do you know what other subscribers are doing on the network?

22  A.   Well --

23          MR. BUCHANAN:  I am going to object, Your Honor.

24  Could I approach because --

25          THE COURT:  Yes.

1866

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  8  (P.M. Portion)

TRIAL TRANSCRIPT

December 11, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1867

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
 3                                JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
 4                                ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
 5                                JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
 6                                4530 Wisconsin Avenue, N.W.
                                  5th Floor
 7                                Washington, D.C. 20015


 8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA
23

24

25
```

1868

1

2                              <u>INDEX</u>

3

   <u>WITNESS</u>                    <u>EXAMINATION</u>      <u>PAGE</u>

4

5    SIDDHARTHA NEGRETTI

                                 DIRECT           1881
6                                CROSS            1908
                                 REDIRECT         1941
7
     LYNNE JANET WEBER, PH.D.
8                                DIRECT           1951

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA628**

S. Negretti - Direct

1889

1   thinking, and so the consumer insights team will work with us

2   to figure out what type of survey instrument or what type of

3   research mechanism should be used to get that answer in the

4   most unbiased way possible.

5   Q.   And what are some of the tools that the consumer insights

6   group uses to determine what consumers want?

7   A.   Sure, absolutely.  There's lots of different surveys that

8   could be done, surveys where they call you on the telephone and

9   ask you questions, surveys where they send you an e-mail and do

02:32:15  10   something online with you.  It could be things like

11   qualitative, which is asking a series of open-ended questions,

12   or quantitative, which is asking very discrete questions, in

13   order to help build some of that information.

14   Q.   And generally speaking, can you explain to the jury what

15   consumer surveys would show relative to Cox's broadband

16   service?

17   A.   Well, it often shows the top things that drive a customer

18   to consider broadband and where points of friction are with the

19   service, and even some of the less desirable reasons why they

02:32:44  20   wouldn't consider broadband service at all.

21   Q.   And can you describe what kinds of questions you would

22   expect a consumer survey in Cox's broadband service to ask?

23   A.   A perfect example would be if I gave you a list of ten

24   choices, can you explain to me your top two reasons for making

25   a choice for internet?  Why do you use it in the home?  What

1    are your top five reasons for using the internet in your home?

2    What speeds do you need in your home in order to feel satisfied

3    as a customer?

4            Those are probably some examples of questions we

5    would ask.

6    Q.   And do they also do research on competitors?

7    A.   Absolutely.

8    Q.   So in your experience in product marketing, why do people

9    choose Cox for internet service?

02:33:29 10  A.   Yes.  So there's two key reasons, and this is a two

11   longstanding key reasons why people choose our service.  Number

12   one is based on the speeds that we provide in the marketplace,

13   and number two is based on the price that we charge for our

14   service.

15   Q.   So relative to other factors, including the one that you

16   mentioned, do you know whether speed is an important

17   consideration for consumers?

18   A.   Yeah.  It's actually the leading consideration for a

19   consumer.  As much as we as product marketers would like to

02:33:58 20  differentiate some of those considerations, it is the leading

21   reason why consumers choose internet providers in the

22   marketplace.

23   Q.   And do you have an understanding about what drives

24   consumers' desire for high speeds?

25   A.   Sure.  If you think about your own lifestyles and you

1891

think about the things that you're doing in your home, it's
very similar to the consumers that we're talking about here,
which is consumers have a need and want information inside
their home on their different devices.  They're doing things
like streaming videos, and they're doing things like looking up
things on social media.  They're participating in society and
shopping using the internet, and so the more speed they have,
the more satisfactory that performance is.

Q.    Do you know whether Cox actually promotes the speed of its
service?

A.    Yes, absolutely.

Q.    How does it do that?

A.    Often we will talk about their reasons to do business with
us, but at the end of the day, the consumer wants to get down
to brass tacks in making a purchase decision, and again, that
purchase decision is based off of speed and price, and so we
will showcase those speeds and those prices in the marketing
piece.

        Oftentimes, however, the speed of the service falls
flat in terms of what a consumer can do with it.  They don't
understand what of 60 meg or 80 meg or a gig of speed does for
them, so we will have to paint visual illustrations for them to
give them examples.  If you're this type of household, this is
what you can use the internet for at this speed.

Q.    So how do you bring it to life, the notion of speed?

S. Negretti - Direct

1892

1    A.   Well, what we'll do is we'll create messages and images on

2    the marketing pieces, for example, that depict, for example,

3    people -- a group of people sitting in their living room on

4    their tablets or their laptops watching streaming video,

5    posting to social media, doing electronic gaming, things like

6    that.

7    Q.   And have you learned the types of internet activities that

8    speed is important for?

9    A.   Yes, absolutely.

02:35:49 10   Q.   What are they?

11   A.   Yeah, it's not a surprise because I've said it a couple

12   times, but by far and away, people want to be able to consume

13   content, and when I mean consume content, things like streaming

14   video, being able to watch Netflix.  People like posting to

15   social media, being able to post to Facebook.  People like

16   being able to use their electronic gaming machines to --

17   particularly the younger generation, to be able to play video

18   games.

19   Q.   Mr. Negretti, have you assisted in the preparation of

02:36:22 20   certain slides to illustrate the different activities in which

21   speed is used with your internet service?

22   A.   Yes, absolutely.

23   Q.   Okay.  I'd like to ask you to take a look at your, your

24   slides and take the jury through what you've presented.

25   A.   Sure.  And I thought it was helpful to go through some

S. Negretti - Direct

1893

```
 1  basic terms in terms of the speed of internet comes through for
 2  three or four different ways for the consumer.  The first one
 3  is streaming, and I talked about wanting to get access to
 4  things like Netflix, and so that's the top use, one of the top
 5  uses of the internet today and was for -- has been for quite
 6  some time.
 7          And so when you're streaming, you're basically
 8  pulling information down from a single server or remote
 9  location onto your devices of choice in the living room.  So
10  for example, you see a family of four using the internet for
11  different purposes.  They're streaming information to them.
12  They're not bringing or downloading that information to them.
13  It's located on a remote location.
14  Q.    Please proceed to your next slide.
15  A.    Sure.  So we often talk about downloading as well.  You'll
16  hear that term used, and you've probably used it yourself.
17  Downloading is slightly different but achieves the same
18  purpose.  So instead of information staying on that remote
19  server, it's being pulled down from that remote server onto the
20  customer's device.  So the customer then has a copy of that
21  information.
22          A pretty common use of this is downloading a photo or
23  downloading a file such as a Word document or a PowerPoint
24  document.  Then you physically have a copy of it on your device
25  as well.
```

02:37:11 (line 10)
02:37:40 (line 20)

1894

1    Q.   And what do you show in your next slide?

2    A.   Sure.  And then the internet is also a two-way

3    communication device, which means not only can I get

4    information from it; I can put information on it, and I think a

5    lot of people are doing this today in terms of being able to

6    use the internet to upload.

7         And so taking the information that's on my device, on

8    my cell phone, or on my laptop, and uploading it to the

9    internet, to that remote server so that other people can see

02:38:19 10  it.  A perfect example is using it to upload photos of my

11   family.

12   Q.   How has Cox changed its marketing based on its

13   understanding as to how people use the internet?

14   A.   Sure, absolutely.  As consumer needs change in the

15   marketplace, which they often do, and as the competitors

16   continue to come out with their own versions of products and

17   services that they can offer their customers, we have to

18   continue to make sure that our marketing messages stay relevant

19   to the consumer, particularly the person that we don't yet have

02:38:46 20  a relationship with.  We need to be able to cut through the

21   clutter and explain to them why we have a strong value

22   proposition.

23   Q.   And what activities were you emphasizing in the 2013-2014

24   time frame?

25   A.   Yeah.  Again, it's somewhat unchanged from today, which is

1   that we're emphasizing the speed and the price of the services.

2   Q.   Okay.  Any particular type of activity?

3   A.   Sure.  Things like streaming video from Netflix.  Again,

4   not to wear that point down, but that's a very important part

5   of why consumers use the internet, being able to access things

6   like YouTube and post videos on YouTube, social media.

7   Q.   And just again harkening back simply to the issue of

8   speed, based on your familiarity with how your competitors

9   promote their high-speed internet, is Cox unique in promoting

02:39:36 10   the speed of its services?

11   A.   Well, again, as a product marketer, I like to think that I

12   can bring a unique flavor to their experience, and in a lot of

13   ways, we try to understand from the consumers' perspective what

14   unique things that we can do, but at the end of the day,

15   they're often making a tradeoff between the speed that they can

16   get from us and the price that they have to pay for it.

17        We will often try to insert things like the trusted

18   factor of doing business with us or the reliability factor of

19   doing business with us, but the consumer most often is making a

02:40:03 20   decision based on us and other companies in the marketplace

21   based on the speed and the price of our services, and that's

22   how they're marketed in the marketplace.

23   Q.   So in your experience at Cox, is the desire for fast

24   internet service uniquely associated with any particular kinds

25   of uses?

|  | 1 | A.   Well, as we talked about, and that's perhaps one of the |

```
                1   A.   Well, as we talked about, and that's perhaps one of the

                2   benefits of those definitions, streaming capacity uses a lot of

                3   internet speed, and so the ability to stream better comes with

                4   the ability to have higher speeds.

                5   Q.   What are high -- what are bandwidth intensive uses?

                6   A.   Yes.  So streaming content is one of them.  Watching shows

                7   on Netflix, electronic gaming, playing things like Fortnite, if

                8   you have children that are doing that, those are things that

                9   are high bandwidth intensive usage activities.

02:40:57  10   Q.   Okay.  I'd like you to turn to, it may be Exhibit -- it

               11   may be tab 1 in your binder.  It's Defendants' 239.

               12            And I think, Your Honor, this is the one document

               13   where the parties agreed to substitute for purposes of the

               14   examination a more legible copy.

               15            THE COURT:  All right.

               16            MR. ELKIN:  An older document.

               17            THE COURT:  All right.  Thank you.

               18            THE WITNESS:  Tab 1 or tab 2?

               19   BY MR. ELKIN:

02:41:24  20   Q.   It should be, the first page should be Opportunities to

               21   Maximize Demand.

               22   A.   Tab 2, yes.

               23   Q.   Yes.  And do you know who prepared this document?

               24   A.   This is a document prepared by our consumer insights group

               25   that we spoke about earlier.
```

S. Negretti - Direct

1897

```
            1   Q.   And did the Cox product marketing team play any role in

            2   the preparation of this study?

            3   A.   Yes.  We were the customer for a document like this.

            4   Q.   And was this study conducted by Cox in the ordinary course

            5   of its business?

            6   A.   Absolutely.

            7   Q.   And was this document maintained by Cox in the ordinary

            8   course of business?

            9   A.   Absolutely.

02:41:53   10        MR. ELKIN:  Your Honor, I would offer into evidence

           11   Defendants' Exhibit 239.

           12        THE COURT:  Any objection?

           13        MR. ZEBRAK:  No objection, Your Honor.

           14        THE COURT:  It's received.

           15        MR. ELKIN:  Thank you, Your Honor.

           16   BY MR. ELKIN:

           17   Q.   Mr. Negretti, could you just explain to the jury what this

           18   study is?

           19   A.   Yeah, absolutely.  So this document that we're looking at

02:42:10   20   here was done, like many documents, to understand different

           21   ways that we could package our internet services.  As the

           22   environment became more and more competitive, as we spoke about

           23   earlier, it became important for us to understand are there

           24   different things that we could package together in our internet

           25   service to make our internet service more attractive to the
```

S. Negretti - Direct

1898

1   consumers in the marketplace.

2   Q.   Okay.  And what's the date of this?

3   A.   This was done in August of 2014.

4   Q.   Okay.  Turn to the second page of this exhibit, and can

5   you read the second sentence under the word "Objectives"?

6   A.   Starting with "Cox management"?

7   Q.   Yes, sure.

8   A.   Sure.  Cox management seeks to explore alternative ways of

9   packaging its internet services to both increase appeal among

02:42:58 10   key consumer segments and simplify decision making.

11   Q.   Why did Cox management want to do this?

12   A.   Again, the environment continues to be competitive in the

13   marketplace, and at this time, it was very competitive, with

14   alternative sources of high-speed internet available to them,

15   and so Cox wanted to make sure that we had the best products

16   and services for the customers to choose from in the

17   marketplace, and so this was --

18   Q.   And how did this study concern itself with understanding

19   how Cox's customers use the internet?

02:43:26 20   A.   There's a couple different ways.  It asks them when you're

21   making a selection for your internet provider, what's important

22   to you?  And then when you're using the internet, what's

23   important to you?  And then it asks them to give us answers

24   based off of that.

25   Q.   Okay.  Turn to the sixth page of this exhibit.  It should

S. Negretti - Direct

1899

1    be on your monitor as well.

2    A.    Yes.   Price and download speed?

3    Q.    Tell the jury what this, this slide depicts.

4    A.    Sure.   So I talked about wanting to understand what

5    features are important to a consumer when they're making a

6    selection for an internet provider, and this is a stack ranking

7    of different features that we thought of and thought were

8    important to the consumer, and we wanted to get a reaction from

9    them how important they were.

02:44:21  10         And it's broken up into four different key areas:

11   core features, things that are absolutely important; important

12   features, things that are equally important but maybe slightly

13   less valuable; and then so on and so forth down to less

14   important features.

15         So what this basically does is it helps us understand

16   when a customer is making a selection for internet, why they

17   might be choosing it.

18   Q.    Okay.   Do you see the material in the box following the

19   first paragraph?   In the second line in parentheses, it says

02:44:52  20   N = 1513.   What does that refer to?

21   A.    Yes, okay.   Great point.   That means this is how many

22   people were surveyed and gave responses to us to these

23   questions.   So the 1,513 people were asked and gave responses

24   to these questions.

25   Q.    Okay.   And do you -- on this slide, are there

S. Negretti - Direct

1900

1   characteristics that are identified as the core features?

2   A.   Yes.  There's two, and they're not different from what I

3   had been talking about earlier, which is the monthly

4   subscription price of internet as well as the download speed of

5   the service.

6   Q.   Okay.  And does this slide also refer to download speed

7   and upload speed?

8   A.   Yes, it does.

9   Q.   To what extent in your experience is download speed

02:45:36  10   related to downloading content to a subscriber's computer?

11   A.   That's the key thing in terms of being able to use the

12   internet, either downloading or streaming services to their

13   devices for enjoyment.

14   Q.   And to what extent does download speed apply to streaming

15   applications?

16   A.   Again, these are -- this is -- the best visual way to

17   think about this is download speed refers to the number of

18   lanes available to a consumer on a freeway, and then the more

19   lanes they have, the faster download speeds they have available

02:46:08  20   to them to be able to get to the content they want.

21   Q.   Okay.  Please turn to page 8 of this exhibit.  What does

22   this slide depict?

23   A.   Okay.  So this is slightly different.  The slide before it

24   talked about why you might make a selection of internet

25   providers.  This one gets into frequent internet activity that

S. Negretti - Direct

1901

1   the consumer is actually using inside their home.

2          So this talks about, again, a stack ranking based on

3   choices that the consumer was given about what they're using

4   the internet for.

5   Q.   And how does streaming audio and video relate to

6   downloading in terms of what's more prevalent --

7   A.   Well, first of all --

8   Q.   -- that's depicted on this slide?

9   A.   -- as you see here, it's actually 20 percent more

02:46:48 10  important to a consumer in terms of what they're using the

11  internet for than downloading speeds, for example, downloading

12  things.

13  Q.   And have you observed trends in your work at Cox in how

14  consumers use the internet to consume music?

15  A.   Sure, absolutely.

16  Q.   Could you comment on that?

17  A.   Sure.  Again, then, just as today, there are services such

18  as iHeartRadio, Pandora, and Spotify available to a consumer to

19  allow them to stream music services into their home, not only

02:47:17 20  onto their, you know, laptops and tablets, but also on their

21  phones so they can use inside and outside of the home to be

22  able to listen to music.

23          MR. ELKIN:  Okay.  You can take that down, James.

24  BY MR. ELKIN:

25  Q.   In your job, did you ever review at any time any surveys

1   or studies that looked at the prevalence of copyright

2   infringement by consumers?

3   A.   There's two answers to that.  The first answer is no, and

4   then the second answer is not only did I not review it, we

5   never fielded any studies like that.

6   Q.   And why is that?

7   A.   It's not helpful to us.  It doesn't help us understand

8   what the consumer wants to use the internet for.  As you saw

9   earlier, there's lots of different uses for the consumer to use

02:48:02 10   the internet both in terms of making a purchase decision and in

11   what they actually use the internet for, and that's not

12   something that helps us.

13          Mainly, it's an illegal activity that we don't want

14   anything to do with.

15   Q.   To your knowledge, do you know whether Cox ever asked

16   survey questions about copyright infringement in any consumer

17   surveys?

18   A.   No.

19   Q.   Have you ever reviewed any surveys or studies that concern

02:48:30 20   consumers' use of peer-to-peer file sharing?

21   A.   Sure.  And that's a little different than infringing

22   copyrighted material.

23   Q.   And what effect did that information, file sharing, have

24   on Cox's marketing strategies?

25   A.   Not much.  Although there are some mentions in some

1   different research studies from time to time about the presence

2   of peer-to-peer as a source of activity for consumers, it

3   doesn't rate high or popular with most of our consumers, so

4   it's not something that we actively use to create messages.

5   Q.   Okay.  Take a look at the other exhibit in your binder,

6   and this is Defendants' Exhibit 337.

7   A.   Okay.

8   Q.   Do you know -- have you seen this document before?

9   A.   Yes.  A member of my team, Robert Jordan, prepared this

02:49:24 10   document.

11   Q.   Okay.  And do you know whether Mr. Jordan prepared this in

12   the ordinary course of business?

13   A.   Yes, he did.

14   Q.   Did he have a business duty to do so?

15   A.   Yes, he did.

16   Q.   Was this maintained in the ordinary course of business at

17   Cox?

18   A.   Yes, it was.

19        MR. ELKIN:  Your Honor, I would offer into evidence

02:49:39 20   Defendants' Exhibit 337.

21        THE COURT:  Any objection?

22        MR. ZEBRAK:  No objection, Your Honor.

23        THE COURT:  It's received.

24   BY MR. ELKIN:

25   Q.   Could you take the jury through the contents of this?

S. Negretti - Direct

1904

1   A.   Yes.  So this is a relatively simple document.  This is a

2   rate card basically.  This tells us internally at Cox

3   Communications the different rates that we charged in 2013,

4   according to this sheet here, and then there's a second tab for

5   2014, that we charged for our internet services.

6        And the simple way to read this is on the left-hand

7   side or the left axis, the Y axis, was a list of all the

8   different cities in which we offered our high-speed internet

9   service in 2013.  Then along the top of the page, or the X

02:50:19  10   axis, was a list of the five or six different internet tiers

11   that we offered our consumers -- our customers at that point in

12   time.  There were starter and essential tiers, which were lower

13   speed tiers, on up to premium and ultimate, which were higher

14   speed tiers.

15        And then this simply is a rate card that lists out

16   the rates that we charge for a customer who had other services

17   with us as well as internet, such as cable TV and/or telephone

18   service or just purchased internet by itself.

19   Q.   And what were the years covered by these rack rates?

02:50:52  20   A.   I'm sorry, say that again?

21   Q.   What were the years covered?  What years?

22   A.   Yes.  So again, this is 2013 on this page here.  There's a

23   subsequent tab at the bottom that shows the rack rates for

24   2014.

25   Q.   And why are there different -- on the left-hand side of

S. Negretti - Direct

1906

1  amount of data that a subscriber can use for different tiers of

2  service?

3  A.   Yes.  So I don't have the exact amounts of data off the

4  top of my head, but what I'll say is similar to the speeds, the

5  more speed you purchase and the more you pay for your service,

6  the more data consumption that you are allotted for each of

7  those tiers.

8  Q.   Was there a limit on the amount of data that they could

9  use?

02:52:48 10  A.   There was a limit.

11  Q.   Do you know whether or not those limits were enforced

12  during the 2013 to 2014 period?

13  A.   Unfortunately, they were not enforced.

14  Q.   So in your experience, what factors are the most important

15  in driving consumer preference -- you can take that down.

16  Sorry.  Withdrawn.

17        In your experience, what factors are the most

18  important in driving consumer preferences for increased speed?

19  A.   Again, we've been talking a lot about this in the last

02:53:18 20  half-hour or so, but it comes down to the speed and the price

21  that they pay for the service based on what they want to use it

22  for, being able to use it in their home to be able to get to

23  things like Netflix, streaming video through their iPhone or

24  their tablet, for example.

25  Q.   So in your -- in your knowledge and capacity in product

1907

1  marketing, to what extent does Cox want to retain existing

2  customers?

3  A.   Yes.  It's very beneficial of us to keep our existing

4  customers.  We've invested in those customers.  We've offered

5  them discounts to do business with us, and it's a lot easier

6  financially for us to maintain a relationship with them than

7  going out into the marketplace and acquiring new subscribers.

8  Q.   Are there some customers that aren't good for Cox?

9  A.   Sure, absolutely.  There are many customers.

02:54:05  10  Q.   Which ones?

11  A.   Well, we talked earlier about people who use the internet

12  for copyright infringement.  Those customers are not good for

13  Cox.

14  Q.   Why not?

15  A.   Well, first of all, they're doing an illegal activity, and

16  we don't want anything to do with that.

17  Q.   To what extent, if you know, does Cox benefit if

18  subscribers access content illegally for free?

19  A.   It's actually not a benefit.  It's a risk.

02:54:32  20  Q.   Is there any -- to what extent does Cox give customers

21  special treatment with respect to copyright infringement

22  because they bring in a lot of revenue?

23  A.   We don't give them any special treatment.  In fact, we

24  would probably prefer not to do business with them at all.

25  Q.   Why not?

S. Negretti - Cross

1917

1 service, yes, by enabling a better customer service experience,

2 higher levels of trust, or stronger reliable services, we hope

3 that that would be able to win a customer, yes.

4 Q.   And I believe you said before that Cox knows that some

5 segment of its subscribers use its service for copyright

6 infringement, right?

7 A.   Yes, that's correct.

8 Q.   Right.  And, in fact, it's not just a general knowledge.

9 It receives infringement notices from particular rights owners

03:06:06 10 telling Cox which particular accounts are being used for

11 infringement, correct?

12 A.   I'll have to trust you on that.  That's not information

13 that I have or know or understand.

14 Q.   Well, you understand what infringement notice is?

15 A.   I do understand, but I don't understand the process in

16 which Cox received notices from other entities.

17 Q.   Well, so let's talk about the segment of the Cox customer

18 base that wants to use the service for infringement, okay?

19 A.   I don't have a lot to give you an answer on that, but

03:06:36 20 we'll try, yes.

21 Q.   Well, I mean, you've already said that there is some

22 segment of Cox's customer base that uses the service for

23 infringement.  We've already established that, right?

24 A.   Yes.

25 Q.   Okay.  So whatever that pool of subscribers is, whatever

1918

1    size it is, Cox's service is more appealing for those

2    subscribers, is it not, if Cox gives, gives that subscriber

3    warning after warning, without terminating their service?

4    A.   I don't have any substantiation for that.

5    Q.   Well, you used the term "friction" in your direct

6    testimony.  Do you recall that?

7    A.   I do.

8    Q.   Friction is something the customer doesn't want, correct?

9    A.   That's correct.  That's correct.

03:07:16  10    Q.   Something that interferes with them using the service how

11   they want it, when they want it, right?

12   A.   Correct.

13   Q.   In the way they want it, right?

14   A.   That's correct.

15   Q.   For instance, a suspension would be an example of

16   friction, correct?

17   A.   Perhaps.  If a customer was suspended for not paying our

18   bill, regardless of the level of friction it creates, we don't

19   want to have a relationship with them.  If a customer was

03:07:41  20   suspended for doing something fraudulent or illegal, we

21   wouldn't mind that friction because we wouldn't want to have a

22   relationship with them.

23   Q.   So your testimony is that if Cox is aware that its

24   customer has violated the rules for using its service, it

25   doesn't want a customer relationship with them; correct?

S. Negretti - Cross

1919

```
 1   A.   That is correct.

 2   Q.   So there'd be no reason for Cox to be told again and again

 3   and again and again of specific subscribers engaging in

 4   infringement but retain them as a customer, would there?

 5   A.   I don't have details on that, but I can trust that that

 6   would be something we would not want to do.

 7   Q.   You want your customers to have a deep connection with the

 8   Cox service, right?

 9   A.   That's right.
```
03:08:22 10   Q.   And friction gets in the way of that, right?
```
11   A.   Correct.  It does.

12   Q.   For example, if you're identified in notices as being an

13   infringer and your service is suspended, that's an example of

14   friction, right?

15   A.   Well, if -- again, what we were just talking about, that

16   may be an example of friction for the consumer that we're

17   willing to take on because the consumer might be doing

18   something illegal that we don't want to do business with them.

19   Q.   You're aware, as we've been talking about, that Cox has a
```
03:08:50 20   set of rules that govern its customers' use of its internet
```
21   service, right?

