No. 21-1168

IN THE
# United States Court of Appeals for the Fourth Circuit

SONY MUSIC ENTERTAINMENT, ET AL.,
*Plaintiffs-Appellees*,

*v.*

COX COMMUNICATIONS, INC. and COXCOM, LLC,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:18-cv-950 (LO/JFA)
Hon. Liam O'Grady

## PETITION FOR REHEARING EN BANC

Michael S. Elkin
Jennifer A. Golinveaux
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037

E. Joshua Rosenkranz
Christopher J. Cariello
Alexandra Bursak
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellants*

March 5, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION & RULE 35 STATEMENT ...................................... 1

STATEMENT OF THE CASE ................................................... 3

ARGUMENT ...................................................................... 7

I.    The Panel And *BMG*'s Holding On Material Contribution Conflicts With Supreme Court Precedent And Deepens A Circuit Conflict. ................................................................ 7

    A.    The panel's opinion conflicts with *Sony*, *Grokster*, and *Twitter*. ................................................................ 8

    B.    The panel's opinion deepens a circuit conflict. .................. 14

II.   *BMG*'s Holding On Willfulness Conflicts With Eighth Circuit Precedent And Bedrock Standards For Willful Conduct.............. 15

III.  These Issues Are Extraordinarily Important. ............................ 20

CONCLUSION ............................................................... 22

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018)...................................1, 4, 5, 8, 12, 17, 18

*Costar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004)............................................................7

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003)...........................................................10

*Lyons P'ship v. Morris Costumes, Inc.*,
243 F.3d 789 (4th Cir. 2001).......................................................17, 18

*Matthew Bender & Co. v. West Publ'g Co.*,
158 F.3d 693 (2d Cir. 1998) ..........................................................14

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)....................................................................16

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).....................................................2, 3, 6, 8, 9, 13

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)........................................................14

*RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*,
845 F.2d 773 (8th Cir. 1988).....................................................2, 17, 18

*Rosemond v. United States*,
572 U.S. 65 (2014) .....................................................................12

*RSM, Inc. v. Herbert*,
466 F.3d 316 (4th Cir. 2006)...........................................................16

*Safeco Ins. v. Burr*,
551 U.S. 47 (2007) .....................................................................16

ii

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................................. 8

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ............................... 2, 6, 8, 9, 10, 11, 12

*Wickersham v. Ford Motor Co.*,
997 F.3d 526 (4th Cir. 2021) ........................................... 19

**Statutes & Rules**

17 U.S.C. § 504(c) .................................................................. 5, 18

Fed. R. App. P. 35(b)(1)(A) ....................................................... 2

Fed. R. App. P. 35(b)(1)(B) ....................................................... 2

## INTRODUCTION & RULE 35 STATEMENT

This petition presents a question of exceeding importance to anyone who cares about access to the internet:  Does an internet service provider, or ISP, materially contribute to copyright infringement by continuing to provide a passive internet connection to a home or business knowing that someone is likely to use that connection to infringe?  With the panel opinion below and a previous panel opinion, *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293 (4th Cir. 2018), this Court has become the first and only Circuit to answer this question Yes.

The resulting regime is the most severe in the country.  If an ISP receives more than one accusation that some anonymous person used a specified internet connection to download infringing songs, it can avoid liability only by swiftly throwing every person in that home or business off the internet, disconnecting the guilty and innocent alike from their schools, their livelihoods, their nanny cams, their news, and everything else they do online.  If instead the ISP continues to provide the connection, a jury can find it engaged in "culpable conduct" akin to aiding-and-abetting a crime.

This rule conflicts with Supreme Court precedent rejecting the notion that "internet or cell service providers incur culpability merely for providing their services to the public writ large," *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 499 (2023), and demanding a showing that the defendant had the "object of promoting" infringement, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005). It also deepens a circuit split. En banc review is therefore warranted. Fed. R. App. P. 35(b)(1)(A), (B).

Rehearing is also warranted to decide whether a secondary infringer can be adjudged willful, exposing it to dramatically enhanced statutory damages, merely because it had knowledge of an *internet user's* direct infringement. *BMG* adopted that rule, but it makes little sense, because willfulness requires the defendant's awareness that *its own* conduct violates the law, as the Eighth Circuit has squarely held in a secondary infringement case like this one. *RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 779-80 (8th Cir. 1988). Fed. R. App. P. 35(b)(1)(B).

Together, these two rules yield an unprecedented framework: First the material contribution ruling ratchets down the culpability

2

required for liability to mere knowledge of subscriber infringement; then the virtually identical willfulness standard collapses the two inquiries so that *all* contributory infringement is automatically *willful* infringement. The result is the most draconian approach in the country. Rehearing should be granted.

## STATEMENT OF THE CASE

Cox connects 6 million homes and businesses to the internet. JA1613. People use these internet connections for countless purposes. A small fraction (less than 1% on this record) use them to access so-called "peer-to-peer networks" and illegally download music. JA264. Cox does not, and cannot, track what users do online. JA422, 530-31. Nor can it block access to specific sites. JA422-23, 530.

The music industry has long battled online piracy. In the early 2000s, it sued the people it caught infringing, JA299-300, and sensibly attacked services (like Napster) designed and promoted to facilitate piracy, JA305; *see Grokster*, 545 U.S. 913. But the industry has pivoted to a new strategy: It has brought a spate of lawsuits against ISPs like Cox, RB5 n.2, blaming them for subscriber infringement. JA302.

The industry hires vendors who use bots to monitor popular peer-

3

to-peer networks. JA356. When the bots detect their copyrighted works, they automatically send notices to an ISP alleging that someone at a particular IP address used that connection to infringe. JA356. The theory is that once an ISP learns that the account has (allegedly) been used to infringe, it is liable as a contributory infringer if it does not terminate the subscriber's internet connection. JA1783-84, JA1787. The industry drowned ISPs in notices, sending Cox, for example, over a million per year. JA506.

BMG Rights Management first targeted Cox with a lawsuit in 2014, seeking to hold Cox secondarily liable for subscribers' infringement on two theories—vicarious and contributory liability. *BMG*, 881 F.3d at 300. A jury rejected BMG's vicarious liability claim, but found for BMG on its contributory liability claim. This Court overturned the verdict, however, finding that the jury instructions failed to require BMG to prove that Cox knew of the "*specific* instances of infringement" for which it was ostensibly liable. *Id.* at 311. *BMG* held that the knowledge element of contributory liability is satisfied only by actual knowledge that "infringement is substantially certain to result" from the continued provision of internet service. *Id.* at 307, 311.

4

After *BMG* settled, Plaintiffs filed this follow-on suit, again alleging both vicarious and contributory liability based on Cox's conduct during the same period at issue in *BMG*. On summary judgment, the district court found that Plaintiffs had established Cox's knowledge of subscriber infringement as a matter of law. JA248-50. With that knowledge element established, JA801, the jury found for Plaintiffs on both theories of liability, JA822.

The jury also found that Cox was willful, JA823, based on a jury instruction previously approved in *BMG*, 881 F.3d at 312-13. That instruction provided that Cox acted willfully if it "had knowledge that *its subscribers' actions* constituted infringement," JA804 (emphasis added)—a standard necessarily satisfied once the court instructed the jury that the knowledge element *for liability* was established as a matter of law. The willfulness finding increased the maximum allowable statutory damages from $30,000 per work to $150,000 per work. 17 U.S.C. § 504(c). The jury awarded $99,830 for each of 10,017 works asserted, for an even $1 billion in damages. JA823.

Cox appealed, challenging both theories of liability. Cox argued that contributory liability is "akin to aiding and abetting." OB36. As

5

such, it requires "culpable … conduct," OB44 (quoting *Grokster*, 545
U.S. at 937) (emphasis omitted); cannot be based on "the design or
distribution of a product capable of substantial lawful use," OB44
(quoting *Grokster*, 545 U.S. at 933); and will not lie for "mere[] …
failure to take affirmative steps to prevent infringement," OB46
(quoting *Grokster*, 545 U.S. at 939 n.12).

While the appeal was pending, the Supreme Court decided *Twitter
v. Taamneh*.  *Twitter* strictly constrained aiding-and-abetting liability
for the misdeeds of users in the online context.  598 U.S. at 498-99, 503.
Cox notified the panel in a Rule 28(j) letter.  Dkt. 87 at 1-2.

The panel issued its decision on February 20, 2024.  Dkt. 92.  It
first correctly concluded that "Cox is not vicariously liable for its
subscribers' copyright infringement," reversing the jury verdict.  Op. 9-
16.  On this basis, it vacated the damages award as well.  Op. 24-25.
But the panel affirmed the contributory liability verdict, remanding for
a new damages trial.  Op. 32.  The panel did not address *Twitter*.

