Case No. 21-1168

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

SONY MUSIC ENTERTAINMENT, ET AL.,

*Plaintiffs-Appellees,*

v.

COX COMMUNICATION, INC. and COXCOM, LLC,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Eastern District of Virginia
Case No. 1:18-cv-950-LO-JFA
Hon. Liam O'Grady

## BRIEF OF *AMICI CURIAE* AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF RESEARCH LIBRARIES, PUBLIC KNOWLEDGE, ELECTRONIC FRONTIER FOUNDATION, AND LIBRARY FUTURES IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING EN BANC

Monica T. Monday (VSB No. 33461)
Gentry Locke
P.O. Box 40013
Roanoke, Virginia 24022
540-983-9405
540-983-9400 (fax)
Monday@gentrylocke.com
*Counsel for Amici Curiae*

March 12, 2024

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-01168     Caption: Sony Music Entertainment et al. v. Cox Communications

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Library Association, Association of Research Libraries, Public Knowledge, Electronic Frontier
(name of party/amicus)

Foundation, Library Futures

 who is _____amici curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Monica T. Monday          Date: March 12, 2024

Counsel for: amici curiae

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 2

ARGUMENT ................................................................................ 3

       The Panel's Holding on Contributory Infringement and
       Willfulness Would Cause Disproportionate Harm to the Public ................... 3

   A.  Maintaining this Holding Would Result in Innocent and
       Vulnerable Users Losing Essential Internet Access ................................ 3

   B.  Losing Internet Access Is an Extreme Public Harm ............................... 8

       1.   Internet Access Is Essential to Participation in Economic,
           Cultural, and Social Activity ............................................. 9

       2.   The COVID-19 Pandemic Intensified Reliance on
           Internet Access – and That Reliance Will Persist ..........................10

       3.   The Consequences of Losing Internet Access Are Severe
           and Disproportionate .....................................................11

CONCLUSION .............................................................................13

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE
REQUIREMENTS PURSUANT TO FED. R. APP. P 32(a)(7)(C).......................15

CERTIFICATE OF SERVICE ...............................................................16

i

# TABLE OF AUTHORITIES

## CASES

*Digital Sin, Inc. v. Does 1–176*,
279 F.R.D. 239 (S.D.N.Y. 2012) ................................................................5

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) ................................................................................9

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
464 F. Supp. 3d 795 (E.D. Va. 2020) .......................................................8

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
384 F. Supp. 3d 743 (W.D. Tex. 2019) .....................................................4

*United States v. Ellis*,
984 F.3d 1092 (4th Cir. 2021) ...................................................................8

*United States v. Hamilton*,
986 F.3d 413 (4th Cir. 2021) .....................................................................9

*United States v. LaCoste*,
821 F.3d 1187 (9th Cir. 2016) ...................................................................9

## OTHER AUTHORITIES

2020 Broadband Deployment Report,
35 FCC Rcd. 8986, (Apr. 24, 2020)........................................................6, 8

Colby Leigh Rachfal, Cong. Rsch. Serv., *COVID-19 and Broadband:
Potential Implications for the Digital Divide (2020)* ..............................11

*Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*,
Wayback Mach. (Dec. 7, 2017) ..................................................................4

*Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*,
Xfinity ..........................................................................................................4

Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, § 904.................10

NEW/NEW/11731728v1

D'Vera Cohn & Jeffrey S. Passel, *A Record 64 Million Americans Live in Multigenerational Households*, Pew Rsch. Ctr. (Apr. 5, 2018) ...............................6

H. Trostle et al., *Profiles of Monopoly: Big Cable and Telecom*, Inst. for Loc. Self-Reliance (2020) ...........................................................................6

*In re Bridging the Digital Divide for Low-Income Consumers*, 34 FCC Rcd. 10886 (Nov. 19, 2019)...............................................................8

*In re Emergency Broadband Benefit Program*, 36 FCC Rcd. No. 20-445 (Feb. 26, 2021)..................................................10

*In re Lifeline and Link Up Reform & Modernization*, 30 FCC Rcd. 7818 (June 18, 2015) ...............................................................9