22   A.   I am aware of that, yes.

23   Q.   It's called an AUP?

24   A.   Acceptable Usage (sic) Policy, yes.

25   Q.   And one of the things it does is prohibit use of the
```

1920

1  service for copyright infringement, right?

2  A.   That's correct.

3  Q.   Your view, am I correct, is that if a company has a set of

4  rules but it doesn't enforce those rules because it thinks that

5  not enforcing those rules will give its customers some added

6  value, that that would be a company engaging in fraud, correct?

7  A.   That is not my view, no.

8  Q.   Well, sir, do you recall when I took your deposition in

9  this matter?  Do you recall that?

03:09:32 10  A.   Sure, absolutely.

11  Q.   It was on June 14 of this year?

12  A.   That's correct.

13  Q.   You had Cox's counsel with you at that deposition, right?

14  A.   I did, yes.

15  Q.   And you took an oath to tell the truth in that deposition,

16  right?

17  A.   To the best of my ability to the understanding of the

18  questions being asked, correct.

19  Q.   And you took that oath seriously and told the truth,

03:09:54 20  right?

21  A.   Absolutely.

22  Q.   So I'm going to now read you beginning at page 140 of your

23  deposition, at line 17.

24       Question:  Are you aware of whether Cox considers not

25  enforcing its authorized usage policy as something as a means

1933

1      the abstract, right?  It tries to relate it to specific online

2      activities; is that correct?

3      A.   That's absolutely my mission and our mission as a company,

4      to help the customer understand that, correct.

5      Q.   Right.  Because just seeing bits and bytes doesn't mean

6      anything to a customer.  They want to know how fast can I do a

7      certain kind of activity, right?

8      A.   That is correct.

9      Q.   Okay.  So it is true, is it not, sir, that downloading

03:26:21  10   music is one of the key online activities that Cox has marketed

11     to consumers while trying to sell its internet service?

12     A.   It is definitely a key activity.  It's not the only

13     activity, but it's definitely a key activity.

14     Q.   So -- and, in fact, it's been a very effective marketing

15     message for Cox, has it not, to advertise use of its internet

16     service for downloading music?

17     A.   Again, I think that's a subjective answer to whether it's

18     been very effective.  It is an element that we have used in

19     different marketing messages in the past, correct.

03:26:50  20   Q.   You'll acknowledge that it's been effective for Cox to

21     advertise downloading music as a marketing message to sell its

22     service, right?

23     A.   I acknowledge that we have used it.  We do not currently

24     use messages like that.  One, the marketplace has changed, and

25     two, the responses to that haven't been overwhelming.

1   Q.   Okay.  Sir, I'm going to remind you of something you said

2   when I deposed you, which we've already established that you

3   tried to tell the truth and were under oath, right?

4   A.   That's correct.

5   Q.   Okay.  So page 65 of your deposition, beginning at line 7:

6   So is downloading of music one of the online activities that

7   Cox has advertised in terms of activities where speed can be

8   used?

9        So when downloading music was part of the consumer as

03:27:33 10  a whole, their need to access internet, the internet, when that

11  was important and popular, then that was a marketing message

12  that became effective for us to use.

13  A.   That's correct.

14  Q.   Okay.  So marketing your service to download music has

15  been effective for Cox, correct?

16  A.   Has been effective at different points in time but is not

17  currently an effective message that we use.

18  Q.   So you're saying that today, Cox doesn't advertise

19  downloading music?

03:28:00 20  A.   That's correct.

21  Q.   So why don't we look at -- well, are you aware, sir, that

22  Cox for many years has tried to sell its service by relating

23  speed to downloading music in the form of a hundred songs in

24  three seconds?

25  A.   That's correct.  That is the visual imagery that we were

S. Negretti - Cross

1935

1    trying to connote when it came to music.

2    Q.   Right.  So you admit that for many years, including 2013

3    and '14, Cox has advertised speed in relation to downloading

4    music, correct?

5    A.   I don't know if it was many years, but definitely during

6    that time frame is correct.

7    Q.   And that includes --

8    A.   It was in association with our gig internet products, yes.

9    Q.   And that includes downloading a hundred songs in three

03:28:48  10  seconds, right?

11   A.   Correct.

12   Q.   Right.  And by doing the simply math, a hundred songs in

13   three seconds would be a thousand songs in thirty seconds,

14   would it not?

15   A.   That's correct.

16   Q.   Okay.  Sir, I'm going to show you a document that's

17   already been admitted as evidence in this case as PX 1, and I'm

18   just going to actually just pull it up on the screen.  It's not

19   in the binder that you have in front of you.

03:29:12  20       And I'm going to ask Mr. Duval to scroll through

21   that -- or actually, excuse me, Mr. Ruelas is helping me out,

22   making me look good.

23       Why don't you take a few seconds and look at what's

24   behind tab 1.  That's a list of the sound recordings that are

25   at issue in this case, and there's 6,734 of them.  Take a look

S. Negretti - Cross

1936

1    and tell me if you're familiar with any of those artists as you

2    flip through it.

3    A.    I'm familiar with many of them.

4    Q.    And why is that?

5    A.    Because these are either artists that I personally enjoy

6    or artists that the consumers in the marketplace enjoy.

7    Q.    All right.  And could you turn to the last page of that

8    document, sir, and tell me, do you agree with me, sir, that

9    there's 6,734 sound recordings there on that list?

03:30:09 10    A.    I agree the list ends at 6,734.

11    Q.    And will you agree with me, sir, that downloading a

12    thousand songs in thirty seconds means that it takes just about

13    three-and-a-half minutes for someone to download the entirety

14    of that list?

15    A.    That sounds like the correct mathematical assessment if

16    done linearly; that's correct.

17    Q.    Have you ever downloaded amounts like that from iTunes?

18    A.    Well, I don't have that kind of budget, so I can't afford

19    that much music.

03:30:41 20    Q.    Are you familiar with what a permanent download is?

21    A.    No, unfortunately I'm not, other than to say it sounds

22    like something that the customer retains a copy of.

23    Q.    Right.  Well, you understand that streaming involves

24    listening to music, but you don't keep a copy afterwards,

25    correct?

L. Weber - Direct

1961

1    go through and become incorporated as tickets in the ticket

2    database.

3         And then in the ticket database, we have the data

4    that was produced.  We have the date, a ticket ID, a number for

5    the ticket.  We have the account ID, which identifies the

6    subscriber.  We have the IP address, and we have the actions

7    that were taken based on, on that ticket.

8         And you'll notice that both the RIAA notice database

9    and the ticket database that's Cox's, they both have a date and

04:29:26  10    an IP address, and I think you've already heard testimony that

11    that is how the two are linked together.

12    Q.   And what did you look at with regard to the Cox billing

13    data?

14    A.   So for the Cox billing data, I looked at whether the

15    subscriber was a single family residential subscriber, what's

16    called a multifamily residential subscriber, which is a very

17    small subset of the subscribers at issue here, and the

18    commercial subscribers.  I used it for that.

19         And then I also used it to determine at what point

04:30:09  20    the subscriber left Cox and was no longer being billed, and

21    that -- you'll see that may be -- that will be relevant to some

22    of my analyses.

23    Q.   So let's turn to your first opinion.  Do you have it on

24    the screen?

25    A.   I do.

L. Weber - Direct

1962

1    Q.   And could you explain how you reached conclusions in this

2    opinion?

3    A.   Okay.  So the opinion is that after each step in Cox's

4    graduated response, fewer subscribers continued to be the

5    subject of copyright infringement notices, and by the 12th such

6    notice, the notices stop for the vast majority of subscribers.

7             So that's the opinion, and I got to that opinion by

8    analysis of the RIAA notices as well as the Cox tickets.

9    Q.   Okay.  You used the term "vast majority."  What do you

10   mean by that?

11   A.   So I mean it's not -- it's more than half and it's

12   not just a little bit more than half.  It's, it's the vast

13   majority.  It's -- and for the cases I'm going to talk about,

14   it's over 90 percent.

15   Q.   Do you have additional slides that show your analysis and

16   your results?

17   A.   Yes, I do.  So, so the first thing I looked at was I

18   looked at the RIAA notices.  These are the notices that are in

19   the database that MarkMonitor allegedly sent to Cox.  And the

20   49 percent of the at-issue subscribers here only got one

21   notice -- were only the subject of one notice from the RIAA in

22   the relevant period, which is roughly February 2013 through the

23   end of November 26, 2014.  So almost half only got one.

24            When we go to three or fewer notices, 78 percent, or

25   more than three-quarters of the at-issue subscribers got one,

04:31:06 appears at line 10

04:31:46 appears at line 20

L. Weber - Direct

1963

1    two, or three notices, were the subject of one, two, or three

2    notices from the RIAA.

3         When we get to five, 88 -- 87 percent of the at-issue

4    subscribers were the subject of five or fewer notices from the

5    RIAA.  We go up a little bit more and we see that by the time

6    we get to 12 notices, that 98 percent of the at-issue

7    subscribers were the subject of no more than 12 notices from

8    the RIAA.  So that means that 2 percent got -- were the subject

9    of 13 or more notices from the RIAA in this relevant period.

04:33:18 10   Q.   Okay.  Did you analyze this data in any other way?

11   A.   I did.

12   Q.   Did you put it on a slide?

13   A.   I did.  So, so the -- I have two issues with this data,

14   and the first issue is the set of subscriber accounts is

15   biased.

16   Q.   Which set of accounts?

17   A.   The set of accounts that are in the data, both in the RIAA

18   notice data and also, more importantly, in the, in the Cox

19   ticket data.  That set of subscriber accounts is biased.

04:33:58 20   Q.   Okay.  And you say you took a deeper dive to determine

21   this bias.  First, explain the bias.

22   A.   Sure.  So, I mean, you might think, how can it be biased?

23   It just is the set of at-issue subscribers, right?  You would

24   think it's not biased, but it is biased, and let me see if I

25   can explain how.

L. Weber - Direct

1964

1        So if there's a -- and I'm going to use an example of

2   three notices received, a subscriber who was the subject of

3   three notices from the RIAA in 2012.  So if a subscriber was

4   the subject of three notices from the RIAA to Cox in 2012 and

5   then no notices at all after that in 2013 and '14, that

6   subscriber is not in any of the data I looked at or any of the

7   other experts you've heard testify so far looked at in -- as

8   far as the RIAA data and the Cox ticket data.

9   Q.   Why, why is that?  Why are they excluded?

04:35:05  10   A.   Because this, this period, the relevant period, which is

11   very similar to the claim period, it's just off by a couple

12   days from the claim period, this relevant period is the period

13   for which Cox matched the RIAA notices and the IP addresses in

14   those notices to their customer database.

15        So if there was a subscriber that didn't get any, any

16   notices from the RIAA in 2013 or 2014, that subscriber was not

17   one of the accounts that was picked out as matching, and so I

18   don't see that subscriber in, in any of the data that, that I

19   was given for this case.

04:35:57  20        However, consider another subscriber who also got

21   three notices -- was the subject of three notices from the RIAA

22   in 2012, but that subscriber also had some notices that they

23   were the subject of from the RIAA in 2013.  All right.  That

24   same subscriber is in, but the subscriber who got three notices

25   and then no more is out.

1    I have the short period to look, on average it's 80 percent of

2    the accounts of three or fewer.  With twice as long, it only

3    changes by 2 percent.  It just goes down to 78 percent.

4           And when I get up to 12 or fewer notices, it's

5    actually 99 percent for -- 99 percent of the accounts have 12

6    or fewer days on which they get RIAA notices, and it only drops

7    down to 98 percent for 12.  So there's still -- even with twice

8    as long, there's still only 2 percent of the at-issue

9    subscribers that are the subject of 13 or -- RIAA notices on 13

10   or more days.

11   Q.   So what does this mean?

12   A.   Well, to me, I was just really, really surprised.  I mean,

13   I would have expected to see that the accounts that had two

14   notices -- many of the accounts that had two notices, now I

15   would see when I'm looking at this subset that has twice a

16   long, I would expect a lot of them to move over and be getting

17   four notices.  And the ones that were getting three notices, I

18   would have expected with twice as long to look on average, I

19   would be getting more of them seeing six notices.  And the ones

20   that had seven, eight, nine, ten, 11 notices, I would expect

21   them to move over to the 13-plus column.

22          And that's not what I see, and so that tells me that

23   the, the RIAA notices mostly, mostly really stopping.  Okay.

24   Not for all accounts, right, not for the 2 percent and not for

25   the 1 to 3 percent that seem to continue when I, when I doubled

L. Weber - Direct

1973

1    the length of time, but for the vast majority of them, the RIAA

2    notices are really stopping.

3    Q.   Okay.  So we've talked about notices now.  Did you look at

4    the same, the same analysis with ticket data?

5    A.   Yes.  So I did many of the same things with ticket data,

6    and the big picture is that the results -- the conclusions are

7    similar for tickets.  Now, there are more tickets than notices,

8    right, because the tickets are not just from the RIAA.  The

9    tickets are from other, other copyright holders that, that are

04:51:14  10  sending the Cox notices that comply with Cox's policies.  So

11   there's, so there's a lot more copyright holders who are

12   sending notices.

13        So yes, there's more tickets than notices,

14   absolutely.  I did the similar analysis, and the tickets really

15   do mostly stop.  Again, there's a percentage that continue on,

16   and there's that 13-plus percent always, so -- but they really

17   do mostly stop.

18        And then, you know, for this sample, and this is

19   again the 26 percent, that's representative of Cox's

04:51:55  20  subscribers who are the subject of RIAA notices, 33 percent get

21   only one ticket.  So there's more tickets, so that, you know,

22   that number is obviously smaller than, than for one RIAA

23   notice.  77 percent get five or fewer tickets, and when you get

24   to 12 or fewer tickets, it's, it's 95 percent that get 12 or

25   fewer tickets.

L. Weber - Direct

1974

Q.   Can you draw any opinions from the analysis of the ticket data in this fashion?

A.   Yes.  So the, the -- I can.  I think I have another slide to show that, and here, here we have the infamous golf tee to try and illustrate that situation.  So here I'm looking at the -- I'm actually looking at the three-quarters now, the 77 percent, but I'm looking -- and you can see that from the pie chart up in the top right -- I'm looking at single family residential subscribers because, of course, Cox's policy is different for single family residential than it is for business customers.

So I'm focused on single family residential subscribers with RIAA notices.  There are 42,025 such residential subscribers in our data who got at least one ticket.

Then as we move forward and we watch and observe and more tickets come in, you see that by the time you get to people who have three or more tickets, it's gone down quite a bit.  It's now down to 18,600.  By the time you get to five or more tickets, it's down more.  It's down to 10,200.

By the time you get to 13 or more tickets for this group of 77 percent, it's down to 1,330, which is only 3.2 percent of the original population.

And remember, these -- this is the 77 percent that is where the data has been unbiased, and so it's reflective of the

L. Weber - Direct

1981

1    database, you know.  It's been done both ways.

2         Dr. McCabe testified about the tickets, and I'm

3    testifying about the RIAA notices, notice database that he also

4    relied on, but, yes, so I tied the whether it's commercial,

5    multifamily, or single family residential in the billing

6    database, and then I used the account ID to find the people

7    that were the at-issue subscribers to tie those two together,

8    at-issue subscriber, what's the account ID, look in the billing

9    data, see if it's commercial, single family residential, or

05:05:20  10   multifamily.

11        I will say there were a few accounts I couldn't tell

12   but -- because the billing data, you know, didn't have an

13   indication, but that was just a very small number.

14   Q.   So did you hear Dr. Lehr testify about how many

15   residential subscribers had over a hundred tickets?

16   A.   I did.

17   Q.   Okay.  How many based on your research had over 100

18   tickets?  How many residential customers?

19   A.   They were -- it was only one single family residential

05:05:51  20   subscriber that it was at issue that had more than 100, and

21   it -- that particular residential subscriber had 101, so it

22   must be the one that -- the one that Dr. Lehr chose to pull out

23   and show the jury is the one with -- the only one over, with

24   over 100 tickets.

25   Q.   From an expert statistical standpoint, is that

L. Weber - Direct

1982

1   representative of what had transpired here?

2   A.   It is not at all representative of either the subscribers

3   with 100 or more tickets, and that one single family

4   residential subscriber with 101 tickets is -- it's, it's the

5   one out of over 50,000 single family representative -- single

6   family residential subscribers, it's the only one out of 50,000

7   that has more than 100 tickets.

8   Q.   You mentioned something about subscribers with 50 or more

9   RIAA notices in a relevant period.  What category did they fall

05:07:12 10  in?

11  A.   I do have that in my report.  Oh, no, no, I do know that.

12  So the ones with 50 or more -- that are subject to 50 or more

13  notices from the RIAA in the relevant period, all of them, and

14  I think there are 20-something of them, but all of them are

15  commercial accounts.

16       Should I go ahead and finish up on the --

17  Q.   Sure.  Can you break down further the type of subscriber

18  that we're talking about here?

19  A.   Right.  So with the subscribers with the 100-plus tickets,

05:07:53 20  the picture completely flips.  So for the subscribers with

21  100-plus tickets, 46 of 49 of them are commercial subscribers.

22  Two of them are the multifamily subscribers, and there's only

23  17 of them in the entire list of at-issue subscribers for

24  multifamily, and only one, the one we've just been talking

25  about that Dr. Lehr showed the jury, only one is a single

L. Weber - Direct

1983

1    family residential subscriber with actually 101 tickets.

2    Q.   And did you break down these commercial subscribers

3    further in your analysis?

4    A.   I did.  So of these 49 commercial -- 49 at-issue

5    subscribers that had 100 or more tickets over the three-year

6    period, they're mostly ISPs and multi-occupancy housing.  So

7    the largest number of them, 15 of them are ISPs.  They're other

8    ISPs.

9    Q.   And ISP is what?

05:09:03 10  A.   It's another internet service provider, a regional

11   internet service provider, for example, that contracts with Cox

12   so that that service provider can provide internet service to

13   their hundreds or thousands or tens of thousands of customers,

14   and they have a contract with Cox to do that.

15        So 15 of these subscribers with more than 100

16   tickets, they are internet service providers.

17   Q.   What about the breakdown for the rest?

18   A.   So for the rest, there's a fair number of university or

19   student housing.  There's hotels.  There's a few apartment

05:09:42 20  complexes.  There's a few that are military housing.  There's a

21   few that are retail and, as I said before, two multifamily and

22   one single family residential.

23   Q.   Were you able to determine which of this group had the,

24   the most tickets?

25   A.   Yes.  So I looked at the five subscribers with the most

...

L. Weber - Direct

1984

tickets in this period, and the five top subscribers ranged
from 713 tickets up to 4,786 tickets, and these five were all
regional internet service providers who have -- you know, as
I've mentioned before, they have potentially many, many
customers.

Q.   And what's the time period that these notices or tickets
were created with regard to these particular internet service
providers?

A.   It's a span of over three years -- sorry, not exactly.
It's a span of three years, from 2012, '13, '14.

Q.   Okay.  So what is the impact of terminating a local ISP's
access to Cox's networks?

         MR. OPPENHEIM:  Objection.  No foundation.

         THE COURT:  Sustained.

BY MR. BUCHANAN:

Q.   Okay.  You worked with internet service providers?

A.   I have.  I have worked with, for example, I've worked
with -- I've worked with many companies in the
telecommunications industry, including internet service
providers.  I've worked with AT&T.  I've worked with
Cablevision.  I've worked with a number of other internet
service providers.  I've worked with telecommunications
companies and satellite industry cell phones, etc.

Q.   Are you familiar with the operations between one ISP such
as Cox and a regional ISP?

     1   contact -- get into the internet from that server?

     2            MR. OPPENHEIM:  Obviously not.  Its coming out of an

     3   expert's mouth, Your Honor, gives it a qualification which it

     4   shouldn't get.

     5            THE COURT:  All right.  I'll allow it.

     6            MR. OPPENHEIM:  They can draw that inference, I

     7   believe.

     8            THE COURT:  I'm going to allow it.  Your exception is

     9   noted.

    10            NOTE:  The sidebar discussion is concluded; whereupon

    11   the case continues before the jury as follows:

    12   BEFORE THE JURY

    13   BY MR. BUCHANAN:

    14   Q.   So, Dr. Weber, back to the demonstrative and to the first

    15   point at the bottom of the graph of the demonstrative, it says

    16   terminating an ISP could cut off the internet for thousands of

    17   households not the subject of notices.

    18            Could you just briefly explain how that happens?

    19   A.   Sure.  So if there is an ISP with thousands or tens of

05:14:58  20   thousands of subscribers, we only have -- you know, we don't

    21   have tens of thousands of tickets here, right?  And those

    22   tickets are probably not --

    23            MR. OPPENHEIM:  Objection, Your Honor.  She has no

    24   foundation as to the number of customers --

    25            THE COURT:  Sustained.

L. Weber - Direct

1988

BY MR. BUCHANAN:

Q.   Just focus on what would happen.

A.   Got it.  Okay.  So, yes, if you cut off the internet

service to that ISP, then there would be no internet service

for all of that ISP's customers.

Q.   Okay.  And then your next point:  Terminating all Cox

services could cut off internet access to emergency personnel.

A.   So, again, the same thing.  If you cut off internet

access, that would include internet access to emergency

05:15:52   personnel such as, as police and fire.  They are also

subscribers of -- to internet service.

Q.   Okay.  So let's move to your fourth opinion.  What did you

look at for that, and what is that opinion?

A.   So that opinion, at a high level, is that the RIAA sent

far fewer notices to Cox than Cox agreed to allow.

Q.   So how many notices did the RIAA contract with MarkMonitor

to send to Cox during the claim period?

A.   Okay.  So I looked at the contracts that RIAA had with

MarkMonitor.  I actually looked at three years' worth of

05:16:38   contracts, but for this, we're going to talk about 2013 and '14

because that's the claim period.

          The RIAA contract with MarkMonitor specified 450 a

day for Cox.

Q.   And for what period was this?  Is this 2014?

A.   So this is 2013.

L. Weber - Direct

1988

BY MR. BUCHANAN:

Q.    Just focus on what would happen.

A.    Got it.  Okay.  So, yes, if you cut off the internet
service to that ISP, then there would be no internet service
for all of that ISP's customers.

Q.    Okay.  And then your next point:  Terminating all Cox
services could cut off internet access to emergency personnel.

A.    So, again, the same thing.  If you cut off internet
access, that would include internet access to emergency
personnel such as, as police and fire.  They are also
subscribers of -- to internet service.

Q.    Okay.  So let's move to your fourth opinion.  What did you
look at for that, and what is that opinion?

A.    So that opinion, at a high level, is that the RIAA sent
far fewer notices to Cox than Cox agreed to allow.

Q.    So how many notices did the RIAA contract with MarkMonitor
to send to Cox during the claim period?

A.    Okay.  So I looked at the contracts that RIAA had with
MarkMonitor.  I actually looked at three years' worth of
contracts, but for this, we're going to talk about 2013 and '14
because that's the claim period.

      The RIAA contract with MarkMonitor specified 450 a
day for Cox.

Q.    And for what period was this?  Is this 2014?

A.    So this is 2013.

L. Weber - Direct

1989

```
  1    Q.    Okay.

  2    A.    Starting in April of 2013.  And also in 2014, there was a

  3    contract that took effect in April of 2013 and a second

  4    contract that took effect in April of 2014, and they both

  5    specified 450 per day for Cox.

  6    Q.    So what is your understanding of the number of notices

  7    that Cox agreed to accept from the RIAA during this time

  8    period?

  9    A.    So I think the jury has already heard testimony about

05:17:32 10  this, so I won't go into great detail, but as, as you may

 11    remember, the RIAA asked, you know, could we have 5 or 600 in

 12    April -- on April -- in April of 2013, and a few days later,

 13    Cox -- Randy Cadenhead, head of Cox, replied:  We can try

 14    accepting 600 per weekday.

 15          So you can see that in the image, Cox was -- agreed

 16    to accepting 600, but even after that agreement, the contract

 17    for 2013 was unchanged, and the contract for 2014 also had 450.

 18    Q.    So prior to Cox agreeing to 600 notices a day, do you know

 19    what the prior agreement was with regard to accepting notices

05:18:22 20  between Cox and the RIAA?

 21    A.    I do.  I think, I think I would best exhibit this with a

 22    graph, so -- because it's a whole lot better to see it

 23    graphically.

 24          So this chart starts at the, at the beginning of the

 25    claim period, February of 2013, and goes through November of
```

1998

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
      -vs-                     :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  9  (A.M. Portion)

TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

1999

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
 3                                JEFFREY M. GOULD, ESQ.
                                  MICHAEL J. DRUCKMAN, ESQ.
 4                                ANDREW L. GUERRA, ESQ.
                                  LUCY G. NOYOLA, ESQ.
 5                                JIA RYU, ESQ.
                                  Oppenheim + Zebrak, LLP
 6                                4530 Wisconsin Avenue, N.W.
                                  5th Floor
 7                                Washington, D.C. 20015


 8
     FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                Winston & Strawn LLP
                                  1700 K Street, N.W.
10                                Washington, D.C. 20006-3817
                                    and
11                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
12                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
13                                Winston & Strawn LLP
                                  200 Park Avenue
14                                New York, NY 10166-4193
                                    and
15                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
16                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
17                                San Francisco, CA 94111-5840
                                    and
18                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
19                                35 West Wacker Drive
                                  Chicago, IL 60601
20                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
21                                Winston & Strawn LLP
                                  333 South Grand Avenue
22                                Suite 3800
                                  Los Angeles, CA 90071
23

24

25
```

**JA671**

2000

1

2                                      INDEX

3     WITNESS                        EXAMINATION        PAGE

4
      LYNNE WEBER
5                                    CROSS              2005
                                     REDIRECT           2055
6
      RANDY CADENHEAD via video deposition
7                                    EXAMINATION        2073
                                     EXAMINATION        2107
8
      SLAWOMIR PASZKOWSKI via video deposition
9                                    EXAMINATION        2110
                                     EXAMINATION        2122
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    long, long time.

2    Q.    When you first came to Cox, what is your recollection of

3    what the graduated response policy was?

4    A.    The, the team of people that -- when I first came to Cox,

5    the team of people who, who managed that process came to me and

6    asked me to take a look at it to see if, if I felt it was, it

7    was consistent with the law and if I had any suggestions, I

8    guess, and so I, I did do that.

9           And it was, it was a -- it seemed to me to be a

10    pretty robust and well-thought-out program.  It involved being

11    able to receive electronically notices of infringement under

12    the DMCA, to -- and, and they had automated the ability to

13    document receipt and, and to automate -- on an automated basis

14    begin the graduated response process that they had built.

15          And the program did evolve over time, but basically

16    it involved one or more ways to notify the customer about

17    receipt of the complaint, helping to educate the customer, and

18    if problems seemed to continue, that the automated process was

19    taken over by the customer having to talk to, as people say

20    these days, a live person who's trained to help educate the

21    customer, and at the -- if that still didn't solve the problem,

22    then the, the process was built such that the customer service

23    could and, if necessary, would be terminated.

24          And that's, that's kind of the way I recall it

25    originally being set up.  It did evolve over time, but

R. Cadenhead Deposition - Examination

2080

1    that's -- I hope that answers your question.

2    Q.   So why, why did Cox have a graduated response program?

3    What was the purpose of it?

4    A.   I'll give you my opinion because I don't speak for Cox,

5    but my opinion was that Cox recognized that there was a real

6    issue and a real problem with, with copyright infringement, and

7    that your clients, the recording industry, had some, some

8    proper concerns about it, and that our customers needed to

9    understand better why that was a problem and that -- and that

10   copying music, let's say, without paying for it was not the

11   right thing to do.