## ARGUMENT

**I. The Panel And *BMG*'s Holding On Material Contribution Conflicts With Supreme Court Precedent And Deepens A Circuit Conflict.**

A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Costar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). Plaintiffs advanced only a material contribution theory: that Cox, with knowledge that specified internet connections were used to infringe, materially contributed to infringement by failing to terminate those connections. Op. 21 n.4; JA881-83 (district court JMOL decision).

Applying *BMG*, the panel held that "supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement." Op. 22. That is wrong—and it is most obviously wrong where the "product" is general-purpose internet service and the "culpable conduct" is declining to terminate that service. The ruling conflicts with Supreme Court authority and deepens a circuit conflict.

7

**A.**   **The panel's opinion conflicts with *Sony*, *Grokster*, and *Twitter*.**

**1.**  As the panel and *BMG* acknowledged, contributory liability is aiding-and-abetting liability.  Op. 23; *BMG*, 881 F.3d at 309; *see Grokster*, 545 U.S. at 936.  The Supreme Court has repeatedly emphasized that the touchstone of such liability is "culpable expression and conduct."  *Grokster*, 545 U.S. at 937.  Liability requires a defendant to "consciously, voluntarily, and culpably participate in or support the relevant wrongdoing," "as in something that [it] wishes to bring about, that [it] seek[s] by [its] action to make … succeed."  *Twitter*, 598 U.S. at 490, 505 (quotation marks omitted).

The Court first applied this principle in *Sony Corp. of Am. v. Universal City Studios, Inc.*, rejecting a challenge to the Betamax.  464 U.S. 417 (1984).  Though the Betamax *could* be used to infringe by recording television programs, selling the device was non-culpable because it was "capable of substantial noninfringing uses."  *Id.* at 442.  *Sony* thus "barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use."  *Grokster*, 545 U.S. at 933.

*Grokster* further elucidated this key limitation on liability.

8

Applying aiding-and-abetting principles, it explained that contributory liability requires "affirmative steps taken to foster infringement," such as selling a product that is "good for nothing else but infringement" or taking "active steps … to encourage direct infringement."  545 U.S. at 919, 932, 936 (quotation marks omitted).  But like *Sony*, *Grokster* "absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused."  *Id.* at 932-33.

Just last term in *Twitter*, the Supreme Court applied the same aiding-and-abetting principles.  Though *Twitter* was not a copyright case, it confronted a directly analogous theory of secondary liability: that social-media platforms, including Twitter and YouTube, could be liable for continuing to provide services to those they knew were using them for illegal purposes (there, to aid acts of terrorism).  The Supreme Court unanimously rejected that theory.  It held that online platforms' "mere" "provision of the infrastructure which provides material support to ISIS" did not state a claim for aiding-and-abetting because such provision is not "culpable" conduct.  598 U.S. at 499 (quotation marks

omitted).

Like *Sony* and *Grokster*, *Twitter* begins from the fundamental premise that secondary liability for assisting another's wrong requires a defendant to "take some affirmative act with the intent of facilitating the offense's commission." *Id.* at 490 (quotation marks omitted). Merely providing "infrastructure" that is "generally available to the internet-using public" is not an "affirmative act" demonstrating a culpable intent to aid unlawful conduct, *id.* at 490, 498-99, but mere "passive" conduct, *id.* at 498-99. And because the plaintiffs could "identify no duty that would require defendants or other communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends," mere continued provision of service could not be sufficient. *Id.* at 501 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (Easterbrook, J.) (rejecting liability for communications "intermediary" even where it "know[s] the information's [unlawful] content")).

*Twitter* thus rejected liability predicated on the very basis the panel opinion accepted here. The complaint there alleged that the defendants "knew that ISIS was uploading [harmful] content" and

"have known that ISIS has used their platforms for years." *Id.* at 481,
498. The Ninth Circuit ruled that it was enough that "defendants
supplied generally available virtual platforms that ISIS made use of,
and that defendants failed to stop ISIS despite knowing it was using
those platforms." *Id.* at 505. And the Supreme Court reversed, because
this "elided the fundamental question of aiding-and-abetting liability,"
which requires proof that the defendant "consciously, voluntarily, and
culpably participate[d]" in the "wrongdoing." *Id.*

The panel decision wrongly equated Cox's "knowledge that the
recipient will use [the internet] to infringe copyrights" with culpable
conduct, Op. 22, the exact rationale *Twitter* so forcefully rejected. Yet
despite Cox's Rule 28(j) letter, the panel did not discuss *Twitter* at all,
nor meaningfully address *Sony* and *Grokster*'s consistent application of
the same principles.

**2.** The panel justified its holding with an analogy: "Lending a
friend a hammer is innocent conduct; doing so with knowledge that the
friend will … break into a credit union ATM supports a conviction for
aiding and abetting bank larceny." Op. 23. But no analogy was
necessary, because *Twitter* flatly rejected aiding-and-abetting liability

11

in the precise context at issue here: where a defendant provides a customer with internet "infrastructure" that is "generally available to the internet-using public," even if it knows that the customer is "using the service for illicit ends."  598 U.S. at 498-99, 501.

Anyway, the hammer analogy fails on its own terms, extending even *BMG*'s reasoning past the breaking point.  *BMG* acknowledges that aiding-and-abetting liability is limited to those who "actively participate[]" in a crime, 881 F.3d at 309, and cites *Rosemond v. United States*, 572 U.S. 65 (2014).  *Rosemond*, in turn, finds that "incidental[] facilitat[ion]" of a crime alone is not "active participation," offering the example of a firearm store owner "who sells a firearm to a criminal, *knowing* but not caring *how the gun will be used.*"  *Id.* at 77 n.8 (emphasis added).  That tracks the panel's analogy exactly, just with the opposite result.

In all events, the internet is not a hammer.  Cox provides arms-length services to millions of homes and businesses on equal terms.  Just as a telephone company is not liable for wire fraud when it does not cut off phone service to a notorious crime syndicate, an ISP is not liable for failing to cut the cord based on allegations of past

12

infringement.  In each instance, a decision not to terminate service is nowhere near the same as lending a co-conspirator the hammer with which to commit a bank heist.

**3.**  Finally, the panel included a makeweight, suggesting that "[t]he evidence at trial … showed more than mere failure to prevent infringement."  Op. 23.  The panel pointed to purported evidence of Cox's desire to "avoid losing revenue"; "increasingly liberal policies and procedures for responding to reported infringement"; and "internal Cox emails and chats as displaying contempt for laws intended to curb online infringement."  *Id.*

None of this moves the needle.  *Grokster* prohibits liability unless the defendant acted with "the purpose of bringing about infringing acts" or an "object of promoting" infringement.  545 U.S. at 936, 938.  That is not this case.  There is no evidence that Cox wanted or encouraged anyone to infringe—indeed, the panel, in rejecting vicarious liability, found that Cox derives no benefit at all from infringing conduct.  Op. 9-16.  The "intent" evidence the panel cited at most supports Plaintiffs' narrative that Cox may have *tolerated* infringement.  That is legally insufficient.

13

**B.     The panel's opinion deepens a circuit conflict.**

The panel opinion also entrenches a three-way circuit conflict,

adopting the most draconian approach to material contribution in the

country.

The Second Circuit rule accords with *Grokster* and the analysis

above:  In a case about an electronic database, the court held that

"provision of equipment does not amount to contributory infringement if

the equipment is 'capable of substantial noninfringing uses'" absent

conduct "influenc[ing] or encourag[ing] unlawful copying." *Matthew*

*Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998).  No

one disputes that under that rule, Cox would be entitled to judgment as

a matter of law on all claims.  *See* OB43-49.

The Ninth Circuit adopted a laxer test:  Even without direct

encouragement, a defendant may still be liable "if it has actual

knowledge that specific infringing material is available using its

system, *and can take simple* measures"—defined as "reasonable and

feasible" steps—"to prevent further damage to copyrighted works, yet

continues to provide access to infringing works." *Perfect 10, Inc. v.*

*Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (emphasis

14

changed) (citation omitted).  Thus, in the Ninth Circuit, it is not enough to prove actual knowledge of specific infringement:  A defendant is not culpable unless it also fails to take proportional steps to prevent infringement.  Cox argued before the panel that this standard should not apply, but that if it did, termination of subscriber internet service could never be reasonable and feasible for the vast majority of alleged infringers in this case.  OB51-52.