Institute of Museum and Library Sciences, *Rural Libraries in America* (2017) ...............................................................................................5

*Internet Access in Maryland*, BroadbandNow.......................................................7

*Internet Access in North Carolina*, BroadbandNow................................................7

*Internet Access in South Carolina*, BroadbandNow................................................7

*Internet Access in Virginia*, BroadbandNow ........................................................7

*Internet Access in West Virginia*, BroadbandNow ................................................7

Jon Brodkin, *Comcast, Charter Expand Broadband Domination as Cable Hits 67% Market Share*, Ars Technica (Mar. 9, 2020) ...................................3

*Keep Americans Connected Pledge*, FCC ...........................................................11

Kellen Browning, *Seniors Seeking Vaccines Have a Problem: They Can't Use the Internet*, N.Y. Times (Feb. 28, 2021) .....................................12

Natalie C. Benda et al., *Broadband Internet Access Is a Social Determinant of Health,* 110 Am. J. Pub. Health 1123 (2020)...............................12

iii

Natasha Singer, *Learning Apps Have Boomed in the Pandemic. Now Comes the Real Test.*, N.Y. Times (Mar. 17, 2021) .........................................12

Natasha Singer, *Online Schools are Here to Stay, Even After the Pandemic*, N.Y. Times (Apr. 11, 2021).................................................12

Pew Research Center, *Library usage and engagement* (2019)..................................5

Pew Research Center, *Public libraries and technology: From 'houses of knowledge' to 'houses of access'* (2014)...................................4, 5

Press Release, Fed. Commc'ns Comm'n, *FCC Waives Rural Health Care and E-Rate Program Gift Rules to Promote Connectivity for Hospitals and Students During Coronavirus Pandemic* (Mar. 18, 2020)......................................13

Rachel Oaks, *Internet Provider Data Caps Guide*, CableTV.com (Mar. 30, 2021) ...............................................................................6

Richard Fry, *More Adults Now Share Their Living Space, Driven in Part by Parents Living with Their Adult Children*, Pew Rsch. Ctr. (Jan. 31, 2018).................................................................5

Stan Horaczek, *Here's How Much Internet Bandwidth You Actually Need to Work from Home*, Popular Sci. (Mar. 12, 2020) .........................................6

Stuart Andreason et al., Fed. Rsrv. Bank of Atlanta, *The Digital Divide and the Pandemic: Working from Home and Broadband and Internet Access* (2020) ...................................................10

Todd Haselton, Y*our Phone's Unlimited Data Plan Isn't Really Unlimited – This is What You Really Get*, CNBC (July 14, 2018)......................6, 7

Tony Romm, *Biden announces $42 billion to expand high-speed internet acces*s, Washington Post (June 26, 2023) ........................................... 10-11

Vinhcent Le & Gissela Moya, *On the Wrong Side of the Digital Divide: Life Without Internet Access, and Why We Must Fix it in the Age of COVID-19*, Greenlining Inst. (June 2, 2020).........................................................8

iv

# STATEMENT OF INTEREST[1]

The American Library Association is a nonprofit professional organization
of more than 50,000 librarians dedicated to providing and improving library
services and promoting the public interest in a free and open information society.
The Association of Research Libraries is an association of 127 research libraries in
North America. Together, ALA and ARL represent more than 100,000 libraries
and 350,000 individuals. Libraries provide Internet access for over 100 million
Americans.

Public Knowledge is a non-profit public interest organization that defends
consumer rights online. Public Knowledge promotes balanced copyright policies
that promote the public interest and ensure access to knowledge.

Electronic Frontier Foundation is a member-supported, non-profit civil
liberties organization that works to protect consumer interests, innovation, and free
expression in the digital world.

---

[1] No party's counsel authored this brief in whole or in part. Neither any party
nor any party's counsel contributed money that was intended to fund preparing or
submitting this brief. No person other than *amici*, their members, or their counsel
contributed money that was intended to fund the preparing or submitting of this
brief. Amici have filed a motion for leave to file this brief pursuant to Rule
29(a)(3).