12           And so we, we wanted to -- I think Cox wanted to find

13   a way to help your clients and our customers understand -- I'm

14   sorry -- your clients with this problem and our customers with

15   some ignorance, understand what was the right thing to do,

16   and -- so they tried to design a system that would deal with

17   that, would fix it.

18   Q.   So you began your answer, Mr. Cadenhead, by saying your

19   opinion, but you don't speak for Cox.  Just to be clear, I want

20   to know what you understood at the time you were at Cox was the

21   purpose of the graduated response program.

22   A.   That's what I think it was.

23   Q.   So you understood that the purpose was to address real

24   problems with copyright infringement that copyright owners

25   had --

R. Cadenhead Deposition - Examination

2081

1    A.    Um-hum.

2    Q.    -- and to help customers be educated; is that correct?

3    A.    So they'd stop.

4    Q.    Did, did Cox at the time that you were there actually want

5    to stop the piracy that was occurring on its network?

6    A.    Well, you use "piracy."  That's a loaded term.  But I

7    think the answer to your question is yes.

8    Q.    But you do believe -- or you did believe when you were at

9    Cox that one of the purposes of the graduated response program

10   was to stop copyright infringement on the Cox network, correct?

11   A.    Yes.  And I think more specifically its, its first purpose

12   was to get the customers to stop, and if that didn't work, then

13   for Cox to do something about it.

14   Q.    Well, Mr. Cadenhead, did Cox care whether or not copyright

15   owners were being infringed?

16   A.    I thought so.

17   Q.    You did think so?

18   A.    I thought so.

19   Q.    Did Cox -- when you -- when you arrived at Cox in, in 2003

20   and you looked at the graduated response policy that was in

21   place, was there a mechanism to measure whether or not the

22   policy was effective at stopping infringement?

23   A.    I don't know.

24   Q.    So when you first arrived at, at Cox in 2003, the

25   graduated response policy was a three-strike rule, correct?

R. Cadenhead Deposition - Examination

2083

1  infringement?

2  A.    Let me try and answer it.  I know that it evolved over

3  time, and I don't remember any, anything like a specific

4  number.  I do remember that, that Cox required an actual human

5  conversation with the customer, sometimes more than one, before

6  they would terminate service, and I don't -- and, and my, my

7  recollection is that that number probably varied based upon the

8  conversations with the customer.  That's my recollection.

9  Q.    When you were counsel for Cox overseeing the graduated

10  response program, did you understand that Cox permitted its

11  subscribers to engage in some level of copyright infringement?

12  A.    No, I don't think it did.

13  Q.    Cox was clear that users were strictly prohibited from

14  engaging in copyright infringement, correct?

15  A.    I think that's what the policy said.

16  Q.    Mr. Cadenhead, I'm asking you, as the lawyer responsible

17  for overseeing the legal aspects of the graduated response

18  program --

19  A.    Um-hum.

20  Q.    -- was it your understanding that when Cox received its

21  first notice of infringement from a copyright owner with

22  respect to a subscriber, that Cox would permit that subscriber

23  to continue to infringe?

24  A.    I don't think that's a, a -- I don't think that's a fair

25  characterization.

R. Cadenhead Deposition - Examination

2084

1   Q.   Why not?

2   A.   Because you're, you're describing it as if Cox was doing

3   something actively, and I, I don't remember that being the

4   case.

5   Q.   What do you recall it being?

6   A.   When Cox got a notice, it started its graduated response

7   process.

8   Q.   And during that process, did Cox find a way to prevent the

9   subscriber from infringing?

10  A.   The process was meant, as I understood it, to educate the

11  customer so that the customer would not do that.

12  Q.   So as you oversaw the graduated response program, you

13  recognized that some of Cox's subscribers may be infringing

14  copyrights intentionally, correct?

15  A.   Well, I, I oversaw it from a legal standpoint, and I, I

16  think the program -- the process recognized that some customers

17  were infringing and almost certainly knew they were infringing

18  and needed to stop, and we tried to get them to stop.

19  Q.   Was there a point in time when Cox instituted a policy --

20  a graduated response policy that had a specific number of steps

21  before a customer would be terminated?

22  A.   Cox began with notifying the customer through several

23  means and steps, which varied over time.  Cox required that

24  there be an actual communication between a knowledgeable

25  representative at Cox and the customer at least once and

1  sometimes until the representative -- this is the way I

2  understood it -- till the representative recognized that the

3  customer wasn't going to change his or her behavior, and then

4  Cox could terminate -- that, that, that representative was

5  authorized to terminate the, the customer's service.  And

6  that's the way I understood it.

7  Q.   So I'm going to ask my question again, which is:  Was

8  there a point in time where you recall that Cox instituted a

9  graduated response policy that had a specified number of steps

10  before the customer would be terminated?

11  A.   I wouldn't say -- of course, I'm remembering, but I

12  wouldn't say it that way.

13  Q.   So during all ten years that you were at Cox, between 2003

14  and 2013, where you served as legal counsel overseeing the

15  graduated response program, you don't have any recollection

16  that that program had a specific number of steps that Cox would

17  go through before it would consider terminating the subscriber;

18  is that correct?

19  A.   There's, there's two parts to that answer.  First of all,

20  for the last two years that, that I was with Cox, I was not

21  doing much, if anything, related to this subject matter.  So

22  put that aside.

23        The, the policy -- and some of these documents

24  probably make reference to it -- as a rule, Cox did not

25  terminate a customer service -- the policy wasn't to terminate

R. Cadenhead Deposition - Examination

2101

1    with, with the one exception I've mentioned, I don't remember

2    ever being involved in any specific changes related to anybody.

3    Q.   Why did you need to confer with Matt Carothers in order to

4    respond to the RIAA request?

5    A.   I can say that in my opinion, he was the right person to

6    communicate with about this particular kind of question.

7    That's, that's it.

8    Q.   You see that Ms. Sheckler on behalf of the RIAA in April

9    of 2013 reaches out to you to ask whether or not Cox will

10   increase the limit of 400 notices per day?

11   A.   Right.

12   Q.   And you respond several days later, saying:  We have a

13   fairly hard limit on the number of calls from customers that

14   our team can handle in a day, but within those parameters, we'd

15   be happy to discuss the number of notices that we accept from

16   you.

17          Do you see that?

18   A.   Um-hum.

19   Q.   And you ask her a sense of what she's thinking, right?

20   A.   Right.  I did.

21   Q.   And she responds 500 to 600 per weekday?

22   A.   Right.

23   Q.   And you then, I guess, forward that to Brent Beck; is that

24   right?

25   A.   That sounds right.

1   Q.   And --

2   A.   It may have included Jason.  It says it's cc'd to Jason

3   Zabek, just -- go ahead.

4   Q.   Correct.  And, and then you got an e-mail back from Jason

5   Zabek, correct?

6   A.   I did.

7   Q.   Why did you forward these notices to the two of them?

8   A.   They, they were the people around that time that, that

9   were managing the, you know, the flow of, of these notices and

10  the processing, and they were the right ones to answer her

11  question.

12  Q.   So at the time, you didn't view it as a negotiation, but

13  rather just an effort to work with the RIAA's request?

14  A.   I never analyzed it one way or the other.  I -- my primary

15  interest and concern was responding to the recording industry

16  re Vicky, about a legitimate question that, that, that she, she

17  wanted us to, to consider, and, and we did.  And I asked if

18  that sounded okay.  She said thanks.

19          And I didn't draw any legal conclusions from that at

20  the time, and it's been so long, I don't think I could answer

21  your question about legal anyway at this point.

22  Q.   So, Mr. Cadenhead, you personally participated in the

23  discussions regarding the copyright alert system, correct?

24  A.   I did.

25  Q.   And you served as, for lack of a better term, Cox's

R. Cadenhead Deposition - Examination

2103

1    representative in those discussions?

2    A.    One of them.

3    Q.    And did you participate in the discussions for as long as

4    Cox participated in them?

5    A.    I think so.

6    Q.    Cox ultimately decided not to join the copyright alert

7    system, correct?

8    A.    Right.

9    Q.    Why?

10   A.    I can give you my general recollection, although I think

11   there's a document floating around that you probably have that

12   summarizes it better than, than I could, and for the sake of

13   time, maybe, maybe that would be smart.

14   Q.    No, no.  I'm not aware of the document you're referring

15   to, so --

16   A.    Oh, so maybe you just have to do best with my memory.

17   We'll do that.  That's fine.

18   Q.    Well, that and the RIAA's, but --

19   A.    Oh, well, no.  You're asking me.  I don't know theirs.

20         Cox -- I presented our process early in the

21   discussions to the whole group as an example of the fact that

22   good things could be done to do meaningful work to address

23   copyright infringement issues over the internet, and, and the

24   negotiations that went on and took place, there were

25   companies -- you know, negotiations have give and take, and

R. Cadenhead Deposition - Examination

2104

1   there were companies that had things that they just couldn't or

2   weren't willing to do, and -- so the ultimate agreement, in my

3   opinion, fell short of what our process was designed to do and

4   would have required us to, to spend a good deal of money to, to

5   revise it in a way that seemed to -- seemed to me to be less

6   effective.

7          And so I felt like the process we had designed was

8   better and under, under all the circumstances, it made sense

9   for us to apply what we were doing, apply what we had designed.

10  And that was, that was my recommendation.

11  Q.   In your participation in CAS, did you have a view one way

12  or the other on whether or not CAS was intended to provide the

13  paradigm for how ISPs would comply with the DMCA safe harbor

14  requirements?

15  A.   I don't think so.  I think it was -- it wasn't replacing

16  any law.  It was, it was, it was a cooperative effort to work

17  together to put together a program that everybody could live

18  with, that addressed the problem everybody recognized, that

19  there was a need for dealing with content infringement from

20  people on the internet.

21  Q.   And it was principally focused on the issue of education,

22  correct?

23  A.   No.  I, I think it was -- it was what it was, and I --

24  it's not fair to call it one thing.

25  Q.   Was one of the principal issues that was discussed as part

R. Cadenhead Deposition - Examination

2105

1   of CAS the desire to have an educational program?

2   A.   Absolutely.

3   Q.   I'm going to hand you what's been marked as Plaintiff's

4   Exhibit 201.  Mr. Cadenhead, Plaintiff's Exhibit 201, which is

5   Bates labeled COX_SONY_00519137 through 199.  Earlier you

6   described that -- I believe you described having given a

7   presentation to those who were participating in the CAS

8   discussions.  Is that correct?

9   A.   Yes.

10  Q.   Is the presentation you gave the document that is attached

11  to Plaintiff's Exhibit 201?

12  A.   Some of it looks familiar.

13  Q.   Mr. Cadenhead, I'm going to focus on pages 8 --

14  A.   Oh, good.  Thank you.

15  Q.   -- through 22 of the presentation, which I do believe was

16  part of the presentation you gave, but you tell me.

17  A.   Yeah, this, this looks -- this looks like -- I gave, I

18  gave presentations like this, I don't know, a bunch of times,

19  but I did give it to the group and -- or a version of it to the

20  group, and this looks like that, a version of something close

21  to that, yeah.

22  Q.   And according to the cover e-mail, you gave this

23  presentation on March 11, 2010.  Does that sound right to you?

24  A.   That's a good guess.

25  Q.   Okay.  And did you create the slides, at least 8 to 22?

S. Paszkowski Deposition - Examination

2117

1  A.   I believe this is one of the ways it can happen.

2  Q.   Well, is the software written to cause the system to

3  download a piece of -- a full piece of data when it contacts a

4  BitTorrent peer?

5  A.   The software does how it's instructed, and we have

6  different levels of investigation.  So if the software is

7  instructed to download a piece of the content, then that's what

8  it does, and after that, concludes the investigation.

9  Q.   Okay.  And this is illustrating what happens when the

10  software is instructed to download a piece of the content from

11  the peer; is that right?

12  A.   The document shows an example of how this could happen,

13  yes.

14  Q.   Is the software written to similarly download contents

15  from peers from the Gnutella, eDonkey, and Ares networks?

16  A.   The software is written to follow the protocols and get

17  the evidence needed for the -- to, yeah, to collect the data on

18  the peers infringing activity.

19  Q.   And in those other networks, does that data include pieces

20  or complete content files?

21  A.   Different networks have different characteristics, and

22  some networks have pieces and some don't have pieces.  Some

23  networks have full downloads, and that's the only way you can

24  get content from there.

25  Q.   The networks with full downloads would include eDonkey,

S. Paszkowski Deposition - Examination

2118

1    Ares, and Gnutella; is that correct?

2    A.   That is not correct because --

3    Q.   Okay.

4    A.   -- as far as I know, as far as I know, eDonkey also allows

5    for download of pieces and parts of a file.

6    Q.   And Ares -- and eDonkey also allows for full downloads; is

7    that correct?

8    A.   EDonkey allows for both piece, part, and full download

9    from other peer, depending on what is needed.

10   Q.   And Gnutella and Ares, they only allow for complete

11   download?

12   A.   As far as I recall, Ares and Gnutella, they are full

13   download networks.

14   Q.   What is the content info log?

15   A.   This is a log created by MarkMonitor to provide

16   information about the content that was distributed by the peer

17   where we secured evidence.

18   Q.   And the description says:  The content info section

19   contains the name, hash value, and size of the torrent, as well

20   as an indication of the percentage of the data which was shared

21   by the user, and the portion which was downloaded and hash

22   checked by MarkMonitor antipiracy.

23          Do you see that passage?

24   A.   That is correct.

25   Q.   And then that's illustrated in figure 9; is that correct?

S. Paszkowski Deposition - Examination

2119

1   A.   That is correct.

2   Q.   We were looking at the passage that says:  The content

3   info section includes the name, hash value, and size of the

4   torrent, as well as an indication of the percentage of the data

5   which was shared by the user, and the portion which was

6   downloaded and hash checked by MarkMonitor antipiracy.

7             Have you got that passage in front of you?

8   A.   Yes, I have that passage in front of me.

9   Q.   In BitTorrent investigations, are these fields

10  specifically collected?

11  A.   So we would know what we are dealing with, so that would

12  be a content info, and we would know what, what is the size of

13  the content.  We would know how much is shared, and if download

14  was part of the investigation, we would also know how much of

15  it we downloaded.  And same with hash value.

16  Q.   And you would know that because it's recorded in the

17  content info file?

18  A.   Well, in BitTorrent case, there are a couple of different

19  places where this information exists.  First of all, some of it

20  exists in the torrent file, because that's the start of the

21  investigation is based on the torrent file.  We have the file

22  name.  In this case, it's actually a torrent name.  We would

23  know what is the size of the whole torrent content that is

24  supposed to be downloaded, investigated.  We would know the

25  hash value of it, and then based on the investigation, we would

2126

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :    Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  9  (P.M. Portion)

TRIAL TRANSCRIPT

December 12, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2127

APPEARANCES:


FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                             SCOTT A. ZEBRAK, ESQ.
                             JEFFREY M. GOULD, ESQ.
                             MICHAEL J. DRUCKMAN, ESQ.
                             ANDREW L. GUERRA, ESQ.
                             LUCY G. NOYOLA, ESQ.
                             JIA RYU, ESQ.
                             Oppenheim + Zebrak, LLP
                             4530 Wisconsin Avenue, N.W.
                             5th Floor
                             Washington, D.C. 20015


FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                             GEOFFREY P. EATON, ESQ.
                             Winston & Strawn LLP
                             1700 K Street, N.W.
                             Washington, D.C. 20006-3817
                               and
                             SEAN R. ANDERSON, ESQ.
                             MICHAEL S. ELKIN, ESQ.
                             THOMAS P. LANE, ESQ.
                             CESIE C. ALVAREZ, ESQ.
                             Winston & Strawn LLP
                             200 Park Avenue
                             New York, NY 10166-4193
                               and
                             JENNIFER A. GOLINVEAUX, ESQ.
                             THOMAS J. KEARNEY, ESQ.
                             Winston & Strawn LLP
                             101 California Street, 35th Floor
                             San Francisco, CA 94111-5840
                               and
                             MICHAEL L. BRODY, ESQ.
                             Winston & Strawn LLP
                             35 West Wacker Drive
                             Chicago, IL 60601
                               and
                             DIANA HUGHES LEIDEN, ESQ.
                             Winston & Strawn LLP
                             333 South Grand Avenue
                             Suite 3800
                             Los Angeles, CA

**JA688**

2128

INDEX

OPENING STATEMENTS BY:

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| | | |
| CHRISTOPHER KENNETH MONSON | | |
| | DIRECT | 2149 |
| | REDIRECT | 2176 |
| | | |
| NICK FEAMSTER | | |
| | DIRECT | 2181 |
| | CROSS | 2249 |

CLOSING ARGUMENTS BY:

COURT'S RULINGS/JURY INSTRUCTIONS

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1    Q.   Okay.  Let's zero in on that word, "verify."

2         Can we have the next slide?

3         Why is it important -- why was it important for

4    MarkMonitor to verify what it found on the computers of the Cox

5    subscribers?

6    A.   Yeah, there's two aspects to verification.  One is --

7    first of all, needed -- needs to determine if it has a -- you

8    know, given if it had a complete copy of a file, it needs to

9    know what that file is or represents, right?

10        So there's an aspect to verification that says, is

11   this file one of the works?  Okay.  So --

12   Q.   And the "it" here, is that MarkMonitor?

13   A.   That's --

14   Q.   Can we go back, please?

15   A.   That's right.

16   Q.   And what's the second aspect of verification?

17   A.   So as I mentioned, the first aspect basically just says,

18   what is this file?  Let's check that.

19        The second aspect says, what is a peer in a

20   peer-to-peer network actually doing?  Is it sharing that file

21   all -- in all -- all or in part, right?

22   Q.   Okay.

23   A.   So first relates to the content; second relates to what is

24   a peer doing or not doing.

25   Q.   Okay.  And I gather you concluded that the verification

1    was not sufficient in this case; is that right?

2    A.    That's what I said, yes.

3    Q.    Can we see the next slide, please?

4          What did you -- what conclusion did you draw from the

5    deficiencies in the verification process?

6    A.    Because the verification process was deficient, right,

7    essentially because they didn't adequately verify what was

8    going on, there's no reliable evidence that the Cox subscribers

9    actually were sharing copies of the plaintiffs' works.

10   Q.    Okay.  And the verification we're talking about here,

11   that's verification of what was going on on the subscribers'

12   computers, right?

13   A.    That's correct.

14   Q.    Okay.  So with all that by way of prelude, can you briefly

15   summarize the basis for your -- the opinions that you reached?

16   A.    Yes.

17   Q.    Next slide, please.

18         What -- how are you going to do that?

19   A.    Right.  So before we get into the details there, what I

20   need to do is lay some groundwork and talk a little bit about

21   how peer-to-peer networks operate, and I'm going to do that in

22   the context of BitTorrent.  Okay?

23   Q.    Okay.

24   A.    Then what we're going to do, given that basic

25   understanding, is talk about the general capabilities of the

N. Feamster - Direct

2200

1    MarkMonitor system, some of which we've heard about a little

2    bit at trial as well, but how basically it operated in the

3    context of the Copyright Alert System.

4    Q.   Okay.

5    A.   And then by way of contrast, I should say, we'll talk

6    about how it operated in the context of this trial.

7    Q.   So let's start with the operation of peer-to-peer

8    networks.

9            Can we have the next slide, please?

10           What's the -- what's illustrated on this slide?

11   A.   Right.  So here we have a cartoon picture of the internet.

12   It's a little bit more complicated than this, but the main

13   thing to -- that I want to point out here is that while, you

14   know, it's sort of common to think in colloquial terms of the

15   internet as, you know, one homogenous thing, it's actually not

16   that at all.

17           Internet actually comes from the word "internetwork,"

18   okay, meaning that there's actually tens of thousands of

19   independently operated networks that connect to form the

20   internet, upwards to 70,000 now, I think, all around the world.

21   Cox is but one of those.

22           So when you transfer a file on the internet, as the

23   animation is showing, your data actually might start in the Cox

24   network but end up somewhere, somewhere completely different in

25   a totally different network.

N. Feamster - Direct

2201

1   Q.   How does the internet relate to peer-to-peer networking?

2   A.   Good question.  So in the context of a peer-to-peer

3   network, the peers in a peer-to-peer network like BitTorrent

4   are going to be located all around the internet, all right, so

5   not just all on the Cox network.  There might be one peer on

6   the Cox network.  There may be other peers in other parts of

7   the, of the internet.

8   Q.   Okay.  Can we -- have you got a slide that illustrates

9   that?

10  A.   Yes.

11  Q.   Can we see the next slide, please?

12       What does this slide show?

13  A.   Right.  It shows what I just described, and then we're

14  going to get into a little bit more detail.  You can see here

15  peer 1 is sitting in the Cox network, and then we've basically

16  got a bunch of other peers in that peer-to-peer network.  In

17  BitTorrent parlance, we'd call this a swarm.

18       So these are all peers who would like to exchange or

19  obtain copies of a particular file.  This one, for the sake of

20  illustration is, in deference to Mr. Zebrak, a good song, "Lean

21  on Me," Bill Withers, and in this particular case, what we're

22  seeing is the peer says, I'm interested in, you know, getting a

23  copy of, you know, "Lean on Me."

24  Q.   Okay.  Before we --

25  A.   Yes.

1  Q.   -- start downloading music --

2  A.   Sure.

3  Q.   -- let me just ask you some questions to orient us with

4  respect to the network.

5       First of all, are you going to talk about a

6  particular type of network for the most part in your testimony?

7  A.   We'll focus mostly on BitTorrent for the sake of examples

8  here.

9  Q.   Okay.  And the jury's heard about three other peer-to-peer

10 networks:  Ares, Gnutella, and eDonkey.

11 A.   That's right.

12 Q.   For purposes of your testimony today, how do those differ

13 from BitTorrent?

14 A.   There are some differences.  I think for the purposes of

15 today, we can think of them as substantially the same.

16 Q.   Okay.  Now, in this illustration, one of the peers has a,

17 what I take it is a complete copy of "Lean on Me," and one has

18 nothing, and three have portions of the file.  What does that

19 illustrate?

20 A.   That is -- that's what we're seeing.  Okay.  So basically,

21 this is pretty fundamental to the operation of BitTorrent, and

22 this is one of the differences, right, is that BitTorrent,

23 actually, the peers exchange pieces or chunks.  In Ares and

24 Gnutella, I believe they exchange entire files.

25 Q.   Okay.

N. Feamster - Direct

2203

1   A.    Here the idea is that all these peers eventually want to

2   get a complete copy.  Only one in this case, peer 4, has that

3   complete copy.  It's called a seeder.  Okay?

4          But in order for everybody to get the copy, they have

5   to trade pieces.  Obviously, if we're going to trade, I need to

6   have something you don't have, and you need to have something I

7   don't have.  So there are some strategies that -- and aspects

8   of the design of BitTorrent that kind of make it all work out,

9   but generally speaking, this is sometimes referred to as tit

10  for tat.

11  Q.    What -- you said that tit for tat creates some incentives.

12  What's the incentive that tit for tat creates?

13  A.    It's a good question.  So this is, this is really

14  important, right?  Because in order for me to download pieces

15  of a file that I want, I have to have pieces that somebody else

16  wants.  If you can see, there's a bootstrapping problem here,

17  right?  If you start out with nothing, I've got a problem.

18         Now, BitTorrent has some ways to get around that

19  particular corner case, but generally speaking, we're trading,

20  and so I have incentives to basically say that I have certain

21  pieces of a file that you want, all right?

22         So, Mike, if you have a piece that -- if you're

23  looking for a piece and I'm looking for a piece that you have,

24  I might say, I've got that piece.

25  Q.    Are you familiar with the concept of a bitfield in

**JA695**

1    BitTorrent?

2    A.   Yes.

3    Q.   Okay.  And can you -- can a peer use the bitfield to

4    advertise that it has a piece of a file?

5    A.   That's, that's generally the mechanism that it uses to do

6    so.

7    Q.   Okay.

8    A.   In fact, we sort of see a version of that here on, on the

9    slide itself.

10   Q.   Okay.

11   A.   You can see -- yeah.

12   Q.   So let's go back to our peer who's been -- had his

13   question lingering.  What, what is the peer doing, peer 1 doing

14   at this point?

15   A.   At this point, peer 1 doesn't have any of the file, so

16   peer 1 is trying to determine who has pieces of this file,

17   "Lean on Me," okay?  So what it's going to do is basically ask

18   something called a tracker.

19   Q.   Okay.  How does it -- who does peer 1 direct that -- how

20   does peer 1 find out who has the pieces of the file?

21   A.   That's, that's a good question.  So there are two steps to

22   that.  The first thing it has to do is actually get something

23   called a torrent file, and it's got to search the internet for,

24   for the torrent file.  Okay.

25          Once it has the torrent, the torrent file is going to

2205

1   point that peer towards something called a tracker, okay?  The

2   tracker basically is a machine on the internet shown on the

3   right side of this slide that keeps track of the other peers in

4   the so-called swarm that are supposed to have pieces of that

5   file.  It's also keeping track of essentially the information

6   that we see right there on the -- in the graphic.

7   Q.   Okay.  And does the tracker send that information to the

8   peer requesting it?

9   A.   That's right.

10          MR. BRODY:  Can we click again, please?  There it is.

11  BY MR. BRODY:

12  Q.   What's the next step in this process?

13  A.   Okay.  So at this point, peer 1 has learned from, from the

14  tracker which peers have which pieces.  Now, what this

15  illustration isn't showing is that, that swapping that I just

16  described, of course, that's important, but for the sake of

17  illustration, we're just looking at the download half.

18          Through that process that I described, the peer

19  begins to accumulate and assemble pieces or chunks.  If I use

20  the word "chunks," I mean pieces, same things.  Pieces or chunk

21  of that file, begins to assemble them.  As those pieces come

22  in -- yeah, please.

23          MR. BRODY:  Can we click again?

24  BY MR. BRODY:

25  Q.   What happens when the pieces come in?

N. Feamster - Direct

2206

1    A.    As those pieces come in, the peer is going to check

2    whether or not that piece that it just downloaded from some

3    other peer on the internet is actually a piece of the file that

4    it thinks that it's getting.  So this is the verification that

5    we actually just heard about in the Harbor Labs testimony.