The panel did not address this argument, instead going much further than the Ninth Circuit:  Under the panel's ruling, continuing to provide the instrumentality used to infringe is *categorically* sufficient for liability, with no need even to consider how unreasonable or infeasible it would be to terminate the internet access of any particular subscriber.  This extreme rule conflicts with both the Second and Ninth Circuit approaches.

## II. *BMG*'s Holding On Willfulness Conflicts With Eighth Circuit Precedent And Bedrock Standards For Willful Conduct.

En banc rehearing is also warranted to correct an error Cox preserved, but could not press, at the panel stage, OB55 n.3: *BMG*'s incorrect definition of willfulness, which allowed the jury to find that

15

Cox was willful if it had "knowledge that its subscribers' actions constituted infringement." JA804. That definition conflicts directly with a ruling of the Eighth Circuit, as well as bedrock conceptions of willfulness this Court and the Supreme Court have recognized.

**A.** As this Court has explained, "[i]n a civil action, 'willful' generally requires a showing of a disregard for the law," or a "'reckless' lack of concern for an action's potential illegality." *RSM, Inc. v. Herbert*, 466 F.3d 316, 321 n.1 (4th Cir. 2006) (citation omitted). A willful actor is therefore one who acts despite a risk that *its own* actions are *unlawful*—someone who is "reckless in falling down in its duty." *Safeco Ins. v. Burr*, 551 U.S. 47, 68 (2007). Where, by contrast, a defendant "acts reasonably in determining *its legal obligation*, its action cannot be deemed willful." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n.13 (1988) (emphasis added).

Because the focus for willfulness is *the defendant's* understanding of the legality of *the defendant's* conduct, willfulness in a secondary infringement case does not turn on the defendant's knowledge of the *direct infringer's* conduct. The question is whether the secondary infringer knew (or recklessly disregarded a risk that) *its own* conduct

16

constitutes secondary infringement.  Reasonable uncertainty on that question forecloses willfulness.

The Eighth Circuit held precisely that in *RCA*.  There, the defendant was accused of vicarious liability for manufacturing and providing access to machines for duplicating cassettes, which some customers used to infringe.  845 F.2d at 776-80.  Though the rightsowners gave the defendants "notice … of claimed … duplication on [the defendants'] machines," the companies' counsel advised them—ultimately incorrectly—that the companies were not secondary infringers based on customer copying.  *Id.* at 777.  The court held that because the companies did not "underst[and] their own actions to be culpable" and "w[ere] not reckless" in adopting that view, their conduct was not willful.  *Id.* at 779.  Cox's proposed jury instruction reflected this correct understanding of the law.  Proposed Jury Instructions at 44 (D. Ct. Dkt. 606-1).

**B.**  *BMG*'s contrary holding erroneously relied exclusively on cases addressing the willfulness of *direct* infringers, whose willfulness necessarily turns on knowledge that *their own* conduct is infringing.  *See* 881 F.3d at 312-13.  *BMG* thus quoted a prior case, *Lyons*

17

*Partnership v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001), for the proposition that "copyright infringement is willful if the defendant 'recklessly disregards a copyright holder's rights,'" 881 F.3d at 312.

But *BMG* overlooked *Lyons*'s statement, drawing from *RCA*, that a defendant "does not act willfully … if he believes in good faith that *his conduct* is innocent." 243 F.3d at 779-800 (emphasis added) (citing *RCA*, 845 F.2d at 779). The *BMG*-approved instruction deprived Cox of the opportunity to make that case to the jury. Under *BMG*, if Cox had knowledge that subscribers infringed, the jury could find it willful *even if* Cox had an entirely reasonable and good-faith belief that *Cox*'s action or inaction did not constitute contributory infringement.

The consequence is to erase the difference between contributory infringement and willful infringement: Because contributory infringement already requires knowledge of subscriber infringement, this instruction automatically converts *all* contributory infringement into *willful* contributory infringement, and subjects it to dramatically enhanced penalties. 17 U.S.C. § 504(c).

**C.** This error was immensely consequential. As the panel acknowledged, the record reflects "Cox's anti-infringement efforts and its claimed success at deterring repeat infringement." Op. 23. Moreover, the panel found that Cox derived no financial benefit from infringement as a matter of law, leaving a properly instructed jury with no basis for concluding that Cox had an incentive to contribute to infringement. And beyond that, Cox has been found liable in this case only on the basis of an unprecedented material contribution standard.

In these circumstances, there is at least a reasonable probability that a properly instructed jury would have rejected willfulness as to all alleged infringement. *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 535 (4th Cir. 2021) (standard for setting aside verdict based on erroneous instruction). At an absolute minimum, such a jury could have found it reasonable for Cox to conclude it was not legally required to terminate the many subscribers who were accused of infringing only a handful of times. *See* OB51-52. This Court should rehear the issue and allow a properly instructed jury to consider willfulness on remand.

19

## III.   These Issues Are Extraordinarily Important.

The issues presented here are deeply important, not only to copyright defendants like Cox, but to millions of people who depend on internet access every day.  Among the subscribers Plaintiffs impugn in this case are the working parent whose teenager infringes in the basement; the hospital whose orderly downloads songs on break; even regional ISPs, which rely on Cox internet to bring broadband to homes in rural areas.  At the panel stage, a chorus of amici warned of the dangers of a rule that would obligate an ISP to throw entire homes or businesses off the internet.

Yet the legal regime the panel decision and *BMG* enact requires an ISP to cut the cord on subscribers after receiving just a handful of notices alleging that some anonymous person has used the subscribers' connection to infringe.  If the ISP does so, the resulting punishment is wildly disproportionate to the copyright harms suffered by Plaintiffs (typically, the loss of about $1 per download)—and the punishment is imposed not only on the infringer, but on all others who rely upon the same internet connection for lawful uses.  If the ISP does not terminate, it exposes itself to statutory damages, made all the more daunting by a

20

willfulness standard under which all contributory infringement is willful infringement.

Though Plaintiffs will doubtless point to the safe harbor provisions of the Digital Millenium Copyright Act as avoiding these consequences, they are no panacea. RB2-5. As amici attested at the panel stage, the DMCA itself is rife with uncertainty, Brief for Internet Commerce Coalition as Amicus Curiae Supporting Defendants-Appellants at 9-10, Dkt. 32-1, which the music industry has repeatedly attempted to capitalize on in their many suits against ISPs across the country, RB5 n.2.

Without meaningful limits on secondary liability, ISPs face powerful incentives to swiftly terminate the internet connections of innumerable businesses and households, their monthly subscription fees a pittance compared to the threat of $150,000 in damages for every downloaded song. The full Court should grant rehearing and reject a Hobson's choice that threatens to throw countless ordinary people offline in service of the music industry's bottom line.

## CONCLUSION

This Court should grant rehearing en banc.

Respectfully submitted,

*/s/ E. Joshua Rosenkranz*

Michael S. Elkin
Jennifer A. Golinveaux
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

Mark S. Davies
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037

E. Joshua Rosenkranz
Christopher J. Cariello
Alexandra Bursak
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellants*

March 5, 2024

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Fed. R. App. P. 40(b), because this brief contains 3895 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
*Counsel for Defendants-Appellants*

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 21-1168**

—————————

SONY MUSIC ENTERTAINMENT; ARISTA MUSIC; ARISTA RECORDS, LLC; LAFACE RECORDS LLC; PROVIDENT LABEL GROUP, LLC; SONY MUSIC ENTERTAINMENT US LATIN LLC; VOLCANO ENTERTAINMENT III, LLC; ZOMBA RECORDINGS LLC; SONY/ATV MUSIC PUBLISHING LLC; EMI AI GALLICO MUSIC CORP.; EMI ALGEE MUSIC CORP.; EMI APRIL MUSIC INC.; EMI BLACKWOOD MUSIC INC.; COLGEMS-EMI MUSIC INC.; EMI CONSORTIUM MUSIC PUBLISHING INC., d/b/a EMI Full Keel Music; EMI CONSORTIUM SONGS, INC., d/b/a EMI Longitude Music; EMI FEIST CATALOG INC.; EMI MILLER CATALOG INC.; EMI MILLS MUSIC, INC.; EMI UNART CATALOG INC.; EMI U CATALOG INC.; JOBETE MUSIC COMPANY, INCORPORATED; STONE AGATE MUSIC; SCREEN GEMS-EMI MUSIC, INCORPORATED; STONE DIAMOND MUSIC CORP.; ATLANTIC RECORDING CORPORATION; BAD BOYS RECORDS LLC; ELEKTRA ENTERTAINMENT GROUP, INCORPORATED; FUELED BY RAMEN LLC; ROADRUNNER RECORDS, INC.; WARNER-TAMERLANE PUBLISHING CORPORATION; WB MUSIC CORPORATION; UNICHAPPELL MUSIC, INCORPORATED; RIGHTSONG MUSIC INC.; COTILLION MUSIC, INCORPORATED; INTERSONG U.S.A., INC.; UMG RECORDINGS, INCORPORATED; CAPITOL RECORDS, LLC; UNIVERSAL MUSIC CORPORATION; UNIVERSAL MUSIC-MGB NA LLC; UNIVERSAL MUSIC PUBLISHING INC.; UNIVERSAL MUSIC PUBLISHING AB; UNIVERSAL PUBLISHING LIMITED; UNIVERSAL MUSIC PUBLISHING MGB LIMITED; UNIVERSAL MUSIC - Z TUNES LLC; UNIVERSAL/ISLAND MUSIC LIMITED; UNIVERSAL/MCA MUSIC PUBLISHING PTY. LIMITED; POLYGRAM PUBLISHING, INC.; SONGS OF UNIVERSAL, INC.; WARNER RECORDS, INC., f/k/a W.B.M. Music Corp.; WARNER CHAPPELL MUSIC, INC., f/k/a Warner/Chappell Music, Inc.; W.C.M. MUSIC CORP., f/k/a W.B.M. Music Corp.,