1

Library Futures is a nonprofit organization uncovering and confronting the fundamental policy issues that threaten libraries in the digital age.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The panel's holding concerning contributory infringement, when combined with its holding concerning willful infringement, will have an adverse effect on innocent Internet users. For this reason, this Court should grant rehearing en banc.

Every use of the Internet, be it for access to government services, healthcare, commerce, education, political organizing, finding community, or simply entertainment, requires the services of an Internet service provider. Terminating that service means withdrawing an essential tool for participation in daily life. Moreover, terminating an ISP account doesn't just cut off an allegedly infringing subscriber. It potentially cuts off every household member or – in the case of a school, library, or business – every student, faculty member, patron, and employee who shares the Internet connection. With little or no competition among broadband ISPs in many areas of the country, those users may have no other way to connect.

The stakes of this case for Internet users are enormous. If allowed to stand, the panel's holdings concerning contributory infringement and willfulness will force ISPs to terminate more subscribers with less justification to avoid staggering liability.

NEW/NEW/11731739v1

## ARGUMENT

## The Panel's Holding on Contributory Infringement and Willfulness Would Cause Disproportionate Harm to the Public.

The panel's misguided approach to both contributory infringement and willfulness is likely to have a profound effect on all Internet users. ISPs will respond to the lower threshold for secondary liability and exposure to unbounded damage awards by increasing account terminations, cutting off users' ability to meaningfully participate in economic and civic life.

### A.    Maintaining this Holding Would Result in Innocent and Vulnerable Users Losing Essential Internet Access.

While ISPs are secretive about their repeat-infringer policies, available information demonstrates they would respond to new and unpredictable liability by tightening policies and increasing account terminations. For example, Comcast, the country's largest fixed broadband access provider,[2] revised its policy from "reserv[ing] the right" to consider an account with multiple notifications as

---

[2] Jon Brodkin, *Comcast, Charter Expand Broadband Domination as Cable Hits 67% Market Share*, Ars Technica (Mar. 9, 2020, 12:03 PM), https://perma.cc/Y7WH-GV78.

NEW/NEW/11731739v1

violating its policy to treating any such account as a repeat infringer.[3] As

rightsholders file more cases against ISPs, those ISPs are terminating subscribers

more readily. *See UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384

F. Supp. 3d 743, 755 (W.D. Tex. 2019) (ISP terminated an account for the first

time in six years).

More aggressive termination policies would punish the innocent and guilty

alike. Multiple users in organizations or households share ISP subscriptions. For

example, the record shows many instances of alleged infringement associated with

accounts for universities, hospitals, local government agencies, and, in the case of

subcontracted services, entire municipalities. *See, e.g.,* Trial Tr. vol. 5 (P.M.

Portion), ECF No. 642, 1044. These institutions are sources of Internet access for

millions. The same holds true for public libraries, upon which 77% of Americans

without Internet access in their homes rely for Internet access.[4] Users of libraries'

---

[3] *Compare Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Xfinity, https://perma.cc/9CGC-457J, *with Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Wayback Mach. (Dec. 7, 2017), https://perma.cc/E4QG-BGXE.

[4] Pew Research Center, *Public libraries and technology: From 'houses of knowledge' to 'houses of access'*, (2014) https://perma.cc/NT5F-3JJ3 (2014). https://perma.cc/NT5F-3JJ3.

4

computers and Internet connections are more likely to be young, Black, female, and lower income.[5] They are also likely to live in rural communities.[6]

Cox was rightly hesitant to terminate accounts like these. *See* Trial Tr. vol. 5 (P.M. Portion), ECF No. 642, 1085–95, 1099–1100. Given a potentially $1 billion damage award, combined with the panel's lower threshold for contributory infringement liability, neither Cox nor other ISPs would hesitate again.

Even for residential accounts, the consequences of terminating Internet access would not be confined to individual repeat infringers. In other file-sharing cases, rightsholders have estimated that 30% of the names of account holders identified as infringers were not responsible for the alleged infringement. *See, e.g., Digital Sin, Inc. v. Does 1–176*, 279 F.R.D. 239, 242 (S.D.N.Y. 2012).