6    Q.    And we got three checks and an X.  What is the X supposed

7    to indicate?

8    A.    The X would indicate that a peer did this check and that

9    the check failed.

10   Q.    Okay.

11   A.    And at that point, the peer would determine, okay, this

12   chunk of content that I just received actually isn't part of

13   the file that I'm seeking, the thing that the peer just sent me

14   isn't going to be useful for reassembling this, so at that

15   part -- at that point, it will discard that piece and try to go

16   find that piece from some other peer in the swarm.

17            MR. BRODY:  Okay.  Can you click again, please?  And

18   there it goes.

19   BY MR. BRODY:

20   Q.    Now, let me ask you a couple of questions about this

21   checking process.

22   A.    Yes.

23   Q.    First of all, what is a consistent -- what is the peer

24   doing to check the piece?

25   A.    Good question.  So there's a couple of pieces to that

1    check -- sorry, a couple of aspects to that check.  There's a

2    check on the individual piece that we saw, and then there's

3    also a check on the whole file, okay?

4            So this process is done -- I'm sorry, this check is

5    done through a process called hashing.  We sometimes call it

6    computing the hash.  And the word "computing" is also quite

7    important, right?  The peer that received it needs to compute a

8    hash on the piece it just received.

9            Computing isn't enough, right?  Because that's just

10   going to give you a value, right?  What the peer is going to do

11   with the result of that computation, that's the SHA-1 hash that

12   we may have heard about, what it's going to do with the result

13   of that computation is compare it against another value, right?

14   That other value is sitting in the torrent file, and so the

15   torrent file contains a list -- for every piece, the torrent

16   file says this is the hash value for that piece, okay.

17           So when the peer basically gets this piece from

18   somewhere else on the internet, says, I don't know what the

19   heck this is.  Let me run this hash computation and compare it

20   against what's in the torrent file.  If those two things match,

21   boom, we're good.  If they don't match, that piece was garbage.

22   Q.   And this --

23   A.   There's also a hash over the entire file, which is what

24   we're seeing here in the diagram.

25   Q.   And this process of computing the hash, does that require

2208

1  actually examining the content of the piece that the peer is

2  receiving?

3  A.    Depends on what you mean by the word "examining," but yes,

4  basically what that is is a computation over the contents of

5  that piece.

6  Q.    So the peer doesn't simply rely on whatever hash it's been

7  told it would be receiving?  It actually verifies that?

8  A.    Yeah.  The hash by itself actually is meaningless.  That's

9  just basically a report of, like, if you find something on the

10 internet, if you want to know that it matches, you know, that

11 piece that you think it is, then perform the computation and do

12 the comparison.

13 Q.    Why, why is there any risk?  Why, why would it be the case

14 that a peer would get a piece or a file that is not what it

15 purports to be?

16 A.    Yeah, that's a good question.  There are a whole host of

17 reasons, both benign and not so benign, but this really comes

18 to, to the fundamental operation of how BitTorrent works, which

19 as we talked about, was -- it centers around incentives, all

20 right?

21        So you remember that example I gave before where, you

22 know, Mike and I can only trade a piece if he has something

23 that I want and I have something he wants.  Well, what if I

24 want what he has and I don't have anything he wants?  Well,

25 then there's a huge incentive for me to basically say, I've got

**JA700**

N. Feamster - Direct

2209

1    this piece, everybody, Mike, and I'd give you anything.  If you

2    don't check it, all bets are off.

3          That's why BitTorrent actually runs the check we just

4    talked about.

5    Q.   Okay.

6    A.   That's one example.  There are a few others, but that's a

7    predominant sample.

8          MR. BRODY:  Okay.  And can we click the last step in

9    this process?

10   BY MR. BRODY:

11   Q.   What is this illustrating?

12   A.   So at this point, the peer has basically received all

13   pieces of that file.  This is, this is the last piece that

14   basically it's checking against.  At that point, it can

15   reassemble the entire file and perform a check over the, over

16   the entire file.

17   Q.   Is there any risk of -- are there any other reasons other

18   than dishonesty that you were talking about or the

19   misrepresentation on why it would be important to perform the

20   check, the hash check?

21   A.   Sure.  Files can be corrupted.  I think actually I

22   listened to the Bahun testimony.  We heard about a disc

23   corruption case there.

24          Bit errors, there can be errors in transmission.

25   Now, network protocols are supposed to correct for those types

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

N. Feamster - Direct

2210

1  of things, but it doesn't always happen.  So those are some

2  other, some other possibilities.  That's not an exhaustive

3  list.

4  Q.  You said, you said that you might want to misrepresent to

5  me what it is that you've got so that I'll trade with you.

6  How, how would you go about doing that?

7  A.  Well, it's pretty straightforward.  Just in the way that

8  I -- we just did it in human space here.  A piece of software

9  could do the exact same thing, basically just say, I've got a

10  piece.

11  Q.  And is there software like that available to peers on a

12  network?

13  A.  Quite a lot.  I guess I should add it's --

14        THE COURT:  No, wait for the next question.

15        THE WITNESS:  Yes, please.  Thank you.

16        MR. BRODY:  Can we have the next slide, please?

17  BY MR. BRODY:

18  Q.  So we saw this slide before, and you told us before that

19  verification was a key issue for your analysis of the

20  MarkMonitor system.  What you've just explained to us about how

21  the peer-to-peer network works and how it checks these pieces

22  as they come in, how does that relate to the overall question

23  of MarkMonitor's verification?

24  A.  Yeah, that's a very good question.  So let's go -- just

25  bounce back up a level.

2291

1    of potential exposure here is the shear number of works that

2    the jury gets to decide.  If they find Cox liable, they can tag

3    a statutory damages award on.

4            And I know that Your Honor did not decide the issue,

5    the Section 504(c)(1) issue, on summary judgment, but now we

6    have a situation where clearly there are sound recordings that

7    were published as albums.  We have corresponding music

8    compositions with sound recordings.

9            Assuming that Your Honor is going to -- if Your Honor

10   doesn't agree with our arguments, then it's really no issue.

11   But to the extent that Your Honor is inclined to consider that

12   issue, I -- the way I -- my experience in the past, not to say

13   that it matters to the Court, is that a lot of that can be

14   dealt with on a Rule 50 motion because it's going to be very

15   difficult and complex for a jury to follow all of that with the

16   evidence and looking at the certificates of registration.

17           But to the extent that that's not going to happen and

18   that goes to the jury, then being able to parse that -- they

19   did not have -- plaintiffs did not have in their jury

20   instructions, as I'm sure Your Honor observed, those issues.

21   And so, I definitely want to sort of take that issue up.

22           The other factors related to damages are, you know,

23   what the jury can consider on statutory damages, of course, and

24   the issue of willfulness and -- innocent infringement,

25   obviously, is out of the case, so we don't have to worry about

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

2292

1    that.

2           And, you know, as far as willfulness, we made the

3    argument that Your Honor declined in BMG, and we appealed it

4    and lost that at the Fourth Circuit.  I have to reserve on it.

5    I know what the decision here is, but if this case were to go

6    up to en banc or beyond that, I have to reserve on that.

7           THE COURT:  Sure.

8           MR. ELKIN:  So I'm not going to sit here and -- I'm

9    going to stand here and argue that, but I have to do that.

10          THE COURT:  Okay.

11          MR. ELKIN:  But with regard to the, you know,

12   statutory damages, I do think that the issues that we have

13   are -- I'm sure Your Honor is not going to be surprised to hear

14   this, you know, Cox's profits and size, we heard a lot of that

15   testimony the last couple of days, and also this notion that

16   they have in their proposed instruction about punishing, I find

17   that -- you know, that's also an issue.

18          I just want to make sure I'm sort of done.

19          THE COURT:  Yeah, I mean, we'll revisit these later

20   instructions, so I'll ask you --

21          MR. ELKIN:  Is that helpful?  Is that what you wanted

22   to hear?

23          THE COURT:  Yeah.  Thank you.  Let me hear from --

24          MR. OPPENHEIM:  Unless the Court wants otherwise, I'm

25   going to limit my comment to just this safe harbor issue for

**JA704**

1    the moment.

2            THE COURT:  Sure.

3            MR. OPPENHEIM:  Not for a moment are we suggesting

4    that Cox can't make an argument that because it's an ISP, that

5    in terms of culpability, the jury can consider that, or

6    consider it in the context of willfulness or consider it in the

7    context of damages.

8            But the idea that they can argue that because they're

9    an ISP, they should never be held liable for the infringement

10   of their subscribers, doesn't go to any of the elements.

11           We're not suggesting they can't make the argument or

12   the argument should be disregarded --

13           THE COURT:  I didn't hear that they should never be

14   held liable.  And if you did, I think it was Zebrak, you know,

15   whispering in your ear.

16           MR. ZEBRAK:  Well deserved, Your Honor, thank you.

17           MR. OPPENHEIM:  I believe that the testimony of

18   Mr. Carothers was squarely to that point.  And we can cite it

19   to the Court later if you would like, Your Honor.

20           THE COURT:  I was thinking of the opening statement.

21   But -- okay.

22           MR. OPPENHEIM:  So what we tried to do in that last

23   paragraph that we proposed here is not -- we're not trying to

24   reach, Your Honor.  All we're saying is that to the extent that

25   you're considering that argument, you must follow the

1    to -- I think that the copyright registrations are plain, and

2    the law is plain, and Your Honor could decide it in our favor

3    or not in our favor.

4           I, frankly, would rather have it decided one way or

5    the other on Rule 50 because it's going to be very complex to

6    take the jury through it, although I'm prepared to do it with

7    the right instructions.

8           THE COURT:  How does it play into the rulings I've

9    already made?

10          MR. ELKIN:  Well, Your Honor hasn't decided -- I

11   mean, let's just take a step back.

12          The plaintiff is able to recover on as many works

13   that the jury can find Cox has either contributorily or

14   vicariously infringed.

15          THE COURT:  Right.

16          MR. ELKIN:  And so, the issue -- and, frankly, if

17   they were pursuing compensatory damages, this is really not an

18   issue, right, because they were able to pursue damages on all

19   of those works.

20          But they're electing, which is their right, to pursue

21   statutory damages.  And the first -- and section 504(c)(1) says

22   that if you -- all parts of a compilation get merged into one

23   statutory damages award.

24          And I think the language is not only clear, there has

25   been a lot of cases, and we cited them -- I think I -- we both

2304

1    argued before Your Honor at the Rule 56 motion, whether it's

2    MP3 tunes or otherwise.  And the -- and this has been, you

3    know, debated in the halls of Congress.  This is not a subject

4    that's been lightly covered.

5          And the issue here, it's -- in many respects, this

6    case is easier than the case that you had before Your Honor in

7    BMG when you're dealing with music compositions, which is far

8    more murkier.

9          Here where you have sound recordings that are

10   typically, they're published as an album or a CD, and where

11   they are embodied on a certificate of registration, the only

12   way you get the ability to put them on a registration is if, by

13   force of nature, they are a compilation.

14         So all of the -- if there are ten songs that are in a

15   registration that is identified as such -- and there really

16   can't be any genuine issue as to whether or not the

17   certificates include the songs -- there's only an

18   identification of those songs in -- you know, as part of the

19   infringing works here.

20         What we had hoped to do, you know, at the close of

21   our case is to be able to hand up a schedule and point to the

22   evidence and to, you know, make a request for Your Honor to

23   rule on that.

24         But in the absence of that, we would ask for an

25   instruction, you know, consistent with what we've proposed, and

**JA707**

2305

1     the same could be said with respect to the music composition.

2     You didn't have sound recordings and music compositions in <u>BMG</u>,

3     but here, you know, we can identify the music composition that

4     correlates to a sound recording.

5            And to the extent that we can do that, they don't

6     have to be on the same registration because they, wouldn't be,

7     obviously, because it's not a PA versus an SR, those would be

8     sort of the subject either as part of our Rule 50 motion or

9     part of the instruction.

10           Personally, I'd rather not spend as much time in the

11    closing argument to have to go through all that, so this is a

12    little bit of a selfish request.  But if Your Honor gives that

13    instruction and doesn't rule on the Rule 50 motion, then I

14    think I need to do that.  It's a lot of exposure for Cox, and

15    I've got to do my job.

16           THE COURT:  Yeah.  Okay.  So that's 31, 32 -- yeah,

17    31 and 32 where you deal with number of works, compilations,

18    and recordings and compositions and, again, number of works.

19    Okay.

20           MR. ELKIN:  Thank you, Your Honor.

21           THE COURT:  All right.

22           MR. OPPENHEIM:  So I think, Your Honor, with respect

23    to both the compilation issue and the composition, sound

24    recording issue, there's a pure legal argument as to why the

25    instruction shouldn't be given, which we've made to Your Honor

2306

1   before in the context of summary judgment, and we can make

2   again.

3          But at this moment, the more, I think, compelling

4   reason that these instructions shouldn't be given is that there

5   has been zero testimony elicited on any of these issues or

6   evidence presented to the jury by which they could consider

7   this.

8          So Your Honor denied the defendants' summary judgment

9   motion on this.  So the -- so it was -- it's been incumbent on

10  them to present a case factually that the jury could consider

11  this.  And they have not done that.  There have been no --

12  there has been nothing on their side on this.

13         In the meantime, the plaintiffs have presented

14  witnesses who have talked about the independent value of the

15  works.  That they are sold -- that albums and tracks are sold

16  separately and differently.  That music publishers and record

17  companies are entirely different entities that do different

18  things.  And that the values of those compositions and the use

19  of those compositions are entirely different than the value and

20  the use of the sound recordings.

21         So we've made a case that everything that we've put

22  forward in the 10,000 works is appropriately there.

23         Cox has presented no evidence in support of either of

24  these positions.  And to give the jury an instruction on this

25  as they're suggesting, in light of the fact that there's no,

2307

1    absolutely no evidence, would be inapposite and just confuse

2    the jury, I believe, Your Honor.

3           MR. ELKIN:  It may shock the Court, but I actually

4    hadn't forgotten about putting on evidence with regard to this.

5           I think, as I mentioned a few minutes ago, we have

6    requests for admissions, answers to rogs.  And if we needed to,

7    we can rely on the deposition testimony because they're

8    admissions.  But they're certificate of registrations.  So

9    plaintiff need not worry, we understand that we have the burden

10   to put in that evidence.

11          THE COURT:  Okay.

12          MR. OPPENHEIM:  I don't know what the intent is with

13   respect to depositions.  We've put representatives of the

14   companies on the stand.  They've had opportunities to examine

15   them.  They haven't asked questions --

16          THE COURT:  Well, you know -- there's more to come.

17          MR. OPPENHEIM:  There is more to come and maybe,

18   maybe the landscape changes.  But as of right now, Your

19   Honor --

20          THE COURT:  All right.  I'm on notice.  We'll deal

21   with that the beginning of next week.  And I'm happy to look at

22   it again as a matter of law, or whether I decide it needs to go

23   to the jury, we'll look at it and continue to consider it.

24          MR. OPPENHEIM:  Not that I want to burden Your Honor

25   with additional briefing, but if you would like additional

**JA710**

2308

1    briefing on the issue, we're happy to submit it.

2         THE COURT:  I think the summary judgment pleadings

3    were pretty complete.  So I'll go back and look at those.  If I

4    need something, I'll let you know.

5         MR. OPPENHEIM:  Okay.

6         THE COURT:  Okay.  All right.  The effect of

7    instructions as to damages I think is pretty bland, and both of

8    you put in pretty close to the same thing.

9         Damages generally.

10        So let's go to statutory damages.  Mr. Oppenheim,

11   have you revised your instruction 30?

12        MR. OPPENHEIM:  No, we have not, Your Honor.  I can

13   respond briefly to the issue that Mr. Elkin raised previously,

14   which is the factor of punishment.

15        I believe the case law on this is clear, Your Honor.

16   We're happy to submit another bench memo on it.  But that the

17   jury gets to consider the issue of punishment, especially in

18   the case where there may be a finding of willfulness.

19        And that's particularly appropriate in this case,

20   Your Honor, we believe, given the evidence that's come in.

21        THE COURT:  Well, in your sixth bullet point in your

22   instruction, you say:  Whether Cox acted willfully or

23   intentionally in contributorily or vicariously infringing.

24        Did you mean for the word "intentional" to be in, "or

25   intentionally"?

2329

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  10  (A.M. Portion)

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2330

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:            MATTHEW J. OPPENHEIM, ESQ.
                                     SCOTT A. ZEBRAK, ESQ.
 3                                   JEFFREY M. GOULD, ESQ.
                                     MICHAEL J. DRUCKMAN, ESQ.
 4                                   ANDREW L. GUERRA, ESQ.
                                     LUCY G. NOYOLA, ESQ.
 5                                   JIA RYU, ESQ.
                                     Oppenheim + Zebrak, LLP
 6                                   4530 Wisconsin Avenue, N.W.
                                     5th Floor
 7                                   Washington, D.C. 20015


 8
       FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
 9                                  GEOFFREY P. EATON, ESQ.
                                    Winston & Strawn LLP
10                                  1700 K Street, N.W.
                                    Washington, D.C. 20006-3817
11                                    and
                                    SEAN R. ANDERSON, ESQ.
12                                  MICHAEL S. ELKIN, ESQ.
                                    THOMAS P. LANE, ESQ.
13                                  CESIE C. ALVAREZ, ESQ.
                                    Winston & Strawn LLP
14                                  200 Park Avenue
                                    New York, NY 10166-4193
15                                    and
                                    JENNIFER A. GOLINVEAUX, ESQ.
16                                  THOMAS J. KEARNEY, ESQ.
                                    Winston & Strawn LLP
17                                  101 California Street, 35th Floor
                                    San Francisco, CA 94111-5840
18                                    and
                                    MICHAEL L. BRODY, ESQ.
19                                  Winston & Strawn LLP
                                    35 West Wacker Drive
20                                  Chicago, IL 60601
                                      and
21                                  DIANA HUGHES LEIDEN, ESQ.
                                    Winston & Strawn LLP
22                                  333 South Grand Avenue
                                    Suite 3800
23                                  Los Angeles, CA 90071