Plaintiffs – Appellees,

and

NONESUCH RECORDS INC.; WARNER BROS. RECORDS, INC.; WARNER/CHAPPELL MUSIC, INC.; W.B.M. MUSIC CORP.; UNIVERSAL - POLYGRAM INTERNATIONAL TUNES, INC.; UNIVERSAL - SONGS OF POLYGRAM INTERNATIONAL, INC.; UNIVERSAL POLYGRAM INTERNATIONAL PUBLISHING, INC.; MUSIC CORPORATION OF AMERICA, INC., d/b/a Universal Music Corporation; RONDOR MUSIC INTERNATIONAL,

   Plaintiffs,

  v.

COX COMMUNICATIONS, INCORPORATED; COXCOM, LLC,

   Defendants – Appellants.

------------------------

INTERNET ASSOCIATION; ELECTRONIC FRONTIER FOUNDATION; CENTER FOR DEMOCRACY AND TECHNOLOGY; AMERICAN LIBRARY ASSOCIATION; ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES; ASSOCIATION OF RESEARCH LIBRARIES; PUBLIC KNOWLEDGE; NTCA THE RURAL BROADBAND ASSOCIATION; CTIA - THE WIRELESS ASSOCIATION; USTELECOM THE BROADBAND ASSOCIATION; INTERNET COMMERCE COALITION; INTELLECTUAL PROPERTY LAW PROFESSORS,

   Amici Supporting Appellant,

  and

NATIONAL MUSIC PUBLISHERS' ASSOCIATION; NASHVILLE SONGWRITERS ASSOCIATION INTERNATIONAL; SONGWRITERS OF NORTH AMERICA; COPYRIGHT ALLIANCE,

   Amici Supporting Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, Senior District Judge.  (1:18-cv-00950-LO-JFA)

———————

2

Argued:  March 9, 2022                    Decided:  February 20, 2024

---

Before HARRIS and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Rushing wrote the opinion, in which Judge Harris and Senior Judge Floyd joined.

---

**ARGUED:**  E. Joshua Rosenkranz, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, for Appellants.  Catherine Emily Stetson, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Michael S. Elkin, Jennifer A. Golinveaux, Geoffrey P. Eaton, WINSTON & STRAWN LLP, New York, New York; Mark S. Davies, Sheila A. Baynes, Washington, D.C., Christopher J. Cariello, Rachel G. Shalev, Alexandra Bursak, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, for Appellants.  Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould, OPPENHEIM + ZEBRAK, LLP, Washington, D.C.; Jo-Ann Tamila Sagar, Patrick C. Valencia, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees.  Joseph C. Gratz, Samuel J. Zeitlin, DURIE TANGRI LLP, San Francisco, California, for Amicus Internet Association.  Mitchell L. Stoltz, Corynne McSherry, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California; Erik Stallman, Juliana DeVries, Samuelson Law, Technology & Public Policy Clinic, UC BERKELEY SCHOOL OF LAW, Berkeley, California, for Amici Electronic Frontier Foundation, Center for Democracy and Technology, American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Public Knowledge.  David E. Weslow, Megan L. Brown, Ari S. Meltzer, Kevin G. Rupy, Adrienne J. Kosak, WILEY REIN LLP, Washington, D.C., for Amici NTCA – The Rural Broadband Association, CTIA – The Wireless Association, and USTelecom – The Broadband Association.  Andrew L. Deutsch, DLA PIPER LLP (US), Los Angeles, California, for Amicus Internet Commerce Coalition.  Phillip R. Malone, Juelsgaard Intellectual Property and Innovation Clinic, Mills Legal Clinic, STANFORD LAW SCHOOL, Stanford, California, for Amici Intellectual Property Law Professors.  Danielle M. Aguirre, Kerry M. Mustico, Christopher A. Bates, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, Washington, D.C.; Ruthanne M. Deutsch, Hyland Hunt, Alexandra Mansbach, DEUTSCH HUNT PLLC, Washington, D.C., for Amici National Music Publishers' Association, Nashville Songwriters Association International, and Songwriters of North America.  Nancy Wolff, Sara Gates, COWAN DEBAETS ABRAHAMS & SHEPPARD LLP, New York, New York, for Amicus The Copyright Alliance.

---

RUSHING, Circuit Judge:

Defendant Cox Communications sells internet, telephone, and cable television service to 6 million homes and businesses across the United States. Plaintiffs—Sony Music Entertainment and numerous other record companies and music publishers—own some of the most popular copyrighted musical works of our time. Some users of Cox's internet service infringed Plaintiffs' copyrights by downloading or distributing songs over the internet without permission. Rather than sue those individuals, Plaintiffs sued Cox, seeking to hold it responsible for its customers' copyright infringement.

Federal law protects internet service providers from monetary liability for copyright infringement committed by users of their networks, but only if those service providers reasonably implement a policy to terminate repeat infringers in appropriate circumstances. In a prior case, our Court held that Cox had failed to reasonably implement an anti-piracy program and therefore did not qualify for the statutory safe harbor.

This case proceeded to trial on two theories of secondary liability: vicarious and contributory copyright infringement. The jury found Cox liable for both willful contributory and vicarious infringement of 10,017 copyrighted works owned by Plaintiffs and awarded $1 billion in statutory damages. Cox appealed.

We affirm the jury's finding of willful contributory infringement. But we reverse the vicarious liability verdict and remand for a new trial on damages because Cox did not profit from its subscribers' acts of infringement, a legal prerequisite for vicarious liability.

4

I.

Copyright owners possess the "exclusive rights" to "reproduce," "distribute," "perform," "display," or "prepare derivative works based upon" their copyrighted works, subject to limitations not relevant here.  17 U.S.C. § 106.  Anyone who violates any of these exclusive rights of the copyright owner is "an infringer of the copyright."  *Id.* § 501(a).  A copyright owner may "institute an action" against an infringer, *id.* § 501(b), and receive either statutory damages, *id.* § 504(a)(2), or actual damages plus the infringer's profits, *id.* § 504(a)(1).  Although the Copyright Act "does not expressly render anyone liable for infringement committed by another," the Supreme Court has long held that vicarious and contributory liability for copyright infringement rest on firm legal footing. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434–435 (1984).

Congress recognized that internet service providers may get caught in the crossfire when infringers use the internet to reproduce or distribute copyrighted works, so it created a safe harbor defense in the Digital Millennium Copyright Act (DMCA).  *See* 17 U.S.C. § 512.  To be eligible for the defense, an internet service provider must have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  *Id.* § 512(i)(1)(A).  This Court previously held that Cox did not qualify for the safe harbor because its repeat infringer policy as implemented was inadequate under the DMCA.  *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 301–305 (4th Cir. 2018).  The claim period in this case coincides with the

5

period during which Cox was ineligible for the safe harbor, so Cox faces the secondary liability claims here without that protection.[1]

This lawsuit began when Sony and other owners of copyrighted musical works (collectively, Sony or Plaintiffs) sued Cox for infringement committed by subscribers to Cox's internet service from 2013 to 2014. During the claim period, Cox provided internet service to residential and commercial subscribers, charging different flat fees for different download speeds according to a tiered pricing plan.