Multi-user accounts are especially common in shared households, a growing category.[7] Since non-white, low-income individuals are more likely to live in

---

[5] Pew Research Center, *Library usage and engagement*, (2019) https://perma.cc/D5C5-EE92.

[6] Institute of Museum and Library Sciences, *Rural Libraries in America* (2017) https://perma.cc/RHV3-ZLXQ (one in five rural library visitors access the internet on library terminals).

[7] Richard Fry, *More Adults Now Share Their Living Space, Driven in Part by Parents Living with Their Adult Children*, Pew Rsch. Ctr. (Jan. 31, 2018), https://perma.cc/U87Q-YZVS.

5

shared households and share broadband subscriptions,[8] stepped-up termination

would worsen the racial and economic digital divide.

These effects are exacerbated by the lack of competition in the broadband

market. Nationwide, more than 75 million people have access to just one

broadband provider.[9] In these areas, termination by a single ISP means loss of

broadband Internet access entirely. Although mobile broadband services do exist,

they are incomplete substitutes for wireline broadband.[10] Aside from lower average

speeds, mobile broadband plans often come with low monthly data caps that users

quickly exceed if they use mobile data for necessary day-to-day functions, such as

telecommuting or remote education.[11] Users must then choose between paying

---

[8] *See* D'Vera Cohn & Jeffrey S. Passel, *A Record 64 Million Americans Live in Multigenerational Households*, Pew Rsch. Ctr. (Apr. 5, 2018), https://perma.cc/FX3K-XVTJ.

[9] H. Trostle et al., *Profiles of Monopoly: Big Cable and Telecom*, Inst. for Loc. Self-Reliance 39 (2020), https://perma.cc/698Q-R4GF.

[10] 2020 Broadband Deployment Report, 35 FCC Rcd. 8986, ¶ 12 (Apr. 24, 2020).

[11] *See* Stan Horaczek, *Here's How Much Internet Bandwidth You Actually Need to Work from Home*, Popular Sci. (Mar. 12, 2020), https://perma.cc/NV9X-HJ4X. *Compare* Rachel Oaks, *Internet Provider Data Caps Guide*, CableTV.com (Mar. 30, 2021), https://perma.cc/685M-APFA, *with* Todd Haselton, *Your Phone's Unlimited Data Plan Isn't Really Unlimited – This is What You Really Get*, CNBC (July 14, 2018, 11:52 AM) https://perma.cc/5A44-MDMA.

overages (a financial strain on low-income subscribers in particular) or losing Internet access.[12] It is difficult, if not impossible, to fill out many job applications on a smartphone.

In Virginia, 608,000 out of approximately 8.5 million residents have access to only one wired broadband Internet provider.[13] Similar numbers exist in North Carolina,[14] South Carolina,[15] and West Virginia.[16] Maryland fares somewhat better, but 249,000 Maryland residents have access to only one ISP.[17] This lack of options puts many "on the wrong side of the 'digital divide,'" which "affects low-

---

[12] *See* Haselton, *supra* (explaining how users are capped on high-speed data even when subscribed to "unlimited" data plans, which exist on priced tiers).

[13] *Internet Access in Virginia*, BroadbandNow https://broadbandnow.com/Virginia [https://perma.cc/UZ77-8QQ8]; *QuickFacts Virginia*, U.S. Census Bureau (July 1, 2019), https://perma.cc/2Q3A-MTQ9.

[14] *Internet Access in North Carolina*, BroadbandNow, https://perma.cc/2KFL-EU2X (over 1.3 million residents have no high-speed broadband, no wired internet, or access to only one provider).

[15] *Internet Access in South Carolina*, BroadbandNow, https://perma.cc/K55S-7LRA (over 1 million residents have no high-speed broadband, no wired internet, or access to only one provider).

[16] *Internet Access in West Virginia*, BroadbandNow, https://perma.cc/3CN7-VBUR (over 900,000 residents have no broadband, no wired internet, or access to only one provider).

[17] *Internet Access in Maryland*, BroadbandNow, https://perma.cc/G7MB-YH5K.