24

25
```

2331

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| NICK FEAMSTER | | |
| | CROSS | 2345 |
| | REDIRECT | 2379 |
| | RECROSS | 2391 |
| | REDIRECT | 2397 |
| WILLIAM CHRISTOPHER BAKEWELL | | |
| | DIRECT | 2406 |
| | CROSS | 2436 |
| | REDIRECT | 2478 |

1    A.    That's not true.  I think that I have an issue with this

2    calculation because it's misleading.  This is an outlier, and

3    this is not representative of the population of data.

4    Q.    You agree, sir, that this type of analysis could be done

5    for every subscriber, to compare billings against ticket data,

6    correct?

7    A.    I think the data is available for every single subscriber;

8    that's correct.  That's why just pulling one out is not

9    reasonable.

10   Q.    And you understand that even under Cox's lengthy graduated

11   response system, even Cox would consider or claim to consider

12   termination after 13 tickets, correct?

13   A.    It depends upon the situation.  I think that their --

14   certainly their awareness might be -- or their interest might

15   be piqued, and as we heard testimony, they don't want people

16   doing things that are wrong on their network, but they would

17   also consider whether or not education would work or what the

18   fundamentals are.

19   Q.    I thought I asked you a simple question.  You understand,

20   sir, that under Cox's graduated response in the 20- -- late

21   2012, 2013, and 2014 period, even Cox would consider

22   termination after 13 tickets that it processed, correct?

23        MR. BUCHANAN:  Asked and answered, Your Honor.  And

24   now he's testifying about the graduated response.

25        THE COURT:  No, he identified the 13, which is coming

C. Bakewell - Cross

2461

1   off the slide.  I'll permit it, and ask it again.

2   BY MR. GOULD:

3   Q.   You understand, sir, that under Cox's graduated response,

4   even Cox under its elaborate system would consider termination

5   of subscribers after 13 tickets that it processed, correct?

6   A.   I'm aware that the process changed over time.  There were

7   different thresholds that were considered, and the overall

8   direction was towards education.  I would have to see something

9   specific to be more specific in my answer.

10  Q.   Taking a look at the customer history shown on the slide

11  on your screen, you would agree that if Cox had terminated this

12  customer's internet service after 13 tickets, it wouldn't have

13  collected any -- it wouldn't have billed or collected any

14  revenue for internet service, correct?

15  A.   Correct.

16  Q.   You take issue with including billings and video and

17  voice, and we'll get to that, but for the purposes of this

18  question, you agree that after termination, they wouldn't bill

19  and collect those payments, correct?

20  A.   I'll agree with that.  I don't think that's totally right

21  because you can reinstate somebody after they've been

22  terminated, but setting aside reinstatement and the possibility

23  for that, then that's true.

24  Q.   So if this infringer -- sorry.  So if this infringer had

25  been reactivated immediately based on Cox's then in place

C. Bakewell - Cross

2462

1   policy, they might continue to collect revenue from them?

2   A.    It depends.  You need to know what the circumstances are

3   for reactivation and whether or not it was a situation where

4   reeducation was permitted and there was some comfort that the

5   behavior was going to change.

6   Q.    And likewise --

7   A.    You have to know more.

8   Q.    I didn't mean to interrupt, I'm sorry.

9   A.    No, fair enough.

10  Q.    Are you finished?

11  A.    Yes.

12  Q.    And --

13          MR. BUCHANAN:  Your Honor, can we have a sidebar,

14  please?

15          THE COURT:  Yes, sir.

16          NOTE:  A sidebar discussion is had between the Court

17  and counsel out of the hearing of the jury as follows:

18  AT SIDEBAR

19          MR. ELKIN:  Your Honor, the -- we're talking about

20  the claims period.  The reactivation stopped from and after

21  December 2012.  He solicited testimony in his question,

22  assuming the reactivation occurred immediately.  There's no

23  testimony to that.

24          In fact, we know from the testimony that that

25  practice, about which Your Honor had written extensively on

C. Bakewell - Cross

2463

1    summary judgment in the prior case, had stopped, and he's got

2    to confine his question to the time frame where that's

3    happened.

4            MR. GOULD:  I think the question was general and fair

5    that if he's reactivated, they get back on.  There's -- I also

6    don't think there's any foundation or testimony in the record

7    about when that process stopped.

8            THE COURT:  I'm not sure it's in this record.  I

9    don't recall hearing it in this record.  Who do you think --

10           MR. ELKIN:  It happened in my direct of Mr. Zabek.  I

11   asked him that question.

12           THE COURT:  Okay.  All right.  Then your question did

13   suggest that there was a reactivation taking place, the way I

14   heard it said.

15           MR. GOULD:  Immediately?

16           THE COURT:  Yeah, immediately.  So let's -- what was

17   his answer?

18           MR. GOULD:  It was long, and I'm not sure it answered

19   the question or whether I remember it, very frankly.

20           THE COURT:  If -- yeah, it was if you assume that it

21   reactivated right away, then your answer is correct.

22           I'll just say that the reactivation issue is --

23           MR. OPPENHEIM:  Your Honor, on this issue --

24           THE COURT:  Um-hum.

25           MR. OPPENHEIM:  -- I'd like an opportunity to look at

C. Bakewell - Cross

2464

1    the Zabek transcript because I -- my recollection is not the

2    same as Mr. Elkin, but I'd like to check it before we say

3    anything.

4            THE COURT:  I'm just going to tell them this last

5    question was a hypothetical and didn't assume any specific

6    facts in evidence, okay?

7            MR. BUCHANAN:  All right.  Your Honor, can I just --

8    I mean, they're examining this witness as if he's an expert on

9    graduated response.

10           THE COURT:  I mean, they've asked two questions.  So

11   are you going to continue on with -- he knows a whole lot more

12   about the Cox's system than you suggested early on in his -- in

13   this cross.  So he studied --

14           MR. BUCHANAN:  But I didn't ask -- what he might know

15   has nothing to do with what he testified to and what he was

16   responding to.

17           THE COURT:  But if he's disregarding what --

18           MR. BUCHANAN:  But he just took Dr. Lehr's one,

19   three, and five.  That's all he focused on.  Dr. Lehr didn't --

20           THE COURT:  And he said it makes no sense and it's

21   arbitrary.

22           MR. BUCHANAN:  Right.

23           THE COURT:  He can't get any stronger than arbitrary,

24   except it's nonsense.  And so I think that identifying what

25   Sony believes should have been other information that he should

C. Bakewell - Cross

2465

1    have considered is relevant, and it may -- you know, I mean,

2    he's answered -- I don't -- it doesn't change my opinion, but I

3    think it's in the wheelhouse.  So I'm going to allow it.

4              MR. ELKIN:  All right.  Thank you, Your Honor.

5              THE COURT:  All right.  Thank you.

6              NOTE:  The sidebar discussion is concluded; whereupon

7    the case continues before the jury as follows:

8    BEFORE THE JURY

9              THE COURT:  All right.  You've heard some testimony

10   about, you know, getting back into graduated response and when

11   Cox took -- may have taken certain actions.  Those were

12   hypothetical questions and not assuming facts in evidence.  So

13   just consider them as that, okay?  Thank you.

14             All right.  Please continue, Mr. Gould.

15   BY MR. GOULD:

16   Q.   Sir, you also agree that if Cox had terminated this

17   customer after three or five tickets, it wouldn't have billed

18   or received internet revenue from that customer during the

19   period of that termination, correct?

20   A.   In that hypothetical, during whatever that period of

21   termination would be, however that's defined, that would be

22   true by definition.

23   Q.   And I want to take a look at one more of these charts,

24   sir, a similar chart for a business customer that was a

25   fraternity.  You recall this slide and testimony about it?

C. Bakewell - Cross

2466

1    A.   Yes, I do.

2    Q.   And you don't dispute that Cox billed this customer over

3    $12,000 in the period after Cox had received and processed

4    13 tickets for the customer?

5    A.   I don't take issue with that.

6    Q.   And you agree that if Cox had terminated this customer

7    after 3 or 5 or 13, Cox wouldn't have billed or received any

8    revenue for the internet service for the period during the

9    termination?

10   A.   Only during the part where you say during the termination,

11   whatever that might be, I'd agree with because it's terminated

12   for whatever that period might be.

13   Q.   And your point, I think, is that if they sign back up,

14   then they would resume billing and revenue?

15   A.   You can terminate somebody and then reinstate.  Like, if

16   you discuss with them that their behavior is going to change

17   and you get some assurance, then you can -- they'd be

18   reinstated, and I'm sure everybody would be fine with that.

19   Q.   You understand, sir, that Dr. Lehr provided no opinions on

20   when Cox should have terminated customers?

21   A.   I agree.  I raised that as an issue.

22   Q.   And you understood his testimony to demonstrate in his

23   opinion for the jury, the different scenarios of what might

24   occur if Cox terminated at different scenarios?

25   A.   I don't think he quite said that, but I can accept that.

C. Bakewell - Cross

2467

1   I don't think that's exactly right, but for purposes of moving

2   things along, I'll accept it.

3   Q.   You recall this slide, sir?

4   A.   Yes.

5   Q.   And when you talked about this slide, you talked about

6   that the infringing activity was a small amount of the user's

7   activity or something along those lines, right?

8   A.   I don't think I actually said that, but I did say that

9   context is important, yes.

10  Q.   Well, I may have misheard because I didn't expect it, but

11  I thought you did.  You didn't do any measurement or analysis

12  or study to determine the amount of peer-to-peer activity

13  occurring on Cox's network, did you?

14  A.   I know the subscribers, I know some information that I've

15  read, but I haven't done, like, created an equation with that

16  in it.

17  Q.   And you don't dispute or disagree that peer-to-peer is a

18  highly bandwidth-intensive activity, do you?

19  A.   When it's done, it's bandwidth intensive.  The question

20  is, like, when it's done relative to everything else that's

21  happening --

22  Q.   And you -- I'm sorry.

23  A.   -- that might be -- might go to what you're asking.

24          But when it's done, it takes a fair amount of data,

25  yes.

C. Bakewell - Cross

2468

1    Q.   And you don't dispute, sir, that Cox's own consultant,

2    inCode, reported to Cox in 2012 that approximately 21 percent

3    of the U.S. traffic on the internet was based on peer-to-peer

4    activity, do you?

5    A.   In 2012, that might have been true.

6    Q.   Mr. Bakewell, you would agree that in order to understand

7    the value of a subscriber to Cox, you need to account for all

8    of the services that that subscriber purchases from Cox?

9    A.   I agree, generally.  I mean, there's more to it, but

10   generally, I agree.

11   Q.   And you recall Dr. Lehr's opinion that when Cox considered

12   whether to enforce a more aggressive termination policy, Cox

13   would have considered the full value of the subscriber?  Do you

14   recall him testifying to that?

15   A.   I remember what he said, and I took issue with that, and I

16   talked about that on my direct.

17   Q.   You have a difference of opinion, fair to say?

18   A.   We certainly do.

19   Q.   Dr. Lehr's opinion was that Cox would have considered the

20   full value of a subscriber in assessing its economic incentive

21   to tolerate infringement, correct?

22   A.   He said something like that.

23   Q.   That's how you understood it?

24   A.   Something of that nature.  Not exactly right.

25   Q.   But you think it was improper for Dr. Lehr to consider,

2483

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
      -vs-                     :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  10  (P.M. Portion)

TRIAL TRANSCRIPT

December 16, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2484

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                 SCOTT A. ZEBRAK, ESQ.
                                 JEFFREY M. GOULD, ESQ.
                                 MICHAEL J. DRUCKMAN, ESQ.
                                 ANDREW L. GUERRA, ESQ.
                                 LUCY G. NOYOLA, ESQ.
                                 JIA RYU, ESQ.
                                 Oppenheim + Zebrak, LLP
                                 4530 Wisconsin Avenue, N.W.
                                 5th Floor
                                 Washington, D.C. 20015

FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                             GEOFFREY P. EATON, ESQ.
                             Winston & Strawn LLP
                             1700 K Street, N.W.
                             Washington, D.C. 20006-3817
                               and
                             SEAN R. ANDERSON, ESQ.
                             MICHAEL S. ELKIN, ESQ.
                             THOMAS P. LANE, ESQ.
                             CESIE C. ALVAREZ, ESQ.
                             Winston & Strawn LLP
                             200 Park Avenue
                             New York, NY 10166-4193
                               and
                             JENNIFER A. GOLINVEAUX, ESQ.
                             THOMAS J. KEARNEY, ESQ.
                             Winston & Strawn LLP
                             101 California Street, 35th Floor
                             San Francisco, CA 94111-5840
                               and
                             MICHAEL L. BRODY, ESQ.
                             Winston & Strawn LLP
                             35 West Wacker Drive
                             Chicago, IL 60601
                               and
                             DIANA HUGHES LEIDEN, ESQ.
                             Winston & Strawn LLP
                             333 South Grand Avenue
                             Suite 3800
                             Los Angeles, CA

**JA725**

2485

INDEX

OPENING STATEMENTS BY:


WITNESS                          EXAMINATION        PAGE


PAUL JOHN JARCHOW

                                 DIRECT             2501
                                 CROSS              2509

SAMUEL RUBIN via video deposition

                                 EXAMINATION        2526
                                 EXAMINATION        2534

KEVIN CHRISTOPHER ALMEROTH

                                 DIRECT             2537
                                 CROSS              2574
                                 REDIRECT           2591

CLOSING ARGUMENTS BY:




COURT'S RULINGS/JURY INSTRUCTIONS

K. Almeroth - Direct

2557

packets, who sent and received those packets.  It would create

statistics that could be used to understand what was happening

in Cox's network, at least from a high level.  What it would

then do with those statistics is to try and do things like

capacity planning.

So there was testimony by videotape of a gentleman

from inCode, and he testified in the video about receiving

information from a tool like Procera, plugging it into kind of

a forecasting system, and then providing feedback to Cox about

how the volume and type of traffic in Cox's network might

evolve over a period of time.  So those are the kinds of things

that Cox could do with its monitoring tools.

Q.   And you have Traffic Monitoring there on the top.  What

types of traffic can Procera monitor?

A.   Procera can look at the headers of a protocol and look at,

for example, what's called a port number.  Some port number are

reserved for particular applications, so, for example, Port 80

would be for web traffic, and so Procera could look at these

port numbers and determine what kinds of applications the port

numbers relate to.

So to the extent you have a set of ports that are

used for an application, Procera can collect statistics and

provide reports based on that kind of information.

Q.   What would be some examples of those types of

applications?

K. Almeroth - Direct

2558

        1   A.   Web traffic, streaming media traffic, peer-to-peer

        2   traffic, those kinds of applications.

        3   Q.   You mentioned peer-to-peer.  Could Procera be used to

        4   monitor the amount of BitTorrent traffic that a specific Cox

        5   subscriber uses on a particular day?

        6   A.   Yes.  Procera would be able to perform that kind of

        7   monitoring and to provide statistics at least about the fact

        8   that it was BitTorrent traffic and do that on a per subscriber

        9   basis.

15:52:52 10  Q.   How would it do that?

       11   A.   Again, it would get copies of packets that were sent

       12   across Cox's network and that were provided to the Procera

       13   devices for processing, and it would be able to analyze those

       14   headers and create the statistics about the types of traffic.

       15   Q.   Are there -- are there limits on what Cox could do with

       16   that functionality of Procera?

       17   A.   Yes, ma'am, there are.

       18   Q.   What are those limits?

       19   A.   So the next slide talks about what some of these limits

15:53:20 20  would be with respect to network monitoring tools, and I have

       21   three of them.  The first is that Cox can't determine the

       22   content of BitTorrent traffic.  Much of the BitTorrent traffic

       23   is encrypted, and so even if you look into the payloads of

       24   traffic, you can't really determine what types of files there

       25   are, in particular if it's encrypted.  So the most you can

K. Almeroth - Direct

2559

1    really do is determine that it's of an application type that's

2    BitTorrent or that's peer-to-peer.

3            The second point is that Cox can't determine whether

4    BitTorrent traffic is infringing.  So setting aside the fact

5    that it's encrypted, if Cox could look at that traffic, it

6    isn't able to determine whether or not it's infringing.  Cox

7    doesn't have the kinds of hashes, it doesn't have the kinds of

8    information that you've heard testimony about that's used in

9    this particular case.

15:54:17 10          MR. ZEBRAK:  Objection.

11          THE WITNESS:  The second point around Cox not being

12   able to determine whether BitTorrent traffic is infringing, I

13   mean, there is the exchange of copyrighted information.

14   There's also the exchange of information that's not copyrighted

15   or where the copyright owner allows that information to be

16   exchanged.

17          MR. ZEBRAK:  Objection, Your Honor.

18          THE COURT:  I'm sorry?

19          MR. ZEBRAK:  Objection, Your Honor.  Lack of

15:54:40 20   foundation for this.  He's speculating about infringement

21   issues.

22          THE COURT:  Sustained.  Lay a foundation.  Go ahead.

23          MS. LEIDEN:  Thank you, Your Honor.

24   BY MS. LEIDEN:

25   Q.   Dr. Almeroth, as part of your research and work in

1    peer-to-peer traffic, have you done any research as to

2    legitimate purposes, uses of peer-to-peer networks?

3    A.   Yes, ma'am.  I've published a number of papers that talk

4    about peer-to-peer traffic, talk about the ways in which

5    peer-to-peer can be used for legitimate purposes to develop new

6    services.  For example, content providers who own content can

7    use peer-to-peer to distribute content through a peer-to-peer

8    network, and there's reasons why even someone who owns a

9    copyright would want to use a peer-to-peer network to

15:55:34 10   distribute their content.

11            THE COURT:  Go ahead.  You may proceed.

12            MS. LEIDEN:  Thank you.

13   BY MS. LEIDEN:

14   Q.   Dr. Almeroth, was there another opinion that you had with

15   respect to the limitations on using network monitoring tools?

16   A.   Yes.  There's this concept of net neutrality, and the

17   concept of net neutrality is inconsistent with this concept of

18   blocking peer-to-peer traffic.  So, again, even to the extent

19   that Cox had the ability to look at encrypted traffic, if Cox

15:56:06 20   had the ability to determine that that content was copyrighted,

21   that it was copyright infringement, the concept of net

22   neutrality would really prohibit Cox from taking any particular

23   role in managing that network traffic.

24            And just to be clear, as I pointed out in the first

25   two bullets, Cox doesn't have those capabilities.  I mean,

1    that's the whole point of encryption is so that people who see

2    your packets can't tell what you're sending.

3    Q.   And from a technical perspective, why might blocking

4    peer-to-peer traffic be inconsistent with the concept of net

5    neutrality?

6    A.   So net neutrality is this idea in the internet where

7    traffic from different providers should be treated the same,

8    and the concept of net neutrality was put in place to keep

9    traffic on the internet flowing, to make it a fair place for

15:57:09 10  ISPs to exchange traffic.

11            There's a good example.  If Google gets very big,

12   which it is, and it decided that somebody was trying to start a

13   new search engine that would compete with Google, Google is so

14   big, they could go to ISPs and say:  We will pay you money not

15   to deliver the traffic of this new search engine, and they can

16   thwart competition in the marketplace by exerting undue

17   influence on whether or not their packets versus the packets

18   and traffic of another competitor flow through the network.

19            So the idea of net neutrality is that the traffic in

15:57:51 20  the network should be unencumbered, that it shouldn't have

21   restrictions on it as it flow through the network.

22   Q.   And briefly going back to the second point there, where

23   you said Cox cannot determine whether the traffic is

24   infringing, and I believe you had said that you had actually

25   conducted research on legitimate uses of BitTorrent; is that

1    correct?

2    A.    Yes, ma'am.

3    Q.    And do you have a slide that illustrates that in part?

4    A.    I do.  The next slide -- there's testimony and papers that

5    identify legitimate uses of peer-to-peer.  I guess I'm touting

6    some of my own work here, but sometimes that's what happens.

7         A student of mine wrote a paper called "Pixie," and

8    we were looking to support the efficient peer exchange of

9    content and to use peer-to-peer networks on behalf of content

15:58:40 10    providers to enable new kinds of services.

11         As an example, there's also been testimony.  One good

12    example is what's happened with NASA.  NASA generates a huge

13    volume of traffic, satellite images, images from telescopes,

14    including the Hubble telescope, and as a government agency,

15    NASA doesn't have the infrastructure to make a petabyte's worth

16    of data, billions and trillions and quadrillion bytes of data

17    available from all of the different missions.  And so NASA uses

18    BitTorrent for the exchange of that information, and you heard

19    testimony on that earlier this week.

15:59:21 20         There's other instances, too.  There's Linux is an

21    operating system.  Updates to the Linux operating system are

22    distributed using BitTorrent and peer-to-peer file sharing

23    protocols, and a number of witnesses have testified to that as

24    well.

25         So kind of in this time frame of 2013 to 2014, there

K. Almeroth - Direct

2563

1    were a significant number of legitimate uses of BitTorrent, and

2    if Cox had attempted to block that traffic, it first of all

3    wouldn't be able to tell what was infringing, and it would be

4    inappropriate for them to block that traffic according to net

5    neutrality.

6    Q.   And, Dr. Almeroth, did you come to any conclusion with

7    respect to Cox's use of network monitoring tools?

8    A.   Yes.

9    Q.   What were those conclusions?

16:00:04 10    A.   Cox was able to use its monitoring tools to determine

11    types of applications, who was sending and receiving data, what

12    times of day, but beyond those kinds of statistics, Cox wasn't

13    in a position to use that kind of data in any meaningful way as

14    it relates to monitoring peer-to-peer traffic.

15         THE COURT:  Is this is a good time for a break now,

16    or do you have a final couple of --

17         MS. LEIDEN:  I have two more questions and then it

18    would be a natural break.

19         THE COURT:  Please.  All right, great.  Go ahead.

16:00:38 20    BY MS. LEIDEN:

21    Q.   Dr. Almeroth, do you have an understanding of whether Cox

22    used the information that it could obtain from Procera about

23    the volume of BitTorrent traffic in relation to processing

24    copyright notices?

25    A.   I do.  The understanding I have is that they didn't need

R. Almeroth - Direct

2564

1    to use Procera because they accepted the copyright notices as

2    being accurate.  And so there wasn't a need as part of

3    receiving these copyright notices for them to do any kind of

4    confirmation that the information in those notices were

5    correct.  They simply assumed that they were correct.

6            MS. LEIDEN:  Thank you.  This would be a good time

7    for a break.

8            THE COURT:  All right.  Thank you.

9            All right.  Let's take our mid-afternoon break and

10:01:20 10   take 15 minutes, and we'll come back and continue.

11           Thank you.  You're excused.

12           NOTE:  At this point, the jury leaves the courtroom;

13   whereupon, the case continues as follows:

14   JURY OUT

15           THE COURT:  All right.  Anything before we break?

16           MS. LEIDEN:  No, Your Honor.

17           THE COURT:  All right.  Then let's take 15 minutes.

18   We're in recess.

19           NOTE:  At this point a recess is taken; at the

20   conclusion of which the case continues in the absence of the

21   jury as follow:

22   JURY OUT

23           THE COURT:  Ready for our jury?

24           MS. LEIDEN:  Yes, Your Honor.

25           MR. ZEBRAK:  Yes, Your Honor.

K. Almeroth - Direct

2570

1    strikes.  And this is well within Dr. Almeroth's expert report.

2              THE COURT:  Yeah, I think it is.  So your exception

3    is noted.  I am going to allow it.

4              NOTE:  The sidebar discussion is concluded; whereupon

5    the case continues before the jury as follows:

6    BEFORE THE JURY

7              THE COURT:  All right.  Please proceed.

8              MS. LEIDEN:  Thank you.

9    By MS. LEIDEN: (Continuing)

16:30:43 10   Q.   Dr. Almeroth, I believe you were just referring to Pixius

11   Communication.  What would be the consequence of terminating

12   the Internet service of a regional ISP like Pixius

13   Communication?

14   A.   If Pixius -- if Pixius Communication were terminated, its

15   connection to the Internet that you see here at the top through

16   Cox and onto the rest of the Internet would also be terminated.

17   Meaning all of its customers -- or none of its customers would

18   be able to reach the Internet for any kind of service.  Whether

19   those customers are businesses or individuals or public safety

16:31:20 20   organizations, they would not be able to reach the Internet at

21   all.

22   Q.   And going back to your discussion of what you believe that

23   Ms. Frederiksen-Cross did not consider, why did you consider

24   the Copyright Alert System in forming your opinions?

25   A.   The Copyright Alert System was an industry system that had

R. Almeroth - Direct

2571

1   been agreed to by content owners here on the left and some of

2   the largest ISPs.  And as such, it was really a good basis for

3   comparison against what Cox was doing with its graduated

4   response.

5   Q.   And before this case, had you ever heard of the Copyright

6   Alert System?

7   A.   I had not.

8   Q.   Had you ever looked into why it was established?

9   A.   No.

16:32:13 10   Q.   And had you looked into why -- or excuse me -- into the

11   circumstances of how the memorandum of understanding was

12   negotiated?

13   A.   No.

14   Q.   But you do have an understanding today based on the

15   documents that you had put on the slide previous as to what the

16   Copyright Alert System is, correct?

17   A.   Yes, ma'am, I do.

18   Q.   And in the context of the Copyright Alert System, do you

19   have an understanding of how copyright notices were handled?

16:32:38 20   A.   Yes, ma'am, I do.

21   Q.   Could you explain that to the jury.

22   A.   Sure.  I have another slide here that shows the CAS

23   graduated response system here on the left, which was the

24   subject of that industry standard in the MOU.  And it

25   essentially describes in that document a set of responses 1

K. Almeroth - Direct

2572

1    through 6.

2            And you see here what's described, you would start

3    with e-mail warnings, and then click-through messages, and then

4    ultimately at offense five and six there were temporary

5    restrictions.

6            And in the CAS graduated response system, there would

7    be one alert sent per week.  At that point, once that had

8    happened, then nothing else happened after that.  And you see

9    testimony here describing that after that sixth alert, nothing

16:33:35 10   happens.  There is no requirement for termination or

11   consideration for termination, for example.

12   Q.   And in your analysis of that, did that differ from Cox's

13   graduated response?

14   A.   Yes.  So I think the witnesses and the testimony over the

15   last couple weeks, including from Mr. Carothers, have described

16   the Cox graduated response system in a fair amount of detail.

17   And it had that first step, the hold for more, then there was a

18   series of e-mail warnings.

19           Now, you will notice that in the Cox graduated

16:34:05 20   response system, those e-mail warnings, and working through the

21   offenses second through seventh, happens one e-mail sent per

22   day.  As compared to CAS and one sent per week.

23           And then you get into the escalating steps of

24   suspension and limited warning pages, suspension and required

25   to call a support technician, and then suspension and required

R. Almeroth - Direct

2573

         1    to call a specialized technician, and then, eventually,

         2    consideration for termination.

         3    Q.   And what was your conclusion, if any, on the comparison

         4    between the two systems?

         5    A.   Well, when you compare the two systems, including the fact

         6    that CAS didn't have further action after that sixth offense, I

         7    felt that both systems were intended to be educational, and

         8    that the Cox graduated response system had greater restrictions

         9    than what CAS had.

16:35:02 10    Q.   And did you form a conclusion regarding the testimony and

        11    evidence that you just summarized regarding CAS and CATS with

        12    respect to Ms. Frederiksen-Cross' testimony?

        13    A.   Yes.

        14    Q.   What is that conclusion?

        15    A.   That I believe Ms. Frederiksen-Cross should have

        16    considered CAS as a benchmark for what the industry had

        17    negotiated and agreed to in her assessment of Cox's graduated

        18    response.

        19    Q.   Dr. Almeroth, do you agree with Ms. Frederiksen-Cross'

16:35:36 20    testimony that Cox -- that CATS, excuse me, could have been

        21    programmed to do anything?

        22    A.   That's a difficult question to answer.  On the one hand,

        23    computer programming is very flexible.  You could have a

        24    computer program and write a computer program to do just about

        25    anything, but what you have to consider is the education and

K. Almeroth - Cross

2574

1    engagement goals of what CATS was designed for.

2            And so, if that's the kind of system you're trying to

3    implement, then that constrains what you can do with the

4    application.  It means you can't really just do anything if you

5    are trying to meet those goals.

6            MS. LEIDEN:  Thank you very much.

7            Pass the witness.

8            THE COURT:  Cross-examination.

9            MR. ZEBRAK:  Thank you, Your Honor, yes.

16:36:44 10    CROSS-EXAMINATION

11    BY MR. ZEBRAK:

12    Q.   Nice to see you again, Dr. Almeroth.

13    A.   Nice to see you, sir.

14    Q.   You're not testifying today as a legal expert, are you?

15    A.   No, sir, I am not.

16    Q.   You're not giving a legal opinion on net neutrality, are

17    you?

18    A.   No, sir, I am not.

19    Q.   And by the same token, I take that to mean that you're not

16:37:43 20    giving a legal opinion on how ISPs are permitted to respond or

21    not respond to infringement notices, correct?

22    A.   That's correct, yes, sir.

23    Q.   Now, do you recall discussing net neutrality during your

24    testimony a little while ago?

25    A.   Yes, sir.

2615

1    our motion and from the -- what we're asking for here, from the

2    numbers that I just recounted.  The only time that an

3    individual SR would be implicated in the 504(c)(1) context is

4    where there is a PA for the same song.

5           So I think the independent economic fact finding is

6    something that becomes relevant where there is an issue about

7    whether something, you know, was at some point published

8    separately.  And whether it was exploited separately and

9    whether or not it can be viewed and deemed to be, you know,

17:59:24 10   part of some sort of a collective work.

11          But I don't think there is any serious issue when you

12   have a limitation, as we are proposing in terms of the argument

13   that I'm attempting to frame up, where all of the constituent

14   sound recordings are registered as a compilation.

15          THE COURT:  Okay.  Thank you.

16          MR. ELKIN:  Okay.  Thank you.  You're welcome.

17          MR. OPPENHEIM:  Your Honor, I'm somewhat at a loss as

18   to how this could be done on a Rule 50 motion.

19          The idea that the day before the trial ends we're

18:00:04 20   being told that there should be a Rule 50 motion to reduce the

21   number of works in the suit from 10,000 to 2,300 without any

22   evidence that has been put forward in the case about how they

23   arrived at that number, to me doesn't make any sense.

24          And if he's going to orally get up here and try to

25   give you some summary and analysis and expect that the

2616

1    plaintiffs are going to be able to respond in this context,

2    that's not the purpose of a Rule 50 motion.  It's not how I've

3    ever seen it used in a copyright case, and don't think it's the

4    proper vehicle here.

5            There's been testimony, which has not been challenged

6    by Cox, from the record company and the music publisher

7    witnesses, all of whom testified that these works have their

8    own independent lives, they're marketed and sold

9    independently -- individually.  They're also sold as albums.

18:01:08  10     The fact that they may be copied -- the copyright

11   registration may be a compilation, is not a function of whether

12   or not they should get individualized protection.

13           And so, the idea that we're going to present this in

14   a Rule 50 to me doesn't work, it doesn't make sense.

15           THE COURT:  It all is going to fall, you know, from

16   the framework of the jury instructions, which are an

17   independent consideration, whether we have a Rule 50 motion or

18   we have -- the jury needs to be told how to calculate damages.

19   And the case law is, frankly, all over the place as to

18:01:50  20  whether -- if you have compilations, whether individual works

21   within that compilation get their own separate damages

22   consideration, or you look at the compilation.  Right?

23           MR. OPPENHEIM:  So, Your Honor, I'm not sure on the

24   compilation issue that the case law is kind of all over the

25   place.  I believe that on that issue that the case law has all

2617

1   been leaning towards allowing individual works to be subject to

2   a separate damage award.

3           And we can, we can address that as a matter of law,

4   Your Honor.  But the way -- I mean, Cox chose to present it to

5   you in a way -- in a summary judgment brief that I think wasn't

6   the proper way to put it forward to the Court, and the Court

7   appropriately denied it.

8           The idea now that it's a Rule 50 motion -- it's not a

9   directed verdict.  It's a -- the question that they're asking

18:02:56 10   is whether or not you should be able to get a damage award with

11   respect to certain works in the suit.  That's the question.

12   That's not a directed verdict question.  So I don't think it's

13   a Rule 50 issue.

14           Now, the question of whether it goes to a jury is a

15   separate question.  So -- and on that issue, I think the jury

16   would see the instruction, have absolutely no idea what to do

17   with it because there's been no testimony on it.

18           So I would be inclined to say there should be no

19   instruction on it because there's no reason to confuse the jury

18:03:27 20   on the last day of the trial on something like this.

21           To the extent that they believe that as a matter of

22   law -- let's assume the jury comes back with a -- there's no

23   instruction on it to the jury, there's no Rule 50 motion, and

24   the jury returns a verdict on 10,000 or so works.  To the

25   extent that Cox believes as a matter of law that is improper

2666

1          MR. OPPENHEIM:  But the point that the Court made

2    still applies.  Which is that there are times where a copyright

3    owner brings a secondary liability claim, it's more efficient

4    and it's more appropriate.

5          And to suggest that there should be a mitigation

6    instruction to the jury would be to undermine the principle

7    that the Supreme Court articulated.

8          But I come back to, mitigation is an offsetting of

9    damages issue.  And what the defendants have presented is this

19:15:15 10   idea that because we sued Cox, that they shouldn't be held

11   liable because we chose not to sue the direct infringers.

12   That's what they've said.

13         I also can't let go, Mr. Elkin got up here and said

14   that we have brought a case based on the idea that Cox didn't

15   terminate.  That's not what our case is.  And it's not a proper

16   interpretation of our case.

17         I think when you come back to the fundamental notion

18   that copyright infringers are jointly and severally liable for

19   an infringement, right, Cox is arguably jointly and severally

19:15:54 20   liable with the direct infringers, that's the way the law would

21   play out.

22         THE COURT:  Well, that's why you have contributory

23   and various infringement instructions, right?  I mean, the jury

24   is going to understand that that's what they're asked to

25   decide.

2667

1          MR. OPPENHEIM:  In the context of traditional

2  copyright law, if you have two parties who jointly engage in

3  infringement and you sue one, and you get a verdict against

4  one, that one can seek contribution from the other.

5          But there is no law that suggests that this one can

6  say, because you chose not to sue this one, the jury gets to

7  consider a lesser damage award.  The defendants haven't cited

8  to any case law like that because I'm not aware that it exists.

9  But that's the principle that they're putting forward.

19:16:42 10          THE COURT:  Okay.  I'll look at Grokster, but I

11  really don't believe your argument is correct.  I mean, I

12  think -- and we'll look at it a little further, but I don't --

13  I think you can -- unless I'm convinced otherwise, I'm going to

14  give the mitigation instruction.  And I'm just not sure whether

15  I'm going to put it in the verdict form or not.

16          So what's your next one?

17          MR. OPPENHEIM:  I'm not sure there were any issues on

18  the willfulness instruction, which would be the last one, I

19  believe.

19:17:37 20          MR. ELKIN:  Your Honor, we -- I think we addressed

21  this at the last charging conference.

22          THE COURT:  Yeah.

23          MR. ELKIN:  We -- Your Honor gave the instruction

24  that was upheld by the Fourth Circuit.  We know that you're not

25  going to change that instruction.  We're just reserving in case

2668

1    it goes up, up, up.

2          THE COURT:  Okay.  All right.  So I am going to give

3    instruction 31 on willfulness as plaintiffs have proposed.

4          And, of course, your exceptions are noted.

5          All right.  Where else are we going?

6          MR. OPPENHEIM:  Your Honor, I think the remaining

7    issues are -- for us to address is the verdict form and the

8    length of the closing.  That's all I have left on my list, I

9    believe.

19:18:30 10          THE COURT:  So we talked about giving you an hour

11   each, and you thought that was a good idea.  You might -- you

12   were thinking about whether you needed a little extra time for

13   the rebuttal.

14          Where are you on length?

15          MR. OPPENHEIM:  I think we can do our initial opening

16   in the hour, but we would like 15 minutes for rebuttal, Your

17   Honor.  We're trying to narrow the issues, and maybe we don't

18   need all that time, but we think that that's, that would allow

19   us to present the evidence cleanly.

19:19:05 20          THE COURT:  All right.  I will give you that.

21          Verdict form.

22          MR. OPPENHEIM:  Verdict form.

23          THE COURT:  Incredibly, I've found it.

24          MR. OPPENHEIM:  So we did make some progress, Your

25   Honor, on the verdict form.  There still remain some disputes.

2669

1          Should we hand up a copy of your redline just so the

2     judge can follow this and we can identify the disputes?

3          So, Your Honor, I think the first question was

4     whether or not there needed to be a direct infringement

5     instruction, and Cox now agrees to remove that.  So we're past

6     that hurdle.

7          THE COURT:  Okay.

8          MR. OPPENHEIM:  With respect to the liability for

9     contributory and vicarious infringement, we think that our

19:20:07 10     approach in our proposed verdict form is the better approach.

11     It is a cleaner, easier question to the jury.

12          We think that including "preponderance of the

13     evidence" and the language of "for direct infringement of it

14     subscribers" is unnecessary here.

15          We think that there is a lot of instructions that

16     you're going to give the jury, and to just call out those two

17     to put them in, I think just what we have proposed is, "is Cox

18     liable for contributory infringement of plaintiffs' copyrighted

19     works"?  Yes or no.  I think that's a simpler, easier question.

19:20:50 20          THE COURT:  I always give the burden in the verdict

21     forms as well.  It is -- is it repetitious?  Yes, but I think

22     it's important to have it on the verdict form.

23          So I would leave it in there.

24          MR. OPPENHEIM:  Okay.  But we would recommend, Your

25     Honor, taking out "for the direct infringement of its

2686

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                                :
     -vs-                       :   Case No. 1:18-cv-950
                                :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                                :
--------------------------------:
```