Plaintiffs are members of the Recording Industry Association of America (RIAA), which hired the anti-piracy company MarkMonitor to catch infringements of its members' copyrights on peer-to-peer networks using file-sharing protocols like BitTorrent and others. *See BMG*, 881 F.3d at 298–299 (explaining peer-to-peer file sharing and BitTorrent). When MarkMonitor discovered an internet user downloading or distributing a copyrighted music file, it notified the user's internet service provider. Only the service provider can match an alleged infringer's internet protocol address to its owner's identity. When Cox received infringement notices from MarkMonitor, Cox's automated system sent notices to the infringing subscribers. The notice Cox sent varied by how far along the subscriber was in Cox's thirteen-strike policy, ranging from an email warning to a temporary suspension. *See BMG*, 881 F.3d at 299 (describing the thirteen-strike policy).

---

[1] The DMCA safe harbor defense is not exclusive, so Cox remains "entitled to all other arguments under the law" in its defense. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552 (4th Cir. 2004); *see* 17 U.S.C. § 512(l).

Over time, Cox developed various methods to stem the tidal wave of infringement notices it was receiving and mitigate the consequences for its subscribers. It capped the number of notices it would accept from RIAA, eventually holding it at 600 notices per day. It took no action on the first DMCA complaint for each subscriber, limited the number of account suspensions per day, and restarted the strike count for subscribers once it terminated and reinstated them. MarkMonitor sent Cox 163,148 infringement notices during the claim period. Over that time, Cox terminated 32 subscribers for violation of its Acceptable Use Policy, which prohibits copyright infringement among other things. By comparison, it terminated over 600,000 subscribers for nonpayment over that same time. Frustrated with Cox's lackluster response to the notices, Sony sued Cox for vicarious and contributory copyright infringement.

After discovery, Sony and Cox cross-moved for summary judgment. Two of the district court's rulings at that stage are relevant for this appeal. First, the district court concluded that the infringement notices MarkMonitor sent to Cox proved Cox's knowledge of infringement as a matter of law. That knowledge established one element of contributory liability. Second, the district court denied Cox's motion to reduce the number of copyrighted works in suit. Cox argued that, for the purpose of statutory damages, all songs included on a single album constitute one work, and a sound recording and the music composition it embodies likewise count as a single work. *See* 17 U.S.C. § 504(c)(1) (authorizing statutory damages for infringement "with respect to any one work" and explaining that "all the parts of a compilation or derivative work constitute one work"). The district court found that issues of material fact remained and so this claim should "be

7

resolved at trial." *Sony Music Ent. v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d. 217, 236 (E.D. Va. 2019).

The parties presented their case to the jury over the course of twelve days. Plaintiffs limited their case to Cox subscribers who received three or more infringement notices. In the end, the jury found Cox liable for vicarious and contributory infringement of all 10,017 copyrighted works alleged. The jury also found that Cox's infringement was willful, which increased the available maximum statutory damages to $150,000 per work. *See* 17 U.S.C. § 504(c)(1)–(2). The jury awarded Sony $99,830.29 per infringed work, for a total of $1 billion in statutory damages.

After the verdict, Cox renewed its motion for judgment as a matter of law, which the district court ultimately denied in full. Regarding liability, the district court rejected Cox's arguments that the evidence did not prove vicarious or contributory infringement. Cox also sought again to reduce the number of works—and with it, damages—to account for compilations and derivative works. The district court rejected Cox's request as to compilations but invited Cox to submit a calculation of the derivative works that were allegedly double counted. After receiving Cox's submission, however, the district court denied any reduction in the number of works, reasoning that Cox's posttrial arguments required factfinding within the province of the jury and that Cox had failed to present evidence sufficient to enable the jury to make the adjustments it requested.

Now on appeal, Cox raises numerous questions of law concerning the scope of secondary liability for copyright infringement and what constitutes a compilation or

derivative work in the internet age.  Ultimately, we find we must answer only some of these novel questions to resolve this appeal.

## II.

We begin with Cox's contention that the district court erred in denying it judgment as a matter of law on Sony's vicarious infringement claim.  We review that ruling de novo. *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 391 (4th Cir. 2014).  Judgment as a matter of law is proper if, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party, "a reasonable jury would not have a legally sufficient evidentiary basis to find for [that] party."  Fed. R. Civ. P. 50(a)(1).  A district court should grant judgment as a matter of law "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof."  *Russell*, 763 F.3d at 391 (internal quotation marks omitted).

A defendant may be held vicariously liable for a third party's copyright infringement if the defendant "[1] profits directly from the infringement and [2] has a right and ability to supervise the direct infringer."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005); *see also CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) ("[A] defendant who 'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities' is [vicariously] liable." (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971))).  Cox contests both elements on appeal.  Because we conclude Sony failed, as a matter of law, to prove that Cox profits directly from its

9

subscribers' copyright infringement, we do not reach the additional question of Cox's right and ability to supervise its subscribers.

Cox argues that it does not profit directly from its subscribers' infringement because "[a]ll subscribers pay Cox a flat monthly fee for their internet access package no matter what they do online." Opening Br. 27. Whether a subscriber uses her internet access for lawful or unlawful purposes, Cox receives the same monthly fee, and a subscriber's decision to download or distribute a copyrighted song without permission does not benefit Cox. The district court rejected this argument, concluding that Sony had proven Cox's direct financial interest by showing that Cox repeatedly declined to terminate the accounts of infringing subscribers in order to continue collecting their monthly fees. To understand this issue, some legal background is necessary.

Vicarious liability for copyright infringement is an "outgrowth of the agency principles of respondeat superior." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996); *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001). It extends beyond a strict employer-employee relationship to other settings in which a defendant similarly "'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Costar Grp.*, 373 F.3d at 550 (quoting *Gershwin Pub. Corp.*, 443 F.2d at 1162). So, for example, we have held that a property owner was vicariously liable for its closely related developer's infringing use of copyrighted architectural drawings in a construction project. *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513–514 (4th Cir. 2002). In addition to its control over the project, the property owner had "an obvious and direct financial interest in the

10

[developer's] infringing activities" because the owner "enjoyed the benefit of any increase in the Project's value resulting from [the developer's] infringement" of the copyrighted drawings. *Id.* at 514. In another example, a company that sold nutritional supplements was vicariously liable for its distributors' infringing use of copyrighted photographs to advertise its products because the company could control the distributors and stood to benefit from increased sales spurred by the infringing advertisements. *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 389 (3d Cir. 2016).

The landmark case on vicarious liability for infringing copyrighted musical recordings is *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963). There a department store was held accountable for the infringing sale of "bootleg" records by a concessionaire operating in its stores. *Id.* at 307–308. The store retained the ultimate right to supervise the concessionaire and its employees, demonstrating its control over the infringement. And the store received a percentage of every record sale, "whether 'bootleg' or legitimate," giving it "a most definite financial interest" in the infringing sales.[2] *Id.*

Courts have recognized, however, that a defendant may possess a financial interest in a third party's infringement of copyrighted music even absent a strict correlation

---

[2] In an analysis that courts still use today, the *Shapiro* court contrasted two types of relationships: (1) landlords and tenants and (2) dance halls and bands. *Shapiro*, 316 F.2d at 307; *see Sony*, 464 U.S. at 437 n.18 (picking up this comparison); *Leonard*, 834 F.3d at 388–389 (same). A landlord is not vicariously liable for a tenant's copyright infringement, the court explained, because he exercises no supervision over the tenant and charges a fixed rental fee regardless of whether the tenant infringes copyrights in the rented house. *Shapiro*, 316 F.2d at 307. But the dance hall proprietor who hires a band can control the premises, and the band's infringing performances of copyrighted songs "provide the proprietor with a source of customers and enhanced income," exposing him to vicarious liability. *Id.*

11

between each act of infringement and an added penny of profits.  For example, *Fonovisa* concerned the operator of a swap meet who allowed vendors to sell infringing records.  The complaint alleged that the operator collected "admission fees, concession stand sales and parking fees"—but no sales commission—"from customers who want[ed] to buy the counterfeit recordings at bargain basement prices."  *Fonovisa*, 76 F.3d at 263.  These allegations sufficed to state a direct financial benefit to the swap meet operator, the court held, because "the sale of pirated recordings at the . . . swap meet [was] a 'draw' for customers."  *Id.*  The infringing sales "enhance[d] the attractiveness of the venue to potential customers," giving the swap meet operator a financial interest in the infringement sufficient to state a claim for vicarious liability.  *Id.*

Applying these principles to copyright infringement in cyberspace, courts and Congress agree that "'receiving a one-time set-up fee and flat periodic payments for service'" from infringing and noninfringing users alike ordinarily "'would not constitute receiving a financial benefit directly attributable to the infringing activity.'"  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (quoting S. Rep. 105-190, at 44 (1998)).  But "'where the value of the service lies in providing access to infringing material,'" those flat fees may constitute a direct financial benefit.  *Id.* (quoting S. Rep. 105-190, at 45).