NEW/NEW/11731739v1

income families and communities of color the most."[18] Rural areas, including tribal lands, have particularly limited ISP options,[19] often because providers have little economic incentive to build out services in sparsely populated places.

Further, the record demonstrates that ISPs would be especially likely to terminate "low-return" subscribers. *See Sony Music Ent. v. Cox Commc'ns, Inc*., 464 F. Supp. 3d 795, 838 (E.D. Va. 2020) ("[Cox] looked at the total revenue coming from each subscriber when considering possible . . . termination."). Many such users rely upon state and federal subsidies for Internet access[20] and cannot afford to sign up for expensive "bundled" accounts that ISPs may be more reluctant to terminate.

## B.     *Losing Internet Access Is an Extreme Public Harm.*

Loss of Internet access "imposes a massive deprivation of liberty[,]" *United States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021), now that so much economic

---

[18] Vinhcent Le & Gissela Moya, *On the Wrong Side of the Digital Divide: Life Without Internet Access, and Why We Must Fix it in the Age of COVID-19*, Greenlining Inst. (June 2, 2020), https://perma.cc/EGY8-ZZLH.

[19] 2020 Broadband Deployment Report, 35 FCC Rcd. at 8990, ¶ 9.

[20] *See In re Bridging the Digital Divide for Low-Income Consumers*, 34 FCC Rcd. 10886, ¶ 3 (Nov. 19, 2019) (Fifth Report and Order).

8

and social activity has moved online. Accordingly, the public has a strong interest in preserving, not terminating, that access.

### 1. Internet Access Is Essential to Participation in Economic, Cultural, and Social Activity.

As this Court stated when reviewing supervised release conditions, "the Internet is crucial in finding jobs, paying bills, and navigating life in this digital age." *United States v. Hamilton*, 986 F.3d 413, 421 (4th Cir. 2021). The Federal Communications Commission concurs, noting that "institutions and schools, and even government agencies, require Internet access for full participation in key facets of society."[21] Cutting off Internet access "constrains . . . freedom in ways that make it difficult to participate fully in society and the economy." *United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016). The Supreme Court has similarly recognized that social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," such that banning this subset of Internet use can impermissibly burden First Amendment rights. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).

---

[21] *In re Lifeline and Link Up Reform & Modernization*, 30 FCC Rcd. 7818, ¶ 4 (June 18, 2015) (Second Further Notice of Proposed Rulemaking).

NEW/NEW/11731739v1

## 2. The COVID-19 Pandemic Intensified Reliance on Internet Access – and That Reliance Will Persist

During the pandemic, business and school closures nationwide "led people to turn to virtual learning, telemedicine, and telework to enable social distancing measures."[22] That, in turn exposed pre-existing divides between those with and without access.[23] It also permanently enmeshed broadband usage in daily life. Consequently, Congress and the FCC are striving to ensure that low-income households can afford and maintain broadband internet access. The Consolidated Appropriations Act of 2021 provided $3.2 billion to reimburse broadband providers serving low-income households. *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, § 904. Further, the Congress appropriated $42.5 billion to the Broadband Equity Access and Deployment Program to expand the availability of broadband in rural and other underserved areas.[24] And the FCC has

---

[22] *In re Emergency Broadband Benefit Program*, 36 FCC Rcd. No. 20-445, ¶ 1 (Feb. 26, 2021) (Report and Order).

[23] *See* Stuart Andreason et al., Fed. Rsrv. Bank of Atlanta, *The Digital Divide and the Pandemic: Working from Home and Broadband and Internet Access*, 1 (2020), https://perma.cc/5A4B-CP6L.

[24] Tony Romm, *Biden announces $42 billion to expand high-speed internet access*, Washington Post (June 26, 2023), https://www.washingtonpost.com/business/2023/06/26/high-speed-internet-white-house-announcement/

10

urged ISPs not to terminate subscribers for non-payment or exceeding data caps and to open WiFi hotspots to those in need.[25]

The panel's decision would undermine these policies. ISPs would be much less inclined to maintain public WiFi hotspots in underserved neighborhoods, because doing so risks crushing liability. They also would be incentivized to increase terminations for alleged copyright infringement, regardless of how many users a single account termination would affect.