VOLUME  11  (A.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

JA747

2687

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:           MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
4                                  MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
5                                  LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
6                                  Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
7                                  5th Floor
                                   Washington, D.C. 20015
8

9    FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                  GEOFFREY P. EATON, ESQ.
10                                Winston & Strawn LLP
                                  1700 K Street, N.W.
11                                Washington, D.C. 20006-3817
                                    and
12                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
13                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
14                                Winston & Strawn LLP
                                  200 Park Avenue
15                                New York, NY 10166-4193
                                    and
16                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
17                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
18                                San Francisco, CA 94111-5840
                                    and
19                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
20                                35 West Wacker Drive
                                  Chicago, IL 60601
21                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
22                                Winston & Strawn LLP
                                  333 South Grand Avenue
23                                Suite 3800
                                  Los Angeles, CA
24

25
```

JA748

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| SANFORD MENCHER | | |
| | DIRECT | 2715 |
| | CROSS | 2737 |
| CHRISTIAN D. TREGILLIS | | |
| | DIRECT | 2766 |
| | CROSS | 2825 |

2706

1    entirety for them.

2          THE COURT:  Well, I mean, if they argue that there

3    were no registrations and I made an error, that there were

4    registrations for this song or that song, I'm not sure that

5    that's preserved, but is it not relevant for that purpose?

6          MR. OPPENHEIM:  I, I would think that -- so a denial

7    of summary judgment is not preserved, but the grant of summary

8    judgment is always preserved.

9          THE COURT:  All right.

09:31:43 10          MR. OPPENHEIM:  And so they can always attack that

11    decision on -- not only on appeal but posttrial.  So, so --

12          THE COURT:  And are the registrations relevant to

13    that?

14          MR. OPPENHEIM:  The registrations were submitted for

15    that.  Your Honor had findings on that.  And we have no dispute

16    with that summary judgment decision and everything under that

17    summary judgment decision being something that the defendants

18    can rely on for purposes of posttrial motions and for appeal,

19    but that's very different than them being able to use it -- use

09:32:13 20    them with Mr. Tregillis to argue about them in closing.

21          THE COURT:  They just said they're not using it.

22    It's merely for record purposes.  That's, that's what I heard

23    Mr. Buchanan just say.

24          MR. OPPENHEIM:  Yeah.  My, my fear is, Your Honor, is

25    I don't want later, whether it be before Your Honor, who will

1    know the record, or the Fourth Circuit, there to be some

2    argument, well, look at these 7,200.  They don't necessarily

3    include everything.  And -- because we haven't had an

4    opportunity to go through them.

5              To the extent that they need to preserve issues

6    posttrial or appeal, the summary judgment decision, Your Honor,

7    does that.  So I don't think we need to admit them for that

8    purpose.

9              THE COURT:  All right.  So I'm going to admit them

09:32:56  10   provisionally, and they're not going to be used in any further

11   testimony during this trial.  I'll give Sony an opportunity to

12   actually look at what's in there and file any supplemental

13   pleading that they think is appropriate.

14             But I think they're relevant.  We looked at a portion

15   of them, I'm not sure which ones, and in determining the

16   summary judgment, they aren't -- you know, that issue's been

17   resolved.  It's not a jury issue, but it's not irrelevant, and

18   so that's my ruling.

19             All right.  Mr. Buchanan?

09:33:47  20   MR. BUCHANAN:  On the, on the slides --

21             THE COURT:  Yeah.  Go ahead.

22             MR. BUCHANAN:  I'm sorry.  Do you need to address

23   that?

24             THE COURT:  Well, what exhibits are we talking about

25   now, 612 through 648?  Is that -- yeah, the DX 3758 is no

2708

```
          1    longer in?

          2               MR. BUCHANAN:  PX 612 through PX 8478.

          3               THE COURT:  8478, okay.  And they're all -- they're

          4    all digital?

          5               MR. BUCHANAN:  Yes, Your Honor.

          6               MR. OPPENHEIM:  I don't believe they've been marked,

          7    Your Honor.

          8               THE COURT:  Okay.

          9               MR. BUCHANAN:  We'll confirm that, Your Honor.

09:34:36 10               THE COURT:  Okay.

         11               MR. BUCHANAN:  On the slides, I mean, we went over

         12    this yesterday, and we heard the same argument.

         13               THE COURT:  Yeah, but I had a chance to look at the

         14    Tregillis reports and the deposition, and where is any of this?

         15    Is any of it --

         16               MR. BUCHANAN:  So actually, I passed you -- I gave

         17    you those passages from the reports.

         18               THE COURT:  And it's not there.

         19               MR. BUCHANAN:  Well, if you looked at -- if you

09:35:02 20    looked at those charts, he calculates those that are musical

         21    composition, those that are sound recording, and those that

         22    are, you know, separate and distinct.  So in some cases, you

         23    have both a sound recording and musical composition.  Sometimes

         24    you have a sound recording.  Sometimes you have a musical

         25    composition.
```

2712

```
 1              THE COURT:  Well, they identify -- beginning back on

 2    28, where it's an SR plaintiff and then MC plaintiff and SR 1

 3    and MC 1, I'm not sure what those figures -- so he does

 4    identify works which contain both an SR and an MC, right, in 29

 5    and --

 6              MR. OPPENHEIM:  There is one individual example or

 7    two individual examples --

 8              THE COURT:  30, 34.

 9              MR. OPPENHEIM:  -- and now they want to claim that
```
09:40:58 10    because he referenced that in the context of a discussion about
```
11    notices, that now because he references a couple of examples,

12    that he gets to put in something that he did no analysis for?

13    Yesterday, they were saying, look at Schedule 6.

14              We looked at Schedule 6.  It's not what it is.

15              And now they're saying, oh, no, no, no.  Let's try

16    this.

17              Your Honor, this is exactly what isn't supposed to

18    happen.  You've been -- you've restricted the plaintiffs to

19    presenting their experts, constrained by the reports and their
```
09:41:32 20    testimony.  The rules should apply equally.  It's -- this
```
21    analysis is not here.

22              And the fact that it's an ever-moving target of

23    numbers, I mean, Mr. Buchanan said, you know:  We fly-spec'd it

24    last night.

25              That analysis was not done at the time of his report.
```

2713

1  That's the question, was the analysis done at the time of his

2  report, and the answer is no.

3          THE COURT:  All right.  All right.  The motion to

4  preclude the exhibits which contain the lower portions of 13

5  and 21, 22, 23, 26, and the last two, the motion is granted.

6  Those will be amended -- or not presented.  I find that the --

7  in going over the reports, and in particular, the pages that

8  defendants have pointed to, that the analysis was not done.

9  There has been no notice that Mr. Tregillis was going to

09:42:35 10  testify about those matters.

11          This is clearly outside of the report, the summaries

12  that he gave of what his testimony was going to be, and

13  although they're not, as Mr. Buchanan pointed out, the most

14  resounding modifications, they are modifications, and they do

15  change the dynamics of his report, and that's -- it's

16  impermissible to do that this late in the -- on the last day of

17  trial.  So the motion is granted to just -- those will be --

18  exhibits will either be redacted or they won't be used.

19          All right.  What else do we have this morning?

09:43:26 20          MR. OPPENHEIM:  I don't think anything else at the

21  moment, Your Honor.

22          THE COURT:  Okay.  All right.  What -- does that --

23  who is -- Tregillis is the next witness?  Is that --

24          MR. ELKIN:  No, Your Honor.  We're calling

25  Mr. Mencher.

2714

1          THE COURT:  Okay.  All right.  Are we ready for our

2    jury then?

3          MR. ELKIN:  Yes, Your Honor.

4          THE COURT:  All right.  Joe, let's get our jury,

5    please.

6          THE COURT SECURITY OFFICER:  Yes, sir.

7          NOTE:  At this point, the jury returns to the

8    courtroom; whereupon, the case continues as follows:

9    JURY IN

09:44:44 10          THE COURT:  All right.  Good morning, ladies and --

11    please have a seat, everyone.  Sorry again for the delay.

12    Hopefully you were comfortable.

13          Thank you for coming in on time, and please give me

14    that nod of heads that you didn't do any research or

15    investigation or talk to anybody.

16          NOTE:  All jurors nodding heads.

17          THE COURT:  Thank you, sir.  Thank you-all.

18          All right.  Next witness?

19          MR. ELKIN:  Thank you, Your Honor.  The defendants

09:45:10 20    call Sanford Mencher.

21          THE COURT:  All right.

22          SANFORD MENCHER, DEFENDANTS' WITNESS, SWORN

23          MR. ELKIN:  May I inquire?

24          THE COURT:  Yes.  Good morning, sir.

25          Please proceed, Mr. Elkin.

S. Mencher - Cross

2740

1  Q.    And Cox receives a financial benefit from having a greater

2  number of subscribers, correct?

3  A.    We can.

4  Q.    Does Cox receive a financial benefit from having a greater

5  number of subscribers?

6  A.    It depends on the subscribers.  Generally, yes, but if a

7  subscriber is heavily discounted, they may cost more than what

8  they are paying us.  That would not necessarily be a financial

9  benefit, but as we operate our business as a whole, we tend to

10:25:42 10  operate it taking those factors into account.

11  Q.    Do you recall I asked you this question and you gave this

12  answer in your deposition, sir:

13        "Does Cox receive a financial benefit from having a

14  greater number of subscribers?

15        "Answer:  Yes."

16  A.    Yes.

17  Q.    And likewise, Cox receives a financial benefit from having

18  a greater market share, correct?

19  A.    Yes.

10:26:05 20  Q.    And related, the total number of subscribers or customers

21  factors into Cox's profitability?

22  A.    It does.

23  Q.    And the ability to retain existing customers factors into

24  Cox's profitability?

25  A.    It does.

S. Mencher - Cross

2741

1    Q.   And we talked about -- you talked a little bit about the

2    different tiers of service.  Do you recall that, the internet

3    tiers of service?

4    A.   Yes.

5    Q.   And generally, the higher the bandwidth and the higher the

6    speed, the higher the price for that service, correct?

7    A.   Yes.

8    Q.   And the different prices that Cox charges its tiers of

9    internet service factor into Cox's profitability?

10:26:47 10  A.   Yes.

11   Q.   And the payments received from customers that Cox retains

12   factors into Cox's profitability?

13   A.   Yes.  The payments we receive and the payments we don't

14   receive, for that matter, both factor into profitability.

15   Q.   Does Cox collect more revenue from a customer that it

16   terminates for copyright infringement or that it retains on its

17   network?

18   A.   I'm not familiar with what we terminate or don't terminate

19   for a copyright infringement.  What I can say is customers that

10:27:27 20  we have, we get revenue from, and customers that we don't have,

21   we don't get revenue from.

22   Q.   And that would include customers terminated for copyright

23   infringement, correct?

24   A.   Again, I don't know whether we are terminating or what's

25   the process for terminating customers for copyright

S. Mencher - Cross

2742

1  infringement, so it's difficult for me to answer that question

2  directly.

3  Q.   Are you saying you're not aware of whether Cox terminates

4  customers for copyright infringement violations?

5  A.   I'm not aware -- I don't -- I'm not familiar with the

6  details of the process through which customers get terminated,

7  so it's, it's difficult for me to say.

8  Q.   You're the vice president of finance and accounting.  Are

9  you aware, yes or no, whether Cox terminates customers for

10:28:08  10  copyright infringement violations?

11  A.   I believe we do.

12  Q.   And if a customer is terminated for a copyright violation,

13  does Cox collect more revenue from that customer or a customer

14  that it keeps on its network?

15  A.   Any customer that is terminated, we will no longer collect

16  revenue from.

17  Q.   You talked about Cox not charging data overage fees.  Did

18  I get that right?

19  A.   Yes.

10:28:36  20  Q.   You're talking about a particular time frame, though,

21  aren't you?

22  A.   I am.

23  Q.   Because starting in 2015, Cox actually began charging data

24  overage fees, correct?

25  A.   I don't remember the exact date, but we do collect overage

S. Mencher - Cross

2743

1    fees today.

2    Q.    Still do today.

3          And if we looked at the ICOMS billing data for

4    customers, we could determine whether or not they were charged

5    overage fees on any given day, correct?

6    A.    Yes.

7    Q.    Do you know whether any of the 57,000 customers that were

8    the notices of plaintiffs' infringement notices have been

9    subject to overage fees for bandwidth or data usage?

10   A.    I'm not.

10:29:20

11          MR. ELKIN:  Objection, Your Honor.  A quick sidebar?

12   I think it's going to be difficult for me to explain it.

13          THE COURT:  Okay.  Please.

14          NOTE:  A sidebar discussion is had between the Court

15   and counsel out of the hearing of the jury as follows:

16   AT SIDEBAR

17          THE COURT:  So I think he testified on direct that in

18   '13-'14, there were no data overage fees charged, right?  And

19   you asked him whether they've changed that policy, and so where

20   are we?

10:30:10

21          MR. ELKIN:  So the question that he raised in

22   isolation is a fine question, but in the context, it's

23   misleading because if the customers in 2014 and '15 continue --

24   they have data for these same customers in ICOMS from '15 and

25   beyond.  So I, I was slow to raise an objection with respect to

S. Mencher - Cross

2753

1    $1 billion, $1.5 billion, and $1.4 billion, respectively.

2            Correct?

3    A.   Yes.

4    Q.   And those are cash dividends paid out of -- paid out from

5    Cox Communications' free cash flow?

6    A.   Yes.

7    Q.   And free cash flow is essentially what's left from Cox's

8    operating cash after accounting for taxes and capital

9    investments and interest payments, correct?

10:44:18 10   A.   Yes, in addition.  There are some other --

11   Q.   Some other things.  Depreciation?

12   A.   Investments.

13   Q.   Investments.  So the dividends come out of the free cash

14   available after Cox pays all of those things, correct?

15   A.   Yes.

16   Q.   So when you think of the dividend, the cash dividend, it's

17   cash paid out, what you have left over afterwards, right?

18   A.   I'm not sure I understand the question.

19   Q.   Well, I'll ask a better question.  The cash dividend shown

10:44:52 20   here is cash that Cox was able to take out of the business as

21   it was growing in the 2012 to 2014 period, correct?

22   A.   Yes.

23   Q.   When Cox bills its customers -- I'm shifting gears here a

24   little, just to give you a heads-up.  When Cox bills its

25   customers, it does a pretty good job collecting on the amounts

S. Mencher - Cross

2754

```
         1   billed, correct?

         2   A.    I would say yes.

         3   Q.    In general, Cox collects about 98 to 99 percent of the

         4   bills issued, correct?

         5   A.    Yes.

         6             MR. GOULD:  Pull up PX 365.

         7   BY MR. GOULD:

         8   Q.    Mr. Mencher, I want to talk about disconnects for

         9   nonpayment.

10:45:59 10             Page 11, please.

        11             You testified about this in direct, but we didn't

        12   look at the numbers.  So I want to make sure we're on the same

        13   page here.

        14             If you could pull up just the two paragraphs,

        15   including the yellow?  That's fine.

        16             And the jury has seen this before, so I'll move

        17   quickly.  You agree, sir, that Cox has reported disconnecting

        18   the internet service for roughly 600,000 and change residential

        19   customers, and 21,000 and change business customers, in the

10:46:31 20   years 2013 and 2014, correct?

        21   A.    Yes.

        22   Q.    And you understand, sir, that Cox has argued in this case

        23   that it can't be expected to terminate internet service of

        24   business customers for copyright infringement violations

        25   because they might include hospitals or fire stations?
```

S. Mencher - Cross

2755

```
          1    A.    I'm unaware of any testimony in the case.

          2    Q.    Notwithstanding, you would agree that Cox terminated over

          3    21,000 business customers in the two years, 2013 to 2014?

          4    A.    I haven't done the math, but that's -- it looks in the

          5    general vicinity.

          6    Q.    And you described a process of late bills and soft

          7    disconnects about nonpayment.  I want to go through that in a

          8    minute, but I first want to understand, was that the process

          9    that's in place now or in the 2013-2014 period?

10:47:38 10    A.    That is the process that is in place now, but I don't know

         11    of any major changes to that process over the last few years.

         12    Q.    Fairly confident that it was the same process in

         13    2013-2014?

         14    A.    I am.

         15    Q.    Not certain but fairly confident?

         16    A.    Yes.

         17    Q.    So I want to walk through that to make sure that I

         18    understood it.  There's a lot going on in that slide.  The --

         19    Cox sends a customer a bill, correct?

10:48:11 20    A.    We do.

         21    Q.    And generally that bill is due in about 21 to 22 days.  I

         22    think your slide showed the March 1 bill was due March 22,

         23    correct?

         24    A.    Yes.

         25    Q.    And if the customer hasn't paid that bill within 30 days
```

S. Mencher - Cross

2756

```
            1    of the due date, then Cox disconnects the service, right, a

            2    soft disconnect?

            3    A.    Yes.

            4    Q.    So if the bill's 30 days late -- 30 days late, turn off

            5    their service, right?

            6    A.    Thirty days late, we deprovision their services, yes.

            7    Q.    From the customer's point of view, you turned off their

            8    service, right?

            9    A.    Yes.

10:48:47   10    Q.    And you called it a deprovisioning.  You basically flick a

           11    switch on the modem, and maybe they still get 911, but they

           12    can't do their TV, their phone, their internet, other than the

           13    emergency call?

           14    A.    That is correct.

           15    Q.    And if the customer still hasn't paid for another two

           16    weeks, 14 days, then you do a hard disconnect, right?

           17    A.    Yes.

           18    Q.    And a hard disconnect means you really shut them off,

           19    correct?

10:49:14   20    A.    Yes.

           21    Q.    I want to pull up a slide that you showed about this for a

           22    second.  We have a due date, and then after 30 days, a soft

           23    disconnect, and you've talked about some things here:  texts

           24    and phone calls and e-mails.

           25          Those are all automated things, correct?
```

1         Why don't you just go through and summarize them.

2    A.   Okay.  So I think you read it accurately, and that is what

3    I intend to -- intended to depict here.  I put these slides

4    together in an attempt to explain my opinions.

5         And so, this one relates to the idea that Dr. Lehr

6    has offered opinions that in some instances, like I said, I

7    find to be not supported, not supported by facts, and in some

8    situations are not tied to the accused wrongful acts of Cox.

9         I think I'll explain that in more detail when we get

10   into it.  But he talks about things that are more general harms

11   about piracy generally, but not related to what I understand to

12   be at issue in this lawsuit.  That's what that first one

13   relates to.

14   Q.   Okay.  And the second one?

15   A.   The second is using the infringement notices sent by the

16   RIAA, and assuming that each notice represents a displaced

17   legitimate digital download of each track with a copyright in

18   suit, I've calculated what I've referred to as displaced

19   downloads of $692,000.

20        So for all of the notices, each one, if that was to

21   have a $1 price tag associated with it, that adds up to

22   $692,000, if you pick up each of the tracks that has a

23   copyright in suit in those notices.

24   Q.   And your third opinion?

25   A.   The third is that many users and tracks had few notices.

C.D. Tregillis - Direct

2778

1    Dr. McCabe testified about the fact that there was one, at

2    least, notice that implicated each of the copyrights in suit.

3    And I thought I would go deeper and say, is it more than one or

4    how many?  I thought I would investigate that further.

5    Q.   Now, you testified a moment ago that you have additional

6    slides or information with regard to each of these opinions.

7    So could we start with the first of your opinions.

8         Did you prepare some slides to summarize or help with

9    your testimony in that regard?

10   A.   Yes.  So the first area is, like I said, is my opinion

11   relating to the opinions of Dr. Lehr.

12        And so, what I have done here is put up a slide that

13   was one of his slides in which he talks about, as it says in

14   the title:  Piracy harms copyright holders.

15        So like I was saying a minute ago, this is an opinion

16   about piracy, generally.  This is not an opinion about the

17   accused wrongful acts of Cox.

18        Cox is accused of engaging in its business in a way

19   that is alleged to be wrongful.  Again, I'm not taking on

20   whether it's wrongful or not.  That's not my opinion.  My

21   opinion though is that any time you're talking about

22   quantifying economic harm, it should be the harm relating to

23   the accused wrongful behavior, not piracy generally.

24        So Dr. Lehr, when he talks about the effects of

25   piracy generally, well, piracy has been something that has been

C.D. Tregillis - Direct

2810

1    was about 49,000 and change that didn't have a work in suit,

2    but 113,000 I found that did.

3           And then also, like I said earlier, there are a lot

4    more of these in 2013 than 2014.

5    Q.   Okay.  So what did you do next with this data?

6    A.   If you go to the next slide, I think that -- well, here we

7    go back to that next slide.  And continue one further.  There

8    you go.

9           So what you found -- or what I found is, I was

10   able -- Dr. McCabe said he found all of the 10,017 claimed

11   works in suit.  I was able to find 9,801 of them.  So that's

12   98 percent agreement.

13          There are some examples where I disagreed with him.

14   It really is situations in which he has found what he thinks is

15   the musical composition.  It looked to me like it wasn't the

16   same musical composition.  It might be a different song with

17   the same title, and I thought that he had made an improper

18   connection.

19          But for purposes of my analysis, I'm just giving him

20   the benefit of the doubt.  It's only 2 percent, so I'm just

21   going to assume all of them, even if I disagree.  I'm going to

22   give him those anyway for purposes of my analysis.

23   Q.   Okay.  So let's go to the -- you looked at the notices and

24   tracks.  Let's go to the next slide, and this is:  Displaced

25   download and revenue share to plaintiffs.

C.B. Tregillus - Direct

2811

1          So what does this depict and how does this relate to

2   your conclusions and analysis.

3   A.   Well, like I was saying earlier, I calculated displaced

4   downloads of $692,000.  So I tried to put together a graph to

5   explain what that means.  What that means is, we have examples

6   where this user on the left has gotten files from those three

7   people that are each through BitTorrent making files available

8   and pieces of files that could be assembled on that user on the

9   left's computer.

10          What I'm saying is, if that didn't happen and it

11   didn't go through path 2 and it went through path 1, then what

12   does that turn into?

13          And you can see if that had been a legitimate

14   download, it would have been a purchase for between $0.79 and

15   $1.29 through iTunes.  And there's a part of that, a revenue

16   share that goes to the plaintiffs.

17          So for those that, like I said, it's a range of $0.79

18   up to $1.29, I looked at the information that the plaintiffs

19   produced about how much their revenue share is, and I rounded

20   it up.  And it looks at about $0.90 for sound recordings and

21   $0.10 for musical compositions.

22          And so, I used that in my calculation of the money

23   that the plaintiffs would have gotten if these downloads, that

24   group of downloads had gone through channel 1, had all been

25   iTunes types of purchases, instead of getting them from

1   BitTorrent or another peer-to-peer network.

2   Q.   Okay.  So did you do any analysis or make any assumptions

3   with regard to whether if someone downloaded a song, whether

4   that same person would have purchased that same song from

5   iTunes if they were unable to download it?

6   A.   Yes.  I think Dr. Lehr testified about that.  There was a

7   question for many of these people who are going the route of

8   BitTorrent, would these people, if they weren't able to do that

9   and go through BitTorrent or a peer-to-peer network, would they

10  have purchased something from the plaintiffs?

11         Dr. Lehr said that it might not be all of them.  And

12  I agree, it might not be all of them.  But for purposes of my

13  analysis, I assumed every one of them, even if it's somebody

14  that maybe wouldn't have, I'm assuming they all would have

15  bought a download through iTunes or a similar source.

16  Q.   Okay.  So you talked about looking at the tracks and the

17  notices.  And so, what did you find or conclude after looking

18  at them and comparing them?

19  A.   I think if you go to the next slide, you can see here the

20  results of what I found.

21         And that is, there are 677 total, what I call, track

22  notices.  So I described earlier how there is that dataset of

23  the notices of about 162,000, about 113,000 of which contain

24  the works in suit.  But this shows that there are about six

25  tracks per notice, because there are a lot of albums.

C.D. Tregillis - Direct

2813

1    And so, if you say that each one -- let's say there's

2  an album of ten tracks, that's going to turn into $10 that

3  would go to the plaintiffs for purposes of my analysis, because

4  it depends on how many tracks are in each notice.

5    And so, all of the tracks in all of the notices gets

6  you to 677,000 of the ones that I was able to trace.  And that

7  is for a total of 7,421 tracks that are covered by those 9,801

8  works in suit that I found.

9    So it's a little higher if you give the benefit of

10 the doubt to Dr. McCabe and the plaintiffs.  Instead of 9,801

11 works in suit, then it goes all the way up to the 10,017.  And

12 7,421 becomes 7,608.

13 Q.  You used the term "a conservative approach or analysis"

14 several times.  What do you mean by that?

15 A.  There were multiple times in my analysis where I used what

16 I thought were conservative inputs.  Like, for example,

17 assuming all of these would have turned into legitimate

18 downloads that the plaintiffs would have gotten paid for.

19 That's an example.

20    But I think in the next slide, perhaps -- there you

21 go.

22    So you can see in the next slide that there is the

23 benefit of the doubt on that 2 percent.  So although there are

24 some with which I think Dr. McCabe, I think, got it wrong, I'm

25 saying, put those in there anyway.

C.D. Tregillis - Direct

2814

1          Also, I'm giving the plaintiffs a dollar per track no

2    matter how -- what copyright they hold.  Because as we

3    described earlier, like the Nicki Minaj track where they just

4    have a musical composition, if all they have is the musical

5    composition, they would only get the $0.10 musical composition

6    royalty for their revenue share.

7          If they have just a sound recording, like with Katy

8    Perry, they just would get $0.90.

9          I have assumed that for all of the 7,421 tracks, they

10   have all -- well, actually 7,608, I'm assuming -- because I'm

11   giving them the benefit of the doubt, I'm going -- I'm adding

12   that 2 percent in there.

13         So for all 7,608, they get credit for having a sound

14   recording and a musical composition, even if they only have

15   one, which is frequently.  Normally they have only one.  I gave

16   them the benefit of having both, gave them a dollar, not just

17   $0.90 or $0.10.

18   Q.   And you used the word "track."  What do you mean by

19   tracks?

20   A.   Well, like I said, a track is a song.  And so, you have

21   copyrights, there are 10,017 copyrights, but only 7,608 tracks.

22   And that's because some of the tracks have both a copyright

23   and -- a copyright and a musical composition and a sound

24   recording.  So you're going to have fewer.  There's a piece

25   that have just one, there's a piece that have just the other,

2837

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,         :
                               :
      -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.         :
                               :
-------------------------------:
```