For example, the file-sharing service Napster had a direct financial interest in its users' exploitation of copyrighted music.  An increasing volume of pirated music available for download drew more users to register with Napster, and its "future revenue [was] directly dependent upon increases in userbase."  *Napster*, 239 F.3d at 1023 (internal quotation marks omitted).

12

By contrast, America Online (AOL) was not vicariously liable for copyright infringement occurring over an online forum to which it provided its subscribers access. Although access to online forums encouraged overall subscription to AOL's services, there was no direct financial benefit from infringement where no evidence indicated "that AOL customers either subscribed because of the available infringing material" or "canceled subscriptions" when the material was no longer available. *Ellison*, 357 F.3d at 1079. Without "evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of [its] eventual obstruction of the infringement," "no jury could reasonably conclude that AOL received a direct financial benefit from providing access to the infringing material." *Id.*

As these cases illustrate, the crux of the financial benefit inquiry is whether a causal relationship exists between the infringing activity and a financial benefit to the defendant. If copyright infringement draws customers to the defendant's service or incentivizes them to pay more for their service, that financial benefit may be profit from infringement. *See*, *e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016). But in every case, the financial benefit to the defendant must flow directly from the third party's acts of infringement to establish vicarious liability. *See Grokster*, 545 U.S. at 930 & n.9; *Nelson-Salabes*, 284 F.3d at 513.

To prove vicarious liability, therefore, Sony had to show that Cox profited from its subscribers' infringing download and distribution of Plaintiffs' copyrighted songs. It did not.

The district court thought it was enough that Cox repeatedly declined to terminate infringing subscribers' internet service in order to continue collecting their monthly fees. Evidence showed that, when deciding whether to terminate a subscriber for repeat infringement, Cox considered the subscriber's monthly payments. *See*, *e.g.*, J.A. 1499 ("This customer will likely fail again, but let's give him one more chan[c]e. [H]e pays 317.63 a month."). To the district court, this demonstrated the requisite connection between the customers' continued infringement and Cox's financial gain.

We disagree. The continued payment of monthly fees for internet service, even by repeat infringers, was not a financial benefit flowing directly from *the copyright infringement itself*. As Cox points out, subscribers paid a flat monthly fee for their internet access no matter what they did online. Indeed, Cox would receive the same monthly fees even if all of its subscribers stopped infringing. Cox's financial interest in retaining subscriptions to its internet service did not give it a financial interest in its subscribers' myriad online activities, whether acts of copyright infringement or any other unlawful acts. An internet service provider would necessarily lose money if it canceled subscriptions, but that demonstrates only that the service provider profits directly from the sale of internet access. Vicarious liability, on the other hand, demands proof that the defendant profits directly from the *acts of infringement* for which it is being held accountable.

Sony responds that, even if we disagree with the district court, the jury heard other evidence of Cox's direct financial interest in its subscribers' copyright infringement. But none of Sony's alternative theories supports vicarious liability here.

14

First, Sony contends that the jury could infer from the volume of infringing activity on Cox's network that the ability to infringe was a draw for customers.  In support, Sony highlights evidence that roughly 13% of Cox's network traffic was attributable to peer-to-peer activity and over 99% of peer-to-peer usage was infringing.  Even if the jury believed Sony's characterization that this was a high volume of infringing activity in general, the evidence falls considerably short of demonstrating that customers were drawn to purchase Cox's internet service, or continued to use that service, because it offered them the ability to infringe Plaintiffs' copyrights. *Cf. Ellison*, 357 F.3d at 1079.  Many activities of modern life demand internet service.  No one disputes that Cox's subscribers need the internet for countless reasons, whether or not they can infringe.  Sony has not identified evidence that any infringing subscribers purchased internet access because it enabled them to infringe copyrighted music.  Nor does any evidence suggest that customers chose Cox's internet service, as opposed to a competitor's, because of any knowledge or expectation about Cox's lenient response to infringement.

Second, Sony asserts that "subscribers were willing to pay more for the ability to infringe," but the evidence does not go nearly so far.  Response Br. 36.  Cox had a tiered pricing structure by which it charged customers higher monthly fees for increased data allowances.  According to Sony, peer-to-peer activity is "bandwidth-intensive," "more data usage requires more speed," and Cox advertised its network speeds in relation to how quickly a user could download songs.  Response Br. 37.  Further, Sony explains, "residential subscribers who were the subject of 20 or more infringement notices from 2012

[to] 2014 paid Cox more per month, on average, than residential subscribers who were the subject of only 1 or 2 infringement notices."  Response Br. 34.

None of this raises a reasonable inference that any Cox subscriber paid more for faster internet in order to engage in copyright infringement.  As Sony's expert testified, other data intensive activities include legally streaming movies, television shows, and music, as well as playing video games.  Subscribers may have purchased high speed internet for lawful streaming and downloads or because their households had many internet users; Sony's expert didn't claim to know why any customer purchased a higher tier of service.  Sony has not identified any evidence that customers were attracted to Cox's internet service or paid higher monthly fees because of the opportunity to infringe Plaintiffs' copyrights.

At bottom, Sony offered no legally adequate theory to establish the required causal connection between subscribers' copyright infringement and increased revenue to Cox. While Cox profited from the sale of internet service, Sony has not shown that Cox, in any sense, had a financial interest in its subscribers committing infringement. *See Costar Grp.*, 373 F.3d at 550.  And it is the infringement itself that must in some fashion profit the defendant for vicarious liability to attach.  Accordingly, under the correct legal standard, no reasonable jury could find that Cox received a direct financial benefit from its subscribers' infringement of Plaintiffs' copyrights.  We therefore conclude that Cox is not vicariously liable for its subscribers' copyright infringement and reverse the district court's denial of Cox's motion for judgment as a matter of law.

III.

We turn next to contributory infringement.  Under this theory, "'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another' is liable for the infringement, too."  *CoStar Grp.*, 373 F.3d at 550 (quoting *Gershwin Pub.*, 443 F.2d at 1162).  The district court resolved the question of Cox's knowledge on summary judgment, while the jury found material contribution at trial, so we address Cox's challenge to each element separately.

A.

We review the district court's grant of summary judgment de novo, applying the same standard the district court was required to apply.  *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Our Court has recently clarified the intent necessary to prove contributory infringement by an internet service provider based on its subscribers' direct infringement.  In *BMG Rights Management v. Cox Communications*, we held that intent to cause infringement may be shown by willful blindness—which is not at issue in this appeal—or by "know[ledge] that infringement [was] substantially certain to result from the sale" of internet service to a customer.  881 F.3d at 307.  General knowledge of infringement occurring on the defendant's network is not enough; "[s]elling a product with both lawful and unlawful uses suggests an intent to cause infringement only if the seller knows of *specific* instances of infringement."  *Id.* at 311.  Applying these principles to Cox in that

17

case, we held that Cox could not be contributorily liable absent "knowledge that infringement [was] substantially certain to result from Cox's continued provision of Internet access to particular subscribers." *Id.*

As *BMG* suggests, in this scenario, knowledge that particular subscribers are substantially certain to infringe is a predictive question. We reasoned in *BMG* that knowledge of past infringement is relevant to proving this element. *See id.* at 308. Here, Cox produced data purporting to show the effectiveness of each step of its thirteen-strike policy at reducing future infringement, which could also be relevant. And Sony highlights internal emails implying that Cox continued providing internet service to certain habitual infringers despite believing they would infringe again. A jury could consider this and other evidence to determine whether, when Cox continued providing internet service to customers receiving three or more infringement notices, it knew they were substantially certain to infringe Plaintiffs' copyrights by, for example, downloading another song or distributing a song they had previously downloaded.

Cox argues that the district court erred by taking this factual determination away from the jury and deciding as a matter of law that notices of past infringement established Cox's knowledge that subscribers were substantially certain to infringe in the future. Unfortunately, Cox did not make any argument of this ilk to the district court when opposing summary judgment on the knowledge element. Instead, Cox's opposition to Sony's motion for summary judgment on knowledge focused exclusively on the adequacy of the infringement notices from MarkMonitor. Cox argued that the notices lacked information, that the notices were too vague to notify Cox of infringement of specific

18

copyrighted works by specific internet users, and that Sony needed additional evidence beyond the notices to prove that those infringements occurred.