### 3. The Consequences of Losing Internet Access Are Severe and Disproportionate.

Distance learning, telework, and telemedicine became essential during the pandemic and remain so now.

*Education.* Even before the pandemic, "a growing number of schools [were] issuing homework assignments online."[26] Increased use of free Internet-based education tools during the pandemic "has sped the adoption of technology in

---

[25] *Keep Americans Connected Pledge*, FCC, https://perma.cc/BCN7-JMFF (last visited Feb. 22, 2021).

[26] *See* Colby Leigh Rachfal, Cong. Rsch. Serv., *COVID-19 and Broadband: Potential Implications for the Digital Divide* (2020).

11

education by easily 5 to 10 years."[27] School districts nationwide are also creating online schools "with an eye to operating them for years to come."[28] Thus, loss of broadband access could be equivalent to suspension or expulsion from school.

*Employment.* COVID-19 moved many jobs online, where they remain. Terminating a residential broadband subscription because of a teenager's infringing conduct could cause his parent to lose her job.

*Health.* Connectivity has become a "life-or-death" matter for twenty- million older Americans who rely on the Internet for critical healthcare information.[29] Health policy experts conclude that, for all age groups, "broadband Internet access . . . must be recognized as a social determinant of health."[30] Hence the FCC waived rules in order to ease broadband providers' participation in federal telehealth programs, recognizing that broadband access "will play an increasingly critical part

---

[27] *See* Natasha Singer, *Learning Apps Have Boomed in the Pandemic. Now Comes the Real Test.*, N.Y. Times (Mar. 17, 2021).

[28] Natasha Singer, *Online Schools are Here to Stay, Even After the Pandemic*, N.Y. Times (Apr. 11, 2021), https://perma.cc/R58A-WDJP.

[29] *See* Kellen Browning, *Seniors Seeking Vaccines Have a Problem: They Can't Use the Internet*, N.Y. Times (Feb. 28, 2021), https://perma.cc/5UHB-5XRM.

[30] *See* Natalie C. Benda et al., *Broadband Internet Access Is a Social Determinant of Health,* 110 Am. J. Pub. Health 1123, 1123 (2020).

12

in treating patients and helping healthcare providers maximize their impact on their communities."[31]

* * *

In sum, terminated subscribers would face near-insurmountable difficulties with such fundamental parts of life as finding and maintaining work, getting an adequate education, and obtaining healthcare. Innocent users, who may not even know they share an Internet connection with repeat infringers, should not lose the ability to participate in economic and civic life. This punishment is overly harsh for most infringers as well—the harm of being cut off from much of society is disproportionate to the costs of noncommercial, small-scale copyright infringement. No judge-made doctrine of contributory infringement or interpretation of 17 U.S.C. § 504 requires these consequences.

## CONCLUSION

Accordingly, this Court should grant rehearing en banc.

---

[31] Press Release, Fed. Commc'ns Comm'n, *FCC Waives Rural Health Care and E-Rate Program Gift Rules to Promote Connectivity for Hospitals and Students During Coronavirus Pandemic* (Mar. 18, 2020), https://perma.cc/G4KH-EXP9.

13

Dated: March 12, 2024              Respectfully submitted,

*/s/ Monica T. Monday*
Monica T. Monday (VSB No. 33461)
Gentry Locke
P.O. Box 40013
Roanoke, Virginia 24022
540-983-9405
540-983-9400 (fax)
Monday@gentrylocke.com

*Counsel for Amici Curiae*

NEW/NEW/11731739v1

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.      This Brief of *Amici Curiae* in Support of Defendants-Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a) or Fed. R. App. P. 28.1 because this brief contains 2531, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman.

Dated: March 12, 2024                     */s/ Monica T. Monday*

                                          *Counsel of Record for Amici Curiae*

NEW/NEW/11731739v1

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on March 12, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 12, 2024         */s/ Monica T. Monday*

                                        *Counsel of Record for Amici Curiae*

NEW/NEW/11731739v1