VOLUME  11   (P.M. Portion)

TRIAL TRANSCRIPT

December 17, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

2838

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                  SCOTT A. ZEBRAK, ESQ.
                                  JEFFREY M. GOULD, ESQ.
4                                 MICHAEL J. DRUCKMAN, ESQ.
                                  ANDREW L. GUERRA, ESQ.
5                                 LUCY G. NOYOLA, ESQ.
                                  JIA RYU, ESQ.
6                                 Oppenheim + Zebrak, LLP
                                  4530 Wisconsin Avenue, N.W.
7                                 5th Floor
                                  Washington, D.C. 20015
8

9    FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                  GEOFFREY P. EATON, ESQ.
10                                Winston & Strawn LLP
                                  1700 K Street, N.W.
11                                Washington, D.C. 20006-3817
                                    and
12                                SEAN R. ANDERSON, ESQ.
                                  MICHAEL S. ELKIN, ESQ.
13                                THOMAS P. LANE, ESQ.
                                  CESIE C. ALVAREZ, ESQ.
14                                Winston & Strawn LLP
                                  200 Park Avenue
15                                New York, NY 10166-4193
                                    and
16                                JENNIFER A. GOLINVEAUX, ESQ.
                                  THOMAS J. KEARNEY, ESQ.
17                                Winston & Strawn LLP
                                  101 California Street, 35th Floor
18                                San Francisco, CA 94111-5840
                                    and
19                                MICHAEL L. BRODY, ESQ.
                                  Winston & Strawn LLP
20                                35 West Wacker Drive
                                  Chicago, IL 60601
21                                  and
                                  DIANA HUGHES LEIDEN, ESQ.
22                                Winston & Strawn LLP
                                  333 South Grand Avenue
23                                Suite 3800
                                  Los Angeles, CA
24

25
```

2839

## INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| CHRISTIAN D. TREGILLIS (Resumed) | | |
| | CROSS | 2840 |
| | REDIRECT | 2852 |
| TERRENCE PATRICK McGARTY | | |
| | DIRECT | 2864 |
| | CROSS | 2887 |

COURT'S JURY INSTRUCTIONS

| THE COURT | | 2912 |
|---|---|---|

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

2840

1                    A F T E R N O O N   S E S S I O N

2            NOTE:  The December 17, 2019, afternoon portion of

3  the case begins in the absence of the jury as follows:

4  JURY OUT

5            THE COURT:  Ready for the jury?

6            MR. ZEBRAK:  Yes, Your Honor.

7            THE COURT:  Okay.  Joe, let's get our jury, please.

8            NOTE:  At this point, the jury returns to the

9  courtroom; whereupon, the case continues as follows:

10 JURY IN

11           THE COURT:  All right.  Please have a seat.

12           Mr. Zebrak, please continue, sir.

13           MR. ZEBRAK:  Thank you, Your Honor.

14         CHRISTIAN D. TREGILLIS, DEFENDANTS' WITNESS,

15                   PREVIOUSLY SWORN, RESUMED

16                   CROSS-EXAMINATION (Cont'd.)

17 BY MR. ZEBRAK:

18 Q.   Good afternoon, Mr. Tregillis.

19 A.   Hi.

20 Q.   Do you recall that just before the lunch break, we were

21 talking about your damages calculations?

22 A.   I think it was an analysis of economic harm; that's

23 right.

24 Q.   With respect to your analysis of economic harm, you

25 multiplied the infringement notices times a royalty rate,

C. D. Tregillis - Cross

2841

1   correct?

2   A.   Right.  The revenue share that would go to the

3   plaintiffs, a dollar.

4   Q.   Okay.  So before lunch, we already talked about what you

5   used for the quantity.  I'd like to now talk about the royalty

6   rate that you applied.  Okay?

7   A.   Okay.  Great.

8   Q.   Now, you used a dollar per notice, right?

9   A.   Right.

10  Q.   Okay.  And you used the dollar because that was your

11  calculation, sort of the average cost of a single-track

12  download from iTunes, correct?

13  A.   Not exactly.  A single-track download from iTunes is

14  somewhere between $0.79 and $1.29.  In production, you and

15  your clients provided information that told me how much of

16  that you get, and for sound recordings, you get up to about

17  $0.90, and for musical compositions, you get $0.10.  So I used

18  all of that, assuming you get all of the musical compositions

19  and all sound recordings, even though those -- that's not

20  actually the case, but that's where those come from, is your

21  disclosures.

22  Q.   All right.  The activity for which that rate applied was

23  the single-track download for digital download from iTunes,

24  correct?

25  A.   It's based on the $0.79 up to a $1.29 for a single-track

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

C. D. Tregillis - Cross

2842

1  download, that's right.

2  Q.   Right.  And you looked to the single-track download rate

3  because you understood that these tracks were available for

4  purchase on an individual basis on iTunes, correct?

5  A.   Right.

6  Q.   Now, in choosing a royalty rate, it's true, is it not,

7  sir, that it's important that the royalty rate fit the

8  economic realities of the situation that you're applying it

9  toward, correct?

10  A.   Yes.

11  Q.   And the single-track download rate when someone buys a

12  track from iTunes, that's the rate for obtaining the track for

13  personal use, correct?

14  A.   Yes.

15  Q.   That price is not the price for authorization to

16  distribute it to countless people through a peer-to-peer

17  network, correct?

18  A.   That's right.  It's for an individual to purchase and use

19  that track.  That's my understanding of it.

20  Q.   Right.  And it's also your understanding, sir, that

21  plaintiffs have never granted a license for anyone to

22  distribute their music all across peer-to-peer networks on an

23  unlimited basis, correct?

24  A.   That's right.

25  Q.   The cost of that would be enormous, correct?

C. D. Tregillis - Cross

2843

1    A.    I don't think so in this situation for the fact -- like

2    you just described, the economic realities of this, what's

3    happening here, which I talked about somewhat in my direct --

4    Q.    So --

5    A.    -- I don't think -- I don't think it would call for an

6    enormous rate at all.

7              I think my rate is appropriate.

8    Q.    All right.  Well, again, we just reviewed, your rate is

9    the rate for, for the activity of someone buying a

10   single-track download for their own personal use, right?

11   That's what we talked about?

12   A.    That's right.  That's what I was able to observe is that

13   rate.

14   Q.    Right.  I understand.

15             I'd like to run through a few of your slides with

16   you, sir.

17             Mr. Duval, would you please call it up on the

18   screen, beginning with slide 20?  Next slide, please.  Thank

19   you.

20             Now, is this a slide that you participated in the

21   preparation of?

22   A.    I did it all myself actually.

23   Q.    So this is the rate you used, right?

24   A.    It's the basis for the rate.  I used the rate that's

25   reflected in the $0.90 and $0.10 over to the right on the

1          THE COURT:  Do you want to give them -- do you want

2     me to excuse the jury, give them 15 minutes, and we'll --

3     where are we going after your preliminary?

4          MR. ELKIN:  I just wanted to make a, just make a

5     brief, quick proffer regarding the sound recordings and music

6     publishing, if I can, with regard to the, what's in the

7     record.

8          THE COURT:  Yes, sir.

9          MR. ELKIN:  I'll be quick about it.

10         THE COURT:  No, that's fine.

11         MR. ELKIN:  So this is based on the exhibits that

12    Your Honor provisionally admitted subject to their review.

13         THE COURT:  This is the 7,200?

14         MR. ELKIN:  Yes.  So with regard to -- so I have two

15    examples, two exemplars.  One is the sound recordings, and one

16    is the publishing.

17         So what you have here under Plaintiff's Exhibit

18    4281, this is a sound recording for -- the title is "Dookie,"

19    Green Day, which is a -- covered by a separate registration,

20    and it has nine different sound recordings on it, and there is

21    another -- yes, so this is with regard to the -- this is --

22    all of these tracks, Your Honor, are actually part of the

23    works in issue in the case.

24         THE COURT:  All right.

25         MR. ELKIN:  And then with regard to -- I can hand

2858

1    this out to, to Your Honor.

2              THE COURT:  Thank you.

3              MR. ELKIN:  Then with regard to the publishing

4    example of that, and this is Plaintiff's Exhibit 369, this

5    is -- the title of the work is Chris Brown, "I Can Transform

6    Ya," and this is a music composition.

7              And there is in the case under Plaintiff's Exhibit

8    1833 a sound recording which is owned by Sony Music which has

9    the Chris Brown song "I Can Transform Ya."  So I wanted to

10   hand that up for consideration.

11             THE COURT:  Are these exhibits admitted previously

12   or we'll consider that in a minute?

13             MR. ELKIN:  They were provisionally --

14             THE COURT:  These are part of the 7,200

15   registrations?

16             MR. OPPENHEIM:  It's part of the 7,200 registrations

17   that we'll file something on after we review them posttrial.

18             MR. ELKIN:  I just wanted to make the proffer, Your

19   Honor, before we rest.

20             THE COURT:  Okay.

21             MR. ELKIN:  That was the only purpose of this.

22             MR. OPPENHEIM:  Can we --

23             MR. ELKIN:  I'm not trying to sandbag anyone.  I

24   just wanted to make sure, we understood Your Honor reserved

25   your decision on the issue from last night, and I wanted to

2859

```
1    make sure that we at least got that in.

2              THE COURT:  Okay.

3              MR. ELKIN:  And then the other thing is with regard

4    to the Rule 50 motion, let me just cover the --

5              MR. OPPENHEIM:  I'm sorry, can I just have a

6    question?  Is this not --

7              MS. GOLINVEAUX:  Yeah, cross that out.

8              MR. OPPENHEIM:  Okay.  Thank you.  Sorry.  Go ahead.

9              MR. ELKIN:  That was a holdover.

10             So there were six issues that we moved under:  the

11   504(c) on derivative works; the 504(c) on compilations; on

12   direct infringement, both distribution and reproduction;

13   contributory, no material contribution; vicarious both as to

14   no direct financial interest and no ability to supervise; and

15   then finally, no direct infringement by business owners, sort

16   of keying off of the Cobbler case.  Those are the --

17             THE COURT:  Right.  Do you want to preserve your --

18   by Rule 50, yes.

19             Do you want to respond?

20             MR. OPPENHEIM:  We also would like to make a Rule 50

21   motion, Your Honor.  If you want to excuse the jury, that's

22   fine, or I'll do it right now orally.