In the district court, all parties (and the court itself) appear to have proceeded on the assumption that knowledge of subscribers' past infringement sufficed to prove this element of contributory liability. Addressing the arguments Cox actually made, the district court concluded that the infringement notices from MarkMonitor were sufficiently detailed to notify Cox of specific instances of infringement.[3] And based on Cox's knowledge of those notices, the court concluded that Sony had established the knowledge element of contributory liability as a matter of law.

Cox did not argue to the district court, as it does now on appeal, that notices of past infringement failed to establish its knowledge that the same subscriber was substantially certain to infringe again. Cox cites certain pages of its memorandum opposing Sony's motion for summary judgment where it claims to have preserved this argument. But no arguable interpretation of those pages or their context reveals any theory like the one Cox advances on appeal. In the district court, Cox contested the sufficiency of the infringement notices to prove Cox's knowledge *of the past infringements alleged therein*. On appeal, Cox argues that its knowledge of past infringements "does not prove Cox *knew ex ante that the same subscriber was 'substantially certain' to infringe again*." Opening Br. 38 (emphasis added). "These are different arguments entirely, and making the one does not

---

[3] To the extent Cox suggests that disputes about the information in particular infringement notices independently warrant vacatur of summary judgment, we agree with the district court that these disputes are immaterial.

preserve the other." *Laber v. Harvey*, 438 F.3d 404, 428 n.24 (4th Cir. 2006). Indeed, Cox did not even mention the "substantially certain" standard anywhere in its memorandum opposing summary judgment. *Cf.* Opening Br. 38 (Cox faulting the district court for not mentioning this "requirement" in its opinion).

Because Cox did not press this argument in the district court, it is forfeited for appeal. "Arguments raised in a trial court must be specific and in line with those raised on appeal." *In re Under Seal*, 749 F.3d 276, 287 (4th Cir. 2014). "[A]n objection on one ground does not preserve objections based on different grounds." *Id.* (internal quotation marks omitted); *see also*, *e.g.*, *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014) ("To preserve an argument on appeal, the defendant must object on the same basis below as he contends is error on appeal."); *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 379 (4th Cir. 1995) ("[A] theory not raised at trial cannot be raised on appeal.").

"Absent exceptional circumstances, . . . we do not consider issues raised for the first time on appeal." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009); *see also Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir. 1990) ("We will not accept on appeal theories that were not raised in the district court except under unusual circumstances."). Cox does not contend that any such circumstances exist here, nor does Cox make any effort to show "fundamental error or a denial of fundamental justice." *In re Under Seal*, 749 F.3d at 285 (internal quotation marks omitted); *see id.* at 292 (finding that appellant abandoned any argument for overlooking forfeiture by failing to brief it). Consequently, we decline to consider Cox's new argument on appeal.

B.

Moving to the material contribution element of contributory liability, Cox appeals the district court's denial of its renewed motion for judgment as a matter of law. We review that denial de novo and must affirm if, "viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor." *First Union Com. Corp. v. GATX Cap. Corp.*, 411 F.3d 551, 556 (4th Cir. 2005) (internal quotation marks and brackets omitted); *see* Fed. R. Civ. P. 50(a)(1). We may not weigh evidence or judge the credibility of witnesses. *See First Union Com. Corp.*, 411 F.3d at 556.

The district court declined to disturb the jury's contributory liability verdict because sufficient evidence supported a finding that Cox materially contributed to its subscribers' direct infringement of Plaintiffs' copyrights.[4] As the court explained, Cox's internet service "was indispensable to each instance of [peer-to-peer] infringement on its network." *Sony Music Ent. v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 816 (E.D. Va. 2020). And, considering the evidence in the light most favorable to Plaintiffs, a reasonable jury could have found that Cox provided that service "with actual knowledge" of infringement occurring "on specific subscribers' accounts," yet "fail[ed] to address" that infringement occurring on its network. *Id*.

Cox makes two principal objections. The first rests on the contention that it cannot be liable for materially contributing to copyright infringement because the internet service

---

[4] The jury instruction asked if Cox "induced, caused, or materially contributed to the infringing activity," J.A. 801, but only material contribution is before us on appeal.

it provides is capable of substantial lawful use and not designed to promote infringement. We rejected that argument in *BMG*: "In fact, providing a product with 'substantial non-infringing uses' *can* constitute a material contribution to copyright infringement." 881 F.3d at 306. As we explained there, "*Grokster* makes clear that what matters is not simply whether the product has some or even many non-infringing uses, but whether the product is distributed with the *intent* to cause copyright infringement." *Id.* Accordingly, Cox's concern that businesses "would be automatically liable for providing any product or service with knowledge that some small set of customers may use it, in part, to infringe" is misplaced. Opening Br. 45.

Second and similarly, Cox claims its contribution must "amount[] to culpable conduct equivalent to aiding and abetting the infringement," Opening Br. 43 (internal quotation marks and ellipsis omitted), and that "failing to prevent" its subscribers' infringement does not suffice, Opening Br. 46. This argument ignores the evidence before the jury.

It is true that "mere[] . . . failure to take affirmative steps to prevent infringement" does not establish contributory liability "in the absence of other evidence of intent." *Grokster*, 545 U.S. at 939 n.12. But supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement. For example, in *BMG* we reasoned that leasing a VCR to a customer—innocent conduct by itself—can support contributory liability if the lessor knows the customer is substantially certain to use it for copyright infringement. *See BMG*, 881 F.3d at 308. In such a situation, providing the means to infringe *is* culpable pursuant

22

to the common law rule that a person is presumed to intend the substantially certain results of his acts. *See id.* at 307. This accords with principles of aiding and abetting liability in the criminal law. Lending a friend a hammer is innocent conduct; doing so with knowledge that the friend will use it to break into a credit union ATM supports a conviction for aiding and abetting bank larceny. *See United States v. Thompson*, 539 Fed. App. 778, 779 (9th Cir. 2013); *United States v. Thompson*, 728 F.3d 1011, 1013 (9th Cir. 2013).

The evidence at trial, viewed in the light most favorable to Sony, showed more than mere failure to prevent infringement. The jury saw evidence that Cox knew of specific instances of repeat copyright infringement occurring on its network, that Cox traced those instances to specific users, and that Cox chose to continue providing monthly internet access to those users despite believing the online infringement would continue because it wanted to avoid losing revenue. Sony presented extensive evidence about Cox's increasingly liberal policies and procedures for responding to reported infringement on its network, which Sony characterized as ensuring that infringement would recur. And the jury reasonably could have interpreted internal Cox emails and chats as displaying contempt for laws intended to curb online infringement. To be sure, Cox's anti-infringement efforts and its claimed success at deterring repeat infringement are also in the record. But we do not weigh the evidence at this juncture. The evidence was sufficient to support a finding that Cox materially contributed to copyright infringement occurring on its network and that its conduct was culpable. Therefore we may not disturb the jury's verdict finding Cox liable for contributory copyright infringement.

23

IV.

Having reversed on one theory of liability and affirmed on the other, we now must address the scope of the vacatur and proceedings on remand.  We conclude that reversal of the vicarious infringement verdict warrants vacatur of the damages award and remand for a new trial on damages.  But we see no reason to vacate the contributory infringement verdict, nor will we direct the district court to enter judgment on any part of the now-vacated statutory damages verdict.

A.

When a jury returns a special verdict form finding two bases for liability but a general damages verdict that does "not apportion damages between the claims," reversal of one theory of liability on appeal typically requires "a new trial . . . on the damages issue." *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1994).  Only "where it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it" is vacatur of the general damages award unnecessary.  *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 314 (4th Cir. 2012) (internal quotation marks omitted).

We lack sufficient confidence that the jury's vicarious liability verdict here did not materially influence its statutory damages award.  The $1 billion award was a "global figure" for all infringements in the case. *Barber*, 34 F.3d at 1278.  Although the vicarious and contributory infringement claims were predicated on the same conduct and the maximum damages for each is identical, the statutory range is wide and the jury's choice within it is highly discretionary and may have been influenced by the vicarious

24

infringement verdict. *See* 17 U.S.C. § 504(c)(1), (2) (authorizing a "just" award between $750 and $150,000 per work for willful infringement). Unlike actual damages, statutory damages are not tethered to concrete figures like lost profits or incurred expenses. To the contrary, the jury was instructed to award an amount it found "fair under the circumstances," taking into consideration factors such as "[t]he profits Cox earned because of the infringement," "[t]he expenses Cox saved because of the infringement," "[t]he circumstances of the infringement," and "the need to punish Cox," among others. J.A. 803. We have reversed the vicarious liability verdict because Cox did not directly profit from its subscribers' infringement. Without that legally erroneous finding, the jury's assessment of at least these damages factors may be different. Given the jury's wide discretion in assessing the appropriate damages and its legally erroneous finding that Cox had a direct financial interest in its subscribers' infringement, we are not "reasonably certain that the jury was not significantly influenced" in its statutory damages award by its finding of vicarious liability. *Tire Eng'g*, 682 F.3d at 314 (internal quotation marks omitted). We therefore vacate the damages award and remand for a new trial on damages.