23             THE COURT:  Yeah, go ahead.  Do it now.

24             MR. OPPENHEIM:  Your Honor, we believe that pursuant

25   to Rule 50, plaintiffs have demonstrated both their
```

1          So I think right there, you can say the jury would

2     have no idea what to do with it, but I think more

3     fundamentally, Your Honor, the decision of which tortfeasor to

4     sue is not mitigation.  That's the option copyright

5     fundamentally gives to a copyright owner when there are

6     multiple infringers.

7          So I think, I think for that reason, it's wrong.

8     And ultimately, it really does smack of blaming the victim

9     here.  You know, the record companies and music publishers

10    should have the option of suing who they want to sue, without

11    having it thrown in their face, oh, you should have sued the

12    other guy, which is, which is what's being claimed here.

13         So Your Honor ruled on summary judgment and, and

14    eliminated two of the three mitigation defenses.  We've not

15    objected to the presentation of evidence on the issue.  That

16    evidence is before the jury.  The jury obviously under the

17    statutory damage factors can consider anything it wants, it

18    can consider that, but a mitigation instruction is a step too

19    far, Your Honor, I believe.

20         THE COURT:  Okay.

21         MR. OPPENHEIM:  With respect to the, I guess, the

22    first issue you raised, which is the album track issue, I

23    believe -- we had lengthy argument on this morning, and I

24    don't want to repeat that, but I believe that what Your Honor

25    said was that you would conditionally admit it subject to our

2902

1  submitting something posttrial on it but that the parties were

2  not permitted to use those documents for purposes of the trial

3  with respect to witnesses and in closing.

4      And I think what I understand Mr. Elkin to be saying

5  is now something somewhat contrary, which is, well, the jury

6  can look at this in the back.

7      I don't see how they could do that.  It's only been

8  conditionally admitted.  Certainly we don't expect them to go

9  through 7,200 different registrations, which we haven't even

10  reviewed yet.

11      So I don't think that there's anything that the jury

12  has presented to them on the registration issue.  They do,

13  however, have evidence and testimony repeatedly on these

14  issues that are favorable to the plaintiffs and contrary to

15  the defendants' arguments.  Mr. Kokakis testified at some

16  great length about the difference between sound recordings and

17  published works and that they have independent economic value,

18  they have different licensing schemes, different revenues,

19  different owners.  He testified at that at some length.

20      We always had experts, such as Mr. Tregillis, who

21  testified that every work in this suit was offered

22  individually on iTunes, showing that they're individually

23  marketed.

24      So the plaintiffs have a record to support the

25  positions that they've taken with respect to these two

2903

1    copyright issues.  The defendants could have presented

2    evidence on it.  They chose not to.  I don't believe giving an

3    instruction to the jury on those issues right now will leave

4    the jury with any sense what to do with them because they have

5    nothing in front of them to understand what they mean.

6              THE COURT:  All right.  Mr. Elkin?

7              MR. ELKIN:  Thank you, Your Honor.  I'll be brief.

8    There was a reference to last night's charging conference, and

9    I think Mr. Oppenheim just doubled down on this notion of

10   joint tortfeasors.  This is not a situation where Cox and the

11   subscribers are jointly being pursued for direct infringement.

12   There's a different standard for secondary infringement.

13             It then -- what the standard is for direct

14   infringement, I'm not going to -- Your Honor knows the

15   additional requirements, so he's really comparing apples to

16   oranges.

17             I don't want to repeat and rehash the same

18   arguments.  I think you have it.  I just -- I do think in the

19   circumstances, we did not question Mr. Tregillis on the issues

20   about which you instructed us not to.  The notion that somehow

21   his testimony could be used against us when we were precluded

22   from producing the information is ironic, but I just harken

23   back to the argument that I made with regard to the

24   certificates.  I didn't think that Your Honor had precluded

25   the certificates to be a bar to -- for us to pursue this.  It

1    had to do more with the bar to using it in the case, and we

2    declined, of course, and pursuant to Your Honor's order, did

3    not even go there.

4            THE COURT:  Well, I make rulings on individual

5    pieces of evidence, and you-all map out how you want to put

6    your case on, what witnesses you want to put in, and what

7    testimony you believe is appropriate and admissible, and then

8    I look at the end of the case to see what's there and what's

9    not there, and so I -- and when you have experts testifying,

10   as I've demonstrated, I think they should be held to the

11   confines of their reports.  They get, you know, rebuttal

12   reports.  They get beginning reports, rebuttal, surrebuttal

13   reports.  There shouldn't be any surprises.  So the

14   limitations I've imposed on expert testimony is based on, on

15   the notice requirements under Rule 26.

16           And the registrations, obviously, we looked at them

17   at the issue when it was, when it was initially offered on

18   summary judgment and ownership and registration issues, and

19   then it comes up again yesterday with these 7,200, which

20   there's just no testimony as to what's in that pile.

21           And so to now somehow expect the jury to pluck out

22   the works that are both sound recordings and music

23   compositions or allow you to, I guess, in closing arguments

24   just say, listen, there's 4,000 of these or 3,000 of these are

25   both one and the other, that, I think, is improper.

2905

1           I expected that there would be testimony about how

2   many of these sound recordings were also music compositions,

3   and the jury would be -- would have that evidence through the

4   witness stand when they were deliberating.

5           I mean, it's a close issue even to begin with as to

6   whether in this day and age, when the courts have clearly been

7   looking at the independent value of the works versus whether

8   they're music compositions and sound recordings, and I'm not

9   sure that Mr. Oppenheim isn't correct that we shouldn't even

10  be looking at the traditional Second Circuit analysis that

11  you've cited and is one of the governing cases, but I just

12  don't see that there's evidence from which they could collect

13  and cull and determine whether they wanted to combine the

14  statutory damages award for those works that are -- contained

15  both sound recordings and music compositions.

16          So I'm going to find that they should be allowed to

17  deliberate on the 10,017 individual works, regardless of

18  whether they're compositions or sound recordings, and your

19  exception, of course, is noted.

20          The other issue on mitigation, you know, I didn't

21  know how that would go in the course of the trial, but, you

22  know, clearly we had the instruction that I gave in BMG

23  talking about the -- that the mitigation instruction included

24  both that plaintiffs had failed to use reasonable efforts to

25  mitigate damages and also that the amount by which damages

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1   would have been mitigated, and there's absolutely an absence

2   of any evidentiary testimony about, you know, how they would

3   look at that.

4           I mean, the worst of the worst -- that's no standard

5   from which they could say, okay, there is -- and there's no

6   testimony about who are the worst the worst.  I mean, there

7   are a couple of isolated occasions where there were a hundred

8   or more or a thousand for business customers where the

9   testimony was about, but that's not a standard that they could

10  look at and reasonably deliberate on, on where's that line

11  drawn.

12          So I'm not going to give the mitigation instruction,

13  either, and again, your exception is noted.  I don't find that

14  the evidence -- you know, there is the Trickey testimony.

15  There was the John Doe lawsuits, and so that evidence is out

16  there, but when you compare that to what the jury would be

17  asked to deliberate, and I think that mitigation instruction

18  is the correct instruction to give to the jury, I find that

19  none of that evidence weighs on those issues.

20          So again, your exception is noted.

21          MR. ELKIN:  I understand, Your Honor.  May I just

22  clarify two issues on Your Honor's last ruling?

23          THE COURT:  Yes, sir.

24          MR. ELKIN:  One is with regard to the mitigation,

25  just to be clear, I don't know this is going to alter Your

2911

1   conclusion of which the case continues in the absence of the

2   jury as follow:

3   JURY OUT

4           THE COURT:  All right.  Any final comments before I

5   charge the jury?

6           MR. OPPENHEIM:  The jury instructions look good to

7   plaintiffs, Your Honor.

8           We have a suggestion on the verdict form, but we can

9   deal with that after we charge the jury and let them go.

10          THE COURT:  Okay.  That's fine.

11          All right.  Then, Joe, let's get our jury, please.

12          MR. EATON:  Your Honor, just from our point of view,

13  we agree about the verdict form, that won't be hard to fix.

14          We are fine with the jury instructions.

15          And at the risk of being belts and braces, I just

16  want to make sure we have fully preserved all of our

17  objections.

18          THE COURT:  Certainly, you are preserved.

19          MR. EATON:  Thank you, sir.

20          MR. OPPENHEIM:  And similarly plaintiffs.

21          THE COURT:  Yeah, similarly plaintiffs.

22          Yes, sir, now we're ready, Joe.

23          If you kind of head towards the podium, Mr. Eaton --

24  Mr. Eaton, if you head towards the podium, then I understand

25  there's something that you want to -- want say.  And I look

2912

1    around and my signal is that somebody is heading towards the

2    podium.

3           MR. EATON:  Sorry.  Understood.

4           THE COURT:  No, that's all right.

5           NOTE:  At this point the jury returns to the

6    courtroom; whereupon the case continues as follows:

7    JURY IN

8           THE COURT:  All right, please have a seat.

9           So this will take a little awhile.  And I don't do

10   this for a living, fortunately.

11          So I'll read the instructions to you.  The good news

12   is you'll have copies of the instructions when you are

13   deliberating, we'll send several copies back for you to refer

14   to if you need it.  But I appreciate you trying to listen

15   while I go through them tonight.

16          And then, as you know, we're going to excuse you for

17   the evening and then come back and have closing arguments in

18   the morning.

19          Does 9 o'clock work for you all in the morning?

20   Okay, then we'll plan on coming back at 9 a.m. for closing

21   arguments, and then you'll get the case for deliberation.

22          All right.  Now that you've heard the evidence in

23   the case, it's my duty to instruct you on the applicable law.

24   It is your duty to follow the law as I state it.  You must

25   apply the law to the facts as you find them from the evidence

2913

1    in the case.  Do not single out one instruction as stating the

2    law, but consider the instructions as a whole.  Do not be

3    concerned about the wisdom of any rule of law.  You must

4    follow and apply the law.

5         The lawyers may refer to some of the governing rules

6    of law in their arguments.  If there is any difference between

7    the law as stated by me versus by the lawyers, you must follow

8    these instructions.

9         Nothing I say in these instructions indicates that I

10   have an opinion about the facts of the case.  You're not --

11   you, not I, have the duty to determine the facts.

12        You must perform your duties as jurors without bias

13   or prejudice as to any party.  The law does not permit you to

14   be controlled by sympathy, prejudice, or public opinion.  All

15   parties expect that you will carefully and impartially

16   consider all the evidence, follow the law as it is now being

17   given to you, and reach a just verdict regardless of the

18   consequences.

19        Unless you're otherwise instructed, the evidence in

20   the case consists of the sworn testimony of the witnesses,

21   including deposition testimony, regardless of who called the

22   witness, all exhibits received in evidence regardless of who

23   may have produced them, and all facts and events that may have

24   been admitted to or stipulated to.

25        Statements and arguments by the lawyers are not

2914

1    evidence.  The lawyers are not witnesses.  What they have said

2    in their opening statements or what they will say in closing

3    arguments and at other times is intended to help you

4    understand the evidence, but it's not the evidence.  However,

5    when the lawyers on both sides stipulate or agree on the

6    existence of a fact, unless otherwise instructed, you must

7    accept the stipulation and regard that fact as proved.

8            If I have taken judicial notice of a fact or

9    instructed you that certain facts have already been

10   established, you must accept it as true.

11           Any evidence to which I have sustained an objection

12   and evidence that I have ordered stricken must be entirely

13   disregarded.

14           If a lawyer asks a witness a question that contains

15   an assertion of fact, you may not consider the assertion as

16   evidence of the fact.  The lawyer's questions and statements

17   are not evidence.

18           During the trial I may sometimes ask a witness

19   questions.  Please do not think I have any opinion about the

20   subject matter of my questions.  I may ask a question simply

21   to clarify a matter, not to help one side of the case or harm

22   the other side.

23           Remember at all times that you as the jurors are the

24   sole judges of the facts in the case.

25           It's my duty to caution or warn an attorney who does

1    something I believe is not in keeping with the rules of

2    evidence or procedure.  You are not to draw any inference

3    against the side I may caution or warn during the trial.

4         Testimony exhibits -- and exhibits may be admitted

5    into evidence during the trial only if they meet certain

6    criteria or standards.  It's the lawyer's duty to object when

7    the other side offers testimony or an exhibit that a lawyer

8    believes is not properly admissible under the rules of law.

9    Only by offering an objection can a lawyer request and obtain

10   a ruling from me on the admissibility of the evidence being

11   offered by the other side.  You should not be influenced

12   against any lawyer or the client because the lawyer has made

13   objections.

14        Do not attempt to interpret my rulings on objections

15   as somehow indicating how I think you should decide the case.

16   I'm simply making a ruling on a legal question.

17        There's nothing particularly different in the way

18   that a juror should consider the evidence in a trial from that

19   which any reasonable and careful person would deal with any

20   very important question that must be resolved by examining

21   facts, opinions, and evidence.  You are expected to use your

22   good sense in considering and evaluating the evidence in the

23   case.  Use the evidence only for those purposes for which it

24   has been received, and give the evidence a reasonable and fair

25   construction in the light of your common knowledge of the

1   natural tendencies and inclinations of human beings.

2           If any reference by the Court or by counsel to

3   matters of testimony or exhibits does not coincide with your

4   own recollection of that evidence, it's your recollection

5   which should control during your deliberations and not the

6   statements of the Court or of counsel.

7           As I said, you're the judges of the evidence

8   received in the case.

9           Sometimes evidence may be admitted for a particular

10  purpose and not generally for all purposes.  You may recall

11  that during the course of this trial I instructed you that

12  I've admitted certain evidence for a limited purpose.  You

13  must consider this evidence only for the limited purpose for

14  which it was admitted.

15          Plaintiffs have the burden of proving their case by

16  what's called the preponderance of the evidence.  That means

17  plaintiffs have to prove to you, in light of all the evidence,

18  that what they claim is more likely so than not so.

19          To say it differently, if you were to put the

20  evidence favorable to plaintiffs and the evidence favorable to

21  defendants on opposite sides of the scale, plaintiffs would

22  have to make the scales tip somewhat on their side.

23          If you find after considering all the evidence that

24  a claim or fact is more likely so than not so, then the claim

25  or fact has been proved by a preponderance of the evidence.

2917

1    This standard does not require proof of an absolute certainty

2    since proof of an absolute certainty is seldom possible in any

3    case.

4         In determining whether any fact in issue has been

5    proved by a preponderance of the evidence, unless otherwise

6    instructed, you may consider the testimony of all witnesses

7    regardless of who may have called them, all exhibits received

8    in evidence regardless of who may have produced them.

9         You may have heard of the term "proof beyond a

10   reasonable doubt."  That's a stricter standard applicable in

11   criminal cases.  It does not apply in civil cases such as

12   this.  And you should, therefore, not consider it.

13        Generally speaking, there are two types of evidence

14   presented during a trial, direct and circumstantial evidence.

15   Direct evidence is proof that does not require an inference,

16   such as testimony of someone who claims to have personal

17   knowledge of a fact.

18        Circumstantial evidence is proof of a fact or a

19   series of facts that tends to show that some other fact is

20   true.

21        As an example, direct evidence that it is raining is

22   testimony from a witness who says, I was outside a minute ago

23   and I saw it raining.

24        Circumstantial evidence that it is raining is the

25   observation of someone entering a room carrying a wet

2918

1   umbrella.

2          The law makes no distinction between the weight or

3   value to be given to either direct or circumstantial evidence.

4   A greater degree of certainty is not required of

5   circumstantial evidence.

6          In reaching your verdict, you should consider all

7   the evidence in the case, including both direct and

8   circumstantial evidence.

9          You are to consider only the evidence in the case.

10  However, you are not limited to the statements of the

11  witnesses.  You may draw from the facts you find that have

12  been proved such reasonable inferences as seemed -- as seem

13  justified in light of your experience.

14         Inferences are deductions or conclusions that reason

15  and common sense lead you to draw from facts established by

16  the evidence in the case.

17         You are the sole judges of the credibility of the

18  witnesses and the weight that their testimony deserves.  You

19  may be guided by the appearance and conduct of a witness, or

20  by the manner in which a witness testifies, or by the

21  character of the testimony given, or by evidence contrary to

22  the testimony.

23         You should carefully examine all the testimony

24  given, the circumstances under which each witness has

25  testified, and every matter in evidence tending to show

2919

1    whether a witness is worthy of belief.  Consider each witness'

2    intelligence, motive and state of mind, and demeanor or manner

3    while testifying.

4         Consider the witness' ability to observe the matters

5    to which the witness has testified, and whether the witness

6    impresses you as having an accurate recollection of these

7    matters.  Also, consider any relation each witness may have

8    with either side of the case, the manner in which each witness

9    might be affected by the verdict, and the extent to which the

10   testimony of each witness is either supported or contradicted

11   by other evidence in the case.

12        Inconsistencies or discrepancies in the testimony of

13   a witness or between the testimony of different witnesses may

14   or may not cause you to discredit such testimony.  Two or more

15   witnesses -- persons seeing an event may see or hear it

16   differently.

17        In weighing the effect of a discrepancy, always

18   consider whether it pertains to a matter of importance or an

19   unimportant detail, and whether the discrepancy results from

20   innocent error or intentional falsehood.

21        After making your own judgment, you'll give the

22   testimony of each witness such weight, if any, that you think

23   deserves.  In short, you may accept or reject the testimony of

24   any witness in whole or in part.

25        In addition, the weight of the evidence is not

2920

1    necessarily determined by the number of witnesses testifying

2    to the existence or non-existence of any fact.  You may find

3    that the testimony of a small number of witnesses as to any

4    fact is more credible than the testimony of a larger number of

5    witnesses to the contrary.

6            A witness may be discredited or impeached by

7    contradictory evidence or by evidence that at some other time

8    the witness said or did -- or has said or done something, or

9    has failed to say or do something that is inconsistent with

10   the witness' present testimony.

11           If you believe any witness has been impeached and

12   thus discredited, you may give the testimony of that witness

13   such credibility, if any, you think it deserves.

14           If a witness is shown knowingly to have testified

15   falsely about any material matter, you have a right to

16   distrust such witness' other testimony, and you may reject all

17   the testimony of that witness or give it such credibility as

18   you think it deserves.

19           An act or omission is knowingly done if the act is

20   done voluntarily and intentionally, and not because of mistake

21   or accident or innocent reason.

22           The rules of evidence ordinarily do not permit

23   witnesses to testify as to opinions or conclusions.  There is

24   an exception to this rule for expert witnesses.

25           An expert witness is a person who by education and

**JA796**

2921

1  experience has become expert in some art, science, profession,

2  or calling.  Expert witnesses may state their opinions as to

3  matters in which they profess to be expert, and may also state

4  their reasons for their opinions.

5        You should consider each expert opinion received in

6  evidence in this case and give it such weight as you think it

7  deserves.  If you should decide the opinion of an expert

8  witness is not based on sufficient education and experience,

9  or if you should conclude that the reasons given in support of

10  the opinion are not sound, or if you feel the expert's opinion

11  is outweighed by other evidence, you may disregard the opinion

12  entirely.

13        During the trial certain testimony has been

14  presented by way of deposition.  The deposition consisted of

15  sworn, recorded answers to questions asked of the witnesses in

16  advance of the trial by attorneys for the parties in the case.

17  The testimony of a witness who, for some reason, is not

18  present to testify from the witness stand may be presented in

19  writing under oath or on a videotape.  Such testimony is

20  entitled to the same consideration and is to be judged as to

21  credibility, weighed, and otherwise considered by you, insofar

22  as possible, in the same way as if the witness had been

23  present and had testified from the witness stand.

24        Each party has introduced into evidence certain

25  interrogatories; that is, questions together with answers,

2922

1    signed and sworn to by another party.  A party is bound by its

2    sworn answers.

3          By introducing an opposing party's answers to

4    interrogatories, the introducing party does not bind itself to

5    these answers.  The introducing party may challenge the

6    opposing parties' answers in whole or in part or may offer

7    contrary evidence.

8          As I stated in my initial instructions at the

9    beginning of the case, you have heard testimony now and seen

10   documents that refer to the Digital Millennium Copyright Act,

11   known as the DMCA.  The DMCA provides that an internet service

12   provider, like Cox, may have a defense to liability arising

13   from infringement on its network and that there is a defense

14   called a safe harbor defense, which is included in the DMCA in

15   part of that statute.  It's not a defense for Cox in this

16   case.

17         However, the fact that the safe harbor provision

18   does not apply does not bear adversely on the consideration of

19   a defense by Cox that Cox's conduct is not infringing under

20   the Copyright Act or any other defense.

21         I will be sending the exhibits that have been

22   received in evidence during the trial back to you, and you

23   will have them while you deliberate.

24         A copyright is a set of rights granted by federal

25   law to the owner of an original work of authorship.  The owner

2923

1   of a copyright has the exclusive right to:  One, reproduce the

2   copyrighted work.

3           Two, prepare derivative works based upon the

4   copyrighted work.

5           Three, distribute copies or phone records --

6   phonorecords of the copyrighted -- to the public by sale or

7   other transfer of ownership or by rental, lease, or lending.

8           Four, perform publicly a copyrighted literary work,

9   musical work, dramatic work, choreographic work, pantomime

10  work, or motion picture.

11          Five, display publicly a copyrighted literary work,

12  music work, dramatic work, choreographic work, pantomime work,

13  pictorial work, graphic work, sculptural work, or the

14  individual images of a motion picture.

15          The term "owner" includes the author of the work, an

16  assignee, and an exclusive licensee.

17          This case involves two kinds of copyrighted works:

18  Sound recordings, i.e., recorded music, and musical

19  compositions, which include music and lyrics.

20          In this case, plaintiffs contend that Cox is

21  contributorily and vicariously liable for the infringement of

22  plaintiffs' 10,017 copyrighted works by users of Cox's

23  internet service.

24          Plaintiffs have already established that they are

25  the owners of the 10,017 copyrighted works as issue -- at

1   issue in this case, and that the copyright and registration in

2   each of these 10,017 works is valid.

3         Plaintiffs have also established the knowledge

4   element of their contributory infringement claim.  That is,

5   plaintiffs have established that Cox had specific enough

6   knowledge of the infringement occurring on its network that

7   Cox could have done something about it.

8         In order to prove contributory or vicarious

9   copyright infringement, plaintiffs must first establish by a

10  preponderance of the evidence that users of Cox's internet

11  service used that service to infringe plaintiffs' copyrighted

12  works.

13        Plaintiffs are not required to prove the specific

14  identities of the infringing users.

15        A copyright owner's exclusive right to distribute,

16  reproduce, and copy its copyrighted work is infringed by the

17  downloading or uploading of the copyrighted work without

18  authorization.

19        If you find that users of Cox's internet service

20  uploaded or downloaded all or part of plaintiffs' copyrighted

21  works at issue without authorization, then plaintiffs have

22  established that the users of Cox's internet service have

23  infringed plaintiffs' copyrighted works.

24        A copyright may be infringed by contributory

25  infringing.  With certain exceptions, a person is liable for

2925

1  copyright infringement by another if the person knows or was

2  willfully blind to the infringing activity and induces,

3  causes, or materially contributes to the activity.

4        Plaintiff has the burden of proving each of the

5  following by a preponderance of the evidence:  First, that

6  there was direct infringement of plaintiffs' copyrighted works

7  at issue by users of Cox's internet service.

8        Second, that Cox knew of specific instances of

9  infringement or was willfully blind to such instances.

10        And, third, that Cox induced, caused, or materially

11  contributed to the infringing activity.

12        The second element, that Cox knew of the specific

13  instances of infringement, has already been established.  As

14  such, there is no need to consider this knowledge element in

15  your deliberations.

16        A copyright may also be infringed by vicariously

17  infringing.  A person is liable for copyright infringement by

18  another if the person has a financial interest and the right

19  and ability to supervise the infringing activity, whether or

20  not the person knew of the infringement.

21        In order to prove vicarious copyright infringement,

22  plaintiffs have the burden of proving each of the following by

23  a preponderance of the evidence:  First, that there was direct

24  infringement of plaintiffs' copyrighted works by users of

25  Cox's internet service.

2926

1          Second, that Cox had a direct financial interest in

2     the infringing activity of its users.

3          And, third, that Cox had the right and ability to

4     supervise such infringing activity.

5          The fact that I'm instructing you on the proper

6     measure of damages should not be considered as indicating any

7     view of mine as to which party is entitled to your verdict in

8     the case.  Instructions as to the measure of damages are given

9     for your guidance only in the event you should find in favor

10    of the plaintiffs from a preponderance of the evidence in the

11    case in accordance with the other instructions.

12         If you find that Cox is liable for contributory

13    infringement or you find Cox is liable for vicarious

14    infringement, then you should consider the amount of money to

15    award the plaintiffs.

16         If you find that Cox is neither liable for

17    contributory or vicarious infringement, then you should not

18    consider this issue.

19         Plaintiffs seek an award of statutory damages under

20    the United States Copyright Act.  Statutory damages are

21    damages that are established by Congress in the Copyright Act

22    because actual damages in copyright cases are often difficult

23    to establish with precision.  The purposes are to compensate

24    the copyright owner, penalize the infringer, and deter future

25    copyright law violations.

1             The amount awarded must be between 750 and $30,000

2     for each copyrighted work that you find to be infringed.

3             If plaintiffs prove that Cox acted willfully in

4     contributorily or vicariously infringing plaintiffs'

5     copyrights, you may, but are not required to, increase the

6     statutory damage award to a sum as high as $150,000 per

7     copyrighted work.

8             You should award as statutory damages an amount that

9     you find to be fair under the circumstances.  In determining

10    the appropriate amount to award, you may consider the

11    following factors:  The profits Cox earned because of the

12    infringement.

13            The expenses Cox saved because of the infringement.

14            The revenues that plaintiffs lost because of the

15    infringement.

16            The difficulty of proving plaintiffs' actual

17    damages.

18            The circumstances of the infringement.

19            Whether Cox acted willfully or intentionally in

20    contributorily or vicariously infringing plaintiffs'

21    copyrights.

22            Deterrence of future infringement.

23            In the case of willfulness, the need to punish Cox.

24            In considering what amount would have a deterrent

25    effect, you may consider Cox's total profits and the effect

2928

1     the award may have on Cox in the marketplace.

2           Plaintiffs are not required to prove any actual

3     damage suffered by plaintiffs to be awarded statutory damages.

4     You should award statutory damages whether or not there is

5     evidence of the actual damage suffered by plaintiffs, and your

6     statutory damage award need not be based on the actual damages

7     suffered by plaintiffs.

8           Cox's contributory or vicarious infringement is

9     considered willful if plaintiffs prove by a preponderance of

10    the evidence that Cox had knowledge that its subscribers'

11    actions constituted infringement of plaintiffs' copyrights,

12    acted with reckless disregard for the infringement of

13    plaintiffs' copyrights, or was willfully blind to the

14    infringement of plaintiffs' copyrights.

15          You must follow these rules while deliberating and

16    returning your verdict.  First, when you go to the jury room,

17    you must select a foreperson.  The foreperson will preside

18    over your discussions and speak for you here in court.

19          Second, it's your duty as jurors to discuss this

20    case with one another in the jury and try to reach an

21    agreement.  Each of you must make your own conscious decision,

22    but only after you have considered all the evidence, discussed

23    it fully with the other jurors, and listened to the views of

24    the other jurors.

25          Do not be afraid to change your opinions if the

2934

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
SONY MUSIC ENTERTAINMENT, et al.,:
            Plaintiffs,        :
                               :
     -vs-                      :   Case No. 1:18-cv-950
                               :
COX COMMUNICATIONS, INC., et al.,:
            Defendants.        :
                               :
-------------------------------:
```

VOLUME  12

TRIAL TRANSCRIPT

December 18, 2019

Before:  Liam O'Grady, USDC Judge

And a Jury

JA805

2935

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:          MATTHEW J. OPPENHEIM, ESQ.
                                   SCOTT A. ZEBRAK, ESQ.
                                   JEFFREY M. GOULD, ESQ.
 4                                 MICHAEL J. DRUCKMAN, ESQ.
                                   ANDREW L. GUERRA, ESQ.
 5                                 LUCY G. NOYOLA, ESQ.
                                   JIA RYU, ESQ.
 6                                 Oppenheim + Zebrak, LLP
                                   4530 Wisconsin Avenue, N.W.
 7                                 5th Floor
                                   Washington, D.C. 20015
 8

 9    FOR THE DEFENDANTS:          THOMAS M. BUCHANAN, ESQ.
                                   GEOFFREY P. EATON, ESQ.
10                                 Winston & Strawn LLP
                                   1700 K Street, N.W.
11                                 Washington, D.C. 20006-3817
                                     and
12                                 SEAN R. ANDERSON, ESQ.
                                   MICHAEL S. ELKIN, ESQ.
13                                 THOMAS P. LANE, ESQ.
                                   CESIE C. ALVAREZ, ESQ.
14                                 Winston & Strawn LLP
                                   200 Park Avenue
15                                 New York, NY 10166-4193
                                     and
16                                 JENNIFER A. GOLINVEAUX, ESQ.
                                   THOMAS J. KEARNEY, ESQ.
17                                 Winston & Strawn LLP
                                   101 California Street, 35th Floor
18                                 San Francisco, CA 94111-5840
                                     and
19                                 MICHAEL L. BRODY, ESQ.
                                   Winston & Strawn LLP
20                                 35 West Wacker Drive
                                   Chicago, IL 60601
21                                   and
                                   DIANA HUGHES LEIDEN, ESQ.
22                                 Winston & Strawn LLP
                                   333 South Grand Avenue
23                                 Suite 3800
                                   Los Angeles, CA
24

25
```

**JA806**

2936

1

2                                I  N  D  E  X

3

Closing Argument by Mr. Oppenheim:                Page 2938
4
Closing Argument by Mr. Elkin:                    Page 2977
5
Rebuttal Argument by Mr. Oppenheim:               Page 3021
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA807**

2940

1          The number of infringements that were the subject of

2    notices was lengthy.  You have seen this list during the trial

3    and will recall that it shows over 270,000 infringement notices

4    between 2012 and 2014, but we know from the testimony -- excuse

5    me, we know from the testimony that the list of infringements

6    on the entirety of what was being infringed is much greater

7    than that.

8          In 2010, the RIAA sent an e-mail to Cox with a

9    spreadsheet showing all of the infringements it was finding on

09:13:25 10  the Cox network but could not send to Cox because of the caps

11   that were imposed.  Based on what the RIAA found, Mr. Marks

12   approximated that in 2009 to 2010, there were over 280,000

13   infringements that the RIAA was not permitted to send notices

14   on.

15         If you extrapolate that out for the claim period in

16   this case, it means that there were roughly 1.1 million

17   infringements on the Cox network of plaintiffs' works for which

18   there were no notices.  And these numbers are just the

19   infringements of the plaintiffs' companies.  If you add in all

09:14:06 20  of the infringements of all of the other copyright holders who

21   you have heard about during the course of this case, you can

22   see that Cox's network was swarming in piracy.

23         Cox said one thing but did another, and as I said

24   previously, this was a habit of Cox.  Cox told subscribers

25   copyright infringement was prohibited but then allowed repeated

2941

1    copyright infringement.  Cox told copyright owners it would

2    stop the infringement but implemented rules that did anything

3    but stop the infringement.  Cox said it wanted to educate

4    customers but rarely forwarded infringement notices to those

5    customers.  This defies common sense.

6         Cox said it had a policy that led to termination but

7    created an unwritten policy that undid terminations, and then

8    they stopped terminating altogether.  Cox said it took

9    copyright infringement seriously, but Cox's abuse team treated

09:15:19 10   the issue with anything but respect.

11        And Cox now says, as you heard during Cox's opening

12   statement, that Internet service was too precious to terminate

13   lightly.  It was an essential service.  But then Cox terminated

14   over 600,000 customers when they didn't pay.

15        Keep all of this in mind and think critically when

16   you hear more talk and argument from Cox in its closing.  Pay

17   attention to what Cox did, not what Cox now says it did.

18        Cox put its profits above the law.  In e-mail after

19   e-mail, we saw what motivated Cox.  It was profits.  Cox

09:16:08 20   prioritized customer payments over all else in deciding whether

21   to terminate.

22        You have seen both of these e-mails during the course

23   of this trial:  Mr. Sikes indicating that this customer pays

24   over $400 a month and will likely cancel services if

25   terminated, every terminated customer becomes lost revenue; or

2942

1    Mr. Zabek's e-mail to his abuse group, advising them to try to

2    keep customers and gain more RGUs, revenue-generating units.

3         Remember Mr. Bakewell?  He testified that if Cox had

4    terminated customers, it would have lost monthly billings.

5         That is putting profits ahead of the law.

6         As Cox was getting crushed by DMCA notices -- and

7    that's their term.  Remember in the e-mail, they said they were

8    getting crushed by notices.  It slashed its TOC, the call

9    center responsible for dealing with infringement calls.  It

09:17:13 10  slashed the staffing there from nine to four, and the abuse

11   team was slashed from five to two.

12        When you think about the size of Cox and its over

13   20,000 employees, it is beyond baffling that it would not staff

14   up a real team of real employees to address these infringement

15   issues.  It is even more baffling that it cut the staff as the

16   problem was growing.

17        Cox wasn't concerned with complying with the law.  It

18   was concerned about keeping its costs down and its profits up.

19        Cox refuses to accept responsibility.  Listening to

09:17:55 20  Cox at this trial, everyone else is to blame but Cox.

21   MarkMonitor doesn't work properly.  Peer-to-peer users lie

22   about bitfield and fake content.  Plaintiffs should have sued

23   tens of thousands of Cox's subscribers anonymously, as though

24   Cox didn't do anything wrong.  Plaintiffs should have sued

25   other ISPs.  The RIAA should have sent more notices, but other

2943

1    copyright owners sent too many.  Net neutrality prevented Cox

2    from acting responsibly.  CAS didn't do enough, but it cost too

3    much for Cox to participate.  Rightscorp shouldn't have made

4    settlement offers in its infringement notices.

5            Instead of accepting responsibilities for its

6    failings, Cox blames the victims.

7            Let's turn to the issue, the elements of the claims.

8    One of the Cox's main arguments in opening was to say that

9    there was no evidence of direct infringement.  This is absurd.

09:19:13 10  Just saying something without backing it up means nothing.  The

11   evidence of infringement was overwhelming, and more

12   importantly, it was documented.

13           For all of Cox's efforts to deny that the

14   infringement occurred, it cannot point to any documentation to

15   support its argument.  Importantly, while Cox now argues that

16   the infringement was not happening, Cox never told the RIAA at

17   the time that the infringement notices were inadequate or

18   inaccurate.

19           In fact, Mr. Zabek even testified that when Cox

09:19:51 20  received an RIAA notice, it assumed they were valid, and

21   Mr. Carothers similarly testified that he took the RIAA

22   allegations to be fair and proper infringement notices.

23           So as we consider the evidence of direct

24   infringement, remember it includes both downloading, which is

25   copying or reproduction, and uploading, which is distribution

3027

1            And material contribution, similarly.  Without the

2    service that Cox provides, these subscribers would not be

3    infringing on the network.

4            And it's not -- you can't just say, oh, they might

5    infringe elsewhere.  That's like saying, well, you know, why

6    arrest them in this county because they could commit the crime

7    in another county?  It doesn't make sense.  It's not an excuse.

8    It's saying, we shouldn't be held responsible for responding to

9    notices.

10           Cox says that it didn't believe that it was

11   facilitating infringement.

12           Can you pull up PX 242, please.

13           Do you remember this document?  After a number of

14   changes that they made in the graduated response policy, Jason

15   Zabek sends this out.  And focus on the bottom, the second half

16   of that sentence:  I think we didn't help anyone with this

17   action, expect -- he means except -- except the law-breaking

18   customers.

19           They knew exactly what they were doing every time

20   they changed the policy.  It was in their culture, it was what

21   was driving them because they wanted customers and revenue.

22           And Cox presented in their closing all this

23   testimony, we really want to do the right thing, it's important

24   to us.  And it's easy to say that now after the fact and

25   testimony.  The question is, what were they saying at the time

3028

1    when they weren't in front of a judge and a jury?

2              Well, what did they say?  Let's look at PX 335.

3              This was their respect for the law.  This is what

4    they said:  "F" the DMCA.

5              And then when somebody saw that that was in the

6    e-mails, they responded.  Let's go to the next one, please.

7              Mr. Carothers said:  Please stop sending e-mails out

8    that say "F" the DM -- "F" the law or "F" some company.  If we

9    get sued, those e-mails are discoverable and would not look

10   good in court.

11             That's what they were worried about.  Not whether or

12   not they had an effective system.

13             I want to respond to the notion that a $750-a-work

14   statutory damage award would be appropriate and put it in

15   context.

16             Everybody agreed, there's no ability to measure the

17   number of downloads that happened here.  We heard it from every

18   witness.  Even the experts agreed on that.  So we have no idea

19   what the total harm was.

20             But what Cox wants to have to pay, what they want the

21   award to be is the same amount that they're paying one of their

22   experts for one hour.  That's for the entire recording as much

23   as it was used, the entire musical composition for as much as

24   it was used for years.

25             So Cox literally puts billions and billions of

3029

1    dollars in its pockets, and it wants to give one hour's worth

2    of their expert's time to an artist for unlimited theft of that

3    recording or composition.

4         Let me close on this.  We have seen something

5    important and telling during this trial.  To this day, Cox

6    still refuses to accept responsibility.  It refuses to

7    acknowledge that what it did was wrong.

8         Think about Cox's opening.  Think about the evidence

9    that was presented.  Think about the questions that were asked

10   and the testimony of the witnesses on both sides.  Has anyone

11   on behalf of Cox said, you know what, we made mistakes?  Not

12   one.

13        Cox refuses to recognize that what it did was wrong.

14   They call e-mails goofy.  That's what they say, they're goofy.

15   That's not goofy.  When you say the things they've said, you're

16   telling the world what you think.

17        Cox refuses to acknowledge the wholesale failure to

18   abide by its own policies.  They set their policies, we didn't.

19   They didn't abide by their own policies.

20        Copyright infringement is not a victimless crime, but

21   Cox refuses to acknowledge that its actions harmed copyright

22   owners.  It harmed recording artists.  It harmed songwriters.

23   It harmed everybody in the ecosystem.  It harmed the back-up

24   musicians, the union musicians, the digital engineers.  It

25   harmed everybody in that process.  And Cox refuses to