B.

Cox urges us to vacate not just the damages award but also the contributory liability verdict because, in its view, the two types of secondary liability are intertwined. We don't see much to support Cox's unadorned claim that a wrong conclusion on direct financial interest in subscriber infringement would significantly influence the jury's finding on material contribution to infringement. Accordingly, we decline to vacate the contributory infringement verdict on this ground.

25

C.

Finally, Cox argues that, even if we remand the case for a new trial on damages, we should direct the district court to enter judgment in Cox's favor as to certain copyrighted works that Cox claims cannot be used to calculate statutory damages. Cox renewed its motion for judgment as a matter of law on this ground after trial, and the district court denied relief. Even though we have vacated the entire damages determination, we address this issue because if Cox were right, it would be entitled to exclude a number of works from consideration for statutory damages and would not have to prove the status of those works to the jury at retrial.

The Copyright Act authorizes an award of statutory damages within a certain dollar range "for all infringements involved in the action, with respect to any one work" and specifies that, "[f]or the purposes of this subsection, all the parts of a compilation or derivative work constitute one work."[5] 17 U.S.C. § 504(c)(1). "Although parts of a compilation or derivative work may be regarded as independent works for other purposes, for purposes of statutory damages, they constitute one work." *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). It is undisputed on appeal that Cox's subscribers infringed 10,017 copyrighted works owned by Plaintiffs. But Cox contends that many of those works cannot properly be the subject of separate

---

[5] The range depends on whether the infringement was willful. Non-willful infringement results in a statutory damages range of $750 to $30,000 per work, whereas for willful infringement the upper limit increases to $150,000. 17 U.S.C. § 504(c)(1), (2).

statutory damages awards because they are part of a compilation or derivative work. Specifically, Cox claims that the number of compensable works was inflated in two ways: (1) by counting both musical compositions and their derivative sound recordings, and (2) by counting individual sound recordings that were compiled in a single album.

A "derivative work" is "a work based upon one or more preexisting works, such as a . . . sound recording[.]" 17 U.S.C. § 101. The copyrighted works in this case include sound recordings and musical compositions, some of which overlap. In other words, some of the copyrighted recordings are performances of the copyrighted compositions. Throughout this litigation, Cox has maintained that Plaintiffs cannot collect statutory damages for infringement of both a copyrighted musical composition and its derivative sound recording. *See* 17 U.S.C. § 504(c)(1).

A "compilation" is "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes [a] collective work[]," which is "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. In Cox's view, a musical album is a compilation, and because "all the parts of a compilation . . . constitute one work" for purposes of statutory damages and some of the infringed songs were included on albums together, Plaintiffs were limited to one statutory damages award per album, not one per song. 17 U.S.C. § 504(c)(1).

27

Whether any of the works in this case are derivative or part of a compilation is a mixed question of law and fact. *See Bryant v. Media Right Prods.*, 603 F.3d 135, 140 (2d Cir. 2010); *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993). The subsidiary legal questions were for the district court to resolve, and the factual questions were for the jury to decide. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998) ("[T]he Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself."); *cf. Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199–1200 (2021) (explaining mixed questions of law and fact).

Before and during trial, the parties were aware of the need for evidence to identify the alleged derivative works and compilations among the 10,017 copyrighted works at issue. Pretrial, the district court denied Cox's motion for summary judgment on the topics, observing that issues of material fact remained. At various points during the trial, Cox acknowledged its obligation to put forth evidence identifying the derivative works and compilations and forecasted that it would do so through requests for admissions, answers to interrogatories, deposition testimony, certificates of registration, or expert testimony. But it did not, and pertinent testimony from Cox's expert witness was excluded from evidence as beyond the bounds of his expert report and disclosures.[6] Having heard no

---

[6] Cox does not appeal this evidentiary ruling.

evidence or argument about the number of derivative works or compilations, the jury returned a statutory damages award for each of the 10,017 copyrighted works infringed.[7]

After trial, Cox asked the district court to reduce the damages award to account for derivative works and compilations. The court declined, and we review its judgment de novo. *See First Union Com. Corp.*, 411 F.3d at 556.

1.

Regarding derivative works, the district court agreed with Cox on the legal question, ruling that Plaintiffs were entitled to only one statutory damages award, not two, for infringement of a musical composition and its derivative sound recording.[8] But on the factual question, the court concluded that Cox had not presented evidence from which the jury could determine which recordings and compositions overlapped.

In support of its posttrial motion, Cox created three schedules identifying the works that it claimed overlapped and those that did not. To do so, Cox consulted two trial exhibits—PX1, which listed the infringed sound recordings, and PX2, which listed the infringed musical compositions—and the works' copyright registration certificates, some but not all of which were in evidence. Cox compared information from these sources, including the title of the work, artist, album, publication date, and ownership information,

---

[7] Cox does not challenge the jury instructions or verdict form on appeal.

[8] Sony challenges that ruling on appeal as an alternative basis for affirmance. Because we affirm on the ground Cox raised, we need not address Sony's alternative argument.

29

to make judgment calls about whether a particular sound recording and musical composition overlapped.

As the district court realized, this additional information necessary for distinguishing derivative from non-derivative works had not been presented to the jury. Even if the jury had been asked to comb through the thousands of entries on PX1 and PX2, that comparison alone would not have enabled it to determine which entries were derivative of each other, as demonstrated by Cox's posttrial submissions.  The court therefore correctly concluded that it could not use the new analysis in Cox's posttrial schedules to decide which works were derivative and reduce the damages award.  As the court explained, "Cox did not provide the information to the jury that it has provided to the [c]ourt in its post-trial brief," and "[t]he jury answered that question [about statutory damages] with the information available" at trial.  *Sony Music Ent. v. Cox Commc'ns, Inc.*, No. 1:18-cv-00950, 2021 WL 1254683, at *3 (E.D. Va. Jan. 12, 2021).

Cox now argues, based on the information it presented to the district court after trial, that the jury's verdict was unjust because 2,235 sound recordings are undisputedly derivative works.  But like the district court when deciding the Rule 50 motion, we must assess the verdict based on the evidence before the jury, not Cox's efforts to supplement the record after trial.  *See* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2529 (3d ed. & Supp. 2023) ("Rule 50 motions must be considered in light of the evidence presented at trial.").  Because the evidence at trial supported the jury's verdict, we affirm the district court's denial of judgment as a matter of law.

30

2.

As for compilations, Cox contends that Plaintiffs were not entitled to separate statutory damages awards for songs that were contained on the same album. We need not decide whether Cox's legal premise is sound because, even assuming it is for the sake of argument, Cox does not identify evidence from which the jury could have determined which songs were released on albums together.[9]

Nowhere in its briefing does Cox identify evidence it presented to the jury about whether infringed works were contained on albums. Neither PX-1 (the list of infringed sound recordings) nor PX-2 (the list of infringed compositions) mentions the album information for any work. To bridge this gap, Cox relies on the summary judgment record, citing deposition testimony and the supposed absence of dispute at that stage about certain facts. But we see no indication this evidence was presented to the jury, and our focus when reviewing the district court's Rule 50 ruling must be the record created at trial. *See* Fed. R. Civ. P. 50(a)(1); *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) ("Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion."). Accordingly, we affirm the district court's denial of judgment as a matter of law on compilations too.

---

[9] The district court rejected Cox's legal theory. It instead followed the reasoning of the Second Circuit in *EMI Christian*, which "allowed separate statutory damages awards for songs that the plaintiffs issued as singles, even if those songs were also made available on albums." 844 F.3d at 101. Other circuits have applied a third approach—the "independent economic value test"—to determine whether a copyrighted work is part of a compilation subject to only one statutory damages award. *See*, *e.g.*, *Sullivan v. Flora, Inc.*, 936 F.3d 562, 570–572 (7th Cir. 2019). We need not delve into these conflicting interpretations of the Copyright Act to resolve this appeal.

31

V.

For the foregoing reasons, we reverse the district court's order denying Cox judgment as a matter of law on Sony's claim of vicarious copyright infringement.  We affirm the district court's orders denying Cox relief from the jury's contributory infringement verdict and denying judgment as a matter of law regarding the number of derivative works and compilations.  Given our reversal of the vicarious liability verdict, we also vacate the damages award and remand for a new trial on the amount of statutory damages to be awarded.

*SO ORDERED*